Peter N. Wang (PW 9216)
Robert A. Scher (RS 2910)
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016-1314
Telephone:    212.682.3401
Facsimile:    212.687.2329

and

Michael M. Conway
Amy P. Purcell
Rebecca R. Hanson
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, IL 60610
Telephone:    312.832.4351
Facsimile:    312.832.4700

*Attorneys for Plaintiff*
*Navigant Consulting, Inc.*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK





NAVIGANT CONSULTING, INC., a Delaware corporation,

      Plaintiff,

    v.

JESS VARUGHESE, an individual,

      Defendant.

Case No. 07 CIV 4854

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Navigant Consulting, Inc. ("Navigant"), by its attorneys, states its

Complaint for Damages and Other Relief against Defendant Jess Varughese ("Varughese") as

follows:

## SUMMARY OF THE ACTION

1.     This action arises from a covert plot by Varughese, while employed by Navigant, and with other then-active Navigant employees, to breach his fiduciary duty of loyalty to Navigant and his agreements with Navigant by usurping Navigant's corporate opportunities with its current clients and by improperly soliciting fellow Navigant employees to implement that plan.

2.     As an utterly faithless fiduciary, Varughese, in coordination with others, sought to enrich himself at the expense of Navigant while still on the Navigant payroll. While employed by Navigant as the leader of Navigant's Global Financial Institutions subpractice (the "GFI subpractice") and a co-leader of Navigant's national Financial Services Practice, Varughese, and others acting in concert with him, schemed to create a competing business venture, Milestone Advisory Services LLC ("Milestone"), and was actively competing with Navigant for client opportunities and other resources during this time. Milestone was officially formed just one business day after he left Navigant.

3.     In furtherance of his wrongful scheme, Varughese has, in tandem with others, executed a carefully-coordinated and methodical raid on Navigant personnel, misappropriated active Navigant client projects or opportunities, and plotted to usurp existing Navigant client and business opportunities. Through these and other wrongful actions committed by Varughese, he has willfully and wantonly breached his fiduciary duty, contractual obligations and other legal duties to Navigant.

4.     In addition, Varughese breached a contractual obligation to Navigant by refusing to repay Navigant a pro rata share of his starting bonus of $350,000, which he promised

2

to repay pro rata if he terminated his employment within 36 months. He has also refused to repay Navigant a pro rata share of his March 2007 retention bonus of $115,000, which he promised to repay pro rata if he terminated his employment within 36 months. In each instance, Varughese voluntarily terminated his employment with Navigant before he had fully earned the bonus payments.

5.     In this action, Navigant brings claims against Varughese for, among other things, damages for breach of fiduciary duty, usurpation of corporate opportunities, improper solicitation of Navigant employees and clients, repayment of monies which he contractually owes to Navigant because of his voluntary termination prior to the time that he had fully earned the 2005 signing bonus and the 2007 retention bonus, breach of the Agreement Regarding Confidential Information, Intellectual Property and Non-Solicitation (the "Non-Solicitation Agreement") with Navigant, and violation of the Computer Fraud and Abuse Act by willfully causing the deletion of all materials from his Navigant-owned computer, in violation of federal law and governing Navigant computer use policies.

## THE PARTIES

6.     Plaintiff Navigant is a corporation organized under the laws of the State of Delaware with its principal place of business located at 615 N. Wabash, Chicago, Illinois. Navigant is a publicly-owned company, whose shares are traded on the New York Stock Exchange. Navigant is a specialized independent consulting firm that is principally engaged in the business of providing litigation, financial, healthcare, energy and operational consulting services to companies, government agencies, legal counsel and others facing the challenges of uncertainty, risk, distress and significant change.

3

7.     Defendant Varughese is and at all relevant times was a citizen of the State of New York, residing at 14 Bayberry Road, Armonk, New York, within this judicial district. Varughese is a former employee of Navigant. He was a co-leader of Navigant's Financial Services Practice and a Managing Director of Navigant's GFI subpractice. He represented the Financial Services Practice on Navigant's Management Committee.

## JURISDICTION

8.     This Court has diversity jurisdiction under 28 U.S.C. § 1332. Navigant is a citizen of the States of Delaware and Illinois. Specifically, Navigant is a Delaware corporation with its principal place of business in Illinois. Defendant Varughese is a citizen of the State of New York. The amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

9.     This Court also has jurisdiction under 28 U.S.C. § 1331, as Navigant's claim for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, arises under the laws of the United States as set forth in Count IV.

10.    This Court has personal jurisdiction over Defendant Varughese. Varughese is a citizen of the State of New York who resides in this judicial district. In addition, Varughese has performed business for Navigant in New York, and has committed wrongs in or directed into New York that directly relate to the subject matter of this action.

11.    Venue is appropriate in this District pursuant to 28 U.S.C. § 1391 because, *inter alia*, a substantial part of the events giving rise to the claims asserted herein occurred within the Southern District of New York. In addition, Varughese executed the Non-Solicitation Agreement, an employment-related agreement with Navigant, that directly relates to

4

the subject matter of this action and that stipulates that each party agrees to exclusive venue in any state or federal court of competent jurisdiction in or for Armonk, New York. A true and accurate copy of the Non-Solicitation Agreement is attached hereto as Exhibit A.

## FACTUAL ALLEGATIONS

### Navigant's Financial Services Practice

12.    Navigant's Financial Services Practice provides a range of services to clients involved in banking and other financial investment industries. It is composed of three subgroups – the GFI subpractice, the Financial and Accounting subpractice, and the Business Advisory Operations Consulting subpractice – and has approximately 150 employees.

### Navigant's GFI Subpractice

13.    Navigant's GFI subpractice provides financial, staffing, and operations advisory services for its clients. The GFI subpractice's main client has been Deutsche Bank. The GFI subpractice primarily provides staffing support for Deutsche Bank, and particularly Deutsche Bank's Office of the CFO for the Americas and Deutsche Bank's Business Area Controlling function in the Americas. Navigant provides these services to Deutsche Bank's New York office and elsewhere.

14.    Navigant's GFI subpractice provides staffing support in two main ways. First, the Group provides a team of 5 full-time professionals to Deutsche Bank that Deutsche Bank uses throughout its organization on projects as Deutsche Bank directs. The team consists generally of Navigant consultants, senior consultants and managing consultants with a background in finance and accounting and an understanding of the financial services industry. The team is used to help fill temporary staffing needs.

5

15.    The second way that Navigant's GFI subpractice provides services to Deutsche Bank is by fulfilling additional temporary support needs as they arise. This is coordinated using Navigant's management oversight. As positions open, Navigant finds appropriate professionals to fulfill these positions. Navigant's first option is to use Navigant employees with prior experience working on similar projects at Deutsche Bank.

16.    In addition to the staff augmentation services described above, Navigant provides Deutsche Bank with additional consulting support.

17.    Navigant finds appropriate individuals to work in on-site positions within Deutsche Bank. If Navigant is not able to find someone who is a full-time Navigant employee, Navigant may call upon organizations with whom Navigant has contracted as subcontractors to find an appropriate person. Sometimes the Navigant employee works directly with Deutsche Bank supervisors, and sometimes the Navigant employee works through a Navigant supervisor. Either way, Navigant remains responsible for directing these individuals and for billing for their services.

18.    Until recently, approximately 40 billable consultants were deployed on GFI projects. The GFI subpractice was led by Managing Director, Varughese. Under him, Konstantine Kostakis was a Director in the GFI subpractice whom Varughese relied upon heavily. Peter Bond was an Associate Director in GFI who worked very closely with Varughese and Kostakis. The remaining individuals in Navigant's GFI subpractice were Navigant consultants.

6

### Defendant's Employment with Navigant

19.     Navigant hired Defendant Varughese in the Summer of 2005.  Varughese was hired as a Managing Director and assigned to Navigant's New York office.  Varughese was hired at an annual salary of $450,000, plus a sign-on bonus of $350,000, which was subject to repayment if Varughese resigned within 36 months.

20.     Varughese was hired to build Navigant's presence in New York and to build the GFI subpractice.

21.     The Managing Director position is a high-level position in Navigant's organization, and typically is reserved for key employees who have a significant leadership role at Navigant.

22.     As Managing Director, Varughese was the head of the GFI subpractice. His duties and responsibilities included, without limitation, leading and coordinating the marketing of Navigant's services in the financial services industry, identifying, analyzing, and exploiting new business opportunities with clients, and supervising staffing, senior leadership recruiting and other issues with clients on new and ongoing projects.  Varughese was also responsible for providing financial projections for the GFI subpractice.

23.     In January, 2007, Varughese was promoted to co-leader of Navigant's national Financial Services Practice and asked to represent the Financial Services Practice on Navigant's Management Committee.  This Management Committee was comprised of a select group of high-level practice leaders who were responsible for, among other things, setting strategy, providing financial projections and directing the management of the Business Advisory segment of Navigant.

7

24.    Varughese oversaw the Deutsche Bank engagements, and supervised the Directors in the subpractice, including Kostakis, as he answered questions from Navigant employees staffed on projects for the GFI subpractice, managed those employees, and staffed current and new projects for Navigant's clients.

25.    When staffing projects, Navigant would first place Navigant employees within the GFI subpractice on new projects. When there were not available Navigant GFI subpractice employees, someone acting under Varughese's direction (generally Kostakis) would contact Jennifer Page, Business Manager of the Financial Services Practice. Page would review the status of Navigant employees in all three sections of the Financial Services Practice, and across Navigant, in an attempt to staff projects with Navigant employees.

26.    If Navigant was not able to staff a project with its own employees, then Navigant, based upon pre-existing contractual arrangements with firms who supplied subcontractors, would screen, interview, and select individuals hired from those made available by the third party services as subcontractor consultants. Once retained, Navigant paid the subcontractor an hourly fee for the services of the individuals assigned to a Navigant project and Navigant directed work assignments to these individuals, supervised their work, and billed Navigant's clients for their services in the same manner as it would bill for the services of its own employees.

27.    Varughese was familiar with the details of Navigant's arrangements with its subcontractors and Navigant's business relationship with Deutsche Bank and other clients.

8

### Certain of the Defendant's Fiduciary, Contractual and Other Duties

28.    Throughout his employment with Navigant, Varughese owed and, as to certain matters, continues to owe, Navigant fiduciary duties of the highest order, including without limitation a fiduciary duty to act at all times with the utmost good faith, loyalty and fair dealing towards Navigant and to avoid conflicts of interest.

29.    As a result of his Navigant employment and his role as Managing Director of the GFI subpractice, Varughese had access to Navigant clients, prospects and subcontractors as well as significant Navigant confidential and proprietary information, including without limitation information concerning Navigant's client lists and client information; client pricing and contract arrangements; staffing strategies; personnel information (including the identity of Navigant employees, their responsibilities, competence and abilities, and relative compensation); subcontractor information and arrangements; strategic acquisition planning and execution; techniques for servicing clients; financial information such as sales, cost and profitability data; sales and marketing strategies and techniques; and overall strategic planning.

30.    Varughese would not have had access to such employees, subcontractors or confidential and proprietary information but for his employment with Navigant and the belief that he induced in Navigant that he was acting consistent with his fiduciary responsibilities to Navigant. This confidential and proprietary information was developed in part by the expenditure of money and time by Navigant, including marketing and client development activities by Varughese for which Navigant paid. Navigant's confidential and proprietary information is not generally known publicly and, for this and other reasons, is of substantial value to Navigant in giving it an advantage over its competitors.

9

31. As a condition of his employment, Varughese signed the Non-Solicitation Agreement on July 15, 2005. *See* Exhibit A.

32. In his Non-Solicitation Agreement, Varughese agreed (among other things) as follows:

> 1. *Competitive Employment.* While I am employed by NCI, I will not, either directly or indirectly, either as a principal, agent, employee, employer, partner or shareholder (other than as an owner of 2% or less of the stock of a public corporation) or in any other capacity, engage in any manner in the business conducted by NCI or any of its divisions, subsidiaries or affiliates.

> 2. *Definition of Confidential Information:* I realize that my position with NCI creates a relationship of high trust and confidence with respect to Confidential Information owned by NCI, its clients or suppliers that may be learned or developed by me while employed by NCI. I further acknowledge that my access to such Confidential Information is contingent upon my execution of this Agreement. For purposes of this Agreement, "Confidential Information" includes all information that NCI desires to protect and keep confidential or that NCI is obligated to third parties to keep confidential, including but not limited to "Trade Secrets" to the full extent of the definition of that term under Illinois law. It does not include "general skills, knowledge and experience" as those terms are defined under Illinois law, nor does it include information which is generally known to the public through no action on my part.

> 3. *Examples of Confidential Information:* Confidential Information includes, but is not limited to: computer programs; unpatented inventions, discoveries and improvements; marketing, manufacturing, organizational, operating and business plans; strategic models; research and development; NCI policies and manuals; sales forecasts; personnel information (including the identity of NCI employees, their responsibilities, competence and abilities, and compensation); medical information about employees; pricing and nonpublic financial information; current and prospective client lists and information on clients or their employees; information concerning planned or pending acquisitions or divestitures; and information concerning purchases of major equipment or property.

> \* \* \*

> 5. *Confidentiality Obligations.* During and after my employment with NCI, I will not (a) disclose, directly or indirectly, any Confidential Information to anyone outside of NCI or to any employees of NCI not authorized to receive such information or (b) use any Confidential Information other than as may be

10

necessary to perform my duties at NCI. In no event will I disclose any Confidential Information to, or use any Confidential Information for the benefit of, any current or future competitor, supplier or client of NCI, whether on behalf of myself, any subsequent employer, or any other person or entity not Notwithstanding the foregoing, I will not be prohibited under this paragraph 5 from disclosing Confidential Information pursuant to a validly issued subpoena or order of a court or administrative agency of competent jurisdiction, provided, further, that I will promptly notify NCI if I received a subpoena, court order or administrative order requiring such disclosure to allow NCI to seek protection therefrom.

* * *

9.  *Return of Property.* Upon termination of my employment with NCI or upon NCI's request, I will deliver to NCI all NCI's property in my possession, including notebooks, reports, manuals, programming data, listings and materials, engineering or patent drawings, patent applications, any other documents, file or materials which contain, mention or relate to Confidential Information, and all copies and summaries of such material whether in human- or machine-readable-only form, that I may have or that may come into my custody while employed by NCI.

10.  *Restrictive Covenants.*

(a)  <u>Non-Solicitation of Employees</u>. While employed by NCI and for a period of twelve (12) months from the date of termination of my employment with NCI for any reason, I shall not directly or indirectly solicit, induce or encourage any of NCI's employee(s) to terminate their employment with NCI or to accept employment with any competitor, supplier or client of NCI, nor shall I cooperate with others in doing or attempting to do so. As used herein, the term "solicit, induce or encourage" includes, but is not limited to, (i) initiating communications with a Company employee relating to possible employment, (ii) offering bonuses or additional compensation to encourage NCI's employees to terminate their employment with NCI and accept employment with a competitor, supplier, or client of NCI, or (iii) referring NCI's employees to personnel or agents employed by competitors, suppliers or clients of NCI.

(b)  <u>Non-Solicitation of Customers</u>. While employed and for a period of twelve (12) months from the date of termination of my employment with NCI for any reason, I agree that I will not, either directly or indirectly, as a principal, agent, contractor, employee, employer, partner or shareholder (other than as an owner of 2% or less of the stock of a public corporation) or in any other capacity, solicit or engage in the business engaged in by NCI as of the date of termination of my employment ("Navigant Business") with any client which was a client, or a prospective client, of NCI (provided I had responsibilities or duties with respect to, possessed Confidential Information regarding or was involved in the development of, such client or prospective client), within the twelve (12) months immediately preceding my termination . . . .

11

* * *

11.     *Injunctive Relief.* I acknowledge that my violation of the foregoing confidentiality and non-solicitation obligations will cause NCI irreparable harm. I agree that NCI is entitled to protection from such violations, including protection by injunctive relief, in addition to other remedies available under the law.

* * *

23.     *Recovery of Expenses.* I agree to pay to NCI the costs and reasonable attorney's fees incurred by NCI if it prevails in enforcing any or all of the terms of this Agreement.

* * *

26.     *Governing Law.* This Agreement shall be construed in accordance with laws governing contracts made and to be performed in the State of Illinois, without regard to its conflict of laws principles. Each party irrevocably agrees that the exclusive venue for any dispute related to this Agreement shall be any state or federal court of competent jurisdiction in or for Armonk, New York.

33.     On August 30, 2005, Varughese signed a Certificate of Receipt acknowledging that he had received and reviewed Navigant's Employee Handbook:

> I, Jess Varughese, have received and read the Navigant Consulting, Inc. Employee Handbook, 2000 Edition. I agree to comply with Navigant Consulting's policies set forth in the Employee Handbook, including specifically the 'Standards of Conduct'. I understand that these policies may be modified by Navigant Consulting at any time...

34.     Navigant's Employee Handbook covers a range of Navigant's policies, including Navigant's computer resource policies. The portion of Navigant's Employee Handbook regarding Navigant's computer resource policies is referred to as the "Acceptable Use Policy." Under Navigant's Acceptable Use Policy, there is no expectation of privacy for any materials on laptops or computer systems of Navigant. Specifically, the Acceptable Use Policy provides:

> *Policy*

It is the policy of Navigant Consulting ("the Company") that Computer Resources are the property of the Company and shall be used for legitimate business purposes in the interest of serving clients or potential clients of the Company. All computer resources in the possession of the user must be returned upon termination of employment....

\*\*\*

***Expectation of privacy***

Users should have no expectation of privacy while using Company Computer Resources. By using said systems, Users are consenting to allow personnel of the Company to review all material, including but not limited to, anything a User shall create, store, send, or receive on or via a Computer Resource. The Company will routinely use human or automated means to monitor the use of its Computer Resources and reserves the right to determine whether personal use of Computer Resources is being abused.

Use of Personal Assets when conducting Company business makes such assets subject to the Acceptable Use Policy and may subject user to subpoena and/or investigatory seizure. For this reason, use of Personal Assets is strongly discouraged.

35.    "Computer Resources" is defined as Navigant's entire computer network. Per the Employee Handbook, Computer Resources includes, but is not limited to host computers, file servers, application servers, mobile devices, LAN/WAN devices, telephones, e-mail systems, Internet access points, and networks directly attached to any or all of the internal network, communication servers, web servers, workstations, stand-alone computers, laptops, software, Information Assets, and all external communication networks.

36.    Per the Employee Handbook, Navigant's policies forbid the destruction of data from its computers. Navigant's Acceptable Use Policy provides:

13

***Destruction of Intellectual Property***
The unauthorized destruction of intellectual property is prohibited.
Upon termination of employment from the Company, individuals
may not clean their computers of data. The use of forensic tools to
perform permanent deletion operations upon Computer Resources
shall be considered a denial of service attack and may be
prosecuted under the Federal hacking laws.

37.     Navigant's Employee Handbook (which includes the Acceptable Use

Policy) was available to Navigant's employees through the Navigant Intranet.

## Varughese's Starting Bonus

38.     Varughese's offer letter provided, in addition to his salary, that Varughese

was to receive a starting bonus of $350,000. The offer letter states that the bonus is contingent

on Varughese signing an Employment Incentive Recovery Agreement (the "Recovery

Agreement"). The Recovery Agreement is dated June 29, 2005 and was signed by Varughese

on July 15, 2005. A true and accurate copy of the Recovery Agreement is attached hereto as

Exhibit B. Navigant paid Varughese the $350,000 starting bonus in accordance with these

terms.

39.     The Recovery Agreement provides that if Varughese terminates his

employment with Navigant less than three years after his starting date, he is required to

immediately repay Navigant for the pro rata share of his starting bonus.

40.     In Section 2 of the Recovery Agreement, Varughese agreed, in pertinent

part:

REPAYMENT. In the event that Employee either fails to begin
employment with NCI as scheduled, or voluntarily terminates
his/her employment with NCI within thirty-six (36) months of the
Employee's starting date of employment, Employee will
immediately repay NCI an amount equal to (1) the One Time

14

Incentive Bonus amount actually received by Employee (i.e., net of taxes and other amounts withheld), (2) reduced pro rata by 1/36 of the amount in subparagraph (1) for each full month that the Employee has worked for NCI prior to his date of termination; and (3) further reduced by any amounts withheld or set-off by NCI pursuant to Section 3 of this Agreement.

41.    Section 4 of the Recovery Agreement provides that Navigant is entitled to costs and attorneys' fees incurred in connection with collecting Navigant's share of the starting bonus. It also provides for interest on Navigant's share of the bonus from the date of default.

42.    Section 5 of the Recovery Agreement provides that Illinois law governs interpretation and enforcement.

43.    Pursuant to Section 8, the Recovery Agreement "may be amended or modified only by written agreement duly executed by Employee and NCI."

### Varughese's Retention Bonus

44.    In March, 2007, Varughese received a $115,000 retention bonus, pursuant to the Retention Bonus Recovery Agreement (the "Retention Bonus Agreement"). The Retention Bonus Agreement has an effective date of March 9, 2007 (the "Effective Date"). A true and accurate copy of the Retention Bonus Agreement is attached hereto as Exhibit C.

45.    The Retention Bonus Agreement provides that if Varughese terminates his employment with Navigant less than three years after the Effective Date, he is required to immediately repay Navigant for the pro rata share of his starting bonus.

46.    In Section 2 of the Retention Bonus Agreement, Varughese agreed, in pertinent part:

REPAYMENT. In the event that, within thirty six (36) months of the Effective Date of this Agreement, Employee either (i) voluntarily terminates his/her employment with NCI; or (ii) is terminated by NCI for "Cause" (as defined below) then, Employee will immediately repay NCI an amount equal to 1/36[th] of the Gross Bonus Amount multiplied by the number of full or partial months between the date of such termination and the date 36 months following the Effective Date. Employee shall make such repayment without any demand for payment by NCI.

47.     Section 4 of the Retention Bonus Agreement provides that Navigant is entitled to costs and attorneys' fees incurred in connection with collecting Navigant's share of the retention bonus. It also provides for interest on Navigant's share of the bonus from the date of default.

48.     Section 5 of the Retention Bonus Agreement provides that Illinois law governs interpretation and enforcement.

49.     Pursuant to Section 8, the Retention Bonus Agreement "may be amended or modified only by written agreement duly executed by Employee and NCI."

## Varughese Received Restricted Stock Pursuant To Restricted Stock Award Agreement

50.     On or about September 13, 2005, Varughese signed a Navigant Restricted Stock Award Agreement (the "Stock Agreement"). A true and accurate copy of the Stock Agreement is attached hereto as Exhibit D.

51.     Pursuant to Section 1 of the Stock Agreement, Varughese was given 25,854 shares of restricted stock on a specified vesting schedule. Under Section 4(a) of the Stock Agreement, 5,170 shares vested on August 31, 2006; 5,171 shares were to vest on August

16

31, 2007; 5,171 shares were to vest on August 31, 2008; 5,171 shares were to vest on August 31, 2009; and 5,171 shares were to vest on August 31, 2010.

52.    Section 4(b) provides that unvested shares are automatically forfeited upon Varughese's employment termination.

53.    Section 10 provides that all restricted shares, whether vested or unvested, are forfeited in the event Varughese breaches his non-solicitation, non-compete, or non-disclosure obligations:

> Breach of Restrictive Covenant. The Participant agrees and acknowledges that if the Participant breaches any non-compete, non-solicitation or non-disclosure provision of any agreement between the Participant and the Company, including without limitation any restrictive covenant contained in the Participant's employment agreement, the breach will result in the immediate termination of this Award and the forfeiture of the Restricted Stock granted to him or her under this Award Agreement, even if and to the extent it may already have vested.

54.    Currently, Varughese has vested awards of 5,170 shares of restricted stock. These shares should be forfeited under Section 10 of the Stock Agreement.

## Varughese's Development of New and Competing Business Venture

55.    Varughese put into effect his scheme to create a new company to divert Navigant business opportunities in furtherance of his own personal interests, at Navigant's expense and in violation of his fiduciary duty. In the Spring of 2007, while still employed by Navigant as Managing Director for Navigant and still a member of Navigant's Management Committee, Varughese began active, covert competition with Navigant for client opportunities and other resources, and soon after began planning his departure to start a competitive business.

The development of Varughese's new and competing venture progressed unbeknownst to Navigant. While Varughese's plans were unfolding, he was still receiving a handsome compensation from Navigant, which included an additional retention bonus paid to him in March, 2007.

56.    On March 7, 2007, Varughese sent external counsel an email attaching Navigant's proposed Retention Bonus Agreement for review. Varughese had not yet informed Navigant of his planned departure, which would result in the pro rata obligation to repay the bonus. He signed the Retention Bonus Agreement two days later nonetheless and received payment of $115,000 from Navigant.

57.    In early April, 2007, Varughese voluntarily resigned from Navigant. Varughese lied to his superior at Navigant about the reasons for his departure, saying he was taking some time off and was not going to continue in a consulting practice. His last day was April 20, 2007. Varughese asked to remain on the Navigant premises after his last day of employment, but that request was denied.

58.    After his resignation, and upon Navigant's request, Varughese returned the computer used while he was Managing Director of Navigant's GFI subpractice. His computer hard-drive had been systematically wiped clean of all data, including the operating system, thereby destroying Navigant's property.

59.    Varughese, having already commenced his competitive actions, which involved breaching his fiduciary duties and contractual obligations owed to Navigant, was listed as the contact person for Milestone, a limited liability company with offices in Manhattan, that was formed just one business day after Varughese's resignation.

18

### Varughese's Plot to Raid Navigant's
### Employees and Business Opportunities

60.    Before leaving Navigant, Varughese's team (consisting of Varughese, Kostakis, or Bond, at various times) stepped up their efforts to develop relationships with Navigant subcontractors, to find out information about subcontractor employees whom they could utilize after leaving Navigant, to lure Navigant employees away from Navigant, to identify and secure new work from current Navigant clients for Milestone, and to set these opportunities aside, without Navigant's knowledge or consent, so that they could staff these assignments with employees or subcontractors for the benefit of Milestone after leaving Navigant.  Varughese began to put his plan into effect.

61.    Varughese's team began communicating with Navigant's subcontractors, and requested resumes from Navigant subcontractors Phoenix Partners and ExlService.com, Inc. ("Exl").

62.    These requests were not part of an attempt to fill new positions that could not be filled by Navigant.  In fact, no staffing needs were raised by Varughese's team during the Financial Services Practice staffing calls on March 20, April 4, and April 18, 2007.

63.    In addition, in the middle of March, Page also sent Kostakis and Bond resumes of some NCI consultants who were available for new projects.  Page never received a response.  Page followed up later in March but again received no response.

64.    In April, when Varughese's team was receiving resumes from subcontractors, there were individuals within Navigant that were available to fill any new job postings at Navigant's clients.  These inquiries into Navigant's subcontractors were, in

19

hindsight, efforts to find staffing capability to be utilized by Varughese's team for Milestone's benefit.

65.    Varughese's team went beyond simply communicating with subcontractors. Kostakis reviewed resumes and interviewed a number of the employees used by those subcontractors. Navigant has subsequently discovered that some of these individuals, whose resumes were sent to Kostakis in the middle of April, have been hired by Deutsche Bank as non-Navigant consultants.

66.    In April of 2007, Varughese's team was working to find potential employees to use for their own interests, in contrast to Navigant's interests, after their resignations.

67.    While still Directors of Navigant, they also made attempts to solicit Navigant employees to join the competing firm and to thereby violate their agreements with Navigant.

68.    Kostakis had dinner with then Navigant consultant Stephanie Davis on March 26, 2007. Davis gave notice on approximately April 25, 2007 and her last day with Navigant was May 3, 2007. Davis is now employed by Milestone. On information and belief, Milestone is Varughese's competing venture which has usurped the corporate opportunities of Navigant that were temporarily set aside by Varughese's team.

69.    Chris Milham communicated with Varughese's team on a regular basis. Milham resigned on May 4, 2007. Originally, when Milham gave notice that he was leaving Navigant, he said his last day was going to be May 11. Then, he changed his last day to May 9.

However, when Navigant began to question the resignations of Varughese's GFI subpractice members, on May 3, Milham suddenly changed his own resignation to the following day, May 4. Milham is currently working for Milestone, and has been working for Deutsche Bank as a Milestone consultant.

70.    Tom Ellis also communicated with Varughese's team on a regular basis. Ellis also resigned on May 4, 2007. Ellis is currently working for Milestone, and has been working for Deutsche Bank as a Milestone consultant.

71.    Davis, Milham, and Ellis each signed a Confidentiality and Property Agreement (the "Confidentiality Agreement"), which prohibits them from continuing to work on the same matters after leaving Navigant. (Attached as Exhibits E, F, and G). In the Confidentiality Agreement signed by Ellis and Milham, they agreed:

> I further agree that at the termination of my working relationship with the Company, I will not engage in work of any sort on any matters on which I have worked and which are in progress at the time of my termination, except as otherwise agreed to by the Company.

72.    In the Confidentiality Agreement signed by Davis, she agreed:

> I further agree that at the termination of my working relationship with NCI, I will not engage in work of any sort on any matters on which I have worked and which are in progress at the time of my termination, except as otherwise agreed to by NCI.

73.    During the past few months, Navigant's GFI subpractice, led by Varughese, decreased from approximately 40 individuals staffed on GFI projects to approximately 25 employees. Many of these individuals resigned within the same general time period that Varughese resigned – in April or early May of 2007. The two Navigant leaders

21

directly under Varughese – Bond and Kostakis – resigned the first business day after Varughese's departure and left Navigant within two weeks of Varughese's departure. Several Navigant employees gave Navigant false or pretextual reasons for their resignation, on information and belief, in order to conceal their true intention of joining a competing business with Varughese, and others, who sought to take the existing Deutsche Bank work and usurp existing opportunities for future assignments.

74.    While still leaders of Navigant's GFI subpractice, Varughese's team was working to carry out the plot to solicit employees and divert business opportunities from Navigant. Preceding their departures from Navigant, Varughese's team began to identify new work for at least one current Navigant client, Deutsche Bank, through current Navigant employees. Varughese's team withheld these new business opportunities for Milestone (not yet formed), rather than for Navigant. They either staffed that new work with non-Navigant employees while they were still at Navigant or set aside that work so that it could be staffed with non-Navigant employees after their resignations from Navigant.

### Varughese's Team Steals Corporate Opportunities from Navigant

75.    While still at Navigant, Varughese, working in tandem with others, began to carry out his scheme to take new Deutsche Bank staffing opportunities away from Navigant, and divert them to Milestone, the new business venture, for his own profit. Varughese and his team systematically identified, secured, and set aside Navigant's corporate opportunities for their own benefit. They staffed these new opportunities gradually, so as not to attract attention. First, Varughese's team used employees that they had identified and investigated while purporting to act on Navigant's behalf – employees whose resumes they received from Navigant subcontractors. Next, they brought in former Navigant consultants who had worked under

22

Varughese at Navigant and whom he had brought over to the new venture, Milestone. Chris Milham, Tom Ellis, and Stephanie Davis are three former Navigant consultants who worked under Varughese at Navigant, left during the same time period, and are now employed by Milestone and staffed at Deutsche Bank. Varughese's efforts to effect his scheme were taken in willful breach of his fiduciary duty to Navigant and his obligations under his agreements with Navigant, and aided others in breaching their fiduciary duty to Navigant.

### Varughese's Team Takes First Corporate Opportunity

76.    In early April of 2007, prior to Varughese's departure, Deutsche Bank asked Navigant to bring on four more consultants. A Navigant employee staffed at Deutsche Bank was told by Deutsche Bank that four more consultants were needed and he informed Navigant of the request. He also provided the Deutsche Bank person requesting these additional consultants with the contact information for Kostakis and Bond and told Kostakis and Bond that the Deutsche Bank person would be contacting them.

77.    As Managing Director of GFI, Varughese was ultimately responsible for handling this new request from Navigant's client and for ensuring proper staffing with Navigant employees or subcontractors. The new project was expected to last for many months and result in several hundreds of thousands of dollars of revenues.

78.    Contrary to both Navigant procedure and his duty of loyalty to Navigant, Varughese did not ensure that the project was staffed with Navigant consultants. Varughese's team did not contact Jennifer Page, Business Manager of the Financial Services Practice, to find out if Navigant employees were available to staff the project. Navigant employees were available to begin working at Deutsche Bank, but were not staffed. Instead, on April 23, 2007,

23

three days after Varughese's departure, four non-Navigant individuals began working for Deutsche Bank, even though the individuals were not Navigant employees and had not gone through the standard Navigant screening and evaluation process.

79.    Varughese's team received the resumes of two of those four non-Navigant employees on April 13, 2007, from Navigant subcontractor Exl. One of those two individuals, Sweta Goenka, is currently listed at Deutsche Bank as a Milestone employee.

80.    Another one of the four non-Navigant employees currently staffed on that Deutsche Bank project, Steve Wolf, at first represented that he was from Navigant. He was carrying a Navigant computer bag when a Navigant employee saw him, and was listed on Deutsche Bank's list as a Navigant employee. However, Wolf was not (and is not) a Navigant employee or Navigant subcontractor.

81.    Contrary to Deutsche Bank's request and Navigant's interests, the four individuals hired by Navigant's GFI subpractice, led by Varughese, that started working on Navigant's matters for Deutsche Bank were not Navigant employees and were not being billed as Navigant employees. In addition, a Deutsche Bank leader thought these four individuals were Navigant employees and was surprised to learn the individuals were not Navigant employees.

82.    Upon information and belief, these four individuals work for Milestone, or an entity being directed by Milestone.

24

**Varughese's Team Takes Second Corporate Opportunity**

83.     As part of their scheme to divert opportunities and revenue to Varughese's new firm, Varughese's team repeatedly filled Navigant positions at Deutsche Bank with non-Navigant employees.

84.     In one instance, Deutsche Bank requested that a particular Navigant consultant fill a position. Although he was available, Deutsche Bank was told he was unavailable.

85.     Instead, a non-Navigant person was given the assignment at Deutsche Bank.

86.     The timing of the arrival of the non-Navigant consultant coincides with the departure of members of Varughese's team (Kostakis and Bond) from Navigant.

87.     On May 7, 2007, the Monday following the resignations of Kostakis and Bond, a new consultant came into Deutsche Bank's New York offices for training so that she could replace the Navigant GFI consultant working in that position. The non-Navigant employee was listed as a Navigant employee. However, the new consultant was not a Navigant employee nor contracted for through Navigant. The new consultant was from Milestone.

88.     Upon information and belief, as an incentive to use the new Milestone venture, Milestone promised Deutsche Bank that it would not charge Deutsche Bank for the period of transition, presumably referencing the general period where Varughese's team was transitioning work from Navigant to Milestone, in violation of their legal obligations.

25

89.    The resume of the Milestone consultant had been emailed to Varughese's team, upon request, while Varughese was still employed by Navigant.

90.    This instance, like the others, was part of Varughese's overall plot to take Navigant's corporate opportunities for himself and the others believed to be working for Milestone.

### Varughese's Team Takes Third Corporate Opportunity

91.    Punya Sandhu is a consultant from Exl, one of Navigant's subcontracting firms. She was hired by Navigant to work as a subcontractor consultant on a project for another of Navigant's clients, not Deutsche Bank. She was selected by Navigant for this position, supervised by Navigant, and billed through Navigant, which was entitled to the revenue generated.

92.    A Navigant consultant was staffed in a position at Deutsche Bank. He was recently replaced by Sandhu. Sandhu was not hired for the Deutsche Bank position as a Navigant employee, and Varughese's team was responsible for staffing that position for Deutsche Bank.

93.    As a result, Navigant lost the revenue it would have received from Sandhu's staffing for the other client and the revenue from the Navigant consultant's work for Deutsche Bank or the revenue Navigant would have received by staffing Sandhu as a Navigant subcontractor on that project.

94.     This is another example of Varughese's team again taking the opportunities presented to Navigant's GFI subpractice and giving them to Milestone, the new venture.

### Varughese's Team Attempts To Take Another Corporate Opportunity

95.     As part of their scheme to divert opportunities from Navigant to Milestone, Varughese's team again brought in a non-Navigant consultant for a new Deutsche Bank opening without informing Navigant of that need so that it could staff it internally.

96.     Dean Carson, a consultant for Navigant subcontractor Phoenix Partners ("Phoenix"), began working at Deutsche Bank at the end of April, 2007. Kostakis received his resume from Phoenix on or around April 10, interviewed him, and asked him to begin working. Navigant was not aware of this new opening, and would have staffed it with a Navigant consultant.

97.     Upon information and belief, Carson was hired by Milestone for this opening and would have been billed through Milestone had Navigant not intervened. However, Navigant discovered that Carson had started working at Deutsche Bank in a Navigant opening, and, after discussions with Carson, an arrangement was made so that Carson is now a Navigant subcontractor for this particular project.

### COUNT I – BREACH OF FIDUCIARY DUTY AND
### AIDING AND ABETTING OTHERS IN BREACH OF THEIR FIDUCIARY DUTIES

98.     Navigant repeats and realleges Paragraphs 1 through 97 above as if fully set forth herein.

99.    Varughese breached his fiduciary duties to Navigant, and aided and abetted other Navigant employees in breaching their fiduciary duties to Navigant by, *inter alia*, engaging in the following conduct, either personally or through one or more agents:

    (a)    while still employed by Navigant, developing a scheme to engineer a mass resignation of Navigant employees;

    (b)    executing that plot by engaging in a pervasive campaign to target and recruit Navigant employees to his competing venture; and

    (c)    usurping or attempting to usurp Navigant corporate opportunities for his own benefit, while he was still employed by Navigant; and

    (d)    causing others to fail to inform Navigant of new projects from Navigant client Deutsche Bank, to use Navigant resources to find potential candidates for new projects, and to staff the new projects with subcontractors not employed by Navigant, while still at Navigant.

100.    Varughese and others also caused Navigant consultants to leave and begin working for Deutsche Bank through a competing venture, in violation of their contractual obligations to Navigant.

101.    Navigant is entitled to compensatory damages as well as recoupment of any and all compensation paid by Navigant to Varughese during the period of his disloyal and wrongful conduct.

28

102.    Through Varughese's breaches of fiduciary duty, and aiding and abetting the breach of fiduciary duty by other Navigant employees, Varughese caused Navigant to suffer losses aggregating in the hundreds of thousands of dollars, including without limitation, lost corporate opportunities and the costs of Navigant's information technology personnel, management, and legal counsel investigating the damage caused.

### COUNT II – BREACH OF CONTRACT

103.    Navigant repeats and realleges Paragraphs 1 through 102 above as if fully set forth herein.

104.    Varughese's conduct as alleged in this Complaint breached his Non-Solicitation Agreement. These breaches include, but are not limited to, the misconduct described in Count I above, further including without limitation Varughese's solicitation of Navigant employees and his usurpation of Navigant business opportunities.

105.    Navigant has fully performed and complied with all of its obligations under the Non-Solicitation Agreement.

106.    Varughese's breaches of the Non-Solicitation Agreement entitle Navigant to compensatory damages and the return of vested shares of Navigant restricted stock, as well as an award of attorney fees pursuant to paragraph of 23 of the Non-Solicitation Agreements, quoted *supra* at ¶ 32.

### COUNT III – REPAYMENT UNDER RECOVERY AGREEMENT AND RETENTION BONUS AGREEMENT

107.    Navigant repeats and realleges Paragraphs 1 through 106 above as if fully set forth herein.

29

108. Pursuant to the Recovery Agreement, Varughese has an obligation to repay Navigant for a pro rata share of his starting bonus if he voluntarily terminates his employment with Navigant within three years of his starting date.

109. Varughese's starting date at Navigant was August 31, 2005. His resignation date was on or around April 20, 2007. Because Varughese did not serve the full three years after his starting date, he must repay his starting bonus of $350,000, reduced pro rata by 1/36 for each full month he worked for Navigant.

110. Varughese owes Navigant $155,555.56 under the Recovery Agreement and has refused to pay Navigant, despite demand for repayment.

111. Pursuant to the Retention Bonus Agreement, Varughese has an obligation to repay Navigant for a pro rata share of his retention bonus if he voluntarily terminates his employment with Navigant within three years of the effective date of the Retention Bonus Agreement.

112. The effective date of the Retention Bonus Agreement was March 9, 2007. His resignation date was on or around April 20, 2007. Because Varughese did not serve the full three years after the effective date, he must repay his retention bonus of $115,000, reduced pro rata by 1/36 for each full month he worked for Navigant.

113. Varughese owes Navigant $111,805.56 under the Retention Bonus Agreement and has refused to pay Navigant.

30

114.    Navigant is also entitled to recoupment of all costs and attorney's fees incurred by Navigant in collecting the money from Varughese as well as interest on the amount in default.

## COUNT V – COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030 ET SEQ.)

115.    Navigant repeats and realleges Paragraphs 1 through 114 above as if fully set forth herein.

116.    Varughese intentionally caused to be deleted all documents and files from the computer assigned to him to use in the performance of his work for Navigant.

117.    Varughese's hard drive was wiped clean of everything before he returned it to Navigant, including the operating system.

118.    On information and belief, Varughese intentionally deleted materials that belonged to Navigant and did so without authorization from Navigant.

119.    The computer that Navigant assigned to Varughese to use in the performance of his duties, from which he intentionally deleted information, is a computer used in interstate or foreign commerce and communication.

120.    Through such conduct, Varughese violated Section 1030(a)(4) of the Computer Fraud and Abuse Act which covers one who "knowingly and with intent to defraud accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value...." 18 U.S.C. § 1030(a)(4).

121.    Through such conduct, Varughese violated Section 1030(a)(5)(A)(iii) of the Computer Fraud and Abuse Act which covers one who "intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage." 18 U.S.C. § 1030(a)(5)(A)(i).

122.    Through such conduct, Varughese caused Navigant to suffer losses aggregating at least $5,000 in value, including without limitation the costs of Navigant's information technology personnel, outside information technology experts, management, and legal counsel investigating the damage caused. Accordingly, Navigant is entitled to relief against Varughese pursuant to 18 U.S.C. § 1030(g).

123.    Varughese also breached Section 9 of the Non-Solicitation Agreement, and Navigant's computer use policies, by causing the deletion of all information from his harddrive before returning it to Navigant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Navigant Consulting, Inc., respectfully requests that the Court enter judgment in favor of Navigant and against Varughese, and enter an Order:

    (a)    providing for an accounting of the records and accounts relating to the profits, revenues and other benefits that Varughese has gained due to his unlawful and wrongful conduct as alleged in this Complaint, and establishing a constructive trust for the benefit of Navigant with respect to all such profits, revenues and other benefits;

    (b)    holding Varughese liable for the payment to Navigant of:

        (i)    an amount of money damages to be proven;

        (ii)    $267,361.12 in repayment of retention bonuses pursuant to the Recovery Agreement and the Retention Bonus Agreement; and

(iii)  an additional amount constituting forfeiture of any and all compensation in any form that Varughese received or earned during any and all periods in which he was breaching his fiduciary duty to Navigant;

(c)  permanently enjoining Varughese, and any persons acting by or under his authority or in privity or concert with him, from soliciting or hiring any current or former Navigant employees for a period of one year from the date of the Court's entry of final judgment;

(d)  permanently enjoining Varughese, and any persons acting by or under his authority or in privity or concert with him, from soliciting any Navigant clients for which he had responsibilities or duties, possessed Confidential Information regarding, or was involved in the development of, for a period of one year from the date of the Court's entry of final judgment;

(e)  permanently enjoining Varughese, and any persons acting by or under his authority or in privity or concert with him, from directly or indirectly pursuing or benefiting from any corporate opportunity of Navigant that Varughese usurped in violation of his fiduciary duties to Navigant;

(f)  awarding the return of vested shares of Navigant restricted stock, pursuant to the Restricted Stock Award Agreement;

(g)  awarding to Navigant an amount equal to Navigant's costs and attorneys' fees incurred in enforcing its rights against Varughese; and

(h)  granting Navigant such other and further relief as the Court deems just and appropriate.

33

Dated: June 7, 2007
New York, New York

FOLEY & LARDNER LLP

By: _Robert Scher_

Peter N. Wang (PW 9216)
Robert A. Scher (RS 2910)
90 Park Avenue
New York, NY 10016
Telephone: (212) 682-7474
Facsimile: (212) 681-9471

and

Michael M. Conway
Amy P. Purcell
Rebecca R. Hanson
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, IL 60610
Telephone: 312.832.4351
Facsimile: 312.832.4700

*Attorneys for Plaintiff*
*Navigant Consulting, Inc.*