# EXHIBIT A

Mr. Jess Varughese

June 29, 2005

## AGREEMENT REGARDING CONFIDENTIAL INFORMATION, INTELLECTUAL PROPERTY NON-SOLICITATION

In consideration of my employment or continued employment by Navigant Consulting, Inc. or any parent, division, subsidiary, affiliate, successor or assignee thereof (collectively "NCI"), and the compensation and benefits paid to me from time to time by NCI, I agree as follows:

1.  *Competitive Employment.* While I am employed by NCI, I agree that, other than for NCI, I will not, either directly or indirectly, either as a principal, agent, employee, employer, partner or shareholder (other than as an owner of 2% or less of the stock of a public corporation) or in any other capacity, engage in any manner in the business conducted by NCI or any of its divisions, subsidiaries or affiliates.

2.  *Definition of Confidential Information.* I realize that my position with NCI creates a relationship of high trust and confidence with respect to Confidential Information owned by NCI, its clients or suppliers that may be learned or developed by me while employed by NCI. I further acknowledge that my access to such Confidential Information is contingent upon my execution of this Agreement. For purposes of this Agreement, "Confidential Information" includes all information that NCI desires to protect and keep confidential or that NCI is obligated to third parties to keep confidential, including but not limited to "Trade Secrets" to the full extent of the definition of that term under Illinois law. It does not include "general skills, knowledge and experience" as those terms are defined under Illinois law, nor does it include information which is generally known to the public through no action on my part.

3.  *Examples of Confidential Information.* Confidential Information includes, but is not limited to: computer programs; unpatented inventions, discoveries and improvements; marketing, manufacturing, organizational operating and business plans; strategic models; research and development; NCI policies and manuals; sales forecasts; personnel information (including the identity of NCI employees, their responsibilities, competence and abilities, and compensation); medical information about employees; pricing and nonpublic financial information; current and prospective client lists and information on clients or their employees; information concerning planned or pending acquisitions or divestitures; and information concerning purchases of major equipment or property.

4.  *General Skills, Knowledge and Experience.* If I leave NCI, I may take with me and use the general skills, knowledge and experience that I have learned or developed in my position or positions with NCI or others.

5.  *Confidentiality Obligations.* During and after my employment with NCI, I will not (a) disclose, directly or indirectly, any Confidential Information to anyone outside of NCI or to any employees of NCI not authorized to receive such information or (b) use any Confidential Information other than as may be necessary to perform my duties at NCI. In no event will I disclose any Confidential Information to, or use any Confidential Information for the benefit of, any current or future competitor, supplier or client of NCI, whether on behalf of myself, any subsequent employer, or any other person or entity not Notwithstanding the foregoing, I will not be prohibited under this paragraph 5 from disclosing Confidential Information pursuant to a validly issued subpoena or order of a court or administrative

07/15/2005 11:41 FAX ... Case 1:07-cv-04854-PKL Document 1-2 Filed 06/07/2007 Page 3 of 30 ... NAVIGANT CONSULTING ... @009

07/15/2005 11:41 FAX

Mr. Jess Varughese June 29, 2005

agency of competent jurisdiction, provided, further, that I will promptly notify NCI if I receive a subpoena, court order or administrative order requiring such disclosure to allow NCI to seek protection therefrom.

6. *Duration.* With respect to Trade Secrets, my obligations under paragraph 5 shall continue indefinitely or until such Trade Secret information has been made available generally to the public either by NCI or by a third party with NCI's consent or is otherwise not considered a Trade Secret under Illinois law. With respect to Confidential Information which is not a Trade Secret (herein referred to as "Proprietary Information"), my obligations under paragraph 5 shall continue in duration until the first to occur of the following: (a) five (5) years has elapsed since termination of my employment with NCI for any reason, or (b) the Proprietary Information has been made available generally to the public either by NCI or by a third party with NCI's consent.

7. *Geographic Scope of Confidentiality Obligations.* I understand that NCI has sales and operations facilities throughout the United States and in a number of foreign countries, that it purchases equipment and materials from suppliers located throughout the world, and that it expects to expand the scope of its international activities in the future. I therefore agree that my obligations under paragraph 5 shall extend worldwide.

8. *Former Employers.* I acknowledge that NCI expects me to respect and safeguard the trade secrets and confidential information of my former employers. I will not disclose to NCI, use in NCI's business, or cause NCI to use, any information or material that is confidential to any former employer, unless such information is no longer confidential or NCI or I have obtained the written consent of such former employer to do so.

9. *Return of Property.* Upon termination of my employment with NCI or upon NCI's request, I will deliver to NCI all NCI's property in my possession, including notebooks, reports, manuals, programming data, listings and materials, engineering or patent drawings, patent applications, any other documents, files or materials which contain, mention or relate to Confidential Information, and all copies and summaries of such material whether in human- or machine-readable-only form, that I may have or that may come into my custody while employed by NCI.

10. *Restrictive Covenants.*

(a) Non-Solicitation of Employees. While employed by NCI and for a period of twelve (12) months from the date of termination of my employment with NCI for any reason, I shall not directly or indirectly retain any of NCI's employees, nor shall I solicit, induce or encourage any of NCI's employee(s) to terminate their employment with NCI or to accept employment with any competitor, supplier or client of NCI, nor shall I cooperate with any others in doing or attempting to do so. As used herein, the term "solicit, induce or encourage" includes, but is not limited to, (i) initiating communications with a Company employee relating to possible employment, (ii) offering bonuses or additional compensation to encourage NCI's employees to terminate their employment with NCI and accept employment with a competitor, supplier or client of NCI, or (iii) referring NCI's employees to personnel or agents employed by competitors, suppliers or clients of NCI.

(b) Non-Solicitation of Customers. While employed and for a period of twelve (12) months from the date of termination of my employment with NCI for any reason, I agree that I will not, either directly or indirectly, as a principal, agent, contractor, employee, employer, partner or shareholder (other than as an owner of 2% or less of the stock of a public corporation) or in any other capacity, solicit or

Mr. Jess Varughese                                                June 29, 2005

engage in the business engaged in by NCI as of the date of termination of my employment ("Navigant Business") with any client which was a client, or a prospective client, of NCI (provided I had responsibilities or duties with respect to, possessed Confidential Information regarding or was involved in the development of, such client or prospective client), within the twelve (12) months immediately preceding my termination.

(c). No Employment by Customers. While employed by NCI and for a period of twelve (12) months from the date of termination of any employment with NCI for any reason, I agree that, without the prior express written permission of NCI, I will not accept a position as an officer, director, or employee of any of NCI's client or prospective clients, provided I had responsibilities or duties with respect to, possessed Confident al Information regarding, or was involved in the development of such client or prospective client within the twelve (12) months immediately preceding my termination

(d) Notwithstanding any other provision of this Agreement, if NCI terminates my employment, other than for "Cause" as defined in my offer of employment dated June 29, 2005, then the restrictive covenants in Sections 10(b) and 10(c) shall be null, void and of no effect.

(e) I acknowledge that the restrictions set forth in this paragraph will not prevent me from obtaining gainful employment following termination of my employment with NCI.

(f)In the event that any provision of this paragraph is held to be unreasonable, a court may modify such provision in any manner which results in an enforceable restriction.

11. *Injunctive Relief.* I acknowledge that my violation of the foregoing confidentiality and non-solicitation obligations will cause NCI irreparable harm. I agree that NCI is entitled to protection from such violations, including protection by injunctive relief, in addition to other remedies available under the law.

12. *Disclosure of Developments.* I will disclose promptly to NCI all inventions, discoveries, developments, improvements, works of authorship and computer programs, ideas, concepts, enhancements, writings, graphics, designs, models, artwork, code, routines, compilations and related documentation (collectively, "Developments") that are made, conceived, first reduced to practice or learned by me either solely or jointly with another or others while employed by NCI, whether or not they are patentable, copyrightable or subject to trade secret protection.

13. *Ownership of Developments.* I agree that, except as otherwise provided in paragraph 16 hereof, all Developments shall be the sole and exclusive property of NCI. Any Development for which copyright protection is available shall be considered a work made for hire or, if I am an independent contractor, assigned by me to NCI. I agree to assign and do hereby assign to NCI, or to some other legal entity ("Assignee") designated by NCI, all of my right, title and interest in and to all Developments in all media throughout the world in perpetuity. I further agree to waive any moral or similar rights to the Developments.

14. *Protection of Developments.* NCI or Assignee shall have the right to use the Developments and obtain Letters Patent, Copyrights (as author or assignee) or other statutory or common law protections for Developments in any and all countries. I will provide NCI or Assignee such assistance as may be requested in order for NCI to obtain or otherwise secure, and from time to time enforce, U.S. or

07/15/2005 11:41 FAX                                                              @011

Mr. Jess Varughese                                                           June 29, 2005

foreign Letters Patent, copyrights or other statutory or common law protections for Developments, including the execution of any and all documents that NCI or Assignee may wish to use or obtain or otherwise secure or enforce such rights, together with any assignments thereof to NCI or Assignee, and to the successors and assigns of NCI or Assignee, transferring all of my right, title and interest in any Development, and the right to apply for or otherwise obtain any such rights. NCI or Assignee shall have the sole right to determine what action, if any, to take with respect to any Development. All expenses incurred in obtaining and enforcing rights in Developments owned by or assigned to NCI shall be borne by NCI.

15. *Post-Employment Assistance.* If I am no longer employed by NCI, NCI or Assignee shall compensate me at a reasonable rate for time actually spent by me at the request of NCI or Assignee on the assistance referred to in paragraph 14. Such rate shall be determined by NCI and shall be based on my compensation at the time my employment with NCI was terminated. NCI or Assignee shall also reimburse me for pre-approved traveling and personal expenses incurred in complying with such request.

16. *Employee Inventions.* I understand that the provisions of paragraphs 12, 13 and 14 of this Agreement do not apply to an invention for which none of NCI's equipment, supplies, facilities or trade secret information was used and which was developed entirely on my own time, unless the invention relates to NCI's business or to NCI's actual or demonstrably anticipated research or development activities, or unless the invention results from work I perform for NCI.

17. *Pre-Existing Developments.* I have identified at the end of this Agreement all Developments that have been made or conceived or first reduced to practice by me alone or jointly with others prior to my employment with NCI, and that I desire to exclude from operation of this Agreement. If there are no Developments listed, I represent that I have made no such Developments.

18. *Payments.* With respect to any Development for which NCI seeks to obtain U.S. or foreign Letters Patent, NCI will pay me the sum of Five Hundred Dollars ($500) when I execute an assignment of the Development to NCI, or when I execute the first patent application and assignment covering the Development, whichever occurs first. Divisional or continuation-in-part applications shall be considered to cover separate Developments. The payment of the sum of Five Hundred Dollars ($500) shall relieve NCI of any obligation it may have had to make any further payments to me with respect to such Development. If there are several co-inventors, this sum shall be divided equally between them.

19. *Identification of Authorship.* NCI, its assignees and licensees are not required to designate me as the author of any Developments created as a work made for hire or assigned under this Agreement when any such work is distributed publicly, nor to make any such public distribution or any use thereof.

20. *Subsidiaries and Affiliates.* I understand and agree that this Agreement is executed by NCI on its own behalf and on behalf of each of its subsidiaries and affiliates, that my obligations under this Agreement shall apply equally to each of NCI's subsidiaries and affiliates and that such subsidiaries and affiliates may enforce this Agreement in their own names and if they were parties to this Agreement.

Mr. Jess Varughese                                                    June 29, 2005

21. *Entire Agreements.* This Agreement supercedes all previous or contemporaneous agreements, written or oral, relating to the same subject matter. The terms of this Agreement may only be modified in a writing signed by me and an officer of NCI.

22. *Severability.* If any provisions of this Agreement are held by a court to be void or unenforceable for any reason, the remaining provisions of this Agreement shall continue in full force and effect. If a court is of the opinion that any part of this Agreement is unreasonable, it may modify this Agreement to make it reasonable and enforceable in all respects.

23. *Recovery of Expenses.* I agree to pay to NCI the costs and reasonable attorney's fees incurred by NCI if it prevails in enforcing any or all of the terms of this Agreement.

24. *Survival of Obligations.* The provisions of paragraph 2-15 and 17-23 of this Agreement shall survive its termination.

25. *Assignment.*

    (a) By the Employee. I understand and agree that my duties and responsibilities under this Agreement are personal in nature and that this Agreement shall not be assigned, transferred or shared by me with any other person or entity without the prior written notification to and written approval of NCI, which approval may be withheld in the sole discretion of NCI.

    (b) By NCI. I acknowledge and agree that this Agreement and the rights and obligations of NCI hereunder may be assigned by NCI to an affiliate or successor by purchase or otherwise of NCI without my prior written approval, upon notice to me.

26. *Governing Law.* This Agreement shall be construed in accordance with laws governing contracts made and to be performed in the State of Illinois, without regard to its conflict of laws principles. Each party irrevocably agrees that the exclusive venue for any dispute related to this Agreement shall be any state or federal court of competent jurisdiction in or for Armonk, New York.

_____          _____7/15/05_____
EMPLOYEE                                      Date

NAVIGANT CONSULTING, INC.

By: _____
Doug Reichert
Executive Managing Director                 Date:  June 29, 2005

The following are pre-existing Developments not covered by paragraphs 12-14, in which I have any right, title or interest, and which were conceived or written either wholly or in part by me prior to my employment with NCI, but neither published nor filed in any Patent Office.

Mr. Jess Varughese

June 29, 2005

## DESCRIPTION OF DOCUMENTS AND PATENTS (if applicable)

Title of Document                     Date of Document              Name of Witness
                                                             Document

# EXHIBIT B

Mr. Jess Varughese                                                                                June 29, 2005

## EMPLOYMENT INCENTIVE RECOVERY AGREEMENT

This Incentive Recovery Agreement ("Agreement") is made this 29th day of June, 2005 by and between Mr. Jess Varughese ("Employee") and Navigant Consulting, Inc. ("NCI").

     1. NCI has offered employment to Employee and, as incentive to Employee to accept the offer, has agreed to pay Employee a one-time incentive bonus.

     2. Employee has accepted employment with NCI.

In consideration of the mutual promises contained in this Agreement, the parties agree as follows:

    1. **INCENTIVE BONUS.** NCI will pay Employee a One-Time Incentive Bonus of $350,000 payable with Employee's first paycheck.

    2. **REPAYMENT.** In the event that Employee either fails to begin employment with NCI as scheduled, or voluntarily terminates his/her employment with NCI within thirty-six (36) months of the Employee's starting date of employment, Employee will immediately repay NCI an amount equal to (1) the One-Time Incentive Bonus amount actually received by Employee (i.e., net of taxes and other amounts withheld), (2) reduced pro rata by 1/36 of the amount in subparagraph (1) for each full month that the Employee has worked for NCI prior to his date of termination; and (3) further reduced by any amounts withheld or set-off by NCI pursuant to Section 3 of this Agreement. Notwithstanding the preceding sentence or any other provision of this Agreement, in the event Employee is terminated other than for "cause" as defined in his offer of employment dated June 29, 2005, or if his employment is terminated by reason of his Death or Disability, as defined in the Company's 2005 Long-Term Incentive Plan, then he (or his estate or legal representatives) shall have no obligation whatsoever to repay any portion of the One-Time Incentive Bonus.

    3. **EMPLOYEE AUTHORIZATION.** Employee hereby authorizes NCI, without further notice to Employee, to withhold either from Employee's final pay, accrued bonus, any final expense reimbursement due Employee, or any accrued vacation amount, such amounts sufficient to satisfy the repayment obligation described in Paragraph 2 of this Agreement.

    4. **ATTORNEY'S FEES AND INTEREST.** If Employee fails to repay the Incentive Bonus as set forth in this Agreement and NCI refers the matter to an attorney for collection, Employee agrees to pay all costs and reasonable attorney's fees incurred by NCI in connection with such collection efforts. Interest shall accrue from the date of default at the prime rate as published in the Wall Street Journal as of the date Employee is in default of his/her repayment obligation.

    5. **CONSTRUCTION.** This Agreement shall be governed by and construed and enforced under the laws of the State of Illinois.

    6. **SUCCESSORS.** The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the successors, assigns, heirs, survivors, and personal representatives of Employee and shall inure to the benefit of NCI, its successors, and assigns.

Mr. Jess Varughese                                              June 29, 2005

7.  NO BREACH. No breach of any provision of this Agreement shall be deemed waived unless it is
    waived in writing. Waiver of any one breach shall not be deemed a waiver of any other breach of
    the same or any other provision of this Agreement.

8.  AMENDMENTS. This Agreement may be amended or modified only by written agreement duly
    executed by Employee and NCI.

9.  SEVERABILITY.  In the event that any provision or provisions of this Agreement shall be
    declared to be illegal or unenforceable by a court of competent jurisdiction, such illegality or
    unenforceability shall not affect the validity and enforceability of the remaining provisions.

10. This is a contract.  By signing this Agreement, Employee understands and acknowledges that
    he/she is undertaking an enforceable legal obligation and authorizing NCI to take certain
    actions to protect its interests.

                                        NAVIGANT CONSULTING, INC.

                                        By: _____
                                            Doug Reichert

Agreed and accepted:

By: _____
    Mr. Jess Varughese

Dated __7|15____, 2005

Please return with signed offer letter to Mary Stafford.

# EXHIBIT C

# RETENTION BONUS RECOVERY AGREEMENT

...us Retention Bonus Recovery Agreement ("Agreement") is made this 9th day of March, 2007 ("Effective Date") by and between Jess Varughese ("Employee") and Navigant Consulting, Inc. ("NCI").

In consideration of the mutual promises contained in this Agreement, and for other consideration, the sufficiency of which is mutually acknowledged, the parties hereby agree as follows:

1. RETENTION RECOVERY BONUS. NCI will pay Employee a One-Time Retention Incentive Bonus of $115,000 ("Gross Bonus Amount",) less customary deductions and withholdings, payable on the date of the regularly-scheduled paycheck following receipt of this executed Agreement.

2. REPAYMENT. In the event that, within thirty six (36) months of the Effective Date of this Agreement, Employee either (i) voluntarily terminates his/her employment with NCI; or (ii) is terminated by NCI for "Cause" (as defined below) then, Employee will immediately repay NCI an amount equal to 1/36th of the Gross Bonus Amount multiplied by the number of full or partial months between the date of such termination and the date 36 months following the Effective Date. Employee shall make such repayment without any demand for payment by NCI.

   For purposes of this Agreement, "Cause" shall mean (i) the commission of a felony or the commission of any other crime that is injurious to the Company, to a Company employee or to a client of the Company; (ii) willful misconduct, dishonesty, fraud, attempted fraud or other willful action or willful failure to act that is injurious to the Company, to a Company employee or to a client of the Company; (iii) any material breach of fiduciary duty owed to the Company or to a client of the Company; (iv) any material breach of the terms of any agreement with the Company (including without limitation any employment agreement and any agreement regarding non-competition, non-solicitation of clients or employees, or confidentiality); (v) any material violation of a restriction on disclosure or use of privileged, proprietary or confidential information (including information belonging to the Company, to a client of the Company or to a third party to whom the Company owes a duty of confidentiality), but only if such violation is committed with actual notice of such restriction on disclosure; or (vi) any other material breach of the Company's Code of Business Conduct and Ethics or its securities trading policies, as amended from time to time.

3. EMPLOYEE AUTHORIZATION. Employee hereby authorizes NCI, without further notice to Employee, to withhold either from Employee's final pay,

accrued bonus, any final expense reimbursement due Employee, or any accrued vacation amount, such amounts sufficient to satisfy the repayment obligation described in Paragraph 2 of this Agreement.

4. **ATTORNEY'S FEES AND INTEREST.** If Employee fails to repay the Incentive Bonus as set forth in this Agreement and NCI refers the matter to an attorney for collection, Employee agrees to pay all costs and reasonable attorney's fees incurred by NCI in connection with such collection efforts. Interest shall accrue from the date of default at the prime rate as published in the Wall Street Journal as of the date Employee is in default of his/her repayment obligation.

5. **CONSTRUCTION.** This Agreement shall be governed by and constructed and enforced under the laws of the State of Illinois, without regard to such state's conflicts of laws principles.

6. **SUCCESSORS.** The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the successors, assigns, heirs, survivors, and personal representatives of Employee and shall inure to the benefit of NCI, its successors, and assigns.

7. **NO BREACH.** No breach of any provision of this Agreement shall be deemed waived unless it is waived in writing. Waiver of any one breach shall not be deemed a waiver of any other breach of the same or any other provision of this Agreement.

8. **AMENDMENTS.** This Agreement may be amended or modified only by written agreement duly executed by Employee and NCI.

9. **SEVERABILITY.** In the event that any provision or provisions of this Agreement shall be declared to be illegal or unenforceable by a court of competent jurisdiction, such illegality or unenforceability shall not affect the validity and enforceability of the remaining provisions.

10. **THIS IS A CONTRACT**. By signing this Agreement, Employee understands and acknowledges that he/she is undertaking an enforceable legal obligation and authorizing NCI to take certain actions to protect its interests.

NAVIGANT CONSULTING, INC.

By:

Pamela Glueck
Human Capital Director

Agreed and accepted:

By:

Jess Varughese

Dated 3 / 9 / , 2007

Please fax a signed copy of this letter and attachments to Pamela Glueck at 312.583.6898
and return the original executed copy of this letter and attachments to Pamela Glueck,
Director of Human Capital Service Delivery, 30 S. Wacker, Suite 3400- Chicago, Il. 60606.

# EXHIBIT D

**FORM OF RESTRICTED STOCK AWARD AGREEMENT**

**UNDER**

**NAVIGANT CONSULTING, INC. 2005 LONG-TERM INCENTIVE PLAN**

This RESTRICTED STOCK AWARD AGREEMENT (the "Agreement") is entered into as of the 31st day of August, 2005 (the "Effective Date") between Navigant Consulting, Inc. (the "Company") and Jess Varughese (the "Participant").    Notwithstanding the foregoing, this Agreement will become effective upon the execution of this Agreement by the Company.

Any term capitalized but not defined in this Agreement will have the meaning set forth in the Navigant Consulting, Inc. 2005 Long-Term Incentive Plan (the "Plan").

The Plan provides for the grant of Restricted Stock to certain eligible individuals, as approved by the Committee.   In the exercise of its discretion under the Plan, the Committee has determined that the Participant should receive a Restricted Stock award under the Plan and, accordingly, the Company and the Participant hereby agree as follows:

1.    Grant.   The Company hereby grants to the Participant a Restricted Stock Award (the "Award") of 25,854 shares of restricted stock (the "Restricted Stock").   The Award will be subject to the terms and conditions of the Plan and this Agreement. The Award constitutes the right, subject to the terms and conditions of the Plan and this Agreement, to shares of the Company's common stock, par value $0.001 per share (the "Common Stock") upon vesting of the Restricted Stock.

2.    Restricted Stock and Stock Certificates.   The Company will cause its transfer agent to maintain a book entry account reflecting the issuance of the Restricted Stock in the Participant's name.   The Company's transfer agent will cause the Restricted Stock to be maintained as restricted stock in a book entry account, until the Restricted Stock is either: (a) forfeited; or (b) vested. This Agreement will be evidence of the Participant's Restricted Stock and no certificate will be issued. The Company, or its transfer agent, will distribute to the Participant (or, if applicable, the Participant's designated beneficiary or other appropriate recipient in accordance with Section 5 hereof) certificates evidencing ownership of shares of Common Stock as and when provided in Sections 5 through 8 hereof.

3.    Rights as Stockholder.   On and after the Effective Date, and except to the extent specifically provided herein, the Participant will be entitled to all the rights of a stockholder with respect to the Restricted Stock, including the right to vote the shares of Restricted Stock, the right to receive dividends and other distributions payable with respect to the shares of Restricted Stock, and the right to participate in any capital adjustment applicable to all holders of Common Stock. Notwithstanding the foregoing, a distribution with respect to shares of Common Stock, other than a regular cash dividend, will be deposited with the Company and will be subject to the same restrictions as the Restricted Stock.   If the Participant forfeits any rights he or she may have under this Award, the

1

Participant will, on the day following the event of forfeiture, no longer have any rights as a stockholder with respect to the forfeited portion of the Restricted Stock or any interest therein (or with respect to any shares of Restricted Stock not then vested), and the Participant will no longer be entitled to receive dividends with respect to the Restricted Stock or vote the Restricted Stock as of any record date occurring thereafter.

4.    Vesting; Effect of Termination of Employment.  The Participant's Restricted Stock will become vested as described in the following paragraph.

(a)    the Restricted Stock subject to this Award will vest on the following dates:

| Number of Shares Vested | Vested Date |
|---|---|
| 5,170 | August 31, 2006 |
| 5,171 | August 31, 2007 |
| 5,171 | August 31, 2008 |
| 5,171 | August 31, 2009 |
| 5,171 | August 31, 2010 |

(b)    Except as provided in subsection 4(c) below, if the Participant's employment with the Company and any of its Affiliates terminates before August 31, 2010 he or she will forfeit any portion of the Restricted Stock that has not yet then vested as of the date of the termination.  The Company will not have any further obligations to the Participant under this Agreement as to shares of Restricted Stock that are forfeited as provided herein.

(c)    At the direction of the Compensation Committee of the Company's Board of Directors, all or any portion of the Award will become vested upon the Participant's death or Permanent and Total Disability.

5.    Terms and Conditions of Distribution.  As soon as practicable upon the execution of this Agreement, the Company will cause its transfer agent to make a book entry account (a "BEA") reflecting the issuance of the Restricted Stock to the Participant. As soon as practicable upon the vesting of the Award, and assuming the Participant has paid to the Company, in cash, an amount sufficient to pay the withholding obligations with respect to the portion of the Award then vested, the Company will cause its transfer agent to make a BEA reflecting the removal of the restrictions on the portion of the Award that has vested.  The Company or its transfer agent will distribute to the Participant certificates for shares of Common Stock underlying the vested portion of the Award only after they vest if the Participant has paid the Company any required withholding obligations with respect to the vested shares, and only if the Participant requests a certificate.

2

Subject to the Participant's obligation to pay the Company, in cash, an amount sufficient to pay any applicable withholding obligations, if the Participant dies or becomes Permanently and Totally Disabled before the Company has made the BEA or distributed certificates for any shares of Common Stock, the Company will make the BEA or distribute certificates for those shares of Common Stock and, pursuant to Section 4(c) hereof, shares of Common Stock with respect to the balance of the Award which the Committee has determined will become vested upon the Participant's death or Permanent and Total Disability, to the Participant or, in the event of his or her death, to the beneficiary designated by the Participant on a form provided by the Company for this purpose. If the Participant failed to designate a beneficiary, the Company will make the BEA or distribute certificates for those shares of Common Stock in accordance with the Participant's will or, if the Participant did not have a will, in accordance with the laws of descent and distribution. The Company will make the BEA or distribute certificates for any undistributed shares of Common Stock to the appropriate recipient no later than six months after the Participant's death or Permanent and Total Disability.

Notwithstanding the foregoing, the Company will not make any BEA or distribute any shares of Common Stock under this Section 5 before the first date that those shares may be distributed to the Participant without penalty or forfeiture under federal or state laws or regulations governing short swing trading of securities. In determining whether a distribution would result in such a penalty or forfeiture, the Company and the Committee may rely upon information reasonably available to them or upon representations of the Participant's legal or personal representative.

6.     Transfer Restrictions; Legend on Stock Certificates. Notwithstanding anything to the contrary contained in this Agreement, pursuant to the terms of the Plan, no shares of Restricted Stock may be transferred by the Participant (by assignment, sale, pledge, hypothecation or otherwise) before they have vested.

While the Restricted Stock is maintained by the Company's transfer agent in uncertificated form in a book entry account, the account will bear an appropriate notation to the effect that the Restricted Stock included in it is subject to the restrictions of this Agreement. The Company may instruct its transfer agent to impose stop transfer instructions with respect to any unvested portion of this Award, or with respect to any vested shares of Common Stock that cannot be distributed to the Participant, his or her beneficiary, or his or her estate because the withholding tax obligations have not been paid to the Company or because distributing the shares would violate federal or state laws or regulations regarding short swing profits in trading of securities.

The foregoing notation and stop transfer instructions will be removed from the account maintained for all or any portion of this Award after the conditions set forth in Sections 4 and 5 of this Agreement and this Section 6 have been satisfied.

3

7.    <u>Delivery of Certificates</u>.  Despite the provisions of Sections 4 and 5 of this Agreement, the Company is not required to issue or deliver any certificates for shares of Common Stock underlying any vested portion of this Award if at any time the Company determines that the listing, registration or qualification of such shares of Common Stock upon any securities exchange or under any law, or the consent and approval of any governmental body, or the taking of any other action is necessary or desirable as condition of, or in connection with, the delivery of the shares of Common Stock hereunder, unless listing, registration, qualification, consent, approval or other action has been effected or obtained, free of any conditions not acceptable to the Company.

8.    <u>Withholding Tax</u>.  By executing this Award agreement, the Participant has agreed to satisfy any withholding taxes, whether federal or state, triggered by the distribution of shares of Common Stock underlying the Restricted Stock granted pursuant to this Award or, if the Participant has executed a Section 83(b) Election, by the grant of this Award.  The Participant must satisfy the withholding obligation by rendering cash payment to the Company.

9.    <u>No Right to Employment or Service</u>.  Nothing in the Plan or this Agreement will be construed as creating any right in the Participant to continued employment with the Company, or as altering or amending the existing terms and conditions of the Participant's employment.

10.   <u>Breach of Restrictive Covenant</u>.  The Participant agrees and acknowledges that if the Participant breaches any non-compete, non-solicitation or non-disclosure provision of any agreement between the Participant and the Company, including without limitation any restrictive covenant contained in the Participant's employment agreement, the breach will result in the immediate termination of this Award and the forfeiture of the Restricted Stock granted to him or her under this Award Agreement, even if and to the extent it may already have vested.

11.   <u>Nontransferability</u>.  No interest of the Participant or any designated beneficiary in or under this Agreement may be assigned or transferred by voluntary or involuntary act or by operation of law, other than as set forth in Section 5 of this Agreement.  Distribution of shares underlying any vested portion of this Award will be made only to the Participant; or, if the Committee has been provided with evidence acceptable to it that the Participant is legally incompetent, the Participant's personal representative; or, if the Participant is deceased, to the designated beneficiary or other appropriate recipient in accordance with Section 5 of this Agreement.  The Committee may require personal receipts or endorsements of a Participant's personal representative, designated beneficiary or alternate recipient, and the Committee will extend to those individuals the rights otherwise exercisable by the Participant with regard to any withholding tax election in accordance with Section 5 of this Agreement.  Any effort to otherwise assign or transfer the rights under this Agreement will be wholly ineffective, and will be grounds for termination by the Committee of all rights of the Participant and his or her beneficiary in and under this Agreement.

4

12.     <u>Administration; Plan Document Controls</u>.  The Compensation Committee of the Company's Board of Directors (the "Committee") has the authority to manage and supervise the administration of the Plan.   Notwithstanding anything in this Agreement to the contrary, the terms of this Agreement will be subject to the terms of the Plan to the same extent and with the same effect as if set forth fully herein.  If the terms of this Agreement conflict with the terms of the Plan, the Plan will control.  The Committee has the right to resolve all questions which may arise in connection with this Agreement.   This Agreement is subject to all interpretations, determinations, or other actions made or taken by the Committee regarding the Plan or this Agreement, which interpretations, determinations or other actions will be final, binding and conclusive.

13.     <u>Entire Agreement; Governing Law</u>.  The Plan, this Agreement and any documents expressly referred to herein constitute the entire agreement of the parties with respect to the subject matter hereof and any and all prior oral or written representations are merged into this Agreement.   This Agreement and all determinations made and actions taken pursuant hereto, to the extent not otherwise governed by the Code or the laws of the United States, will be governed by the laws of the State of Illinois, without giving effect to the principles of conflicts of law.

14.     <u>Severability</u>.  If any provision of this Agreement is held to be illegal or invalid for any reason, the illegality or invalidity will not affect the remaining parts of the Agreement, and the Agreement will be construed and enforced as if the illegal or invalid provision had not been included.

15.     <u>Binding Effect</u>.  This Agreement will be binding upon and will inure to the benefit of the Company and the Participant and, as and to the extent provided herein, their respective heirs, executors, administrators, legal representatives and assigns.

16.     <u>Amendment and Waiver</u>.  The provisions of this Agreement may be amended or waived only by written agreement between the Company and the Participant, and no course of conduct or failure or delay in enforcing the provisions of this Agreement will affect the validity, binding effect or enforceability of this Agreement.

The Participant acknowledges receipt of a copy of the Plan and represents that he or she is familiar with the terms and provisions of the Plan, and hereby accepts this Award subject to all of the terms and provisions of the Plan effective as of the Date of Grant. The Participant has reviewed the Plan and this Agreement in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Agreement and fully understands all provisions of the Plan and this Agreement.

IN WITNESS WHEREOF, the Company and the Participant have duly executed this Agreement as of the day and year described in the first paragraph above.

NAVIGANT CONSULTING, INC.

By: _____

Its: ___Executive Director___


Participant:

___Jess Paul Vaughere___
(Participant's Signature)

___JESS VANUGHERE___
Name Printed

Dated: ___9/13/05___

Residence Address:

___14, BAYBERRY ROAD___
___ARMONK, NY 10504___

6

# EXHIBIT E

Stephanie Davis                                                    7/21/2003

# CONFIDENTIALITY AND PROPERTY AGREEMENT

Navigant Consulting, Inc., its subsidiaries, divisions and affiliated entities (collectively, the "**NCI**") is an industry leader in many respects. As an employee/expert of NCI, NCI has or will provide me with very valuable information regarding its business and the businesses of its clients. Such information is confidential and may not be disclosed. NCI requires that all current and former employees/experts of NCI honor and respect the confidentiality of this information.

In consideration of my relationship with NCI, I hereby agree that I will keep confidential and not publish, use or disclose to any other individual or entity, either directly or indirectly, any Confidential Information. "**Confidential Information**" means any information, whether written or not, of or concerning NCI, its business, consultants, customers and/or clients that is not generally known in the industry or by its competitors, or that has been treated by NCI as confidential, or that is of competitive advantage to NCI. My obligation to not disclose any Confidential Information shall continue during and after my working relationship with NCI. I also understand that NCI does not wish to incorporate any unlicensed or unauthorized material into its products or services or those of its affiliates and I agree not to do so.

I acknowledge and agree that all client lists, supplier lists, computer hardware and software, source and object code, promotional material and training material that I obtain from or while I am employed by or associated with NCI, and all other Confidential Information, are the property of NCI. I agree that at the termination of my working relationship with NCI or otherwise at its request, I shall immediately return all NCI property and other Confidential Information to NCI, including all copies thereof. The purpose of this transfer is, among other things, to maintain the integrity of client matters and NCI business that an employee/expert had involvement in at NCI. I further agree that at the termination of my working relationship with NCI, I will not engage in work of any sort on any matters on which I have worked and which are in progress at the time of my termination, except as otherwise agreed to by NCI.

I acknowledge and agree that (a) all ideas, inventions, designs, processes, discoveries, enhancements, plans, writings, and other developments or improvements (the "**Inventions**") made or conceived by me, alone or with others, during the term of his/her engagement, whether or not during working hours, relating in any manner to the actual or anticipated business, research or development work of NCI are the sole and exclusive property of NCI and (b) all of the Inventions eligible under the copyright laws are "work made for hire", except that the foregoing does not apply to (i) Inventions to which a individual or entity other than me has an exclusive right pursuant to a written agreement with me entered into prior to my employment or affiliation with NCI or (ii) Inventions to which the Chief Executive Officer of NCI has been notified in writing and to which he, in his sole discretion, has agreed to exclude from the provisions hereof by written notification to me and to which I assign NCI a perpetual, non-exclusive, royalty-free right to use such Inventions for its own benefit and for the benefit of its clients. **I have been notified that to the extent provided by the Employee Patent Act, Illinois Public Act 83-493, the provisions of this section shall not apply to any Inventions for which no equipment, supplies, facility or trade secret information of NCI was used and which were developed entirely on my own time, unless (A) the Invention relates (1) to the business**

3

Stephanie Davis                                                                                                7/21/2003

of NCI, or (2) **to actual or demonstrably anticipated research or development of NCI, or (B) the Invention results from any work performed by me for NCI.**  At the request of and without charge to NCI (other than my out-of-pocket expenses), I will do all things deemed by NCI to be reasonably necessary to perfect title to the Inventions in NCI and to assist in obtaining for NCI such patents, copyrights or other protection as may be provided under law and desired by NCI, including but not limited to executing and signing any and all relevant applications, assignments or other instruments.

I acknowledge that I may become aware of "material" nonpublic information relating to NCI and its clients whose stock is publicly traded.  I acknowledge that I am prohibited by law as well as by NCI policy from trading in the shares of NCI and such clients while in possession of such information or directly or indirectly disclosing such information to any other persons so that they may trade in these shares.  I understand that I am also prohibited from trading in shares of NCI except during authorized trading windows, which are set forth in NCI's Insider Trading and Tipping Compliance Procedures and Guidelines from time to time. I understand that "material" information may include any information, positive or negative, which might be of significance to an investor in determining whether to purchase, sell or hold the stock of publicly traded clients. Information may be significant for this purpose even if it would not alone determine the investor's decision.   Examples include a potential business acquisition, internal financial information that might depart in any way from what the market would expect, the acquisition or loss of a major contract, or an important financing transaction.

I agree that nothing contained herein creates any right of employment or limit or restrict NCI's right to terminate my employment at any time with or without cause.

I acknowledge and agree that in the event of a breach by me, NCI will suffer irreparable harm and that, in addition to any and all other remedies that may be available to NCI at law or in equity, any court of competent jurisdiction may issue a decree of specific performance or issue a temporary and permanent injunction, without the necessity of NCI posting bond or furnishing other security.

**EMPLOYEE/EXPERT:**

_Stephanie Davis_
Signature

_Stephanie Davis_
Print Name

_July 23, 2003_
Date

4

# EXHIBIT F



## CONFIDENTIALITY AND PROPERTY AGREEMENT

Navigant Consulting, Inc., its subsidiaries, divisions and affiliated entities (collectively, the "**Company**") is an industry leader in many respects. As an employee/expert of the Company, the Company has or will provide me with very valuable information regarding its business and the businesses of its clients. Such information is confidential and may not be disclosed. The Company requires that all current and former employees/experts of the Company honor and respect the confidentiality of this information.

In consideration of my relationship with the Company, I hereby agree that I will keep confidential and not publish, use or disclose to any other individual or entity, either directly or indirectly, any Confidential Information. "**Confidential Information**" means any information, whether written or not, of or concerning the Company, its business, consultants, customers and/or clients that is not generally known in the industry or by its competitors, or that has been treated by the Company as confidential, or that is of competitive advantage to the Company. My obligation to not disclose any Confidential Information shall continue during and after my working relationship with the Company. I also understand that the Company does not wish to incorporate any unlicensed or unauthorized material into its products or services or those of its affiliates and I agree not to do so.

I acknowledge and agree that all client lists, supplier lists, computer hardware and software, source and object code, promotional material and training material that I obtain from or while I am employed by or associated with the Company, and all other Confidential Information, are the property of the Company. I agree that at the termination of my working relationship with the Company or otherwise at its request, I shall immediately return all Company property and other Confidential Information to the Company, including all copies thereof. The purpose of this transfer is, among other things, to maintain the integrity of client matters and Company business that an employee/expert had involvement in at the Company. I further agree that at the termination of my working relationship with the Company, I will not engage in work of any sort on any matters on which I have worked and which are in progress at the time of my termination, except as otherwise agreed to by the Company.

I acknowledge and agree that (a) all ideas, inventions, designs, processes, discoveries, enhancements, plans, writings, and other developments or improvements (the "**Inventions**") made or conceived by me, alone or with others, during the term of his/her engagement, whether or not during working hours, relating in any manner to the actual or anticipated business, research or development work of the Company are the sole and exclusive property of the Company and (b) all of the Inventions eligible under the copyright laws are "work made for hire," except that the foregoing does not apply to (i) Inventions to which a individual or entity other than me has an exclusive right pursuant to a written agreement with me entered into prior to my employment or affiliation with the Company or (ii) Inventions to which the Chief Executive Officer of the Company has been notified in writing and to which he, in his sole discretion, has agreed to exclude from the provisions hereof by written notification to me and to which I assign the Company a perpetual, non-exclusive, royalty-free right to use such Inventions for its own benefit and for the benefit of its

clients. I have been notified that to the extent provided by the Employee Patent Act, Illinois Public Act 83-493, the provisions of this section shall not apply to any Inventions for which no equipment, supplies, facility or trade secret information of the Company was used and which were developed entirely on my own time, unless (A) the Invention relates (1) to the business of the Company, or (2) to actual or demonstrably anticipated research or development of the Company, or (B) the Invention results from any work performed by me for the Company. At the request of and without charge to the Company (other than my out-of-pocket expenses), I will do all things deemed by the Company to be reasonably necessary to perfect title to the Inventions in the Company and to assist in obtaining for the Company such patents, copyrights or other protection as may be provided under law and desired by the Company, including but not limited to executing and signing any and all relevant applications, assignments or other instruments.

I acknowledge that I may become aware of "material" nonpublic information relating to the Company and its clients whose stock is publicly traded. I acknowledge that I am prohibited by law as well as by Company policy from trading in the shares of the Company and such clients while in possession of such information or directly or indirectly disclosing such information to any other persons so that they may trade in these shares. I understand that I am also prohibited from trading in shares of the Company except during authorized trading windows, which are set forth in the Company's Insider Trading and Tipping Compliance Procedures and Guidelines from time to time. I understand that "material" information may include any information, positive or negative, which might be of significance to an investor in determining whether to purchase, sell or hold the stock of publicly traded clients. Information may be significant for this purpose even if it would not alone determine the investor's decision. Examples include a potential business acquisition, internal financial information that might depart in any way from what the market would expect, the acquisition or loss of a major contract, or an important financing transaction.

I agree that nothing contained herein creates any right of employment or limit or restrict the Company's right to terminate my employment at any time with or without cause.

I acknowledge and agree that in the event of a breach by me, the Company will suffer irreparable harm and that, in addition to any and all other remedies that may be available to the Company at law or in equity, any court of competent jurisdiction may issue a decree of specific performance or issue a temporary and permanent injunction, without the necessity of the Company posting bond or furnishing other security.

_____

Employee Signature

_____

Print Name

_____

Date

# EXHIBIT G



## CONFIDENTIALITY AND PROPERTY AGREEMENT

Navigant Consulting, Inc., its subsidiaries, divisions and affiliated entities (collectively, the "Company") is an industry leader in many respects. As an employee/expert of the Company, the Company has or will provide me with very valuable information regarding its business and the businesses of its clients. Such information is confidential and may not be disclosed. The Company requires that all current and former employees/experts of the Company honor and respect the confidentiality of this information.

In consideration of my relationship with the Company, I hereby agree that I will keep confidential and not publish, use or disclose to any other individual or entity, either directly or indirectly, any Confidential Information. "Confidential Information" means any information, whether written or not, of or concerning the Company, its business, consultants, customers and/or clients that is not generally known in the industry or by its competitors, or that has been treated by the Company as confidential, or that is of competitive advantage to the Company. My obligation to not disclose any Confidential Information shall continue during and after my working relationship with the Company. I also understand that the Company does not wish to incorporate any unlicensed or unauthorized material into its products or services or those of its affiliates and I agree not to do so.

I acknowledge and agree that all client lists, supplier lists, computer hardware and software, source and object code, promotional material and training material that I obtain from or while I am employed by or associated with the Company, and all other Confidential Information, are the property of the Company. I agree that at the termination of my working relationship with the Company or otherwise at its request, I shall immediately return all Company property and other Confidential Information to the Company, including all copies thereof. The purpose of this transfer is, among other things, to maintain the integrity of client matters and Company business that an employee/expert had involvement in at the Company. I further agree that at the termination of my working relationship with the Company, I will not engage in work of any sort on any matters on which I have worked and which are in progress at the time of my termination, except as otherwise agreed to by the Company.

I acknowledge and agree that (a) all ideas, inventions, designs, processes, discoveries, enhancements, plans, writings, and other developments or improvements (the "Inventions") made or conceived by me, alone or with others, during the term of his/her engagement, whether or not during working hours, relating in any manner to the actual or anticipated business, research or development work of the Company are the sole and exclusive property of the Company and (b) all of the Inventions eligible under the copyright laws are "work made for hire," except that the

foregoing does not apply to (i) Inventions to which a individual or entity other than me has an exclusive right pursuant to a written agreement with me entered into prior to my employment or affiliation with the Company or (ii) Inventions to which the Chief Executive Officer of the Company has been notified in writing and to which he, in his sole discretion, has agreed to exclude from the provisions hereof by written notification to me and to which I assign the Company a perpetual, non-exclusive, royalty-free right to use such Inventions for its own benefit and for the benefit of its clients. I have been notified that to the extent provided by the Employee Patent Act, Illinois Public Act 83-493, the provisions of this section shall not apply to any Inventions for which no equipment, supplies, facility or trade secret information of the Company was used and which were developed entirely on my own time, unless (A) the Invention relates (1) to the business of the Company, or (2) to actual or demonstrably anticipated research or development of the Company, or (B) the Invention results from any work performed by me for the Company. At the request of and without charge to the Company (other than my out-of-pocket expenses), I will do all things deemed by the Company to be reasonably necessary to perfect title to the Inventions in the Company and to assist in obtaining for the Company such patents, copyrights or other protection as may be provided under law and desired by the Company, including but not limited to executing and signing any and all relevant applications, assignments or other instruments.

I acknowledge that I may become aware of "material" nonpublic information relating to the Company and its clients whose stock is publicly traded. I acknowledge that I am prohibited by law as well as by Company policy from trading in the shares of the Company and such clients while in possession of such information or directly or indirectly disclosing such information to any other persons so that they may trade in these shares. I understand that I am also prohibited from trading in shares of the Company except during authorized trading windows, which are set forth in the Company's Insider Trading and Tipping Compliance Procedures and Guidelines from time to time. I understand that "material" information may include any information, positive or negative, which might be of significance to an investor in determining whether to purchase, sell or hold the stock of publicly traded clients. Information may be significant for this purpose even if it would not alone determine the investor's decision. Examples include a potential business acquisition, internal financial information that might depart in any way from what the market would expect, the acquisition or loss of a major contract, or an important financing transaction.

I agree that nothing contained herein creates any right of employment or limit or restrict the Company's right to terminate my employment at any time with or without cause.

I acknowledge and agree that in the event of a breach by me, the Company will suffer irreparable harm and that, in addition to any and all other remedies that may be available to the Company at law or in equity, any court of competent jurisdiction may issue a decree of specific performance or issue a temporary and permanent injunction, without the necessity of the Company posting bond or furnishing other security.

_Thomas W. Ellis_
Employee Signature

_THOMAS W. ELLIS_
Print Name

_6/4/2006_
Date