# EXHIBIT 1

07/15/2005 11:40 FAX    202 973 2401    NAVIGANT CONSULTING    @002



NAVIGANT
CONSULTING

1801 K Street NW, Suite 500
Washington, DC 20006
202.973.2400  phone
202.973.2401  fax

**CONFIDENTIAL**

June 29, 2005

Mr. Jess Varughese
14 Bayberry Road
Armonk, New York 10504

Subject: Offer of Employment

Dear Jess,

We are impressed with you and your background. Navigant Consulting, Inc. (NCI) is pleased to offer you employment as a Managing Director within the Financial Insurance & Claims Group and be assigned to the New York office.

The following terms will apply to this offer of employment:

- **Base Salary:** Your salary will be $450,000, payable at a rate of $17,308 per biweekly pay period, based on 26 pay periods per year.

- **Employment Incentive Bonus:** You will be paid a one-time Employment Incentive Bonus totaling $350,000 with your first paycheck. This payment will be subject to regular withholding and to your executing the attached Employment Incentive Recovery Agreement. Please note that you must be employed by NCI when the incentive payment is due in order to receive the payment.

- **Annual Variable Incentive Compensation:** You will be eligible to participate in NCI's Variable Incentive Compensation program in 2005. This program provides annual cash payments made in the first quarter of the year following each fiscal year. Payment would be contingent on the financial performance of NCI, the achievement of certain goals by the Financial Insurance & Claims Practice, your personal utilization rate and your performance the prior fiscal year.

  As a Managing Director, 80% of your earned incentive compensation will be paid in cash and 20% will be paid in restricted shares. You will be given a special election to take an additional 20% of your cash bonus in the form of restricted shares if you choose. All of these restricted shares will vest 100% in six months. In addition, NCI will grant you additional restricted shares equal to 35% of all the restricted shares earned through the Incentive Compensation Plan. The NCI granted restricted shares vest over eighteen months from date of grant.

- **Initial Equity Grant:** You will be granted restricted shares of NCI common stock under NCI's 2005 Long-Term Incentive Plan in an amount equal to $500,000, calculated based upon the closing price of NCI shares on your date of hire. A copy of this plan will be provided to you after you start. The restricted shares will vest according to the following schedule: 20% (percent) following one year of employment, 20% (percent) following two years of employment, 20% (percent) following three years of employment, 20% (percent) following four years of employment and 20% following five years of

07/15/05  10:45 FAX 202 973 2401          NAVIGANT CONSULTING                    ☑003
07/15/2005 11:40 FAX                                                               ☑003

Mr. Jess Varughese                                                      June 29, 2005

employment.  If your employment terminates due to your Death or Disability as defined in NCI's 2005 Long-Term Incentive Plan, your restricted shares will continue to vest in accordance with the preceding sentence.

- **Stock Ownership Guidelines:** NCI has adopted Stock Ownership Guidelines to align the interests of its key employees and public shareholders. As a Managing Director, you will be expected, over time, to achieve and maintain minimum stock ownership equal to 1.5 times your annual base salary. Copies of the Stock Ownership Guidelines and other NCI policies will be provided to you after you start.

- **401(k) Plan:** Participation in NCI's 401(k) Plan, subject to the rules in effect and amended from time to time. The plan allows employees to contribute a portion of their salary, through payroll deduction, to a retirement savings program on a pre-tax basis. For the first 3% of a participant's eligible compensation that is contributed, the company will match dollar per dollar. In addition, our Plan allows a Catch-up Contribution for those age 50 and up, based on guidelines provided each year by the IRS. The catch-up contribution is not eligible for the company match.

- **Employee Stock Purchase Plan:** Participation in the NCI Employee Stock Purchase Plan, subject to the rules in effect from time to time.  The plan allows employees to contribute up to 15 percent of their salary that will then be used to make quarterly purchases of NCI stock. The stock purchase price is determined by the closing price of the stock on the last day of the quarter, less a 15 percent employee discount.

- **Group Insurance Program:**  Participation in NCI's group insurance program, subject to the requirements established by the group insurance carriers.  Our plans currently include group life insurance, disability insurance, and optional group medical, dental and vision insurance.  Group medical, dental, and vision insurance are available for both employees and dependents.  Certain participation costs for each of these plans are borne by the employees.  The effective date for the insurance programs is the first of the month following hire date.

- **Discretionary Time Off:**  You will be eligible for the Discretionary Time Off (DTO) program. Under this program, employees may take paid time off at their discretion.  Employees are encouraged to schedule their time off in accordance with NCI, client, and personal needs. Although we do not define a standard number of days for DTO, we consider 20 business days to be reasonable.

- **Severance:**  In the event that NCI terminates your employment other than for Cause, as defined below, NCI will pay you within 30 days of such termination a Severance Amount as follows. If such termination occurs prior to the first anniversary of your start date, the Severance Amount will equal nine months of your Base Salary (i.e., $337,500). The Severance Amount will increase by one month's Base Salary for each additional full year of employment, up to a maximum of 12 months Base Salary (i.e. $450,000).  As used in this offer of employment, "Cause" means (i) conviction or plea of nolo contendere to a felony or any other crime that is injurious to the Company, to a Company employee or to a client of the Company; (ii) wilful misconduct, dishonesty, fraud, or attempted fraud with respect to the Company, to a Company employee or to a client of the Company; (iii) any material breach of fiduciary duty owed to the Company or to a client of the Company; (iv) any material breach of the terms of any agreement with the Company (including without limitation any employment agreement and any agreement regarding non-competition, non-solicitation of clients or employees, or confidentiality); (v) any material violation of a restriction on disclosure or use of privileged, proprietary or confidential information (including information belonging to the Company, to a client of the Company or to a third party to whom the Company owes a duty of

Mr. Jess Varughese                                                                June 29, 2005

confidentiality), but only if such violation is committed with actual notice of such restriction on disclosure; or (vi) any other material breach of the Company's Code of Business Conduct and Ethics or its securities trading policies, as amended from time to time; provided, however, that in the case of any alleged action constituting Cause under clauses (ii), (iii), (iv), (v) or (vi), you are provided written notice specifying the proscribed conduct and a reasonable opportunity to cure the alleged breach or violation at issue.

This offer of employment is extended with the understanding that you will join our New York office but be available to travel to other offices or client locations as necessary.

As a condition of employment with NCI, you will be asked to sign the attached Agreement Regarding Confidential Information, Intellectual Property and Non-Solicitation. Upon acceptance of this offer, please review this agreement, sign and return with executed offer letter. Copies will then be provided to you. This offer of employment is conditioned on your reviewing and signing this agreement and your willingness thereafter to abide by its terms. NCI acknowledges that you have shared with us the applicable restrictive covenants in your employment agreement with your current employer and you acknowledge that NCI has informed you that it expects you to abide by all such restrictive covenants in accordance with their terms. The parties agree that NCI's offer and your acceptance of this offer are not intended to and, to the best of their knowledge, will not interfere with or violate any contractual or legal obligation that you have to your current employer.

On your start date, please be prepared to provide two forms of valid identification, one of which must contain a picture, to complete the I-9 form. Acceptable forms of identification include your passport or driver's license and social security card or birth certificate. This offer is subject to your providing us with acceptable documentation establishing your current authorization to work in the United States.

This offer of employment is contingent upon completion of an employment application and satisfactory check of business references and background check.

It is understood that you are not being offered employment for a definite period of time and that either you or NCI may terminate the employment relationship at any time and for any reason without prior notice. Nothing in NCI's offer to you should be interpreted as creating anything other than an at-will employment relationship. In addition, NCI reserves the right to periodically review and adjust each of its compensation and benefit programs it offers to you in its sole discretion.

We are delighted at the prospect of you joining NCI. This offer will expire on 5 p.m. EST on Friday, July 15, 2005, if your prior written acceptance is not received.

Sincerely,

Navigant Consulting, Inc.

By: _Doug A. Reichert_

Doug Reichert
Executive Managing Director


Agreed and accepted:

Mr. Jess Varughese                                          June 29, 2005

By: _Jess Paul Varughese_
    Mr. Jess Varughese

Dated: _7/15/05_ , 2005

Please fax a signed copy of this letter and attachments to Mary Stafford, Operations Manager at 646-227-4299 and return an executed copy of this letter and attachments to Mary Stafford, Navigant Consulting Inc., The Chrysler Building, 666 Third Ave., 20th Floor, New York, New York 10017.

# EXHIBIT 2

LEXSEE 48 U.C.C. REP. SERV. 2D (CALLAGHAN) 1367

**HANGZHOU SILK IMPORT AND EXPORT CORPORATION, Plaintiff, - against - P.C.B. INTERNATIONAL INDUSTRIES, INC. d/ b/ a PATRICK CHRISTO-PHER, Defendant.**

**00 Civ. 6344 (RLC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2002 U.S. Dist. LEXIS 16578; 48 U.C.C. Rep. Serv. 2d (Callaghan) 1367*

**September 4, 2002, Decided
September 5, 2002, Filed**

**DISPOSITION:**    [*1]  Post-trial findings of fact, conclusions of law, and entry of judgment.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff garment manufacturer sued defendant garment sales company for goods sold and delivered, account stated, and quantum meruit. The garment sales company counterclaimed for delivery of nonconforming goods, fraud, and consequential damages. The case proceeded to trial.

**OVERVIEW:** The manufacturer claimed that it was owed for clothing delivered to the company. The company claimed that the clothing was defective, and not made at a particular facility claimed by the manufacturer. The court held that the manufacturer committed fraud when it showed the company one particular facility's high-quality production samples, but in fact, fulfilled the production order with garments from another facility, which produced a lower-quality garment. Further, even though the company never returned any goods to the manufacturer, and also performed acts inconsistent with the manufacturer's ownership of the garments by delivering them to the company's customers, the company was still entitled to bring suit for breach of contract or warranty. Specifically, the contract between the parties allowed 30 days to register a claim for nonconformity. Such a time frame was not manifestly unreasonable to inspect the goods and determine whether they were made to specifications. Finally, since the company had received payment from its customers for the bulk of its shipments from the manufacturer, the company was only entitled to damages for the nonconforming styles.

**OUTCOME:** The court found in favor of the company's fraud and breach of warranty counterclaims, and awarded the manufacturer $ 417,716.35 for goods sold and delivered, less damages for fraud and breach of warranty of $ 8,242.80, resulting in a net award to the manufacturer of $ 409,473.55, with interest accruing from November 22, 1999.

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > General Overview*
*Civil Procedure > Federal & State Interrelationships > Choice of Law > General Overview*
[HN1] When jurisdiction in a federal case is premised on diversity and both parties present arguments based on the law of the forum state, it is appropriate for the court to the law of the forum.

*Contracts Law > Consideration > Detrimental Reliance*
*Contracts Law > Consideration > Enforcement of Promises > General Overview*
*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN2] To establish a claim for fraud in the inducement of a contract, it is necessary for a party to show, with specificity, that another party made a representation of material fact that was untrue and that it knew to be untrue or recklessly made at the time it was given, offered to deceive the other party and induce it to rely thereon to its detriment.

2002 U.S. Dist. LEXIS 16578, *; 48 U.C.C. Rep. Serv. 2d (Callaghan) 1367

*Contracts Law > Contract Conditions & Provisions > Waivers > General Overview*
*Contracts Law > Defenses > Fraud & Misrepresentation > General Overview*
*Contracts Law > Remedies > Ratification*
[HN3] Acceptance of the benefits under a contract subsequent to the discovery of fraud constitutes affirmance of the contract and, therefore, acts as a bar to attempts by the defrauded party to rescind the contract. Whether under a waiver or ratification analysis, a party may not avoid an agreement on grounds of fraud if, after acquiring knowledge of the fraud, he affirms the contract by accepting a benefit under it. However, while a party cannot rescind a contract under these circumstances, it may still maintain a separate action for damages arising from the fraud. Upon discovering fraud, a purchaser may tender return of the property and seek rescission or he may retain the property and seek recovery of damages deriving from the fraud. A defrauded party to a contract may elect to either disaffirm the contract by a prompt rescission or stand on the contract and thereafter maintain an action at law for damages attributable to the fraud. The mere fact, however, of affirming or ratifying the contract by deciding to retain its fruits, as distinguished from approving of the fraud and deceit and waiving any right to redress on account thereof, is insufficient to show a waiver of the cause of action for damages. In short, ratification does not preempt a claim for damages arising from the fraud.

*Civil Procedure > Pleading & Practice > Pleadings > Counterclaims > General Overview*
*Contracts Law > Breach > General Overview*
*Contracts Law > Sales of Goods > Warranties > General Overview*
[HN4] When a buyer receives goods that are nonconforming, he is deemed to have accepted the goods pursuant to *U.C.C. § 2-606* when he signifies to the seller that he will retain them despite their nonconformity, fails to reject them after a reasonable opportunity to inspect them, or performs any act inconsistent with the seller's ownership. While acceptance normally obligates the buyer to pay the contract price for the goods, it does not prevent the buyer from interposing a counterclaim for breach of the underlying contract due to the nonconformity. A defendant's acceptance of nonconforming goods does not preclude a counterclaim for breach of contract or warranty. To establish such a claim for breach after acceptance, the buyer is required to provide timely notice to the seller of the breach.

*Commercial Law (UCC) > Sales (Article 2) > Breach, Repudiation & Excuse > Acceptance of Goods > Notice Requirements > General Overview*
*Commercial Law (UCC) > Sales (Article 2) > Performance > General Overview*
[HN5] See *U.C.C. § 2-607(3)*.

*Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > Reasonable Time & Seasonableness*
*Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview*
*Commercial Law (UCC) > Sales (Article 2) > Subject Matter > General Overview*
[HN6] According to *U.C.C. § 1-204*, whenever the U.C.C. specifies that some action be taken within a reasonable time, any time that is not manifestly unreasonable may be set by agreement.

*Business & Corporate Law > Agency Relationships > Duties & Liabilities > Authorized Acts of Agents > Unauthorized Acts*
*Business & Corporate Law > Agency Relationships > Ratification > Express & Implied Ratification*
[HN7] When a principal condones an agent's acts and accepts the benefits arising therefrom, the principal is bound by those acts even if the agent exceeded his authority by so acting.

*Contracts Law > Contract Conditions & Provisions > General Overview*
*Contracts Law > Defenses > General Overview*
*Contracts Law > Formation > Execution*
[HN8] Ignorance of the terms and conditions of a contract is no defense for a party that has already executed the contract. A party who signs a document without any valid excuse for having failed to read it is conclusively bound by its terms. Especially with regard to sophisticated business people, capable of resort to counsel for advice, as is the situation here, the law presumes that parties to a contract will only sign it if they fully understand its terms and conditions.

*Commercial Law (UCC) > General Provisions (Article 1) > General Overview*
*Commercial Law (UCC) > Sales (Article 2) > Breach, Repudiation & Excuse > Acceptance of Goods > Notice Requirements > Notice of Claim*
*Contracts Law > Sales of Goods > Breach, Repudiation & Excuse > Acceptance of Goods > Notice of Breach*

2002 U.S. Dist. LEXIS 16578, *; 48 U.C.C. Rep. Serv. 2d (Callaghan) 1367

[HN9] The Official Comment to *U.C.C. § 2-607* states that notice of a breach need not involve a claim for damages but instead need only be sufficient to let the seller know that the transaction is troublesome, thereby opening the way for settlement. *U.C.C. § 2-607*, Official Comment 4 states that there is not reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy. As the Official Comment further makes clear, the notification provisions of *U.C.C. § 2-607(3)* are intended to prevent commercial bad faith. *U.C.C. § 2-607*, Official Comment 4.

*Commercial Law (UCC) > Sales (Article 2) > Subject Matter > Goods > General Overview*
*Contracts Law > Defenses > Fraud & Misrepresentation > General Overview*
*Contracts Law > Sales of Goods > Breach, Repudiation & Excuse > General Overview*
[HN10] Where a party has been fraudulently induced to enter a contract, the measure of damages is governed by the out-of-pocket rule: the loss occasioned by the fraud or the consideration paid to the party responsible for the fraud, less the value of the goods received. The measure of damages for breach of contract or warranty with respect to accepted goods is the difference between the fair market value of the goods accepted and their fair market value if they had been as warranted. *U.C.C. § 2-714*.

*Contracts Law > Defenses > Fraud & Misrepresentation > General Overview*
*Contracts Law > Sales of Goods > Breach, Repudiation & Excuse > Acceptance of Goods > General Overview*
*Contracts Law > Sales of Goods > Warranties > General Overview*
[HN11] In an action for fraud, a party is allowed to recover consequential damages stemming from the fraud, and in an action for breach of contract or warranty with regard to accepted goods, the buyer can recover consequential and incidental damages. *U.C.C. §§ 2-714, 2-715*. Under New York law, consequential damages for a breach of contract or warranty claim can include loss of goodwill, including the loss of customers, future profits, and harm to business reputation. Above all, it is well-settled that an award of damages cannot be speculative in nature. Damages may only be allowed when there is probative evidence of the amount of damages. And while, where damages cannot be precisely proved, proof upon a reasonable basis is sufficient, no damages may be awarded on a purely speculative basis. It is fundamental in the law of damages that damages must be proved, and will not be presumed, even though a wrong, such as a breach of contract, is shown.

*Contracts Law > Remedies > Compensatory Damages > General Overview*
*Contracts Law > Sales of Goods > Damages & Remedies > General Overview*
[HN12] To succeed on a claim for consequential damages in the form of loss of goodwill, a party must make three showings: (1) that a loss of goodwill did in fact occur; (2) objective proof of the amount of that loss; and (3) that the loss was caused by the opposing party's breach. The loss must be reasonably certain in amount, and an award cannot stand if based on little more than guesswork.

*Contracts Law > Remedies > Compensatory Damages > General Overview*
*Contracts Law > Remedies > Foreseeable Damages > Lost Profits*
[HN13] If a new business is seeking to recover for loss of future profits due to a breach of a contract with another party, a stricter standard is imposed for the obvious reason that there does not exist a reasonable basis of experience upon which to estimate lost profits with the requisite degree of reasonable certainty.

**COUNSEL:** ELLIOT L. SCHAEFFER, STEVEN J. LUCKNER, Of Counsel, SCHAEFFER & KRONGOLD LLP, New York, New York, for Plaintiff.

ROBERT K. ERLANGER, Of Counsel, DWYER & BRENNAN, New York, New York, for Defendant.

**JUDGES:** ROBERT L. CARTER, U.S.D.J.

**OPINION BY:** ROBERT L. CARTER

**OPINION**

ROBERT L. CARTER, District Judge

Plaintiff Hangzhou Silk Import and Export Corporation ("Hangzhou"), a garment manufacturer located in Hangzhou Province, China, sues for goods sold and delivered, account stated, and quantum meruit in the amount of $ 417,716.35. Defendant P.C.B. International Industries, Inc. d/ b/ a Patrick Christopher ("PCB"), a garment sales company with its principal place of business in New York, New York, counterclaims for delivery of nonconforming goods, fraud, and consequential damages. The case was tried to the court on April 29-30, 2002. Post-trial findings of fact and conclusions of law were submitted on June 3, 2002.

BACKGROUND

Case 1:07-cv-04854-PKL     Document 8-2     Filed 07/19/2007     Page 10 of 64

Page 4
2002 U.S. Dist. LEXIS 16578, *; 48 U.C.C. Rep. Serv. 2d (Callaghan) 1367

The following facts were established at trial. Richard Blauner, president of defendant PCB, traveled to China [*2] in June, 1998 to find a factory to produce garments for PCB to sell in the United States. He sought to develop a high-quality garment business operation that would import garments from China, produced to the specifications of PCB's Secretary-Treasurer and designer, Patricia Blauner, for sale to retailers in the United States such as Neiman Marcus. On June 7, 1998, in Hangzhou Province, China, Richard Blauner, through a contact named Peter Wang, was introduced to an individual by the name of Xiaoli Wang, a merchandiser with Hangzhou, who proceeded to take Blauner and Peter Wang on a tour of a factory. Upon meeting Richard Blauner, Xiaoli Wang gave him a business card with the name, "Feng Xiao Gao," and a company name, "Hangzhou Jiang Gneng Silk Clothing Manufacturing Limited," on it. Richard Blauner understood the card to be Xiaoli Wang's and Xiaoli Wang represented to him that he was the owner of the factory that Blauner was being shown, later determined to be Xiang Gneng Garment Factory ("Xiang Gneng"). (Tr. at 161-162.) Richard Blauner described the factory he saw that day as consisting of three or four buildings with a circular driveway, a very large fountain in the center, and [*3] the name "Hangzhou Silk Jiang Gneng" in English printed on an exterior sign. (Tr. at 163.) During the tour, Richard Blauner testified that he saw numerous examples of high quality merchandise, including thousands of finished and semi-finished garments. (Tr. at 163-64.)

After returning to the United States, on June 19, 1998 Richard Blauner informed Xiaoli Wang by fax that he found the factory he toured with him to be excellent, emphasized his commitment to provide work to it, and that he was aiming for shipments to commence in November, 1998. (Tr. at 172.; Def.'s Exh. 1.) Xiaoli Wang, in turn, forwarded to PCB two very high-quality garments that Richard Blauner accepted as samples, a "Hugo Buscati" jacket and shirt and an "Anna and Frank" blouse. In early July, 1998, Richard Blauner asked Xiaoli Wang to make a few counter-samples using PCB's patterns. Immediately, problems were apparent with the counter-samples. Due to the poor counter-samples, Richard Blauner suspected that they were produced at a factory other than the factory he had toured with Xiaoli Wang. When Richard Blauner directly questioned Xiaoli Wang about the factory, his suspicions were confirmed. In a faxed letter from [*4] Xiaoli Wang, dated July 10, 1998, Wang disclosed that the garments were being made at Xing Yi factory instead of the one Richard Blauner had toured. (See Pl.'s Exh. A2.) While Xiaoli Wang later disputed that the factory he had first shown Richard Blauner was Xiang Gneng, claiming instead that it was called Xiang Yu and did not have any fountain or a sign written in English in front of it, (Tr. at

7, 14-15, 146.), he admitted that the garments were manufactured at a new factory, Xing Yi, and insisted that it was actually a better factory than the one toured by Richard Blauner. (Pl.'s Exh. A2.)

At Xing Yi, Xiaoli Wang was in charge of quality control for the production of PCB's garments and communicated with Cary Tsang, PCB's production consultant, who would notify Xiaoli Wang of quality problems with the counter-samples and send him specifications and cutting tickets for garment production. Four to five times per year, Tsang would visit Xing Yi, accompanied by Xiaoli Wang. Tsang also had his own quality control person based in Shanghai who would visit Xing Yi intermittently. When Tsang identified any problem in production, he would bring it to Xiaoli Wang's attention. Sometimes [*5] the problems were remedied and other times they were not. (Tr. at 82-83.)

Defendant PCB asserts that the quality of plaintiff Hangzhou's work was spotty and inconsistent from the beginning of their dealings with each other. Richard Blauner testified that the quality of one of the first shipments that PCB received from Hangzhou, a sportswear order, was "inconsistent to poor." (Tr. at 176.) Sleeve lengths were eight inches longer than the patterns required and the seam allowances were not to specifications. Patricia Blauner echoed this appraisal of the garments. (Tr. at 200.) Similarly, Tsang, in general, recalled numerous complaints about the quality of the garments Hangzhou produced for PCB. (Tr. at 112-13.)

On December 28, 1998, Richard Blauner wrote a letter to Xiaoli Wang notifying him of the problems with the first set of garments. (See Def.'s Exh. 9.) On January 6, 1999, Tsang faxed another letter to Xiaoli Wang, the subject of which was defective panama linen fabric found in finished garments. (See Def.'s Exh. 10.) On January 25 and 27, 1999, respectively, Tsang faxed Xiaoli Wang in regard to switched hang-tags in a shipment of pants and jackets and poor pressing in [*6] silk samples resulting in "puckering." (See Def.'s Exhs. 12, 13.) On March 4, 1999, Tsang faxed Xiaoli Wang about three defects in a bulk linen garment shipment. (See Def.'s Exh. 15.) The shipment was in two different shades of white, the pressing problem reappeared, and a thinner poly bag was used to ship the garments than the bag that was ordered. (Id.) On March 22, 1999, Tsang faxed Xiaoli Wang concerning 87 garments that PCB's customers had returned because they were ivory and not bleached white as ordered. (See Def.'s Exh. 33.) Additional complaints by Tsang were registered with Xiaoli Wang regarding, among other things, a defective shoulder pad in a sample jacket, a poor jacket sample, a shoulder pad color problem, unacceptable delays in the delivery of garments, a defectively-dyed shirt button resulting in a customer return, and garments manufactured "out of

Case 1:07-cv-04854-PKL    Document 8-2    Filed 07/19/2007    Page 11 of 64

Page 5

2002 U.S. Dist. LEXIS 16578, *; 48 U.C.C. Rep. Serv. 2d (Callaghan) 1367

tolerance" or in the wrong sizes. (See Def.'s Exhs. 17, 18, 24, 25, 27, and 30.) The sheer number of these complaints resulted in a letter faxed by Tsang to Xiaoli Wang, on November 8, 1999, in which Tsang wrote:

> WE RECEIVED A LOT OF RETURNS AND COMPLAIN [sic] FROM OUR CUSTOMER [sic] RECENTLY [*7] ABOUT THE QUALITY OF THE GARMENT [sic] WE DELIVERIED [sic].
>
> SPECIFICATIONS ARE TOO BIG OR TOO SMALL WHICH ARE OUT OF TOLARANCE [sic], POOR PRESSING, POOR WORKMANSHIP ETC. ETC.
>
> WE CANNOT ACCEPT ANYMORE OF THE ABOVE ....

(Def.'s Exh. 29.)

On December 15, 1999, Patricia Blauner faxed to Xiaoli Wang a letter wherein she wrote that $ 50,000 would be sent to Hangzhou by December 16, 1999, that an additional $ 25,000 would be sent by December 30, 1999, and that all monies due to Hangzhou would be paid in full. (See Pl.'s Exh. A9.) As of the date of that letter, PCB had paid Hangzhou a total of $ 386,324 exclusive of sums paid for by letters of credit. (See Pl.'s Exh. 8.) PCB then proceeded to pay Hangzhou $ 50,000 as promised, followed by sums of $ 15,000 and $ 5,000. (Tr. at 120-22, 128.) Hangzhou and PCB ceased doing business together after Patricia Blauner's letter dated December 15. On June 8, 2000, Patricia Blauner faxed Xiaoli Wang a letter in which she communicated PCB's intention to pay the balance of $ 444,318.35 due and owing to Hangzhou as soon as possible. (See Pl.'s Exh. A12.) Patricia Blauner claims that she had received that figure from Xiaoli [*8] Wang and had written it in her own handwriting on the letter because Xiaoli Wang informed her that if Hangzhou was not paid he would lose his job and be arrested; however, Xiaoli Wang denies ever making statements to that effect. (Def.'s Prop. Findings of Fact and Conc. of Law at 10; Tr. at 139.) Despite this denial, Xiaoli Wang, as PCB points out, did write in a previously faxed letter, dated January 26, 2000, that, in the event he did not receive payment, he would have to face "the management and law in China" and that he did not "want to be put into jail." (Def.'s Exh. 41.)

The court credits the testimony of Richard Blauner and Patricia Blauner. While there were not problems with every shipment of garments, it is clear from the repeated correspondence between the parties that many of the shipments had defects throughout the parties' course of dealing and were not made to the specifications of PCB. As a result, the court is convinced that PCB has interposed valid counterclaims to plaintiff Hangzhou's demand for payment for goods sold and delivered, account stated, and quantum meruit.

DISCUSSION

[HN1] When jurisdiction in a federal case is premised on diversity and both parties present [*9] arguments based on New York law, the law of the forum state, it is appropriate for the court to apply New York law. *Merrill Lynch Interfunding, Inc. v. Argenti, 155 F.3d 113, 121 n.5 (2d Cir. 1998).*

*(1) PCB's Fraud Counterclaim*

The court finds that defendant PCB's fraud counterclaim has merit. PCB argues that plaintiff Hangzhou committed fraud when Xiaoli Wang, Hangzhou's merchandiser, showed Richard Blauner the Xiang Gneng factory and high-quality production samples from it in addition to giving Blauner a business card that was not his own but created the impression that Wang was affiliated with Xiang Gneng, written on the card as "Jiang Gneng." (Def.'s Prop. Findings of Fact and Conc. of Law at 12.) PCB also points out that Xiaoli Wang sent Richard Blauner a Buscati jacket and shirt and an Anna and Frank blouse similar to those Blauner had seen while touring Xiang Gneng. (Id. at 13.) PCB argues that such tactics were intended to induce PCB to enter into an agreement with Hangzhou. (Id.) PCB's fraud claim, as such, is more appropriately stylized as a claim for fraud in the inducement. [HN2] To establish a claim for fraud in the inducement, it is necessary [*10] for a party to show, with specificity, that another party made a representation of material fact that was untrue and that it knew to be untrue or recklessly made at the time it was given, offered to deceive the other party and induce it to rely thereon to its detriment. *Chopp v. Welbourne & Purdy Agency, Inc., 135 A.D.2d 958, 522 N.Y.S.2d 367, 368 (3rd Dep't 1987).*

Plaintiff Hangzhou argues that PCB's fraud counterclaim must fail because Richard Blauner and PCB, despite knowing, as early as July, 1998 that garments were being produced at Xing Yi instead of Xiang Gneng, did not terminate the business relationship at that time, opting instead to continue to accept garments from Xing Yi. (Pl.'s Prop. Findings of Fact and Conc. of Law at 14.) Under this scenario, Hangzhou argues that PCB effectively ratified the agreement, thereby waiving any claim it might have had to fraud. (Id.)

Hangzhou is correct to the extent that the [HN3] acceptance of benefits under a contract subsequent to the discovery of fraud constitutes affirmance of the contract

Case 1:07-cv-04854-PKL    Document 8-2    Filed 07/19/2007    Page 12 of 64

Page 6

2002 U.S. Dist. LEXIS 16578, *; 48 U.C.C. Rep. Serv. 2d (Callaghan) 1367

and, therefore, acts as a bar to attempts by the defrauded party to rescind the contract. "Whether under a waiver or ratification [*11] analysis, a party may not avoid an agreement on grounds of fraud if, after acquiring knowledge of the fraud, he affirms the contract by accepting a benefit under it." *Agristor Leasing-II v. Pangburn, 162 A.D.2d 960, 557 N.Y.S.2d 183, 185* (4th Dep't 1990) (involving counterclaim for fraud in the inducement). See also *Barrier Systems, Inc. v. A.F.C. Enterprises, Inc., 264 A.D.2d 432, 694 N.Y.S.2d 440, 442* (2d Dep't 1999). However, while a party cannot rescind a contract under these circumstances, it may still maintain a separate action for damages arising from the fraud. "Upon discovering fraud, a purchaser may tender return of the property and seek rescission or he may retain the property and seek recovery of damages deriving from the fraud." *Clearview Concrete Products Corp. v. S. Charles Gherardi, Inc., 88 A.D.2d 461, 453 N.Y.S.2d 750, 754* (2d Dep't 1982). See also *Big Apple Car, Inc. v. City of New York, 204 A.D.2d 109, 611 N.Y.S.2d 533, 534* (1st Dep't 1994) ("it is well settled that a defrauded party to a contract may elect to either disaffirm the contract by a prompt rescission or stand on the contract and thereafter [*12] maintain an action at law for damages attributable to the fraud"); *Potts v. Lambie, 138 A.D. 144, 122 N.Y.S. 935, 937* (1st Dep't 1910) ("The mere fact, however, of affirming or ratifying the contract by deciding to retain its fruits, as distinguished from approving of the fraud and deceit and waiving any right to redress on account thereof, is insufficient to show a waiver of the cause of action for damages."). In short, ratification does not preempt a claim for damages arising from the fraud. As such, despite its ratification of the contract, PCB is entitled to damages arising from fraud if it can prove that such fraud occurred and that it was damaged thereby.

Based on the evidence offered at trial, the court is convinced that PCB has established the elements for fraud in the inducement. Xiaoli Wang misrepresented himself as the owner of the company listed on the business card that he gave to Richard Blauner on his factory tour. (Tr. at 162.) The company listed on the business card was "Hangzhou Jiang Gneng Silk Clothing Manufacturing Company Limited," similar to the name on the sign outside the factory, "Hangzhou Silk Jiang Gneng," that Richard Blauner testified [*13] to seeing. (Tr. at 161-62, 163.) As such, Richard Blauner understood that he was touring the Jiang Gneng factory, (Tr. at 162.), and that Xiaoli Wang, obviously, had some connection to it. This perception on Richard Blauner's part is reinforced by a letter, dated June 19, 1998, in which Blauner tells Xiaoli Wang that "we will provide work for your factory as was visited be [sic] me with [Peter] Wang and you there." (Pl.'s Exh. Al.) As such, Xiaoli Wang knew that Richard Blauner expected the garments to be manufactured at the factory he toured with him and believed him

to own yet failed to disclose that the garments would be produced elsewhere once the parties commenced their business dealings. When viewed in conjunction with the Buscati and Anna and Frank samples that Xiaoli Wang sent to PCB after Richard Blauner's return to the United States, the court is thus persuaded that Xiaoli Wang's goal was to induce PCB to do business with Hangzhou by showing Richard Blauner a pristine factory but, ultimately, one that he did not intend to use for producing PCB's goods. As a result, Xiaoli Wang and Hangzhou committed fraud in the inducement with regard to PCB and PCB is entitled to sue [*14] for damages arising from the fraud.

*(2) PCB's Counterclaim for Nonconforming Goods*

[HN4] When a buyer receives goods that are nonconforming, he is deemed to have accepted the goods pursuant to *§ 2-606 of the Uniform Commercial Code (U.C.C.)* when he signifies to the seller that he will retain them despite their nonconformity, fails to reject them after a reasonable opportunity to inspect them, or performs any act inconsistent with the seller's ownership. While acceptance normally obligates the buyer to pay the contract price for the goods, it does not prevent the buyer from interposing a counterclaim for breach of the underlying contract due to the nonconformity. *B. Milligan Contracting Inc. v. Andrew R. Mancini Associates Inc., 174 A.D.2d 136, 578 N.Y.S.2d 931, 932-33* (3rd Dep't 1992). See also *G.W. White & Son, Inc. v. Gosier, 219 A.D.2d 866, 632 N.Y.S.2d 910, 911* (4th Dep't 1995) ("defendant's acceptance of nonconforming goods does not preclude a counterclaim for breach of contract or warranty"); *Sears, Roebuck & Co. v. Galloway, 195 A.D.2d 825, 600 N.Y.S.2d 773, 775* (3rd Dep't 1993). To establish such a claim for breach after [*15] acceptance, the buyer is required to provide timely notice to the seller of the breach. [HN5] In particular, the U.C.C. provides:

> Where a tender has been accepted
>
> (a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy ....

*U.C.C. § 2-607(3)*. Furthermore, [HN6] according to *U.C.C. § 1-204*, whenever the U.C.C. specifies that some action be taken "within a reasonable time," any time that is not "manifestly unreasonable" may be set by agreement.

It is undisputed that PCB never returned any goods to Hangzhou. (Tr. at 229; Pl.'s Prop. Findings of Fact and Conc. of Law at 5.) PCB also performed acts inconsistent

Case 1:07-cv-04854-PKL     Document 8-2     Filed 07/19/2007     Page 13 of 64

Page 7

2002 U.S. Dist. LEXIS 16578, *; 48 U.C.C. Rep. Serv. 2d (Callaghan) 1367

with Hangzhou's ownership of the garments by delivering them to its customers such as Neiman Marcus and Nordstrom's for sale in their stores. As such, PCB clearly accepted all the goods that Hangzhou delivered to it. The question then is whether it is entitled to bring suit for breach of contract or warranty after such acceptance has occurred. The court is convinced that it is.

The contract between Hangzhou and PCB contains the following provision:

> The Sellers [*16] are only responsible for claims against bad workmanship or faulty materials. Claims concerning quality shall be made within 30 days after the arrival of the goods at destination.

(Pl.'s Exh. 2, P 15.) Thirty days to register a claim for nonconformity does not strike the court as a manifestly unreasonable timeframe for PCB to inspect the goods and determine whether they were made to specifications. This is not a case where defects with the merchandise would be especially hard to detect. Indeed, Tsang was able to detect poor pressing in some samples immediately upon their arrival. (See Def.'s Exh. 13.) Since P 15 of the contract comports with *U.C.C. § 1-204* in that the period it sets out is not manifestly unreasonable, see *U.C.C. § 1-204*, supra, and both PCB and Hangzhou agreed to be bound by it when they entered into the contract, the court will defer to it as the standard by which to govern whether PCB gave notice of breach within a reasonable time.

PCB, however, argues that it should not be bound by the terms and conditions of the sales contract since it never received them until almost the end of the business relationship between the parties. (Def.'s Prop. [*17] Findings of Fact and Conc. of Law at 15.) The applicable terms and conditions were listed on the reverse side of the sales contract but, according to PCB, were never included in the faxes that Xiaoli Wang sent to the Blauners, which contained only the front side of the sales contract, with the exception of one fax near the end of the business relationship that contained both. (Id.) Xiaoli Wang claims that he faxed both sides of the sales contract to PCB at the beginning of the business relationship and admits to faxing only the front later on in the relationship. (Tr. at 131.) At any rate, PCB's argument along these lines is unavailing. The fact of the matter is that Cary Tsang, PCB's production consultant, signed many of these sales contracts. (See Tr. at 91.) In this capacity, Tsang testified that he was acting on PCB's behalf and that Patricia Blauner was aware that he was so acting. (Id.) Since Patricia Blauner, an officer of PCB, never thereafter disaffirmed Tsang's actions, PCB's assent to

them is implied and it is bound by them. See *New York State Medical Transporters Ass'n, Inc. v. Perales, 160 A.D.2d 710, 553 N.Y.S.2d 790, 792* (2nd Dep't 1990) [*18] [HN7] (when principal condones an agent's acts and accepts benefits arising therefrom, the principal is bound by those acts even if the agent exceeded his authority by so acting).

Accordingly, given that PCB approved the agreement between the parties, it will not now be heard to attempt to avoid the contract by claiming ignorance of its provisions. [HN8] Ignorance of the terms and conditions of a contract is no defense for a party that has already executed the contract. "A party who signs a document without any valid excuse for having failed to read it is 'conclusively bound' by its terms." *Sofio v. Hughes, 162 A.D.2d 518, 556 N.Y.S.2d 717, 718-19* (2nd Dep't 1990) (quoting *Gillman v. Chase Manhattan Bank, 73 N.Y.2d 1, 537 N.Y.S.2d 787, 792, 534 N.E.2d 824 (1988)*). Especially with regard to sophisticated business people, capable of resort to counsel for advice, as is the situation here, the law presumes that parties to a contract will only sign it if they fully understand its terms and conditions.

Bound by the 30-day period or not, it makes little difference to the vitality of PCB's claims since PCB, in the court's estimation, gave notice of breach within the [*19] 30 days required by the contract. The record is replete with testimony and correspondence between the parties showing that Hangzhou received timely notification of problems with the garments that it delivered to PCB. Many of the garments were routinely inspected upon delivery to PCB and Cary Tsang would notify Hangzhou of the problems, sometimes on the same day the garments were received or soon thereafter. (See, e.g., Exhs. 12, 13, and 33.) In general, the course of dealing between the parties suggests that it was PCB's custom to complain to Hangzhou about defective garments after delivery and upon inspection. Hangzhou does not seem to dispute this. Rather it argues that PCB made no claims against Hangzhou for any amounts due to nonconforming goods and, as such, failed to provide timely notice of breach. (Pl.'s Prop. Findings of Fact and Conc. of Law at 13.) This argument is unpersuasive, however, because [HN9] the Official Comment to *U.C.C. § 2-607* states that notice of breach need not involve a claim for damages but instead need only be sufficient to let the seller know that the transaction is troublesome, thereby opening the way for settlement. See *U.C.C. § 2-607*, Official [*20] Comment 4 ("Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy."); *Allied Leather Corp. v. Interco Inc., 1993 U.S. Dist. LEXIS 6128*, No. 88 Civ. 1394, 1993 WL 159970, at *6 (S.D.N.Y. May 10, 1993) (Francis, M.J.). As the Official Comment further makes clear, the notification provisions

Case 1:07-cv-04854-PKL    Document 8-2    Filed 07/19/2007    Page 14 of 64

Page 8

2002 U.S. Dist. LEXIS 16578, *; 48 U.C.C. Rep. Serv. 2d (Callaghan) 1367

of U.C.C. § 2-607(3) were intended to prevent commercial bad faith. See U.C.C. § 2-607, Official Comment 4. Allowing PCB to benefit from the safeguards afforded by U.C.C. § 2-607(3) would not frustrate this purpose. To the extent the court believes that PCB was notifying Hangzhou of nonconforming goods in good faith, with the goal of ensuring that it received high-quality merchandise as opposed to attempting to avoid its obligations under any contracts, PCB should not be denied these protections.

### (3) Damages

[HN10] Where a party has been fraudulently induced to enter a contract, the measure of damages is governed by the out-of-pocket rule: the loss occasioned by the fraud or the consideration paid to the party responsible for the fraud, less the value of the goods received. Deerfield Communications Corp. v. Chesebrough-Ponds, Inc., 68 N.Y.2d 954, 510 N.Y.S.2d 88, 89, 502 N.E.2d 1003 (1986); [*21] Schlenoff v. Kroll, 207 Misc. 1082, 141 N.Y.S.2d 370, 374 (1955); Campers' World Int'l, Inc. v. Perry Ellis Int'l, Inc., 2002 U.S. Dist. LEXIS 14909, No. 02 Civ. 453, 2002 WL 1870243, at *5 (S.D.N.Y. Aug. 13, 2002) (Patterson, J.); Bazzano v. L'Oreal, S.A., 1996 U.S. Dist. LEXIS 6529, No. 93 Civ. 7121, 1996 WL 254873, at *3 (S.D.N.Y. May 14, 1996) (Stein, J.). The measure of damages for breach of contract or warranty with respect to accepted goods is the difference between the fair market value of the goods accepted and their fair market value if they had been as warranted. U.C.C. § 2-714; Wayne County Vinegar & Cider Corp. v. Schorr's Famous Pickled Products, Inc., 118 Misc. 2d 52, 460 N.Y.S.2d 209, 217 (1983); Gem Jewelers, Inc. v. Dykman, 160 A.D.2d 1069, 553 N.Y.S.2d 890, 892 (3rd Dep't 1990) (specifying fair market value as the proper standard).

Furthermore, [HN11] in an action for fraud a party is allowed to recover consequential damages stemming from the fraud, Delcor Labs., Inc. v. Cosmair, Inc., 169 A.D.2d 639, 564 N.Y.S.2d 771, 772 (1st Dep't 1991), and in an action for breach of contract or warranty with regard to accepted goods, the [*22] buyer can recover consequential and incidental damages. U.C.C. §§ 2-714, 2-715. Under New York law, consequential damages for a breach of contract or warranty claim can include loss of goodwill, including the loss of customers, future profits, and harm to business reputation. Toltec Fabrics, Inc. v. August Inc., 29 F.3d 778, 780 (2d Cir. 1994). Above all, it is well-settled that an award of damages cannot be speculative in nature. "Damages may only be allowed when there is probative evidence of the amount of damages. And while, where damages cannot be precisely proved, proof upon a reasonable basis is sufficient, no damages may be awarded on a purely speculative basis." Wayne County Vinegar, 460 N.Y.S.2d at 217-18 (foot-

note omitted). See also Mohawk Nat'l Bank of Schenectady, N.Y. v. Citizens Trust Co., 38 Misc. 2d 222, 237 N.Y.S.2d 956, 959 (1963) ("It is fundamental in the law of damages that damages must be proved, and will not be presumed, even though a wrong, such as a breach of contract, is shown.").

Patricia Blauner testified that PCB never returned any garments to Hangzhou and that PCB's customers paid for most of the garments [*23] that PCB shipped to them. (Tr. at 229.) Moreover, while Patricia Blauner did testify as to three chargebacks of $ 1,000 each for merchandise delivered to Jacobson's, (Tr. at 216; Def.'s Exh. 34.), she was unable to conclusively establish, amid a range of possibilities, why these deductions were granted, other than to testify that Jacobson's was not pleased with the merchandise it received. (Tr. at 207, 224.) No witness from Jacobson's was ever called to testify or deposed in this case. At the same time, Cary Tsang testified that a total of five styles of garment shipments were nonconforming--Style 232 in the amount of $ 1,485.20, Style 306 in the amount of $ 1,306.60, Style 2078 in the amount of $ 1,840, Style 3058 in the amount of $ 1,911, and Style 2798 in the amount of $ 1,700--resulting in a total of $ 8,242.80 in damages. (Tr. at 92-99; Pl.'s Exhs. G and H.) Given that PCB received payment from its customers for the bulk of its shipments from Hangzhou and admitted as much, it has not shown that it suffered any immediate injury on account of Hangzhou's actions with the exception of Tsang's testimony as to the $ 8,242.80 worth of nonconforming styles. As such, PCB is entitled to [*24] recover $ 8,242.80 and to offset its outstanding liabilities to Hangzhou by that amount.

PCB has also filed a claim for consequential damages. PCB insists that it is entitled to consequential damages for harm done to its reputation and goodwill by virtue of Hangzhou's failure to deliver conforming goods. (Def.'s Prop. Findings of Fact and Conc. of Law at 14-15.) [HN12] To succeed on a claim for consequential damages in the form of loss of goodwill, a party must make three showings: 1) that a loss of goodwill did in fact occur; 2) objective proof of the amount of that loss; and 3) that the loss was caused by the opposing party's breach. Toltec Fabrics, 29 F.3d at 781. The evidence PCB proffered at trial falls short of this standard. While the court concedes that PCB is a fledgling business, attempting to establish a reputation in its industry and especially vulnerable to failure to meet its demands, it has failed to show that the termination of several of its accounts had anything to do with Hangzhou's breach. PCB does not offer letters from any of its customers communicating either their growing frustration with garments made by Hangzhou or the reasons underlying their individual [*25] decisions to terminate their business ar-

Case 1:07-cv-04854-PKL    Document 8-2    Filed 07/19/2007    Page 15 of 64

Page 9

2002 U.S. Dist. LEXIS 16578, *; 48 U.C.C. Rep. Serv. 2d (Callaghan) 1367

rangements with PCB. Instead of calling witnesses from each customer to testify as to why it chose to terminate the business relationship, PCB chose to rely on inadmissible hearsay and speculation to make its case. (See, e.g., Tr. at 207, 213-14.)

In addition to failing to prove causation, PCB was unable to present objective proof of the amount of its loss. "The loss must be 'reasonably certain in amount,' and an award cannot stand if based on 'little more than guesswork.'" *Toltec Fabrics, 29 F.3d at 781* (quoting *Robert T. Donaldson, Inc. v. Aggregate Surfacing Corp. of America, 47 A.D.2d 852, 366 N.Y.S.2d 194, 196 (1975)).* PCB produced Exhibit 31, which gave a breakdown of PCB's volume of annual sales by customer, but it was not allowed in evidence because PCB had failed to lay the proper foundation for it sufficient to verify the accuracy of the figures listed therein. (Tr. at 220-23.) Nor did PCB call any experts familiar with the industry or its business to provide informed opinions and market analyses as to the damage to goodwill that PCB claims to have suffered. In the absence of such evidence, the [*26] court is unable to determine damages arising from the loss of goodwill with any measure of certainty.

PCB argues that, based on the evidence it has presented to the court, its damages are hard to quantify. (Def.'s Prop. Findings of Fact and Conc. of Law at 16.) Unfortunately, if PCB cannot even provide a more complete picture as to the consequential damages it has suffered, the court cannot be called upon to pick up the slack for fear that it may alight on some arbitrary award that bears little resemblance to the alleged loss of good-

will sustained by PCB. Unfortunately, the fact that PCB is an upstart only raises the bar it has to meet. [HN13] "If it is a new business seeking to recover for loss of future profits, a stricter standard is imposed for the obvious reason that there does not exist a reasonable basis of experience upon which to estimate lost profits with the requisite degree of reasonable certainty." *Kenford Co., Inc. v. Erie County, 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 493 N.E.2d 234 (1986).* Since PCB bears the burden of proving the amount of damages it has suffered and has failed to do so, the court cannot award it consequential damages to compensate it for [*27] its alleged loss of goodwill.

CONCLUSION

For the foregoing reasons, the court finds in favor of defendant PCB's fraud and breach of warranty counterclaims and awards plaintiff Hangzhou $ 417,716.35 for goods sold and delivered, less damages for fraud and breach of warranty of $ 8,242.80 in PCB's favor, resulting in a net award to Hangzhou of $ 409,473.55, with interest accruing from November 22, 1999.

**IT IS SO ORDERED.**

Dated: New York, New York

September 4, 2002

**ROBERT L. CARTER**

**U.S.D.J.**

LEXSEE 2003 U.S. DIST. LEXIS 13079

**SOTHEBY'S FINANCIAL SERVICES, INC., Plaintiff, v. MICHAEL CHRISTO-PHER BARAN, Defendant. MICHAEL CHRISTOPHER BARAN, Third-Party Plaintiff, v. SOTHEBY'S, INC., Third-Party Defendant.**

**00 Civ. 7897 (BSJ)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 13079*

**July 25, 2003, Decided**
**July 29, 2003, Filed**

**SUBSEQUENT HISTORY:** Affirmed by *Sotheby's Fin. Servs. v. Baran, 2004 U.S. App. LEXIS 13578 (2d Cir. N.Y., June 29, 2004)*

**DISPOSITION:** [*1] Motion for summary judgment granted. Counter-claims dismissed. Third-party claims dismissed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff lender filed suit against defendant borrower to recover an unpaid loan plus interest, facility fee, and insurance, pursuant to a secured promissory note and security agreement and a letter agreement. The lender moved for summary judgment pursuant to *Fed. R. Civ. P. 56(c)*. In opposition to the motion, the borrower asserted affirmative defenses and eight counter-claims against the lender.

**OVERVIEW:** The borrower alleged the following claims: (1) fraud; (2) fraud in the inducement; (3) breach of fiduciary duty; (4) negligence; (5) negligent misrepresentation; (6) conversion; (7) breach of duty as a bailee; and (8) breach of contract. Additionally, he filed a third-party complaint against third-party defendant corporation asserting the previous eight claims and a ninth claim for indemnification or contribution. There were no material issues of fact in dispute regarding the lender's claim against the borrower, or regarding the borrower's counter-claims and third-party claims. Consequently, summary judgment was appropriate. The borrower repeatedly ratified his obligations to pay the lender, and was thus precluded from asserting fraudulent inducement. The borrower's affirmative defense of breach of a fiduciary duty based on a joint venture agreement was

unavailable and his remaining affirmative defenses were without merit. The borrower's third-party claims for breach of fiduciary duty and negligence against the corporation were time barred and his remaining claims against both defendants were meritless.

**OUTCOME:** The court granted summary judgment to the lender and the corporation and dismissed all of the borrower's counter-claims and third-party claims.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Standards > Appropriateness*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
[HN1] Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. The moving party has the burden to show the absence of a genuine issue of material fact. Once the moving party has met this burden, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Fed. R. Civ. P. 56(e)*. Speculative and conclusory allegations are insufficient to meet this burden. Further, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.

2003 U.S. Dist. LEXIS 13079, *

*Contracts Law > Contract Interpretation > Parol Evidence > General Overview*
*Contracts Law > Defenses > Fraud & Misrepresentation > General Overview*
*Evidence > Relevance > Parol Evidence*
[HN2] It is well settled that under New York law, if a contract recites that all of the parties' agreements are merged in the written document, parol evidence is not admissible to vary, or permit escape from, the terms of the integrated contract. However, a general merger clause may not operate to bar parol evidence that a party was fraudulently induced to enter into the contract. Consequently, a party may escape liability under the contract by establishing that he was induced to enter the contract by fraud.

*Contracts Law > Defenses > Fraud & Misrepresentation > General Overview*
[HN3] A party may be precluded from asserting that he was induced to enter into a contract in reliance upon certain misrepresentations where a contract specifically disclaims the existence of reliance on those specified representations. The United States Court of Appeals for the Second Circuit has held that under New York law, a contract must contain explicit disclaimers of the specific representations that form the basis of the claim for fraudulent inducement in order to be considered sufficiently particular to bar that defense.

*Contracts Law > Defenses > Fraud & Misrepresentation > General Overview*
*Contracts Law > Remedies > Ratification*
[HN4] It is well settled that under New York law, a contract is voidable when it is the product of fraud. Under the doctrine of ratification, however, a party loses the right to be released from his obligations under a voidable contract if: (1) the circumstances that made the contract voidable have ceased to exist; and (2) either (a) the party manifests his intention to affirm the contract or (b) acts with respect to anything he has received in a manner inconsistent with disaffirmance.

*Contracts Law > Remedies > Ratification*
[HN5] Where a party ratifies a contract, he cannot succeed on defenses asserting that he should not be bound by the contract. Moreover, a party who re-affirms his contractual obligations in a subsequent written agreement is precluded from asserting defenses to those obligations under that agreement.

*Contracts Law > Defenses > Fraud & Misrepresentation > General Overview*
*Contracts Law > Remedies > Rescission & Redhibition > General Overview*
[HN6] It is well settled that a party wishing to rescind a contract due to fraud in the inducement must act promptly. Upon discovery of the fraud, he must immediately announce his intention to rescind the contract. If he remains silent he has elected to waive his rights to be released from his obligations.

*Business & Corporate Law > Joint Ventures > Formation*
*Contracts Law > Types of Contracts > Joint Contracts*
[HN7] Pursuant to New York law, in order to establish the existence of a joint venture, all five of the following elements must exist: (1) two or more persons must enter into a specific agreement to carry on an enterprise for profit; (2) their agreement must evidence their intent to be joint venturers; (3) each must make a contribution of property, financing, skill, knowledge, or effort; (4) each must have some degree of joint control over the venture; and (5) there must be a provision for sharing of both profits and losses.

*Governments > Fiduciary Responsibilities*
*Torts > Intentional Torts > Breach of Fiduciary Duty > Defenses*
*Torts > Malpractice & Professional Liability > Professional Services*
[HN8] New York courts apply either a three-year or a six-year statute of limitations claim to breach of fiduciary duty claims, depending upon the remedy sought. Pursuant to *N.Y. C.P.L.R. 214(4)*, claims for damages from a breach of a fiduciary duty have a three-year statute of limitations. Likewise, under New York law, claims for negligence are governed by a three-year statute of limitations. *N.Y. C.P.L.R. 214(4)*. Moreover, where a party is added to a lawsuit by way of a third-party complaint, claims against the third-party defendant are deemed interposed at the time of service of the third-party complaint.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Torts > Business Torts > Fraud & Misrepresentation > Negligent Misrepresentation > Defenses*
*Torts > Procedure > Statutes of Limitations > General Overview*
[HN9] Under New York law, claims for negligent misrepresentation based on fraud are governed by a six-year statute of limitations period. *N.Y. C.P.L.R. 213(8)*.

*Contracts Law > Consideration > Enforcement of Promises > General Overview*
*Torts > Business Torts > Fraud & Misrepresentation > Negligent Misrepresentation > General Overview*
[HN10] The elements of a claim for negligent misrepresentation under New York law are that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.

*Torts > Business Torts > Fraud & Misrepresentation > Negligent Misrepresentation > Elements*
[HN11] Promises of future conduct are not actionable as negligent misrepresentations. The alleged misrepresentation must be factual in nature and not promissory or relating to future events that might never come to fruition.

*Contracts Law > Secured Transactions > Default > General Overview*
*Contracts Law > Types of Contracts > Guaranty Contracts*
[HN12] A creditor may not be required to surrender any part of his collateral till payment has been made in full.

*Contracts Law > Breach > Causes of Action > General Overview*
*Torts > Procedure > Multiple Defendants > Contribution > General Overview*
[HN13] New York law is clear that contribution claims are unavailable when the underlying claim is for purely economic loss resulting from the breach of contractual obligations.

*Torts > Procedure > Multiple Defendants > Contribution > General Overview*
[HN14] The predicate of common-law indemnity is vicarious liability without actual fault on the part of the proposed indemnitee. In order for a claim for indemnification to exist, a party must have an express right to indemnification by way of a contract, or a special relationship between the parties must exist such that a right to indemnification is implied.

**COUNSEL:** For Sotheby's Financial Services, Inc, PLAINTIFF: Dean R Nicyper, Flemming, Zulack & Williamson, LLP, New York, NY USA.

For Michael Christopher Baran, DEFENDANT: Gary S Graifman, Kantrowitz, Goldhamer & Graifman, PC, Chestnut Ridge, NY USA.

For Michael Christopher Baran, COUNTER-CLAIMANT: Gary S Graifman, Kantrowitz, Goldhamer & Graifman, PC, Chestnut Ridge, NY USA.

For Sotheby's Financial Services, Inc, COUNTER-DEFENDANT: Dean R Nicyper, Flemming, Zulack & Williamson, LLP, New York, NY USA.

For Michael Christopher Baran, THIRD-PARTY PLAINTIFF: Gary S Graifman, Kantrowitz, Goldhamer & Graifman, PC, Chestnut Ridge, NY USA.

For Sotheby's, Inc, THIRD-PARTY DEFENDANT: Dean R Nicyper, Flemming, Zulack & Williamson, LLP, New York, NY USA.

**JUDGES:** BARBARA S. JONES, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** BARBARA S. JONES

**OPINION**

**MEMORANDUM AND ORDER**

I. INTRODUCTION

Plaintiff Sotheby's Financial Services, Inc. ("SFS') brought this action [*2]  against defendant Michael Christopher Baran ("Baran") to recover an unpaid loan of $ 326,710 plus interest, facility fee and insurance, pursuant to an August 22, 1997 Secured Promissory Note and Security Agreement ("Loan Agreement") and a March 1999 Letter Agreement ("Letter Agreement"). Plaintiff contends that Baran breached the agreements by defaulting on the loan.

Plaintiff moves for summary judgment pursuant to *Federal Rule of Civil Procedure 56(c)*. In opposition to the motion, Baran asserts affirmative defenses and eight counter-claims against SFS alleging: (1) fraud; (2) fraud in the inducement; (3) breach of fiduciary duty; (4) negligence; (5) negligent misrepresentation; (6) conversion; (7) breach of duty as a bailee; and (8) breach of contract. Additionally, Baran filed a third-party complaint against third-party defendant Sotheby's, Inc. ("SI") asserting the previous eight causes of action, along with a ninth claim for indemnification or contribution. [1]

1    SFS and SI are collectively referred to as "Sotheby's".

[*3] A. Background

The following facts are undisputed, or are read most favorably to defendant Baran. SI is a New York corporation engaged in the sale of fine art and jewelry by auction. SFS is a Nevada corporation engaged in financing and loans. Baran is an entrepreneur who founded six companies and has been engaged in the purchase and sale of gems since the early 1990's.

In July 1997, Paul Russo, who was at the time Senior Vice President and Director of the Jewelry Department for SI, contacted Baran regarding a potential business opportunity with two brothers from Brazil, Khaled and Amer Jezzini, who had three rough stones that were to be finished and put up for auction by SI. [2] (Def.'s 56.1 Statement PP 18, 20). Russo told Baran that SI could not directly participate in the venture to finish the stones because it would be a "conflict of interest for [SI] to be identified directly as a partner with one of its clients," but that he would arrange for a loan through SFS so that Baran could get involved in the finishing of the stones. (Def.'s 56.1 Statement PP 22, 24).

2    Paul Russo had worked with Baran in the past with respect to gem purchases and gem collections.

[*4] Baran and SFS signed a Secured Promissory Note and Security Agreement dated August 22, 1997 ("Loan Agreement"), under which SFS agreed to loan Baran $ 350,000 for a one-year term. Under the Loan Agreement, Baran granted a security interest in collateral listed in an attached schedule in addition to "all other property of the Maker [Baran], and the proceeds thereof, now or at any time in the future in the possession of [SFS] or any of its affiliated corporations." (Nicyper Aff. Ex. H P 4). The collateral consisted of five valuable gems from Baran's personal collection.

The Loan Agreement specifically provided that it "contained all of the terms and provisions and constitute[d] the entire agreement between the parties with respect to the subject matter hereof" and that it "superseded all prior or contemporaneous written, oral or implied understandings, representations and agreements of the parties." (Nicyper Aff. Ex. H P 7). Additionally, the Loan Agreement stated that "the obligations of the Maker [Baran] hereunder are absolute and unconditional and the payment of any amounts due hereunder shall not be subject to the results of any sale of the Collateral or any defenses, set-offs [*5] or counterclaims of any kind whatsoever." (Nicyper Aff. Ex. H P 1(h)).

Around the same time, Baran entered into an agreement with Amer and Khaled Jezzini, two brothers who were Brazilian dealers of fancy colored gems. Baran agreed to advance $ 347,000 [3] to finance the finishing of two rough stones and to finance completion and delivery of a third stone. (Def.'s 56.1 Statement P 27). Baran prepared a draft letter agreement that included the provision that SI would control the processing and sale of the stones. (Graifman Aff. Ex. G). The letter agreement additionally provided that "[SI] will not be held responsible for any damages whatsoever involving the processing of the rough diamonds or their outcome if unsold at auction." (Graifman Aff. Ex. G). Pursuant to Baran's Loan Agreement with SFS, Baran directed SFS to wire-transfer the proceeds of his loan from SFS to an account to which the Jezzinis had access. (Baran 7/6/01 Tr. 178:17-179:4, 179:20-23; Nicyper Aff. Ex. M). Additionally, Baran discussed with his lawyer the possibility of establishing a new company, Global Mineral Investments, to raise capital to acquire rough stones that the Jezzinis would deliver in the future, after [*6] the three stones were delivered and sold at auction. (Baran 7/6/01 Tr. 147:25-148:21, 270:12-21). This company was never formed.

3    The agreement between Amer Jezzini and Baran states that Baran was to "advance $ 345,000 ... for the purpose of purchasing unprocessed rough diamonds." (Graifman Aff. Ex. G; see also Nicyper Aff. Ex. K). However, the parties appear to agree that $ 347,000 was actually advanced.

A Loan and Consignment Agreement dated July 28, 1997 evidences that SFS had previously agreed to loan Khaled Jezzini $ 400,000 in connection with consignment to SI of two stones for sale at public auction. (Graifman Aff. Ex. I P 1(a)). Paragraph 8 of this agreement provides that proceeds from the sale of the stones would be received and collected as follows:

first, to [SI] commissions and reimbursable expenses, ... second, to the payment to SFS of all interests accrued on the Loan, ..., third, to the repayment to SFS of the outstanding principal amount of the Loan, fourth, to any outstanding [*7] indebtedness of [Jezzini] to SFS, [SI] or any of their affiliated companies ..., fifth, [SI] will deliver to [Jezzini] the remaining balance of the net proceeds.

(Graifman Aff. Ex. I P 8).

Paragraph 8 was amended by letter signed by Russo on behalf of SI and signed by Shelly Fischer on behalf of SFS, dated September 19, 1997, to provide that "fifth, [SI] will deliver to Mr. Michael Christopher Baran an amount of up to $ 350,000 of any remaining net proceeds" from the sale of the stones at the October 1997 SI jewelry auction. (Nicyper Aff. Ex. L P 1).

The two stones were sold at the October 1997 auction for a total net amount of $ 734,200. [4] Baran received $ 314,000 of the proceeds. (Baran Aff. P 41). Following the auction, the Jezzinis failed to produce any other rough stones for finishing or for auction, and the relationship between the Jezzinis and Baran deteriorated. For example, the Jezzinis did not return several of Baran's telephone calls. Russo arranged for the Jezzinis to turn over a 44-gemstone collection to SI for Baran so that the Jezzinis could account to Baran for his loss on the investment. (Russo 8/2/01 Tr. 199:8-17, 200:6-21, 204:16-17, 206:5-25). [*8] Baran is currently in possession of the 44 gemstones. (Baran 7/6/01 Tr. 163:16-18).

> 4   The pre-sale estimate for the two stones was $ 715,000 to $ 800,000 (Nicyper Aff. Ex. N). However, it is unclear whether Baran ever saw this pre-sale estimate.

Baran paid interest and all out-of-pocket expenses on the Loan for the one-year term of the Loan Agreement, but none of the principal. On March 21, 1999, Baran paid the remaining interest accrued on the Loan to that date and paid $ 23,290 of the outstanding principal amount of $ 350,000. Additionally, at some point following the auction, Baran delivered to SI five additional pieces of jewelry for auction, in part, to pay the loan. ("Additional Gem Collection"). SI still has possession of the Additional Gem Collection.

The Loan Agreement was extended by mutual agreement for another year on March 31, 1999. (Nicyper Aff. P 41; Baran 5/29/01 Tr. 101:13-21; Baran 7/6/01 Tr. 198:22-199:20). In this Letter Agreement, SFS agreed to further extend the terms of the Loan until [*9] March 30, 2000. The Letter Agreement incorporated by reference all the terms of the original Loan Agreement and provided that Baran was obligated to "make principal payments in quarterly installments of at least $ 25,000," the first of which was due June 22, 1999. (Nicyper Aff. Ex. Q PP 1-3). Specifically, the Letter Agreement provided that Baran "confirmed that all of [his] representations and warranties set forth in the [Loan] Agreement are true and correct on and as of the date of this letter agreement" and that the original Loan Agreement, except as amended, "remains and continues in full force and effect." (Nicyper Aff. Ex. Q PP 4-5). Baran failed to pay his quarterly installment on June 22, 1999, and failed to make any subsequent payments. (Nicyper Aff. P 47).

Thus, he has been in default on his obligations under the Loan Agreement and Letter Agreement since June 22, 1999.

SFS filed this lawsuit on October 17, 2000 alleging that Baran breached his obligations under the Loan Agreement and Letter Agreement, seeking damages for breach of the Agreements in the amount of $ 406,353.02, plus interest, costs and expenses, and other out-of-pocket expenses.

Baran responded with the [*10] following affirmative defenses against SFS: unclean hands, fraudulent inducement, aiding and abetting fraud, breach of fiduciary duty as a joint venturer, failure to satisfy sums due through sale of collateral at reasonable market value, and failure to liquidate the collateral before seeking judgment for a deficiency. Additionally, Baran asserts eight counter-claims against SFS and nine third-party claims against SI, including (1) fraud; (2) fraud in the inducement; (3) breach of fiduciary duty; (4) negligence; (5) negligent misrepresentation; (6) conversion; (7) breach of duty as a bailee; and (8) breach of contract. Baran also asserts a claim for contribution or indemnification against SI. For the reasons set forth below, the Court grants summary judgment to the plaintiff and third-party defendant, and dismisses all of defendant's counter-claims and third-party claims.

## II. DISCUSSION

### A. Summary Judgment Standard

[HN1] Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment [*11] as a matter of law." *Fed. R. Civ. P. 56(c).* The moving party has the burden to show the absence of a genuine issue of material fact. Once the moving party has met this burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* "Speculative and conclusory allegations are insufficient to meet this burden." *Hogan v. 50 Sutton Place S. Owners, Inc., 919 F. Supp. 738, 742 (S.D.N.Y. 1996),* (citing *Allen v. Coughlin, 64 F.3d 77, 80 (2d Cir. 1995); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)).* Further, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson, 477 U.S. at 248.*

Based on the reasoning to follow below, the Court finds that there are no material issues of fact in dispute

regarding SFS's claim against Baran, or regarding Baran's counter-claims and third-party claims. Consequently, summary judgment is appropriate.

B. Baran's [*12] Default and Breach of the Loan Agreement

Baran does not dispute that he signed the original Loan Agreement and the 1999 Letter Agreement reaffirming his obligations under the original Loan Agreement, nor does he dispute that he ceased payment of his obligations under those Agreements. Instead, he opposes summary judgment mainly on the ground that he was fraudulently induced to enter into the Loan Agreement with SFS by Paul Russo of SI, and that SI and SFS breached a fiduciary duty owed to him, either as an advisor or as a member of a joint venture between Baran, the Jezzinis, SI, and SFS. Specifically, Baran contends that (1) Russo told Baran that a third stone, an "Additional Pink Gemstone," was to be part of the transaction, (2) Russo told Baran that he would arrange for Baran to receive a loan from SFS to enable the joint venture to go forward and that five of Baran's gemstones would constitute the collateral for the loan, (3) Russo told Baran that he would be able to pay back the loan from the sale of the first two stones, that the proceeds from the sale of the third stone would be profit, and that the third stone would be sold for a substantial amount, (4) Russo arranged [*13] the meetings between Baran and the Jezzinis, (5) Baran was informed only minutes before signing the loan documents and giving SFS his approval to wire $ 347,000 to the Jezzinis that the money he was borrowing to complete the transaction would not be the first lien against the first two stones because SFS had already advanced $ 400,000 against those gems, (6) Russo assured Baran that the "large pink stone" would sell for over $ 1 million dollars, that Russo said it was a great deal for all of the parties, however, the large pink stone only sold for $ 750,000, [5] (7) Russo knew that the large pink stone would not sell for $ 1 million, (8) Russo assured Baran that the third stone would be delivered within 72 hours of the wire transfer of funds to the Jezzinis, and (9) Russo continued to assure Baran that the third stone was forthcoming at the auction.

    5    Baran additionally contends that Russo fraudulently raised the final bid price by pretending that a bidder was on the telephone, although there was actually no bidder on the telephone.

[*14] C. Baran's Affirmative Defenses

1. The Merger Clause and "No Right to Set-Off" Clause Do Not Bar All of Baran's Defenses

Sotheby's contends that certain clauses of the Loan Agreement bar all of Baran's defenses, counter-claims,

and third-party claims, and that summary judgment should be granted on that basis alone. The Court does not agree.

The Loan Agreement between SFS and Baran contained the following clause:

> This agreement, including the Schedule hereto, contains all of the terms and provisions and constitutes the entire agreement between the parties with respect to the subject matter hereof. This agreement supersedes all prior or contemporaneous written, oral or implied understandings, representations and agreements of the parties relating to the subject matter of this Agreement .... No provisions of this Agreement may be amended, supplemented or waived other than by means of a writing signed by the Maker [Baran] and [SFS].

(Nicyper Aff. Ex. H P 7). The attached schedule described five gemstones as the "Collateral".

The Loan Agreement also contained a clause which stated that "the obligations of the Maker [Baran] hereunder are absolute and unconditional [*15] and the payment of any amounts due hereunder shall not be subject to the results of any sale of the Collateral or to any defenses, set-offs or counterclaims of any kind whatsoever." (Nicyper Aff. Ex. H P 1(h)).

Because of the language contained in the above clauses, Sotheby's contends that Baran may not now claim that he was fraudulently induced to enter into the contract. The Court does not agree that this language is specific enough to bar Baran's defense of fraudulent inducement.

[HN2] It is well settled that under New York law, [6] "if a contract recites that all of the parties' agreements are merged in the written document, parol evidence is not admissible to vary, or permit escape from, the terms of the integrated contract." *Mfrs. Hanover Trust Co. v. Yanakas, 7 F.3d 310, 315 (2d Cir. 1993)* (citing *Fogelson v. Rackfay Construction Co., 300 N.Y. 334, 340, 90 N.E.2d 881, 884 (1950)*). However, a general merger clause may not operate to bar parol evidence that a party was fraudulently induced to enter into the contract. *See Mfrs. Hanover Trust Co., 7 F.3d at 315*. Consequently, "a party may escape liability under the contract by establishing [*16] that he was induced to enter the contract by fraud." *Mfrs. Hanover Trust Co., 7 F.3d at 315* (citations omitted).

Case 1:07-cv-04854-PKL    Document 8-2    Filed 07/19/2007    Page 22 of 64

Page 7
2003 U.S. Dist. LEXIS 13079, *

6  The parties appear to agree that New York law applies to the claims in this action. Accordingly, the Court will apply New York law. *See Int'l Bus. Machines Inc. v. Liberty Mut. Fire Ins. Co., 303 F.3d 419, 423 (2d Cir. 2002).*

[HN3] A party may, however, be precluded from asserting that he was induced to enter into a contract in reliance upon certain misrepresentations where a contract specifically disclaims the existence of reliance on those specified representations. *See Mfrs. Hanover Trust Co., 7 F.3d at 315* (citations omitted). The Second Circuit has held that under New York law, a contract must contain explicit disclaimers of the specific representations that form the basis of the claim for fraudulent inducement in order to be considered sufficiently particular to bar that defense. *See Grumman Allied Indus., Inc. v. Rohn Indus., Inc., 748 F.2d 729, 735 (2d Cir. 1984).* [*17]

In the present case, the Court finds that the disclaimers at issue in the Loan Agreement were not sufficiently explicit to bar the defense of fraudulent inducement. *See, e.g., Mfrs. Hanover Trust Co., 7 F.3d at 317; Rhythm & Hues, Inc. v. The Terminal Marketing Co., 01 Civ. 4697, 2002 U.S. Dist. LEXIS 10908, at *21 (S.D.N.Y. June 18, 2002).* Consequently, the Court must consider whether Baran is precluded from relying on that defense for some other reason.

2. Baran's Ratification of the Loan Agreement Bars His Defense of Fraudulent Inducement

Sotheby's contends that Baran is precluded from claiming the affirmative defenses of fraud and fraudulent inducement [7] because he ratified the Loan Agreement when he continued to make payments for several years following the alleged fraud and when he executed a Letter Agreement, dated March 31, 1999, re-affirming his obligation to pay under the Loan Agreement. The Court agrees.

7  Although Baran purports to assert two separate defenses of fraud and fraudulent inducement, the elements of the defenses are the same. *See Wells Fargo Bank Northwest, N.A. v. Taca Int'l Airlines, S.A., 247 F. Supp. 2d 352, 364 (S.D.N.Y. 2002).* Consequently, the Court will simply refer to this claim as fraudulent inducement.

[*18] [HN4] It is well settled that under New York law, a contract is voidable when it is the product of fraud. *Landau v. Am. Int'l Group, Inc., 97 Civ. 3465, 1997 U.S. Dist. LEXIS 14325, at *7 (S.D.N.Y. Sept. 23, 1997), aff'd, 164 F.3d 618 (2d Cir. 1998).* Under the doctrine of ratification, however, a party loses the right to be released from his obligations under a voidable contract if: "(1) the circumstances that made the contract voidable have ceased to exist; and (2) either (a) the party

manifests his intention to affirm the contract or (b) acts with respect to anything that he has received in a manner inconsistent with disaffirmance." *Landau, 97 Civ. 3465, 1997 U.S. Dist. LEXIS 14325, at *8* (citations omitted).

[HN5] Where a party ratifies a contract, he cannot succeed on defenses asserting that he should not be bound by the contract. *See Daniel Gale Assocs., Inc. v. Hillcrest Estates, Ltd., 283 A.D.2d 386, 387, 724 N.Y.S.2d 201, 202 (2d Dep't 2001)* (rejecting misrepresentation defense to contract where defendant's partial payment was consistent with agreement and effectively ratified the agreement); *Lindenwood Dev. Corp. v. Levine, 178 A.D.2d 633, 634, 578 N.Y.S.2d 209, 210* [*19] *(2d Dep't 1991)* (fraud in the inducement defense barred by plaintiffs' "failure to disaffirm or take action when learning of the alleged fraud" and by plaintiffs' having "regarded the contracts as valid until they were sued" by making partial payments in accordance with agreement.); *Luftig v. Luftig, 239 A.D.2d 225, 227, 657 N.Y.2d 638, 659, 657 N.Y.S.2d 658 (1st Dep't 1997)* (holding that failure to reject payment under agreement for three years precluded fraudulent inducement counter-claim.)

Moreover, a party who re-affirms his contractual obligations in a subsequent written agreement is precluded from asserting defenses to those obligations under that agreement. *See Barrier Sys. v. A.F.C. Enters., Inc., 264 A.D.2d 432, 694 N.Y.S.2d 440 (2d Dep't 1999)* (holding that after retaining benefit of agreement and entering subsequent modification agreement, defendant is precluded from asserting fraud in the inducement).

In this case, the Court finds that Baran repeatedly ratified his obligations to pay SFS under the Loan Agreement, and is thus precluded from asserting the affirmative defense of fraudulent inducement. Baran learned that the "large pink stone" [*20] sold for significantly less than $ 1 million in late October, 1997, when the auction occurred. Additionally, Baran knew that the third stone, which the parties allegedly agreed would be part of the transaction, was not delivered within 72 hours of the wire transfer of Baran's funds to the Jezzinis. Indeed, Baran was aware that the third stone was never delivered, yet he continued to make payments under the Loan Agreement. Consequently, Baran was aware of the falsity of any alleged misrepresentations made by Russo at the latest, by the end of October 1997. However, Baran continued to make payments pursuant to the Loan Agreement well after this date. Baran paid the interest and all out-of-pocket expenses on the Loan during the entire one-year term of the Loan Agreement, although he did not pay any of the principal. (Nicyper Aff. P 39; Baran 5/29/01 Tr. 101:13-21; Baran 7/6/01 Tr. 198:22-199:20). Moreover, on March 21, 1999, Baran paid the remaining interest accrued on the Loan and paid $ 23,290 of the outstanding principal amount of $ 350,000,

leaving $ 326,710 of the principal amount outstanding. (Baran 5/29/01 Tr. 102:6-13, 106:13-18). On March 31, 1999, Baran agreed to extend the [*21] term of the Loan Agreement for another year and executed a Letter Agreement whereby he explicitly "confirmed that all of [his] representations and warranties set forth in the [Loan] Agreement are true and correct on and as of the date of this letter agreement" and that the terms of the Loan Agreement, except as amended, "remain[] and continue[] in full force and effect." (Nicyper Aff. Ex. Q PP 4, 6).

In sum, Baran's actions, up until the time he was sued, were entirely consistent with his intention to comply with the terms of the Loan Agreement. Indeed, Baran admitted that if he had the assets or cash, he would have paid off his loan to SFS in its entirety. (Baran 5/29/01 Tr. 106:1-19, 107:3, 108:13-16, 109:25-110:24; Baran 7/6/01 Tr. 199:14-19, 200:11-12, 206:18-20). Also significant is the fact that Baran never tried to rescind the Loan Agreement nor argue that he was fraudulently induced to enter into the Loan Agreement until SFS filed suit against him.

While Baran concedes that he made payments under the Loan Agreement, he contends that he only made these payments during a period when SFS, SI and Baran were attempting to amicably resolve their differences. Specifically, [*22] Baran claims that his payments under the Loan Agreement were made during the period that Russo was in contact with the Jezzinis in an attempt to secure the third stone, in addition to other stones, and that SI delivered to Baran 44 gemstones that the Jezzinis had given to SI in an effort to compromise. It was only under these circumstances, Baran contends, that he continued to make payments under the Loan Agreement. However, even if the delivery to Baran of the 44 gemstones constitutes some effort to compromise, it is undisputed that these efforts ceased in February 1998. (Baran 5/29/01 Tr. 67:17-68:7; Baran 7/6/01 Tr. 163:4-18; Russo 8/2/01 Tr. 221:6-22). Moreover, Baran fails to provide any evidence that any discussions regarding his obligations under the Loan Agreement took place after February 1998. Not only did Baran continue to make payments under the Loan Agreement well after that date, but he affirmatively endorsed a new Letter Agreement acknowledging his obligations under the original Loan Agreement in March 1999. Consequently, the Court finds that there is no material issue of fact with respect to Baran's ratification of the Loan Agreement. [8]

     8 Additionally, the Court notes that Baran's argument that he acted within a reasonable time to rescind the Loan Agreement is meritless. Indeed, even without Baran's affirmative re-acknowledgement of his obligations under the

Loan Agreement, the time delay between the alleged fraudulent inducement and Baran's claim that he was fraudulently induced would bar Baran's defense. [HN6] It is well settled that a party wishing to rescind a contract due to fraud in the inducement must act promptly. See Miller v. Cont'l Shipbuilding Corp., 265 F. 158, 161 (2d Cir. 1920); Int'l Motor Sports Group, Inc. v. Gordon, 98 Civ. 5611, 1999 U.S. Dist. LEXIS 12610, at *16 (S.D.N.Y. Aug. 16, 1999) (citations omitted); West Tsusho Co. v. Prescott Bush & Co., 92 Civ. 3378, 1993 U.S. Dist. LEXIS 8467, at *11 (S.D.N.Y. June 23, 1993). Upon discovery of the fraud, he must immediately announce his intention to rescind the contract. See Miller, 265 F. at 161. If he remains silent he has elected to waive his rights to be released from his obligations. See Miller, 265 F. at 161. In this case, three years passed between the alleged fraud and the commencement of proceedings when Baran first asserted that he was fraudulently induced to enter into the agreement. Consequently, he cannot now claim that he acted within a reasonable time to rescind the agreement.

[*23] 3. The Affirmative Defense of Breach of Fiduciary Duty Based on a Joint Venture is Unavailable

Baran also asserts the defense of breach of fiduciary duty based upon an alleged oral joint venture agreement between SI, SFS, Baran and the Jezzinis. The Court finds that this affirmative defense fails because there was no joint venture between SI, SFS, Baran and the Jezzinis.

[HN7] Pursuant to New York law, in order to establish the existence of a joint venture, all five of the following elements must exist: "(1) two or more persons must enter into a specific agreement to carry on an enterprise for profit; (2) their agreement must evidence their intent to be joint venturers; (3) each must make a contribution of property, financing, skill, knowledge, or effort; (4) each must have some degree of joint control over the venture; and (5) there must be a provision for sharing of both profits and losses." Itel Containers Int'l Corp. v. Atlanttrafik Express Serv., Ltd., 909 F.2d 698, 701 (2d Cir. 1990) (citations omitted); see also Dinaco, Inc. v. Time Warner, Inc., 98 Civ. 6422, 2002 U.S. Dist. LEXIS 20173, at *4-5 (S.D.N.Y. Oct. 22, 2002).

In this case, there is [*24] no indication that the parties intended for a joint venture to exist. Baran points to the fact that Russo was the one who first involved Baran in the venture and the fact that SI was to be the exclusive auctioneer of the gems involved in the transaction as evidence that a joint venture existed. Additionally, Baran contends that a letter dated September 19, 1997 in which the signatures of Russo (for SI), Fischer (for SFS),

Khaled Jezzini, and Baran appear establishes the existence of a joint venture between the parties. The Court disagrees that these facts suffice to create a triable issue of fact as to whether a joint venture existed between the parties.

While the letter establishes that there were some dealings between the four parties, Baran has failed to present facts sufficient to meet all the elements required for the existence of a joint venture. First, Baran has failed to present any facts that all of the parties intended to enter into a joint venture. Indeed, Baran conceded that Russo told him that SI could not directly participate as a partner because it would be a "conflict of interest for [SI] to be identified directly as a partner with one of its clients," but that instead [*25] he would arrange for Baran to obtain a loan through SFS so that Baran could enter into business with the Jezzinis. (Def.'s 56.1 Statement PP 22, 24).

Additionally, Baran fails to present evidence that there was any agreement between the parties to share losses. Because Baran has failed to produce any evidence to allow a reasonable juror to find that a joint venture existed between SFS, SI, Baran and the Jezzinis, the Court finds Baran's affirmative defense of breach of a fiduciary duty based on a joint venture agreement to be without merit. *See, e.g.,  Dinaco Inc., 2002 U.S. Dist. LEXIS 20173, at *6.*

### 4. Baran's Remaining Affirmative Defenses are Without Merit

In his amended answer, Baran additionally asserts the affirmative defenses of unclean hands, aiding and abetting SI to defraud him, and failure to liquidate the collateral enumerated in the security agreement in a commercially reasonable manner before seeking judgment. All of these defenses are wholly without merit.

First, Baran does not provide any evidence to support a defense of unclean hands. He does not allege any wrongdoing on the part of SFS. Instead, he admits that SFS did nothing wrong, and relies [*26] solely on the acts of SI, through Russo. Moreover, he does not address this affirmative defense in his papers. Consequently, the Court finds this defense to be without merit.

Second, the plain language of the Loan Agreement, as discussed above, precludes Baran's claim that SFS was required to liquidate the collateral before seeking to recover for default on the Loan Agreement. As discussed above, the Loan Agreement provides that Baran's obligations "are absolute and unconditional and the payment of any amounts due hereunder shall not be subject to the results of any sale of the Collateral or to any defenses, set-offs or counterclaims of any kind whatsoever". (Nicyper Aff. Ex. H P 1(h)). Consequently, Baran cannot

rely on the defense that the Agreement requires SFS to liquidate the collateral before seeking judgment for default. *See, e.g.,  Chemical Bank v. Kaufman, 142 A.D.2d 526, 527 N.Y.S.2d 582, 583 (1st Dep't 1988)* (reversing denial of summary judgment and rejecting defendant's contention that "plaintiff failed to act in a 'commercially reasonable manner' and first liquidate certain collateral to reduce the amount of the debt before proceeding on the guarantee" [*27] where defendant [] "specifically agreed ... that impairment of collateral would constitute no defense to an action on the guarantees.") Moreover, Baran does not point to any statute that would require SFS to liquidate the collateral before seeking judgment. Indeed, Sotheby's points to numerous New York cases that state that secured parties are permitted to retain collateral while awaiting payment on loan obligations. *See, e.g.,  McGrath v. Carnegie Trust Co., 221 N.Y. 92, 95, 116 N.E. 787, 788 (1917)* (Cardozo, J.) (stating that "[a] creditor may not be required to surrender any part of his collateral till payment has been made in full."); *Reich v. Bowery Sav. Bank, 183 A.D.2d 884, 885-886, 583 N.Y.S.2d 978, 979-80 (2d Dep't 1992)* (holding that bank was entitled to hold collateral from personal loan even after personal loan was paid because corporate loan was in default.) Consequently, this argument is also meritless.

### D. Baran's Counter-Claims and Third-Party Claims

1. Baran's Claim for Fraudulent Inducement is Meritless Because the Court has previously found that Baran ratified his obligations under the Loan Agreement by continuing to pay SFS [*28] under the Agreement, and by re-affirming his obligations under the Loan Agreement by signing the Letter Agreement in March 1999, Baran's counter-claims and third-party claims for fraudulent inducement are also without merit. Consequently, those claims are dismissed.

2. Baran's Third-Party Claims for Breach of Fiduciary Duty and Negligence Against SI are Barred by the Statute of Limitations

Sotheby's contends that Baran's claims against SI for breach of fiduciary duty, negligence, and negligent misrepresentation must be dismissed because they are barred by the applicable statute of limitations. The Court agrees with respect to the claims for breach of fiduciary duty and negligence.

[HN8] New York courts apply either a three-year or a six-year statute of limitations claim to breach of fiduciary duty claims, depending upon the remedy sought. *See Loengard v. Santa Fe Indus., Inc., 70 N.Y.2d 262, 266, 519 N.Y.S.2d 801, 514 N.E.2d 113 (1987).* Pursuant to *N.Y. C.P.L.R. § 214(4)*, claims for damages from a breach of a fiduciary duty have a three-year statute of limitations. *See  Cooper v. Parsky, 140 F.3d 433, 440-41*

*(2d Cir. 1998); Svenska Finans Int'l BV v. Scolaro, Shulman, Cohen, Lawler & Burstein P.C., 37 F. Supp. 2d 178, 183 (N.D.N.Y. 1999); [*29] Geren v. Quantam Chem. Corp., 832 F. Supp. 728, 735 (S.D.N.Y. 1993).* Likewise, under New York law, claims for negligence are governed by a three-year statute of limitations. *See N.Y. C.P.L.R. § 214(4); Herrington v. Verrilli, 151 F. Supp. 2d 449, 460 (S.D.N.Y. 2001).* Moreover, where a party is added to a lawsuit by way of a third-party complaint, claims against the third-party defendant are deemed interposed at the time of service of the third-party complaint. *See Fitzpatrick v. City of New York, 714 N.Y.S.2d 185, 189, 185 Misc. 2d 79, 83 (Sup. Ct. N.Y. Cty. 2000).*

Because Baran seeks money damages for his breach of fiduciary duty claim, the statute of limitations on this claim is three years. Baran filed his third-party complaint against SI on December 21, 2000. The events that form the bases of Baran's breach of fiduciary duty and negligence claims occurred, at the latest, in October 1997, more than three years prior to the commencement of the third-party action. Consequently, Baran's claims for breach of fiduciary duty and negligence in the third-party complaint are time barred and will be dismissed. *See Fitzpatrick, 714 N.Y.S.2d at 185, 185 Misc.2d at 83 [*30]* (holding that negligence claim asserted in an amended complaint was time barred where third-party action was not commenced until after the statute of limitations had run on the negligence claim); *Polo v. City of New York, 193 A.D.2d 411, 412, 597 N.Y.S.2d 74 (1st Dep't 1993)* (refusing to permit plaintiff to assert claims against third-party defendants where third-party complaint was served after the expiration of the underlying statute of limitations period.)

3. Baran's Negligent Misrepresentation Claim Against SI is Meritless

[HN9] Under New York law, claims for negligent misrepresentation based on fraud are governed by a six-year statute of limitations period. *See N.Y. C.P.L.R. § 213(8); Calcutti v. SBU, Inc., 224 F. Supp. 2d 691, 701 (S.D.N.Y. 2002)* (stating that "in New York, a negligent misrepresentation claim that is based on the same factual situation as a fraud claim is subject to a six-year statute of limitations.") (citations omitted). Consequently, Baran's claim against SI for negligent misrepresentation is not time-barred and cannot be dismissed on this ground.

[HN10] The elements of a claim for negligent misrepresentation under New York law [*31] "are that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000)* (citations omitted).

Baran alleged that he entered into the transaction with the Jezzinis based on Russo's representation that the "large pink stone" would sell for over $ 1 million, a fact Russo knew was false, and that a third stone would be provided for auction.

In this case, Baran's negligent misrepresentation claim against SI fails because neither of Russo's alleged statements are actionable. First, Russo's alleged statement that the "large pink stone" would sell for over $ 1 million was a mere prediction with respect to future events. *See Sheth v. New York Life Ins. Co., 273 A.D.2d 72, 74, 709 N.Y.S.2d 74 (1st Dep't [*32] 2000)* (holding that "the purported misrepresentations relied upon by plaintiffs may not form the basis of a claim for ... negligent misrepresentation since they are ... opinions of value or future expectations.").

Second, Russo's alleged statement that a third stone would be involved in the transaction was merely a promise as to a future event, and thus not actionable. *See Murray v. Xerox Corp., 811 F.2d 118, 123 (2d Cir. 1987)* (stating that [HN11] "promises of future conduct are not actionable as negligent misrepresentations."); *see also Hydro Investors, Inc., 227 F.3d at 20-21* (stating that "the alleged misrepresentation must be factual in nature and not promissory or relating to future events that might never come to fruition."). Consequently, Baran's claim against SI for negligent misrepresentation will be dismissed.

5. Baran's Counter-Claims for Breach of Fiduciary Duty, Negligence, and Negligent Misrepresentation Against SFS are Meritless

Baran claims that SFS is liable to him for breach of fiduciary duty, negligence, and negligent misrepresentation. However, it is undisputed that any alleged breach of fiduciary duty, negligence, or negligent misrepresentation [*33] occurred based on the acts of Paul Russo, who was not employed by SFS. (Fischer 6/26/01 Tr. 17:4-6). In fact, Baran concedes that he found SFS reasonable to deal with and was not "disappointed with them." (Baran 5/29/01 Tr. 107:9-13). Because Baran merely asserts that SFS is an "affiliate" of SI without providing any evidence with respect to the relationship between the two companies, he has failed to adequately allege that there is some ground upon which to hold SFS liable for the acts of Russo. [9] Consequently, the Court dismisses Baran's claims against SFS for breach of fiduciary duty, negligence, and negligent misrepresentation.

9    Although Russo's signature appears on the Loan Agreement above the line reserved for a signature on behalf of SFS, the signature of Shelley Fischer, Senior Vice-President of SFS, superseded Russo's signature. There is no dispute that Russo worked for SI, not SFS.

6. Baran's Claims Against SI and SFS for Conversion and Breach of Duty as a Bailee are Meritless

Baran also asserts [*34] counter-claims against SFS and third-party claims against SI for conversion and breach of duty as a bailee over the collateral held by SI, including the "Additional Gem Collection" Baran delivered to SI. The Court finds that there is no material issue of fact with respect to these claims.

As discussed above, pursuant to the Loan Agreement, Baran granted a security interest in collateral listed in an attached schedule in addition to "all other property of the Maker [Baran], and the proceeds thereof, now or at any time in the future in the possession of [SFS] or any of its affiliated corporations." Moreover, the Loan Agreement was explicit that SFS could, upon the occurrence of default, and in its "sole discretion ... proceed against [Baran] and/or against any or all of the Collateral in any order or combination as [SFS] may from time to time see fit." *See McGrath v. Carnegie Trust Co., 221 N.Y. 92, 95, 116 N.E. 787, 788 (1917)* (stating that [HN12] "[a] creditor may not be required to surrender any part of his collateral till payment has been made in full."); *Reich v. Bowery Sav. Bank, 183 A.D.2d 884, 884-85, 583 N.Y.S.2d 978, 979-80 (2d Dep't 1992)* [*35] (holding that bank was entitled to retain collateral from personal loan even after personal loan was paid because corporate loan was in default). Further, Baran has expressly admitted that he delivered the "Additional Gem Collection" that is the basis of this claim to SI, at least in part, to pay off the SFS Loan. (Nicyper Aff. Ex. B P 25). Because those items were given for this express purpose, Baran cannot now claim that SFS and SI, by holding them, are liable for conversion or breach of a bailee's duty. Accordingly, Baran's claims for conversion and breach of bailee's duty are without merit, and these claims will be dismissed.

7. Baran's Breach of Contract Claims Against SI and SFS are Without Merit

Defendant's claims for breach of contract also lack merit. These claims are based on the assumption that SFS and SI breached a duty of good faith and fair dealing with respect to an agreement to enter into a joint venture. As discussed above, the Court finds that there was no joint venture between the parties. Consequently, there is no material issue of fact with respect to Baran's breach of contract claims, and these claims are dismissed.

8. Baran's Claim for Contribution or Indemnification [*36] Against SI is Meritless

Finally, Baran brings a claim against SI for contribution or indemnification for any amount he is required to pay to SFS. The Court finds that neither a claim for contribution nor indemnification is available to Baran.

[HN13] New York law is clear that "contribution claims are unavailable when the underlying claim is for purely economic loss resulting from the breach of contractual obligations." *Intellisec v. Firecom, Inc., 00 CV 3557, 2001 U.S. Dist. LEXIS 2619, at *43 (E.D.N.Y. Feb. 1, 2001)* (citing *Morse/Diesel, Inc. v. Trinity Indus., Inc., 859 F.2d 242 (2d Cir. 1988)*). In this case, SFS seeks to recover for economic loss based upon Baran's default on the loan. Accordingly, a claim for contribution from SI is unavailable and this claim will be dismissed.

Likewise, the Court finds that a claim for indemnification is also unavailable. [HN14] "The predicate of common-law indemnity is vicarious liability without actual fault on the part of the proposed indemnitee." *Trustees of Columbia Univ. v. Mitchell/ Giurgola Assocs., 109 A.D.2d 449, 492 N.Y.S.2d 371, 375 (1st Dep't 1985)*. In order for a claim for indemnification to [*37] exist, a party must have an express right to indemnification by way of a contract, or a special relationship between the parties must exist such that a right to indemnification is implied. *See Sabater v. Lead Indus. Ass'n, 00 Civ. 8026, 2001 U.S. Dist LEXIS 14758, at *15 (S.D.N.Y. Sept. 21, 2001)*. Baran does not allege that there is a provision of any agreement by which SI has agreed to indemnify him. Nor has he alleged the existence of any special relationship sufficient to create a right of indemnification. Examples of such special relationships include "employer/employee, building owner/independent contractor, and motor vehicle owner/negligent driver." *Sabater, 2001 U.S. Dist. LEXIS 14758, at *15*. Accordingly, Baran's claim for indemnification is dismissed.

III. CONCLUSION

For the reasons set forth in this opinion, plaintiff and third-party defendant's motion for summary judgment is granted in its entirety. Plaintiff is entitled to Judgment as set forth below. The defendant's counter-claims against SFS shall be dismissed. Likewise, each and every third-party claim against SI shall be dismissed. The Clerk of the Court is directed to enter Judgment [*38] as set forth below and close the case.

IV. JUDGMENT

The plaintiff has submitted an affidavit supporting a judgment of $ 549,002.39 plus all interest, expenses, and costs accruing until the date of payment in full to SFS. (Fischer Aff. PP 5, 6). Because this affidavit is unop-

2003 U.S. Dist. LEXIS 13079, *

posed and is based entirely on the provisions of the Loan Agreement, the Clerk is directed to enter judgment for plaintiff in the amount of $ 549,002.39, plus all interest, expenses, and costs accruing until the date of payment in full.

**SO ORDERED:**

**BARBARA S. JONES**

**UNITED STATES DISTRICT JUDGE**

Dated: July 25, 2003

LEXSEE 2007 US DIST. LEXIS 49641

**MANHATTAN MOTORCARS, INC., Plaintiff, - against - AUTOMOBILI LAM-
BORHINI, S.p.A., CHAMPION MOTOR GROUP, INC., and CHAMPION MO-
TORS, INC., d/b/a LAMBORGHINI LONG ISLAND, Defendants.**

**07 Civ. 978 (SAS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2007 U.S. Dist. LEXIS 49641*

**July 9, 2007, Decided
July 9, 2007, Filed**

**COUNSEL:** [*1] For Plaintiff: David M. Kolko, Esq., Michael Cohen, Esq., Phillips Nizer LLP, New York, New York.

For Defendants: Daniel V. Gsovski, Esq., Keith A. Frederick, Esq., Herzfeld & Rubin, P.C., New York, New York; James R. Vogler, Esq., Randall L. Oyler, Esq., David M. Wiese, Esq., Barack Ferrazzano Kirschbaum Perlman & Nagelberg LLP, Chicago, Illinois.

**JUDGES:** Shira A. Scheindlin, U.S.D.J.

**OPINION BY:** Shira A. Scheindlin

**OPINION**

**OPINION AND ORDER**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

**I. INTRODUCTION**

Manhattan Motorcars, Inc. ("Manhattan") brings this diversity action [1] against Automobili Lamborghini, S.p.A. ("Lamborghini" or "Defendant") claiming common-law fraud, breach of contract, breach of implied covenant of good faith and fair dealing, unjust enrichment, breach of fiduciary duty, negligent misrepresentation, violation of the New York Franchised Motor Vehicle Dealer Act, and account stated. [2] The claims arise from the circumstances surrounding Manhattan's operation of a Lamborghini dealership and its attempts to expand dealership operations into Westhampton, New York. Manhattan seeks over fifty million dollars in damages, as well as five million dollars in punitive damages. Lamborghini now moves to dismiss all claims brought [*2] against it for failure to satisfy *Rules 9(b)* and *12(b)(6) of the Federal Rules of Civil Procedure*. Manhattan opposes this motion. For the following reasons, defendant's motion to dismiss is granted in part and denied in part.

1   This Court has jurisdiction over this matter pursuant to *section 1332(a) of title 28 of the United States Code.*

2   Manhattan alternately characterizes its claim in account stated as a claim for "Monies Owed." *See* Amended Complaint ("Am. Compl.") at 17. The Court has found no authority for the existence of such a claim.

**II. BACKGROUND** [3]

3   The following facts, drawn from the Amended Complaint, are assumed to be true for the purposes of this motion.

**A. The Parties**

Manhattan, a New York corporation, [4] "is a dealer and seller of expensive, unique and top of the line automobiles including Rolls Royce, Bentley, Porsche, and Lamborghini, with its primary showroom located at 270 Eleventh Avenue, New York . . . ." [5] Lamborghini is an Italian-based company which manufactures and sells the Lamborghini automobile through dealerships located throughout the world, including New York. [6]

4   *See* Am. Compl. P 1.

5   *Id.* P 2.

6   *See id.* PP 3-4.

2007 U.S. Dist. LEXIS 49641, *

## B. The 1996 Agreement

In 1996, Lamborghini sought to induce [*3] Manhattan to enter into a dealer agreement with it for the marketing and sale of Lamborghini automobiles from plaintiff's Manhattan showroom. [7] In order to induce Manhattan to become a dealer, Lamborghini, through its representatives, advised Manhattan's president and owner, Brian Miller, that if Manhattan became a dealer, it would have "an exclusive territory in and throughout New York State for the marketing and sale of Lamborghini vehicles for as long as [Manhattan] acted as a dealer." [8] According to Manhattan, this representation was a necessary inducement due to the unique nature of the Lamborghini automobile, which bears a price tag "well in excess of $ 150,000" [9] as well as high insurance and maintenance costs. [10] These factors result in a limited market for the Lamborghini automobile. [11] In fact, competition is so "stiff" among dealers that a reduction in sales volume of even a few vehicles has the potential to "significantly impair the revenues and profitability" of a Lamborghini dealership. [12] Moreover, Lamborghini allegedly requires its dealers to satisfy "exacting design, construction and showroom standards in order to maintain the prestige and special image of the Lamborghini." [*4] [13] The costs of compliance with these standards, which are borne by the dealers, are "substantial." [14] As a result of these considerations, Lamborghini allegedly must offer potential dealers an exclusive territory in order to persuade them to enter into dealer agreements, which would likely be unprofitable otherwise. [15]

7  *See id.* P 11.

8  *Id.* P 16.

9  *Id.* P 12.

10  *See id.* P 13.

11  *See id.* Manhattan alleges that approximately five hundred Lamborghini automobiles are sold each year through approximately forty-seven Lamborghini dealers located throughout the United States. *See id.*

12  *Id.*

13  *Id.* P 15.

14  *Id.*

15  *See id.* P 17.

Manhattan alleges that without the assurance of exclusivity in New York, it would not have entered into a dealer agreement with Lamborghini. [16] In 1996, in reliance upon Lamborghini's alleged representations regarding exclusive territory in New York, Manhattan entered into a written dealer agreement with Lamborghini ("1996 Agreement"). [17] The 1996 Agreement, however, makes no mention of exclusivity or territory. [18] Between 1996 and 2005, Manhattan served as the sole Lamborghini dealer in New York State. [19]

16  *See id.* P 22.

17  *See id.* P 18.

18  *See id.* Manhattan alleges that this conspicuous silence [*5] was an attempt by Lamborghini to conceal the fact that it had no intention of granting an exclusive license to Manhattan for the New York area. *See id.* P 21.

19  *See id.* P 23.

Since the 1996 Agreement was originally entered into by the parties, it has been renewed from time to time. [20] The most recent incarnation of the Agreement was entered into on September 1, 2005 ("2005 Agreement"). [21] The 2005 Agreement contains an integration clause, which states: "[t]his Agreement is the entire and sole agreement and understanding between the parties [and] terminates and supersedes any and all other prior agreements between the parties, whether oral or in writing." [22]

20  *See id.* P 18.

21  *See* 2005 Agreement, Ex. A. to Am. Compl., at 40.

22  *Id.* at 36.

## C. The Westhampton Facility

On January 16, 2004, Manhattan and Lamborghini entered into a written Letter of Intent, in which Lamborghini "consented" to Manhattan's construction of a new facility in Westhampton, New York for the sale and service of Lamborghini automobiles. [23] The Letter of Intent designated the new facility as a satellite of plaintiff's Manhattan dealership, [24] and stated that "an addendum to the main contract would be drafted and signed to reflect [*6] Lamborghini's acceptance of the proposed additional location in Long Island." [25] Lamborghini represented to Miller, both before and after the signing of the Letter of Intent, that plaintiff's Westhampton facility would "be the sole dealership selling Lamborghinis in

Long Island . . . ." [26] Manhattan relied on these representations in that it would not have signed the Letter of Intent had it known that it would not have exclusive dealer rights on Long Island. [27]

  23  Id. P 24.

  24  See id.

  25  Id.

  26  Id. P 26.

  27  See id. P 39. Manhattan alleges that these representations were made to induce Manhattan to expand its dealership to Long Island and that the representations were knowingly false when made. See id. P 41.

After signing the Letter of Intent, Manhattan "expended several million dollars to renovate a temporary facility for the Westhampton dealership and then to build a new, permanent facility in Westhampton . . . ." [28] Lamborghini was aware of these expenditures since 2004. [29] In September 2005, Lamborghini "changed course" and "insisted" that the Westhampton facility be operated as a separate dealership by Manhattan, rather than as a satellite facility of the Manhattan dealership. [30] "[H]aving [*7] already expended several millions of dollars on the Westhampton facility," plaintiff had "little choice but to accede to [Lamborghini's] demand . . . ." [31]

  28  Id. P 27.

  29  See id. P 31.

  30  Id. P 28.

  31  Id. P 29.

As the Westhampton facility would be operated as a separate dealership, Manhattan was required to submit a new dealer application and obtain approval of the application from Lamborghini. [32] On October 15, 2005, Manhattan filed the requisite dealer application ("Westhampton Dealer Application"). [33] Miller was later informed by a Lamborghini official that the Westhampton facility was "in full compliance with all standards and requirements, that his application for the Westhampton dealership would soon be approved, and he should expect a dealer agreement to sign." [34] To date, Manhattan's Westhampton Dealer Application remains pending, and Lamborghini has "refused to formally approve said application or send a dealer agreement to [Manhattan] for execution." [35] Despite a lack of formal approval, Manhattan "is holding itself out and acting as a Lamborghini dealer in its West-

hampton facility[,]" an activity that Lamborghini encourages. [36]

  32  See id. P 28.

  33  See id. P 29.

  34  Id. P 33.

  35  Id. P 35.

  36  Id.

## D.  [*8] The Appointment of Champion

In the summer of 2006, Manhattan learned that Lamborghini had signed a Letter of Interest with another car dealership, Champion Motor Group, Inc. ("Champion"). [37] Under the Letter of Interest, Lamborghini authorized Champion to market and sell Lamborghinis in New York. [38] Champion's showroom is located in Jericho, New York, about fifty miles from Manhattan's Westhampton facility. [39] Lamborghini entered into the Letter of Interest fully aware of the substantial expenditures Manhattan made in connection with the construction of its Westhampton dealership. [40] Manhattan alleges that, in fact, Lamborghini intentionally concealed its relationship with Champion with the intention of inducing Manhattan to incur these expenses so as "to induce, if not coerce [Manhattan] to accede to the rights granted to Champion." [41] As a result of "unfair competition" from Champion, Manhattan "has and will lose sales from its Manhattan and Westhampton dealerships and will suffer substantial loss of profits." [42] At the same time, the additional Lamborghini dealership on Long Island has benefitted Lamborghini by increasing its revenues and promoting its good will. [43]

  37  See id. P 36.

  38  See [*9] id.

  39  See id.

  40  See id. P 38.

  41  Id. P 80.

  42  Id. P 42.

  43  See id. P 66.

## III. LEGAL STANDARDS

## A. Motion to Dismiss

"*Federal Rule of Civil Procedure 8(a)(2)* requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary . . . ." [44] When a complaint is attacked by a *Rule 12(b)(6)* motion to dismiss, the plaintiff need not provide "detailed factual allegations." [45] To survive a motion to dismiss, it is enough that the complaint "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." [46]

> 44   *Erickson v. Pardus, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007).*

> 45   *Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007).*

> 46   *Id.*

The task of the court is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." [47] When determining the sufficiency of plaintiff's claim for *Rule 12(b)(6)* purposes, consideration is limited to the factual allegations in plaintiff's amended complaint, which are accepted as true, as well as "documents relied on or incorporated by reference in the complaint." [48] While there are legitimate reasons to dismiss [*10] a case under *Rule 12(b)(6)*, "[t]he case cannot, however, be dismissed on the ground that petitioner's allegations of harm were too conclusory to put these matters in issue." [49] Thus, while a court must take the plaintiff's allegations as true, "the claim may still fail as a matter of law if it appears . . . that the plaintiff can prove no set of facts in support of its claim which would entitle [him] to relief, or if the claim is not legally feasible." [50]

> 47   *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 176 (2d Cir. 2004)* (quotation marks and citation omitted).

> 48   *International Design Concepts, LLC v. Saks, Inc., 486 F. Supp. 2d 229, 235-36 (S.D.N.Y. 2007).*

> 49   *Erickson, 127 S. Ct. at 2200 (2007).*

> 50   *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 457 F. Supp. 2d 455, 459 (S.D.N.Y. 2006)* (citing *Allaire Corp. v. Okumus, 433 F.3d 248, 250 (2d Cir. 2006)).*

**B. Common-Law Fraud**

To recover damages for fraud under New York law, a plaintiff must prove: (1) a misrepresentation of material

fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5)  [*11] which caused injury to the plaintiff. [51] "The claim also requires a showing of proximate causation, such that the injury 'is the natural and probable consequence of the defrauder's misrepresentation or . . . the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud.'" [52] A claim for fraud can also be based on concealment of information if the plaintiff, in addition to showing an intentional failure to disclose a material fact reasonably resulting in injury, can demonstrate that the defendant had a duty to disclose material information. [53] Such a duty can arise in the course of negotiations pursuant to a business transaction in three situations -- (1) "where [one] party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party, it cannot give only half of the truth"; (2) "when the parties stand in a fiduciary or confidential relationship with each other"; and (3) "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." [54]

> 51   *See Wynn v. AC Rochester, 273 F.3d 153, 156 (2d Cir. 2001).*

> 52   *Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 104-05 (2d Cir. 2001)*  [*12] (quoting *Cumberland Oil Corp. v. Thropp, 791 F.2d 1037, 1044 (2d Cir. 1986)).*

> 53   *See Swersky v. Dreyer & Traub, 219 A.D.2d 321, 643 N.Y.S.2d 33, 36 (1st Dep't 1996).*

> 54   *Brass v. American Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993).*

A claim for fraud under New York law must also satisfy the heightened pleading standards of *Federal Rule of Civil Procedure 9(b)*, which requires "all averments of fraud" to be "stated with particularity." [55] This requirement must be met even in suits in which subject matter jurisdiction is based, as here, on diversity of citizenship and in which state law controls the elements of the fraud claim. [56] For claims of fraudulent misrepresentation, the Second Circuit has held that *Rule 9(b)* requires allegations that "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." [57] In the case of fraudulent concealment or omission, where the plaintiff is unable to specify the time and place because no act occurred, "the complaint must still allege: (1) what the omissions were; (2) the person responsible for the

failure to disclose; (3) [*13] the context of the omissions and the manner in which they misled the plaintiff; and (4) what the defendant obtained through the fraud." [58]

55 *Fed. R. Civ. P. 9(b).*

56 *See, e.g., Malmsteen v. Berdon, LLP, 477 F. Supp. 2d 655, 664 (S.D.N.Y. 2007)* (citing 5A Charles Alan Wright et al., FEDERAL PRACTICE AND PROCEDURE § 1297 (3d ed. 2004)).

57 *Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000)* (quotation marks omitted).

58 *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd., 85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000).*

**C. Breach of Contract**

To establish a claim for breach of contract under New York law, a party must prove "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." [59] In determining a party's obligations under a contract, it is not for the court to "supply a specific obligation the parties themselves did not spell out." [60] "The interpretation of an unambiguous contract is a question of law for the court, and the provisions of a contract addressing the rights of the parties will prevail over the allegations in a complaint." [61] At the motion to dismiss stage, where a plaintiff's "factual allegations or legal conclusions are flatly [*14] contradicted by documentary evidence, they are not presumed to be true, or even accorded favorable inference[,]" in the context of a breach of contract action. [62] If the language of the contract is ambiguous, New York law requires the court to interpret a written contract "so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." [63] Where "a contract recites that all of the parties' agreements are merged in the written document, parol evidence is not admissible to vary, or permit escape from, the terms of the integrated contract." [64] Finally, under the New York Statute of Frauds, an agreement which by its terms cannot to be performed within one year must be in writing. [65]

59 *Terwilliger v. Terwilliger, 206 F.3d 240, 245-46 (2d Cir. 2000).*

60 *Tonking v. Port Auth. of New York and New Jersey, 3 N.Y.3d 486, 490, 821 N.E.2d 133, 787 N.Y.S.2d 708 (2004).*

61 *Taussig v. Clipper Group, L.P., 13 A.D.3d 166, 787 N.Y.S.2d 10, 11 (1st Dep't 2004).*

62 *Id.*

63 *Cruden v. Bank of New York, 957 F.2d 961, 976 (2d Cir. 1992).*

64 *Manufacturers Hanover Trust Co. v. Yanakas, 7 F.3d 310, 315 (2d Cir. 1993).*

65 *See N.Y. Gen. Oblig. Law § 5-701(a)(1)* (McKinney 2007).

**D. Breach of Implied Covenant of Good Faith and [*15] Fair Dealing**

"In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance." [66] Breach of the implied covenant is considered a breach of the underlying contract. [67] "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." [68] Additionally, the covenant imposes an obligation on the parties to refrain from "'intentionally and purposefully [doing] anything to prevent the other party from carrying out the agreement on his part.'" [69] While the implied covenant of good faith and fair dealing does not "imply obligations 'inconsistent with other terms of the contractual relationship,'" [70] it does encompass "'any promises which a reasonable person in the position of the promisee would be justified in understanding were included.'" [71]

66 *511 West 232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d 144, 153, 773 N.E.2d 496, 746 N.Y.S.2d 131 (2002)* (citations omitted).

67 *See Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 80 (2d Cir. 2002).*

68 *Id.* (quotation marks omitted).

69 *Carvel Corp. v. Diversified Mgmt. Group., 930 F.2d 228, 230 (2d Cir. 1991)* [*16] (quoting *Grad v. Roberts, 14 N.Y.2d 70, 75, 198 N.E.2d 26, 248 N.Y.S.2d 633 (1964)).*

70 *511 West 232nd Owners, 98 N.Y.2d at 153* (quoting *Murphy v. American Home Prods. Corp., 58 N.Y.2d 293, 304, 448 N.E.2d 86, 461 N.Y.S.2d 232 (1983)).*

71 *Id.* (quoting *Rowe v. Great Atl. & Pac. Tea Co., 46 N.Y.2d 62, 69, 385 N.E.2d 566, 412 N.Y.S.2d 827 (1978)).*

**E. Unjust Enrichment**

A plaintiff may recover in a claim for unjust enrichment if it can show that "(1) defendant was benefited; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." [72] Under New York law, "[t]he theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the *absence* of any agreement." [73] Therefore, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." [74] However, this rule only applies when the existence of a contract governing the transaction in question is undisputed. [75]

> [72] *Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (citation omitted).

> [73] *Id. at 586-87*(citation omitted) (emphasis added).

> [74] *Id. at 587* (citation omitted).

> [75] *See Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 663 (2d Cir. 1996) [*17] (claim for unjust enrichment "properly pleaded as such in the alternative to the contractual claim" where one defendant disputes being a party to the contract). *See also Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 249 (S.D.N.Y. 2006) (unjust enrichment claim survived dismissal where the parties disagreed as to whether underlying contracts were binding on defendants).

## F. Breach of Fiduciary Duty

A claim for breach of fiduciary duty involves three elements: "breach by a fiduciary of a duty owed to plaintiff; defendant's knowing participation in the breach; and damages." [76] There are four elements essential to the establishment of a fiduciary relationship: "(1) [t]he vulnerability of one party to the other which (2) results in the empowerment of the stronger party by the weaker which (3) empowerment has been solicited or accepted by the stronger party and (4) prevents the weaker party from effectively protecting itself." [77] Generally, where parties deal at arms-length in a commercial transaction, "'no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances.'" [78] Nevertheless, "a distributorship [*18] agreement may, in some rare instances, create a confidential relationship out of which a duty of fiduciary care arises." [79]

> [76] *SCS Commc'ns, Inc. v. Herrick Co.*, 360 F.3d 329, 342 (2d Cir. 2004).

> [77] *Atlantis Info. Tech., GmbH v. CA, Inc.*, 485 F. Supp. 2d. 224 (E.D.N.Y. 2004) (quotation marks omitted).

> [78] *Cal Distributor, Inc. v. Cadbury Schweppes Ams. Bevs., Inc.*, No. 06 Civ. 496, 2007 U.S. Dist. LEXIS 854, 2007 WL 54534, at *9 (S.D.N.Y. Jan. 5, 2007) (quoting *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 511 (S.D.N.Y. 1994)).

> [79] *Lake Erie Distrib., Inc. v. Martlet Importing Co.*, 221 A.D.2d 954, 634 N.Y.S.2d 599, 601 (4th Dep't 1995). Accord *A.S. Rampell, Inc. v. Hyster Co.*, 3 N.Y.2d 369, 377, 144 N.E.2d 371, 165 N.Y.S.2d 475 (1957) (upholding sufficiency of claim for breach of fiduciary duty owed by manufacturer to distributor).

A fiduciary is obliged to exercise the "highest degree of good faith, honesty, integrity, fairness and fidelity" in its dealings with those to whom the duty is owed. [80] It is "elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect." [81] Once a fiduciary duty is established, it is so "inflexible" that the fiduciary must avoid not only self-dealing, but also "situations [*19] in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty." [82]

> [80] *U.S. Ice Cream Corp. v. Bizar*, 240 A.D.2d 654, 659 N.Y.S.2d 492, 492 (2d Dep't 1997).

> [81] *Birnbaum v. Birnbaum*, 73 N.Y.2d 461, 466, 539 N.E.2d 574, 541 N.Y.S.2d 746 (1989).

> [82] *Id.*

## G. Negligent Misrepresentation

Under New York law, a claim of negligent misrepresentation must satisfy the following five elements: "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that it should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." [83] The alleged misrepresentation must be factual in nature: promises of future conduct or representations as to future events are not actionable as negligent misrepresentations. [84] The special relationship and duty required for a negligent misrepresentation

claim is based on consideration of the following three factors: "whether the person making the representation held or appeared to [*20] hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." [85] A simple commercial relationship, such as that between a franchisor and franchisee, does not constitute the kind of special relationship necessary for a negligent misrepresentation claim. [86] However, courts have found a special relationship and duty, for example, where a defendant sought to induce plaintiffs into a business transaction by making certain statements or providing specific information with the intent that plaintiffs rely on those statements or information. [87]

    83   *Hydro Investors, Inc. v Trafalgar Power, Inc., 227 F.3d 8, 20 (2d Cir. 2000).*

    84   *See id. at 20-21.*

    85   *Suez Equity Investors, 250 F.3d at 103.*

    86   *See Dimon, Inc. v. Folium, Inc., 48 F. Supp. 2d 359, 373 (S.D.N.Y. 1999).*

    87   *See Kimmell v. Schaefer, 89 N.Y.2d 257, 264-65, 675 N.E.2d 450, 652 N.Y.S.2d 715 (1996).*

## H. The New York Franchised Motor Vehicle Dealer Act

    The Franchised Motor Vehicle Dealer Act (the "FMVDA") regulates motor vehicle manufacturers, distributors and factory or distributor representatives, as well as dealers [*21] of motor vehicles doing business in the State of New York. [88] Section 466 of the FMVDA makes it unlawful "for a franchisor directly or indirectly to impose unreasonable restrictions on [a] franchised motor vehicle dealer relative to . . . site-control . . . and assertion of legal or equitable rights with respect to its franchise or dealership." [89] Section 469 of the FMVDA provides a private cause of action for a franchised motor vehicle dealer who is or may be aggrieved by a violation of the FMVDA. [90]

    88   *N.Y. Veh. & Traf. Law §§ 460-473* (2007).

    89   *Id. § 466(1).*

    90   *See id. § 469.*

## I. Account Stated

    "An account stated is an agreement between parties to an account based upon prior transactions between them with respect to the correctness of the account items and balance due." [91] Recovery on a claim for account stated is permitted on the theory that "the parties have, by their conduct, evidenced an agreement upon the balance of an indebtedness." [92] The agreement may be express [93] or, it

> may sometimes result from the retention of accounts current without objection. But the result does not always follow. It varies with the circumstances that surround the submission of the statements and those circumstances [*22] include, of course, the relation between the parties. [94]

Among the circumstances to be considered in implying an agreement is whether an objection has been made to the account within a reasonable time. [95]

    91   *Jim-Mar Corp. v. Aquatic Const., Ltd., 195 A.D.2d 868, 600 N.Y.S.2d 790, 790 (3d Dep't 1993)* (citations omitted).

    92   *Interman Indus. Prods., Ltd. v. R.S.M. Electron Power, Inc., 37 N.Y.2d 151, 153-154, 332 N.E.2d 859, 371 N.Y.S.2d 675 (1975).*

    93   *Jim-Mar Corp., 600 N.Y.S.2d at 790* (citations omitted).

    94   *Newburger-Morris Co. v. Talcott, 219 N.Y. 505, 512, 114 N.E. 846 (1916)* (Cardozo, J.).

    95   *See Interman, 37 N.Y.2d at 154.*

## IV. DISCUSSION

### A. Common-Law Fraud

    Lamborghini moves to dismiss the fraudulent misrepresentation, fraudulent omission, and fraudulent inducement claims for failure to plead fraud with the particularity required by *Rule 9(b)*. [96] Specifically, it finds the Amended Complaint deficient due to Manhattan's failure to disclose the names of the Lamborghini representatives who made the allegedly fraudulent representations regarding exclusivity, and where and when the representations were made. [97]

    96   *See* Lamborghini's Memorandum of Law in Support of Motion to Dismiss ("Def. Mem.") at 12.

97  *See id.*

Manhattan's Amended Complaint asserts only that the [*23] allegedly fraudulent statements were made by unnamed "representatives" of Lamborghini, "in or about 1996" in the first instance, [98] and "[b]efore and after the signing of the Letter of Intent" in the second instance. [99] The Amended Complaint also fails to identify where these representations were made. Additionally, Manhattan's allegations of fraudulent omission fail to identify the representatives responsible for the failure to disclose Lamborghini's intentions with regard to Champion. Manhattan's response to these deficiencies -- that the "actual experience of the parties" obviates the failure to satisfy *Rule 9(b)* [100] -- is without support in the law and provides no excuse. [101] Accordingly, Manhattan's causes of action sounding in fraud must be dismissed.

98  Am. Compl. P 16.

99  *Id.* P 26

100  Manhattan's Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("Pl. Opp.") at 9.

101  As Lamborghini notes, this attempted justification "cannot be squared with the text of *Rule 9(b)*, which by its terms applies to 'all averments of fraud.'" Def. Mem. at 3.

## B. Breach of Express Contract

Manhattan's breach of contract claims are based upon an oral agreement, allegedly made in 1996 and re-affirmed [*24] in 2004, whereby Lamborghini granted exclusive selling rights in New York State to Manhattan. [102] Even if Manhattan's allegations regarding oral promises of exclusivity are taken to be true, it is nonetheless apparent that Manhattan's breach of express contract claim must be dismissed.

102  *See* Am. Compl. PP 16, 26.

The relationship between Manhattan and Lamborghini was governed by the 1996 Agreement until the parties entered into the 2005 Agreement, which terminated and superseded "any and all other prior agreements between the parties, whether oral or in writing." [103] Manhattan alleges that Lamborghini breached the contract by conferring dealer rights on Champion in 2006. [104] Thus it is the 2005 Agreement -- entered into September 1, 2005 -- that dictates the rights and obligations of Manhattan and Lamborghini at the time of the alleged breach. [105] The 2005 Agreement makes no mention of exclusivity. Therefore, any contractual right of Manhattan to an exclusive New York territory must stem from the alleged

oral promises of exclusivity. Lamborghini argues, however, that becausee all oral promises alleged in the Amended Complaint pre-date the signing of the 2005 Agreement, enforcement of [*25] those promises is explicitly barred by the integration clause contained in the 2005 Agreement [106] and, therefore, no action for breach of contract can lie. [107]

103  2005 Agreement, Ex. A to Am. Compl. at 36.

104  *See* Am. Compl. PP 36, 51.

105  *See* 2005 Agreement, at 40.

106  *See id.* at 36.

107  *See* Def. Mem. at 14.

Manhattan responds by noting that the 2005 Agreement, although dated September 2005, became effective on January 16, 2004. [108] Therefore, it reasons, oral representations of exclusivity made after January 16, 2004 are not barred by the 2005 Agreement's integration clause. [109] Although the interplay between the integration clause and the Agreement's effective date does create an ambiguity, that ambiguity need not be resolved in the context of this claim. The only representations alleged to have been made after January 2004 are those whereby Lamborghini promised Manhattan that it "would be the sole dealership selling Lamborghinis in Long Island, and [that] if Defendant *ever* wanted to expand its dealer base in Long Island, [Manhattan] would be given the first option." [110] The New York Statute of Frauds has been held to bar the enforcement of oral distributorship agreements of indefinite duration [*26] that can be terminated within one year only by a breach of the agreement (as opposed to at will by either party). [111] As the oral agreement alleged here does not specify a duration, and contains no provision under which either party might rightfully terminate it within the year of its making, it comes within the ambit of the Statute of Frauds. [112] Thus, even if Manhattan's interpretation of the contract were applied, and the oral promises made after January 16, 2004 were not nullified by the integration clause, the alleged oral contract is void for failure to satisfy New York's Statute of Frauds. Accordingly, no action for breach can lie and Manhattan's claims for breach of express contract are dismissed.

108  *See id.* at 27.

109  *See* Pl. Opp. at 9. Manhattan's Amended Complaint alleges that oral representations of exclusivity were made "[b]efore and after signing the Letter of Intent," which was entered into on

January 16, 2004. Am. Compl. P 26. It follows, therefore, that some oral representations of exclusivity were made after the effective date of the 2005 Agreement.

110   Am. Compl. P 26 (emphasis added).

111   *See D & N Boening, Inc. v. Kirsch Beverages, Inc., 63 N.Y.2d 449, 457, 472 N.E.2d 992, 483 N.Y.S.2d 164 (1984)* ("[T]he [*27] oral agreement between the parties called for performance of an indefinite duration and could only be terminated within one year by its breach during that period. As such, the agreement [falls] within the Statute of Frauds, and [is] void."); *Romaine v. Colonial Tanning Corp., 301 A.D.2d 732, 753 N.Y.S.2d 552, 554 (3d Dep't 2003)* (dismissing breach of contract claim where oral employment contract could be terminated within one year only upon breach). *Accord Alan Skop, Inc. v. Benjamin Moore, Inc., 909 F.2d 59, 60 (2d Cir. 1990)* (dismissing breach of contract claim where oral dealership agreement of indefinite duration could be terminated only upon breach).

112   *See D & N Boening, 63 N.Y.2d at 458.*

## C. Breach of Implied Covenant of Good Faith and Fair Dealing

Manhattan asserts a claim for breach of the implied covenant of good faith and fair dealing based on Lamborghini's: (1) grant of dealership rights to Champion, (2) failure to inform Manhattan of its intention to grant rights to another dealer on Long Island, and (3) failure or refusal to approve Manhattan's Westhampton Dealer Application. [113] Lamborghini moves to dismiss this cause of action, characterizing it as an attempt by Manhattan to "shoehorn" [*28] into the 2005 Agreement several rights, none of which were negotiated. [114] While Lamborghini correctly notes that the covenant of good faith and fair dealing cannot be used to impose an obligation that would be inconsistent with other express terms of the contractual relationship, the contract here -- namely, the 2005 Agreement -- is "silent on the issues of exclusivity and territory." [115] Similarly, it makes no mention of a duty to disclose the appointment of new dealers. As the implied covenant of good faith and fair dealing could be interpreted to incorporate these duties without contradicting the express terms of the contract, the proper question is whether such implied terms are appropriate under the circumstances.

113   *See id.* PP 56-58.

114   Def. Mem. at 18.

115   Am. Compl. P 18.

By spelling out the basis for its claims that Lamborghini failed to exercise good faith and deal fairly when it appointed Champion as a dealer on Long Island and failed to inform Manhattan of its decision to do so, Manhattan has pled a valid cause of action for breach of the implied covenant of good faith and fair dealing. Specifically, Manhattan has pled that the unique nature of the market for Lamborghini automobiles [*29] carries with it an understanding that the manufacturer will not "park a competitor in [an approved dealer's] backyard[,]" such that the exclusivity term could fairly be implied into the contract. [116] Manhattan has also noted that Lamborghini's grant of dealer rights to Champion has the potential to deny Manhattan the fruits of its contract, inasmuch as an additional dealer in the same territory "will inevitably cut into the original dealer's allocation." [117] This loss of market share increases "the risk of a termination by Defendant under the dealer agreement, because each dealer must sell a specified minimum number of vehicles, and failure to meet the minimum is grounds for termination . . . ." [118] Combined with the alleged oral promises of an exclusive dealership territory in New York, these considerations support Manhattan's reasonable understanding that Lamborghini would not "cannibalize" its dealer by introducing additional competitors into the same territory. [119] Accordingly, the motion to dismiss Manhattan's claims for breach of the implied covenant of good faith and fair dealing arising from (1) the appointment of Champion as a Lamborghini dealer and (2) Lamborghini's failure [*30] to inform Manhattan of its intention to do so is denied.

116   Pl. Opp. at 11.

117   Am. Compl. P 14.

118   *Id.*

119   Pl. Opp. at 12.

Manhattan's third claim, that Lamborghini has further breached the implied covenant of good faith and fair dealing by failing to approve its Westhampton Dealer Application, is untenable. The language of that Application explicitly states that it "does not give rise to any obligation on the part of Lamborghini and that unless and until a Lamborghini Dealer Agreement is executed by the parties and delivered, [Manhattan] will have no rights as an authorized Lamborghini Dealer." [120] As the Dealer Application creates neither rights in Manhattan, nor obligations in Lamborghini, it cannot properly be characterized as a contract. The Westhampton Dealer Application, therefore, does not give rise to an implied covenant of

good faith and fair dealing and no claim for breach of that covenant can lie. Accordingly, Manhattan's claim that Lamborghini failed to act in good faith and deal fairly by refusing to approve the Westhampton Dealer Application is dismissed with prejudice.

120   Westhampton Dealer Application, Ex. B to Def. Mem. at 13-14.

## D. Unjust Enrichment

Manhattan claims that [*31] Lamborghini has been enriched at Manhattan's expense by retaining proceeds from the sale of Lamborghini automobiles at plaintiff's Westhampton facility and the Champion facility on Long Island, and also through the "promotion of its vehicles, franchises and good will at both facilities." [121] It asserts that it would be unjust for Lamborghini to retain these benefits as Lamborghini has denied Manhattan its "expected exclusivity on Long Island" and withheld formal approval of Manhattan's Westhampton showroom despite "dup[ing]" Manhattan into constructing the facility. [122] Lamborghini moves to dismiss this claim, noting that the law precludes actions sounding in quasi-contract when there is a valid and enforceable contract addressing the subject matter of the claim. [123] As the parties have a bona fide dispute as to the existence of an enforceable contract governing the Westhampton facility, plaintiff's unjust enrichment claim cannot be dismissed at this stage. Accordingly, Lamborghini's motion to dismiss Manhattan's claim for unjust enrichment is denied.

121   Am. Compl. P 62.

122   Id. P 63.

123   See Def. Mem. at 20-21.

## E. Breach of Fiduciary Duty

Manhattan claims that Lamborghini owed it a duty [*32] of fiduciary care arising out of the "fiduciary and confidential relationship" established by their various Dealer Agreements. [124] Manhattan further alleges that Lamborghini breached this fiduciary duty by, inter alia, demanding that Manhattan submit a separate dealer application for the Westhampton facility, granting Champion dealer rights on Long Island, and failing to inform Manhattan of its intention to appoint Champion as a dealer on Long Island. [125] Lamborghini responds that Manhattan has failed to plead sufficiently exceptional circumstances to establish a fiduciary relationship and that Lamborghini owes no such duty to Manhattan. [126]

124   Am. Compl. P 70.

125   See id. P 72.

126   See Def. Mem. at 7-8.

Although the franchisor-franchisee relationship does not give rise to fiduciary obligations absent exceptional circumstances, Manhattan has alleged that a number of terms contained in the Dealer Agreements effectively grant Lamborghini "the authority to exercise near life and death economic power over [Manhattan] . . . ." [127] Of particular significance are those terms "requiring [Manhattan] to provide reports to [Lamborghini] concerning sales, inventories, customer data, and all information [*33] concerning [Manhattan]'s business . . . ." [128] In A.S. Rampell, Inc. v. Hyster Co., the New York Court of Appeals held that contract provisions requiring the plaintiff company to make its lists of prospective customers available to the defendant, and to provide records of business activities and report on its inventory and financial situation, were indicative of a confidential relationship between the parties. [129] The court held that these contractual terms, combined with the "dependency" inherent in the manufacturer/distributor relationship, were sufficient to plead a relationship giving rise to fiduciary duties. [130] The facts alleged in the Amended Complaint, including the presence of a manufacturer/distributor relationship and a contractual requirement that Manhattan turn over proprietary information to Lamborghini, parallel those found in Rampell. Manhattan has therefore pled circumstances sufficiently extraordinary to allow its claims for breach of fiduciary duty to proceed.

127   Am. Compl. P 70.

128   Id.

129   3 N.Y.2d 369, 376-77, 144 N.E.2d 371, 165 N.Y.S.2d 475 (1957).

130   Id. Accord Zimmer-Masiello, Inc. v. Zimmer, Inc., 159 A.D.2d 363, 552 N.Y.S.2d 935, 935 (1st Dep't 1990) (citing Rampell and concluding that plaintiff properly pled [*34] claim for breach of fiduciary duty where defendant manufacturer, inter alia, required plaintiff to provide confidential and proprietary information).

## F. Negligent Misrepresentation

Manhattan alleges that the special relationship between itself and Lamborghini created a duty on Lamborghini's part to use reasonable care when making representations to Manhattan, and that this duty was breached when it "recklessly and negligently" informed Manhattan that it would be the sole Lamborghini dealer in New York. [131] Manhattan claims that because it reasonably

relied upon these representations to its detriment, it is entitled to compensatory damages. [132] While Manhattan has properly pled all of the elements required to state a cause of action for negligent misrepresentation, it has pled purely economic damages as a result of its reliance, thereby inviting application of New York's "economic loss rule." [133] New York courts have attempted to keep "contract law 'from drown[ing] in a sea of tort'" [134] by erecting various "dikes," which serve to bar actions in tort when an action in contract is available. [135] One such dike is the economic loss rule. [136] Viewing the purpose of the law of contract to  [*35] be "the [facilitation] of voluntary economic exchange," New York courts restrict plaintiffs who have "suffered 'economic loss,' but not personal or property injury, to an action for the benefits of their bargains." [137] Thus, "[i]f the damages suffered are of the type remediable in contract, a plaintiff may not recover in tort." [138] Under New York's economic loss rule, because Manhattan has not suffered any personal or property damage, it is limited to an action in contract for the benefit of its bargain.

131  Am. Compl. PP 83-84.

132  See id. PP 85-89.

133  See id. PP 87-88.

134  Carmania Corp., N.V. v. Hambrecht Terrell Int'l, 705 F. Supp. 936, 938 (S.D.N.Y. 1989) (quoting East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 866, 106 S. Ct. 2295, 90 L. Ed. 2d 865 (1986)).

135  Id.

136  See id.

137  Id.

138  Id. Accord PPI Enters. (U.S.) v. Del Monte Foods Co., No. 99 Civ. 3794, 2003 U.S. Dist. LEXIS 16006, 2003 WL 22118977, at *27 (S.D.N.Y. Sept. 11, 2003) (dismissing negligent misrepresentation claim where plaintiff alleged only economic loss).

Manhattan's response -- that it bases its negligent misrepresentation claim on "duties independent of any contract, including the fiduciary duties . . . not to conceal material information and act against the  [*36] interests of the person to whom it owes the duty[,]" -- is inapposite. [139] The fact that the duty breached here is independent of any contract between the parties merely prevents this claim from being dismissed as duplicative of Manhattan's breach of contract claims. [140] It does not allow evasion of the economic loss rule, which presents a second, distinct barrier. [141] Accordingly, Manhattan's claim for negligent misrepresentation is dismissed with prejudice.

139  Pl. Opp. at 24.

140  See Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 389, 516 N.E.2d 190, 521 N.Y.S.2d 653 (1987).

141  See, e.g., Robehr Films, Inc. v. American Airlines, Inc., No. 85 Civ 1072, 1989 U.S. Dist. LEXIS 10998, 1989 WL 111079, at *2 (S.D.N.Y. Sept. 19, 1989) ("Under New York law, . . . [plaintiff must meet] two requirements: (1) it must establish that the defendant violated a legal duty separate from its contractual obligations, and (2) it must demonstrate that the damages suffered do not constitute mere 'economic loss.'" (citation omitted; emphasis added)).

## G. Violation of the New York Franchised Motor Vehicle Dealer Act

Manhattan alleges that Lamborghini violated section 466 of the FMVDA by "imposing unreasonable and capricious restrictions relative to site control  [*37] and compliance with subjective standards, at both the Manhattan and Westhampton facilities," by "holding up approval of the Westhampton Dealer Application," and "by granting certain rights to Champion to sell Lamborghinis in New York." [142] Although Lamborghini argues that these allegations fail to place it on notice of the FMVDA claims against it, [143] Manhattan's allegations satisfy the liberal pleading standards of the Federal Rules of Civil Procedure. [144] Manhattan has stated a valid FMVDA claim with regard to the violations alleged in connection with its Manhattan showroom. Furthermore, Manhattan has alleged both legal and equitable rights to an exclusive territory in New York and that Lamborghini has taken steps designed "to induce, if not coerce [Manhattan] to accede to the rights granted to Champion." Accordingly, Manhattan's allegations regarding Lamborghini's assignment of dealer rights to Champion support a claim under section 466 of the FMVDA.

142  Am. Compl. P 78.

143  See Def. Mem. at 23.

144  See Bell Atlantic Corp., 127 S. Ct. at 1977 (A "bare allegation suffices under a system that 'restricts the pleadings to the task of general notice-giving and invest[s] the deposition-discovery  [*38] process with a vital role in the preparation

for trial.'" (quoting *Hickman v. Taylor, 329 U.S. 495, 501, 67 S. Ct. 385, 91 L. Ed. 451 (1947)*).

Lamborghini also argues that Manhattan cannot bring a claim for alleged violations of the FMVDA at the Westhampton facility because the Letter of Intent had been nullified by the 2005 Agreement's integration clause. [145] With the Letter of Intent no longer in force, Manhattan would have no right to operate the Westhampton facility and no right to bring suit under the FMVDA. Manhattan responds that the 2005 Agreement, although executed in September 2005, is effective as of January 16, 2004. [146] Thus, Manhattan reasons, the integration clause does not encompass the Letter of Intent, which was executed in March 2004. [147] As noted above, the 2005 Agreement is ambiguous on this issue. However, when deciding a motion to dismiss, a court must draw all reasonable inferences in plaintiff's favor. Thus, because the Letter of Intent grants Manhattan the right to operate a Lamborghini dealership in Westhampton, Manhattan may bring a cause of action under the FMVDA. Lamborghini's motion to dismiss Manhattan's claims under the FMVDA is denied.

[145]   *See* Def. Mem. at 24.

[146]   *See* [*39] Pl. Opp. at 22.

[147]   *See id.*

## H. Account Stated

Manhattan asserts that it: (1) "expended monies to promote and market the Lamborghini brand"; (2) that Lamborghini "is required by agreement of the parties to pay for or reimburse" Manhattan for these expenditures; and, (3) that Manhattan rendered invoices to Lambor-

ghini for the expenditures, which were retained "without timely objection" and partially paid. [148] Construing the Amended Complaint liberally, the latter two allegations suffice to plead an implied agreement between the parties as to the existence and amount of the indebtedness. In combination, Manhattan's allegations state a valid claim for an account stated. Accordingly, Lamborghini's motion to dismiss the claim for account stated is denied.

[148]   Am. Compl. PP 97-100.

## V. CONCLUSION

For the foregoing reasons, defendant's motion to dismiss the Amended Complaint is granted as to plaintiff's claims sounding in fraud, breach of contract, and negligent misrepresentation. The motion is denied as to plaintiff's claims of unjust enrichment, breach of fiduciary duty, violations of the Franchised Motor Vehicle Dealer Act and account stated. The motion is granted in part and denied in part with  [*40] regard to plaintiff's claims of and breach of the implied covenant of good faith and fair dealing. Manhattan is granted leave to re-plead the claims that were not dismissed with prejudice, within twenty days of this Opinion and Order. The Clerk of the Court is directed to close this motion (Document # 5). A conference is scheduled for July 30, 2007 at 4:30.

SO ORDERED:

Shira A. Schemdlin

U.S.D.J.

Dated: New York, New York

July 9, 2007

LEXSEE 1999 US DIST. LEXIS 14256

**MARKETING/TRADEMARK CONSULTANTS, INC., Plaintiff, -against- CAT-ERPILLAR, INC., Defendant.**

**98 Civ. 2570 (AGS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1999 U.S. Dist. LEXIS 14256*

**September 14, 1999, Decided
September 16, 1999, Filed**

**DISPOSITION:**    [*1] Defendant's motion DENIED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff trademark consultants sought recovery of funds allegedly due pursuant to a license agreement with defendant equipment company. Defendant moved to amend its answer in order to assert a counterclaim against plaintiff.

**OVERVIEW:** Plaintiff trademark consultants sought recovery of funds allegedly due pursuant to a license placement agreement entered into with a license representative and defendant equipment company. Defendant's proposed counterclaim asserted that the "loss" should be shared by the license representative pursuant to the agreement, and that the license representative therefore owed it a percentage of plaintiff's loss. The court denied defendant's motion to amend its answer because it attempted to add claims that lacked merit and which would not contribute to the resolution of the action. The only reasonable interpretation of the contract was that the language providing for the sharing of liability with respect to "losses" was not intended to imply that the license representative would reimburse defendant for licensing income that defendant was unable to collect. The licensing representative was acting as a licensing agent for defendant, not as a surety.

**OUTCOME:** Defendant's motion to amend denied because the only reasonable interpretation of the contract was that the language providing for the sharing of liability with respect to "losses" was not intended to imply that the license representative would reimburse defendant for licensing income that defendant was unable to collect.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > General Overview*
[HN1] Leave to amend is generally granted freely absent bad faith, undue delay, or prejudice to the opposing party.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > General Overview*
[HN2] A motion to amend may be denied where the amendment would be "futile" and has no colorable merit.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > General Overview*
[HN3] An amendment may be considered "futile" if the amended pleading could not survive a motion to dismiss.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > General Overview*
[HN4] Where it appears that granting leave to amend is unlikely to be productive it is not an abuse of discretion to deny leave to amend.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
*Contracts Law > Contract Interpretation > General Overview*
[HN5] Issues of contract interpretation are generally matters of law and therefore are suitable for disposition on a motion to dismiss.

1999 U.S. Dist. LEXIS 14256, *

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > General Overview*
[HN6] If the contract shows unambiguously on its face that the relief prayed for is not merited, dismissal is both justified and appropriate.

*Contracts Law > Contract Interpretation > General Overview*
*Governments > Courts > Authority to Adjudicate*
[HN7] When interpreting a contract, clear and unambiguous terms should be given their ordinary and natural meaning.

*Contracts Law > Contract Interpretation > General Overview*
*Governments > Courts > Authority to Adjudicate*
[HN8] Under Illinois law, a contract must be interpreted as a whole, giving meaning and effect to each provision.

*Contracts Law > Contract Interpretation > General Overview*
*Contracts Law > Defenses > Ambiguity & Mistake > General Overview*
*Contracts Law > Formation > Ambiguity & Mistake > General Overview*
[HN9] In interpreting a contract, courts should reach for fair and reasonable results, and where contracts are negotiated by counsel for sophisticated commercial parties, courts should interpret ambiguous language to realize the reasonable expectations of the ordinary businessperson.

**COUNSEL:** For MARKETING/TRADEMARK CONSULTANTS, INC., plaintiff: Lynn E. Judell, Rosenthal, Judell & Uchima, New York, NY.

For CATERPILLAR INC., defendant: Michael C. Petronio, Mayer, Brown & Platt, New York, NY.

**JUDGES:** ALLEN G. SCHWARTZ, U.S.D.J.

**OPINION BY:** ALLEN G. SCHWARTZ

**OPINION**

**MEMORANDUM ORDER**

ALLEN G. SCHWARTZ, DISTRICT JUDGE:

Plaintiff Marketing/Trademark Consultants, Inc. ("MTC") filed the instant action on April 10, 1998 seeking recovery of funds allegedly due pursuant to a License Placement Agreement that MTC entered into with defendant Caterpillar, Inc. ("Caterpillar"). Defendants filed their Answer on April 30, 1998. The case is before the Court on defendant's motion to amend its Answer in order to assert a counterclaim against plaintiff. For the reasons that follow, the motion is DENIED.

**FACTUAL BACKGROUND**

The relevant facts on this motion are undisputed. MTC is a corporation organized and existing under the laws of the State of California, with its principal place of business in New York, New York. (Corrected Complaint, annexed as Exhibit A to Defendant's Motion for Leave to Amend Answer to Assert Counterclaim ("Compl.") P 1.) [*2] Caterpillar is a corporation organized and existing under the laws of Delaware with its principal place of business located in Illinois. (Id. P 2.) In 1987, Caterpillar and MTC entered into a contract known as the License Placement Agreement ("LPA"). Pursuant to the LPA, MTC would act as Caterpillar's exclusive representative in connection with the licensing of Caterpillar's copyrights and trademarks. (Id. P 8(a).) The LPA provided that MTC would, inter alia, identify potential licensees and negotiate licensing agreements with such licensees on behalf of Caterpillar. (Id. P 8(b).) As consideration for this service, MTC was entitled to a fee of 15% of all net royalties and other income earned by Caterpillar under licenses entered into by Caterpillar during the first year of the relationship, and the fee would increase to 20% for all subsequent periods. (Id. P 8(c).) The LPA also provided that "litigation judgments in [Caterpillar's] favor in excess of expenses shall be considered as other income to [Caterpillar] and subject to sharing with [MTC] pursuant to this Agreement." (Id. P 8(d).) After termination of the LPA, MTC alleges that the agreement provided [*3] that MTC would still be entitled to fees for licensing agreements that began pre-termination and were continued or renewed by Caterpillar post-termination. (Id. P 12.) The LPA was terminated on March 31, 1991. (Def. Mem. Law at 2.)

On June 1, 1988, during the period that the LPA was effective, Caterpillar entered into a five year licensing agreement with Jerryco Footware Inc. ("Jerryco"). (Compl. P 14.) On or about November 24, 1993, Caterpillar commenced an action against Jerryco in the Central District of Illinois, alleging that Jerryco had failed to make required royalty payments, and had engaged in fraudulent conduct and misappropriation of Caterpillar's trademarks. (Id. P 15; Def. Mem. Law at 3-4.) Caterpillar recovered a judgment on March 30, 1995 in the sum of $ 10,902,570.00 (the "Jerryco Judgment"). (Compl. P 16.)

1999 U.S. Dist. LEXIS 14256, *

MTC alleges that it is entitled to a share of the funds Caterpillar has collected and will collect with respect to the Jerryco Judgment. (Id. P 17.) MTC also alleges that Caterpillar has failed to remit to it fees due on other licensing agreements that were continued or renewed during the effective period of the LPA. (Id. PP 18 - 21.)

The LPA also [*4] contained the following language:

> [Caterpillar and MTC] agree to share liability (in the same proportion as the royalty income is shared) for all *losses, claims, or damages* arising out of or in connection with any License Agreement or the alleged invalidity or inadequacy of any of the Copyrights or Trademarks.

(Defendant's Motion for Leave to Amend Answer to Assert Counterclaim at Exhibit C, P 14.) (emphasis added). Caterpillar moves the Court to permit it to Amend its Answer in order to assert a counterclaim arising under this section of the LPA.

The basis for Caterpillar's counterclaim is as follows. Of the $ 10,902,570 Jerryco Judgment, Caterpillar asserts that its compensatory damages amount to $ 4,225,090. (Def. Mem. Law at 4.) Caterpillar alleges that this amount represents its loss of royalty income and misappropriation of trademarks, while the remainder reflects punitive and treble damages. (Id.) Caterpillar also asserts that, to date, it has only collected $ 2,652,207 of the Jerryco Judgment, and incurred attorneys fees in obtaining and enforcing the Jerryco Judgment of $ 1,985,534. (Id.) Caterpillar alleges, therefore, that out of the $ 4,225,090 [*5] in lost revenue, it has collected only $ 666,673, a shortfall of $ 3,558,417. (Id.) Caterpillar's proposed counterclaim asserts that this "loss" should be shared by MTC pursuant to the LPA, and that MTC therefore owes it 20% of this "loss," amounting to approximately $ 711,683.

## DISCUSSION

[HN1] Leave to amend is generally granted freely "absent bad faith, undue delay, or prejudice to the opposing party." In Re 1993 Corning Securities Litigation, 1996 U.S. Dist. LEXIS 6601, *2, No. 93 Civ. 7015 (AGS), 1996 WL 257603, at *1 (S.D.N.Y. May 15, 1996). However, [HN2] a motion to amend may be denied where the amendment would be "futile" and has "no colorable merit." *Northbrook National Ins. Co. v. J & R Vending Corp., 167 F.R.D. 643, 647 (E.D.N.Y. 1996)* (citing *Oliver v. Demarinis & Co., 1993 U.S. Dist. LEXIS 1033,* No. 90 Civ. 7950 (SS), 1993 WL 33421, *2 (S.D.N.Y. Jan. 29, 1993) (citation omitted)). See also

*Coleman v. Ramada Hotel Operating Co., 933 F.2d 470,* (7th Cir. 1991) (stating that "justice does not demand that Coleman be given leave to append frivolous or repetitive allegations to her complaint at any stage in the proceedings"). [HN3] An amendment may be considered "futile" [*6] if the amended pleading could not survive a motion to dismiss. See *Smith v. Kessner, 183 F.R.D. 373, 373 (S.D.N.Y. 1998).* Additionally, [HN4] "where it appears that granting leave to amend is unlikely to be productive . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co., 987 F.2d 129 (2d Cir. 1993).*

[HN5] Issues of contract interpretation are generally matters of law and therefore are suitable for disposition on a motion to dismiss. See W.R. Grace & Co. - *Conn v. Hampshire Chemical Corp., 1998 U.S. Dist. LEXIS 9,* No. 96 Civ. 8199 (AGS), 1998 WL 2814, at *2 (S.D.N.Y. Jan 6, 1998) (citing *United States v. Liranzo, 944 F.2d 73, 77 (2d Cir. 1991)).* See also *Furniture Consultants, Inc. v. Datatel Minicomputer Co., 1986 U.S. Dist. LEXIS 22978,* *6, No. 85 Civ. 8518 (RLC), 1986 WL 7792, at *2 (S.D.N.Y. Jul. 10, 1986) ("claims may be resolved in a motion to dismiss, if the claims under which the plaintiff seeks relief are barred . . . by the unambiguous terms of a contract attached to the pleadings, because the interpretation of an unambiguous contract is a matter of law for the court"). [HN6] If the contract "shows unambiguously on its face [*7] that the relief prayed for is not merited, dismissal is both justified and appropriate." *Palda v. General Dynamics Corp., 47 F.3d 872, 876 (7th Cir. 1995).* The Court finds that the motion to amend must be denied because it attempts to add claims that are lacking in merit and which would not contribute to the fair and just resolution of the action.

[HN7] When interpreting a contract, "clear and unambiguous terms" should be given their "ordinary and natural meaning." *Emergency Medical Care, Inc. v. Marion Memorial Hosp., 94 F.3d 1059, 1061 (7th Cir. 1996)* (citations omitted). [HN8] Under Illinois law, a "contract must be interpreted as a whole, giving meaning and effect to each provision." Id. This court also takes notice of the rule of construction that, [HN9] in interpreting a contract, courts "should reach for fair and reasonable results," and "where contracts are negotiated by counsel for sophisticated commercial parties, courts should interpret ambiguous language to realize the reasonable expectations of the ordinary businessperson." *Bank of New York v. Amoco Oil Co., 35 F.3d 643, 662 (2d Cir. 1994)* (applying New York law). Here, the only reasonable [*8] interpretation of the contract is that the language providing for the sharing of liability with respect to "losses" was not intended to imply that MTC would reimburse Caterpillar for licensing income that Caterpillar was unable to collect. MTC was acting as a

1999 U.S. Dist. LEXIS 14256, *

licensing agent, not as a surety. For example, if Caterpillar was entitled to $ 100,000 in income under a covered license, but only collected $ 80,000, no reasonable interpretation of the contract would require MTC to pay Caterpillar 20% of the $ 20,000 shortfall. It may be true, however, that MTC, having generated only $ 80,000 in realized income for Caterpillar, would only be entitled to its fee based on the $ 80,000--not on the full $ 100,000.

Should MTC succeed in demonstrating the merits of its complaint, it will be entitled to collect a fee based on the funds collected by Caterpillar on the Jerryco Judgment. If Caterpillar is unable to collect the full amount of the Jerryco Judgment, Caterpillar is entitled to argue that MTC's recovery from Caterpillar should be similarly limited. However, Caterpillar does not have a separate claim with respect to the uncollected part of the Jerryco Judgment, and its motion to amend the [*9] Answer to assert such a claim must be DENIED.

**CONCLUSION**

For the reasons stated, defendant's motion is DENIED.

SO ORDERED.

ALLEN G. SCHWARTZ, U.S.D.J.

Dated: New York, New York

September 14, 1999

LEXSEE 2003 US DIST. LEXIS 17371

**OXYN TELECOMMUNICATIONS, INC., Plaintiff, - vs.- ONSE TELECOM, HYUNDAI TELECOM (USA), INC., HOON YANG, a/k/a Michael Yang and CHI-YEOL KIM, a/k/a Charles Kim, Defendants.**

**01 Civ. 1012 (JSM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 17371*

**September 30, 2003, Decided
September 30, 2003, Filed**

**PRIOR HISTORY:** *Oxyn Telecomms., Inc. v. Onse Telecom, 2003 U.S. Dist. LEXIS 2671 (S.D.N.Y., Feb. 25, 2003)*

**DISPOSITION:** [*1] Defendant Onse's motion for summary judgment dismissing claims granted in part and denied in part. Plaintiff's motions for summary judgment and partial summary judgment denied. Hyundai defendants' motion to dismiss second amended complaint granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff corporation sued defendants, a telecommunications company, a competitor, and its employees, alleging breach of an investment agreement, tortious interference with contract and prospective economic advantage, fraud, prima facie tort, civil conspiracy, and injunctive relief. The telecommunications company and corporation cross-moved for summary judgment. The competitor and its employees moved to dismiss.

**OVERVIEW:** The court initially held that, regarding the telecommunication company's alleged obligation to make a second payment to the corporation, the agreement was unenforceable as it did not include essential terms and left the telecommunications company's entitlements open for future negotiation, but that a question of fact existed as to whether the portion of the agreement concerning the telecommunication company's obligation to make an initial payment was severable from the remainder. The court then held that the corporation's tortious interference with contract claim failed as no third party breached the agreement, that the corporation's tortious interference

with prospective economic relations claim failed as the use of sufficient wrongful means by the telecommunications company lacked any evidentiary support, and that the corporation's fraud claim failed as the corporation failed to show that the telecommunications company did not intend to enter into the agreement. The court finally held that the telecommunications company's tortious interference, conspiracy, injunctive relief, and prima facie tort claims against the competitor and its employees failed as a matter of law.

**OUTCOME:** Summary judgment was granted in part for the telecommunications company as to the claims regarding its alleged obligation to make a second payment, tortious interference with contract and prospective economic advantage, fraud, prima facie tort, civil conspiracy, and injunctive relief. Summary judgment was denied regarding the remaining contract claim. The claims against the competitor and its employees were dismissed.

**LexisNexis(R) Headnotes**

*Contracts Law > Contract Conditions & Provisions > Conditions Precedent*
[HN1] Although there is, generally, a strong presumption against finding binding obligations in agreements which include open terms, call for future approvals, and expressly anticipate future preparation and execution of contract documents, some preliminary agreements create binding obligations.

2003 U.S. Dist. LEXIS 17371, *

*Contracts Law > Contract Conditions & Provisions > Conditions Precedent*
[HN2] The preliminary agreements that create binding obligations fall into two categories: (1) those that are preliminary only in form; only in the sense that the parties desire a more elaborate formalization of the agreement, and (2) those in which the parties agree on certain major terms, but leave other terms open for negotiation. In this second type, the parties are not committed to their ultimate contractual objective. Instead, they merely accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the agreed framework. The key to determining whether, the agreement is binding in either the first or the second sense is the intent of the parties; whether the parties intended to be bound, and if so, to what extent. The language of the agreement is the most important factor in making this determination.

*Contracts Law > Contract Interpretation > Parol Evidence > General Overview*
*Contracts Law > Defenses > Ambiguity & Mistake > General Overview*
*Contracts Law > Formation > Ambiguity & Mistake > General Overview*
[HN3] While parol evidence may be received to explain ambiguous terms or to fill in terms in an unintegrated contract, it may not be introduced to vary or contradict clear contract language.

*Business & Corporate Law > Joint Ventures > Formation*
*Contracts Law > Types of Contracts > Joint Contracts*
[HN4] Details such as the respective roles and degree of control to be exercised by each party in managing a future joint business venture are of prime importance, and are necessary to create an enforceable joint venture agreement under New York law.

*Contracts Law > Breach > General Overview*
*Contracts Law > Third Parties > General Overview*
*Torts > Damages > Compensatory Damages > General Overview*
[HN5] In order to state a claim for tortious interference with contract, a plaintiff must allege the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom.

*Contracts Law > Third Parties > General Overview*
*Torts > Business Torts > Commercial Interference > Contracts > General Overview*
[HN6] For purposes of a claim for tortious interference with contract, the third party, not the plaintiff, must be the one to breach the contract.

*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*
[HN7] In order to state a claim for tortious interference with prospective economic advantage, a plaintiff must allege: (1) business relations with a third party; (2) the defendant's interference with those business relations; (3) that the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship.

*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*
[HN8] In order to state a claim for tortious interference with prospective economic advantage under New York law, the defendant's activities must be directed at the third party and must convince the third party not to enter into a business relationship with the plaintiff.

*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*
[HN9] The wrongful means that are required to support a claim of tortious interference with prospective economic advantage are defined as physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure. Simple persuasion does not suffice.

*Contracts Law > Third Parties > General Overview*
*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*
[HN10] It is clear that, under New York law, a cause of action for interference with prospective economic advantage contemplates a defendant who has interfered with specific pre-contractual relations or a prospective relationship between the plaintiff and a third party that would have proceeded to some sort of binding, if not contractual, relationship but for the defendant's interference.

*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN11] In order to make out a claim to recover damages for fraud, a plaintiff must prove: (1) a misrepresentation

or material omission of fact, (2) which was false and known to be false by the defendant, (3) made for the purpose of inducing the other party to rely upon it, (4) justifiable reliance by the other party on the misrepresentation or material omission, and (5) injury.

*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*
[HN12] For purposes of a claim for tortious interference with prospective economic advantage, persuasion alone is insufficient, even if it is knowingly directed at interference with the contract.

*Torts > Business Torts > Commercial Interference > Contracts > General Overview*
[HN13] Absent a valid contract, there can be no claim for tortious interference with contractual relations.

*Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > Elements*
*Torts > Procedure > Commencement & Prosecution > General Overview*
*Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > General Overview*
[HN14] New York does not recognize the tort of civil conspiracy as an independent cause of action. The conspiracy doctrine merely permits a showing of joint liability in the event that an underlying tort is shown to have been the result of a common scheme or plan.

*Civil Procedure > Remedies > Injunctions > Permanent Injunctions*
[HN15] There is no cause of action for injunctive relief under either New York or federal law. An injunction is a form of relief that is available only if a plaintiff cannot be compensated for a defendant's allegedly wrongful conduct by a remedy at law.

*Torts > Intentional Torts > Prima Facie Tort > Elements*
[HN16] The elements of a cause of action for prima facie tort are: (1) intentional infliction of harm; (2) resulting in special damages; (3) without excuse or justification; (4) by an act that would otherwise be lawful.

*Torts > Intentional Torts > Prima Facie Tort > General Overview*
[HN17] The touchstone for a prima facie tort claim is disinterested malevolence, meaning that the plaintiff

cannot recover unless the defendant's conduct was not only harmful, but done with the sole intent to harm. Motives of profit, self interest, or business advantage have been held to defeat a claim of prima facie tort.

*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN18] A claim for fraud requires a showing of damage.

**COUNSEL:** For Oxyn Telecommunications, Inc, PLAINTIFF: David Molton, Matthew Hearle, Buchanan Ingersoll, New York, NY USA.

For Onse Telecom Corporation, DEFENDANT: Marc J Gottridge, Lovells, Michael M YI, Yi, Tuan & Brunstein, Michael M YI, New York, NY USA.

For Onse Telecom Corporation, COUNTER-CLAIMANT: Marc J Gottridge, Lovells, Michael M YI, Yi, Tuan & Brunstein, Michael M YI, New York, NY USA.

For Oxyn Telecommunications, Inc, COUNTER-DEFENDANT: [*2] David Molton, Matthew Hearle, Buchanan Ingersoll, New York, NY USA.

**JUDGES:** JOHN S. MARTIN, JR., U. S. D. J.

**OPINION BY:** JOHN S. MARTIN, JR.

**OPINION**

**OPINION & ORDER**

JOHN S. MARTIN, JR., District Judge:

Defendant Onse Telecom has moved for summary judgment and Plaintiff Oxyn Telecommunications, Inc. has moved for partial summary judgment pursuant to *Fed. R. Civ. P. Rule 56*. In addition, Defendants Hyundai Telecom, Hoon Yang and Chi-Yeol Kim (the "Hyundai defendants") have moved to dismiss the Second Amended Complaint pursuant to *Fed. R. Civ. P. Rule 12(b)(6)*.

The Facts

On November 10, 2000, Oxyn and Onse entered into an Agreement, pursuant to which Onse, a Korean telecommunications company, agreed to invest $ 15,000,000 in Oxyn, a New York corporation. The first $ 4,000,000 was to be deposited into an Oxyn account within 30 days of the execution of the Agreement; the additional $ 11,000,000 was to be deposited at a time to be agreed, within 15 months of the date of execution of the Agree-

ment. The Agreement was, on its face, preliminary. Its introductory statement of purpose stated:

> WHEREAS, [*3] ONSE has indicated that it wishes to make an investment in OXYN and, in consideration of such investment, wishes to obtain an equity interest in OXYN, and
>
> WHEREAS, the parties have now agreed upon the amount of such investment and the period in which said investment is to be made; and
>
> WHEREAS, the parties *still must complete negotiations with respect to the percentage of shares* in OXYN that ONSE will acquire as a result of its investment, ...

Nov. 10, 2000 Agreement (emphasis added).

In addition, in the body of the Agreement, it is stated:

> It is understood and agreed that, in consideration of this investment, ONSE will receive a percentage of all of the issued and outstanding shares of OXYN, *which percentage is yet to be agreed upon,*

and that:

> In addition to all of the foregoing and not by way of limitation, *all of the terms of ONSE's entitlements as a result of this investment will be negotiated and finalized in a formal agreement,* to be completed and executed either in New York, USA or Seoul, Korea prior to the deposit of the final Eleven Million ($ 11,000,000) Dollars into the OXYN account. November 10, 2000 Agreement (emphasis [*4] added).

Onse announced the Agreement in a press release that stated:

> Onse Telecom's President Chang signed a strategic partnership agreement on the 14th of November. Onse will become the second largest shareholder of Oxyn, a New York based company. This agreement will allow Onse to fully enter the

United States telecommunications market .... The planned budget for this project is $ 45 million.

Second Amended Complaint, Ex. C.

The Agreement also stated that Oxyn and Onse would, as soon as practicable, commence traffic trading, and that the final agreement would provide a volume commitment index for international traffic. The November 10 Agreement did, in fact, contain an Appendix A, titled "Termination rate agreement between OXYN Telecommunications, Inc. and ONSE Telecom," which included an "Asymmetrical Volume Commitment" for international telephone traffic.

Subsequently, on November 16, Mr. Yang of Onse wrote to Oxyn, asking Oxyn to send a termination notice to Dacom, the company with which it had been traffic trading, because Onse anticipated that, as a shareholder of Oxyn, it would take over that business. Oxyn apparently agreed to do so.

Later in November, [*5] Onse's President, Sang-Hyon Chang, asked Oxyn's President, Jason Oh, to amend the Agreement to state that Onse's investment obligation was conditional upon the approval of Onse's Board of Directors. The parties agreed that Charles Kim, an employee of Hyundai Telecom, based in Englewood, New Jersey, would act as Onse's representative to attempt to negotiate an amendment to the Agreement. Those discussions were unsuccessful, and Oxyn alleges that Mr. Chang's request actually was the first step in Onse's attempt to withdraw from its commitments pursuant to the Agreement.

Next, on December 6, 2000, Onse filed an application with Seoul Bank to transfer $ 4,000,000 to Oxyn's account, but was informed by the Bank that under Korean law it could not remit funds for foreign investment without receiving specific information about the number of shares and percentage of total equity that would be acquired in the transaction. Oxyn contends that Onse was well aware of this requirement, purposefully submitted an inadequate application to the Bank, and could easily have satisfied the Bank's concerns, but chose instead to use the Bank's refusal as another excuse to avoid the Agreement. In addition, [*6] Oxyn alleges that the parties had agreed that the number of shares and percentage of equity to be acquired by Onse was to be determined by an independent appraiser to be designated by Onse, and that Onse failed to designate an appraiser because it wanted to avoid the Agreement.

Therefore, although Mr. Chang had suggested sending a group of representatives to New York to further negotiate the specifics of the transaction, immediately

after the December 10 deadline for payment of the first $ 4,000,000 passed and Oxyn did not receive the payment, Mr. Oh faxed a letter to Onse in which he threatened to sue Onse for breach of contract and seek a minimum of $ 200 million in damages. Three Onse employees arrived in New York to meet with Oxyn on December 16, 2000, and met with counsel, as well as with Mr. Kim and Dr. Michael Yang of Hyundai, in preparation for their meeting with Oxyn. All attempts to resolve the dispute between Oxyn and Onse were unavailing and Oxyn filed the Complaint in this action on February 8, 2001.

Breach of Contract Claims

While Oxyn and Onse agree that the November 10 Agreement was preliminary in that it contemplated execution of a more detailed, final contract, [*7] they disagree as to whether the Agreement contained all of the essential terms necessary to create a binding contract, and, if not, whether it constituted a binding agreement to continue to negotiate in good faith or merely an unenforceable agreement to agree. Onse contends that the number of shares that it was to acquire in return for its investment was the most important term of the Agreement, and that consequently the failure to include that term renders the Agreement fatally incomplete and unenforceable. Oxyn argues, to the contrary, that the Agreement contained all necessary terms, and that the number of shares to be received by Onse was fixed by the parties' oral agreement that Onse would become the second largest owner of Oxyn shares, and that the exact percentage of ownership would be determined by an appraiser of Onse's choosing. In turn, Oxyn disputes the existence of such an understanding, and states that an agreement that Onse would appoint an outside appraiser to determine, within an agreed range, the number of shares to be received by Onse, would directly contradict the language in the November 10 Agreement, which states that the "parties still must complete negotiations [*8] with respect to the percentage of shares" that Onse will acquire in Oxyn. The Agreement also stated that the percentage of ownership "is yet to be *agreed* upon" and that the terms of Onse's "entitlements as a result of this investment will be *negotiated* and finalized in a formal agreement." (emphasis added).

[HN1] Although there is, generally, a "strong presumption against finding binding obligations in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents," *Teachers Ins. & Annuity Asso. v. Tribune Co., 670 F. Supp. 491, 499 (S.D.N.Y. 1987)*, some preliminary agreements create binding obligations. *Adjustrite Systems, Inc. v. GAB Business Services, Inc., 145 F.3d 543, 548 (2d Cir. 1998)*. [HN2] These fall into two categories: (1) those that are "pre-

liminary only in form - only in the sense that the parties desire a more elaborate formalization of the agreement," *TIAA v. Tribune Co., 670 F. Supp. at 498 (S.D.N.Y. 1987)*, and (2) those in which the parties "agree on certain major terms, but leave other terms open for negotiation." *Id.* [*9] In this second type, the parties are not committed to their ultimate contractual objective. Instead, they merely "accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement" within the "agreed framework." *Id.* The key to determining whether, the Agreement is binding in either the first or the second sense is the intent of the parties: "whether the parties intended to be bound, and if so, to what extent." *Adjustrite Systems, Inc. v. GAB Business Services, Inc., 145 F.3d at 548-49*. The language of the Agreement is the most important factor in making this determination. *Id. at 549*; *B. Lewis Productions, Inc. v. Angelou, 2003 U.S. Dist. LEXIS 12655, No. 01 Civ. 0530, 2003 WL 21709465, *8 (S.D.N.Y. July 23, 2003)*.

Based on the language of the Agreement, the Court concludes that it is highly likely that when the parties signed the Agreement, they intended that it be binding. Although Oxyn and Onse planned to negotiate further in order to determine the number of Oxyn shares and other "entitlements" that Onse would acquire in return for its investment, the Agreement does not contain any reservations or conditions. Instead, [*10] it sets out the agreed rights and duties of the parties in definitive terms. Thus, it states that "ONSE *will invest*" $ 15,000,000 in Oxyn; Onse "*will receive*" a percentage of all of the issued and outstanding shares of Oxyn; Onse "*will make* an initial deposit" of $ 4,000,000 "within 30 days of the execution of this agreement"; the parties "*will*, as soon as practicable, *commence traffic trading,*" and the final agreement *shall provide* a volume commitment." Neither party's obligations are stated to be contingent on Board, regulatory or other approvals, and, most significantly, the Agreement does not state that Onse's initial $ 4,000,000 payment is dependent on a resolution of the question of the amount of equity to be acquired by Onse. Thus, the Agreement states:

> Pending a determination of the actual percentage of ownership that ONSE will acquire for its total investment of Fifteen Million ($ 15,000,000) Dollars, ONSE will make an initial deposit of Four Million ($ 4,000,000) Dollars within 30 days of the execution of this agreement.

With respect to Onse's "entitlements" as a result of its investment, the same is true. The Agreement states that [*11] the negotiation and finalization of those specifics would be "in addition to all of the foregoing and not by

way of limitation," again indicating an attempt to make the Agreement as binding as possible under the circumstances. [1]

> 1   Outside circumstances also provide evidence of an intent to be bound. These include the fact that the parties rushed into signing the Agreement because Onse wanted to make certain that Oxyn would not renew its traffic trading agreement with Dacom, and the subsequent letter from Onse to Oxyn, asking Oxyn to notify Dacom that it planned to terminate their traffic trading relationship as soon as Onse was in a position to begin traffic trading with Oxyn, given that Onse was going to be a major shareholder in Oxyn.

However, as in *B. Lewis Productions v. Angelou, 2003 U.S. Dist. LEXIS 12655, 2003 WL 21709465, *11-12*, the Court also finds that, in spite of the parties' apparent intent to be bound, the Agreement fails to include essential terms, and therefore is too vague and incomplete to be enforced. [*12] As stated, the first essential term that is missing from the Agreement is the percentage of shares in Oxyn to be acquired by Onse in return for its investment. Plaintiff's argument that Oxyn and Onse had agreed to submit the determination of the percentage of Oxyn shares to be acquired by Onse to an independent appraiser is, in fact, contrary to the language of the Agreement, which provides that this question was to be the subject of future negotiation between the parties. [HN3] While parol evidence may be received to explain ambiguous terms or to fill in terms in an unintegrated contract, it may not be introduced to vary or contradict clear contract language. *Joseph Victori Wines v. Vina Santa Carolina S.A., 933 F. Supp. 347, 352 (S.D.N.Y. 1996)* ("If the writing is not integrated, of course, parol evidence of additional contract terms may be admitted to complete the agreement, so long as the additional terms *do not contradict* the written terms." (emphasis added)); *U.S. West Financial Services, Inc. v. Tollman, 786 F. Supp. 333, 342 (S.D.N.Y. 1992)*. See also *S.E.C. v. Levine, 881 F.2d 1165, 1179 (2d Cir. 1989)* ("With few exceptions . [*13] .. evidence of contemporaneous agreements is not admissible in evidence to contradict a term of the writing."); *Ruttenberg v. Davidge Data Systems Corp., 215 A.D.2d 191, 198, 626 N.Y.S.2d 174, 179 (1st Dep't 1995)*. [2]

> 2   Furthermore, the understanding that Onse would become the second largest shareholder of Oxyn is itself ambiguous because there already were *two* largest shareholders in Oxyn - Jason Oh and Howard Lee, each of whom owned 32,750 shares out of 90,000 shares issued and outstanding. It is not stated whether Mr. Oh and Mr. Lee would remain the "largest shareholder"

jointly, or each separately and equally after Onse received it shares. This ambiguity is significant because if the intention was that together Mr. Oh and Mr. Lee would continue to hold 70% of the issued and outstanding shares, and if Onse were to acquire, for example, 25% of the issued and outstanding shares, there would be virtually no shares remaining to allocate to the investors who it was hoped would contribute an additional $ 30,000,000 to the venture. The obvious solution would be for Oxyn, which was authorized to issue up to 1,000,000 shares, to issue additional shares. However, nothing is stated as to how the various shareholders (including the existing smaller shareholders) would be dealt with in such an event.

[*14] In addition, the Agreement left open for future negotiation Onse's "entitlements as a result of this investment." While the Agreement does not contain language that specifically refers to the formation of a joint venture or partnership, Onse's press release about the signing of the Agreement refers to the arrangement as a "strategic partnership," and the parties agree that Onse's role in the proposed venture was not intended to be that of a passive stockholder/investor, but rather that "through this partnership, Onse and Oxyn [would] enter the local, long distance and international voice market in the United States." Second Amended Complaint, P 10 and Ex. C. Nevertheless, the Agreement does not specify any of the details of how such a "strategic partnership" would work. Instead, the "entitlements" that were left to be determined at a future time presumably included, among other items, the respective roles and degree of control to be exercised by each party in managing the future joint business venture. [HN4] Such details are of prime importance, and are necessary to create an enforceable joint venture agreement under New York law. *B. Lewis Productions, Inc. v. Angelou, 2003 U.S. Dist. LEXIS 12655, No. 01 Civ. 0530, 2003 WL 21709465, [*15] *11-12 (S.D.N.Y. July 23, 2003)*. Thus, the failure to complete the anticipated negotiations leaves open items - both the percentage of shares and the other "entitlements" to be received by Onse - of such magnitude that a court could not enforce the Agreement without running the risk of "imply[ing terms] which the parties themselves failed to insert." [3] *Lui v. Park Ridge at Terryville Ass'n, 196 A.D.2d 579, 581, 601 N.Y.S.2d 496, 498 (2d Dep't 1993)*. See also *Reiss v. Financial Performance Corp., 97 N.Y.2d 195, 199, 738 N.Y.S.2d 658, 661, 764 N.E.2d 958 (2001)*. Accordingly, the Agreement is too incomplete to be enforced, and Onse is entitled to summary judgment in its favor with respect to its alleged breach of its obligation to make the second payment of $ 11,000,000 to Oxyn pursuant to the Agreement.

3   This does leave open the possibility that the contract was a binding preliminary agreement, and that Onse breached the obligation to negotiate in good faith. Such a claim raises issues of fact, including issues relating to Onse's counterclaim that Oxyn fraudulently induced Onse to enter into the Agreement by means of numerous material misrepresentations. It also should be noted that if Plaintiff were to prevail upon such a claim, it would be entitled only to specific performance with respect to that duty, or damages for its reliance on the promise to negotiate. Full expectation damages would be unavailable unless it can be found with certainty that the parties would have reached a final agreement, and what its terms would have been.

[*16] However, although the payment by Onse of the second $ 11,000,000 payment clearly is contingent on the parties reaching agreement as to what percentage of Oxyn shares Onse would acquire in return for its investment, and contemplates negotiation of other significant issues, the Agreement does not appear, on its face, to impose any preconditions on Onse's obligation to make the first $ 4,000,000 payment to Oxyn. As stated above, the language with respect to the first $ 4,000,000 investment appears to be unequivocal, and to be given in return for Oxyn's promise to begin traffic trading with Onse as soon as possible. [4] Therefore, a question of fact exists as to whether that portion of the contract is severable from the remainder, and enforceable as written. [5] Accordingly, summary judgment is denied with respect to the enforceability of that provision of the Agreement.

4   Extrinsic evidence also indicated that Onse believed that due to the traffic trading imbalance anticipated, it would reap significant profits from that relationship, regardless of the resolution of the issues with respect to other terms of the Agreement.

[*17]

5   If that portion of the Agreement is severable, there would also seem to be questions of fact as to whether there was a failure of consideration with respect to that portion, given that Oxyn and Onse never began the traffic trading relationship that the $ 4,000,000 payment apparently was intended to secure.

Tortious Interference with Contractual Relations and Tortious Interference with Prospective Economic Advantage

Oxyn alleges that Onse tortiously interfered with its contractual business relationship with Dacom when it requested, on November 16, 2000, that Oxyn send a notice to Dacom, terminating its relationship with Dacom as of the day before the planned Onse-Oxyn circuits would be operational, and stating that Onse hoped to be ready to begin traffic trading by December 1, 2000. Pursuant to that request, Oxyn did send a termination notice to Dacom. However, although Oxyn and Onse began work to set up the Oxyn-Onse circuits, they were not established until January 2001, when, according to Onse, Oxyn refused to make them operational. Meanwhile, Oxyn and Dacom continued to do business [*18] with each other: Oxyn sending Dacom traffic for termination in Korea until sometime in February 2001, and Dacom sending Oxyn traffic terminating in the United States until October 2001.

[HN5] In order to state a claim for tortious interference with contract, a plaintiff must allege the "existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76, 82, 668 N.E.2d 1370 (1996). Because [HN6] the cases require that the third party, not the plaintiff, must be the one to breach the contract, *Museum Boutique Intercontinental, Ltd v. Picasso, 886 F. Supp. 1155, 1162 n.17 (S.D.N.Y. 1995)*, Oxyn's claim based on its own actions pursuant to Onse's request that it terminate its trade trafficking arrangements with Dacom fails to state a cause of action.

Oxyn also attempts to state a claim for tortious interference with its prospective economic relations with Dacom based on the same facts. [*19] [HN7] In order to state a claim for tortious interference with prospective economic advantage, a plaintiff must allege: (1) business relations with a third party; (2) the defendant's interference with those business relations; (3) that the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship. *Purgess v. Sharrock, 33 F.3d 134, 141 (2d Cir. 1994)*. Again, [HN8] in order to state a claim under New York law, the defendant's activities must be directed at the third party and must convince the third party not to enter into a business relationship with the plaintiff. *G.K.A. Beverage Corp. v. Honickman, 55 F.3d 762, 768 (2d Cir.)*, cert. denied, 516 U.S. 944, 133 L. Ed. 2d 304, 116 S. Ct. 381 (1995); *Fonar Corp. v. Magnetic Resonance Plus, Inc., 957 F. Supp. 477, 482 (S.D.N.Y.)*, aff'd, 128 F.3d 99 (2d Cir. 1997). Since Oxyn's claim is based upon actions directed at Oxyn itself, and on Oxyn's own actions taken as a result of the alleged interference, the claim cannot stand as a matter of law.

Furthermore, Oxyn cites no evidence to [*20] support the proposition that Onse asked Oxyn to terminate its relationship with Dacom either with the sole purpose of harming Oxyn, or by improper means. Clearly, it is undisputed that Onse's request was made to serve its own self-interest, and therefore not for the *sole* purpose of harming Oxyn. Furthermore, Oxyn has come forward with no evidence that at the time Onse made the termination request on November 16, 2000, that it did not intend to begin traffic trading with Oxyn as soon as possible. In fact, it is undisputed that Oxyn's and Onsenet's engineers worked together in Los Angeles to try to establish the necessary interconnection to begin traffic trading, and continued to do so until January 2001. [6] Furthermore, [HN9] the "wrongful means" that are required to support a claim of tortious interference with prospective economic advantage are defined as "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure." *Guard-Life Corp. v. S. Parker Hardware Mfg. Co., 50 N.Y.2d 183, 191, 428 N.Y.S.2d 628, 632, 406 N.E.2d 445 (1980).* Simple persuasion does not suffice. *Jabbour v. Albany Medical Center, 237 A.D.2d 787, 789, 654 N.Y.S.2d 862, 864* [*21] *(3rd Dep't 1997).* The use of sufficient wrongful means by Onse is alleged only in the most conclusory manner and lacks any proffer of evidentiary support.

> [6] Onse states that the interconnection was completed on January 10, 2001, but that Oxyn then refused to begin traffic trading because Onse had not made the anticipated $ 4,000,000 investment in Oxyn pursuant to the Agreement.

In addition, Oxyn claims that Onse's actions tortiously interfered with its prospective economic relations by depriving Oxyn of an additional $ 30,000,000 in investments from third party investors, who had conditioned the possibility that they might invest in Oxyn on Onse's actually making the $ 15,000,000 investment anticipated in the Agreement. This claim also cannot withstand scrutiny. First, Onse neither contacted, nor directed any actions, toward those third parties. Second, [HN10] it is clear that under New York law,

> A cause of action for interference with prospective economic advantage contemplates a defendant who has interfered [*22] with specific precontractual relations or a prospective relationship between the plaintiff and a third party that would have proceeded to some sort of binding, if not contractual, relationship *but for* the defendant's interference.

*D'Andrea v. Rafla-Demetrious, 3 F. Supp. 2d 239, 251 (E.D.N.Y. 1996),* aff'd, *146 F.3d 64 (2d Cir. 1998)* (emphasis added).

The evidence presented by Oxyn was far too vague and speculative to support a claim that any of the companies or individuals with whom Oxyn discussed investing in Oxyn would have gone forward and invested in Oxyn if Onse had, in fact, made a $ 15,000,000 investment in Oxyn. See *Nadel v. Play-By-Play Toys & Novelties, Inc., 208 F.3d 368, 382-83 (2d Cir. 2000).*

Fraud Claims Against Onse

Oxyn alleges that Onse's November 16 letter, in which it demanded that Oxyn terminate its traffic trading relationship with Dacom, constituted fraud because, at the time it sent the termination demand, Onse did not intend to honor the Agreement and become a shareholder in Oxyn. Oxyn claims that Onse sent the termination request letter with the purpose of disrupting Oxyn's relationship [*23] with Dacom and thereby increasing its own leverage in its negotiations with Oxyn. [7] In addition, Oxyn charges that Onse's request that Oxyn agree to the appointment of Mr. Charles Kim as its representative to attempt to negotiate an amendment to the Agreement was false and misleading and was intended to further undermine the Agreement and provide Onse with a justification for providing Mr. Kim with confidential Oxyn documents and information.

> [7] This argument is a bit illogical since Oxyn claims that Onse simply wanted to walk away from the Agreement. If this was so, it is unclear why Onse would seek leverage to apply in negotiations with Oxyn.

[HN11] In order to make out a claim to recover damages for fraud, a plaintiff must prove: (1) a misrepresentation or material omission of fact, (2) which was false and known to be false by the defendant, (3) made for the purpose of inducing the other party to rely upon it, (4) justifiable reliance by the other party on the misrepresentation or material omission, and (5) injury. [*24] *Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 80, 668 N.E.2d 1370 (1996).* This claim also fails as a matter of law because Oxyn has not come forward with any evidence that when Onse asked Oxyn to terminate its traffic trading relationship with Dacom, it did not, in fact, intend to enter into the anticipated traffic trading relationship with Oxyn as soon as possible. In fact, the evidence, including that relating to the efforts of the Onsenet and Oxyn engineers to establish the necessary interconnection, is to the contrary.

As for the allegation that Onse acted fraudulently when it asked Oxyn to permit Mr. Kim to represent Onse in its negotiations with Oxyn and, in that context, to view documents otherwise protected from disclosure by the Non-Disclosure Agreement between Oxyn and Onse (the "NDA"), Oxyn has proferred no evidence of any misstatement by Onse regarding its desire to have Mr. Kim represent it with respect to its request to renegotiate the Agreement. While it is true that Oxyn does allege that Onse's failure to inform Oxyn that Hyundai had approached it with a business proposal, which it had not accepted, was a material omission, [*25] and that if Oxyn had known that fact, it would not have agreed to Mr. Kim's appointment, Oxyn has made no showing that it suffered any injury as a result of either Mr. Kim's appointment or his being given access to Oxyn's documents. [8]

> 8 Oxyn also claims that Onse breached the Non-Disclosure Agreement between itself and Oxyn by revealing confidential information about Oxyn to both Hyundai and Onsenet, Onse's American subsidiary. Oxyn contends that it is entitled to payment of the attorneys fees and costs that it incurred as a result of Onse's alleged breach of the NDA. However, Oxyn has not shown that this alleged breach caused it to incur any costs or fees beyond those it was already paying in connection with its suit for breach of the Agreement. Furthermore, such fees would be payable only if Oxyn prevailed on its claim that the NDA had been breached, which would require proof of damage attributable to the disclosure of the documents to Mr. Kim. See *Gordon v. DeLaurentiis Corp, 141 A.D.2d 435, 436, 529 N.Y.S.2d 777, 779 (1st Dep't 1988)*. As stated, Oxyn has not preferred evidence of such damage.

[*26] Claims against Hyundai Telecom, Dr. Yang and Mr. Kim

Oxyn alleges that Hyundai Telecom and its employees, Dr. Yang and Mr. Kim (the "Hyundai defendants") took steps to induce Onse to breach the Agreement with Oxyn, and attempts, on the basis of that claim, to state claims against Hyundai for tortious interference with contract and tortious interference with prospective economic advantage.

A. Tortious Interference with Prospective Economic Advantage

As stated previously, a claim of tortious interference with prospective economic advantage requires a showing that the defendant's actions were for the sole purpose of harming the plaintiff, or were accomplished through wrongful means. Oxyn itself contends that Hyundai's

motive for its alleged attempts to undermine the Agreement between Oxyn and Onse was its own economic benefit, and a hoped-for future business relationship between itself and Onse. Moreover, the "wrongful means" alleged by Oxyn are not of the type necessary to support an action for tortious interference with prospective economic advantage, since [HN12] "persuasion alone" is insufficient, even if it is "knowingly directed at interference with the contract." [*27] *Jabbour v. Albany Medical Center, 237 A.D.2d 787, 789, 654 N.Y.S.2d 862, 864 (3rd Dep't 1997)*.

Furthermore, to the extent that the Hyundai defendants allegedly used information from improperly disclosed documents to influence Onse, it was Onse's wrong - not Hyundai's - that gave the Hyundai defendants access to those documents. Hyundai also would have had access only to information that was already in Onse's hands, since it was *from* Onse that the documents came *to* Hyundai. Thus the claim against Hyundai, Mr. Kim and Dr. Yang for tortious interference with prospective economic advantage must be dismissed as a matter of law.

To the extent that the Hyundai defendants are alleged to have interfered with Oxyn's prospective economic relations with third party investors, the claim also fails. As stated previously, under New York law, such a claim requires a showing that *but for* the interference of the defendant, the third parties would have entered into a contract with the plaintiff. Here it is undisputed that the major reason that the third party investors did not invest in Oxyn was Onse's failure to invest $ 15,000,000 in Oxyn pursuant to the Agreement -- not [*28] any action by Hyundai or its employees.

Finally, it is alleged that the Hyundai defendants interfered with future relations between Oxyn and Dacom. This claim fails for the same reasons stated previously. First, it was Oxyn itself that terminated its agreement with Dacom in compliance with Onse's request. There also has been no showing that the Hyundai defendants used improper means of the sort required to make out a claim for tortious interference with prospective economic advantage.

B. Tortious Interference with Contract

[HN13] Absent a valid contract, there can be no claim for tortious interference with contractual relations. Since the Court has found that the Agreement is incomplete and unenforceable, at least to the extent that it requires Onse to invest $ 11,000,000 in Oxyn, a claim for tortious interference cannot stand. As to the claim that the Hyundai defendants interfered with the portion of the Agreement in which Onse promised to pay $ 4,000,000 within 30 days of the signing of the Agreement, the validity of which has been held to raise questions of fact

that cannot be determined on this motion, issues of fact also would preclude summary judgment with respect to this [*29] claim. However, Oxyn's allegations that the Agreement had come under attack from constituencies and individuals within Onse (on or before November 22, 2000), and that Onse was already looking for a way to walk away from the Agreement before the Hyundai defendants became involved (on or after November 23, 2000), "is incompatible with an allegation of 'but for' cause as to" the Hyundai defendants. See *Sharma v. Skaarup Ship Management Corp., 916 F.2d 820, 828 (2d Cir. 1990)*, cert. denied, *499 U.S. 907, 113 L. Ed. 2d 218, 111 S. Ct. 1109 (1991)*. Additional Claims Against All Defendants

Finally, Oxyn alleges prima facie tort against both Onse and Hyundai, claims that all Defendants engaged in an illegal civil conspiracy, and makes a claim for injunctive relief. [HN14] New York does not recognize the tort of civil conspiracy as an independent cause of action. *Houbigant, Inc. v. ACB Mercantile, 914 F. Supp. 964, 989 (S.D.N.Y. 1995)*. The conspiracy doctrine merely permits a showing of joint liability in the event that an underlying tort is shown to have been the result of a common scheme or plan. Atlantis Int'l, Ltd. v. Houbigant (In re Houbigant, Inc.), No. 95 Civ. 9541 (JSM), 1996 U.S. Dist. LEXIS 13424, *17 (S.D.N.Y. Sept. 13, 1996). [*30] Therefore, the Fourteenth cause of action, for Civil Conspiracy, is dismissed.

Similarly, [HN15] there is no cause of action for injunctive relief under either New York or federal law. *Reuben H. Donnelley Corp. v. Mark I Mktg. Corp., 893 F. Supp. 285, 293 (S.D.N.Y. 1995)*. An injunction is a form of relief that is available only if a plaintiff cannot be compensated for a defendant's allegedly wrongful conduct by a remedy at law. *Id. at 293-94*.

Prima Facie Tort

[HN16] The elements of a cause of action for prima facie tort are: (1) intentional infliction of harm; (2) resulting in special damages; (3) without excuse or justification; (4) by an act that would otherwise be lawful. *Twin Laboratories, Inc. v. Weider Health & Fitness, 900 F.2d 566, 571 (2d Cir. 1990)*. [HN17] "The touchstone is 'disinterested malevolence,' meaning that the plaintiff cannot recover unless the defendant's conduct was not only harmful, but done with the sole intent to harm." Id. Motives of profit, self interest, or business advantage have been held to defeat a claim of prima facie tort. *Id.* Oxyn has made no showing that Onse's primary intent [*31] was to harm Oxyn, or that it was motivated at any time by anything other than self-interest in its dealings with Oxyn. Therefore, Oxyn's claim of prima facie tort fails to state a cause of action.

Onse's Claims against Oxyn

Oxyn has moved for partial summary judgment dismissing Onse's counterclaims of fraudulent inducement, indefiniteness, bad faith, and unclean hands, and for an Order holding that Onse breached both the Agreement and the NDA. [9]

> 9 As stated previously, Oxyn has failed to demonstrate that Onse's alleged breach of the NDA caused it any injury.

Onse interposed these claims in opposition to Oxyn's breach of contract claims. Accordingly, their disposition follows that of the underlying claims. Because summary judgment is hereby granted in Onse's favor with respect to the allegation that Onse breached the Agreement by failing to pay the second payment of $ 11,000,000, Onse's counterclaims with respect to that part of the Agreement are moot. Because questions of fact exist as to both the [*32] severability of the obligation to pay the first $ 4,000,000, and the intent of the parties with respect to the import of that portion of the Agreement, precluding summary judgment at this time, summary judgment also would be inappropriate regarding Onse's counterclaims with respect to that portion of the Agreement.

In its Answer and Counterclaims, Onse alleged that in its presentations and proposals to Onse, Oxyn misrepresented its financial condition, assets, experience, business relationships, and position in the marketplace, and that Onse relied on these misrepresentations, as well as on Oxyn's allegedly false statements regarding the date on which Oxyn's traffic trading agreement with Dacom would expire, when it entered into the Agreement. Onse proffers numerous details to support this contention. Oxyn responds that its statements to Onse were not misleading, and that, in any event, Onse cannot claim to have justifiably relied on Oxyn's representations because it went ahead and entered into the Agreement without waiting for additional financial information that Man-Soo Chang of Onse had requested. This raises an issue of fact that cannot be resolved on this motion. [10]

> 10    [HN18] A claim for fraud also requires a showing of damage. If it is found that the entire Agreement does not impose a binding obligation on Onse, it may be that Onse has suffered no injury as a result of Oxyn's misrepresentations.

[*33] Conclusion

For the foregoing reasons, Onse's motion for summary judgment is granted in part. Oxyn's claim for breach of the Agreement is dismissed to the extent that it is alleged that Onse breached the obligation to pay Onse $ 11,000,000 toward a total investment of $ 15,000,000

2003 U.S. Dist. LEXIS 17371, *

in Oxyn. Summary judgment is denied to both Onse and Oxyn as to Onse's obligation to pay Oxyn $ 4,000,000 within 30 days of the execution of the Agreement. Summary judgment is granted in Onse's favor with respect to Oxyn's claims for tortious interference with contract, tortious interference with prospective economic advantage, fraud, prima facie tort, civil conspiracy and injunctive relief, and those claims are dismissed. The Hyundai defendants' motion to dismiss the Second Amended Complaint against them is granted. Oxyn's motion for partial summary judgment is denied.

**SO ORDERED.**

Dated: September 30, 2003

JOHN S. MARTIN, JR.

U. S. D. J.

LEXSEE 2004 US DIST. LEXIS 6904

**CENTURY PACIFIC, INC., BECKER ENTERPRISES, INC., Plaintiffs, -against-HILTON HOTELS CORPORATION, DOUBLETREE CORPORATION, RED LION HOTELS, INC., Defendants.**

**03 Civ. 8258 (SAS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2004 U.S. Dist. LEXIS 6904*

**April 20, 2004, Decided**
**April 21, 2004, Filed**

**DISPOSITION:** [*1] Defendants' motion to dismiss was granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff franchisees claimed that defendant franchisors fraudulently induced them into executing franchise agreements for certain hotels by promises to retain the hotel chain. When the chain was sold, the franchisees brought suit, claiming violation of the New York Franchise Sales Act, *N.Y. Gen. Bus. Law § 680 et seq.*, common law fraud, negligent misrepresentation, and fraudulent omission. The franchisors moved to dismiss the complaint.

**OVERVIEW:** The franchisors invoked the franchise sales act based on the choice of law provision in the franchise agreements. However, the unambiguous language of the carve-out clause of the agreements precluded application of this law, which did not apply to commerce that occurred wholly outside of the state. Thus, the court granted the motion to dismiss the franchise sales act claims. However, the court denied the motion to dismiss the franchisees' remaining claims. The complaint adequately averred common law fraud, in that the franchisors knowingly made false representations regarding their plans for the chain. The terms of the agreement granting the franchisors the right to transfer the chain did not supersede these statements. Similarly, the agreements' merger clauses did not bar admission of these statements. These representations were not non-actionable "puffing." The franchisees also adequately asserted a negligent misrepresentation claim from their reliance on the false statements regarding the plans for the chain. Similarly, the franchisees alleged a valid

fraudulent omission claim from the franchisors' withholding of information regarding their plans to sell the chain.

**OUTCOME:** The court granted the franchisors' motion to dismiss the franchisees' state franchise sales act claim. However, the court denied the franchisors' motion to dismiss the franchisees' claims of common law fraud, negligent misrepresentation, and fraudulent omission.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN1] Under *Fed. R. Civ. P. 12(b)(6)*, a motion to dismiss should be granted only if it appears beyond doubt that the plaintiffs can prove no set of facts in support of their claims which would entitle them to relief. The task of the court in ruling on a *rule 12(b)(6)* motion is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof. When deciding a motion to dismiss, courts must accept all factual allegations in the complaint as true, and draw all reasonable inferences in plaintiffs' favor.

*Business & Corporate Law > Distributorships & Franchises > Causes of Action > General Overview*
*Business & Corporate Law > Distributorships & Franchises > Franchise Relationships > General Overview*
[HN2] See *N.Y. Gen. Bus. Law § 683(2)(n)*.

2004 U.S. Dist. LEXIS 6904, *

**Business & Corporate Law > Distributorships & Franchises > Causes of Action > Fraud & Misrepresentation**
**Business & Corporate Law > Distributorships & Franchises > Franchise Relationships > General Overview**
[HN3] See *N.Y. Gen. Bus. Law § 687(2)(b)*.

**Business & Corporate Law > Distributorships & Franchises > Assignments & Transfers**
**Civil Procedure > Federal & State Interrelationships > General Overview**
[HN4] See *N.Y. Gen. Bus. Law § 681(12)(a)*.

**Business & Corporate Law > Distributorships & Franchises > Causes of Action > Choice of Law**
**Business & Corporate Law > Distributorships & Franchises > Franchise Relationships > Franchise Agreements**
**Civil Procedure > Federal & State Interrelationships > General Overview**
[HN5] A choice of law provision may provide for extraterritorial application of the New York Franchise Sales Act, *N.Y. Gen. Bus. Law § 680 et seq.*, in certain cases.

**Contracts Law > Contract Interpretation > General Overview**
**Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > General Overview**
[HN6] Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed. In interpreting a contract, words and phrases are given their plain meaning. A court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case.

**Business & Corporate Law > Distributorships & Franchises > Causes of Action > Choice of Law**
**Business & Corporate Law > Distributorships & Franchises > Franchise Relationships > Franchise Agreements**
**Civil Procedure > Federal & State Interrelationships > General Overview**
[HN7] The New York Franchise Sales Act, *N.Y. Gen. Bus. Law § 680 et seq.*, is applicable only to specific transactions solicited or accepted in New York, or affecting New York.

**Torts > Business Torts > Fraud & Misrepresentation > General Overview**
[HN8] To recover for common law fraud in New York, plaintiffs must demonstrate: (1) a misrepresentation of material fact made with knowledge of falsity, (2) justifiable reliance on such misrepresentation, and (3) resulting harm.

**Contracts Law > Contract Conditions & Provisions > Integration Clauses**
**Contracts Law > Contract Interpretation > Parol Evidence > General Overview**
**Evidence > Documentary Evidence > Parol Evidence**
[HN9] Under New York law, a general merger clause precludes neither an action for fraud in the inducement nor parol evidence concerning fraudulent representations. A court should only bar such evidence where the merger clause contains a provision that specifically contradicts a claimed oral representation.

**Torts > Business Torts > Fraud & Misrepresentation > General Overview**
[HN10] New York law recognizes that while mere promissory statements as to what will be done in the future are not actionable, it is settled that, if a promise was actually made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of material existing fact upon which an action for recision based on fraudulent inducement may be predicated.

**Contracts Law > Consideration > Enforcement of Promises > General Overview**
**Torts > Business Torts > Fraud & Misrepresentation > Negligent Misrepresentation > General Overview**
[HN11] Under New York law, a claim of negligent misrepresentation must satisfy the following five elements: (1) the defendant had a duty, as a result of a special relationship, to give correct information, (2) the defendant made a false representation that he or she should have known was incorrect, (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose, (4) the plaintiff intended to rely and act upon it, and (5) the plaintiff reasonably relied on it to his or her detriment.

**Torts > Business Torts > Fraud & Misrepresentation > Negligent Misrepresentation > Elements**
**Torts > Negligence > Duty > Affirmative Duty to Act > Special Relationships > General Overview**
[HN12] In order to determine the existence of a special relationship and duty in the context of a negligent mis-

2004 U.S. Dist. LEXIS 6904, *

representation claim, New York law requires a fact finder to consider the following three factors: whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose.

*Business & Corporate Law > Distributorships & Franchises > Causes of Action > Fraud & Misrepresentation*
*Torts > Business Torts > Fraud & Misrepresentation > Negligent Misrepresentation > Elements*
*Torts > Negligence > Duty > Affirmative Duty to Act > Special Relationships > General Overview*
[HN13] In general, a simple commercial relationship, such as that between a buyer and seller or franchisor and franchisee, does not constitute the kind of "special relationship" necessary to support a negligent misrepresentation claim. A commercial relationship may become a special relationship, however, where the parties enjoy a relationship of trust and reliance closer than that of the ordinary buyer and seller. Courts have found a special relationship and duty where defendants sought to induce plaintiffs into a business transaction by making certain statements or providing specific information with the intent that plaintiffs rely on those statements or information.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Torts > Business Torts > Fraud & Misrepresentation > Negligent Misrepresentation > Elements*
[HN14] In a negligent misrepresentation claim, a determination of whether a special relationship exists is highly fact-specific and generally not susceptible to resolution at the pleadings stage.

*Governments > Fiduciary Responsibilities*
*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN15] New York law recognizes fraudulent omission as a permutation of the common law action for fraud. Non-disclosure is tantamount to an affirmative representation where a party to a transaction is duty-bound to disclose certain pertinent information. An omission is actionable only in the context of a duty to disclose, but a fiduciary duty is not the sine qua non of fraudulent omissions. New York recognizes a duty by a party to a business transaction to speak in three situations: first, where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a

relevant fact to the other party it cannot give only half of the truth; second, when the parties stand in a fiduciary or confidential relationship with each other; and third, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.

**COUNSEL:** For Plaintiffs: Dwight J. Davis, Esq., Douglas L. Friedman, Esq., Stephen J. Cirami, Esq., KING & SPALDING LLP, New York, New York.

For Plaintiffs: Courtland L. Reichman, Esq., Charmaine D. Williams, Esq., KING & SPALDING LLP, Atlanta, Georgia.

For Defendants: Lee W. Stremba, Esq., JENKENS & GILCHRIST PARKER CHAPIN LLP, New York, New York.

For Defendants: Jonathan Solish, Esq., Glenn Plattner, Esq., JENKENS & GILCHRIST LLP, Los Angeles, California.

**JUDGES:** SHIRA A. SCHEINDLIN, U.S.D.J.

**OPINION BY:** SHIRA A. SCHEINDLIN

**OPINION**

**OPINION AND ORDER**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

Plaintiffs Century Pacific, Inc. and Becker Enterprises, Inc. filed this action against defendants Hilton Hotels Corporation, Doubletree Corporation, (collectively "Hilton/Doubletree"), and Red Lion, Inc. claiming violations of the *New York Franchise Sales Act* and common law fraud, negligent misrepresentation, and fraudulent [*2] omission. The claims arise from the circumstances surrounding the Red Lion hotel franchise agreements plaintiffs entered into with defendants in 2001. Plaintiffs allege that they were victims of a "bait and switch" strategy through which defendants induced plaintiffs to sign long-term franchise agreements by misrepresenting Hilton/Doubletree's plans to retain the Red Lion hotel chain. Plaintiffs claim that at the time of their franchise negotiations with defendants, defendants had, in fact, already decided to sell Red Lion to a smaller, less-profitable hotel chain. Plaintiffs further allege that defendants pursued the franchise agreements with plaintiffs in order to increase Hilton/Doubletree's profits in the planned resale of Red Lion. Defendants move to dismiss on the grounds that the New York Franchise Sales Act does not apply to the franchise agreements and that plaintiffs cannot state viable claims for fraud, negligent

misrepresentation, or fraudulent omission. For the following reasons, defendants' motion to dismiss is granted in part and denied in part.

## I. FACTS

Plaintiffs allege the following facts, all of which are deemed true for the purposes of this motion.

### [*3] A. The Parties

Plaintiffs Century Pacific, a Texas corporation, and Becker Enterprises, a Nevada corporation, entered into franchise agreements with defendants and converted hotels they operated in Colorado into Red Lion franchises in early 2001. *See* Complaint PP 4-5, 22.

Defendant Hilton Hotels is a Delaware corporation with a principal place of business in Beverly Hills, California. *Id.* P6. Hilton develops, owns, manages, or franchises approximately 2,000 hotels and resort and vacation properties around the world. The Hilton family of hotels includes defendant Doubletree Hotels, a Delaware corporation and wholly owned subsidiary of Hilton, as well as Embassy Suites Hotels, Hampton Inn, Homewood Suites, and Hilton Garden Inn. *Id.* PP 7, 14.

Defendant Red Lion is a Delaware corporation with a main office in Spokane, Washington. *Id.* P 8. Red Lion was acquired by Doubletree in 1996 and by Hilton in 1999. *Id.* PP 15-16. Hilton sold Red Lion to WestCoast Hospitality Corporation ("WestCoast") in early 2002. *Id.* P 36. Jurisdiction is premised on diversity of citizenship. *Id.* P 13.

## B. The Red Lion Chain

Red Lion was founded in 1959 and is best known [*4] for its hotel operations in the Northwest and Western U.S. *Id.* P 15. For Hilton/Doubletree, Red Lion represented a less well-known brand name and was acquired only as part of a larger acquisition by Hilton in 1999 of the Promus Hotel Corporation which included more valuable brands like Embassy Suites and Hampton Inn. *Id.* PP 15-16. Hilton/Doubletree initially intended to eliminate the Red Lion brand and began closing down and converting Red Lion hotels after the acquisition. *Id.* PP 17-18. Sometime in 2000, Hilton/Doubletree secretly decided instead to actively market the Red Lion brand, build up its value, and then sell it within a very short time frame. *Id.* P 19. Publicly, however, Hilton/Doubletree represented that they were working to reinvigorate and expand the Red Lion brand; Hilton/Doubletree converted several of their hotels to Red Lions and aggressively campaigned to sell Red Lion franchises to other existing hotels. *Id.* PP 19-20, 28. Their strategy was apparently to lock in as many long-term franchise agreements as possible in order to increase the purchase price of Red Lion. *Id.* P 21.

### 1. Franchise Negotiations and Agreements

Plaintiffs were [*5] among those existing hotel operators who were targeted by defendants' marketing campaign. Between Fall of 2000 and February 2001, plaintiffs received Uniform Franchise Offering Circulars ("UFOCs") and negotiated with defendants before entering into Red Lion franchise agreements. *Id.* P 22. Defendants persuaded plaintiffs to become Red Lion franchisees by promoting the value of the "Hilton" name and the benefits of being part of the Hilton family of hotels. *Id.* P 23. These benefits included: access to Hilton's worldwide reservation and group sales systems, cross-selling with sister brands, participation in Hilton's group purchasing program, and future participation in the Hilton HHonors program. *Id.*

Officers and employees of Hilton/Doubletree and Red Lion, including Tom Murray and Manfred Gerling, repeatedly assured plaintiffs that Red Lion was an important and growing part of the Hilton group. *Id.* P 24. These officers and employees specifically told plaintiffs that Hilton/Doubletree had long-term plans to own and grow Red Lion. Murray represented to plaintiffs that he was given "repeated assurances from his seniors that Red Lion is an important part of the Hilton family. [*6] " *Id.* Plaintiffs also received express assurances from Gerling that "we told you before, [Red Lion] is not for sale" and that "Red Lion would have 200 franchises within five years." *Id.* None of defendants' sales and marketing materials, oral statements, or correspondence conveyed to plaintiffs that Hilton/Doubletree had a current intent or desire to sell the Red Lion brand. *Id.* P 25. Instead, those statements and materials all indicated that the Hilton connection was the most important attraction to prospective franchisees. *Id.* P 31.

Plaintiffs relied on those oral and written statements and entered into franchise agreements with defendants on the basis of Hilton/Doubletree's representations as to their intent to keep and grow Red Lion and the benefits Red Lion franchisees would reap as members of the Hilton family. *Id.* PP 27, 32-33.

Plaintiff Becker enterprises executed a franchise agreement with red Lion on January 26, 2001 and plaintiff century Pacific executed an agreement on February 13, 2001. *Id.* P22.

To meet the terms of those agreements and become Red Lion franchisees, plaintiffs spent considerable time and money on converting their existing hotels [*7] into Red Lion hotels and on associated renovations, employee training, and advertising. *Id.* P29. Plaintiffs also agreed to pay substantial royalty fees to become part of the Hil-

ton family. *Id.* P 30. Plaintiffs believed these expenses would be offset by the increased business they would receive as Hilton-affiliated hotels. *Id.* PP 33, 37.

## 2. Sale of Red Lion

Plaintiffs first became aware of Hilton/Doubletree's plans to sell Red Lion on October 19, 2001, when Hilton and WestCoast issued a press release announcing an intended sale to WestCoast. *Id.* P 35. WestCoast acquired Red Lion on or about January 2, 2002 for approximately $ 50 million. *Id.* P 36.

WestCoast is a small, regional hotel chain with less than ten hotels in five states. *Id.* P 38. WestCoast does not offer the kind of benefits or resources that Hilton offered to Red Lion franchisees. *Id.* WestCoast's lack of name brand recognition and franchisee benefits has negatively affected plaintiffs' business. *Id.* Plaintiffs would not have signed franchise agreements with defendants had they known that Red Lion would become affiliated with WestCoast instead of Hilton. *Id.*

Contrary to their [*8] statements and other representations to plaintiffs, defendants knew at the time they were negotiating and executing the franchise agreements that Hilton/Doubletree did not intend to retain the Red Lion brand. *Id.* PP 27, 39. Plaintiffs relied to their detriment on defendants' misrepresentations and failure to disclose their intent to sell Red Lion. *Id.* PP 40-41. Since the sale of Red Lion to WestCoast, plaintiffs have been and continue to be harmed by decreased bookings, loss of walk-ins and regular clientele, and an overall lower value of their franchise hotels because of the brand and name change. *Id.*

## II. LEGAL STANDARD

[HN1] Under *Rule 12(b)(6) of the Federal Rules of Civil Procedure,* a motion to dismiss should be granted only if "'it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim[s] which would entitle [them] to relief.'" *Weixel v. Board of Educ. of New York, 287 F.3d 138, 145 (2d Cir. 2002)* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)).* The task of the court in ruling on a *Rule 12(b)(6)* motion is "merely to [*9] assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Levitt v. Bear Stearns & Co., Inc., 340 F.3d 94, 101 (2d Cir. 2003)* (quotation marks and citations omitted). When deciding a motion to dismiss, courts must accept all factual allegations in the complaint as true, and draw all reasonable inferences in plaintiffs' favor. *See Chambers v. Time Warner Inc., 282 F.3d 147, 152 (2d Cir. 2002).*

## III. DISCUSSION

### A. Claims Under the New York Franchise Sales Act

Plaintiffs bring their first and second causes of action under the New York Franchise Sales Act, *N.Y. Gen. Bus. Law § 680 et seq* ("the Act"). *First,* plaintiffs claim that defendants violated *§ 683(2)(n) of the Act* which requires that the offeror of a franchise provide prospective franchisees an offering prospectus that includes: [HN2] "A statement of any past or present practice or of any intent of the franchisor to sell, assign, or discount to a third party any note, contract, or other obligation of the franchisee or subfranchisor in whole or in part." *N.Y. Gen. Bus. Law § 683(2)(n)* [*10] (2004). Plaintiffs argue that defendants violated this provision by failing to include, in the UFOC they issued to plaintiffs, a statement of Hilton/Doubletree's present intent to sell the Red Lion franchise. *See Complaint P 47. Second,* plaintiffs allege that defendants' failure to disclose a present intent to sell Red Lion also violated the antifraud section of the Act which deems it unlawful for a person [HN3] "in connection with the offer, sale, or purchase of any franchise, to directly or indirectly ... (b) make any untrue statement of a material fact or omit to state a material fact ...." *N.Y. Gen. Bus. Law § 687(2)(b) (2004).*

Plaintiffs invoke the Act on the basis of the choice of law provision in their franchise agreements which specifies New York law as controlling in any contract, tort, or other dispute between the parties. *See* Franchise License Agreement, Red Lion Inn & Suites Pagosa Springs ("Franchise Agreement") P 16(b) (attached as Exhibit 1 to the Affirmation of Tom McKeirnan, Vice President and General Counsel for WestCoast (as parent company of Red Lion), in Support of Defendants' Motion to Dismiss).[1] The choice of law provision [*11] reads as follows:

> We each agree that the State of New York has a deep and well developed history of business decisional law. For this reason, we each agree that except to the extent governed by the United States Trademark Act of 1946 (Lanham Act; 15 U.S.C. P 1050 *et seq.*), as amended, this Agreement, all relations between us, and any and all disputes between us, whether sounding in contract, tort, or otherwise, are to be exclusively construed in accordance with and/or governed by (as applicable) the laws of the State of New York without recourse to New York (or any other) choice of law conflicts of law principles. If, however, any provision of this Agreement would not be enforceable un-

der the laws of New York, and if the Ho-
tel is located outside of New York and the
provision would be enforceable under the
laws of the state in which the Hotel is lo-
cated, then the provision in question (and
only that provision) will be interpreted
and construed under the laws of that state.
Nothing in this section is intended to in-
voke the application of any franchise,
business opportunity, antitrust, "implied
covenant," unfair competition, fiduciary
or any other doctrine [*12] of law of the
State of New York or any other state
which would not otherwise apply absent
this Paragraph 16b.

Franchise Agreement P16(b). The same section of the
agreements also includes a New York forum selection
provision. *See id.*

   1   Plaintiffs have not alleged a breach of contract
   and their Complaint does not quote or incorporate
   the franchise agreements executed with defen-
   dants. Defendants, however, have provided the
   two agreements attached an affidavit filed with
   their motion to dismiss. The agreements are thus
   properly before the Court under *Rule 10(c) of the
   Federal Rules of Civil Procedure.* Because the
   provisions of the agreements relevant to this dis-
   cussion are identical, references to "Franchise
   Agreement" refer to both agreements.

   Defendants argue that notwithstanding the New
York choice of law provision, plaintiffs cannot invoke
the Act because it regulates only franchise offers and
sales made in New York or franchises located in New
York. Under [*13] the Act, [HN4] "an offer or sale of a
franchise is made in this state when an offer to sell is
made in this state, or an offer to buy is accepted in this
state, or, if the franchisee is domiciled in this state, the
franchised business is or will be operated in this state."
*N.Y. Gen. Bus. Law § 681(12)(a)* (2004). Defendants
further argue that the last sentence of the choice of law
provision in the franchise agreements expressly "carves
out" any New York franchise law that would not other-
wise apply to the transaction. This sentence provides:
"Nothing in this section is intended to invoke the appli-
cation of any franchise, business opportunity, antitrust,
'implied covenant,' unfair competition, fiduciary or any
other doctrine of law of the State of New York or any
other state which would not otherwise apply absent this
Paragraph 16b." Franchise Agreement P16(b).

   Plaintiffs do not allege that the franchise offers or
sales were actually made in New York but respond that

the New York choice of law provision alone is sufficient
to invoke the Act. Plaintiffs also argue that the "carve
out" clause of the choice of law provision should not bar
their claims because it is [*14] ambiguous and should be
construed against defendants or, alternatively, because it
should be deemed void against public policy for allowing
defendants to circumvent the protections of the chosen
state law.

   [HN5] A choice of law provision may provide for
extraterritorial application of the New York Franchise
Sales Act in certain cases. *See, e.g., Schwartz v. Pills-
bury, Inc., 969 F.2d 840, 847 (9th Cir. 1992); Mon-Shore
Management, Inc. v. Family Media, Inc., 584 F. Supp.
186, 193 (S.D.N.Y. 1984).* The provision in plaintiffs'
contract, however, unambiguously bars extension of the
Act to their franchises.

   [HN6] "Under New York law, a written contract is
to be interpreted so as to give effect to the intention of
the parties as expressed in the unequivocal language they
have employed." *Cruden v. Bank of New York, 957 F.2d
961, 976 (2d Cir. 1992); see also Paine Webber Inc. v.
Bybyk, 81 F.3d 1193, 1199 (2d Cir. 1996)* ("In interpret-
ing a contract, 'words and phrases are given their plain
meaning.'" (citations omitted)). Similarly, "[a] court may
neither rewrite, under the guise of interpretation, a term
of the contract when the term [*15] is clear and unambi-
guous, nor redraft a contract to accord with its instinct
for the dispensation of equity upon the facts of a given
case." *Cruden, 957 F.2d at 976* (citations omitted).

   Accordingly, the carve out clause in plaintiffs'
agreements, providing that "nothing in this [choice of
law] section is intended to invoke the application of any
franchise [law] ... of the State of New York ... which
would not otherwise apply ...," Franchise Agreement P
16, must be read to preclude the application of New York
franchise regulations like [HN7] the Franchise Sales Act
that "[are] applicable only to specific transactions solic-
ited or accepted in New York, or affecting New York."
*Mon-Shore, 584 F. Supp. at 191.*

   This finding is also consistent with the cases plain-
tiffs cite in which courts have held that the Act can reach
non-New York franchises through a choice of law provi-
sion. In each of those cases, the court applied the Act
specifically because the choice of law language in the
franchise agreement provided that the franchise *"shall be
deemed to have been made in New York."* See *Mon-
Shore, 584 F. Supp. at 193; Schwartz, 969 F.2d at 847;*
[*16] *McGowan v. Pillsbury Co., 723 F. Supp. 530, 536
(W.D. Wash. 1989).* Plaintiffs' agreements have no such
clause and instead *expressly* qualify the scope of New
York law that will apply in any dispute.

   Plaintiffs' alternative argument, that the carve out
provision should be held void as against public policy,

must also fail because it is based on the mistaken assumption that the New York Franchise Sales Act was intended to apply to and proscribe waiver clauses in any agreement that invokes New York law. As discussed above, however, the Act "does not apply to commerce that takes place 'wholly outside' of New York," *Mon-Shore, 584 F. Supp. at 190*, unless the contract terms express this intent by providing for a constructive offer and/or sale in New York.

In sum, because the primary objective in interpreting a contract "is to give effect to the intent of the parties as revealed by the language they chose to use," *Seiden Assoc., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992)*, the unambiguous carve out of New York franchise law from the parties' choice of law provision must be honored by dismissing plaintiffs' claims under [*17] the Act.

## B. Common Law Fraud Claim

Plaintiffs' third cause of action asserts that defendants committed common law fraud by knowingly making material misrepresentations and false statements about Hilton/Doubletree's plans for Red Lion. Defendants argue that the claim is not viable because plaintiffs cannot claim reasonable reliance on defendants' oral statements about their plans for Red Lion. Specifically, defendants contend that any oral statements to plaintiffs: (1) were contradicted by express provisions in the franchise agreements giving defendants the right to transfer Red Lion; (2) were canceled by the integration clause of the agreements; and/or (3) amounted to non-actionable "puffing" or "trade talk." Plaintiffs respond that because fraud lies in the specific misrepresentations of fact, their claims that defendants misrepresented their present intent to retain Red Lion survive challenges based on contract terms and the rule that promissory statements are generally not actionable.

[HN8] To recover for common law fraud in New York, plaintiffs must demonstrate: (1) a misrepresentation of material fact made with knowledge of falsity; (2) justifiable reliance on such misrepresentation; [*18] and (3) resulting harm. *See Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 421, 668 N.E.2d 1370, 646 N.Y.S.2d 76 (1996)*. Plaintiffs claim that they decided to enter into franchise agreements with defendants in reliance on, among other things, oral assurances by officers and employees, including Tom Murray and Manfred Gerling, that "[Red Lion] is not for sale" and that Hilton/Doubletree had long-term plans to grow Red Lion as a Hilton subsidiary. Plaintiffs' ability to show reliance is precluded neither by the contract terms defendants cite nor by the "puffing" doctrine.

*First,* the terms of the franchise agreement granting defendants an express right to transfer Red Lion do not contradict or supersede oral statements by defendants about their present intent to retain Red Lion. Plaintiffs could have reasonably relied on defendants' statements that Hilton/Doubletree had no existing plans to transfer Red Lion while also agreeing to and appreciating defendants' right to transfer Red Lion at any time.

*Second,* the merger or integration clause of paragraph 16(d) of plaintiffs' franchise agreements does not bar admission of defendants' previous oral statements in support of plaintiffs' fraud [*19] claims. [2] [HN9] Under New York law, a general merger clause precludes neither an action for fraud in the inducement nor parol evidence concerning fraudulent representations. *See Lee v. Goldstrom, 135 A.D.2d 812, 522 N.Y.S.2d 917, 918 (2d Dep't 1987)*. A court should only bar such evidence where the merger clause contains a provision that specifically contradicts a claimed oral representation. *See Bibeault v. Advanced Health Corp., 2002 U.S. Dist. LEXIS 225, No. 97 Civ. 6026, 2002 WL 24305, *3-4 (S.D.N.Y. Jan. 8, 2002)* (citing *Danann Realty Corp. v. Harris, 5 N.Y.2d 317, 320-321, 157 N.E.2d 597, 184 N.Y.S.2d 599 (1959))*. The only specific language in the otherwise boilerplate general merger clause of plaintiffs' franchise agreements provides that plaintiffs "agree that no claims, representations or warranties of earnings, sales, profits, success or failure of the Hotel have been made to you." Franchise Agreement P 16(d). The subject of defendants' alleged misrepresentations -Hilton/Doubletree's present intent to retain Red Lion - is not enumerated in the merger clause. Accordingly, the clause does not bar admission of parol evidence to support plaintiffs' claims.

2   Under the merger clause, the parties agreed:

> that this Agreement and its attachments will be construed together and will supersede and cancel any prior and/or contemporaneous discussions or writings (whether described as representations, inducements, promises, agreements or by any other term) between us. We each agree that we placed, and will place, no reliance on any such discussions or writings. You agree that no claims, representations or, warranties of earnings, sales, profits, success or failure of the Hotel have been made to you. This Agreement and its attachments is the entire agreement between us and contains all of the terms, conditions,

rights and obligations between us with respect to the Hotel and any other aspect of the relationship between us.

Franchise Agreement P 16(d).

[*20] Finally, defendants' representations about their present intent to retain Red Lion cannot be summarily dismissed as nonactionable "puffing." [HN10] New York law recognizes that:

while mere promissory statements as to what will be done in the future are not actionable, ... it is settled that, *if a promise was actually made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of material existing fact* upon which an action for recision [based on fraudulent inducement] may be predicated.

*Stewart v. Jackson & Nash, 976 F.2d 86, 89 (2d Cir. 1992)* (quoting *Sabo v. Delman, 3 N.Y.2d 155, 160, 143 N.E.2d 906, 164 N.Y.S.2d 714 (1957)* (emphasis added)). *See also Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994)* ("The failure to fulfill a promise to perform future acts is not ground for a fraud action *unless there existed an intent not to perform at the time the promise was made.*" (emphasis added)).

Plaintiffs have adequately alleged that defendants knew, at the time they were negotiating with plaintiffs, that Hilton/Doubletree was actually planning to sell the subsidiary shortly after closing franchise deals [*21] with plaintiffs and others. Accordingly, because plaintiffs may be able to show that defendants' oral promises about their long-term plans to grow Red Lion were made with an intent not to perform, their common law fraud claim may proceed.

## C. Negligent Misrepresentation Claim

Plaintiffs' fourth cause of action alleges that defendants negligently or recklessly disregarded the falsity of their oral and written statements about Hilton/Doubletree's intent to continue to hold and promote Red Lion and thereby breached a duty not to make misrepresentations to plaintiffs. Defendants argue for dismissal of the claim on the ground that there was no special relationship between the parties and therefore no duty owed by defendants to plaintiffs. Defendants further contend that the alleged misrepresentations are not actionable because they were promissory rather than factual in nature. Plaintiffs respond that a special relation-

ship and corresponding duty existed because of defendants' superior knowledge and awareness that plaintiffs would rely on their misrepresentations. Plaintiffs also reiterate their claim that defendants' misrepresentations were factual because they involved defendants' [*22] present intent.

[HN11] Under New York law, a claim of negligent misrepresentation must satisfy the following five elements:

(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.

*Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000)*. Defendants contest plaintiffs' ability to meet the first and fifth elements.

First, [HN12] in order to determine the existence of a special relationship and duty in the context of a negligent misrepresentation claim, the Second Circuit has held that New York law requires a fact finder to consider the following three factors: "whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker [*23] was aware of the use to which the information would be put and supplied it for that purpose." *Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 103 (2d Cir. 2001)* (quotation marks and citation omitted). In *Kimmell v. Schaefer, 89 N.Y.2d 257, 675 N.E.2d 450, 652 N.Y.S.2d 715 (1996)*, the New York Court of Appeals explained that "in the commercial context, a duty to speak with care exists when the relationship of the parties, arising out of contract or otherwise, [is] such that in morals and good conscience the one has the right to rely upon the other for information." *89 N.Y.2d at 263, 675 N.E.2d 450, 652 N.Y.S.2d 715* (quotation marks and citation omitted).

[HN13] In general, a simple commercial relationship, such as that between a buyer and seller or franchisor and franchisee, does not constitute the kind of "special relationship" necessary to support a negligent misrepresentation claim. *See Dimon, Inc. v. Folium, Inc., 48 F. Supp. 2d 359, 373 (S.D.N.Y. 1999)*. A commercial relationship may become a special relationship, however,

where "the parties ... enjoy a relationship of trust and reliance 'closer.. than that of the ordinary buyer and seller.'" *Polycast Tech. Corp. v. Uniroyal, Inc., 1988 U.S. Dist. LEXIS 9648, No. 87 Civ. 3297, 1988 WL 96586,* [*24] *at *10 (S.D.N.Y. Aug. 31, 1988)* (citations omitted). Courts have found a special relationship and duty, for example, where defendants sought to induce plaintiffs into a business transaction by making certain statements or providing specific information with the intent that plaintiffs rely on those statements or information. *See Kimmell, 89 N.Y.2d at 264-65, 675 N.E.2d 450, 652 N.Y.S.2d 715; Suez Equity Investors, 250 F.3d at 103; New York Islanders Hockey Club, LLP v. Comerica Bank-Texas, 71 F. Supp. 2d 108, 119 (E.D.N.Y. 1999).*

Plaintiffs here have adequately pled a similar fact pattern; their allegations that defendants made numerous false statements about their plans for Red Lion with the specific intent of earning plaintiffs' trust and reliance require a denial of defendants' motion to dismiss this claim. Although it is not clear that defendants' superior knowledge about their own business plans constitutes the kind of unique expertise enumerated in the *Suez Equity Investors* test, the absence of this factor is not fatal at this stage. Courts in this circuit have held that [HN14] a determination of whether a special relationship exists is highly fact-specific and [*25] "generally not susceptible to resolution at the pleadings stage." *Nasik Breeding & Research Farm Ltd. v. Merck & Co., 165 F. Supp. 2d 514, 536 (S.D.N.Y. 2001).*

Defendants' second argument, that plaintiffs cannot state a claim for negligent misrepresentation because they cannot meet the fifth element of showing that they "reasonably relied" on defendants' statements, also falls short. As previously discussed in the fraud analysis, plaintiffs' allegations of misrepresentation are based not on defendants' failure to fulfill promises about future conduct but on defendants' intent at the time they made the statements about Hilton/Doubletree's plans to retain Red Lion. Accordingly, because plaintiffs have pled that defendants made those promises with a present intent not to perform them, their claim of negligent misrepresentation survives along with their fraud claim. *See Murray v. Xerox Corp., 811 F.2d 118, 121-22 (2d Cir. 1987).*

## D. Fraudulent Omission Claim

Finally, plaintiffs' fifth cause of action alleges that defendants had a duty to disclose to plaintiffs their present plans to sell the Red Lion subsidiary but instead withheld the information [*26] with the intent to defraud plaintiffs. Plaintiffs claim that they relied on and were harmed by this fraudulent omission. Defendants contend that this omission is nonactionable because the law imposes no duty on a franchisor to disclose to a franchisee the possibility or probability of such a sale. Plaintiffs

argue that defendants' duty to disclose arose both from its superior knowledge and from the disclosure provisions of the New York Franchise Sales Act.

[HN15] New York law recognizes fraudulent omission as a permutation of the common law action for fraud. *See, e.g., Callahan v. Callahan, 127 A.D.2d 298, 514 N.Y.S.2d 819, 821 (3d Dep't 1987)* ("nondisclosure is tantamount to an affirmative representation where a party to a transaction is duty-bound to disclose certain pertinent information."). An omission is actionable only in the context of a duty to disclose, "but a *fiduciary* duty is not the sine qua non of fraudulent omissions." *United States v. Autuori, 212 F.3d 105, 119 (2d Cir. 2000).* The Second Circuit has held that

> New York recognizes a duty by a party to a business transaction to speak in three situations: first, where the party has [*27] made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth; second, when the parties stand in a fiduciary or confidential relationship with each other; and third, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.

*Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993)* (citations and internal quotations omitted). The court in *Brass* also noted "a tendency in New York to apply the rule of 'superior knowledge' in an array of contexts in which silence would at one time have escaped criticism." *Id. at 151.*

Plaintiffs' claim of fraudulent omission is actionable under either the first or third contexts described by *Brass* as requiring disclosure. Assuming plaintiffs' allegations are true, plaintiffs specifically questioned defendants during negotiations about Hilton/Doubletree's plans to hold or sell Red Lion, and defendants responded not only with enthusiastic guarantees of their commitment to the Red Lion brand [*28] but with specific assurances that they were not planning to sell. These statements thus triggered, under the first *Brass* scenario, a duty to disclose related or corrective information. Similarly, the third *Brass* scenario is relevant if, as alleged, defendants actually had plans to put Red Lion on the market after sealing the franchise deals and knew that plaintiffs' decision to enter into the agreements was based, at least in part, on an understanding that defendants had no present plans to divest or sell Red Lion. Plaintiffs have thus

stated a viable claim of fraudulent omission under New York common law.

Defendants cite a series of cases involving the sale by General Foods of its Burger Chef line of franchises in support of the rule that a franchisor has no duty to disclose a pending sale to a franchisee. These cases are unavailing, however, because they involve plaintiffs who were existing franchisees claiming that they should have been made privy to the franchisor's business plans. *See, e.g., Vaughn v. General Foods Corporation, 797 F.2d 1403, 1414 (7th Cir. 1986)* (describing a fourteen-year arms-length relationship between plaintiff franchisee and defendant [*29] franchisor).

**IV. CONCLUSION**

In sum, after considering all of defendants' arguments in support of their motion to dismiss, their motion is granted as to plaintiffs' claims under the New York Franchise Sales Act and denied as to plaintiffs' claims of common law fraud, negligent misrepresentation, and fraudulent omission.

The Clerk of the Court is directed to close this motion [docket # 8]. A conference is scheduled for April 27, 2004 at 4:30.

SO ORDERED:

Shira A. Scheindlin

U.S.D.J.

Dated: April 20, 2004