# EXHIBIT 1

NAVIGANT CONSULTING     ☒002

07/15/2005 11:40 FAX



**NAVIGANT**
C O N S U L T I N G

1801 K Street NW, Suite 500
Washington, DC 20006
202.973.2400  phone
202.973.2401  fax

**CONFIDENTIAL**

June 29, 2005

Mr. Jess Varughese
14 Bayberry Road
Armonk, New York 10504

Subject: Offer of Employment

Dear Jess,

We are impressed with you and your background. Navigant Consulting, Inc. (NCI) is pleased to offer you employment as a Managing Director within the Financial Insurance & Claims Group and be assigned to the New York office.

The following terms will apply to this offer of employment:

- **Base Salary:** Your salary will be $450,000, payable at a rate of $17,308 per biweekly pay period, based on 26 pay periods per year.

- **Employment Incentive Bonus:** You will be paid a one-time Employment Incentive Bonus totaling $350,000 with your first paycheck. This payment will be subject to regular withholding and to your executing the attached Employment Incentive Recovery Agreement. Please note that you must be employed by NCI when the incentive payment is due in order to receive the payment.

- **Annual Variable Incentive Compensation:** You will be eligible to participate in NCI's Variable Incentive Compensation program in 2005. This program provides annual cash payments made in the first quarter of the year following each fiscal year. Payment would be contingent on the financial performance of NCI, the achievement of certain goals by the Financial Insurance & Claims Practice, your personal utilization rate and your performance the prior fiscal year.

  As a Managing Director, 80% of your earned incentive compensation will be paid in cash and 20% will be paid in restricted shares. You will be given a special election to take an additional 20% of your cash bonus in the form of restricted shares if you choose. All of these restricted shares will vest 100% in six months. In addition, NCI will grant you additional restricted shares equal to 35% of all the restricted shares earned through the Incentive Compensation Plan. The NCI granted restricted shares vest over eighteen months from date of grant.

- **Initial Equity Grant:** You will be granted restricted shares of NCI common stock under NCI's 2005 Long-Term Incentive Plan in an amount equal to $500,000, calculated based upon the closing price of NCI shares on your date of hire. A copy of this plan will be provided to you after you start. The restricted shares will vest according to the following schedule: 20% (percent) following one year of employment, 20% (percent) following two years of employment 20% (percent) following three years of employment, 20% (percent) following four years of employment and 20% following five years of

07/15/05   10:45 FAX 202 973 2401          NAVIGANT CONSULTING                    ☎003 ☑003
07/15/2005 11:40 FAX

Mr. Jess Varughese                                                          June 29, 2005

employment.  If your employment terminates due to your Death or Disability as defined in NCI's
2005 Long-Term Incentive Plan, your restricted shares will continue to vest in accordance with the
preceding sentence.

- **Stock Ownership Guidelines:** NCI has adopted Stock Ownership Guidelines to align the interests of
  its key employees and public shareholders.  As a Managing Director, you will be expected, over time,
  to achieve and maintain minimum stock ownership equal to 1.5 times your annual base salary.
  Copies of the Stock Ownership Guidelines and other NCI policies will be provided to you after you
  start.

- **401(k) Plan:** Participation in NCI's 401(k) Plan, subject to the rules in effect and amended from time
  to time.  The plan allows employees to contribute a portion of their salary, through payroll deduction,
  to a retirement savings program on a pre-tax basis. For the first 3% of a participant's eligible
  compensation that is contributed, the company will match dollar per dollar. In addition, our Plan
  allows a Catch-up Contribution for those age 50 and up, based on guidelines provided each year by
  the IRS. The catch-up contribution is not eligible for the company match.

- **Employee Stock Purchase Plan:** Participation in the NCI Employee Stock Purchase Plan, subject to
  the rules in effect from time to time.  The plan allows employees to contribute up to 15 percent of
  their salary that will then be used to make quarterly purchases of NCI stock.  The stock purchase
  price is determined by the closing price of the stock on the last day of the quarter, less a 15 percent
  employee discount.

- **Group Insurance Program:**  Participation in NCI's group insurance program, subject to the
  requirements established by the group insurance carriers.  Our plans currently include group life
  insurance, disability insurance, and optional group medical, dental and vision insurance.  Group
  medical, dental, and vision insurance are available for both employees and dependents.  Certain
  participation costs for each of these plans are borne by the employees.  The effective date for the
  insurance programs is the first of the month following hire date.

- **Discretionary Time Off:** You will be eligible for the Discretionary Time Off (DTO) program. Under
  this program, employees may take paid time off at their discretion.  Employees are encouraged to
  schedule their time off in accordance with NCI, client, and personal needs. Although we do not
  define a standard number of days for DTO, we consider 20 business days to be reasonable.

- **Severance:**  In the event that NCI terminates your employment other than for Cause, as defined
  below, NCI will pay you within 30 days of such termination a Severance Amount as follows. If such
  termination occurs prior to the first anniversary of your start date, the Severance Amount will equal
  nine months of your Base Salary (i.e., $337,500). The Severance Amount will increase by one month's
  Base Salary for each additional full year of employment, up to a maximum of 12 months Base Salary
  (i.e. $450,000).  As used in this offer of employment, "Cause" means (i) conviction or plea of nolo
  contendre to a felony or any other crime that is injurious to the Company, to a Company employee or to a
  client of the Company; (ii) willful misconduct, dishonesty, fraud, or attempted fraud with respect to the
  Company, to a Company employee or to a client of the Company; (iii) any material breach of fiduciary duty
  owed to the Company or to a client of the Company; (iv) any material breach of the terms of any agreement
  with the Company (including without limitation any employment agreement and any agreement regarding non-
  competition, non-solicitation of clients or employees, or confidentiality); (v) any material violation of a
  restriction on disclosure or use of privileged, proprietary or confidential information (including information
  belonging to the Company, to a client of the Company or to a third party to whom the Company owes a duty of

Mr. Jess Varughese                                                                          June 29, 2005

confidentiality), but only if such violation is committed with actual notice of such restriction on disclosure; or (vi) any other material breach of the Company's Code of Business Conduct and Ethics or its securities trading policies, as amended from time to time; provided, however, that in the case of any alleged action constituting Cause under clauses (ii), (iii), (iv), (v) or (vi), you are provided written notice specifying the proscribed conduct and a reasonable opportunity to cure the alleged breach or violation at issue.

This offer of employment is extended with the understanding that you will join our New York office but be available to travel to other offices or client locations as necessary.

As a condition of employment with NCI, you will be asked to sign the attached Agreement Regarding Confidential Information, Intellectual Property and Non-Solicitation. Upon acceptance of this offer, please review this agreement, sign and return with executed offer letter. Copies will then be provided to you. This offer of employment is conditioned on your reviewing and signing this agreement and your willingness thereafter to abide by its terms. NCI acknowledges that you have shared with us the applicable restrictive covenants in your employment agreement with your current employer and you acknowledge that NCI has informed you that it expects you to abide by all such restrictive covenants in accordance with their terms. The parties agree that NCI's offer and your acceptance of this offer are not intended to and, to the best of their knowledge, will not interfere with or violate any contractual or legal obligation that you have to your current employer.

On your start date, please be prepared to provide two forms of valid identification, one of which must contain a picture, to complete the I-9 form.   Acceptable forms of identification include your passport or driver's license and social security card or birth certificate. This offer is subject to your providing us with acceptable documentation establishing your current authorization to work in the United States.

This offer of employment is contingent upon completion of an employment application and satisfactory check of business references and background check.

It is understood that you are not being offered employment for a definite period of time and that either you or NCI may terminate the employment relationship at any time and for any reason without prior notice.  Nothing in NCI's offer to you should be interpreted as creating anything other than an at-will employment relationship. In addition, NCI reserves the right to periodically review and adjust each of its compensation and benefit programs it offers to you in its sole discretion.

We are delighted at the prospect of you joining NCI. This offer will expire on 5 p.m. EST on Friday, July 15, 2005, if your prior written acceptance is not received.

Sincerely,

Navigant Consulting, Inc.

By: *Doug A. Reichert*

Doug Reichart
Executive Managing Director

Agreed and accepted:

Mr. Jess Varughese                                      June 29, 2005

By: _Jess Paul Varughese_
Mr. Jess Varughese

Dated: _7/15/05_, 2005

Please fax a signed copy of this letter and attachments to Mary Stafford, Operations Manager at 646-227-4299 and return an executed copy of this letter and attachments to Mary Stafford, Navigant Consulting Inc., The Chrysler Building, 666 Third Ave., 20th Floor, New York, New York 10017.

# EXHIBIT 2

LEXSEE 2007 U.S. LEXIS 5901

## BELL ATLANTIC CORPORATION, ET AL., PETITIONERS v. WILLIAM TWOMBLY ET AL.

### No. 05-1126

### SUPREME COURT OF THE UNITED STATES

*127 S. Ct. 1955; 167 L. Ed. 2d 929; 2007 U.S. LEXIS 5901; 75 U.S.L.W. 4337; 2007-1 Trade Cas. (CCH) P75,709; 20 Fla. L. Weekly Fed. S 267*

**November 27, 2006, Argued**
**May 21, 2007, Decided**

**NOTICE:**

[***1] The LEXIS pagination of this document is subject to change pending release of the final published version.

**PRIOR HISTORY:** ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT.
*Twombly v. Bell Atl. Corp., 425 F.3d 99, 2005 U.S. App. LEXIS 21390 (2d Cir., 2005)*

**DISPOSITION:** Reversed and remanded.

**SYLLABUS**

The 1984 divestiture of the American Telephone & Telegraph Company's (AT&T) local telephone business left a system of regional service monopolies, sometimes called Incumbent Local Exchange Carriers (ILECs), and a separate long-distance market from which the ILECs were excluded. The Telecommunications Act of 1996 withdrew approval of the ILECs' monopolies, "fundamentally restructuring local telephone markets" and "subjecting [ILECs] to a host of duties intended to facilitate market entry." *AT&T Corp. v. Iowa Utilities Bd., 525 U.S. 366, 371, 119 S. Ct. 721, 142 L. Ed. 2d 834.* It also authorized them to enter the long-distance market. [***2] "Central to the [new] scheme [was each ILEC's] obligation . . . to share its network with" competitive local exchange carriers (CLECs)." *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 402, 124 S. Ct. 872, 157 L. Ed. 2d 823.*

Respondents (hereinafter plaintiffs) represent a class of subscribers of local telephone and/or high speed Internet services in this action against petitioner ILECs for claimed violations of § 1 of the Sherman Act, which prohibits "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." The complaint alleges that the ILECs conspired to restrain trade (1) by engaging in parallel conduct in their respective service areas to inhibit the growth of upstart CLECs; and (2) by agreeing to refrain from competing against one another, as indicated by their common failure to pursue attractive business opportunities in contiguous markets and by a statement by one ILEC's chief executive officer that competing in another ILEC's territory did not seem right. The District Court dismissed the complaint, concluding that parallel business conduct [***3] allegations, taken alone, do not state a claim under § 1; plaintiffs must allege additional facts tending to exclude independent self-interested conduct as an explanation for the parallel actions. Reversing, the Second Circuit held that plaintiffs' parallel conduct allegations were sufficient to withstand a motion to dismiss because the ILECs failed to show that there is no set of facts that would permit plaintiffs to demonstrate that the particular parallelism asserted was the product of collusion rather than coincidence.

Held:

1. Stating a § 1 claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. An allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Pp. 6-17.

(a) Because § 1 prohibits "only restraints effected by a contract, combination, or conspiracy," *Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 775, 104 S. Ct. 2731, 81 L. Ed. 2d 628,* "the crucial question" is whether the challenged anticompetitive conduct "stems from independent decision or from an agreement," *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 540, 74 S. Ct. 257, 98 L. Ed. 273.* While [***4] a showing of parallel "business behavior is

admissible circumstantial evidence from which" agreement may be inferred, it falls short of "conclusively establishing agreement or . . . itself constituting a Sherman Act offense." *Id., at 540-541, 540, 74 S. Ct. 257, 98 L. Ed. 273.* The inadequacy of showing parallel conduct or interdependence, without more, mirrors the behavior's ambiguity: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market. Thus, this Court has hedged against false inferences from identical behavior at a number of points in the trial sequence, *e.g.,* at the summary judgment stage, see *Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538.* Pp. 6-7.

(b) This case presents the antecedent question of what a plaintiff must plead in order to state a *§ 1* claim. *Federal Rule of Civil Procedure 8(a)(2)* requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80.* [***5] While a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, *ibid.,* a plaintiff's obligation to provide the "grounds" of his "entitlement to relief" requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true. Applying these general standards to a § 1 claim, stating a claim requires a complaint with enough factual matter to suggest an agreement. Asking for plausible grounds does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects *Rule 8(a)(2)*'s threshold requirement that the "plain statement" possess enough heft to "show that the pleader is entitled to relief." A parallel conduct allegation gets the § 1 complaint close to stating a claim, but without further factual enhancement [***6] it stops short of the line between possibility and plausibility. The requirement of allegations suggesting an agreement serves the practical purpose of preventing a plaintiff with "'a largely groundless claim'" from "'taking up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.'" *Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 347, 125 S. Ct. 1627, 161 L. Ed. 2d 577.* It is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive.

That potential expense is obvious here, where plaintiffs represent a putative class of at least 90 percent of subscribers to local telephone or high-speed Internet service in an action against America's largest telecommunications firms for unspecified instances of antitrust violations that allegedly occurred over a 7-year period. It is no answer to say that a claim just shy of plausible entitlement can be weeded out early in the discovery process, given the common lament that the success of judicial supervision in checking discovery abuse has been modest. Plaintiffs' main [***7] argument against the plausibility standard at the pleading stage is its ostensible conflict with a literal reading of *Conley*'s statement construing Rule 8: "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *355 U.S., at 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80.* The "no set of facts" language has been questioned, criticized, and explained away long enough by courts and commentators, and is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Conley* described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival. Pp. 7-17.

2. Under the plausibility standard, plaintiffs' claim of conspiracy in restraint of trade comes up short. First, the complaint leaves no doubt that plaintiffs rest their § 1 claim on descriptions of parallel conduct, not on any independent allegation of actual agreement [***8] among the ILECs. The nub of the complaint is the ILECs' parallel behavior, and its sufficiency turns on the suggestions raised by this conduct when viewed in light of common economic experience. Nothing in the complaint invests either the action or inaction alleged with a plausible conspiracy suggestion. As to the ILECs' supposed agreement to disobey the 1996 Act and thwart the CLECs' attempts to compete, the District Court correctly found that nothing in the complaint intimates that resisting the upstarts was anything more than the natural, unilateral reaction of each ILEC intent on preserving its regional dominance. The complaint's general collusion premise fails to answer the point that there was no need for joint encouragement to resist the 1996 Act, since each ILEC had reason to try and avoid dealing with CLECs and would have tried to keep them out, regardless of the other ILECs' actions. Plaintiffs' second conspiracy theory rests on the competitive reticence among the ILECs themselves in the wake of the 1996 Act to enter into their competitors' territories, leaving the relevant market highly compartmentalized geographically, with minimal competition. This parallel conduct did

[***9] not suggest conspiracy, not if history teaches anything. Monopoly was the norm in telecommunications, not the exception. Because the ILECs were born in that world, doubtless liked it, and surely knew the adage about him who lives by the sword, a natural explanation for the noncompetition is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same. Antitrust conspiracy was not suggested by the facts adduced under either theory of the complaint, which thus fails to state a valid § 1 claim. This analysis does not run counter to *Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508, 122 S. Ct. 992, 152 L. Ed. 2d 1*, which held that "a complaint in an employment discrimination lawsuit [need] not contain specific facts establishing a prima facie case of discrimination." Here, the Court is not requiring heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face. Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed. Pp. 18-24.

*425 F.3d 99*, reversed and remanded.

**COUNSEL: Michael Kellogg** argued the cause for petitioners.

**Thomas O. Barnett** argued the cause for the United States, as amicus curiae, by special leave of court.

**J. Douglas Richards** argued the cause for respondents.

**JUDGES:** SOUTER, J., delivered the opinion [***10] of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, THOMAS, BREYER, and ALITO, JJ., joined. STEVENS, J., filed a dissenting opinion, in which GINSBURG, J., joined, except as to Part IV.

**OPINION BY:** SOUTER

**OPINION**

[**936] [*1961] JUSTICE SOUTER delivered the opinion of the Court.

Liability under § 1 of the Sherman Act, *15 U.S.C. § 1*, requires a "contract, combination . . . , or conspiracy, in restraint of trade or commerce." The question in this putative class action is whether a *§ 1* complaint can survive a motion to dismiss when it alleges that major telecommunications providers engaged in certain parallel conduct unfavorable to competition, absent some factual context suggesting agreement, as distinct from identical, independent action. We hold that such a complaint should be dismissed.

I

The upshot of the 1984 divestiture of the American Telephone & Telegraph Company's (AT&T) local telephone business was a system of regional service monopolies (variously called "Regional Bell Operating Companies," "Baby Bells," or "Incumbent Local Exchange Carriers" (ILECs)), and a separate, competitive market for long-distance service from which the ILECs were excluded. More than a decade [***11] later, Congress withdrew approval of the ILECs' monopolies by enacting the Telecommunications Act of 1996 (1996 Act), 110 Stat. 56, which "fundamentally restructured local telephone markets" and "subjected [ILECs] to a host of duties intended to facilitate market entry." *AT&T Corp. v. Iowa Utilities Bd., 525 U.S. 366, 371, 119 S. Ct. 721, 142 L. Ed. 2d 834 (1999)*. In recompense, the 1996 Act set conditions for authorizing ILECs to enter the long-distance market. See *47 U.S.C. § 271*.

"Central to the [new] scheme [was each ILEC's] obligation . . . to share its network with competitors," *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 402, 124 S. Ct. 872, 157 L. Ed. 2d 823 (2004)*, which came to be known as "competitive local exchange carriers" (CLECs), Pet. for Cert. 6, n. 1 A CLEC could make use of an ILEC's network in any of three ways: by (1) "purchasing local telephone services at wholesale rates for resale to end users," (2) "leasing elements of the [ILEC's] network 'on an unbundled basis,'" or (3) "interconnecting its own facilities with the [ILEC's] network." *Iowa Utilities Bd., supra, at 371, 119 S. Ct. 721, 142 L. Ed. 2d 834* (quoting *47 U.S.C. § 251* [***12] *(c)*). Owing to the "considerable expense and effort" required to make unbundled network elements available to rivals at wholesale prices, *Trinko, supra, at 410, 124 S. Ct. 872, 157 L. Ed. 2d 823*, the ILECs vigorously litigated the scope of the sharing obligation imposed by the 1996 Act, with the result that the Federal Communications Commission (FCC) [**937] three times revised its [*1962] regulations to narrow the range of network elements to be shared with the CLECs. See *Covad Commc'ns. Co. v. FCC, 450 F.3d 528, 533-534 (CADC 2006)* (summarizing the 10-year-long regulatory struggle between the ILECs and CLECs).

Respondents William Twombly and Lawrence Marcus (hereinafter plaintiffs) represent a putative class consisting of all "subscribers of local telephone and/or high speed internet services . . . from February 8, 1996 to present." Amended Complaint in No. 02 CIV. 10220 (GEL) (SDNY) P53, App. 28 (hereinafter Complaint). In this action against petitioners, a group of ILECs, [1] plaintiffs seek treble damages and declaratory and injunctive relief for claimed violations of *§ 1* of the Sherman Act, ch. 647, 26 Stat. 209, as amended, *15 U.S.C. § 1*, which prohibits "every contract, [***13] combination in the form of trust or otherwise, or conspiracy, in restraint of trade

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

or commerce among the several States, or with foreign nations."

1    The 1984 divestiture of AT&T's local telephone service created seven Regional Bell Operating Companies. Through a series of mergers and acquisitions, those seven companies were consolidated into the four ILECs named in this suit: BellSouth Corporation, Qwest Communications International, Inc., SBC Communications, Inc., and Verizon Communications, Inc. (successor-in-interest to Bell Atlantic Corporation). Complaint P21, App. 16. Together, these ILECs allegedly control 90 percent or more of the market for local telephone service in the 48 contiguous States. *Id.*, P48, App. 26.

The complaint alleges that the ILECs conspired to restrain trade in two ways, each supposedly inflating charges for local telephone and high-speed Internet services. Plaintiffs say, first, that the ILECs "engaged in parallel conduct" in their respective service areas to inhibit the growth [***14] of upstart CLECs. Complaint P47, App. 23-26. Their actions allegedly included making unfair agreements with the CLECs for access to ILEC networks, providing inferior connections to the networks, overcharging, and billing in ways designed to sabotage the CLECs' relations with their own customers. *Ibid.* According to the complaint, the ILECs'"compelling common motivation" to thwart the CLECs' competitive efforts naturally led them to form a conspiracy; "had any one [ILEC] not sought to prevent CLECs . . . from competing effectively . . . , the resulting greater competitive inroads into that [ILEC's] territory would have revealed the degree to which competitive entry by CLECs would have been successful in the other territories in the absence of such conduct." *Id.*, P50, App. 26-27.

Second, the complaint charges agreements by the ILECs to refrain from competing against one another. These are to be inferred from the ILECs' common failure "meaningfully [to] pursue" "attractive business opportunities" in contiguous markets where they possessed "substantial competitive advantages," *id.*, PP40-41, App. 21-22, and from a statement of Richard Notebaert, chief executive officer [***15] (CEO) of the ILEC Qwest, that competing in the territory of another ILEC "'might be a good way to turn a quick dollar but that doesn't make it right,'" *id.*, P42, App. 22.

The complaint couches its ultimate allegations this way:

"In the absence of any meaningful competition between the [ILECs] in one another's markets, and in light of the parallel course of conduct that each engaged in to

prevent competition from CLECs within [**938] their respective local telephone and/or high speed internet services markets and the other facts and market circumstances alleged above, Plaintiffs allege upon information [*1963] and belief that [the ILECs] have entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and have agreed not to compete with one another and otherwise allocated customers and markets to one another." *Id.*, P51, App. 27. [2]

2    In setting forth the grounds for § 1 relief, the complaint repeats these allegations in substantially similar language:

"Beginning at least as early as February 6, 1996, and continuing to the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators engaged in a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets by, among other things, agreeing not to compete with one another and to stifle attempts by others to compete with them and otherwise allocating customers and markets to one another in violation of *Section 1* of the Sherman Act." *Id.*, P64, App. 30-31.

[***16]    The United States District Court for the Southern District of New York dismissed the complaint for failure to state a claim upon which relief can be granted. The District Court acknowledged that "plaintiffs may allege a conspiracy by citing instances of parallel business behavior that suggest an agreement," but emphasized that "while 'circumstantial evidence of consciously parallel behavior may have made heavy inroads into the traditional judicial attitude toward conspiracy[, . . . ] "conscious parallelism" has not yet read conspiracy out of the Sherman Act entirely.'" *313 F. Supp. 2d 174, 179 (2003)* (quoting *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 541, 74 S. Ct. 257, 98 L. Ed. 273 (1954)*; alterations in original). Thus, the District Court understood that allegations of parallel business conduct, taken alone, do not state a claim under § 1; plaintiffs must allege additional facts that "tend to exclude independent self-interested conduct as an explanation for defendants' parallel behavior." *313 F. Supp. 2d, at 179.* The District Court found plaintiffs'

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

allegations of parallel ILEC actions to discourage competition inadequate [***17] because "the behavior of each ILEC in resisting the incursion of CLECs is fully explained by the ILEC's own interests in defending its individual territory." *Id., at 183.* As to the ILECs' supposed agreement against competing with each other, the District Court found that the complaint does not "allege facts . . . suggesting that refraining from competing in other territories as CLECs was contrary to [the ILECs'] apparent economic interests, and consequently [does] not raise an inference that [the ILECs'] actions were the result of a conspiracy." *Id., at 188.*

The Court of Appeals for the Second Circuit reversed, holding that the District Court tested the complaint by the wrong standard. It held that "plus factors are not *required* to be pleaded to permit an antitrust claim based on parallel conduct to survive dismissal." *425 F.3d 99, 114 (2005)* (emphasis in original). Although the Court of Appeals took the view that plaintiffs must plead facts that "include conspiracy among the realm of 'plausible' possibilities in order to survive a motion to dismiss," it then said that "to rule that allegations of parallel anticompetitive conduct [***18] fail to support a plausible conspiracy claim, a court would have to conclude that there is no set of facts that would permit a [**939] plaintiff to demonstrate that the particular parallelism asserted was the product of collusion rather than coincidence." *Ibid.*

We granted certiorari to address the proper standard for pleading an antitrust conspiracy through allegations of parallel conduct, *547 U.S.    , 126 S. Ct. 2965, 165 L. Ed. 2d 949 (2006)*, and now reverse.

[*1964] II

A

Because § 1 of the Sherman Act "does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy," *Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 775, 104 S. Ct. 2731, 81 L. Ed. 2d 628 (1984)*, "the crucial question" is whether the challenged anticompetitive conduct "stems from independent decision or from an agreement, tacit or express," *Theatre Enterprises, 346 U.S., at 540, 74 S. Ct. 257, 98 L. Ed. 273.* While a showing of parallel "business behavior is admissible circumstantial evidence from which the fact finder may infer agreement," it falls short of "conclusively establishing agreement or . . . itself constituting a Sherman Act offense." *Id., at 540-541, 74 S. Ct. 257, 98 L. Ed. 273.* Even "conscious [***19] parallelism," a common reaction of "firms in a concentrated market [that] recognize their shared economic interests and their interdependence with respect to price and output decisions" is "not in itself unlawful." *Brooke Group Ltd. v.*

*Brown & Williamson Tobacco Corp., 509 U.S. 209, 227, 113 S. Ct. 2578, 125 L. Ed. 2d 168 (1993);* see 6 P. Areeda & H. Hovenkamp, Antitrust Law P1433a, p. 236 (2d ed. 2003) (hereinafter Areeda & Hovenkamp) ("The courts are nearly unanimous in saying that mere interdependent parallelism does not establish the contract, combination, or conspiracy required by Sherman Act § 1"); Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv. L. Rev. 655, 672 (1962) ("Mere interdependence of basic price decisions is not conspiracy").

The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market. See, *e.g.,* AEI-Brookings Joint Center for Regulatory Studies, Epstein, Motions to Dismiss [***20] Antitrust Cases: Separating Fact from Fantasy, Related Publication 06-08, pp. 3-4 (2006) (discussing problem of "false positives" in § 1 suits). Accordingly, we have previously hedged against false inferences from identical behavior at a number of points in the trial sequence. An antitrust conspiracy plaintiff with evidence showing nothing beyond parallel conduct is not entitled to a directed verdict, see *Theatre Enterprises, supra, 346 U.S. 537, 74 S. Ct. 257, 98 L. Ed. 273;* proof of a § 1 conspiracy must include evidence tending to exclude the possibility of independent action, see *Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984);* and at the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently, see *Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).*

[**940] B

This case presents the antecedent question of what a plaintiff must plead in order to state a claim under § 1 of the Sherman Act. *Federal Rule of Civil Procedure 8(a)(2)* requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in [***21] order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).* While a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, *ibid.; Sanjuan v. American Bd. of Psychiatry and Neurology, Inc., 40 F.3d 247, 251 (CA7 1994),* a plaintiff's obligation to provide the [*1965] "grounds" of his "entitlement to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see *Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d*

Page 6

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

*209 (1986)* (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004) (hereinafter Wright & Miller) ("The pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), [3] on the assumption that all the allegations [***22] in the complaint are true (even if doubtful in fact), see, *e.g., Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508, n. 1, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002); Neitzke v. Williams, 490 U.S. 319, 327, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989)* (*"Rule 12(b)(6)* does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)* (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely").

    3 The dissent greatly oversimplifies matters by suggesting that the Federal Rules somehow dispensed with the pleading of facts altogether. See *post*, at 10 (opinion of STEVENS, J.) (pleading standard of Federal Rules "does not require, or even invite, the pleading of facts"). While, for most types of cases, the Federal Rules eliminated the cumbersome requirement that a claimant "set out *in detail* the facts upon which he bases his claim," *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)* (emphasis added), *Rule 8(a)(2)* still requires a "showing," rather than a blanket assertion, of entitlement to relief. Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only "fair notice" of the nature of the claim, but also "grounds" on which the claim rests. See 5 Wright & Miller § 1202, at 94, 95 (*Rule 8(a)* "contemplates the statement of circumstances, occurrences, and events in support of the claim presented" and does not authorize a pleader's "bare averment that he wants relief and is entitled to it").

    [***23] In applying these general standards to a § 1 claim, we hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. [4] And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof [**941] of those facts is improbable, and "that a recovery is very

remote and unlikely." *Ibid.* In identifying facts that are suggestive enough to render a § 1 conspiracy plausible, we have the benefit [*1966] of the prior rulings and considered views of leading commentators, already quoted, that lawful parallel conduct fails to bespeak unlawful agreement. It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Hence, when [***24] allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.

    4 Commentators have offered several examples of parallel conduct allegations that would state a § 1 claim under this standard. See, *e.g.*, 6 Areeda & Hovenkamp P1425, at 167-185 (discussing "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties"); Blechman, Conscious Parallelism, Signalling and Facilitating Devices: The Problem of Tacit Collusion Under the Antitrust Laws, 24 N. Y. L. S. L. Rev. 881, 899 (1979) (describing "conduct [that] indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement"). The parties in this case agree that "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason" would support a plausible inference of conspiracy. Brief for Respondents 37; see also Reply Brief for Petitioners 12.

    [***25] The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of *Rule 8(a)(2)* that the "plain statement" possess enough heft to "show that the pleader is entitled to relief." A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory. An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of "entitlement to relief." Cf. *DM Research, Inc. v. College of*

*Am. Pathologists, 170 F.3d 53, 56 (CA1 1999)* ("Terms like 'conspiracy,' or even 'agreement,' are border-line: they might well be sufficient in conjunction with a more specific allegation -- for example, identifying a written agreement or even a basis for inferring a tacit agreement, . . . but a court [***26] is not required to accept such terms as a sufficient basis for a complaint"). [5]

> 5 The border in *DM Research* was the line between the conclusory and the factual. Here it lies between the factually neutral and the factually suggestive. Each must be crossed to enter the realm of plausible liability.

We alluded to the practical significance of the *Rule 8* entitlement requirement in *Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)*, when we explained that something beyond the mere possibility of loss causation must be alleged, lest a plaintiff with "'a largely groundless claim'" be allowed to "'take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.'" *Id., at 347, 125 S. Ct. 1627,* [**942] *161 L. Ed. 2d 577* (quoting *Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 741, 95 S. Ct. 1917, 44 L. Ed. 2d 539 (1975)).* So, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, "'this basic deficiency [***27] should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" 5 Wright & Miller § 1216, at 233-234 (quoting *Daves v. Hawaiian Dredging Co., 114 F. Supp. 643, 645 (Haw. 1953));* see also *Dura, supra, at 346, 125 S. Ct. 1627, 161 L. Ed. 2d 577; Asahi Glass Co. v. Pentech Pharmaceuticals, Inc., 289 F. Supp. 2d 986, 995 (ND Ill. 2003)* (Posner, J., sitting by designation) ("Some threshold of plausibility must be crossed at the outset before a patent antitrust case should be permitted to go into its inevitably costly and protracted discovery phase").

Thus, it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, cf. *Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473,* [*1967] *82 S. Ct. 486, 7 L. Ed. 2d 458 (1962)*, but quite another to forget that proceeding to antitrust discovery can be expensive. As we indicated over 20 years ago in *Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 528, n. 17, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)*, "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy [***28] to proceed." See also *Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (CA7 1984)* ("The costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the

plaintiffs can construct a claim from the events related in the complaint"); Note, Modeling the Effect of One-Way Fee Shifting on Discovery Abuse in Private Antitrust Litigation, *78 N. Y. U. L. Rev. 1887, 1898-1899 (2003)* (discussing the unusually high cost of discovery in antitrust cases); Manual for Complex Litigation, Fourth, § 30, p. 519 (2004) (describing extensive scope of discovery in antitrust cases); Memorandum from Paul V. Niemeyer, Chair, Advisory Committee on Civil Rules, to Hon. Anthony J. Scirica, Chair, Committee on Rules of Practice and Procedure (May 11, 1999), 192 F.R.D. 354, 357 (2000) (reporting that discovery accounts for as much as 90 percent of litigation costs when discovery is actively employed). That potential expense is obvious enough in the present case: plaintiffs represent a putative class of at least 90 percent of all [***29] subscribers to local telephone or high-speed Internet service in the continental United States, in an action against America's largest telecommunications firms (with many thousands of employees generating reams and gigabytes of business records) for unspecified (if any) instances of antitrust violations that allegedly occurred over a period of seven years.

It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through "careful case management," *post* at 4, given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side. See, *e.g.*, Easterbrook, Discovery as Abuse, *69 B. U. L. Rev. 635, 638 (1989)* ("Judges can do little about impositional discovery when parties control the legal claims [**943] to be presented and conduct the discovery themselves"). And it is self-evident that the problem of discovery abuse cannot be solved by "careful scrutiny of evidence at the summary judgment stage," much less "lucid instructions to juries," *post*, at 4; the threat of discovery expense will push cost-conscious defendants to settle even [***30] anemic cases before reaching those proceedings. Probably, then, it is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no "'reasonably founded hope that the [discovery] process will reveal relevant evidence'" to support a § 1 claim. *Dura, 544 U.S., at 347, 125 S. Ct. 1627, 161 L. Ed. 2d 577* (quoting *Blue Chip Stamps, supra, at 741, 95 S. Ct. 1917, 44 L. Ed. 2d 539*; alteration in *Dura*). [6]

> 6 The dissent takes heart in the reassurances of plaintiffs' counsel that discovery would be "'"phased"'" and "limited to the existence of the alleged conspiracy and class certification." *Post*, at 24. But determining whether some illegal agreement may have taken place between unspecified

persons at different ILECs (each a multibillion dollar corporation with legions of management level employees) at some point over seven years is a sprawling, costly, and hugely time-consuming undertaking not easily susceptible to the kind of line drawing and case management that the dissent envisions. Perhaps the best answer to the dissent's optimism that antitrust discovery is open to effective judicial control is a more extensive quotation of the authority just cited, a judge with a background in antitrust law. Given the system that we have, the hope of effective judicial supervision is slim: "The timing is all wrong. The plaintiff files a sketchy complaint (the Rules of Civil Procedure discourage fulsome documents), and discovery is launched. A judicial officer does not know the details of the case the parties will present and in theory *cannot* know the details. Discovery is used to find the details. The judicial officer always knows less than the parties, and the parties themselves may not know very well where they are going or what they expect to find. A magistrate supervising discovery does not -- cannot -- know the expected productivity of a given request, because the nature of the requester's claim and the contents of the files (or head) of the adverse party are unknown. Judicial officers cannot measure the costs and benefits to the requester and so cannot isolate impositional requests. Requesters have no reason to disclose their own estimates because they gain from imposing costs on rivals (and may lose from an improvement in accuracy). The portions of the Rules of Civil Procedure calling on judges to trim back excessive demands, therefore, have been, and are doomed to be, hollow. We cannot prevent what we cannot detect; we cannot detect what we cannot define; we cannot define 'abusive' discovery except in theory, because in practice we lack essential information." Easterbrook, Discovery as Abuse, 69 B. U. L. Rev. 635, 638-639 (1989).

[***31] [*1968] Plaintiffs do not, of course, dispute the requirement of plausibility and the need for something more than merely parallel behavior explained in *Theatre Enterprises, Monsanto,* and *Matsushita,* and their main argument against the plausibility standard at the pleading stage is its ostensible conflict with an early statement of ours construing *Rule 8.* Justice Black's opinion for the Court in *Conley* v. *Gibson* spoke not only of the need for fair notice of the grounds for entitlement to relief but of "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S., at 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80.

This "no set of facts" language can be read in isolation as saying that any statement revealing the theory of the claim will suffice unless its factual impossibility may be shown from the face of the pleadings; and the Court of Appeals appears to have read *Conley* in some such way when formulating its understanding of the proper pleading standard, see *425 F.3d at 106, 114* (invoking *Conley*'s "no set [***32] of [**944] facts" language in describing the standard for dismissal). [7]

[7] The Court of Appeals also relied on Chief Judge Clark's suggestion in *Nagler v. Admiral Corp., 248 F.2d 319 (CA2 1957),* that facts indicating parallel conduct alone suffice to state a claim under *§ 1. 425 F.3d at 114* (citing *Nagler, supra, at 325*). But *Nagler* gave no explanation for citing *Theatre Enterprises* (which upheld a denial of a directed verdict for plaintiff on the ground that proof of parallelism was not proof of conspiracy) as authority that pleading parallel conduct sufficed to plead a Sherman Act conspiracy. Now that *Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984),* and *Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986),* have made it clear that neither parallel conduct nor conscious parallelism, taken alone, raise the necessary implication of conspiracy, it is time for a fresh look at adequacy of pleading when a claim rests on parallel action.

[***33] On such a focused and literal reading of *Conley*'s "no set of facts," a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some "set of [undisclosed] facts" to support recovery. So here, the Court of Appeals specifically found the prospect of unearthing direct evidence of conspiracy sufficient to preclude dismissal, even though the complaint [*1969] does not set forth a single fact in a context that suggests an agreement. *425 F.3d at 106, 114.* It seems fair to say that this approach to pleading would dispense with any showing of a "'reasonably founded hope'" that a plaintiff would be able to make a case, see *Dura, 544 U.S., at 347, 125 S. Ct. 1627, 161 L. Ed. 2d 577* (quoting *Blue Chip Stamps, 421 U.S., at 741, 95 S. Ct. 1917, 44 L. Ed. 2d 539*); Mr. Micawber's optimism would be enough.

Seeing this, a good many judges and commentators have balked at taking the literal terms of the *Conley* passage as a pleading standard. See, *e.g., Car Carriers, 745 F.2d at 1106* ("*Conley* has never been interpreted literally" and, "in practice, a complaint . . . must contain either direct or [***34] inferential allegations respecting

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

all the material elements necessary to sustain recovery under *some* viable legal theory" (internal quotation marks omitted; emphasis and omission in original); *Ascon Properties, Inc. v. Mobil Oil Co., 866 F.2d 1149, 1155 (CA9 1989)* (tension between *Conley*'s "no set of facts" language and its acknowledgment that a plaintiff must provide the "grounds" on which his claim rests); *O'Brien v. Di Grazia, 544 F.2d 543, 546, n. 3 (CA1 1976)* ("When a plaintiff . . . supplies facts to support his claim, we do not think that *Conley* imposes a duty on the courts to conjure up unpleaded facts that might turn a frivolous claim of unconstitutional . . . action into a substantial one"); *McGregor v. Industrial Excess Landfill, Inc., 856 F.2d 39, 42-43 (CA6 1988)* (quoting *O'Brien*'s analysis); Hazard, From Whom No Secrets Are Hid, *76 Tex. L. Rev. 1665, 1685 (1998)* (describing *Conley* as having "turned *Rule 8* on its head"); Marcus, The Revival of Fact Pleading Under the *Federal Rules of Civil Procedure, 86* Colum. L. Rev. 433, 463-465 (1986) (noting tension between [***35] *Conley* and subsequent understandings of *Rule 8*).

We could go on, but there is no need to pile up further citations to show that *Conley*'s "no set of facts" language has been questioned, criticized, and explained away long enough. To be fair to the *Conley* Court, the passage should be understood in light of the opinion's preceding summary of the complaint's concrete allegations, which the Court quite reasonably understood as amply stating a claim for [**945] relief. But the passage so often quoted fails to mention this understanding on the part of the Court, and after puzzling the profession for 50 years, this famous observation has earned its retirement. The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. See *Sanjuan, 40 F.3d at 251* (once a claim for relief has been stated, a plaintiff "receives the benefit of imagination, so long as the hypotheses are consistent with the complaint"); accord, *Swierkiewicz, 534 U.S., at 514, 122 S. Ct. 992, 152 L. Ed. 2d 1*; *National Organization for Women, Inc. v. Scheidler, 510 U.S. 249, 256, 114 S. Ct. 798, 127 L. Ed. 2d 99 (1994)*; [***36] *H. J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 249-250, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989)*; *Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984)*. *Conley*, then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival. [8]

8   Because *Conley*'s "'no set of facts'" language was one of our earliest statements about pleading under the Federal Rules, it is no surprise that it has since been "cited as authority" by this Court

and others. *Post*, at 8. Although we have not previously explained the circumstances and rejected the literal reading of the passage embraced by the Court of Appeals, our analysis comports with this Court's statements in the years since *Conley*. See *Dura, 544 U.S., at 347, 125 S. Ct. 1627, 161 L. Ed. 2d 577* (quoting *Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 741, 95 S. Ct. 1917, 44 L. Ed. 2d 539 (1975)*; (requiring "'reasonably founded hope that the [discovery] process will reveal relevant evidence'" to support the claim (alteration in *Dura*)); *Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 526, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)* ("It is not . . . proper to assume that [the plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged"); *Wilson v. Schnettler, 365 U.S. 381, 383, 81 S. Ct. 632, 5 L. Ed. 2d 620 (1961)* ("In the absence of . . . an allegation [that the arrest was made without probable cause] the courts below could not, nor can we, assume that respondents arrested petitioner without probable cause to believe that he had committed . . . a narcotics offense"). Nor are we reaching out to decide this issue in a case where the matter was not raised by the parties, see *post*, at 10, since both the ILECs and the Government highlight the problems stemming from a literal interpretation of *Conley*'s "no set of facts" language and seek clarification of the standard. Brief for Petitioners 27-28; Brief for United States as *Amicus Curiae* 22-25; see also Brief for Respondents 17 (describing "petitioners and their amici" as mounting an "attack on *Conley*'s 'no set of facts' standard").

The dissent finds relevance in Court of Appeals precedents from the 1940s, which allegedly gave rise to *Conley*'s "no set of facts" language. See *post*, at 11-13. Even indulging this line of analysis, these cases do not challenge the understanding that, before proceeding to discovery, a complaint must allege facts suggestive of illegal conduct. See, *e.g., Leimer v. State Mut. Life Assur. Co., 108 F.2d 302, 305 (CA8 1940)* ("'If, in view of what is alleged, it can reasonably be conceived that the plaintiffs . . . could, upon a trial, establish a case which would entitle them to . . . relief, the motion to dismiss should not have been granted'"); *Continental Collieries, Inc. v. Shober, 130 F.2d 631, 635 (CA3 1942)* ("No matter how likely it may seem that the pleader will be unable to prove his case, he is entitled, upon averring a claim, to an opportunity to try to prove it"). Rather, these cases stand for the unobjectionable proposition that, when a complaint adequately

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the fact-finder. Cf. *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)* (a district court weighing a motion to dismiss asks "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims").

[***37]  [**946]  [*1970] III

When we look for plausibility in this complaint, we agree with the District Court that plaintiffs' claim of conspiracy in restraint of trade comes up short. To begin with, the complaint leaves no doubt that plaintiffs rest their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement among the ILECs. *Supra*, at 4. Although in form a few stray statements speak directly of agreement, [9] on fair reading these are merely legal conclusions resting on the prior allegations. Thus, the complaint first takes account of the alleged "absence of any meaningful competition between [the ILECs] in one another's markets," "the parallel course of conduct that each [ILEC] engaged in to prevent competition from CLECs," "and the other facts and market circumstances alleged [earlier]"; "in light of" these, the complaint concludes "that [the ILECs] have entered into a contract, combination or conspiracy to prevent competitive entry into their . . . markets and have agreed not to compete with one another." Complaint P51, App. 27. [10] The nub of the [*1971] complaint, then, is the ILECs' parallel behavior, consisting of steps to keep the CLECs out [***38] and manifest disinterest in becoming CLECs themselves, and its sufficiency turns on the suggestions raised by this conduct when viewed in light of common economic experience. [11]

9   See Complaint PP51, 64, App. 27, 30-31 (alleging that ILECs engaged in a "contract, combination or conspiracy" and agreed not to compete with one another).

10   If the complaint had not explained that the claim of agreement rested on the parallel conduct described, we doubt that the complaint's references to an agreement among the ILECs would have given the notice required by *Rule 8*. Apart from identifying a seven-year span in which the § 1 violations were supposed to have occurred (*i.e.*, "beginning at least as early as February 6, 1996, and continuing to the present," *id.*, P64, App. 30), the pleadings mentioned no specific time, place, or person involved in the alleged conspiracies. This lack of notice contrasts sharply with the

model form for pleading negligence, Form 9, which the dissent says exemplifies the kind of "bare allegation" that survives a motion to dismiss. *Post*, at 6. Whereas the model form alleges that the defendant struck the plaintiff with his car while plaintiff was crossing a particular highway at a specified date and time, the complaint here furnishes no clue as to which of the four ILECs (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place. A defendant wishing to prepare an answer in the simple fact pattern laid out in Form 9 would know what to answer; a defendant seeking to respond to plaintiffs' conclusory allegations in the § 1 context would have little idea where to begin.

[***39]

11   The dissent's quotations from the complaint leave the impression that plaintiffs directly allege illegal agreement; in fact, they proceed exclusively via allegations of parallel conduct, as both the District Court and Court of Appeals recognized. See *313 F. Supp. 2d 174, 182 (SDNY 2003); 425 F.3d 99, 102-104 (CA 2005)*.

We think that nothing contained in the complaint invests either the action or inaction alleged with a plausible suggestion of conspiracy. As to the ILECs' supposed agreement to disobey the 1996 Act and thwart the CLECs' attempts to compete, we agree with the District Court that nothing in the complaint intimates that the resistance to the upstarts was anything more than the natural, unilateral reaction of each ILEC intent on keeping its regional dominance. The 1996 Act did more than just subject the ILECs to competition; it obliged them to subsidize their competitors with their own equipment at [**947] wholesale rates. The economic incentive to resist was powerful, but resisting competition is routine market conduct, and even if the ILECs flouted the 1996 [***40] Act in all the ways the plaintiffs allege, see *id.*, P47, App. 23-24, there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway; so natural, in fact, that if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a § 1 violation against almost any group of competing businesses would be a sure thing.

The complaint makes its closest pass at a predicate for conspiracy with the claim that collusion was necessary because success by even one CLEC in an ILEC's territory "would have revealed the degree to which competitive entry by CLECs would have been successful in the other territories." *Id.*, P50, App. 26-27. But, its logic aside, this general premise still fails to answer the point that there was just no need for joint encouragement to

resist the 1996 Act; as the District Court said, "each ILEC has reason to want to avoid dealing with CLECs" and "each ILEC would attempt to keep CLECs out, regardless of the actions of the other ILECs." *313 F. Supp. 2d, at 184*; cf. *Kramer v. Pollock-Krasner Foundation, 890 F. Supp. 250, 256 (SDNY 1995)* (while the [***41] plaintiff "may believe the defendants conspired . . . , the defendants' allegedly conspiratorial actions could equally have been prompted by lawful, independent goals which do not constitute a conspiracy"). [12]

> 12  From the allegation that the ILECs belong to various trade associations, see Complaint P46, App. 23, the dissent playfully suggests that they conspired to restrain trade, an inference said to be "buttressed by the common sense of Adam Smith." *Post*, at 22, 25-26. If Adam Smith is peering down today, he may be surprised to learn that his tongue-in-cheek remark would be authority to force his famous pinmaker to devote financial and human capital to hire lawyers, prepare for depositions, and otherwise fend off allegations of conspiracy; all this just because he belonged to the same trade guild as one of his competitors when their pins carried the same price tag.

[*1972]  Plaintiffs' second conspiracy theory rests on the competitive reticence among the ILECs themselves in the wake of the 1996 Act, which was [***42] supposedly passed in the "'hope that the large incumbent local monopoly companies . . . might attack their neighbors' service areas, as they are the best situated to do so.'" Complaint P38, App. 20 (quoting Consumer Federation of America, Lessons from 1996 Telecommunications Act: Deregulation Before Meaningful Competition Spells Consumer Disaster, p. 12 (Feb. 2000). Contrary to hope, the ILECs declined "'to enter each other's service territories in any significant way,'" Complaint P38, App. 20, and the local telephone and high speed Internet market remains highly compartmentalized geographically, with minimal competition. Based on this state of affairs, and perceiving the ILECs to be blessed with "especially attractive business opportunities" in surrounding markets dominated by other ILECs, the plaintiffs assert that the ILECs' parallel conduct was "strongly suggestive of conspiracy." *Id.,* P40, App. 21.

But it was not suggestive of conspiracy, not if history teaches anything. In a traditionally unregulated industry with low barriers to entry, sparse competition among large firms dominating separate geographical segments of the market could very well signify illegal agreement, [***43] but here we have an obvious alternative [**948] explanation. In the decade preceding the 1996 Act and well before that, monopoly was the norm

in telecommunications, not the exception. See *Verizon Communs., Inc. v. FCC, 535 U.S. 467, 477-478, 122 S. Ct. 1646, 152 L. Ed. 2d 701 (2002)* (describing telephone service providers as traditional public monopolies). The ILECs were born in that world, doubtless liked the world the way it was, and surely knew the adage about him who lives by the sword. Hence, a natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing.

In fact, the complaint itself gives reasons to believe that the ILECs would see their best interests in keeping to their old turf. Although the complaint says generally that the ILECs passed up "especially attractive business opportunities" by declining to compete as CLECs against other ILECs, Complaint P40, App. 21, it does not allege that competition as CLECs was potentially any more lucrative than other opportunities being pursued by the ILECs during the same period, [13] and [*1973] the complaint is replete with indications that any CLEC faced [***44] nearly insurmountable barriers to profitability owing to the ILECs' flagrant resistance to the network sharing requirements of the 1996 Act, *id.,* P47; App. 23-26. Not only that, but even without a monopolistic tradition and the peculiar difficulty of mandating shared networks, "firms do not expand without limit and none of them enters every market that an outside observer might regard as profitable, or even a small portion of such markets." Areeda & Hovenkamp P307d, at 155 (Supp. 2006) (commenting on the case at bar). The upshot is that Congress may have expected some ILECs to become CLECs in the legacy territories of other ILECs, but the disappointment does not make conspiracy plausible. We agree with the District Court's assessment that antitrust conspiracy was not suggested by the facts adduced under either theory of the complaint, which thus fails to state a valid § 1 claim. [14]

> 13  The complaint quoted a reported statement of Qwest's CEO, Richard Notebaert, to suggest that the ILECs declined to compete against each other despite recognizing that it "'might be a good way to turn a quick dollar.'" P42, App. 22 (quoting Chicago Tribune, Oct. 31, 2002, Business Section, p. 1). This was only part of what he reportedly said, however, and the District Court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn. See *Fed. Rule Evid. 201.*
>
> Notebaert was also quoted as saying that entering new markets as a CLEC would not be "a sustainable economic model" because the CLEC pricing model is "just . . . nuts." Chicago Tribune,

Oct. 31, 2002, Business Section, p. 1 (cited at Complaint P42, App. 22). Another source cited in the complaint quotes Notebaert as saying he thought it "unwise" to "base a business plan" on the privileges accorded to CLECs under the 1996 Act because the regulatory environment was too unstable. Chicago Tribune, Dec. 19, 2002, Business Section, p. 2 (cited at Complaint P45, App. 23).

[***45]

14   In reaching this conclusion, we do not apply any "heightened" pleading standard, nor do we seek to broaden the scope of *Federal Rule of Civil Procedure 9*, which can only be accomplished "'by the process of amending the Federal Rules, and not by judicial interpretation.'" *Swierkiewicz v. Sorema N. A.*, *534 U.S. 506, 515, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)* (quoting *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993)*). On certain subjects understood to raise a high risk of abusive litigation, a plaintiff must state factual allegations with greater particularity than *Rule 8* requires. *Fed. Rules Civ. Proc. 9(b)-(c)*. Here, our concern is not that the allegations in the complaint were insufficiently "particularized", *ibid.;* rather, the complaint warranted dismissal because it failed *in toto* to render plaintiffs' entitlement to relief plausible.

Plaintiffs say that our analysis runs counter to *Swierkiewicz v. Sorema N. A.*, *534 U.S. 506, 508, 122 S. Ct. 992,* [**949] *152 L. Ed. 2d 1 (2002)*, which held that "a complaint in an employment discrimination [***46] lawsuit [need] not contain specific facts establishing a prima facie case of discrimination under the framework set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*." They argue that just as the prima facie case is a "flexible evidentiary standard" that "should not be transposed into a rigid pleading standard for discrimination cases," *Swierkiewicz, supra, at 512, 122 S. Ct. 992, 152 L. Ed. 2d 1*, "transposing 'plus factor' summary judgment analysis woodenly into a rigid *Rule 12(b)(6)* pleading standard . . . would be unwise," Brief for Respondents 39. As the District Court correctly understood, however, "*Swierkiewicz* did not change the law of pleading, but simply re-emphasized . . . that the Second Circuit's use of a heightened pleading standard for Title VII cases was contrary to the Federal Rules' structure of liberal pleading requirements." *313 F. Supp. 2d, at 181* (citation and footnote omitted). Even though Swierkiewicz's pleadings "detailed the events leading to his termination, provided relevant dates, and included the ages and nationalities of at least some of the relevant persons involved with his

termination," the Court of Appeals dismissed [***47] his complaint for failing to allege certain additional facts that Swierkiewicz would need at the trial stage to support his claim in the absence of direct evidence of discrimination. *Swierkiewicz, 534 U.S., at 514, 122 S. Ct. 992, 152 L. Ed. 2d 1*. We reversed on the ground that the Court of Appeals had impermissibly applied what amounted to a heightened pleading requirement by insisting that Swierkiewicz allege "specific facts" beyond [*1974] those necessary to state his claim and the grounds showing entitlement to relief. *Id., at 508, 122 S. Ct. 992, 152 L. Ed. 2d 1*.

Here, in contrast, we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face. Because the plaintiffs have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.

\* \* \*

The judgment of the Court of Appeals for the Second Circuit is reversed, and the cause is remanded for further proceedings consistent with this opinion.

It is so ordered.

**DISSENT BY:** STEVENS

**DISSENT**

JUSTICE STEVENS, with whom JUSTICE GINSBURG joins except as to Part IV, dissenting.

In the first paragraph of its 24-page opinion the Court states that the question to be [***48] decided is whether allegations that "major telecommunications providers engaged in certain parallel conduct unfavorable to competition" suffice to state a violation of *§ 1* of the Sherman Act. *Ante*, at 1. The answer to that question has been settled for more than 50 years. If that were indeed the issue, a summary reversal citing *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 74 S. Ct. 257, 98 L. Ed. 273 (1954)*, would have adequately resolve [**950] this case. As *Theatre Enterprises* held, parallel conduct is circumstantial evidence admissible on the issue of conspiracy, but it is not itself illegal. *Id., at 540-542, 74 S. Ct. 257, 98 L. Ed. 273*.

Thus, this is a case in which there is no dispute about the substantive law. If the defendants acted independently, their conduct was perfectly lawful. If, however, that conduct was the product of a horizontal agreement among potential competitors, it was unlawful. Plaintiffs have alleged such an agreement and, because the complaint was dismissed in advance of answer, the allegation has not even been denied. Why, then, does the case not proceed? Does a judicial opinion that the charge

is not "plausible" provide a legally acceptable reason [***49] for dismissing the complaint? I think not.

Respondents' amended complaint describes a variety of circumstantial evidence and makes the straightforward allegation that petitioners

"entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and have agreed not to compete with one another and otherwise allocated customers and markets to one another." Amended Complaint in No. 02 CIV. 10220 (GEL) (SDNY) P51, App. 27 (hereinafter Complaint).

The complaint explains that, contrary to Congress' expectation when it enacted the 1996 Telecommunications Act, and consistent with their own economic self-interests, petitioner Incumbent Local Exchange Carriers (ILECs) have assiduously avoided infringing on each other's markets and have refused to permit nonincumbent competitors to access their networks. The complaint quotes Richard Notebaert, the former CEO of one such ILEC, as saying that competing in a neighboring ILEC's territory "might be a good way to turn a quick dollar but that doesn't make it right." Id., P42, App. 22. Moreover, respondents allege that petitioners "communicate [***50] amongst themselves" through numerous industry associations. Id., P46, App. 23. In sum, respondents allege that petitioners entered into an agreement that has long been recognized as a classic per se violation of the Sherman Act. See Report [*1975] of the Attorney General's National Committee to Study the Antitrust Laws 26 (1955).

Under rules of procedure that have been well settled since well before our decision in *Theatre Enterprises*, a judge ruling on a defendant's motion to dismiss a complaint, "must accept as true all of the factual allegations contained in the complaint." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508, n. 1, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002); see *Overstreet v. North Shore Corp.*, 318 U.S. 125, 127, 63 S. Ct. 494, 87 L. Ed. 656 (1943). But instead of requiring knowledgeable executives such as Notebaert to respond to these allegations by way of sworn depositions or other limited discovery -- and indeed without so much as requiring petitioners to file an answer denying that they entered into any agreement -- the majority permits immediate dismissal based on the assurances of company lawyers that nothing untoward was afoot. The Court embraces the argument of those lawyers that [***51] "there is no reason to infer that the

companies had agreed among themselves to do what was only natural anyway," *ante*, at 19; that "there was just no need for joint encouragement [**951] to resist the 1996 Act," *ante*, at 20; and that the "natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing," *ante*, at 21.

The Court and petitioners' legal team are no doubt correct that the parallel conduct alleged is consistent with the absence of any contract, combination, or conspiracy. But that conduct is also entirely consistent with the *presence* of the illegal agreement alleged in the complaint. And the charge that petitioners "agreed not to compete with one another" is not just one of "a few stray statements," *ante*, at 18; it is an allegation describing unlawful conduct. As such, the Federal Rules of Civil Procedure, our longstanding precedent, and sound practice mandate that the District Court at least require some sort of response from petitioners before dismissing the case.

Two practical concerns presumably explain the Court's dramatic departure from settled procedural [***52] law. Private antitrust litigation can be enormously expensive, and there is a risk that jurors may mistakenly conclude that evidence of parallel conduct has proved that the parties acted pursuant to an agreement when they in fact merely made similar independent decisions. Those concerns merit careful case management, including strict control of discovery, careful scrutiny of evidence at the summary judgment stage, and lucid instructions to juries; they do not, however, justify the dismissal of an adequately pleaded complaint without even requiring the defendants to file answers denying a charge that they in fact engaged in collective decision-making. More importantly, they do not justify an interpretation of *Federal Rule of Civil Procedure 12(b)(6)* that seems to be driven by the majority's appraisal of the plausibility of the ultimate factual allegation rather than its legal sufficiency.

I

*Rule 8(a)(2)* of the Federal Rules requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The rule did not come about by happenstance and its language is not inadvertent. The English experience with Byzantine special pleading rules [***53] -- illustrated by the hypertechnical Hilary rules of 1834 [1] -- made obvious [*1976] the appeal of a pleading standard that was easy for the common litigant to understand and sufficed to put the defendant on notice as to the nature of the claim against him and the relief sought. Stateside, David Dudley Field developed the highly influential New York Code of 1848, which required "[a] statement of the facts constituting the cause of action, in ordinary

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

and concise language, without repetition, and in such a manner as to enable a person of common understanding to know what is intended." An Act to Simplify and Abridge the Practice, Pleadings and Proceedings of the Courts of this State, ch. 379, § 120(2), 1848 N. Y. Laws pp. 497, 521. Substantially similar language appeared in the Federal Equity Rules adopted in 1912. See Fed. Equity Rule 25 (requiring "a short and simple statement of the ultimate facts upon which the plaintiff asks relief, omitting any mere statement of evidence").

> 1   See 9 W. Holdsworth, History of English Law 324-327 (1926).

[***54] [**952] A difficulty arose, however, in that the Field Code and its progeny required a plaintiff to plead "facts" rather than "conclusions," a distinction that proved far easier to say than to apply. As commentators have noted,

> "it is virtually impossible logically to distinguish among 'ultimate facts,' 'evidence,' and 'conclusions.' Essentially any allegation in a pleading must be an assertion that certain occurrences took place. The pleading spectrum, passing from evidence through ultimate facts to conclusions, is largely a continuum varying only in the degree of particularity with which the occurrences are described." Weinstein & Distler, Comments on Procedural Reform: Drafting Pleading Rules, 57 Colum. L. Rev. 518, 520-521 (1957).

See also Cook, Statements of Fact in Pleading Under the Codes, 21 Colum. L. Rev. 416, 417 (1921) (hereinafter Cook) ("There is no logical distinction between statements which are grouped by the courts under the phrases 'statements of fact' and 'conclusions of law'"). *Rule 8* was directly responsive to this difficulty. Its drafters intentionally avoided any reference to "facts" or "evidence" or "conclusions." See 5 C. [***55] Wright & A. Miller, Federal Practice and Procedure § 1216, p. 207 (3d ed. 2004) (hereinafter Wright & Miller) ("The substitution of 'claim showing that the pleader is entitled to relief' for the code formulation of the 'facts' constituting a 'cause of action' was intended to avoid the distinctions drawn under the codes among 'evidentiary facts,' 'ultimate facts,' and 'conclusions' . . . ").

Under the relaxed pleading standards of the Federal Rules, the idea was not to keep litigants out of court but rather to keep them in. The merits of a claim would be sorted out during a flexible pretrial process and, as appropriate, through the crucible of trial. See *Swierkiewicz,*

*534 U.S., at 514, 122 S. Ct. 992, 152 L. Ed. 2d 1* ("The liberal notice pleading of *Rule 8(a)* is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim"). Charles E. Clark, the "principal draftsman" of the Federal Rules, [2] put it thus:

> "Experience has shown . . . that we cannot expect the proof of the case to be made through the pleadings, and that such proof is really not their function. We can expect a general statement distinguishing the case from all others, so [***56] that the manner and form of trial and remedy expected are clear, and so that a permanent judgment will result." The [*1977] New Federal Rules of Civil Procedure: The Last Phase -- Underlying Philosophy Embodied in Some of the Basic Provisions of the New Procedure, 23 A. B. A. J. 976, 977 (1937) (hereinafter Clark, New Federal Rules).

The pleading paradigm under the new Federal Rules was well illustrated by the inclusion in the appendix of Form 9, a complaint for negligence. As relevant, the Form 9 complaint states only: "On June 1, 1936, in a public highway called Boylston Street in Boston, Massachusetts, defendant negligently drove a motor vehicle against plaintiff who was then [**953] crossing said highway." Form 9, Complaint for Negligence, Forms App., Fed. Rules Civ. Proc., 28 U.S.C. App., p. 829 (hereinafter Form 9). The complaint then describes the plaintiff's injuries and demands judgment. The asserted ground for relief -- namely, the defendant's negligent driving -- would have been called a "'conclusion of law'" under the code pleading of old. See, *e.g.,* Cook 419. But that bare allegation suffices under a system that "restricts the pleadings to [***57] the task of general notice-giving and invests the deposition-discovery process with a vital role in the preparation for trial." [3] *Hickman v. Taylor, 329 U.S. 495, 501, 67 S. Ct. 385, 91 L. Ed. 451 (1947)*; see also *Swierkiewicz, 534 U.S., at 513, n. 4, 122 S. Ct. 992, 152 L. Ed. 2d 1* (citing Form 9 as an example of "'the simplicity and brevity of statement which the rules contemplate'"); *Thomson v. Washington, 362 F.3d 969, 970 (CA7 2004)* (Posner, J.) ("The federal rules replaced fact pleading with notice pleading").

> 2   *Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 283, 108 S. Ct. 1133, 99 L. Ed. 2d 296 (1988).*

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

3   The Federal Rules do impose a "particularity" requirement on "all averments of fraud or mistake," *Fed. Rule Civ. Proc. 9(b)*, neither of which has been alleged in this case. We have recognized that the canon of *expresio unius est exclusio alterius* applies to *Rule 9(b)*. See *Leatherman v. Tarrant Cty. Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993).*

II

[***58]   It is in the context of this history that *Conley v. Gibson, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957),* must be understood. The *Conley* plaintiffs were black railroad workers who alleged that their union local had refused to protect them against discriminatory discharges, in violation of the National Railway Labor Act. The union sought to dismiss the complaint on the ground that its general allegations of discriminatory treatment by the defendants lacked sufficient specificity. Writing for a unanimous Court, Justice Black rejected the union's claim as foreclosed by the language of *Rule 8. Id., at 47-48, 78 S. Ct. 99, 2 L. Ed. 2d 80.* In the course of doing so, he articulated the formulation the Court rejects today: "In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id., at 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80.*

Consistent with the design of the Federal Rules, *Conley's* "no set of facts" formulation permits outright dismissal only when proceeding to discovery or beyond [***59] would be futile. Once it is clear that a plaintiff has stated a claim that, if true, would entitle him to relief, matters of proof are appropriately relegated to other stages of the trial process. Today, however, in its explanation of a decision to dismiss a complaint that it regards as a fishing expedition, the Court scraps *Conley's* "no set of facts " language. Concluding that the phrase has been "questioned, criticized, and explained away long enough," *ante*, at 16, the Court dismisses it as careless composition.

[*1978]   If *Conley's* "no set of facts" language is to be interred, let it not be without a eulogy. That exact language, which the majority says has "puzzled the profession for 50 years," *ibid.*, has been cited as authority in a dozen opinions of this Court and four separate [**954] writings. [4] In not one of those 16 opinions was the language "questioned," "criticized," or "explained away." Indeed, today's opinion is the first by any Member of this Court to express *any* doubt as to the adequacy of the *Conley* formulation. Taking their cues from the federal courts, 26 States and the District of Columbia utilize as their standard for dismissal of a complaint the very language [***60] the majority repudiates: whether it appears "beyond doubt" that "no set of facts" in support of the claim would entitle the plaintiff to relief. [5]

4   *SEC v. Zandford, 535 U.S. 813, 818, 122 S. Ct. 1899, 153 L. Ed. 2d 1 (2002); Davis v. Monroe County Bd. of Ed., 526 U.S. 629, 654, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999); Hartford Fire Ins. Co. v. California, 509 U.S. 764, 811, 113 S. Ct. 2891, 125 L. Ed. 2d 612 (1993); Brower v. County of Inyo, 489 U.S. 593, 598, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989); Hughes v. Rowe, 449 U.S. 5, 10, 101 S. Ct. 173, 66 L. Ed. 2d 163 (1980) (per curiam); McLain v. Real Estate Bd. of New Orleans, Inc., 444 U.S. 232, 246, 100 S. Ct. 502, 62 L. Ed. 2d 441 (1980); Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976); Hospital Building Co. v. Trustees of Rex Hospital, 425 U.S. 738, 746, 96 S. Ct. 1848, 48 L. Ed. 2d 338 (1976); Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974); Cruz v. Beto, 405 U.S. 319, 322, 92 S. Ct. 1079, 31 L. Ed. 2d 263 (1972) (per curiam); Haines v. Kerner, 404 U.S. 519, 521, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972) (per curiam); Jenkins v. McKeithen, 395 U.S. 411, 422, 89 S. Ct. 1843, 23 L. Ed. 2d 404 (1969) (plurality opinion); see also Cleveland Bd. of Ed. v. Loudermill, 470 U.S. 532, 554, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985) (Brennan, J., concurring in part and dissenting in part); Hoover v. Ronwin, 466 U.S. 558, 587, 104 S. Ct. 1989, 80 L. Ed. 2d 590 (1984) (STEVENS, J., dissenting); United Air Lines, Inc. v. Evans, 431 U.S. 553, 561, n. 1, 97 S. Ct. 1885, 52 L. Ed. 2d 571 (1977) (Marshall, J., dissenting); Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26, 55, n. 6, 96 S. Ct. 1917, 48 L. Ed. 2d 450 (1976) (Brennan, J., concurring in judgment).*

[***61]

5   See, e.g., *EB Invs., LLC v. Atlantis Development, Inc., 930 So. 2d 502, 507 (Ala. 2005); Department of Health & Social Servs. v. Native Village of Curyung, 151 P. 3d 388, 396 (Alaska 2006); Newman v. Maricopa Cty., 167 Ariz. 501, 503, 808 P.2d 1253, 1255 (App. 1991); Public Serv. Co. of Colo. v. Van Wyk, 27 P. 3d 377, 385-386 (Colo. 2001) (en banc); Clawson v. St. Louis Post-Dispatch, LLC, 906 A.2d 308, 312 (D. C. 2006); Hillman Constr. Corp. v. Wainer, 636 So. 2d 576, 578 (Fla. App. 1994); Kaplan v. Kaplan, 266 Ga. 612, 613, 469 S. E. 2d 198, 199 (1996); Wright v. Home Depot U.S.A., 111 Haw. 401,*

*406, 142 P. 3d 265, 270 (2006); Taylor v. Maile, 142 Idaho 253, 257, 127 P. 3d 156, 160 (2005); Fink v. Bryant, 2001-CC-0987, p. 4 (La. 11/28/01), 801 So. 2d 346, 349; Gagne v. Cianbro Corp., 431 A.2d 1313, 1318-1319 (Me. 1981); Gasior v. Massachusetts Gen. Hospital, 446 Mass. 645, 647, 846 N.E.2d 1133, 1135 (2006); Ralph Walker, Inc. v. Gallagher, 926 So. 2d 890, 893 (Miss. 2006); Jones v. Montana Univ. System, 337 Mont. 1, 7, 155 P. 3d 1247, ____ (2007); Johnston v. Neb. Dep't of Corr. Servs., 270 Neb. 987, 989, 709 N.W.2d 321, 324 (2006); Blackjack Bonding v. Las Vegas Munic. Ct., 116 Nev. 1213, 1217, 14 P. 3d 1275, 1278 (2000); Shepard v. Ocwen Fed. Bank, 361 N. C. 137, 139, 638 S. E. 2d 197, 199 (2006); Rose v. United Equitable Ins. Co., 2001 ND 154, P10, 632 N.W.2d 429, 434; State ex rel. Turner v. Houk, 112 Ohio St. 3d 561, 562, 2007-Ohio-814, P5, 862 N.E.2d 104, 105 (per curiam); Moneypenney v. Dawson, 2006 OK 53, P2, 141 P. 3d 549, 551; Gagnon v. State, 570 A.2d 656, 659 (R. I. 1990); Osloond v. Farrier, 2003 SD 28, P4, 659 N.W.2d 20, 22 (per curiam); Smith v. Lincoln Brass Works, Inc., 712 S.W.2d 470, 471 (Tenn. 1986); Association of Haystack Property Owners v. Sprague, 145 Vt. 443, 446, 494 A.2d 122, 124 (1985); In re Coday, 156 Wn. 2d 485, 497, 130 P. 3d 809, 815 (2006) (en banc); Haines v. Hampshire Cty. Comm'n, 216 W. Va. 499, 502, 607 S. E. 2d 828, 831 (2004); Warren v. Hart, 747 P.2d 511, 512 (Wyo. 1987); see also Malpiede v. Townson, 780 A.2d 1075, 1082-1083 (Del. 2001)* (permitting dismissal only "where the court determines with reasonable certainty that the plaintiff could prevail on no set of facts that may be inferred from the well-pleaded allegations in the complaint" (internal quotation marks omitted)); *Canel v. Topinka, 212 Ill. 2d 311, 318, 818 N.E.2d 311, 317, 288 Ill. Dec. 623 (2004)* (replacing "appears beyond doubt" in the *Conley* formulation with "is clearly apparent"); *In re Young, 522 N.E.2d 386, 388 (Ind. 1988) (per curiam)* (replacing "appears beyond doubt" with "appears to a certainty"); *Barkema v. Williams Pipeline Co., 666 N.W.2d 612, 614 (Iowa 2003)* (holding that a motion to dismiss should be sustained "only when there exists no conceivable set of facts entitling the non-moving party to relief"); *Pioneer Village v. Bullitt Cty., 104 S. W. 3d 757, 759 (Ky. 2003)* (holding that judgment on the pleadings should be granted "if it appears beyond doubt that the nonmoving party cannot prove any set of facts that would entitle him/her to relief"); *Corley v. Detroit Bd. of Ed., 470 Mich. 274, 277,*

*681 N.W.2d 342, 345 (2004) (per curiam)* (holding that a motion for judgment on the pleadings should be granted only "'if no factual development could possibly justify recovery'"); *Oberkramer v. Ellisville, 706 S.W.2d 440, 441 (Mo. 1986)* (en banc) (omitting the words "beyond doubt" from the *Conley* formulation); *Colman v. Utah State Land Bd., 795 P.2d 622, 624 (Utah 1990)* (holding that a motion to dismiss is appropriate "only if it clearly appears that [the plaintiff] can prove no set of facts in support of his claim"); *NRC Mgmt. Servs. Corp. v. First Va. Bank - Southwest, 63 Va. Cir. 68, 70 (2003)* ("The Virginia standard is identical [to the *Conley* formulation], though the Supreme Court of Virginia may not have used the same words to describe it").

[***62] [*1979] Petitioners have not requested that the *Conley* formulation be retired, nor have any of the six *amici* who filed [**955] briefs in support of petitioners. I would not rewrite the Nation's civil procedure textbooks and call into doubt the pleading rules of most of its States without far more informed deliberation as to the costs of doing so. Congress has established a process -- a rulemaking process -- for revisions of that order. See *28 U.S.C. §§ 2072-2074 (2000 ed. and Supp. IV)*.

Today's majority calls *Conley's* "'no set of facts'" language "an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Ante*, at 16. This is not and cannot be what the *Conley* Court meant. First, as I have explained, and as the *Conley* Court well knew, the pleading standard the Federal Rules meant to codify does not require, or even invite, the pleading of facts. [6] The "pleading standard" label the majority gives to what it reads into the *Conley* opinion -- a statement of the permissible factual support for an adequately [***63] pleaded complaint -- would not, therefore, have impressed the *Conley* Court itself. Rather, that Court would have understood the majority's remodeling of its language to express an *evidentiary* standard, which the *Conley* Court had neither need nor want to explicate. Second, it is pellucidly clear that the *Conley* Court was interested in what a complaint *must* contain, not what it *may* contain. In fact, the Court said without qualification that it was "appraising the *sufficiency* of the complaint." *355 U.S., at 45,* [*1980] *78 S. Ct. 99, 2 L. Ed. 2d 80* (emphasis added). It was, to paraphrase today's majority, describing "the minimum standard of adequate pleading to govern a complaint's survival," *ante*, at 16-17.

6    The majority is correct to say that what the Federal Rules require is a "'showing'" of entitlement to relief. *Ante*, at 8, n. 3. Whether and to

what extent that "showing" requires allegations of fact will depend on the particulars of the claim. For example, had the amended complaint in this case alleged *only* parallel conduct, it would not have made the required "showing." See *supra*, at 1. Similarly, had the pleadings contained *only* an allegation of agreement, without specifying the nature or object of that agreement, they would have been susceptible to the charge that they did not provide sufficient notice that the defendants may answer intelligently. Omissions of that sort instance the type of "bareness" with which the Federal Rules are concerned. A plaintiff's inability to persuade a district court that the allegations actually included in her complaint are "plausible" is an altogether different kind of failing, and one that should not be fatal at the pleading stage.

[***64] We can be triply sure as to *Conley's* meaning by examining the three Court of Appeals cases the *Conley* Court cited as support for the "accepted rule" that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of [**956] facts in support of his claim which would entitle him to relief." *355 U.S., at 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80.* In the first case, *Leimer v. State Mut. Life Assur. Co. of Worcester, Mass., 108 F.2d 302 (CA8 1940),* the plaintiff alleged that she was the beneficiary of a life insurance plan and that the insurance company was wrongfully withholding proceeds from her. In reversing the District Court's grant of the defendant's motion to dismiss, the Eighth Circuit noted that court's own longstanding rule that, to warrant dismissal, "'it should appear from the allegations that a cause of action does not exist, rather than that a cause of action has been defectively stated.'" *Id., at 305* (quoting *Winget v. Rockwood, 69 F.2d 326, 329 (CA8 1934)).*

The *Leimer* court viewed the Federal Rules -- specifically *Rules 8(a)(2), 12(b)(6), 12(e)* (motion for [***65] a more definite statement), and 56 (motion for summary judgment) -- as reinforcing the notion that "there is no justification for dismissing a complaint for insufficiency of statement, except where it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of the claim." *108 F.2d at 306.* The court refuted in the strongest terms any suggestion that the unlikelihood of recovery should determine the fate of a complaint: "No matter how improbable it may be that she can prove her claim, she is entitled to an opportunity to make the attempt, and is not required to accept as final a determination of her rights based upon inferences drawn in favor of the defendant from her amended complaint." *Ibid.*

The Third Circuit relied on *Leimer's* admonition in *Continental Collieries, Inc. v. Shober, 130 F.2d 631*

*(1942),* which the *Conley* Court also cited in support of its "no set of facts" formulation. In a diversity action the plaintiff alleged breach of contract, but the District Court dismissed the complaint on the ground that the contract appeared to be unenforceable under state [***66] law. The Court of Appeals reversed, concluding that there were facts in dispute that went to the enforceability of the contract, and that the rule at the pleading stage was as in *Leimer:* "No matter how likely it may seem that the pleader will be unable to prove his case, he is entitled, upon averring a claim, to an opportunity to try to prove it." *130 F.2d at 635.*

The third case the *Conley* Court cited approvingly was written by Judge Clark himself. In *Dioguardi v. Durning, 139 F.2d 774 (CA2 1944),* the *pro se* plaintiff, an importer of "tonics," charged the customs inspector with auctioning off the plaintiff's former merchandise for less than was bid for it -- and indeed for an amount equal to the plaintiff's own bid -- and complained that two cases of tonics went missing three weeks before the sale. The inference, hinted at by the averments but never stated in so many words, was that the defendant fraudulently denied the plaintiff his rightful claim to the tonics, which, if true, would have violated federal law. Writing six years after the adoption of the Federal Rules he held the lead rein in drafting, Judge Clark said that the defendant [***67]

> "could have disclosed the facts from his point of view, in advance of a trial if he [*1981] chose, by asking for a pre-trial hearing or by moving for a summary judgment with supporting affidavits. But, as it stands, we do not see how the plaintiff may properly be deprived of his day in court to show what he obviously so [**957] firmly believes and what for present purposes defendant must be taken as admitting." *Id., at 775.*

As any civil procedure student knows, Judge Clark's opinion disquieted the defense bar and gave rise to a movement to revise *Rule 8* to require a plaintiff to plead a "'cause of action.'" See 5 Wright & Miller § 1201, at 86-87. The movement failed, see *ibid.; Dioguardi* was explicitly approved in *Conley;* and "in retrospect the case itself seems to be a routine application of principles that are universally accepted," 5 Wright & Miller § 1220, at 284-285.

In light of *Leimer, Continental Collieries,* and *Dioguardi, Conley's* statement that a complaint is not to be dismissed unless "no set of facts" in support thereof would entitle the plaintiff to relief is hardly "puzzling,"

*ante*, at 16. It reflects a philosophy that, unlike [***68] in the days of code pleading, separating the wheat from the chaff is a task assigned to the pretrial and trial process. *Conley*'s language, in short, captures the policy choice embodied in the Federal Rules and binding on the federal courts.

We have consistently reaffirmed that basic understanding of the Federal Rules in the half century since *Conley*. For example, in *Scheuer v. Rhodes, 416 U.S. 232, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)*, we reversed the Court of Appeals' dismissal on the pleadings when the respondents, the Governor and other officials of the State of Ohio, argued that petitioners' claims were barred by sovereign immunity. In a unanimous opinion by then-Justice Rehnquist, we emphasized that

> "when a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. *Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.*" *Id.*, at 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (emphasis added). [***69]

The *Rhodes* plaintiffs had "alleged generally and in conclusory terms" that the defendants, by calling out the National Guard to suppress the Kent State University student protests, "were guilty of wanton, wilful and negligent conduct." *Krause v. Rhodes, 471 F.2d 430, 433 (CA6 1972)*. We reversed the Court of Appeals on the ground that "whatever the plaintiffs may or may not be able to establish as to the merits of their allegations, their claims, as stated in the complaints, given the favorable reading required by the Federal Rules of Civil Procedure," were not barred by the *Eleventh Amendment* because they were styled as suits against the defendants in their individual capacities. *416 U.S., at 238, 94 S. Ct. 1683, 40 L. Ed. 2d 90.*

We again spoke with one voice against efforts to expand pleading requirements beyond their appointed limits in *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993)*. Writing for the unanimous Court, Chief Justice Rehnquist rebuffed the Fifth Circuit's effort to craft a standard for pleading municipal liability that accounted for "the enormous expense involved today in litigation," [***70] *Leatherman v. Tar-*

*rant Cty. Narcotics Intelligence and Coordination Unit,* [**958] *954 F.2d 1054, 1057 (1992)* (internal quotation marks omitted), by requiring a plaintiff to "state with factual detail and [*1982] particularity the basis for the claim which necessarily includes why the defendant-official cannot successfully maintain the defense of immunity." *Leatherman, 507 U.S., at 167,113 S. Ct. 1160, 122 L. Ed. 2d 517* (internal quotation marks omitted). We found this language inconsistent with *Rules 8(a)(2)* and *9(b)* and emphasized that motions to dismiss were not the place to combat discovery abuse: "In the absence of [an amendment to *Rule 9(b)*], federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later." *Id.*, at 168-169,113 S. Ct. 1160, 122 L. Ed. 2d 517.

Most recently, in *Swierkiewicz, 534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1*, we were faced with a case more similar to the present one than the majority will allow. In discrimination cases, our precedents require a plaintiff at the summary judgment stage to produce either direct evidence of discrimination or, if the claim is based primarily on circumstantial evidence, to meet the shifting [***71] evidentiary burdens imposed under the framework articulated in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*. See, e.g., *Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121, 105 S. Ct. 613, 83 L. Ed. 2d 523 (1985)*. Swierkiewicz alleged that he had been terminated on account of national origin in violation of Title VII of the Civil Rights Act of 1964. The Second Circuit dismissed the suit on the pleadings because he had not pleaded a prima facie case of discrimination under the *McDonnell Douglas* standard.

We reversed in another unanimous opinion, holding that "under a notice pleading system, it is not appropriate to require a plaintiff to plead facts establishing a prima facie case because the *McDonnell Douglas* framework does not apply in every employment discrimination case." *Swierkiewicz, 534 U.S., at 511, 122 S. Ct. 992, 152 L. Ed. 2d 1*. We also observed that *Rule 8(a)(2)* does not contemplate a court's passing on the merits of a litigant's claim at the pleading stage. Rather, the "simplified notice pleading standard" of the Federal Rules "relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious [***72] claims." *Id.*, at 512, 122 S. Ct. 992, 152 L. Ed. 2d 1; see Brief for United States et al. as Amici Curiae in *Swierkiewicz* v. *Sorema N. A.*, O. T. 2001, No. 00-1853, p. 10 (stating that a *Rule 12(b)(6)* motion is not "an appropriate device for testing the truth of what is asserted or for determining whether a plaintiff has any evidence to back up what is in the complaint" (internal quotation marks omitted)). [7]

7    See also 5 Wright & Miller § 1202, at 89-90 ("Pleadings under the rules simply may be a general summary of the party's position that is sufficient to advise the other party of the event being sued upon, to provide some guidance in a subsequent proceeding as to what was decided for purposes of res judicata and collateral estoppel, and to indicate whether the case should be tried to the court or to a jury. No more is demanded of the pleadings than this; indeed, history shows that no more can be performed successfully by the pleadings" (footnotes omitted)).

As in the discrimination context, we have developed [***73] an evidentiary framework for evaluating claims under § 1 of the Sherman Act when those claims rest on entirely circumstantial evidence of conspiracy. See *Matsushita* [**959] *Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).* Under *Matsushita*, a plaintiff's allegations of an illegal conspiracy may not, at the summary judgment stage, rest solely on the inferences that may be drawn from the parallel conduct of the defendants. In order to survive a *Rule 56* motion, a § 1 plaintiff "must present evidence 'that tends to exclude [*1983] the possibility' that the alleged conspirators acted independently.'" *Id., at 588, 106 S. Ct. 1348, 89 L. Ed. 2d 538* (quoting *Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984)).* That is, the plaintiff "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action." *475 U.S., at 588, 106 S. Ct. 1348, 89 L. Ed. 2d 538.*

Everything today's majority says would therefore make perfect sense if it were ruling on a *Rule 56* motion for summary judgment and the evidence included nothing more than the Court has described. But it should go without saying in the wake of *Swierkiewicz* [***74] that a heightened production burden at the summary judgment stage does not translate into a heightened pleading burden at the complaint stage. The majority rejects the complaint in this case because -- in light of the fact that the parallel conduct alleged is consistent with ordinary market behavior -- the claimed conspiracy is "conceivable" but not "plausible," *ante*, at 24. I have my doubts about the majority's assessment of the plausibility of this alleged conspiracy. See Part III, *infra*. But even if the majority's speculation is correct, its "plausibility" standard is irreconcilable with *Rule 8* and with our governing precedents. As we made clear in *Swierkiewicz* and *Leatherman*, fear of the burdens of litigation does not justify factual conclusions supported only by lawyers' arguments rather than sworn denials or admissible evidence.

This case is a poor vehicle for the Court's new pleading rule, for we have observed that "in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' . . . dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Building Co. v. Trustees of Rex Hospital, 425 U.S. 738, 746, 96 S. Ct. 1848, 48 L. Ed. 2d 338 (1976)* [***75] (quoting *Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S. Ct. 486, 7 L. Ed. 2d 458 (1962)*); see also *Knuth v. Erie-Crawford Dairy Cooperative Assn., 395 F.2d 420, 423 (CA3 1968)* ("The 'liberal' approach to the consideration of antitrust complaints is important because inherent in such an action is the fact that all the details and specific facts relied upon cannot properly be set forth as part of the pleadings"). Moreover, the fact that the Sherman Act authorizes the recovery of treble damages and attorney's fees for successful plaintiffs indicates that Congress intended to encourage, rather than discourage, private enforcement of the law. See *Radovich v. National Football League, 352 U.S. 445, 454, 77 S. Ct. 390, 1 L. Ed. 2d 456 (1957)* ("Congress itself has placed the private antitrust litigant in a most favorable position . . . . In the face of such a policy this Court should not add requirements to burden the private litigant beyond what is specifically set forth by Congress in those laws"). It is therefore more, not less, important in antitrust cases to resist the urge to [**960] engage in armchair economics at the pleading stage.

The same year we decided *Conley* [***76] , Judge Clark wrote, presciently,

"I fear that every age must learn its lesson that special pleading cannot be made to do the service of trial and that live issues between active litigants are not to be disposed of or evaded on the paper pleadings, i.e., the formalistic claims of the parties. Experience has found no quick and easy short cut for trials in cases generally *and antitrust cases in particular.*" Special Pleading in the "Big Case"? in Procedure -- The Handmaid of Justice 147, 148 (C. Wright & H. Reasoner eds. 1965) (hereinafter [*1984] Clark, Special Pleading in the Big Case) (emphasis added).

In this "Big Case," the Court succumbs to the temptation that previous Courts have steadfastly resisted. 8 While the majority assures us that it is not applying any "'heightened'" pleading standard, see *ante*, at 23, n. 14, I shall now explain why I have a difficult time understanding its opinion any other way.

8  Our decision in *Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)*, is not to the contrary. There, the plaintiffs failed adequately to allege loss causation, a required element in a private securities fraud action. Because it alleged nothing more than that the prices of the securities the plaintiffs purchased were artificially inflated, the *Dura* complaint failed to "provide the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the [alleged] misrepresentation." *Id., at 347, 125 S. Ct. 1627, 161 L. Ed. 2d 577.* Here, the failure the majority identifies is not a failure of notice -- which "notice pleading" rightly condemns -- but rather a failure to satisfy the Court that the agreement alleged might plausibly have occurred. That being a question not of *notice* but of *proof*, it should not be answered without first hearing from the defendants (as apart from their lawyers).

Similarly, in *Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)*, in which we also found an antitrust complaint wanting, the problem was not that the injuries the plaintiffs alleged failed to satisfy some threshold of plausibility, but rather that the injuries *as alleged* were not "the type that the antitrust statute was intended to forestall." *Id., at 540, 103 S. Ct. 897, 74 L. Ed. 2d 723;* see *id., at 526, 103 S. Ct. 897, 74 L. Ed. 2d 723* ("As the case comes to us, we must assume that the Union can prove the facts alleged in its amended complaint. It is not, however, proper to assume that the Union can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged").

[***77] III

The Court does not suggest that an agreement to do what the plaintiffs allege would be permissible under the antitrust laws, see, *e.g., Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 526-527, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)*. Nor does the Court hold that these plaintiffs have failed to allege an injury entitling them to sue for damages under those laws, *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489-490, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977)*. Rather, the theory on which the Court permits dismissal is that, so far as the Federal Rules are concerned, no agreement has been alleged at all. This is a mind-boggling conclusion.

As the Court explains, prior to the enactment of the Telecommunications Act of 1996 the law prohibited the defendants from competing with each other. The new statute was enacted to replace a monopolistic market with a competitive one. The Act did not merely require the regional monopolists [**961] to take affirmative steps to facilitate entry to new competitors, see *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 402, 124 S. Ct. 872, 157 L. Ed. 2d 823 (2004)*; it also permitted the existing firms to compete with each [***78] other and to expand their operations into previously forbidden territory. See *47 U.S.C. § 271.* Each of the defendants decided not to take the latter step. That was obviously an extremely important business decision, and I am willing to presume that each company acted entirely independently in reaching that decision. I am even willing to entertain the majority's belief that any agreement among the companies was unlikely. But the plaintiffs allege in three places in their complaint, PP 4, 51, 64, App. 11, 27, 30, that the ILECs did in fact agree both to prevent competitors from entering into their local markets and to forgo competition with each other. And as the Court [*1985] recognizes, at the motion to dismiss stage, a judge assumes "that all the allegations in the complaint are true (even if doubtful in fact)." *Ante,* at 8-9.

The majority circumvents this obvious obstacle to dismissal by pretending that it does not exist. The Court admits that "in form a few stray statements in the complaint speak directly of agreement," but disregards those allegations by saying that "on fair reading these are merely legal conclusions resting on the prior allegations" of parallel [***79] conduct. *Ante,* at 18. The Court's dichotomy between factual allegations and "legal conclusions" is the stuff of a bygone era, *supra,* at 5-7. That distinction was a defining feature of code pleading, see generally Clark, The Complaint in Code Pleading, 35 Yale L. J. 259 (1925-1926), but was conspicuously abolished when the Federal Rules were enacted in 1938. See *United States v. Employing Plasterers Ass'n, 347 U.S. 186, 188, 74 S. Ct. 452, 98 L. Ed. 618 (1954)* (holding, in an antitrust case, that the Government's allegations of effects on interstate commerce must be taken into account in deciding whether to dismiss the complaint "whether these charges be called 'allegations of fact' or 'mere conclusions of the pleader'"); *Brownlee v. Conine, 957 F.2d 353, 354 (CA7 1992)* ("The Federal Rules of Civil Procedure establish a system of notice pleading rather than of fact pleading, . . . so the happenstance that a complaint is 'conclusory,' whatever exactly that overused lawyers' cliche means, does not automatically condemn it"); *Walker Distributing Co. v. Lucky Lager Brewing Co., 323 F.2d 1, 3-4 (CA9 1963)* ("One purpose of Rule 8 [***80] was to get away from the highly technical distinction between statements of fact and conclu-

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

sions of law . . . "); *Oil, Chemical & Atomic Workers Int'l Union v. Delta, 277 F.2d 694, 697 (CA6 1960)* ("Under the notice system of pleading established by the Rules of Civil Procedure, . . . the ancient distinction between pleading 'facts' and 'conclusions' is no longer significant"); 5 Wright & Miller § 1218, at 267 ("The federal rules do not prohibit the pleading of facts or legal conclusions as long as fair notice is given to the parties"). "Defendants entered into a contract" is no more a legal conclusion than "defendant negligently drove," see Form 9; *supra,* at [**962] 6. Indeed it is less of one. [9]

[9] The Court suggests that the allegation of an agreement, even if credited, might not give the notice required by *Rule 8* because it lacks specificity. *Ante,* at 18-19, n. 10. The remedy for an allegation lacking sufficient specificity to provide adequate notice is, of course, a *Rule 12(e)* motion for a more definite statement. See *Swierkiewicz v. Sorema N. A., 534 U.S. 506, 514, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002).* Petitioners made no such motion and indeed have conceded that "our problem with the current complaint is not a lack of specificity, it's quite specific." Tr. of Oral Arg. 14. Thus, the fact that "the pleadings mentioned no specific time, place, or persons involved in the alleged conspiracies," *ante,* at 18, n. 10, is, for our purposes, academic.

[***81] Even if I were inclined to accept the Court's anachronistic dichotomy and ignore the complaint's actual allegations, I would dispute the Court's suggestion that any inference of agreement from petitioners' parallel conduct is "implausible." Many years ago a truly great economist perceptively observed that "people of the same trade seldom meet together, even for merriment and diversion, but the conversation ends in a conspiracy against the public, or in some contrivance to raise prices." A. Smith, An Inquiry Into the Nature and Causes of the Wealth of Nations, in 39 Great Books of the Western World 55 (R. Hutchins & M. Adler eds. 1952). I am not so cynical as to accept that sentiment at face value, but I need not do so here. Respondents' complaint [*1986] points not only to petitioners' numerous opportunities to meet with each other, Complaint P46, App. 23, [10] but also to Notebaert's curious statement that encroaching on a fellow incumbent's territory "might be a good way to turn a quick dollar but that doesn't make it right," *id.,* P42, App. 22. What did he mean by that? One possible (indeed plausible) inference is that he meant that while it would be in his company's economic self-interest [***82] to compete with its brethren, he had agreed with his competitors not to do so. According to the complaint, that is how the Illinois Coalition for Competitive Telecom construed Notebaert's statement, *id.,* P44, App. 22 (calling the statement "evidence of potential collusion

among regional Bell phone monopolies to not compete against one another and kill off potential competitors in local phone service"), and that is how Members of Congress construed his company's behavior, *id.,* P45, App. 23 (describing a letter to the Justice Department requesting an investigation into the possibility that the ILECs'"very apparent non-competition policy" was coordinated).

[10] The Court describes my reference to the allegation that the defendants belong to various trade associations as "playfully" suggesting that the defendants conspired to restrain trade. *Ante,* at 20, n. 12. Quite the contrary: an allegation that competitors meet on a regular basis, like the allegations of parallel conduct, is consistent with -- though not sufficient to prove -- the plaintiffs' entirely serious and unequivocal allegation that the defendants entered into an unlawful agreement. Indeed, if it were true that the plaintiffs "rest their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement among the ILECs," *ante,* at 18, there would have been no purpose in including a reference to the trade association meetings in the amended complaint.

[***83] Perhaps Notebaert meant instead that competition would be sensible in the short term but not in the long run. That's what his lawyers tell us anyway. See Brief for Petitioners 36. But I would think that no one would know better what Notebaert meant than Notebaert himself. Instead of permitting respondents to ask Notebaert, however, the Court looks to other [**963] quotes from that and other articles and decides that what he meant was that entering new markets as a CLEC would not be a "'sustainable economic model.'" *Ante,* at 22, n. 13. Never mind that -- as anyone ever interviewed knows -- a newspaper article is hardly a verbatim transcript; the writer selects quotes to package his story, not to record a subject's views for posterity. But more importantly the District Court was required at this stage of the proceedings to construe Notebaert's ambiguous statement in the plaintiffs' favor. [11] See *Allen v. Wright, 468 U.S. 737, 768, n. 1, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984).* The inference the statement supports -- that simultaneous decisions by ILECs not even to attempt to poach customers from one another once the law authorized them to do so were the product of an agreement -- sits comfortably within [***84] the realm of possibility. That is all the Rules require.

[11] It is ironic that the Court seeks to justify its decision to draw factual inferences in the defendants' favor at the pleading stage by citing to a rule of evidence, *ante,* at 22, n. 13. Under *Fed-*

*eral Rule of Evidence 201(b)*, a judicially noticed fact "must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Whether Notebaert's statements constitute evidence of a conspiracy is hardly beyond reasonable dispute.

To be clear, if I had been the trial judge in this case, I would not have permitted the plaintiffs to engage in massive discovery based solely on the allegations in this complaint. On the other hand, I surely would not have dismissed the complaint [*1987] without requiring the defendants to answer the charge that they "have agreed not to compete with [***85] one another and otherwise allocated customers and markets to one another." [12] P51, App. 27. Even a sworn denial of that charge would not justify a summary dismissal without giving the plaintiffs the opportunity to take depositions from Notebaert and at least one responsible executive representing each of the other defendants.

> 12  The Court worries that a defendant seeking to respond to this "conclusory" allegation "would have little idea where to begin." *Ante*, at 19, n. 10. A defendant could, of course, begin by either denying or admitting the charge.

Respondents in this case proposed a plan of "'phased discovery'" limited to the existence of the alleged conspiracy and class certification. Brief for Respondents 25-26. Two petitioners rejected the plan. *Ibid.* Whether or not respondents' proposed plan was sensible, it was an appropriate subject for negotiation. [13] Given the charge in the complaint -- buttressed [**964] by the common sense of Adam Smith -- I cannot say that the possibility that joint discussions [***86] [*1988] and perhaps some agreements played a role in petitioners' decision-making process is so implausible that dismissing the complaint before any defendant has denied the charge is preferable to granting respondents even a minimal opportunity to prove their claims. See Clark, New Federal Rules 977 ("Through the weapons of discovery and summary judgment we have developed new devices, with more appropriate penalties to aid in matters of *proof*, and do not need to force the pleadings to their less appropriate function").

> 13  The potential for "sprawling, costly, and hugely time-consuming" discovery, *ante*, at 13, n. 6, is no reason to throw the baby out with the bathwater. The Court vastly underestimates a district court's case-management arsenal. Before discovery even begins, the court may grant a de-

fendant's *Rule 12(e)* motion; *Rule 7(a)* permits a trial court to order a plaintiff to reply to a defendant's answer, see *Crawford-El v. Britton, 523 U.S. 574, 598, 118 S. Ct. 1584, 140 L. Ed. 2d 759 (1998)*; and *Rule 23* requires "rigorous analysis" to ensure that class certification is appropriate, *General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 160, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)*; see *In re Initial Public Offering Securities Litigation, 471 F.3d 24 (CA2 2006)* (holding that a district court may not certify a class without ruling that each *Rule 23* requirement is met, even if a requirement overlaps with a merits issue). *Rule 16* invests a trial judge with the power, backed by sanctions, to regulate pretrial proceedings via conferences and scheduling orders, at which the parties may discuss, *inter alia*, "the elimination of frivolous claims or defenses," *Rule 16(c)(1)*; "the necessity or desirability of amendments to the pleadings," *Rule 16(c)(2)*; "the control and scheduling of discovery," *Rule 16(c)(6)*; and "the need for adopting special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems," *Rule 16(c)(12)*. Subsequently, *Rule 26* confers broad discretion to control the combination of interrogatories, requests for admissions, production requests, and depositions permitted in a given case; the sequence in which such discovery devices may be deployed; and the limitations imposed upon them. See *523 U.S., at 598-599, 118 S. Ct. 1584, 140 L. Ed. 2d 759*. Indeed, *Rule 26(c)* specifically permits a court to take actions "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" by, for example, disallowing a particular discovery request, setting appropriate terms and conditions, or limiting its scope.

In short, the Federal Rules contemplate that pretrial matters will be settled through a flexible process of give and take, of proffers, stipulations, and stonewalls, not by having trial judges screen allegations for their plausibility *vel non* without requiring an answer from the defendant. See *Societe Internationale pour Participations Industrielles et Commerciales, S. A. v. Rogers, 357 U.S. 197, 206, 78 S. Ct. 1087, 2 L. Ed. 2d 1255 (1958)* ("*Rule 34* is sufficiently flexible to be adapted to the exigencies of particular litigation"). And should it become apparent over the course of litigation that a plaintiff's filings bespeak an *in terrorem* suit, the district court has at its call its own *in terrorem* device, in the form of

a wide array of *Rule 11* sanctions. See *Rules 11(b), (c)* (authorizing sanctions if a suit is presented "for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation"); see *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc., 498 U.S. 533, 111 S. Ct. 922, 112 L. Ed. 2d 1140 (1991)* (holding that *Rule 11* applies to a represented party who signs a pleading, motion, or other papers, as well as to attorneys); *Atkins v. Fischer, 232 F.R.D. 116, 126 (DC 2005)* ("As possible sanctions pursuant to *Rule 11*, the court has an arsenal of options at its disposal").

[***87] I fear that the unfortunate result of the majority's new pleading rule will be to invite lawyers' debates over economic theory to conclusively resolve antitrust suits in the absence of any evidence. It is no surprise that the antitrust defense bar -- among whom "lament" as to inadequate judicial supervision of discovery is most "common," see *ante,* at 12 -- should lobby for this state of affairs. But "we must recall that their primary responsibility is to win cases for their clients, not to improve law administration for the public." Clark, Special Pleading in the Big Case 152. As we did in our prior decisions, we should have instructed them that their remedy was to seek to amend the Federal Rules -- not our interpretation of them. [14] See *Swierkiewicz, 534 U.S., at 515, 122 S. Ct. 992, 152 L. Ed. 2d 1; Crawford-El v. Britton, 523 U.S. 574, 595, 118 S. Ct. 1584, 140 L.* [**965] *Ed. 2d 759 (1998); Leatherman, 507 U.S., at 168, 113 S. Ct. 1160, 122 L. Ed. 2d 517.*

14    Given his "background in antitrust law," *ante,* at 13, n. 6, Judge Easterbrook has recognized that the most effective solution to discovery abuse lies in the legislative and rulemaking arenas. He has suggested that the remedy for the ills he complains of requires a revolution in the rules of civil procedure:

"Perhaps a system in which judges pare away issues and focus on investigation is too radical to contemplate in this country -- although it prevailed here before 1938, when the Federal Rules of Civil Procedure were adopted. The change could not be accomplished without abandoning notice pleading, increasing the number of judicial officers, and giving them more authority . . . . If we are to rule out judge-directed discovery, however, we must be prepared to pay the piper. Part of the price is the high cost of unnecessary discovery -- impositional and otherwise." Discovery as Abuse, *69 B. U. L. Rev. 635, 645 (1989).*

[***88] IV

Just a few weeks ago some of my colleagues explained that a strict interpretation of the literal text of statutory language is essential to avoid judicial decisions that are not faithful to the intent of Congress. *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ., 550 U.S. ___, ___, 127 S. Ct. 1534, 167 L. Ed. 2d 449 (2007)* (SCALIA, J., dissenting). I happen to believe that there are cases in which other tools of construction are more reliable than text, but I agree of course that congressional intent should guide us in matters of statutory interpretation. *Id., at ___, 127 S. Ct. 1534, 167 L. Ed. 2d 449* (STEVENS, J., concurring). This is a case in which the intentions of the drafters of three important sources of law -- the Sherman Act, the Telecommunications Act of 1996, and the Federal Rules of Civil Procedure -- all point unmistakably in the same direction, yet the Court marches resolutely the other way. Whether the Court's actions will benefit only defendants in antitrust treble-damages cases, or whether its test for the sufficiency of a complaint will inure to the benefit of all civil defendants, is a question that the future will answer. But that the Court has announced a significant new rule that does not even purport to [***89] respond [*1989] to any congressional command is glaringly obvious.

The transparent policy concern that drives the decision is the interest in protecting antitrust defendants -- who in this case are some of the wealthiest corporations in our economy -- from the burdens of pretrial discovery. *Ante,* at 11-13. Even if it were not apparent that the legal fees petitioners have incurred in arguing the merits of their *Rule 12(b)* motion have far exceeded the cost of limited discovery, or that those discovery costs would burden respondents as well as petitioners, [15] that concern would not provide an adequate justification for this law-changing decision. For in the final analysis it is only a lack of confidence in the ability of trial judges to control discovery, buttressed by appellate judges' independent appraisal of the plausibility of profoundly serious factual allegations, that could account for this stark break from precedent.

15    It would be quite wrong, of course, to assume that dismissal of an antitrust case after discovery is costless to plaintiffs. See *Fed. Rule Civ. Proc. 54(d)(1)* ("Costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs").

[***90] If the allegation of conspiracy happens to be true, today's decision obstructs the congressional policy favoring competition that undergirds both the Telecommunications Act of 1996 and the Sherman Act itself. More importantly, even if there is abundant evidence that the allegation is untrue, directing that the case be dismissed without even looking at any of that evidence

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

marks a fundamental -- and unjustified -- change in the
character of pretrial practice.

Accordingly, I respectfully dissent.

LEXSEE 2002 US DIST LEXIS 16578

**HANGZHOU SILK IMPORT AND EXPORT CORPORATION, Plaintiff, - against - P.C.B. INTERNATIONAL INDUSTRIES, INC. d/ b/ a PATRICK CHRISTOPHER, Defendant.**

**00 Civ. 6344 (RLC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2002 U.S. Dist. LEXIS 16578; 48 U.C.C. Rep. Serv. 2d (Callaghan) 1367*

**September 4, 2002, Decided
September 5, 2002, Filed**

**DISPOSITION:** [*1] Post-trial findings of fact, conclusions of law, and entry of judgment.

**COUNSEL:** ELLIOT L. SCHAEFFER, STEVEN J. LUCKNER, Of Counsel, SCHAEFFER & KRONGOLD LLP, New York, New York, for Plaintiff.

ROBERT K. ERLANGER, Of Counsel, DWYER & BRENNAN, New York, New York, for Defendant.

**JUDGES:** ROBERT L. CARTER, U.S.D.J.

**OPINION BY:** ROBERT L. CARTER

**OPINION**

ROBERT L. CARTER, District Judge

Plaintiff Hangzhou Silk Import and Export Corporation ("Hangzhou"), a garment manufacturer located in Hangzhou Province, China, sues for goods sold and delivered, account stated, and quantum meruit in the amount of $ 417,716.35. Defendant P.C.B. International Industries, Inc. d/ b/ a Patrick Christopher ("PCB"), a garment sales company with its principal place of business in New York, New York, counterclaims for delivery of nonconforming goods, fraud, and consequential damages. The case was tried to the court on April 29-30, 2002. Post-trial findings of fact and conclusions of law were submitted on June 3, 2002.

BACKGROUND

The following facts were established at trial. Richard Blauner, president of defendant PCB, traveled to China [*2] in June, 1998 to find a factory to produce garments for PCB to sell in the United States. He sought to develop a high-quality garment business operation that would import garments from China, produced to the specifications of PCB's Secretary-Treasurer and designer, Patricia Blauner, for sale to retailers in the United States such as Neiman Marcus. On June 7, 1998, in Hangzhou Province, China, Richard Blauner, through a contact named Peter Wang, was introduced to an individual by the name of Xiaoli Wang, a merchandiser with Hangzhou, who proceeded to take Blauner and Peter Wang on a tour of a factory. Upon meeting Richard Blauner, Xiaoli Wang gave him a business card with the name, "Feng Xiao Gao," and a company name, "Hangzhou Jiang Gneng Silk Clothing Manufacturing Limited," on it. Richard Blauner understood the card to be Xiaoli Wang's and Xiaoli Wang represented to him that he was the owner of the factory that Blauner was being shown, later determined to be Xiang Gneng Garment Factory ("Xiang Gneng"). (Tr. at 161-162.) Richard Blauner described the factory he saw that day as consisting of three or four buildings with a circular driveway, a very large fountain in the center, and [*3] the name "Hangzhou Silk Jiang Gneng" in English printed on an exterior sign. (Tr. at 163.) During the tour, Richard Blauner testified that he saw numerous examples of high quality merchandise, including thousands of finished and semi-finished garments. (Tr. at 163-64.)

After returning to the United States, on June 19, 1998 Richard Blauner informed Xiaoli Wang by fax that he found the factory he toured with him to be excellent, emphasized his commitment to provide work to it, and that he was aiming for shipments to commence in November, 1998. (Tr. at 172.; Def.'s Exh. 1.) Xiaoli Wang, in turn, forwarded to PCB two very high-quality garments that Richard Blauner accepted as samples, a "Hugo Buscati" jacket and shirt and an "Anna and Frank" blouse. In early July, 1998, Richard Blauner

Case 1:07-cv-04854-PKL     Document 26-2     Filed 08/22/2007     Page 32 of 89

Page 2

2002 U.S. Dist. LEXIS 16578, *; 48 U.C.C. Rep. Serv. 2d (Callaghan) 1367

asked Xiaoli Wang to make a few counter-samples using PCB's patterns. Immediately, problems were apparent with the counter-samples. Due to the poor counter-samples, Richard Blauner suspected that they were produced at a factory other than the factory he had toured with Xiaoli Wang. When Richard Blauner directly questioned Xiaoli Wang about the factory, his suspicions were confirmed. In a faxed letter from [*4] Xiaoli Wang, dated July 10, 1998, Wang disclosed that the garments were being made at Xing Yi factory instead of the one Richard Blauner had toured. (See Pl.'s Exh. A2.) While Xiaoli Wang later disputed that the factory he had first shown Richard Blauner was Xiang Gneng, claiming instead that it was called Xiang Yu and did not have any fountain or a sign written in English in front of it, (Tr. at 7, 14-15, 146.), he admitted that the garments were manufactured at a new factory, Xing Yi, and insisted that it was actually a better factory than the one toured by Richard Blauner. (Pl.'s Exh. A2.)

At Xing Yi, Xiaoli Wang was in charge of quality control for the production of PCB's garments and communicated with Cary Tsang, PCB's production consultant, who would notify Xiaoli Wang of quality problems with the counter-samples and send him specifications and cutting tickets for garment production. Four to five times per year, Tsang would visit Xing Yi, accompanied by Xiaoli Wang. Tsang also had his own quality control person based in Shanghai who would visit Xing Yi intermittently. When Tsang identified any problem in production, he would bring it to Xiaoli Wang's attention. Sometimes [*5] the problems were remedied and other times they were not. (Tr. at 82-83.)

Defendant PCB asserts that the quality of plaintiff Hangzhou's work was spotty and inconsistent from the beginning of their dealings with each other. Richard Blauner testified that the quality of one of the first shipments that PCB received from Hangzhou, a sportswear order, was "inconsistent to poor." (Tr. at 176.) Sleeve lengths were eight inches longer than the patterns required and the seam allowances were not to specifications. Patricia Blauner echoed this appraisal of the garments. (Tr. at 200.) Similarly, Tsang, in general, recalled numerous complaints about the quality of the garments Hangzhou produced for PCB. (Tr. at 112-13.)

On December 28, 1998, Richard Blauner wrote a letter to Xiaoli Wang notifying him of the problems with the first set of garments. (See Def.'s Exh. 9.) On January 6, 1999, Tsang faxed another letter to Xiaoli Wang, the subject of which was defective panama linen fabric found in finished garments. (See Def.'s Exh. 10.) On January 25 and 27, 1999, respectively, Tsang faxed Xiaoli Wang in regard to switched hang-tags in a shipment of pants and jackets and poor pressing in [*6] silk samples resulting in "puckering." (See Def.'s Exhs. 12,

13.) On March 4, 1999, Tsang faxed Xiaoli Wang about three defects in a bulk linen garment shipment. (See Def.'s Exh. 15.) The shipment was in two different shades of white, the pressing problem reappeared, and a thinner poly bag was used to ship the garments than the bag that was ordered. (Id.) On March 22, 1999, Tsang faxed Xiaoli Wang concerning 87 garments that PCB's customers had returned because they were ivory and not bleached white as ordered. (See Def.'s Exh. 33.) Additional complaints by Tsang were registered with Xiaoli Wang regarding, among other things, a defective shoulder pad in a sample jacket, a poor jacket sample, a shoulder pad color problem, unacceptable delays in the delivery of garments, a defectively-dyed shirt button resulting in a customer return, and garments manufactured "out of tolerance" or in the wrong sizes. (See Def.'s Exhs. 17, 18, 24, 25, 27, and 30.) The sheer number of these complaints resulted in a letter faxed by Tsang to Xiaoli Wang, on November 8, 1999, in which Tsang wrote:

> WE RECEIVED A LOT OF RETURNS AND COMPLAIN [sic] FROM OUR CUSTOMER [sic] RECENTLY [*7] ABOUT THE QUALITY OF THE GARMENT [sic] WE DELIVERIED [sic].
>
> SPECIFICATIONS ARE TOO BIG OR TOO SMALL WHICH ARE OUT OF TOLARANCE [sic], POOR PRESSING, POOR WORKMANSHIP ETC. ETC.
>
> WE CANNOT ACCEPT ANYMORE OF THE ABOVE ....

(Def.'s Exh. 29.)

On December 15, 1999, Patricia Blauner faxed to Xiaoli Wang a letter wherein she wrote that $ 50,000 would be sent to Hangzhou by December 16, 1999, that an additional $ 25,000 would be sent by December 30, 1999, and that all monies due to Hangzhou would be paid in full. (See Pl.'s Exh. A9.) As of the date of that letter, PCB had paid Hangzhou a total of $ 386,324 exclusive of sums paid for by letters of credit. (See Pl.'s Exh. 8.) PCB then proceeded to pay Hangzhou $ 50,000 as promised, followed by sums of $ 15,000 and $ 5,000. (Tr. at 120-22, 128.) Hangzhou and PCB ceased doing business together after Patricia Blauner's letter dated December 15. On June 8, 2000, Patricia Blauner faxed Xiaoli Wang a letter in which she communicated PCB's intention to pay the balance of $ 444,318.35 due and owing to Hangzhou as soon as possible. (See Pl.'s Exh. A12.) Patricia Blauner claims that she had received that figure from Xiaoli [*8] Wang and had written it in her

Case 1:07-cv-04854-PKL    Document 26-2    Filed 08/22/2007    Page 33 of 89

Page 3

2002 U.S. Dist. LEXIS 16578, *; 48 U.C.C. Rep. Serv. 2d (Callaghan) 1367

own handwriting on the letter because Xiaoli Wang informed her that if Hangzhou was not paid he would lose his job and be arrested; however, Xiaoli Wang denies ever making statements to that effect. (Def.'s Prop. Findings of Fact and Conc. of Law at 10; Tr. at 139.) Despite this denial, Xiaoli Wang, as PCB points out, did write in a previously faxed letter, dated January 26, 2000, that, in the event he did not receive payment, he would have to face "the management and law in China" and that he did not "want to be put into jail." (Def.'s Exh. 41.)

The court credits the testimony of Richard Blauner and Patricia Blauner. While there were not problems with every shipment of garments, it is clear from the repeated correspondence between the parties that many of the shipments had defects throughout the parties' course of dealing and were not made to the specifications of PCB. As a result, the court is convinced that PCB has interposed valid counterclaims to plaintiff Hangzhou's demand for payment for goods sold and delivered, account stated, and quantum meruit.

## DISCUSSION

When jurisdiction in a federal case is premised on diversity and both parties present [*9] arguments based on New York law, the law of the forum state, it is appropriate for the court to apply New York law. *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 121 n.5 (2d Cir. 1998).

### (1) PCB's Fraud Counterclaim

The court finds that defendant PCB's fraud counterclaim has merit. PCB argues that plaintiff Hangzhou committed fraud when Xiaoli Wang, Hangzhou's merchandiser, showed Richard Blauner the Xiang Gneng factory and high-quality production samples from it in addition to giving Blauner a business card that was not his own but created the impression that Wang was affiliated with Xiang Gneng, written on the card as "Jiang Gneng." (Def.'s Prop. Findings of Fact and Conc. of Law at 12.) PCB also points out that Xiaoli Wang sent Richard Blauner a Buscati jacket and shirt and an Anna and Frank blouse similar to those Blauner had seen while touring Xiang Gneng. (Id. at 13.) PCB argues that such tactics were intended to induce PCB to enter into an agreement with Hangzhou. (Id.) PCB's fraud claim, as such, is more appropriately stylized as a claim for fraud in the inducement. To establish a claim for fraud in the inducement, it is necessary [*10] for a party to show, with specificity, that another party made a representation of material fact that was untrue and that it knew to be untrue or recklessly made at the time it was given, offered to deceive the other party and induce it to rely thereon to its detriment. *Chopp v. Welbourne & Purdy*

*Agency, Inc.*, 135 A.D.2d 958, 522 N.Y.S.2d 367, 368 (3rd Dep't 1987).

Plaintiff Hangzhou argues that PCB's fraud counterclaim must fail because Richard Blauner and PCB, despite knowing, as early as July, 1998 that garments were being produced at Xing Yi instead of Xiang Gneng, did not terminate the business relationship at that time, opting instead to continue to accept garments from Xing Yi. (Pl.'s Prop. Findings of Fact and Conc. of Law at 14.) Under this scenario, Hangzhou argues that PCB effectively ratified the agreement, thereby waiving any claim it might have had to fraud. (Id.)

Hangzhou is correct to the extent that the acceptance of benefits under a contract subsequent to the discovery of fraud constitutes affirmance of the contract and, therefore, acts as a bar to attempts by the defrauded party to rescind the contract. "Whether under a waiver or ratification [*11] analysis, a party may not avoid an agreement on grounds of fraud if, after acquiring knowledge of the fraud, he affirms the contract by accepting a benefit under it." *Agristor Leasing-II v. Pangburn*, 162 A.D.2d 960, 557 N.Y.S.2d 183, 185 (4th Dep't 1990) (involving counterclaim for fraud in the inducement). See also *Barrier Systems, Inc. v. A.F.C. Enterprises, Inc.*, 264 A.D.2d 432, 694 N.Y.S.2d 440, 442 (2d Dep't 1999). However, while a party cannot rescind a contract under these circumstances, it may still maintain a separate action for damages arising from the fraud. "Upon discovering fraud, a purchaser may tender return of the property and seek rescission or he may retain the property and seek recovery of damages deriving from the fraud." *Clearview Concrete Products Corp. v. S. Charles Gherardi, Inc.*, 88 A.D.2d 461, 453 N.Y.S.2d 750, 754 (2d Dep't 1982). See also *Big Apple Car, Inc. v. City of New York*, 204 A.D.2d 109, 611 N.Y.S.2d 533, 534 (1st Dep't 1994) ("it is well settled that a defrauded party to a contract may elect to either disaffirm the contract by a prompt rescission or stand on the contract and thereafter [*12] maintain an action at law for damages attributable to the fraud"); *Potts v. Lambie*, 138 A.D. 144, 122 N.Y.S. 935, 937 (1st Dep't 1910) ("The mere fact, however, of affirming or ratifying the contract by deciding to retain its fruits, as distinguished from approving of the fraud and deceit and waiving any right to redress on account thereof, is insufficient to show a waiver of the cause of action for damages."). In short, ratification does not preempt a claim for damages arising from the fraud. As such, despite its ratification of the contract, PCB is entitled to damages arising from fraud if it can prove that such fraud occurred and that it was damaged thereby.

Based on the evidence offered at trial, the court is convinced that PCB has established the elements for fraud in the inducement. Xiaoli Wang misrepresented himself as the owner of the company listed on the busi-

Case 1:07-cv-04854-PKL     Document 26-2     Filed 08/22/2007     Page 34 of 89

Page 4

2002 U.S. Dist. LEXIS 16578, *; 48 U.C.C. Rep. Serv. 2d (Callaghan) 1367

ness card that he gave to Richard Blauner on his factory tour. (Tr. at 162.) The company listed on the business card was "Hangzhou Jiang Gneng Silk Clothing Manufacturing Company Limited," similar to the name on the sign outside the factory, "Hangzhou Silk Jiang Gneng," that Richard Blauner testified [*13] to seeing. (Tr. at 161-62, 163.) As such, Richard Blauner understood that he was touring the Jiang Gneng factory, (Tr. at 162.), and that Xiaoli Wang, obviously, had some connection to it. This perception on Richard Blauner's part is reinforced by a letter, dated June 19, 1998, in which Blauner tells Xiaoli Wang that "we will provide work for your factory as was visited be [sic] me with [Peter] Wang and you there." (Pl.'s Exh. A1.) As such, Xiaoli Wang knew that Richard Blauner expected the garments to be manufactured at the factory he toured with him and believed him to own yet failed to disclose that the garments would be produced elsewhere once the parties commenced their business dealings. When viewed in conjunction with the Buscati and Anna and Frank samples that Xiaoli Wang sent to PCB after Richard Blauner's return to the United States, the court is thus persuaded that Xiaoli Wang's goal was to induce PCB to do business with Hangzhou by showing Richard Blauner a pristine factory but, ultimately, one that he did not intend to use for producing PCB's goods. As a result, Xiaoli Wang and Hangzhou committed fraud in the inducement with regard to PCB and PCB is entitled to sue [*14] for damages arising from the fraud.

### (2) PCB's Counterclaim for Nonconforming Goods

When a buyer receives goods that are nonconforming, he is deemed to have accepted the goods pursuant to § 2-606 of the Uniform Commercial Code (U.C.C.) when he signifies to the seller that he will retain them despite their nonconformity, fails to reject them after a reasonable opportunity to inspect them, or performs any act inconsistent with the seller's ownership. While acceptance normally obligates the buyer to pay the contract price for the goods, it does not prevent the buyer from interposing a counterclaim for breach of the underlying contract due to the nonconformity. *B. Milligan Contracting Inc. v. Andrew R. Mancini Associates Inc., 174 A.D.2d 136, 578 N.Y.S.2d 931, 932-33* (3rd Dep't 1992). See also *G.W. White & Son, Inc. v. Gosier, 219 A.D.2d 866, 632 N.Y.S.2d 910, 911* (4th Dep't 1995) ("defendant's acceptance of nonconforming goods does not preclude a counterclaim for breach of contract or warranty"); *Sears, Roebuck & Co. v. Galloway, 195 A.D.2d 825, 600 N.Y.S.2d 773, 775* (3rd Dep't 1993). To establish such a claim for breach after [*15] acceptance, the buyer is required to provide timely notice to the seller of the breach. In particular, the U.C.C. provides:

Where a tender has been accepted

> (a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy ....

*U.C.C. § 2-607(3).* Furthermore, according to *U.C.C. § 1-204,* whenever the U.C.C. specifies that some action be taken "within a reasonable time," any time that is not "manifestly unreasonable" may be set by agreement.

It is undisputed that PCB never returned any goods to Hangzhou. (Tr. at 229; Pl.'s Prop. Findings of Fact and Conc. of Law at 5.) PCB also performed acts inconsistent with Hangzhou's ownership of the garments by delivering them to its customers such as Neiman Marcus and Nordstrom's for sale in their stores. As such, PCB clearly accepted all the goods that Hangzhou delivered to it. The question then is whether it is entitled to bring suit for breach of contract or warranty after such acceptance has occurred. The court is convinced that it is.

The contract between Hangzhou and PCB contains the following provision:

> The Sellers [*16] are only responsible for claims against bad workmanship or faulty materials. Claims concerning quality shall be made within 30 days after the arrival of the goods at destination.

(Pl.'s Exh. 2, P 15.) Thirty days to register a claim for nonconformity does not strike the court as a manifestly unreasonable timeframe for PCB to inspect the goods and determine whether they were made to specifications. This is not a case where defects with the merchandise would be especially hard to detect. Indeed, Tsang was able to detect poor pressing in some samples immediately upon their arrival. (See Def.'s Exh. 13.) Since P 15 of the contract comports with *U.C.C. § 1-204* in that the period it sets out is not manifestly unreasonable, see *U.C.C. § 1-204,* supra, and both PCB and Hangzhou agreed to be bound by it when they entered into the contract, the court will defer to it as the standard by which to govern whether PCB gave notice of breach within a reasonable time.

PCB, however, argues that it should not be bound by the terms and conditions of the sales contract since it never received them until almost the end of the business relationship between the parties. (Def.'s Prop. [*17] Findings of Fact and Conc. of Law at 15.) The applicable terms and conditions were listed on the reverse side of the sales contract but, according to PCB, were never included in the faxes that Xiaoli Wang sent to the Blau-

Case 1:07-cv-04854-PKL    Document 26-2    Filed 08/22/2007    Page 35 of 89

Page 5

2002 U.S. Dist. LEXIS 16578, *; 48 U.C.C. Rep. Serv. 2d (Callaghan) 1367

ners, which contained only the front side of the sales contract, with the exception of one fax near the end of the business relationship that contained both. (Id.) Xiaoli Wang claims that he faxed both sides of the sales contract to PCB at the beginning of the business relationship and admits to faxing only the front later on in the relationship. (Tr. at 131.) At any rate, PCB's argument along these lines is unavailing. The fact of the matter is that Cary Tsang, PCB's production consultant, signed many of these sales contracts. (See Tr. at 91.) In this capacity, Tsang testified that he was acting on PCB's behalf and that Patricia Blauner was aware that he was so acting. (Id.) Since Patricia Blauner, an officer of PCB, never thereafter disaffirmed Tsang's actions, PCB's assent to them is implied and it is bound by them. See *New York State Medical Transporters Ass'n, Inc. v. Perales*, 160 A.D.2d 710, 553 N.Y.S.2d 790, 792 (2nd Dep't 1990) [*18] (when principal condones an agent's acts and accepts benefits arising therefrom, the principal is bound by those acts even if the agent exceeded his authority by so acting).

Accordingly, given that PCB approved the agreement between the parties, it will not now be heard to attempt to avoid the contract by claiming ignorance of its provisions. Ignorance of the terms and conditions of a contract is no defense for a party that has already executed the contract. "A party who signs a document without any valid excuse for having failed to read it is 'conclusively bound' by its terms." *Sofio v. Hughes*, 162 A.D.2d 518, 556 N.Y.S.2d 717, 718-19 (2nd Dep't 1990) (quoting *Gillman v. Chase Manhattan Bank*, 73 N.Y.2d 1, 537 N.Y.S.2d 787, 792, 534 N.E.2d 824 (1988)). Especially with regard to sophisticated business people, capable of resort to counsel for advice, as is the situation here, the law presumes that parties to a contract will only sign it if they fully understand its terms and conditions.

Bound by the 30-day period or not, it makes little difference to the vitality of PCB's claims since PCB, in the court's estimation, gave notice of breach within the [*19] 30 days required by the contract. The record is replete with testimony and correspondence between the parties showing that Hangzhou received timely notification of problems with the garments that it delivered to PCB. Many of the garments were routinely inspected upon delivery to PCB and Cary Tsang would notify Hangzhou of the problems, sometimes on the same day the garments were received or soon thereafter. (See, e.g., Exhs. 12, 13, and 33.) In general, the course of dealing between the parties suggests that it was PCB's custom to complain to Hangzhou about defective garments after delivery and upon inspection. Hangzhou does not seem to dispute this. Rather it argues that PCB made no claims against Hangzhou for any amounts due to nonconforming goods and, as such, failed to provide timely notice of

breach. (Pl.'s Prop. Findings of Fact and Conc. of Law at 13.) This argument is unpersuasive, however, because the Official Comment to *U.C.C. § 2-607* states that notice of breach need not involve a claim for damages but instead need only be sufficient to let the seller know that the transaction is troublesome, thereby opening the way for settlement. See *U.C.C. § 2-607*, Official [*20] Comment 4 ("Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy."); *Allied Leather Corp. v. Interco Inc.*, 1993 U.S. Dist. LEXIS 6128, No. 88 Civ. 1394, 1993 WL 159970, at *6 (S.D.N.Y. May 10, 1993) (Francis, M.J.). As the Official Comment further makes clear, the notification provisions of *U.C.C. § 2-607(3)* were intended to prevent commercial bad faith. See *U.C.C. § 2-607*, Official Comment 4. Allowing PCB to benefit from the safeguards afforded by *U.C.C. § 2-607(3)* would not frustrate this purpose. To the extent the court believes that PCB was notifying Hangzhou of nonconforming goods in good faith, with the goal of ensuring that it received high-quality merchandise as opposed to attempting to avoid its obligations under any contracts, PCB should not be denied these protections.

*(3) Damages*

Where a party has been fraudulently induced to enter a contract, the measure of damages is governed by the out-of-pocket rule: the loss occasioned by the fraud or the consideration paid to the party responsible for the fraud, less the value of the goods received. *Deerfield Communications Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 510 N.Y.S.2d 88, 89, 502 N.E.2d 1003 (1986); [*21] *Schlenoff v. Kroll*, 207 Misc. 1082, 141 N.Y.S.2d 370, 374 (1955); *Campers' World Int'l, Inc. v. Perry Ellis Int'l, Inc.*, 2002 U.S. Dist. LEXIS 14909, No. 02 Civ. 453, 2002 WL 1870243, at *5 (S.D.N.Y. Aug. 13, 2002) (Patterson, J.); *Bazzano v. L'Oreal, S.A.*, 1996 U.S. Dist. LEXIS 6529, No. 93 Civ. 7121, 1996 WL 254873, at *3 (S.D.N.Y. May 14, 1996) (Stein, J.). The measure of damages for breach of contract or warranty with respect to accepted goods is the difference between the fair market value of the goods accepted and their fair market value if they had been as warranted. *U.C.C. § 2-714*; *Wayne County Vinegar & Cider Corp. v. Schorr's Famous Pickled Products, Inc.*, 118 Misc. 2d 52, 460 N.Y.S.2d 209, 217 (1983); *Gem Jewelers, Inc. v. Dykman*, 160 A.D.2d 1069, 553 N.Y.S.2d 890, 892 (3rd Dep't 1990) (specifying fair market value as the proper standard).

Furthermore, in an action for fraud a party is allowed to recover consequential damages stemming from the fraud, *Delcor Labs., Inc. v. Cosmair, Inc.*, 169 A.D.2d 639, 564 N.Y.S.2d 771, 772 (1st Dep't 1991), and in an action for breach of contract or warranty with regard to accepted goods, the [*22] buyer can recover

Page 6

2002 U.S. Dist. LEXIS 16578, *; 48 U.C.C. Rep. Serv. 2d (Callaghan) 1367

consequential and incidental damages. *U.C.C. §§ 2-714, 2-715.* Under New York law, consequential damages for a breach of contract or warranty claim can include loss of goodwill, including the loss of customers, future profits, and harm to business reputation. *Toltec Fabrics, Inc. v. August Inc., 29 F.3d 778, 780 (2d Cir. 1994).* Above all, it is well-settled that an award of damages cannot be speculative in nature. "Damages may only be allowed when there is probative evidence of the amount of damages. And while, where damages cannot be precisely proved, proof upon a reasonable basis is sufficient, no damages may be awarded on a purely speculative basis." *Wayne County Vinegar, 460 N.Y.S.2d at 217-18* (footnote omitted). See also *Mohawk Nat'l Bank of Schenectady, N.Y. v. Citizens Trust Co., 38 Misc. 2d 222, 237 N.Y.S.2d 956, 959 (1963)* ("It is fundamental in the law of damages that damages must be proved, and will not be presumed, even though a wrong, such as a breach of contract, is shown.").

Patricia Blauner testified that PCB never returned any garments to Hangzhou and that PCB's customers paid for most of the garments [*23] that PCB shipped to them. (Tr. at 229.) Moreover, while Patricia Blauner did testify as to three chargebacks of $ 1,000 each for merchandise delivered to Jacobson's, (Tr. at 216; Def.'s Exh. 34.), she was unable to conclusively establish, amid a range of possibilities, why these deductions were granted, other than to testify that Jacobson's was not pleased with the merchandise it received. (Tr. at 207, 224.) No witness from Jacobson's was ever called to testify or deposed in this case. At the same time, Cary Tsang testified that a total of five styles of garment shipments were nonconforming--Style 232 in the amount of $ 1,485.20, Style 306 in the amount of $ 1,306.60, Style 2078 in the amount of $ 1,840, Style 3058 in the amount of $ 1,911, and Style 2798 in the amount of $ 1,700--resulting in a total of $ 8,242.80 in damages. (Tr. at 92-99; Pl.'s Exhs. G and H.) Given that PCB received payment from its customers for the bulk of its shipments from Hangzhou and admitted as much, it has not shown that it suffered any immediate injury on account of Hangzhou's actions with the exception of Tsang's testimony as to the $ 8,242.80 worth of nonconforming styles. As such, PCB is entitled to [*24] recover $ 8,242.80 and to offset its outstanding liabilities to Hangzhou by that amount.

PCB has also filed a claim for consequential damages. PCB insists that it is entitled to consequential damages for harm done to its reputation and goodwill by virtue of Hangzhou's failure to deliver conforming goods. (Def.'s Prop. Findings of Fact and Conc. of Law at 14-15.) To succeed on a claim for consequential damages in the form of loss of goodwill, a party must make three showings: 1) that a loss of goodwill did in fact occur; 2)

objective proof of the amount of that loss; and 3) that the loss was caused by the opposing party's breach. *Toltec Fabrics, 29 F.3d at 781.* The evidence PCB proffered at trial falls short of this standard. While the court concedes that PCB is a fledgling business, attempting to establish a reputation in its industry and especially vulnerable to failure to meet its demands, it has failed to show that the termination of several of its accounts had anything to do with Hangzhou's breach. PCB does not offer letters from any of its customers communicating either their growing frustration with garments made by Hangzhou or the reasons underlying their individual [*25] decisions to terminate their business arrangements with PCB. Instead of calling witnesses from each customer to testify as to why it chose to terminate the business relationship, PCB chose to rely on inadmissible hearsay and speculation to make its case. (See, e.g., Tr. at 207, 213-14.)

In addition to failing to prove causation, PCB was unable to present objective proof of the amount of its loss. "The loss must be 'reasonably certain in amount,' and an award cannot stand if based on 'little more than guesswork.'" *Toltec Fabrics, 29 F.3d at 781* (quoting *Robert T. Donaldson, Inc. v. Aggregate Surfacing Corp. of America, 47 A.D.2d 852, 366 N.Y.S.2d 194, 196 (1975)).* PCB produced Exhibit 31, which gave a breakdown of PCB's volume of annual sales by customer, but it was not allowed in evidence because PCB had failed to lay the proper foundation for it sufficient to verify the accuracy of the figures listed therein. (Tr. at 220-23.) Nor did PCB call any experts familiar with the industry or its business to provide informed opinions and market analyses as to the damage to goodwill that PCB claims to have suffered. In the absence of such evidence, the [*26] court is unable to determine damages arising from the loss of goodwill with any measure of certainty.

PCB argues that, based on the evidence it has presented to the court, its damages are hard to quantify. (Def.'s Prop. Findings of Fact and Conc. of Law at 16.) Unfortunately, if PCB cannot even provide a more complete picture as to the consequential damages it has suffered, the court cannot be called upon to pick up the slack for fear that it may alight on some arbitrary award that bears little resemblance to the alleged loss of goodwill sustained by PCB. Unfortunately, the fact that PCB is an upstart only raises the bar it has to meet. "If it is a new business seeking to recover for loss of future profits, a stricter standard is imposed for the obvious reason that there does not exist a reasonable basis of experience upon which to estimate lost profits with the requisite degree of reasonable certainty." *Kenford Co., Inc. v. Erie County, 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 493 N.E.2d 234 (1986).* Since PCB bears the burden of proving the amount of damages it has suffered and has failed to do so, the court cannot award it consequential dam-

2002 U.S. Dist. LEXIS 16578, *; 48 U.C.C. Rep. Serv. 2d (Callaghan) 1367

ages to compensate it for [*27] its alleged loss of good-will.

CONCLUSION

For the foregoing reasons, the court finds in favor of defendant PCB's fraud and breach of warranty counter-claims and awards plaintiff Hangzhou $ 417,716.35 for goods sold and delivered, less damages for fraud and breach of warranty of $ 8,242.80 in PCB's favor, result-ing in a net award to Hangzhou of $ 409,473.55, with interest accruing from November 22, 1999.

**IT IS SO ORDERED.**

Dated: New York, New York

September 4, 2002

**ROBERT L. CARTER**

**U.S.D.J.**

LEXSEE 2003 US DIST LEXIS 13079

**SOTHEBY'S FINANCIAL SERVICES, INC., Plaintiff, v. MICHAEL CHRISTO-PHER BARAN, Defendant. MICHAEL CHRISTOPHER BARAN, Third-Party Plaintiff, v. SOTHEBY'S, INC., Third-Party Defendant.**

**00 Civ. 7897 (BSJ)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 13079*

**July 25, 2003, Decided
July 29, 2003, Filed**

**SUBSEQUENT HISTORY:** Affirmed by *Sotheby's Fin. Servs. v. Baran, 2004 U.S. App. LEXIS 13578 (2d Cir. N.Y., June 29, 2004)*

**DISPOSITION:**     [*1]  Motion for summary judgment granted. Counter-claims dismissed. Third-party claims dismissed.

**COUNSEL:** For Sotheby's Financial Services, Inc, PLAINTIFF: Dean R Nicyper, Flemming, Zulack & Williamson, LLP, New York, NY USA.

For Michael Christopher Baran, DEFENDANT: Gary S Graifman, Kantrowitz, Goldhamer & Graifman, PC, Chestnut Ridge, NY USA.

For Michael Christopher Baran, COUNTER-CLAIMANT: Gary S Graifman, Kantrowitz, Goldhamer & Graifman, PC, Chestnut Ridge, NY USA.

For Sotheby's Financial Services, Inc, COUNTER-DEFENDANT: Dean R Nicyper, Flemming, Zulack & Williamson, LLP, New York, NY USA.

For Michael Christopher Baran, THIRD-PARTY PLAINTIFF: Gary S Graifman, Kantrowitz, Goldhamer & Graifman, PC, Chestnut Ridge, NY USA.

For Sotheby's, Inc, THIRD-PARTY DEFENDANT: Dean R Nicyper, Flemming, Zulack & Williamson, LLP, New York, NY USA.

**JUDGES:** BARBARA S. JONES, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** BARBARA S. JONES

**OPINION**

**MEMORANDUM AND ORDER**

I. INTRODUCTION

Plaintiff Sotheby's Financial Services, Inc. ("SFS') brought this action [*2]   against defendant Michael Christopher Baran ("Baran") to recover an unpaid loan of $ 326,710 plus interest, facility fee and insurance, pursuant to an August 22, 1997 Secured Promissory Note and Security Agreement ("Loan Agreement") and a March 1999 Letter Agreement ("Letter Agreement"). Plaintiff contends that Baran breached the agreements by defaulting on the loan.

Plaintiff moves for summary judgment pursuant to *Federal Rule of Civil Procedure 56(c)*. In opposition to the motion, Baran asserts affirmative defenses and eight counter-claims against SFS alleging: (1) fraud; (2) fraud in the inducement; (3) breach of fiduciary duty; (4) negligence; (5) negligent misrepresentation; (6) conversion; (7) breach of duty as a bailee; and (8) breach of contract. Additionally, Baran filed a third-party complaint against third-party defendant Sotheby's, Inc. ("SI") asserting the previous eight causes of action, along with a ninth claim for indemnification or contribution. [1]

    1     SFS and SI are collectively referred to as "Sotheby's".

[*3]  A. Background

The following facts are undisputed, or are read most favorably to defendant Baran. SI is a New York corporation engaged in the sale of fine art and jewelry by auc-

tion. SFS is a Nevada corporation engaged in financing and loans. Baran is an entrepreneur who founded six companies and has been engaged in the purchase and sale of gems since the early 1990's.

In July 1997, Paul Russo, who was at the time Senior Vice President and Director of the Jewelry Department for SI, contacted Baran regarding a potential business opportunity with two brothers from Brazil, Khaled and Amer Jezzini, who had three rough stones that were to be finished and put up for auction by SI. [2] (Def.'s 56.1 Statement PP 18, 20). Russo told Baran that SI could not directly participate in the venture to finish the stones because it would be a "conflict of interest for [SI] to be identified directly as a partner with one of its clients," but that he would arrange for a loan through SFS so that Baran could get involved in the finishing of the stones. (Def.'s 56.1 Statement PP 22, 24).

> 2  Paul Russo had worked with Baran in the past with respect to gem purchases and gem collections.

[*4] Baran and SFS signed a Secured Promissory Note and Security Agreement dated August 22, 1997 ("Loan Agreement"), under which SFS agreed to loan Baran $ 350,000 for a one-year term. Under the Loan Agreement, Baran granted a security interest in collateral listed in an attached schedule in addition to "all other property of the Maker [Baran], and the proceeds thereof, now or at any time in the future in the possession of [SFS] or any of its affiliated corporations." (Nicyper Aff. Ex. H P 4). The collateral consisted of five valuable gems from Baran's personal collection.

The Loan Agreement specifically provided that it "contained all of the terms and provisions and constitute[d] the entire agreement between the parties with respect to the subject matter hereof" and that it "superseded all prior or contemporaneous written, oral or implied understandings, representations and agreements of the parties." (Nicyper Aff. Ex. H P 7). Additionally, the Loan Agreement stated that "the obligations of the Maker [Baran] hereunder are absolute and unconditional and the payment of any amounts due hereunder shall not be subject to the results of any sale of the Collateral or any defenses, set-offs [*5] or counterclaims of any kind whatsoever." (Nicyper Aff. Ex. H P 1(h)).

Around the same time, Baran entered into an agreement with Amer and Khaled Jezzini, two brothers who were Brazilian dealers of fancy colored gems. Baran agreed to advance $ 347,000 [3] to finance the finishing of two rough stones and to finance completion and delivery of a third stone. (Def.'s 56.1 Statement P 27). Baran prepared a draft letter agreement that included the provision that SI would control the processing and sale of the

stones. (Graifman Aff. Ex. G). The letter agreement additionally provided that "[SI] will not be held responsible for any damages whatsoever involving the processing of the rough diamonds or their outcome if unsold at auction." (Graifman Aff. Ex. G). Pursuant to Baran's Loan Agreement with SFS, Baran directed SFS to wire-transfer the proceeds of his loan from SFS to an account to which the Jezzinis had access. (Baran 7/6/01 Tr. 178:17-179:4, 179:20-23; Nicyper Aff. Ex. M). Additionally, Baran discussed with his lawyer the possibility of establishing a new company, Global Mineral Investments, to raise capital to acquire rough stones that the Jezzinis would deliver in the future, after [*6] the three stones were delivered and sold at auction. (Baran 7/6/01 Tr. 147:25-148:21, 270:12-21). This company was never formed.

> 3  The agreement between Amer Jezzini and Baran states that Baran was to "advance $ 345,000 ... for the purpose of purchasing unprocessed rough diamonds." (Graifman Aff. Ex. G; see also Nicyper Aff. Ex. K). However, the parties appear to agree that $ 347,000 was actually advanced.

A Loan and Consignment Agreement dated July 28, 1997 evidences that SFS had previously agreed to loan Khaled Jezzini $ 400,000 in connection with consignment to SI of two stones for sale at public auction. (Graifman Aff. Ex. I P 1(a)). Paragraph 8 of this agreement provides that proceeds from the sale of the stones would be received and collected as follows:

> first, to [SI] commissions and reimbursable expenses, ... second, to the payment to SFS of all interests accrued on the Loan, ..., third, to the repayment to SFS of the outstanding principal amount of the Loan, fourth, to any outstanding [*7] indebtedness of [Jezzini] to SFS, [SI] or any of their affiliated companies ..., fifth, [SI] will deliver to [Jezzini] the remaining balance of the net proceeds.

(Graifman Aff. Ex. I P 8).

Paragraph 8 was amended by letter signed by Russo on behalf of SI and signed by Shelly Fischer on behalf of SFS, dated September 19, 1997, to provide that "fifth, [SI] will deliver to Mr. Michael Christopher Baran an amount of up to $ 350,000 of any remaining net proceeds" from the sale of the stones at the October 1997 SI jewelry auction. (Nicyper Aff. Ex. L P 1).

The two stones were sold at the October 1997 auction for a total net amount of $ 734,200. [4] Baran received

$ 314,000 of the proceeds. (Baran Aff. P 41). Following the auction, the Jezzinis failed to produce any other rough stones for finishing or for auction, and the relationship between the Jezzinis and Baran deteriorated. For example, the Jezzinis did not return several of Baran's telephone calls. Russo arranged for the Jezzinis to turn over a 44-gemstone collection to SI for Baran so that the Jezzinis could account to Baran for his loss on the investment. (Russo 8/2/01 Tr. 199:8-17, 200:6-21, 204:16-17, 206:5-25). [*8] Baran is currently in possession of the 44 gemstones. (Baran 7/6/01 Tr. 163:16-18).

   4   The pre-sale estimate for the two stones was $ 715,000 to $ 800,000 (Nicyper Aff. Ex. N). However, it is unclear whether Baran ever saw this pre-sale estimate.

Baran paid interest and all out-of-pocket expenses on the Loan for the one-year term of the Loan Agreement, but none of the principal. On March 21, 1999, Baran paid the remaining interest accrued on the Loan to that date and paid $ 23,290 of the outstanding principal amount of $ 350,000. Additionally, at some point following the auction, Baran delivered to SI five additional pieces of jewelry for auction, in part, to pay the loan. ("Additional Gem Collection"). SI still has possession of the Additional Gem Collection.

The Loan Agreement was extended by mutual agreement for another year on March 31, 1999. (Nicyper Aff. P 41; Baran 5/29/01 Tr. 101:13-21; Baran 7/6/01 Tr. 198:22-199:20). In this Letter Agreement, SFS agreed to further extend the terms of the Loan until [*9] March 30, 2000. The Letter Agreement incorporated by reference all the terms of the original Loan Agreement and provided that Baran was obligated to "make principal payments in quarterly installments of at least $ 25,000," the first of which was due June 22, 1999. (Nicyper Aff. Ex. Q PP 1-3). Specifically, the Letter Agreement provided that Baran "confirmed that all of [his] representations and warranties set forth in the [Loan] Agreement are true and correct on and as of the date of this letter agreement" and that the original Loan Agreement, except as amended, "remains and continues in full force and effect." (Nicyper Aff. Ex. Q PP 4-5). Baran failed to pay his quarterly installment on June 22, 1999, and failed to make any subsequent payments. (Nicyper Aff. P 47). Thus, he has been in default on his obligations under the Loan Agreement and Letter Agreement since June 22, 1999.

SFS filed this lawsuit on October 17, 2000 alleging that Baran breached his obligations under the Loan Agreement and Letter Agreement, seeking damages for breach of the Agreements in the amount of $ 406,353.02, plus interest, costs and expenses, and other out-of-pocket expenses.

Baran responded with the [*10] following affirmative defenses against SFS: unclean hands, fraudulent inducement, aiding and abetting fraud, breach of fiduciary duty as a joint venturer, failure to satisfy sums due through sale of collateral at reasonable market value, and failure to liquidate the collateral before seeking judgment for a deficiency. Additionally, Baran asserts eight counter-claims against SFS and nine third-party claims against SI, including (1) fraud; (2) fraud in the inducement; (3) breach of fiduciary duty; (4) negligence; (5) negligent misrepresentation; (6) conversion; (7) breach of duty as a bailee; and (8) breach of contract. Baran also asserts a claim for contribution or indemnification against SI. For the reasons set forth below, the Court grants summary judgment to the plaintiff and third-party defendant, and dismisses all of defendant's counter-claims and third-party claims.

II. DISCUSSION

A. Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment [*11] as a matter of law." *Fed. R. Civ. P. 56(c)*. The moving party has the burden to show the absence of a genuine issue of material fact. Once the moving party has met this burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e)*; *see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. "Speculative and conclusory allegations are insufficient to meet this burden." *Hogan v. 50 Sutton Place S. Owners, Inc., 919 F. Supp. 738, 742 (S.D.N.Y. 1996)*, (citing *Allen v. Coughlin, 64 F.3d 77, 80 (2d Cir. 1995)*; *Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985))*. Further, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson, 477 U.S. at 248.*

Based on the reasoning to follow below, the Court finds that there are no material issues of fact in dispute regarding SFS's claim against Baran, or regarding Baran's counter-claims and third-party claims. Consequently, summary judgment is appropriate.

B. Baran's [*12] Default and Breach of the Loan Agreement

Baran does not dispute that he signed the original Loan Agreement and the 1999 Letter Agreement reaffirming his obligations under the original Loan Agreement, nor does he dispute that he ceased payment of his

obligations under those Agreements. Instead, he opposes summary judgment mainly on the ground that he was fraudulently induced to enter into the Loan Agreement with SFS by Paul Russo of SI, and that SI and SFS breached a fiduciary duty owed to him, either as an advisor or as a member of a joint venture between Baran, the Jezzinis, SI, and SFS. Specifically, Baran contends that (1) Russo told Baran that a third stone, an "Additional Pink Gemstone," was to be part of the transaction, (2) Russo told Baran that he would arrange for Baran to receive a loan from SFS to enable the joint venture to go forward and that five of Baran's gemstones would constitute the collateral for the loan, (3) Russo told Baran that he would be able to pay back the loan from the sale of the first two stones, that the proceeds from the sale of the third stone would be profit, and that the third stone would be sold for a substantial amount, (4) Russo arranged [*13] the meetings between Baran and the Jezzinis, (5) Baran was informed only minutes before signing the loan documents and giving SFS his approval to wire $ 347,000 to the Jezzinis that the money he was borrowing to complete the transaction would not be the first lien against the first two stones because SFS had already advanced $ 400,000 against those gems, (6) Russo assured Baran that the "large pink stone" would sell for over $ 1 million dollars, that Russo said it was a great deal for all of the parties, however, the large pink stone only sold for $ 750,000, [5] (7) Russo knew that the large pink stone would not sell for $ 1 million, (8) Russo assured Baran that the third stone would be delivered within 72 hours of the wire transfer of funds to the Jezzinis, and (9) Russo continued to assure Baran that the third stone was forthcoming at the auction.

> 5    Baran additionally contends that Russo fraudulently raised the final bid price by pretending that a bidder was on the telephone, although there was actually no bidder on the telephone.

[*14] C. Baran's Affirmative Defenses

1. The Merger Clause and "No Right to Set-Off" Clause Do Not Bar All of Baran's Defenses

Sotheby's contends that certain clauses of the Loan Agreement bar all of Baran's defenses, counter-claims, and third-party claims, and that summary judgment should be granted on that basis alone. The Court does not agree.

The Loan Agreement between SFS and Baran contained the following clause:

> This agreement, including the Schedule hereto, contains all of the terms and provisions and constitutes the entire agreement between the parties with respect to

the subject matter hereof. This agreement supersedes all prior or contemporaneous written, oral or implied understandings, representations and agreements of the parties relating to the subject matter of this Agreement .... No provisions of this Agreement may be amended, supplemented or waived other than by means of a writing signed by the Maker [Baran] and [SFS].

(Nicyper Aff. Ex. H P 7). The attached schedule described five gemstones as the "Collateral".

The Loan Agreement also contained a clause which stated that "the obligations of the Maker [Baran] hereunder are absolute and unconditional [*15] and the payment of any amounts due hereunder shall not be subject to the results of any sale of the Collateral or to any defenses, set-offs or counterclaims of any kind whatsoever." (Nicyper Aff. Ex. H P 1(h)).

Because of the language contained in the above clauses, Sotheby's contends that Baran may not now claim that he was fraudulently induced to enter into the contract. The Court does not agree that this language is specific enough to bar Baran's defense of fraudulent inducement.

It is well settled that under New York law, [6] "if a contract recites that all of the parties' agreements are merged in the written document, parol evidence is not admissible to vary, or permit escape from, the terms of the integrated contract." *Mfrs. Hanover Trust Co. v. Yanakas, 7 F.3d 310, 315 (2d Cir. 1993)* (citing *Fogelson v. Rackfay Construction Co., 300 N.Y. 334, 340, 90 N.E.2d 881, 884 (1950)).* However, a general merger clause may not operate to bar parol evidence that a party was fraudulently induced to enter into the contract. *See Mfrs. Hanover Trust Co., 7 F.3d at 315.* Consequently, "a party may escape liability under the contract by establishing [*16] that he was induced to enter the contract by fraud." *Mfrs. Hanover Trust Co., 7 F.3d at 315* (citations omitted).

> 6    The parties appear to agree that New York law applies to the claims in this action. Accordingly, the Court will apply New York law. *See Int'l Bus. Machines Inc. v. Liberty Mut. Fire Ins. Co., 303 F.3d 419, 423 (2d Cir. 2002).*

A party may, however, be precluded from asserting that he was induced to enter into a contract in reliance upon certain misrepresentations where a contract specifically disclaims the existence of reliance on those specified representations. *See Mfrs. Hanover Trust Co., 7 F.3d at 315* (citations omitted). The Second Circuit has

held that under New York law, a contract must contain explicit disclaimers of the specific representations that form the basis of the claim for fraudulent inducement in order to be considered sufficiently particular to bar that defense. *See Grumman Allied Indus., Inc. v. Rohn Indus., Inc.*, 748 F.2d 729, 735 (2d Cir. 1984). [*17]

In the present case, the Court finds that the disclaimers at issue in the Loan Agreement were not sufficiently explicit to bar the defense of fraudulent inducement. *See, e.g., Mfrs. Hanover Trust Co., 7 F.3d at 317; Rhythm & Hues, Inc. v. The Terminal Marketing Co., 01 Civ. 4697, 2002 U.S. Dist. LEXIS 10908, at *21 (S.D.N.Y. June 18, 2002).* Consequently, the Court must consider whether Baran is precluded from relying on that defense for some other reason.

2. Baran's Ratification of the Loan Agreement Bars His Defense of Fraudulent Inducement

Sotheby's contends that Baran is precluded from claiming the affirmative defenses of fraud and fraudulent inducement [7] because he ratified the Loan Agreement when he continued to make payments for several years following the alleged fraud and when he executed a Letter Agreement, dated March 31, 1999, re-affirming his obligation to pay under the Loan Agreement. The Court agrees.

> 7    Although Baran purports to assert two separate defenses of fraud and fraudulent inducement, the elements of the defenses are the same. *See Wells Fargo Bank Northwest, N.A. v. Taca Int'l Airlines, S.A., 247 F. Supp. 2d 352, 364 (S.D.N.Y. 2002).* Consequently, the Court will simply refer to this claim as fraudulent inducement.

[*18] It is well settled that under New York law, a contract is voidable when it is the product of fraud. *Landau v. Am. Int'l Group, Inc., 97 Civ. 3465, 1997 U.S. Dist. LEXIS 14325, at *7 (S.D.N.Y. Sept. 23, 1997), aff'd, 164 F.3d 618 (2d Cir. 1998).* Under the doctrine of ratification, however, a party loses the right to be released from his obligations under a voidable contract if: "(1) the circumstances that made the contract voidable have ceased to exist; and (2) either (a) the party manifests his intention to affirm the contract or (b) acts with respect to anything that he has received in a manner inconsistent with disaffirmance." *Landau, 97 Civ. 3465, 1997 U.S. Dist. LEXIS 14325, at *8 (citations omitted).*

Where a party ratifies a contract, he cannot succeed on defenses asserting that he should not be bound by the contract. *See Daniel Gale Assocs., Inc. v. Hillcrest Estates, Ltd., 283 A.D.2d 386, 387, 724 N.Y.S.2d 201, 202 (2d Dep't 2001)* (rejecting misrepresentation defense to contract where defendant's partial payment was consistent with agreement and effectively ratified the agree-

ment); *Lindenwood Dev. Corp. v. Levine, 178 A.D.2d 633, 634, 578 N.Y.S.2d 209, 210 [*19] (2d Dep't 1991)* (fraud in the inducement defense barred by plaintiffs' "failure to disaffirm or take action when learning of the alleged fraud" and by plaintiffs' having "regarded the contracts as valid until they were sued" by making partial payments in accordance with agreement.); *Luftig v. Luftig, 239 A.D.2d 225, 227, 657 N.Y.2d 638, 659, 657 N.Y.S.2d 658 (1st Dep't 1997)* (holding that failure to reject payment under agreement for three years precluded fraudulent inducement counter-claim.)

Moreover, a party who re-affirms his contractual obligations in a subsequent written agreement is precluded from asserting defenses to those obligations under that agreement. *See Barrier Sys. v. A.F.C. Enters., Inc., 264 A.D.2d 432, 694 N.Y.S.2d 440 (2d Dep't 1999)* (holding that after retaining benefit of agreement and entering subsequent modification agreement, defendant is precluded from asserting fraud in the inducement).

In this case, the Court finds that Baran repeatedly ratified his obligations to pay SFS under the Loan Agreement, and is thus precluded from asserting the affirmative defense of fraudulent inducement. Baran learned that the "large pink stone" [*20] sold for significantly less than $ 1 million in late October, 1997, when the auction occurred. Additionally, Baran knew that the third stone, which the parties allegedly agreed would be part of the transaction, was not delivered within 72 hours of the wire transfer of Baran's funds to the Jezzinis. Indeed, Baran was aware that the third stone was never delivered, yet he continued to make payments under the Loan Agreement. Consequently, Baran was aware of the falsity of any alleged misrepresentations made by Russo at the latest, by the end of October 1997. However, Baran continued to make payments pursuant to the Loan Agreement well after this date. Baran paid the interest and all out-of-pocket expenses on the Loan during the entire one-year term of the Loan Agreement, although he did not pay any of the principal. (Nicyper Aff. P 39; Baran 5/29/01 Tr. 101:13-21; Baran 7/6/01 Tr. 198:22-199:20). Moreover, on March 21, 1999, Baran paid the remaining interest accrued on the Loan and paid $ 23,290 of the outstanding principal amount of $ 350,000, leaving $ 326,710 of the principal amount outstanding. (Baran 5/29/01 Tr. 102:6-13, 106:13-18). On March 31, 1999, Baran agreed to extend the [*21] term of the Loan Agreement for another year and executed a Letter Agreement whereby he explicitly "confirmed that all of [his] representations and warranties set forth in the [Loan] Agreement are true and correct on and as of the date of this letter agreement" and that the terms of the Loan Agreement, except as amended, "remain[] and continue[] in full force and effect." (Nicyper Aff. Ex. Q PP 4, 6).

In sum, Baran's actions, up until the time he was sued, were entirely consistent with his intention to comply with the terms of the Loan Agreement. Indeed, Baran admitted that if he had the assets or cash, he would have paid off his loan to SFS in its entirety. (Baran 5/29/01 Tr. 106:1-19, 107:3, 108:13-16, 109:25-110:24; Baran 7/6/01 Tr. 199:14-19, 200:11-12, 206:18-20). Also significant is the fact that Baran never tried to rescind the Loan Agreement nor argue that he was fraudulently induced to enter into the Loan Agreement until SFS filed suit against him.

While Baran concedes that he made payments under the Loan Agreement, he contends that he only made these payments during a period when SFS, SI and Baran were attempting to amicably resolve their differences. Specifically, [*22] Baran claims that his payments under the Loan Agreement were made during the period that Russo was in contact with the Jezzinis in an attempt to secure the third stone, in addition to other stones, and that SI delivered to Baran 44 gemstones that the Jezzinis had given to SI in an effort to compromise. It was only under these circumstances, Baran contends, that he continued to make payments under the Loan Agreement. However, even if the delivery to Baran of the 44 gemstones constitutes some effort to compromise, it is undisputed that these efforts ceased in February 1998. (Baran 5/29/01 Tr. 67:17-68:7; Baran 7/6/01 Tr. 163:4-18; Russo 8/2/01 Tr. 221:6-22). Moreover, Baran fails to provide any evidence that any discussions regarding his obligations under the Loan Agreement took place after February 1998. Not only did Baran continue to make payments under the Loan Agreement well after that date, but he affirmatively endorsed a new Letter Agreement acknowledging his obligations under the original Loan Agreement in March 1999. Consequently, the Court finds that there is no material issue of fact with respect to Baran's ratification of the Loan Agreement. [8]

> 8    Additionally, the Court notes that Baran's argument that he acted within a reasonable time to rescind the Loan Agreement is meritless. Indeed, even without Baran's affirmative re-acknowledgment of his obligations under the Loan Agreement, the time delay between the alleged fraudulent inducement and Baran's claim that he was fraudulently induced would bar Baran's defense. It is well settled that a party wishing to rescind a contract due to fraud in the inducement must act promptly. See Miller v. Cont'l Shipbuilding Corp., 265 F. 158, 161 (2d Cir. 1920); Int'l Motor Sports Group, Inc. v. Gordon, 98 Civ. 5611, 1999 U.S. Dist. LEXIS 12610, at *16 (S.D.N.Y. Aug. 16, 1999) (citations omitted); West Tsusho Co. v. Prescott Bush & Co., 92 Civ. 3378, 1993 U.S. Dist. LEXIS 8467, at *11 (S.D.N.Y. June 23, 1993). Upon discovery of the fraud, he must immediately announce his intention to rescind the contract. See Miller, 265 F. at 161. If he remains silent he has elected to waive his rights to be released from his obligations. See Miller, 265 F. at 161. In this case, three years passed between the alleged fraud and the commencement of proceedings when Baran first asserted that he was fraudulently induced to enter into the agreement. Consequently, he cannot now claim that he acted within a reasonable time to rescind the agreement.

[*23]    3. The Affirmative Defense of Breach of Fiduciary Duty Based on a Joint Venture is Unavailable

Baran also asserts the defense of breach of fiduciary duty based upon an alleged oral joint venture agreement between SI, SFS, Baran and the Jezzinis. The Court finds that this affirmative defense fails because there was no joint venture between SI, SFS, Baran and the Jezzinis.

Pursuant to New York law, in order to establish the existence of a joint venture, all five of the following elements must exist: "(1) two or more persons must enter into a specific agreement to carry on an enterprise for profit; (2) their agreement must evidence their intent to be joint venturers; (3) each must make a contribution of property, financing, skill, knowledge, or effort; (4) each must have some degree of joint control over the venture; and (5) there must be a provision for sharing of both profits and losses." Itel Containers Int'l Corp. v. Atlanttrafik Express Serv., Ltd., 909 F.2d 698, 701 (2d Cir. 1990) (citations omitted); see also Dinaco, Inc. v. Time Warner, Inc., 98 Civ. 6422, 2002 U.S. Dist. LEXIS 20173, at *4-5 (S.D.N.Y. Oct. 22, 2002).

In this case, there is [*24] no indication that the parties intended for a joint venture to exist. Baran points to the fact that Russo was the one who first involved Baran in the venture and the fact that SI was to be the exclusive auctioneer of the gems involved in the transaction as evidence that a joint venture existed. Additionally, Baran contends that a letter dated September 19, 1997 in which the signatures of Russo (for SI), Fischer (for SFS), Khaled Jezzini, and Baran appear establishes the existence of a joint venture between the parties. The Court disagrees that these facts suffice to create a triable issue of fact as to whether a joint venture existed between the parties.

While the letter establishes that there were some dealings between the four parties, Baran has failed to present facts sufficient to meet all the elements required for the existence of a joint venture. First, Baran has failed to present any facts that all of the parties intended to enter into a joint venture. Indeed, Baran conceded that Russo told him that SI could not directly participate as a

partner because it would be a "conflict of interest for [SI] to be identified directly as a partner with one of its clients," but that instead [*25] he would arrange for Baran to obtain a loan through SFS so that Baran could enter into business with the Jezzinis. (Def.'s 56.1 Statement PP 22, 24).

Additionally, Baran fails to present evidence that there was any agreement between the parties to share losses. Because Baran has failed to produce any evidence to allow a reasonable juror to find that a joint venture existed between SFS, SI, Baran and the Jezzinis, the Court finds Baran's affirmative defense of breach of a fiduciary duty based on a joint venture agreement to be without merit. See, e.g.,  Dinaco Inc., 2002 U.S. Dist. LEXIS 20173, at *6.

4.  Baran's Remaining Affirmative Defenses are Without Merit

In his amended answer, Baran additionally asserts the affirmative defenses of unclean hands, aiding and abetting SI to defraud him, and failure to liquidate the collateral enumerated in the security agreement in a commercially reasonable manner before seeking judgment. All of these defenses are wholly without merit.

First, Baran does not provide any evidence to support a defense of unclean hands. He does not allege any wrongdoing on the part of SFS. Instead, he admits that SFS did nothing wrong, and relies [*26] solely on the acts of SI, through Russo. Moreover, he does not address this affirmative defense in his papers. Consequently, the Court finds this defense to be without merit.

Second, the plain language of the Loan Agreement, as discussed above, precludes Baran's claim that SFS was required to liquidate the collateral before seeking to recover for default on the Loan Agreement. As discussed above, the Loan Agreement provides that Baran's obligations "are absolute and unconditional and the payment of any amounts due hereunder shall not be subject to the results of any sale of the Collateral or to any defenses, set-offs or counterclaims of any kind whatsoever". (Nicyper Aff. Ex. H P 1(h)). Consequently, Baran cannot rely on the defense that the Agreement requires SFS to liquidate the collateral before seeking judgment for default. See, e.g.,  Chemical Bank v. Kaufman, 142 A.D.2d 526, 527 N.Y.S.2d 582, 583 (1st Dep't 1988) (reversing denial of summary judgment and rejecting defendant's contention that "plaintiff failed to act in a 'commercially reasonable manner' and first liquidate certain collateral to reduce the amount of the debt before proceeding on the guarantee"  [*27]  where defendant [] "specifically agreed ... that impairment of collateral would constitute no defense to an action on the guarantees.") Moreover, Baran does not point to any statute that would require SFS to liquidate the collateral before seeking judgment.

Indeed, Sotheby's points to numerous New York cases that state that secured parties are permitted to retain collateral while awaiting payment on loan obligations. See, e.g., McGrath v. Carnegie Trust Co., 221 N.Y. 92, 95, 116 N.E. 787, 788 (1917) (Cardozo, J.) (stating that "[a] creditor may not be required to surrender any part of his collateral till payment has been made in full."); Reich v. Bowery Sav. Bank, 183 A.D.2d 884, 885-886, 583 N.Y.S.2d 978, 979-80 (2d Dep't 1992) (holding that bank was entitled to hold collateral from personal loan even after personal loan was paid because corporate loan was in default.) Consequently, this argument is also meritless.

D. Baran's Counter-Claims and Third-Party Claims

1.  Baran's Claim for Fraudulent Inducement is Meritless Because the Court has previously found that Baran ratified his obligations under the Loan Agreement by continuing to pay SFS [*28]  under the Agreement, and by re-affirming his obligations under the Loan Agreement by signing the Letter Agreement in March 1999, Baran's counter-claims and third-party claims for fraudulent inducement are also without merit. Consequently, those claims are dismissed.

2.  Baran's Third-Party Claims for Breach of Fiduciary Duty and Negligence Against SI are Barred by the Statute of Limitations

Sotheby's contends that Baran's claims against SI for breach of fiduciary duty, negligence, and negligent misrepresentation must be dismissed because they are barred by the applicable statute of limitations. The Court agrees with respect to the claims for breach of fiduciary duty and negligence.

New York courts apply either a three-year or a six-year statute of limitations claim to breach of fiduciary duty claims, depending upon the remedy sought. See Loengard v. Santa Fe Indus., Inc., 70 N.Y.2d 262, 266, 519 N.Y.S.2d 801, 514 N.E.2d 113 (1987). Pursuant to N.Y. C.P.L.R. § 214(4), claims for damages from a breach of a fiduciary duty have a three-year statute of limitations. See Cooper v. Parsky, 140 F.3d 433, 440-41 (2d Cir. 1998); Svenska Finans Int'l BV v. Scolaro, Shulman, Cohen, Lawler & Burstein P.C., 37 F. Supp. 2d 178, 183 (N.D.N.Y. 1999); [*29]  Geren v. Quantam Chem. Corp., 832 F. Supp. 728, 735 (S.D.N.Y. 1993). Likewise, under New York law, claims for negligence are governed by a three-year statute of limitations. See N.Y. C.P.L.R. § 214(4); Herrington v. Verrilli, 151 F. Supp. 2d 449, 460 (S.D.N.Y. 2001). Moreover, where a party is added to a lawsuit by way of a third-party complaint, claims against the third-party defendant are deemed interposed at the time of service of the third-party complaint. See  Fitzpatrick v. City of New York,

*714 N.Y.S.2d 185, 189, 185 Misc. 2d 79, 83 (Sup. Ct. N.Y. Cty. 2000).*

Because Baran seeks money damages for his breach of fiduciary duty claims, the statute of limitations on this claim is three years. Baran filed his third-party complaint against SI on December 21, 2000. The events that form the bases of Baran's breach of fiduciary duty and negligence claims occurred, at the latest, in October 1997, more than three years prior to the commencement of the third-party action. Consequently, Baran's claims for breach of fiduciary duty and negligence in the third-party complaint are time barred and will be dismissed. *See Fitzpatrick, 714 N.Y.S.2d at 185, 185 Misc.2d at 83* [*30] (holding that negligence claim asserted in an amended complaint was time barred where third-party action was not commenced until after the statute of limitations had run on the negligence claim); *Polo v. City of New York, 193 A.D.2d 411, 412, 597 N.Y.S.2d 74 (1st Dep't 1993)* (refusing to permit plaintiff to assert claims against third-party defendants where third-party complaint was served after the expiration of the underlying statute of limitations period.)

3. Baran's Negligent Misrepresentation Claim Against SI is Meritless

Under New York law, claims for negligent misrepresentation based on fraud are governed by a six-year statute of limitations period. *See N.Y. C.P.L.R. § 213(8); Calcutti v. SBU, Inc., 224 F. Supp. 2d 691, 701 (S.D.N.Y. 2002)* (stating that "in New York, a negligent misrepresentation claim that is based on the same factual situation as a fraud claim is subject to a six-year statute of limitations.") (citations omitted). Consequently, Baran's claim against SI for negligent misrepresentation is not time-barred and cannot be dismissed on this ground.

The elements of a claim for negligent misrepresentation under New York law [*31] "are that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000)* (citations omitted).

Baran alleged that he entered into the transaction with the Jezzinis based on Russo's representation that the "large pink stone" would sell for over $ 1 million, a fact Russo knew was false, and that a third stone would be provided for auction.

In this case, Baran's negligent misrepresentation claim against SI fails because neither of Russo's alleged statements are actionable. First, Russo's alleged statement that the "large pink stone" would sell for over $ 1 million was a mere prediction with respect to future events. *See Sheth v. New York Life Ins. Co., 273 A.D.2d 72, 74, 709 N.Y.S.2d 74 (1st Dep't* [*32] *2000)* (holding that "the purported misrepresentations relied upon by plaintiffs may not form the basis of a claim for ... negligent misrepresentation since they are ... opinions of value or future expectations.").

Second, Russo's alleged statement that a third stone would be involved in the transaction was merely a promise as to a future event, and thus not actionable. *See Murray v. Xerox Corp., 811 F.2d 118, 123 (2d Cir. 1987)* (stating that "promises of future conduct are not actionable as negligent misrepresentations."); *see also Hydro Investors, Inc., 227 F.3d at 20-21* (stating that "the alleged misrepresentation must be factual in nature and not promissory or relating to future events that might never come to fruition."). Consequently, Baran's claim against SI for negligent misrepresentation will be dismissed.

5. Baran's Counter-Claims for Breach of Fiduciary Duty, Negligence, and Negligent Misrepresentation Against SFS are Meritless

Baran claims that SFS is liable to him for breach of fiduciary duty, negligence, and negligent misrepresentation. However, it is undisputed that any alleged breach of fiduciary duty, negligence, or negligent misrepresentation [*33] occurred based on the acts of Paul Russo, who was not employed by SFS. (Fischer 6/26/01 Tr. 17:4-6). In fact, Baran concedes that he found SFS reasonable to deal with and was not "disappointed with them." (Baran 5/29/01 Tr. 107:9-13). Because Baran merely asserts that SFS is an "affiliate" of SI without providing any evidence with respect to the relationship between the two companies, he has failed to adequately allege that there is some ground upon which to hold SFS liable for the acts of Russo. [9] Consequently, the Court dismisses Baran's claims against SFS for breach of fiduciary duty, negligence, and negligent misrepresentation.

9    Although Russo's signature appears on the Loan Agreement above the line reserved for a signature on behalf of SFS, the signature of Shelley Fischer, Senior Vice-President of SFS, superseded Russo's signature. There is no dispute that Russo worked for SI, not SFS.

6. Baran's Claims Against SI and SFS for Conversion and Breach of Duty as a Bailee are Meritless

Baran also asserts [*34] counter-claims against SFS and third-party claims against SI for conversion and

breach of duty as a bailee over the collateral held by SI, including the "Additional Gem Collection" Baran delivered to SI. The Court finds that there is no material issue of fact with respect to these claims.

As discussed above, pursuant to the Loan Agreement, Baran granted a security interest in collateral listed in an attached schedule in addition to "all other property of the Maker [Baran], and the proceeds thereof, now or at any time in the future in the possession of [SFS] or any of its affiliated corporations." Moreover, the Loan Agreement was explicit that SFS could, upon the occurrence of default, and in its "sole discretion ... proceed against [Baran] and/or against any or all of the Collateral in any order or combination as [SFS] may from time to time see fit." *See McGrath v. Carnegie Trust Co., 221 N.Y. 92, 95, 116 N.E. 787, 788 (1917)* (stating that "[a] creditor may not be required to surrender any part of his collateral till payment has been made in full."); *Reich v. Bowery Sav. Bank, 183 A.D.2d 884, 884-85, 583 N.Y.S.2d 978, 979-80 (2d Dep't 1992)* [*35] (holding that bank was entitled to retain collateral from personal loan even after personal loan was paid because corporate loan was in default). Further, Baran has expressly admitted that he delivered the "Additional Gem Collection" that is the basis of this claim to SI, at least in part, to pay off the SFS Loan. (Nicyper Aff. Ex. B P 25). Because those items were given for this express purpose, Baran cannot now claim that SFS and SI, by holding them, are liable for conversion or breach of a bailee's duty. Accordingly, Baran's claims for conversion and breach of bailee's duty are without merit, and these claims will be dismissed.

7. Baran's Breach of Contract Claims Against SI and SFS are Without Merit

Defendant's claims for breach of contract also lack merit. These claims are based on the assumption that SFS and SI breached a duty of good faith and fair dealing with respect to an agreement to enter into a joint venture. As discussed above, the Court finds that there was no joint venture between the parties. Consequently, there is no material issue of fact with respect to Baran's breach of contract claims, and these claims are dismissed.

8. Baran's Claim for Contribution or Indemnification [*36] Against SI is Meritless

Finally, Baran brings a claim against SI for contribution or indemnification for any amount he is required to pay to SFS. The Court finds that neither a claim for contribution nor indemnification is available to Baran.

New York law is clear that "contribution claims are unavailable when the underlying claim is for purely economic loss resulting from the breach of contractual obligations." *Intellisec v. Firecom, Inc., 00 CV 3557, 2001*

*U.S. Dist. LEXIS 2619, at *43 (E.D.N.Y. Feb. 1, 2001)* (citing *Morse/Diesel, Inc. v. Trinity Indus., Inc., 859 F.2d 242 (2d Cir. 1988)*). In this case, SFS seeks to recover for economic loss based upon Baran's default on the loan. Accordingly, a claim for contribution from SI is unavailable and this claim will be dismissed.

Likewise, the Court finds that a claim for indemnification is also unavailable. "The predicate of common-law indemnity is vicarious liability without actual fault on the part of the proposed indemnitee." *Trustees of Columbia Univ. v. Mitchell/ Giurgola Assocs., 109 A.D.2d 449, 492 N.Y.S.2d 371, 375 (1st Dep't 1985)*. In order for a claim for indemnification to [*37] exist, a party must have an express right to indemnification by way of a contract, or a special relationship between the parties must exist such that a right to indemnification is implied. *See Sabater v. Lead Indus. Ass'n, 00 Civ. 8026, 2001 U.S. Dist LEXIS 14758, at *15 (S.D.N.Y. Sept. 21, 2001)*. Baran does not allege that there is a provision of any agreement by which SI has agreed to indemnify him. Nor has he alleged the existence of any special relationship sufficient to create a right of indemnification. Examples of such special relationships include "employer/employee, building owner/independent contractor, and motor vehicle owner/negligent driver." *Sabater, 2001 U.S. Dist. LEXIS 14758, at *15.* Accordingly, Baran's claim for indemnification is dismissed.

III. CONCLUSION

For the reasons set forth in this opinion, plaintiff and third-party defendant's motion for summary judgment is granted in its entirety. Plaintiff is entitled to Judgment as set forth below. The defendant's counter-claims against SFS shall be dismissed. Likewise, each and every third-party claim against SI shall be dismissed. The Clerk of the Court is directed to enter Judgment [*38] as set forth below and close the case.

IV. JUDGMENT

The plaintiff has submitted an affidavit supporting a judgment of $ 549,002.39 plus all interest, expenses, and costs accruing until the date of payment in full to SFS. (Fischer Aff. PP 5, 6). Because this affidavit is unopposed and is based entirely on the provisions of the Loan Agreement, the Clerk is directed to enter judgment for plaintiff in the amount of $ 549,002.39, plus all interest, expenses, and costs accruing until the date of payment in full.

**SO ORDERED:**

**BARBARA S. JONES**

**UNITED STATES DISTRICT JUDGE**

Dated: July 25, 2003

LEXSEE 2007 US DIST LEXIS 49641

**MANHATTAN MOTORCARS, INC., Plaintiff, - against - AUTOMOBILI LAM-
BORHINI, S.p.A., CHAMPION MOTOR GROUP, INC., and CHAMPION MO-
TORS, INC., d/b/a LAMBORGHINI LONG ISLAND, Defendants.**

**07 Civ. 978 (SAS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2007 U.S. Dist. LEXIS 49641*

**July 9, 2007, Decided
July 9, 2007, Filed**

**COUNSEL:** [*1] For Plaintiff: David M. Kolko, Esq.,
Michael Cohen, Esq., Phillips Nizer LLP, New York,
New York.

For Defendants: Daniel V. Gsovski, Esq., Keith A. Fre-
derick, Esq., Herzfeld & Rubin, P.C., New York, New
York; James R. Vogler, Esq., Randall L. Oyler, Esq.,
David M. Wiese, Esq., Barack Ferrazzano Kirschbaum
Perlman & Nagelberg LLP, Chicago, Illinois.

**JUDGES:** Shira A. Scheindlin, U.S.D.J.

**OPINION BY:** Shira A. Scheindlin

**OPINION**

**OPINION AND ORDER**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

**I. INTRODUCTION**

   Manhattan Motorcars, Inc. ("Manhattan") brings this
diversity action [1] against Automobili Lamborghini,
S.p.A. ("Lamborghini" or "Defendant") claiming com-
mon-law fraud, breach of contract, breach of implied
covenant of good faith and fair dealing, unjust enrich-
ment, breach of fiduciary duty, negligent misrepresenta-
tion, violation of the New York Franchised Motor Vehi-
cle Dealer Act, and account stated. [2] The claims arise
from the circumstances surrounding Manhattan's opera-
tion of a Lamborghini dealership and its attempts to ex-
pand dealership operations into Westhampton, New
York. Manhattan seeks over fifty million dollars in dam-
ages, as well as five million dollars in punitive damages.
Lamborghini now moves to dismiss all claims brought
[*2] against it for failure to satisfy *Rules 9(b)* and

*12(b)(6) of the Federal Rules of Civil Procedure.* Man-
hattan opposes this motion. For the following reasons,
defendant's motion to dismiss is granted in part and de-
nied in part.

> 1   This Court has jurisdiction over this matter
> pursuant to *section 1332(a) of title 28 of the
> United States Code.*

> 2   Manhattan alternately characterizes its claim
> in account stated as a claim for "Monies Owed."
> *See* Amended Complaint ("Am. Compl.") at 17.
> The Court has found no authority for the exis-
> tence of such a claim.

**II. BACKGROUND** [3]

   3   The following facts, drawn from the Amended
   Complaint, are assumed to be true for the pur-
   poses of this motion.

**A. The Parties**

   Manhattan, a New York corporation, [4] "is a dealer
and seller of expensive, unique and top of the line auto-
mobiles including Rolls Royce, Bentley, Porsche, and
Lamborghini, with its primary showroom located at 270
Eleventh Avenue, New York . . . ." [5] Lamborghini is an
Italian-based company which manufactures and sells the
Lamborghini automobile through dealerships located
throughout the world, including New York. [6]

> 4   *See* Am. Compl. P 1.

> 5   *Id.* P 2.

> 6   *See id.* PP 3-4.

## B. The 1996 Agreement

In 1996, Lamborghini sought to induce [*3] Manhattan to enter into a dealer agreement with it for the marketing and sale of Lamborghini automobiles from plaintiff's Manhattan showroom. [7] In order to induce Manhattan to become a dealer, Lamborghini, through its representatives, advised Manhattan's president and owner, Brian Miller, that if Manhattan became a dealer, it would have "an exclusive territory in and throughout New York State for the marketing and sale of Lamborghini vehicles for as long as [Manhattan] acted as a dealer." [8] According to Manhattan, this representation was a necessary inducement due to the unique nature of the Lamborghini automobile, which bears a price tag "well in excess of $ 150,000" [9] as well as high insurance and maintenance costs. [10] These factors result in a limited market for the Lamborghini automobile. [11] In fact, competition is so "stiff" among dealers that a reduction in sales volume of even a few vehicles has the potential to "significantly impair the revenues and profitability" of a Lamborghini dealership. [12] Moreover, Lamborghini allegedly requires its dealers to satisfy "exacting design, construction and showroom standards in order to maintain the prestige and special image of the Lamborghini." [*4] [13] The costs of compliance with these standards, which are borne by the dealers, are "substantial." [14] As a result of these considerations, Lamborghini allegedly must offer potential dealers an exclusive territory in order to persuade them to enter into dealer agreements, which would likely be unprofitable otherwise. [15]

7  See id. P 11.

8  Id. P 16.

9  Id. P 12.

10  See id. P 13.

11  See id. Manhattan alleges that approximately five hundred Lamborghini automobiles are sold each year through approximately forty-seven Lamborghini dealers located throughout the United States. See id.

12  Id.

13  Id. P 15.

14  Id.

15  See id. P 17.

Manhattan alleges that without the assurance of exclusivity in New York, it would not have entered into a dealer agreement with Lamborghini. [16] In 1996, in reliance upon Lamborghini's alleged representations regarding exclusive territory in New York, Manhattan entered into a written dealer agreement with Lamborghini ("1996 Agreement"). [17] The 1996 Agreement, however, makes no mention of exclusivity or territory. [18] Between 1996 and 2005, Manhattan served as the sole Lamborghini dealer in New York State. [19]

16  See id. P 22.

17  See id. P 18.

18  See id. Manhattan alleges that this conspicuous silence [*5] was an attempt by Lamborghini to conceal the fact that it had no intention of granting an exclusive license to Manhattan for the New York area. See id. P 21.

19  See id. P 23.

Since the 1996 Agreement was originally entered into by the parties, it has been renewed from time to time. [20] The most recent incarnation of the Agreement was entered into on September 1, 2005 ("2005 Agreement"). [21] The 2005 Agreement contains an integration clause, which states: "[t]his Agreement is the entire and sole agreement and understanding between the parties [and] terminates and supersedes any and all other prior agreements between the parties, whether oral or in writing." [22]

20  See id. P 18.

21  See 2005 Agreement, Ex. A. to Am. Compl., at 40.

22  Id. at 36.

## C. The Westhampton Facility

On January 16, 2004, Manhattan and Lamborghini entered into a written Letter of Intent, in which Lamborghini "consented" to Manhattan's construction of a new facility in Westhampton, New York for the sale and service of Lamborghini automobiles. [23] The Letter of Intent designated the new facility as a satellite of plaintiff's Manhattan dealership, [24] and stated that "an addendum to the main contract would be drafted and signed to reflect [*6] Lamborghini's acceptance of the proposed additional location in Long Island." [25] Lamborghini represented to Miller, both before and after the signing of the Letter of Intent, that plaintiff's Westhampton facility would "be the sole dealership selling Lamborghinis in

Long Island . . . ." [26] Manhattan relied on these representations in that it would not have signed the Letter of Intent had it known that it would not have exclusive dealer rights on Long Island. [27]

    23  *Id.* P 24.

    24  *See id.*

    25  *Id.*

    26  *Id.* P 26.

    27  *See id.* P 39. Manhattan alleges that these representations were made to induce Manhattan to expand its dealership to Long Island and that the representations were knowingly false when made. *See id.* P 41.

After signing the Letter of Intent, Manhattan "expended several million dollars to renovate a temporary facility for the Westhampton dealership and then to build a new, permanent facility in Westhampton . . . ." [28] Lamborghini was aware of these expenditures since 2004. [29] In September 2005, Lamborghini "changed course" and "insisted" that the Westhampton facility be operated as a separate dealership by Manhattan, rather than as a satellite facility of the Manhattan dealership. [30] "[H]aving [*7] already expended several millions of dollars on the Westhampton facility," plaintiff had "little choice but to accede to [Lamborghini's] demand . . . ." [31]

    28  *Id.* P 27.

    29  *See id.* P 31.

    30  *Id.* P 28.

    31  *Id.* P 29.

As the Westhampton facility would be operated as a separate dealership, Manhattan was required to submit a new dealer application and obtain approval of the application from Lamborghini. [32] On October 15, 2005, Manhattan filed the requisite dealer application ("Westhampton Dealer Application"). [33] Miller was later informed by a Lamborghini official that the Westhampton facility was "in full compliance with all standards and requirements, that his application for the Westhampton dealership would soon be approved, and he should expect a dealer agreement to sign." [34] To date, Manhattan's Westhampton Dealer Application remains pending, and Lamborghini has "refused to formally approve said application or send a dealer agreement to [Manhattan] for execution." [35] Despite a lack of formal approval, Manhattan "is holding itself out and acting as a Lamborghini dealer in its West-

hampton facility[,]" an activity that Lamborghini encourages. [36]

    32  *See id.* P 28.

    33  *See id.* P 29.

    34  *Id.* P 33.

    35  *Id.* P 35.

    36  *Id.*

### D. [*8] The Appointment of Champion

In the summer of 2006, Manhattan learned that Lamborghini had signed a Letter of Interest with another car dealership, Champion Motor Group, Inc. ("Champion"). [37] Under the Letter of Interest, Lamborghini authorized Champion to market and sell Lamborghinis in New York. [38] Champion's showroom is located in Jericho, New York, about fifty miles from Manhattan's Westhampton facility. [39] Lamborghini entered into the Letter of Interest fully aware of the substantial expenditures Manhattan made in connection with the construction of its Westhampton dealership. [40] Manhattan alleges that, in fact, Lamborghini intentionally concealed its relationship with Champion with the intention of inducing Manhattan to incur these expenses so as "to induce, if not coerce [Manhattan] to accede to the rights granted to Champion." [41] As a result of "unfair competition" from Champion, Manhattan "has and will lose sales from its Manhattan and Westhampton dealerships and will suffer substantial loss of profits." [42] At the same time, the additional Lamborghini dealership on Long Island has benefitted Lamborghini by increasing its revenues and promoting its good will. [43]

    37  *See id.* P 36.

    38  *See* [*9] *id.*

    39  *See id.*

    40  *See id.* P 38.

    41  *Id.* P 80.

    42  *Id.* P 42.

    43  *See id.* P 66.

### III. LEGAL STANDARDS

### A. Motion to Dismiss

"*Federal Rule of Civil Procedure 8(a)(2)* requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary . . . ." [44] When a complaint is attacked by a *Rule 12(b)(6)* motion to dismiss, the plaintiff need not provide "detailed factual allegations." [45] To survive a motion to dismiss, it is enough that the complaint "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." [46]

> 44    *Erickson v. Pardus, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007).*

> 45    *Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007).*

> 46    *Id.*

The task of the court is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." [47] When determining the sufficiency of plaintiff's claim for *Rule 12(b)(6)* purposes, consideration is limited to the factual allegations in plaintiff's amended complaint, which are accepted as true, as well as "documents relied on or incorporated by reference in the complaint." [48] While there are legitimate reasons to dismiss [*10] a case under *Rule 12(b)(6)*, "[t]he case cannot, however, be dismissed on the ground that petitioner's allegations of harm were too conclusory to put these matters in issue." [49] Thus, while a court must take the plaintiff's allegations as true, "the claim may still fail as a matter of law if it appears . . . that the plaintiff can prove no set of facts in support of its claim which would entitle [him] to relief, or if the claim is not legally feasible." [50]

> 47    *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 176 (2d Cir. 2004)* (quotation marks and citation omitted).

> 48    *International Design Concepts, LLC v. Saks, Inc., 486 F. Supp. 2d 229, 235-36 (S.D.N.Y. 2007).*

> 49    *Erickson, 127 S. Ct. at 2200 (2007).*

> 50    *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 457 F. Supp. 2d 455, 459 (S.D.N.Y. 2006)* (citing *Allaire Corp. v. Okumus, 433 F.3d 248, 250 (2d Cir. 2006)).*

**B. Common-Law Fraud**

To recover damages for fraud under New York law, a plaintiff must prove: (1) a misrepresentation of material

fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) [*11] which caused injury to the plaintiff. [51] "The claim also requires a showing of proximate causation, such that the injury 'is the natural and probable consequence of the defrauder's misrepresentation or . . . the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud.'" [52] A claim for fraud can also be based on concealment of information if the plaintiff, in addition to showing an intentional failure to disclose a material fact reasonably resulting in injury, can demonstrate that the defendant had a duty to disclose material information. [53] Such a duty can arise in the course of negotiations pursuant to a business transaction in three situations -- (1) "where [one] party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party, it cannot give only half of the truth"; (2) "when the parties stand in a fiduciary or confidential relationship with each other"; and (3) "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." [54]

> 51    *See Wynn v. AC Rochester, 273 F.3d 153, 156 (2d Cir. 2001).*

> 52    *Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 104-05 (2d Cir. 2001)* [*12] (quoting *Cumberland Oil Corp. v. Thropp, 791 F.2d 1037, 1044 (2d Cir. 1986)).*

> 53    *See Swersky v. Dreyer & Traub, 219 A.D.2d 321, 643 N.Y.S.2d 33, 36 (1st Dep't 1996).*

> 54    *Brass v. American Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993).*

A claim for fraud under New York law must also satisfy the heightened pleading standards of *Federal Rule of Civil Procedure 9(b)*, which requires "all averments of fraud" to be "stated with particularity." [55] This requirement must be met even in suits in which subject matter jurisdiction is based, as here, on diversity of citizenship and in which state law controls the elements of the fraud claim. [56] For claims of fraudulent misrepresentation, the Second Circuit has held that *Rule 9(b)* requires allegations that "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." [57] In the case of fraudulent concealment or omission, where the plaintiff is unable to specify the time and place because no act occurred, "the complaint must still allege: (1) what the omissions were; (2) the person responsible for the

2007 U.S. Dist. LEXIS 49641, *

failure to disclose; (3) [*13] the context of the omissions and the manner in which they misled the plaintiff; and (4) what the defendant obtained through the fraud." [58]

55  Fed. R. Civ. P. 9(b).

56  See, e.g., Malmsteen v. Berdon, LLP, 477 F. Supp. 2d 655, 664 (S.D.N.Y. 2007) (citing 5A Charles Alan Wright et al., FEDERAL PRACTICE AND PROCEDURE § 1297 (3d ed. 2004)).

57  Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000) (quotation marks omitted).

58  Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd., 85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000).

## C. Breach of Contract

To establish a claim for breach of contract under New York law, a party must prove "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." [59] In determining a party's obligations under a contract, it is not for the court to "supply a specific obligation the parties themselves did not spell out." [60] "The interpretation of an unambiguous contract is a question of law for the court, and the provisions of a contract addressing the rights of the parties will prevail over the allegations in a complaint." [61] At the motion to dismiss stage, where a plaintiff's "factual allegations or legal conclusions are flatly [*14] contradicted by documentary evidence, they are not presumed to be true, or even accorded favorable inference[,]" in the context of a breach of contract action. [62] If the language of the contract is ambiguous, New York law requires the court to interpret a written contract "so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." [63] Where "a contract recites that all of the parties' agreements are merged in the written document, parol evidence is not admissible to vary, or permit escape from, the terms of the integrated contract." [64] Finally, under the New York Statute of Frauds, an agreement which by its terms cannot to be performed within one year must be in writing. [65]

59  Terwilliger v. Terwilliger, 206 F.3d 240, 245-46 (2d Cir. 2000).

60  Tonking v. Port Auth. of New York and New Jersey, 3 N.Y.3d 486, 490, 821 N.E.2d 133, 787 N.Y.S.2d 708 (2004).

61  Taussig v. Clipper Group, L.P., 13 A.D.3d 166, 787 N.Y.S.2d 10, 11 (1st Dep't 2004).

62  Id.

63  Cruden v. Bank of New York, 957 F.2d 961, 976 (2d Cir. 1992).

64  Manufacturers Hanover Trust Co. v. Yanakas, 7 F.3d 310, 315 (2d Cir. 1993).

65  See N.Y. Gen. Oblig. Law § 5-701(a)(1) (McKinney 2007).

## D. Breach of Implied Covenant of Good Faith and [*15] Fair Dealing

"In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance." [66] Breach of the implied covenant is considered a breach of the underlying contract. [67] "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." [68] Additionally, the covenant imposes an obligation on the parties to refrain from "'intentionally and purposefully [doing] anything to prevent the other party from carrying out the agreement on his part.'" [69] While the implied covenant of good faith and fair dealing does not "imply obligations 'inconsistent with other terms of the contractual relationship,'" [70] it does encompass "'any promises which a reasonable person in the position of the promisee would be justified in understanding were included.'" [71]

66  511 West 232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d 144, 153, 773 N.E.2d 496, 746 N.Y.S.2d 131 (2002) (citations omitted).

67  See Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 80 (2d Cir. 2002).

68  Id. (quotation marks omitted).

69  Carvel Corp. v. Diversified Mgmt. Group., 930 F.2d 228, 230 (2d Cir. 1991) [*16] (quoting Grad v. Roberts, 14 N.Y.2d 70, 75, 198 N.E.2d 26, 248 N.Y.S.2d 633 (1964)).

70  511 West 232nd Owners, 98 N.Y.2d at 153 (quoting Murphy v. American Home Prods. Corp., 58 N.Y.2d 293, 304, 448 N.E.2d 86, 461 N.Y.S.2d 232 (1983)).

71  Id. (quoting Rowe v. Great Atl. & Pac. Tea Co., 46 N.Y.2d 62, 69, 385 N.E.2d 566, 412 N.Y.S.2d 827 (1978)).

## E. Unjust Enrichment

A plaintiff may recover in a claim for unjust en-richment if it can show that "(1) defendant was benefit-ted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." [72] Under New York law, "[t]he theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the *absence* of any agreement." [73] Therefore, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." [74] However, this rule only applies when the exis-tence of a contract governing the transaction in question is undisputed. [75]

72   *Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 586 (2d Cir. 2006)* (citation omitted).

73   *Id. at 586-87*(citation omitted) (emphasis added).

74   *Id. at 587* (citation omitted).

75   *See Newman & Schwartz v. Asplundh Tree Expert Co., 102 F.3d 660, 663 (2d Cir. 1996)* [*17] (claim for unjust enrichment "properly pleaded as such in the alternative to the contrac-tual claim" where one defendant disputes being a party to the contract). *See also Soft Classic S.A. de C.V. v. Hurowitz, 444 F. Supp. 2d 231, 249 (S.D.N.Y. 2006)* (unjust enrichment claim sur-vived dismissal where the parties disagreed as to whether underlying contracts were binding on de-fendants).

## F. Breach of Fiduciary Duty

A claim for breach of fiduciary duty involves three elements: "breach by a fiduciary of a duty owed to plain-tiff; defendant's knowing participation in the breach; and damages." [76] There are four elements essential to the es-tablishment of a fiduciary relationship: "(1) [t]he vulner-ability of one party to the other which (2) results in the empowerment of the stronger party by the weaker which (3) empowerment has been solicited or accepted by the stronger party and (4) prevents the weaker party from effectively protecting itself." [77] Generally, where parties deal at arms-length in a commercial transaction, "'no relation of confidence or trust sufficient to find the exis-tence of a fiduciary relationship will arise absent ex-traordinary circumstances.'" [78] Nevertheless, "a distribu-torship [*18] agreement may, in some rare instances, create a confidential relationship out of which a duty of fiduciary care arises." [79]

76   *SCS Commc'ns, Inc. v. Herrick Co., 360 F.3d 329, 342 (2d Cir. 2004)*.

77   *Atlantis Info. Tech., GmbH v. CA, Inc., 485 F. Supp. 2d. 224 (E.D.N.Y. 2004)* (quotation marks omitted).

78   *Cal Distributor, Inc. v. Cadbury Schweppes Ams. Bevs., Inc., No. 06 Civ. 496, 2007 U.S. Dist. LEXIS 854, 2007 WL 54534, at *9 (S.D.N.Y. Jan. 5, 2007)* (quoting *Pan Am Corp. v. Delta Air Lines, Inc., 175 B.R. 438, 511 (S.D.N.Y. 1994))*.

79   *Lake Erie Distrib., Inc. v. Martlet Importing Co., 221 A.D.2d 954, 634 N.Y.S.2d 599, 601 (4th Dep't 1995). Accord A.S. Rampell, Inc. v. Hyster Co., 3 N.Y.2d 369, 377, 144 N.E.2d 371, 165 N.Y.S.2d 475 (1957)* (upholding sufficiency of claim for breach of fiduciary duty owed by manu-facturer to distributor).

A fiduciary is obliged to exercise the "highest degree of good faith, honesty, integrity, fairness and fidelity" in its dealings with those to whom the duty is owed. [80] It is "elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect." [81] Once a fiduciary duty is established, it is so "inflexible" that the fiduciary must avoid not only self-dealing, but also "situations [*19] in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty." [82]

80   *U.S. Ice Cream Corp. v. Bizar, 240 A.D.2d 654, 659 N.Y.S.2d 492, 492 (2d Dep't 1997)*.

81   *Birnbaum v. Birnbaum, 73 N.Y.2d 461, 466, 539 N.E.2d 574, 541 N.Y.S.2d 746 (1989)*.

82   *Id.*

## G. Negligent Misrepresentation

Under New York law, a claim of negligent misrep-resentation must satisfy the following five elements: "(1) the defendant had a duty, as a result of a special relation-ship, to give correct information; (2) the defendant made a false representation that it should have known was in-correct; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." [83] The alleged misrepresenta-tion must be factual in nature: promises of future conduct or representations as to future events are not actionable as negligent misrepresentations. [84] The special relation-ship and duty required for a negligent misrepresentation

claim is based on consideration of the following three factors: "whether the person making the representation held or appeared to [*20] hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." [85] A simple commercial relationship, such as that between a franchisor and franchisee, does not constitute the kind of special relationship necessary for a negligent misrepresentation claim. [86] However, courts have found a special relationship and duty, for example, where a defendant sought to induce plaintiffs into a business transaction by making certain statements or providing specific information with the intent that plaintiffs rely on those statements or information. [87]

> 83    *Hydro Investors, Inc. v Trafalgar Power, Inc., 227 F.3d 8, 20 (2d Cir. 2000).*

> 84    *See id. at 20-21.*

> 85    *Suez Equity Investors, 250 F.3d at 103.*

> 86    *See Dimon, Inc. v. Folium, Inc., 48 F. Supp. 2d 359, 373 (S.D.N.Y. 1999).*

> 87    *See Kimmell v. Schaefer, 89 N.Y.2d 257, 264-65, 675 N.E.2d 450, 652 N.Y.S.2d 715 (1996).*

## H. The New York Franchised Motor Vehicle Dealer Act

The Franchised Motor Vehicle Dealer Act (the "FMVDA") regulates motor vehicle manufacturers, distributors and factory or distributor representatives, as well as dealers [*21] of motor vehicles doing business in the State of New York. [88] Section 466 of the FMVDA makes it unlawful "for a franchisor directly or indirectly to impose unreasonable restrictions on [a] franchised motor vehicle dealer relative to . . . site-control . . . and assertion of legal or equitable rights with respect to its franchise or dealership." [89] Section 469 of the FMVDA provides a private cause of action for a franchised motor vehicle dealer who is or may be aggrieved by a violation of the FMVDA. [90]

> 88    *N.Y. Veh. & Traf. Law §§ 460-473* (2007).

> 89    *Id. § 466(1).*

> 90    *See id. § 469.*

## I. Account Stated

"An account stated is an agreement between parties to an account based upon prior transactions between them with respect to the correctness of the account items and balance due." [91] Recovery on a claim for account stated is permitted on the theory that "the parties have, by their conduct, evidenced an agreement upon the balance of an indebtedness." [92] The agreement may be express [93] or, it

> may sometimes result from the retention of accounts current without objection. But the result does not always follow. It varies with the circumstances that surround the submission of the statements and those circumstances [*22] include, of course, the relation between the parties. [94]

Among the circumstances to be considered in implying an agreement is whether an objection has been made to the account within a reasonable time. [95]

> 91    *Jim-Mar Corp. v. Aquatic Const., Ltd., 195 A.D.2d 868, 600 N.Y.S.2d 790, 790 (3d Dep't 1993)* (citations omitted).

> 92    *Interman Indus. Prods., Ltd. v. R.S.M. Electron Power, Inc., 37 N.Y.2d 151, 153-154, 332 N.E.2d 859, 371 N.Y.S.2d 675 (1975).*

> 93    *Jim-Mar Corp., 600 N.Y.S.2d at 790* (citations omitted).

> 94    *Newburger-Morris Co. v. Talcott, 219 N.Y. 505, 512, 114 N.E. 846 (1916)* (Cardozo, J.).

> 95    *See Interman, 37 N.Y.2d at 154.*

## IV. DISCUSSION

### A. Common-Law Fraud

Lamborghini moves to dismiss the fraudulent misrepresentation, fraudulent omission, and fraudulent inducement claims for failure to plead fraud with the particularity required by *Rule 9(b).* [96] Specifically, it finds the Amended Complaint deficient due to Manhattan's failure to disclose the names of the Lamborghini representatives who made the allegedly fraudulent representations regarding exclusivity, and where and when the representations were made. [97]

> 96    *See* Lamborghini's Memorandum of Law in Support of Motion to Dismiss ("Def. Mem.") at 12.

97  *See id.*

Manhattan's Amended Complaint asserts only that the [*23] allegedly fraudulent statements were made by unnamed "representatives" of Lamborghini, "in or about 1996" in the first instance, [98] and "[b]efore and after the signing of the Letter of Intent" in the second instance. [99] The Amended Complaint also fails to identify where these representations were made. Additionally, Manhattan's allegations of fraudulent omission fail to identify the representatives responsible for the failure to disclose Lamborghini's intentions with regard to Champion. Manhattan's response to these deficiencies -- that the "actual experience of the parties" obviates the failure to satisfy *Rule 9(b)* [100] -- is without support in the law and provides no excuse. [101] Accordingly, Manhattan's causes of action sounding in fraud must be dismissed.

98  Am. Compl. P 16.

99  *Id.* P 26

100  Manhattan's Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("Pl. Opp.") at 9.

101  As Lamborghini notes, this attempted justification "cannot be squared with the text of *Rule 9(b)*, which by its terms applies to 'all averments of fraud.'" Def. Mem. at 3.

**B. Breach of Express Contract**

Manhattan's breach of contract claims are based upon an oral agreement, allegedly made in 1996 and re-affirmed [*24] in 2004, whereby Lamborghini granted exclusive selling rights in New York State to Manhattan. [102] Even if Manhattan's allegations regarding oral promises of exclusivity are taken to be true, it is nonetheless apparent that Manhattan's breach of express contract claim must be dismissed.

102  *See* Am. Compl. PP 16, 26.

The relationship between Manhattan and Lamborghini was governed by the 1996 Agreement until the parties entered into the 2005 Agreement, which terminated and superseded "any and all other prior agreements between the parties, whether oral or in writing." [103] Manhattan alleges that Lamborghini breached the contract by conferring dealer rights on Champion in 2006. [104] Thus it is the 2005 Agreement -- entered into September 1, 2005 -- that dictates the rights and obligations of Manhattan and Lamborghini at the time of the alleged breach. [105] The 2005 Agreement makes no mention of exclusivity. Therefore, any contractual right of Manhattan to an exclusive New York territory must stem from the alleged

oral promises of exclusivity. Lamborghini argues, however, that becausee all oral promises alleged in the Amended Complaint pre-date the signing of the 2005 Agreement, enforcement of [*25] those promises is explicitly barred by the integration clause contained in the 2005 Agreement [106] and, therefore, no action for breach of contract can lie. [107]

103  2005 Agreement, Ex. A to Am. Compl. at 36.

104  *See* Am. Compl. PP 36, 51.

105  *See* 2005 Agreement, at 40.

106  *See id.* at 36.

107  *See* Def. Mem. at 14.

Manhattan responds by noting that the 2005 Agreement, although dated September 2005, became effective on January 16, 2004. [108] Therefore, it reasons, oral representations of exclusivity made after January 16, 2004 are not barred by the 2005 Agreement's integration clause. [109] Although the interplay between the integration clause and the Agreement's effective date does create an ambiguity, that ambiguity need not be resolved in the context of this claim. The only representations alleged to have been made after January 2004 are those whereby Lamborghini promised Manhattan that it "would be the sole dealership selling Lamborghinis in Long Island, and [that] if Defendant *ever* wanted to expand its dealer base in Long Island, [Manhattan] would be given the first option." [110] The New York Statute of Frauds has been held to bar the enforcement of oral distributorship agreements of indefinite duration [*26] that can be terminated within one year only by a breach of the agreement (as opposed to at will by either party). [111] As the oral agreement alleged here does not specify a duration, and contains no provision under which either party might rightfully terminate it within the year of its making, it comes within the ambit of the Statute of Frauds. [112] Thus, even if Manhattan's interpretation of the contract were applied, and the oral promises made after January 16, 2004 were not nullified by the integration clause, the alleged oral contract is void for failure to satisfy New York's Statute of Frauds. Accordingly, no action for breach can lie and Manhattan's claims for breach of express contract are dismissed.

108  *See id.* at 27.

109  *See* Pl. Opp. at 9. Manhattan's Amended Complaint alleges that oral representations of exclusivity were made "[b]efore and after signing the Letter of Intent," which was entered into on

January 16, 2004. Am. Compl. P 26. It follows, therefore, that some oral representations of exclusivity were made after the effective date of the 2005 Agreement.

110  Am. Compl. P 26 (emphasis added).

111  *See D & N Boening, Inc. v. Kirsch Beverages, Inc., 63 N.Y.2d 449, 457, 472 N.E.2d 992, 483 N.Y.S.2d 164 (1984)* ("[T]he [*27] oral agreement between the parties called for performance of an indefinite duration and could only be terminated within one year by its breach during that period. As such, the agreement [falls] within the Statute of Frauds, and [is] void."); *Romaine v. Colonial Tanning Corp., 301 A.D.2d 732, 753 N.Y.S.2d 552, 554 (3d Dep't 2003)* (dismissing breach of contract claim where oral employment contract could be terminated within one year only upon breach). *Accord Alan Skop, Inc. v. Benjamin Moore, Inc., 909 F.2d 59, 60 (2d Cir. 1990)* (dismissing breach of contract claim where oral dealership agreement of indefinite duration could be terminated only upon breach).

112  *See D & N Boening, 63 N.Y.2d at 458.*

## C. Breach of Implied Covenant of Good Faith and Fair Dealing

Manhattan asserts a claim for breach of the implied covenant of good faith and fair dealing based on Lamborghini's: (1) grant of dealership rights to Champion, (2) failure to inform Manhattan of its intention to grant rights to another dealer on Long Island, and (3) failure or refusal to approve Manhattan's Westhampton Dealer Application. [113] Lamborghini moves to dismiss this cause of action, characterizing it as an attempt by Manhattan to "shoehorn" [*28] into the 2005 Agreement several rights, none of which were negotiated. [114] While Lamborghini correctly notes that the covenant of good faith and fair dealing cannot be used to impose an obligation that would be inconsistent with other express terms of the contractual relationship, the contract here -- namely, the 2005 Agreement -- is "silent on the issues of exclusivity and territory." [115] Similarly, it makes no mention of a duty to disclose the appointment of new dealers. As the implied covenant of good faith and fair dealing could be interpreted to incorporate these duties without contradicting the express terms of the contract, the proper question is whether such implied terms are appropriate under the circumstances.

113  *See id.* PP 56-58.

114  Def. Mem. at 18.

115  Am. Compl. P 18.

By spelling out the basis for its claims that Lamborghini failed to exercise good faith and deal fairly when it appointed Champion as a dealer on Long Island and failed to inform Manhattan of its decision to do so, Manhattan has pled a valid cause of action for breach of the implied covenant of good faith and fair dealing. Specifically, Manhattan has pled that the unique nature of the market for Lamborghini automobiles [*29] carries with it an understanding that the manufacturer will not "park a competitor in [an approved dealer's] backyard[,]" such that the exclusivity term could fairly be implied into the contract. [116] Manhattan has also noted that Lamborghini's grant of dealer rights to Champion has the potential to deny Manhattan the fruits of its contract, inasmuch as an additional dealer in the same territory "will inevitably cut into the original dealer's allocation." [117] This loss of market share increases "the risk of a termination by Defendant under the dealer agreement, because each dealer must sell a specified minimum number of vehicles, and failure to meet the minimum is grounds for termination . . . ." [118] Combined with the alleged oral promises of an exclusive dealership territory in New York, these considerations support Manhattan's reasonable understanding that Lamborghini would not "cannibalize" its dealer by introducing additional competitors into the same territory. [119] Accordingly, the motion to dismiss Manhattan's claims for breach of the implied covenant of good faith and fair dealing arising from (1) the appointment of Champion as a Lamborghini dealer and (2) Lamborghini's failure [*30] to inform Manhattan of its intention to do so is denied.

116  Pl. Opp. at 11.

117  Am. Compl. P 14.

118  *Id.*

119  Pl. Opp. at 12.

Manhattan's third claim, that Lamborghini has further breached the implied covenant of good faith and fair dealing by failing to approve its Westhampton Dealer Application, is untenable. The language of that Application explicitly states that it "does not give rise to any obligation on the part of Lamborghini and that unless and until a Lamborghini Dealer Agreement is executed by the parties and delivered, [Manhattan] will have no rights as an authorized Lamborghini Dealer." [120] As the Dealer Application creates neither rights in Manhattan, nor obligations in Lamborghini, it cannot properly be characterized as a contract. The Westhampton Dealer Application, therefore, does not give rise to an implied covenant of

good faith and fair dealing and no claim for breach of that covenant can lie. Accordingly, Manhattan's claim that Lamborghini failed to act in good faith and deal fairly by refusing to approve the Westhampton Dealer Application is dismissed with prejudice.

> 120  Westhampton Dealer Application, Ex. B to Def. Mem. at 13-14.

### D. Unjust Enrichment

Manhattan claims that [*31] Lamborghini has been enriched at Manhattan's expense by retaining proceeds from the sale of Lamborghini automobiles at plaintiff's Westhampton facility and the Champion facility on Long Island, and also through the "promotion of its vehicles, franchises and good will at both facilities." [121] It asserts that it would be unjust for Lamborghini to retain these benefits as Lamborghini has denied Manhattan its "expected exclusivity on Long Island" and withheld formal approval of Manhattan's Westhampton showroom despite "dup[ing]" Manhattan into constructing the facility. [122] Lamborghini moves to dismiss this claim, noting that the law precludes actions sounding in quasi-contract when there is a valid and enforceable contract addressing the subject matter of the claim. [123] As the parties have a bona fide dispute as to the existence of an enforceable contract governing the Westhampton facility, plaintiff's unjust enrichment claim cannot be dismissed at this stage. Accordingly, Lamborghini's motion to dismiss Manhattan's claim for unjust enrichment is denied.

> 121  Am. Compl. P 62.

> 122  *Id.* P 63.

> 123  *See* Def. Mem. at 20-21.

### E. Breach of Fiduciary Duty

Manhattan claims that Lamborghini owed it a duty [*32] of fiduciary care arising out of the "fiduciary and confidential relationship" established by their various Dealer Agreements. [124] Manhattan further alleges that Lamborghini breached this fiduciary duty by, *inter alia,* demanding that Manhattan submit a separate dealer application for the Westhampton facility, granting Champion dealer rights on Long Island, and failing to inform Manhattan of its intention to appoint Champion as a dealer on Long Island. [125] Lamborghini responds that Manhattan has failed to plead sufficiently exceptional circumstances to establish a fiduciary relationship and that Lamborghini owes no such duty to Manhattan. [126]

> 124  Am. Compl. P 70.

> 125  *See id.* P 72.

> 126  *See* Def. Mem. at 7-8.

Although the franchisor-franchisee relationship does not give rise to fiduciary obligations absent exceptional circumstances, Manhattan has alleged that a number of terms contained in the Dealer Agreements effectively grant Lamborghini "the authority to exercise near life and death economic power over [Manhattan] . . . ." [127] Of particular significance are those terms "requiring [Manhattan] to provide reports to [Lamborghini] concerning sales, inventories, customer data, and all information [*33] concerning [Manhattan]'s business . . . ." [128] In *A.S. Rampell, Inc. v. Hyster Co.,* the New York Court of Appeals held that contract provisions requiring the plaintiff company to make its lists of prospective customers available to the defendant, and to provide records of business activities and report on its inventory and financial situation, were indicative of a confidential relationship between the parties. [129] The court held that these contractual terms, combined with the "dependency" inherent in the manufacturer/distributor relationship, were sufficient to plead a relationship giving rise to fiduciary duties. [130] The facts alleged in the Amended Complaint, including the presence of a manufacturer/distributor relationship and a contractual requirement that Manhattan turn over proprietary information to Lamborghini, parallel those found in *Rampell.* Manhattan has therefore pled circumstances sufficiently extraordinary to allow its claims for breach of fiduciary duty to proceed.

> 127  Am. Compl. P 70.

> 128  *Id.*

> 129  3 N.Y.2d 369, 376-77, 144 N.E.2d 371, 165 N.Y.S.2d 475 (1957).

> 130  *Id. Accord Zimmer-Masiello, Inc. v. Zimmer, Inc.,* 159 A.D.2d 363, 552 N.Y.S.2d 935, 935 (1st Dep't 1990) (citing *Rampell* and concluding that plaintiff properly pled [*34] claim for breach of fiduciary duty where defendant manufacturer, *inter alia,* required plaintiff to provide confidential and proprietary information).

### F. Negligent Misrepresentation

Manhattan alleges that the special relationship between itself and Lamborghini created a duty on Lamborghini's part to use reasonable care when making representations to Manhattan, and that this duty was breached when it "recklessly and negligently" informed Manhattan that it would be the sole Lamborghini dealer in New York. [131] Manhattan claims that because it reasonably

relied upon these representations to its detriment, it is entitled to compensatory damages. [132] While Manhattan has properly pled all of the elements required to state a cause of action for negligent misrepresentation, it has pled purely economic damages as a result of its reliance, thereby inviting application of New York's "economic loss rule." [133] New York courts have attempted to keep "contract law 'from drown[ing] in a sea of tort'" [134] by erecting various "dikes," which serve to bar actions in tort when an action in contract is available. [135] One such dike is the economic loss rule. [136] Viewing the purpose of the law of contract to [*35] be "the [facilitation] of voluntary economic exchange," New York courts restrict plaintiffs who have "suffered 'economic loss,' but not personal or property injury, to an action for the benefits of their bargains." [137] Thus, "[i]f the damages suffered are of the type remediable in contract, a plaintiff may not recover in tort." [138] Under New York's economic loss rule, because Manhattan has not suffered any personal or property damage, it is limited to an action in contract for the benefit of its bargain.

131  Am. Compl. PP 83-84.

132  See id. PP 85-89.

133  See id. PP 87-88.

134  Carmania Corp., N.V. v. Hambrecht Terrell Int'l, 705 F. Supp. 936, 938 (S.D.N.Y. 1989) (quoting East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 866, 106 S. Ct. 2295, 90 L. Ed. 2d 865 (1986)).

135  Id.

136  See id.

137  Id.

138  Id. Accord PPI Enters. (U.S.) v. Del Monte Foods Co., No. 99 Civ. 3794, 2003 U.S. Dist. LEXIS 16006, 2003 WL 22118977, at *27 (S.D.N.Y. Sept. 11, 2003) (dismissing negligent misrepresentation claim where plaintiff alleged only economic loss).

Manhattan's response -- that it bases its negligent misrepresentation claim on "duties independent of any contract, including the fiduciary duties . . . not to conceal material information from and act against the [*36] interests of the person to whom it owes the duty[,]" -- is inapposite. [139] The fact that the duty breached here is independent of any contract between the parties merely prevents this claim from being dismissed as duplicative of Manhattan's breach of contract claims. [140] It does not

allow evasion of the economic loss rule, which presents a second, distinct barrier. [141] Accordingly, Manhattan's claim for negligent misrepresentation is dismissed with prejudice.

139  Pl. Opp. at 24.

140  See Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 389, 516 N.E.2d 190, 521 N.Y.S.2d 653 (1987).

141  See, e.g., Robehr Films, Inc. v. American Airlines, Inc., No. 85 Civ 1072, 1989 U.S. Dist. LEXIS 10998, 1989 WL 111079, at *2 (S.D.N.Y. Sept. 19, 1989) ("Under New York law, . . . [plaintiff must meet] two requirements: (1) it must establish that the defendant violated a legal duty separate from its contractual obligations, and (2) it must demonstrate that the damages suffered do not constitute mere 'economic loss.'" (citation omitted; emphasis added)).

### G. Violation of the New York Franchised Motor Vehicle Dealer Act

Manhattan alleges that Lamborghini violated section 466 of the FMVDA by "imposing unreasonable and capricious restrictions relative to site control [*37] and compliance with subjective standards, at both the Manhattan and Westhampton facilities," by "holding up approval of the Westhampton Dealer Application," and "by granting certain rights to Champion to sell Lamborghinis in New York." [142] Although Lamborghini argues that these allegations fail to place it on notice of the FMVDA claims against it, [143] Manhattan's allegations satisfy the liberal pleading standards of the Federal Rules of Civil Procedure. [144] Manhattan has stated a valid FMVDA claim with regard to the violations alleged in connection with its Manhattan showroom. Furthermore, Manhattan has alleged both legal and equitable rights to an exclusive territory in New York and that Lamborghini has taken steps designed "to induce, if not coerce [Manhattan] to accede to the rights granted to Champion." Accordingly, Manhattan's allegations regarding Lamborghini's assignment of dealer rights to Champion support a claim under section 466 of the FMVDA.

142  Am. Compl. P 78.

143  See Def. Mem. at 23.

144  See Bell Atlantic Corp., 127 S. Ct. at 1977 (A "bare allegation suffices under a system that 'restricts the pleadings to the task of general notice-giving and invest[s] the deposition-discovery [*38] process with a vital role in the preparation

for trial.'" (quoting *Hickman v. Taylor, 329 U.S. 495, 501, 67 S. Ct. 385, 91 L. Ed. 451 (1947))*.

Lamborghini also argues that Manhattan cannot bring a claim for alleged violations of the FMVDA at the Westhampton facility because the Letter of Intent had been nullified by the 2005 Agreement's integration clause. [145] With the Letter of Intent no longer in force, Manhattan would have no right to operate the Westhampton facility and no right to bring suit under the FMVDA. Manhattan responds that the 2005 Agreement, although executed in September 2005, is effective as of January 16, 2004. [146] Thus, Manhattan reasons, the integration clause does not encompass the Letter of Intent, which was executed in March 2004. [147] As noted above, the 2005 Agreement is ambiguous on this issue. However, when deciding a motion to dismiss, a court must draw all reasonable inferences in plaintiff's favor. Thus, because the Letter of Intent grants Manhattan the right to operate a Lamborghini dealership in Westhampton, Manhattan may bring a cause of action under the FMVDA. Lamborghini's motion to dismiss Manhattan's claims under the FMVDA is denied.

145   *See* Def. Mem. at 24.

146   *See* [*39] Pl. Opp. at 22.

147   *See id.*

## H. Account Stated

Manhattan asserts that it: (1) "expended monies to promote and market the Lamborghini brand"; (2) that Lamborghini "is required by agreement of the parties to pay for or reimburse" Manhattan for these expenditures; and, (3) that Manhattan rendered invoices to Lambor-

ghini for the expenditures, which were retained "without timely objection" and partially paid. [148] Construing the Amended Complaint liberally, the latter two allegations suffice to plead an implied agreement between the parties as to the existence and amount of the indebtedness. In combination, Manhattan's allegations state a valid claim for an account stated. Accordingly, Lamborghini's motion to dismiss the claim for account stated is denied.

148   Am. Compl. PP 97-100.

## V. CONCLUSION

For the foregoing reasons, defendant's motion to dismiss the Amended Complaint is granted as to plaintiff's claims sounding in fraud, breach of contract, and negligent misrepresentation. The motion is denied as to plaintiff's claims of unjust enrichment, breach of fiduciary duty, violations of the Franchised Motor Vehicle Dealer Act and account stated. The motion is granted in part and denied in part with [*40] regard to plaintiff's claims of and breach of the implied covenant of good faith and fair dealing. Manhattan is granted leave to replead the claims that were not dismissed with prejudice, within twenty days of this Opinion and Order. The Clerk of the Court is directed to close this motion (Document # 5). A conference is scheduled for July 30, 2007 at 4:30.

SO ORDERED:

Shira A. Schemdlin

U.S.D.J.

Dated: New York, New York

July 9, 2007

LEXSEE 1999 US DIST LEXIS 14256

**MARKETING/TRADEMARK CONSULTANTS, INC., Plaintiff, -against- CATERPILLAR, INC., Defendant.**

**98 Civ. 2570 (AGS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1999 U.S. Dist. LEXIS 14256*

**September 14, 1999, Decided**
**September 16, 1999, Filed**

**DISPOSITION:** [*1] Defendant's motion DENIED.

**COUNSEL:** For MARKETING/TRADEMARK CONSULTANTS, INC., plaintiff: Lynn E. Judell, Rosenthal, Judell & Uchima, New York, NY.

For CATERPILLAR INC., defendant: Michael C. Petronio, Mayer, Brown & Platt, New York, NY.

**JUDGES:** ALLEN G. SCHWARTZ, U.S.D.J.

**OPINION BY:** ALLEN G. SCHWARTZ

**OPINION**

**MEMORANDUM ORDER**

ALLEN G. SCHWARTZ, DISTRICT JUDGE:

Plaintiff Marketing/Trademark Consultants, Inc. ("MTC") filed the instant action on April 10, 1998 seeking recovery of funds allegedly due pursuant to a License Placement Agreement that MTC entered into with defendant Caterpillar, Inc. ("Caterpillar"). Defendants filed their Answer on April 30, 1998. The case is before the Court on defendant's motion to amend its Answer in order to assert a counterclaim against plaintiff. For the reasons that follow, the motion is DENIED.

**FACTUAL BACKGROUND**

The relevant facts on this motion are undisputed. MTC is a corporation organized and existing under the laws of the State of California, with its principal place of business in New York, New York. (Corrected Complaint, annexed as Exhibit A to Defendant's Motion for Leave to Amend Answer to Assert Counterclaim ("Compl.") P 1.) [*2] Caterpillar is a corporation organized and existing under the laws of Delaware with its principal place of business located in Illinois. (Id. P 2.) In 1987, Caterpillar and MTC entered into a contract known as the License Placement Agreement ("LPA"). Pursuant to the LPA, MTC would act as Caterpillar's exclusive representative in connection with the licensing of Caterpillar's copyrights and trademarks. (Id. P 8(a).) The LPA provided that MTC would, inter alia, identify potential licensees and negotiate licensing agreements with such licensees on behalf of Caterpillar. (Id. P 8(b).) As consideration for this service, MTC was entitled to a fee of 15% of all net royalties and other income earned by Caterpillar under licenses entered into by Caterpillar during the first year of the relationship, and the fee would increase to 20% for all subsequent periods. (Id. P 8(c).) The LPA also provided that "litigation judgments in [Caterpillar's] favor in excess of expenses shall be considered as other income to [Caterpillar] and subject to sharing with [MTC] pursuant to this Agreement." (Id. P 8(d).) After termination of the LPA, MTC alleges that the agreement provided [*3] that MTC would still be entitled to fees for licensing agreements that began pre-termination and were continued or renewed by Caterpillar post-termination. (Id. P 12.) The LPA was terminated on March 31, 1991. (Def. Mem. Law at 2.)

On June 1, 1988, during the period that the LPA was effective, Caterpillar entered into a five year licensing agreement with Jerryco Footware Inc. ("Jerryco"). (Compl. P 14.) On or about November 24, 1993, Caterpillar commenced an action against Jerryco in the Central District of Illinois, alleging that Jerryco had failed to make required royalty payments, and had engaged in fraudulent conduct and misappropriation of Caterpillar's trademarks. (Id. P 15; Def. Mem. Law at 3-4.) Caterpillar recovered a judgment on March 30, 1995 in the sum of $ 10,902,570.00 (the "Jerryco Judgment"). (Compl. P 16.) MTC alleges that it is entitled to a share of the funds

Caterpillar has collected and will collect with respect to the Jerryco Judgment. (Id. P 17.) MTC also alleges that Caterpillar has failed to remit to it fees due on other licensing agreements that were continued or renewed during the effective period of the LPA. (Id. PP 18 - 21.)

The LPA also [*4] contained the following language:

> [Caterpillar and MTC] agree to share liability (in the same proportion as the royalty income is shared) for all *losses, claims, or damages* arising out of or in connection with any License Agreement or the alleged invalidity or inadequacy of any of the Copyrights or Trademarks.

(Defendant's Motion for Leave to Amend Answer to Assert Counterclaim at Exhibit C, P 14.) (emphasis added.) Caterpillar moves the Court to permit it to Amend its Answer in order to assert a counterclaim arising under this section of the LPA.

The basis for Caterpillar's counterclaim is as follows. Of the $ 10,902,570 Jerryco Judgment, Caterpillar asserts that its compensatory damages amount to $ 4,225,090. (Def. Mem. Law at 4.) Caterpillar alleges that this amount represents its loss of royalty income and misappropriation of trademarks, while the remainder reflects punitive and treble damages. (Id.) Caterpillar also asserts that, to date, it has only collected $ 2,652,207 of the Jerryco Judgment, and incurred attorneys fees in obtaining and enforcing the Jerryco Judgment of $ 1,985,534. (Id.) Caterpillar alleges, therefore, that out of the $ 4,225,090 [*5] in lost revenue, it has collected only $ 666,673, a shortfall of $ 3,558,417. (Id.) Caterpillar's proposed counterclaim asserts that this "loss" should be shared by MTC pursuant to the LPA, and that MTC therefore owes it 20% of this "loss," amounting to approximately $ 711,683.

## DISCUSSION

Leave to amend is generally granted freely "absent bad faith, undue delay, or prejudice to the opposing party." In Re 1993 Corning Securities Litigation, 1996 U.S. Dist. LEXIS 6601, *2, No. 93 Civ. 7015 (AGS), 1996 WL 257603, at *1 (S.D.N.Y. May 15, 1996). However, a motion to amend may be denied where the amendment would be "futile" and has "no colorable merit." *Northbrook National Ins. Co. v. J & R Vending Corp., 167 F.R.D. 643, 647 (E.D.N.Y. 1996)* (citing *Oliver v. Demarinis & Co., 1993 U.S. Dist. LEXIS 1033,* No. 90 Civ. 7950 (SS), 1993 WL 33421, *2 (S.D.N.Y. Jan. 29, 1993) (citation omitted)). See also *Coleman v. Ramada Hotel Operating Co., 933 F.2d 470, (7th Cir.*

1991) (stating that "justice does not demand that Coleman be given leave to append frivolous or repetitive allegations to her complaint at any stage in the proceedings"). An amendment may be considered "futile" [*6] if the amended pleading could not survive a motion to dismiss. See *Smith v. Kessner, 183 F.R.D. 373, 373 (S.D.N.Y. 1998).* Additionally, "where it appears that granting leave to amend is unlikely to be productive . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co., 987 F.2d 129 (2d Cir. 1993).*

Issues of contract interpretation are generally matters of law and therefore are suitable for disposition on a motion to dismiss. See *W.R. Grace & Co. - Conn v. Hampshire Chemical Corp., 1998 U.S. Dist. LEXIS 9,* No. 96 Civ. 8199 (AGS), 1998 WL 2814, at *2 (S.D.N.Y. Jan 6, 1998) (citing *United States v. Liranzo, 944 F.2d 73, 77 (2d Cir. 1991)).* See also *Furniture Consultants, Inc. v. Datatel Minicomputer Co., 1986 U.S. Dist. LEXIS 22978, *6,* No. 85 Civ. 8518 (RLC), 1986 WL 7792, at *2 (S.D.N.Y. Jul. 10, 1986) ("claims may be resolved in a motion to dismiss, if the claims under which the plaintiff seeks relief are barred . . . by the unambiguous terms of a contract attached to the pleadings, because the interpretation of an unambiguous contract is a matter of law for the court"). If the contract "shows unambiguously on its face [*7] that the relief prayed for is not merited, dismissal is both justified and appropriate." *Palda v. General Dynamics Corp., 47 F.3d 872, 876 (7th Cir. 1995).* The Court finds that the motion to amend must be denied because it attempts to add claims that are lacking in merit and which would not contribute to the fair and just resolution of the action.

When interpreting a contract, "clear and unambiguous terms" should be given their "ordinary and natural meaning." *Emergency Medical Care, Inc. v. Marion Memorial Hosp., 94 F.3d 1059, 1061 (7th Cir. 1996)* (citations omitted). Under Illinois law, a "contract must be interpreted as a whole, giving meaning and effect to each provision." Id. This court also takes notice of the rule of construction that, in interpreting a contract, courts "should reach for fair and reasonable results," and "where contracts are negotiated by counsel for sophisticated commercial parties, courts should interpret ambiguous language to realize the reasonable expectations of the ordinary businessperson." *Bank of New York v. Amoco Oil Co., 35 F.3d 643, 662 (2d Cir. 1994)* (applying New York law). Here, the only reasonable [*8] interpretation of the contract is that the language providing for the sharing of liability with respect to "losses" was not intended to imply that MTC would reimburse Caterpillar for licensing income that Caterpillar was unable to collect. MTC was acting as a licensing agent, not as a surety. For example, if Caterpillar was entitled to $

1999 U.S. Dist. LEXIS 14256, *

100,000 in income under a covered license, but only collected $ 80,000, no reasonable interpretation of the contract would require MTC to pay Caterpillar 20% of the $ 20,000 shortfall. It may be true, however, that MTC, having generated only $ 80,000 in realized income for Caterpillar, would only be entitled to its fee based on the $ 80,000--not on the full $ 100,000.

Should MTC succeed in demonstrating the merits of its complaint, it will be entitled to collect a fee based on the funds collected by Caterpillar on the Jerryco Judgment. If Caterpillar is unable to collect the full amount of the Jerryco Judgment, Caterpillar is entitled to argue that MTC's recovery from Caterpillar should be similarly limited. However, Caterpillar does not have a separate claim with respect to the uncollected part of the Jerryco Judgment, and its motion to amend the [*9] Answer to assert such a claim must be DENIED.

## CONCLUSION

For the reasons stated, defendant's motion is DENIED.

SO ORDERED.

ALLEN G. SCHWARTZ, U.S.D.J.

Dated: New York, New York

September 14, 1999

10764G

********** Print Completed **********

Time of Request: Wednesday, August 22, 2007  13:17:41 EST

Print Number:   1821:43742609
Number of Lines: 124
Number of Pages:

Send To:  HANSON, REBECCA
          FOLEY LARDNER
          321 N CLARK ST STE 2800
          CHICAGO, IL 60610-5313

LEXSEE 21 FED. APPX. 70

**COLLEEN MORRISSEY, Plaintiff-Appellant, -v.- GENERAL MOTORS CORPO-RATION, Defendant-Appellee.**

**00-9402**

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

*21 Fed. Appx. 70; 2001 U.S. App. LEXIS 23190*

**October 23, 2001, Decided**

**NOTICE:** [**1] RULES OF THE SECOND CIR-CUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the Eastern District of New York (Mishler, J.).

**DISPOSITION:** Affirmed.

**COUNSEL:** APPEARING FOR APPELLANT: RONALD J. CHISENA, West Hempstead, NY.

APPEARING FOR APPELLEE: JOHN R. SNYDER, Boston, MA (DANIEL J. JACKSON, ANDREW J. CAMELIO, on the brief).

**JUDGES:** PRESENT: HON. JAMES L. OAKES, HON. DENNIS JACOBS, Circuit Judges. HON. GERARD E. LYNCH, District Judge. *

* The Honorable Gerard E. Lynch of the United States District Court for the Southern District of New York, sitting by designation.

**OPINION**

[*71] *SUMMARY ORDER*

Colleen Morrissey appeals the district court's grant of summary judgment, dismissing her diversity claims seeking compensatory and punitive damages against General Motors for breach of contract, breach of the implied covenant of good faith and fair dealing, negligent misrepresentation, and fraudulent misconduct and unfair business practices.

The evidence before the district court, viewed in the light most favorable to Morrissey, shows that Morrissey [**2] and her father, who operated a Pontiac dealership in Commack, New York (the "Commack Franchise"), were asked by General Motors ("GM") in February 1996 whether they would be willing to close the Commack Franchise and acquire an interest in Rockville Centre Motors ("RCM"). As [*72] RCM, the Morrisseys and GM would purchase jointly the assets of Benjamin Pontiac/Oldsmobile ("Benjamin") with a $ 1.5 million capital contribution from GM, and $ 300,000 from the Morrisseys.

Morrissey and her father anticipated that, upon purchase, RCM would relinquish its Oldsmobile franchise and acquire a GMC Truck franchise. During negotiations with GM, Morrissey requested several times that GM commit in writing to a date certain by which RCM would receive the GMC Truck franchise. GM refused to include any written guarantee concerning RCM's right to sell GMC Trucks, and on April 2, 1996, Morrissey received a letter explaining that GM was "not in a position to provide any assurances as to when or under what circumstances" the GMC franchise would be offered. The Morrisseys elected to proceed with the closing on April 4, 1996.

Several of the closing documents contained a general merger clause. One letter, signed [**3] by Morrissey, referenced one of the merger clauses, and provided that Morrissey would "voluntarily terminate her Oldsmobile Division Franchise ... upon the execution of a GMC Dealership Agreement." Morrissey ultimately received and accepted the sought-after GMC Truck franchise in April, 1998.

No document pertaining to the agreements between the parties includes any promises from GM concerning requisite timing or conditions for delivery of the GMC franchise. Morrissey relies on oral promises that: (1) GM

would transfer a GMC Truck franchise to RCM within one to two months after the purchase of Benjamin; (2) GM would pay RCM $ 500,000 for image design renovations upon RCM's sale of its Oldsmobile franchise back to the Oldsmobile Division for that amount; and (3) all agreements were contingent on the Morrisseys' initial closing of the Commack Franchise.

On appeal, Morrissey challenges the grant of summary judgment in favor of GM: (1) on breach of contract and breach of the implied covenant of good faith and fair dealing, because the parol evidence rule (relied on by the district court) does not bar consideration of oral promises that were omitted from the written contract due to fraudulent [**4] inducement or duress; and (2) on fraud and negligent misrepresentation, because the evidence, viewed in the light most favorable to Morrissey, indicated that Morrissey reasonably relied on GM's alleged misrepresentations.

We affirm.

1. This Court reviews a grant of summary judgment *de novo. Beckford v. Portuondo, 234 F.3d 128, 130 (2d Cir. 2000).* Summary judgment is appropriate where the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed R. Civ. P. 56(c).* Reaching this determination, the district court must "examine the evidence in the light most favorable to the nonmoving party." *Adjustrite Systems v. Gab Business Services, 145 F.3d 543, 547 (2d Cir. 1998).* However, "The nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)* (quoting *Fed. R. Civ. P. 56(e))* (citations and footnote omitted). "Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine [**5] issue of fact." *Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998).*

Under New York law, the "parol evidence rule bars proof of prior oral statements offered to refute the unambiguous terms of a written, integrated contract." *O'Hearn v. Bodyonics, Ltd., 22 F. Supp. 2d 7, 13 [*73] (E.D.N.Y. 1998); see also Investors Ins. Co. of America v. Dorinco Reinsurance Co., 917 F.2d 100, 104 (2d Cir. 1990)* (holding that extrinsic evidence cannot be used to "vary the plain meaning of" a fully integrated contract). "Ordinarily, a merger clause provision indicates that the subject agreement is completely integrated." *Tempo Shain Corp. v. Bertek, Inc., 120 F.3d 16, 20 (2d Cir. 1997).* However, as Morrissey argues, a general merger clause does not preclude parol evidence of a claim based on duress or fraudulent inducement. *See id.; Thomas v. Scutt, 127 N.Y. 133, 137, 27 N.E. 961 (1891).*

Morrissey's allegation is that though she signed several completely integrated documents, each of which failed to record the oral promises allegedly made by GM concerning the GMC Truck franchise, she had no choice: she "had already [**6] gone to the closing and ... put [her] money into this deal" based on GM's earlier promises. This claim of duress is procedurally and substantively barred.

A party may not raise an issue for the first time on appeal. *Gurary v. Winehouse, 190 F.3d 37, 44 (2d Cir. 1999).* To the district court, Morrissey failed to present any claim of fraudulent inducement or duress to oppose GM's argument that Morrissey was precluded from relying on extrinsic evidence in support of her breach of contract and breach of implied covenant of good faith and fair dealing claims.

In any event, arguments of duress and fraudulent inducement are not cognizable based on these facts. GM merely requested that Morrissey sign documents recording an agreement on terms previously described in the April 2 letter, received by Morrissey two days before. She was thus aware before the closing that GM would make no concrete commitment about the GMC Truck franchise. With full knowledge, it was her prerogative to proceed.

In any event, Morrissey does not seek rescission and cannot use claims of duress and fraudulent inducement to selectively add or alter contract terms, while affirming the contract generally. [**7] *Soviero Bros. Contracting Corp. v. City of New York, 286 A.D. 435, 142 N.Y.S.2d 508, 514 (App. Div. 1955)* ("One elects either to continue with the contract fraudulently induced or to rescind it. If one elects to continue with it, one accepts all the burdens contained in the contract as well as the benefits.").

2. To succeed on negligent misrepresentation or fraud claims a party must demonstrate that its reliance on another party's false statements was reasonable. *Stone v. Schulz, 231 A.D.2d 707, 647 N.Y.S.2d 822, 823 (App. Div. 1996).*

Morrissey admits receiving notice by April 2 that GM was "not in a position to provide any assurances" concerning the GMC Truck franchise. Morrissey's reliance on GM's alleged oral promises, which directly contradict the terms of that letter and the terms of the April 4 written agreements, was unreasonable as a matter of law. *Robert J. McRell Assocs., Inc. v. Insurance Co. of North Am., 677 F. Supp. 721, 731 (S.D.N.Y. 1987)* ("As a matter of law, [plaintiff is] not entitled to rely on a representation flatly contradicting the express terms" of the contract.); *see also Trifiro v. New York Life Ins. Co., 845 F.2d 30, 33-34 (1st Cir. 1988) [**8]* ("Explicit conflict engenders doubt, and to rely on a statement the veracity of which one should doubt is unreasonable.").

21 Fed. Appx. 70, *; 2001 U.S. App. LEXIS 23190, **

Morrissey argues that not all the terms in the written documents conflict with the alleged oral promises. According to her, the term "voluntarily terminate [the] Oldsmobile Division Franchise", as used in the April 4 letter, does not necessarily mean [*74] she was expected to do so gratuitously, i.e. without the $ 500,000 payment. However, Morrisey's termination of RCM's Oldsmobile franchise would not be gratuitous even in the absence of the oral promises. After all, she was required to terminate only "upon the execution of a GMC Dealer Agreement"--a franchise agreement which Morrissey readily acknowledges would garner significantly greater profits and which Morrissey readily accepted in April, 1998.

LEXSEE 2003 US DIST LEXIS 17371

**OXYN TELECOMMUNICATIONS, INC., Plaintiff, - vs.- ONSE TELECOM, HYUNDAI TELECOM (USA), INC., HOON YANG, a/k/a Michael Yang and CHI-YEOL KIM, a/k/a Charles Kim, Defendants.**

**01 Civ. 1012 (JSM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 17371*

**September 30, 2003, Decided**
**September 30, 2003, Filed**

**PRIOR HISTORY:** *Oxyn Telecomms., Inc. v. Onse Telecom, 2003 U.S. Dist. LEXIS 2671 (S.D.N.Y., Feb. 25, 2003)*

**DISPOSITION:** [*1] Defendant Onse's motion for summary judgment dismissing claims granted in part and denied in part. Plaintiff's motions for summary judgment and partial summary judgment denied. Hyundai defendants' motion to dismiss second amended complaint granted.

**COUNSEL:** For Oxyn Telecommunications, Inc, PLAINTIFF: David Molton, Matthew Hearle, Buchanan Ingersoll, New York, NY USA.

For Onse Telecom Corporation, DEFENDANT: Marc J Gottridge, Lovells, Michael M YI, Yi, Tuan & Brunstein, Michael M YI, New York, NY USA.

For Onse Telecom Corporation, COUNTER-CLAIMANT: Marc J Gottridge, Lovells, Michael M YI, Yi, Tuan & Brunstein, Michael M YI, New York, NY USA.

For Oxyn Telecommunications, Inc, COUNTER-DEFENDANT: [*2] David Molton, Matthew Hearle, Buchanan Ingersoll, New York, NY USA.

**JUDGES:** JOHN S. MARTIN, JR., U. S. D. J.

**OPINION BY:** JOHN S. MARTIN, JR.

**OPINION**

**OPINION & ORDER**

JOHN S. MARTIN, JR., District Judge:

Defendant Onse Telecom has moved for summary judgment and Plaintiff Oxyn Telecommunications, Inc. has moved for partial summary judgment pursuant to *Fed. R. Civ. P. Rule 56*. In addition, Defendants Hyundai Telecom, Hoon Yang and Chi-Yeol Kim (the "Hyundai defendants") have moved to dismiss the Second Amended Complaint pursuant to *Fed. R. Civ. P. Rule 12(b)(6)*.

The Facts

On November 10, 2000, Oxyn and Onse entered into an Agreement, pursuant to which Onse, a Korean telecommunications company, agreed to invest $ 15,000,000 in Oxyn, a New York corporation. The first $ 4,000,000 was to be deposited into an Oxyn account within 30 days of the execution of the Agreement; the additional $ 11,000,000 was to be deposited at a time to be agreed, within 15 months of the date of execution of the Agreement. The Agreement was, on its face, preliminary. Its introductory statement of purpose stated:

> WHEREAS, [*3] ONSE has indicated that it wishes to make an investment in OXYN and, in consideration of such investment, wishes to obtain an equity interest in OXYN, and

> WHEREAS, the parties have now agreed upon the amount of such investment and the period in which said investment is to be made; and

> WHEREAS, the parties *still must complete negotiations with respect to the percentage of shares* in OXYN that

Case 1:07-cv-04854-PKL    Document 26-2    Filed 08/22/2007    Page 67 of 89

Page 2
2003 U.S. Dist. LEXIS 17371, *

ONSE will acquire as a result of its investment, ...

Nov. 10, 2000 Agreement (emphasis added).

In addition, in the body of the Agreement, it is stated:

> It is understood and agreed that, in consideration of this investment, ONSE will receive a percentage of all of the issued and outstanding shares of OXYN, *which percentage is yet to be agreed upon,*

and that:

> In addition to all of the foregoing and not by way of limitation, *all of the terms of ONSE's entitlements as a result of this investment will be negotiated and finalized in a formal agreement,* to be completed and executed either in New York, USA or Seoul, Korea prior to the deposit of the final Eleven Million ($ 11,000,000) Dollars into the OXYN account. November 10, 2000 Agreement (emphasis [*4] added).

Onse announced the Agreement in a press release that stated:

> Onse Telecom's President Chang signed a strategic partnership agreement on the 14th of November. Onse will become the second largest shareholder of Oxyn, a New York based company. This agreement will allow Onse to fully enter the United States telecommunications market .... The planned budget for this project is $ 45 million.

Second Amended Complaint, Ex. C.

The Agreement also stated that Oxyn and Onse would, as soon as practicable, commence traffic trading, and that the final agreement would provide a volume commitment index for international traffic. The November 10 Agreement did, in fact, contain an Appendix A, titled "Termination rate agreement between OXYN Telecommunications, Inc. and ONSE Telecom," which included an "Asymmetrical Volume Commitment" for international telephone traffic.

Subsequently, on November 16, Mr. Yang of Onse wrote to Oxyn, asking Oxyn to send a termination notice to Dacom, the company with which it had been traffic trading, because Onse anticipated that, as a shareholder of Oxyn, it would take over that business. Oxyn apparently agreed to do so.

Later in November, [*5] Onse's President, Sang-Hyon Chang, asked Oxyn's President, Jason Oh, to amend the Agreement to state that Onse's investment obligation was conditional upon the approval of Onse's Board of Directors. The parties agreed that Charles Kim, an employee of Hyundai Telecom, based in Englewood, New Jersey, would act as Onse's representative to attempt to negotiate an amendment to the Agreement. Those discussions were unsuccessful, and Oxyn alleges that Mr. Chang's request actually was the first step in Onse's attempt to withdraw from its commitments pursuant to the Agreement.

Next, on December 6, 2000, Onse filed an application with Seoul Bank to transfer $ 4,000,000 to Oxyn's account, but was informed by the Bank that under Korean law it could not remit funds for foreign investment without receiving specific information about the number of shares and percentage of total equity that would be acquired in the transaction. Oxyn contends that Onse was well aware of this requirement, purposefully submitted an inadequate application to the Bank, and could easily have satisfied the Bank's concerns, but chose instead to use the Bank's refusal as another excuse to avoid the Agreement. In addition, [*6] Oxyn alleges that the parties had agreed that the number of shares and percentage of equity to be acquired by Onse was to be determined by an independent appraiser to be designated by Onse, and that Onse failed to designate an appraiser because it wanted to avoid the Agreement.

Therefore, although Mr. Chang had suggested sending a group of representatives to New York to further negotiate the specifics of the transaction, immediately after the December 10 deadline for payment of the first $ 4,000,000 passed and Oxyn did not receive the payment, Mr. Oh faxed a letter to Onse in which he threatened to sue Onse for breach of contract and seek a minimum of $ 200 million in damages. Three Onse employees arrived in New York to meet with Oxyn on December 16, 2000, and met with counsel, as well as with Mr. Kim and Dr. Michael Yang of Hyundai, in preparation for their meeting with Oxyn. All attempts to resolve the dispute between Oxyn and Onse were unavailing and Oxyn filed the Complaint in this action on February 8, 2001.

Breach of Contract Claims

While Oxyn and Onse agree that the November 10 Agreement was preliminary in that it contemplated exe-

cution of a more detailed, final contract, [*7] they disagree as to whether the Agreement contained all of the essential terms necessary to create a binding contract, and, if not, whether it constituted a binding agreement to continue to negotiate in good faith or merely an unenforceable agreement to agree. Onse contends that the number of shares that it was to acquire in return for its investment was the most important term of the Agreement, and that consequently the failure to include that term renders the Agreement fatally incomplete and unenforceable. Oxyn argues, to the contrary, that the Agreement contained all necessary terms, and that the number of shares to be received by Onse was fixed by the parties' oral agreement that Onse would become the second largest owner of Oxyn shares, and that the exact percentage of ownership would be determined by an appraiser of Onse's choosing. In turn, Onse disputes the existence of such an understanding, and states that an agreement that Onse would appoint an outside appraiser to determine, within an agreed range, the number of shares to be received by Onse, would directly contradict the language in the November 10 Agreement, which states that the "parties still must complete negotiations [*8] with respect to the percentage of shares" that Onse will acquire in Oxyn. The Agreement also stated that the percentage of ownership "is yet to be *agreed* upon" and that the terms of Onse's "entitlements as a result of this investment will be *negotiated* and finalized in a formal agreement." (emphasis added).

Although there is, generally, a "strong presumption against finding binding obligations in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents," *Teachers Ins. & Annuity Asso. v. Tribune Co., 670 F. Supp. 491, 499 (S.D.N.Y. 1987)*, some preliminary agreements create binding obligations. *Adjustre Systems, Inc. v. GAB Business Services, Inc., 145 F.3d 543, 548 (2d Cir. 1998)*. These fall into two categories: (1) those that are "preliminary only in form - only in the sense that the parties desire a more elaborate formalization of the agreement," *TIAA v. Tribune Co., 670 F. Supp. at 498 (S.D.N.Y. 1987)*, and (2) those in which the parties "agree on certain major terms, but leave other terms open for negotiation." *Id.* [*9] In this second type, the parties are not committed to their ultimate contractual objective. Instead, they merely "accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement" within the "agreed framework." *Id.* The key to determining whether, the Agreement is binding in either the first or the second sense is the intent of the parties: "whether the parties intended to be bound, and if so, to what extent." *Adjustrite Systems, Inc. v. GAB Business Services, Inc., 145 F.3d at 548-49*. The language of the Agreement is the most important factor in making this determination. *Id.*

at 549; *B. Lewis Productions, Inc. v. Angelou, 2003 U.S. Dist. LEXIS 12655, No. 01 Civ. 0530, 2003 WL 21709465, *8 (S.D.N.Y. July 23, 2003)*.

Based on the language of the Agreement, the Court concludes that it is highly likely that when the parties signed the Agreement, they intended that it be binding. Although Oxyn and Onse planned to negotiate further in order to determine the number of Oxyn shares and other "entitlements" that Onse would acquire in return for its investment, the Agreement does not contain any reservations or conditions. Instead, [*10] it sets out the agreed rights and duties of the parties in definitive terms. Thus, it states that "ONSE *will invest*" $ 15,000,000 in Oxyn; Onse "*will receive*" a percentage of all of the issued and outstanding shares of Oxyn; Onse "*will make* an initial deposit" of $ 4,000,000 "within 30 days of the execution of this agreement"; the parties "*will,* as soon as practicable, *commence traffic trading,*" and the final agreement *shall provide* a volume commitment." Neither party's obligations are stated to be contingent on Board, regulatory or other approvals, and, most significantly, the Agreement does not state that Onse's initial $ 4,000,000 payment is dependent on a resolution of the question of the amount of equity to be acquired by Onse. Thus, the Agreement states:

> Pending a determination of the actual percentage of ownership that ONSE will acquire for its total investment of Fifteen Million ($ 15,000,000) Dollars, ONSE will make an initial deposit of Four Million ($ 4,000,000) Dollars within 30 days of the execution of this agreement.

With respect to Onse's "entitlements" as a result of its investment, the same is true. The Agreement states that [*11] the negotiation and finalization of those specifics would be "in addition to all of the foregoing and not by way of limitation," again indicating an attempt to make the Agreement as binding as possible under the circumstances. [1]

> 1  Outside circumstances also provide evidence of an intent to be bound. These include the fact that the parties rushed into signing the Agreement because Onse wanted to make certain that Oxyn would not renew its traffic trading agreement with Dacom, and the subsequent letter from Onse to Oxyn, asking Oxyn to notify Dacom that it planned to terminate their traffic trading relationship as soon as Onse was in a position to begin traffic trading with Oxyn, given that Onse was going to be a major shareholder in Oxyn.

However, as in *B. Lewis Productions v. Angelou, 2003 U.S. Dist. LEXIS 12655, 2003 WL 21709465, \*11-12*, the Court also finds that, in spite of the parties' apparent intent to be bound, the Agreement fails to include essential terms, and therefore is too vague and incomplete to be enforced. [\*12] As stated, the first essential term that is missing from the Agreement is the percentage of shares in Oxyn to be acquired by Onse in return for its investment. Plaintiff's argument that Oxyn and Onse had agreed to submit the determination of the percentage of Oxyn shares to be acquired by Onse to an independent appraiser is, in fact, contrary to the language of the Agreement, which provides that this question was to be the subject of future negotiation between the parties. While parol evidence may be received to explain ambiguous terms or to fill in terms in an unintegrated contract, it may not be introduced to vary or contradict clear contract language. *Joseph Victori Wines v. Vina Santa Carolina S.A., 933 F. Supp. 347, 352 (S.D.N.Y. 1996)* ("If the writing is not integrated, of course, parol evidence of additional contract terms may be admitted to complete the agreement, so long as the additional terms *do not contradict* the written terms." (emphasis added)); *U.S. West Financial Services, Inc. v. Tollman, 786 F. Supp. 333, 342 (S.D.N.Y. 1992)*. See also *S.E.C. v. Levine, 881 F.2d 1165, 1179 (2d Cir. 1989)* ("With few exceptions . [\*13] .. evidence of contemporaneous agreements is not admissible in evidence to contradict a term of the writing."); *Ruttenberg v. Davidge Data Systems Corp., 215 A.D.2d 191, 198, 626 N.Y.S.2d 174, 179 (1st Dep't 1995).* [2]

> 2   Furthermore, the understanding that Onse would become the second largest shareholder of Oxyn is itself ambiguous because there already were *two* largest shareholders in Oxyn - Jason Oh and Howard Lee, each of whom owned 32,750 shares out of 90,000 shares issued and outstanding. It is not stated whether Mr. Oh and Mr. Lee would remain the "largest shareholder" jointly, or each separately and equally after Onse received it shares. This ambiguity is significant because if the intention was that together Mr. Oh and Mr. Lee would continue to hold 70% of the issued and outstanding shares, and if Onse were to acquire, for example, 25% of the issued and outstanding shares, there would be virtually no shares remaining to allocate to the investors who it was hoped would contribute an additional $ 30,000,000 to the venture. The obvious solution would be for Oxyn, which was authorized to issue up to 1,000,000 shares, to issue additional shares. However, nothing is stated as to how the various shareholders (including the existing

smaller shareholders) would be dealt with in such an event.

[\*14] In addition, the Agreement left open for future negotiation Onse's "entitlements as a result of this investment." While the Agreement does not contain language that specifically refers to the formation of a joint venture or partnership, Onse's press release about the signing of the Agreement refers to the arrangement as a "strategic partnership," and the parties agree that Onse's role in the proposed venture was not intended to be that of a passive stockholder/investor, but rather that "through this partnership, Onse and Oxyn [would] enter the local, long distance and international voice market in the United States." Second Amended Complaint, P 10 and Ex. C. Nevertheless, the Agreement does not specify any of the details of how such a "strategic partnership" would work. Instead, the "entitlements" that were left to be determined at a future time presumably included, among other items, the respective roles and degree of control to be exercised by each party in managing the future joint business venture. Such details are of prime importance, and are necessary to create an enforceable joint venture agreement under New York law. *B. Lewis Productions, Inc. v. Angelou, 2003 U.S. Dist. LEXIS 12655, No. 01 Civ. 0530, 2003 WL 21709465,* [\*15] *\*11-12 (S.D.N.Y. July 23, 2003).* Thus, the failure to complete the anticipated negotiations leaves open items - both the percentage of shares and the other "entitlements" to be received by Onse - of such magnitude that a court could not enforce the Agreement without running the risk of "imply[ing terms] which the parties themselves failed to insert." [3] *Lui v. Park Ridge at Terryville Ass'n, 196 A.D.2d 579, 581, 601 N.Y.S.2d 496, 498 (2d Dep't 1993).* See also *Reiss v. Financial Performance Corp., 97 N.Y.2d 195, 199, 738 N.Y.S.2d 658, 661, 764 N.E.2d 958 (2001).* Accordingly, the Agreement is too incomplete to be enforced, and Onse is entitled to summary judgment in its favor with respect to its alleged breach of its obligation to make the second payment of $ 11,000,000 to Oxyn pursuant to the Agreement.

> 3   This does leave open the possibility that the contract was a binding preliminary agreement, and that Onse breached the obligation to negotiate in good faith. Such a claim raises issues of fact, including issues relating to Onse's counterclaim that Oxyn fraudulently induced Onse to enter into the Agreement by means of numerous material misrepresentations. It also should be noted that if Plaintiff were to prevail upon such a claim, it would be entitled only to specific performance with respect to that duty, or damages for its reliance on the promise to negotiate. Full expectation damages would be unavailable unless it can be found with certainty that the parties

2003 U.S. Dist. LEXIS 17371, *

would have reached a final agreement, and what its terms would have been.

[*16] However, although the payment by Onse of the second $ 11,000,000 payment clearly is contingent on the parties reaching agreement as to what percentage of Oxyn shares Onse would acquire in return for its investment, and contemplates negotiation of other significant issues, the Agreement does not appear, on its face, to impose any preconditions on Onse's obligation to make the first $ 4,000,000 payment to Oxyn. As stated above, the language with respect to the first $ 4,000,000 investment appears to be unequivocal, and to be given in return for Oxyn's promise to begin traffic trading with Onse as soon as possible. [4] Therefore, a question of fact exists as to whether that portion of the contract is severable from the remainder, and enforceable as written. [5] Accordingly, summary judgment is denied with respect to the enforceability of that provision of the Agreement.

> 4   Extrinsic evidence also indicated that Onse believed that due to the traffic trading imbalance anticipated, it would reap significant profits from that relationship, regardless of the resolution of the issues with respect to other terms of the Agreement.

[*17]

> 5   If that portion of the Agreement is severable, there would also seem to be questions of fact as to whether there was a failure of consideration with respect to that portion, given that Oxyn and Onse never began the traffic trading relationship that the $ 4,000,000 payment apparently was intended to secure.

Tortious Interference with Contractual Relations and Tortious Interference with Prospective Economic Advantage

Oxyn alleges that Onse tortiously interfered with its contractual business relationship with Dacom when it requested, on November 16, 2000, that Oxyn send a notice to Dacom, terminating its relationship with Dacom as of the day before the planned Onse-Oxyn circuits would be operational, and stating that Onse hoped to be ready to begin traffic trading by December 1, 2000. Pursuant to that request, Oxyn did send a termination notice to Dacom. However, although Oxyn and Onse began work to set up the Oxyn-Onse circuits, they were not established until January 2001, when, according to Onse, Oxyn refused to make them operational. Meanwhile, Oxyn and Dacom continued to do business [*18] with each other: Oxyn sending Dacom traffic for termination in Korea until sometime in February 2001, and Dacom sending Oxyn traffic terminating in the United States until October 2001.

In order to state a claim for tortious interference with contract, a plaintiff must allege the "existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76, 82, 668 N.E.2d 1370 (1996). Because the cases require that the third party, not the plaintiff, must be the one to breach the contract, *Museum Boutique Intercontinental, Ltd v. Picasso, 886 F. Supp. 1155, 1162 n.17 (S.D.N.Y. 1995)*, Oxyn's claim based on its own actions pursuant to Onse's request that it terminate its trade trafficking arrangements with Dacom fails to state a cause of action.

Oxyn also attempts to state a claim for tortious interference with its prospective economic relations with Dacom based on the same facts. [*19] In order to state a claim for tortious interference with prospective economic advantage, a plaintiff must allege: (1) business relations with a third party; (2) the defendant's interference with those business relations; (3) that the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship. *Purgess v. Sharrock, 33 F.3d 134, 141 (2d Cir. 1994)*. Again, in order to state a claim under New York law, the defendant's activities must be directed at the third party and must convince the third party not to enter into a business relationship with the plaintiff. *G.K.A. Beverage Corp. v. Honickman, 55 F.3d 762, 768 (2d Cir.)*, cert. denied, *516 U.S. 944, 133 L. Ed. 2d 304, 116 S. Ct. 381 (1995); Fonar Corp. v. Magnetic Resonance Plus, Inc., 957 F. Supp. 477, 482 (S.D.N.Y.)*, aff'd, *128 F.3d 99 (2d Cir. 1997)*. Since Oxyn's claim is based upon actions directed at Oxyn itself, and on Oxyn's own actions taken as a result of the alleged interference, the claim cannot stand as a matter of law.

Furthermore, Oxyn cites no evidence to [*20] support the proposition that Onse asked Oxyn to terminate its relationship with Dacom either with the sole purpose of harming Oxyn, or by improper means. Clearly, it is undisputed that Onse's request was made to serve its own self-interest, and therefore not for the *sole* purpose of harming Oxyn. Furthermore, Oxyn has come forward with no evidence that at the time Onse made the termination request on November 16, 2000, that it did not intend to begin traffic trading with Oxyn as soon as possible. In fact, it is undisputed that Oxyn's and Onsenet's engineers worked together in Los Angeles to try to establish the necessary interconnection to begin traffic trading, and continued to do so until January 2001. [6] Furthermore, the "wrongful means" that are required to support a claim of tortious interference with prospective economic advan-

tage are defined as "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure." *Guard-Life Corp. v. S. Parker Hardware Mfg. Co., 50 N.Y.2d 183, 191, 428 N.Y.S.2d 628, 632, 406 N.E.2d 445 (1980).* Simple persuasion does not suffice. *Jabbour v. Albany Medical Center, 237 A.D.2d 787, 789, 654 N.Y.S.2d 862, 864 [\*21] (3rd Dep't 1997).* The use of sufficient wrongful means by Onse is alleged only in the most conclusory manner and lacks any proffer of evidentiary support.

      6   Onse states that the interconnection was completed on January 10, 2001, but that Oxyn then refused to begin traffic trading because Onse had not made the anticipated $ 4,000,000 investment in Oxyn pursuant to the Agreement.

In addition, Oxyn claims that Onse's actions tortiously interfered with its prospective economic relations by depriving Oxyn of an additional $ 30,000,000 in investments from third party investors, who had conditioned the possibility that they might invest in Oxyn on Onse's actually making the $ 15,000,000 investment anticipated in the Agreement. This claim also cannot withstand scrutiny. First, Onse neither contacted, nor directed any actions, toward those third parties. Second, it is clear that under New York law,

    A cause of action for interference with prospective economic advantage contemplates a defendant who has interfered [\*22] with specific precontractual relations or a prospective relationship between the plaintiff and a third party that would have proceeded to some sort of binding, if not contractual, relationship *but for* the defendant's interference.

*D'Andrea v. Rafla-Demetrious, 3 F. Supp. 2d 239, 251 (E.D.N.Y. 1996),* aff'd, *146 F.3d 64 (2d Cir. 1998)* (emphasis added).

The evidence presented by Oxyn was far too vague and speculative to support a claim that any of the companies or individuals with whom Oxyn discussed investing in Oxyn would have gone forward and invested in Oxyn if Onse had, in fact, made a $ 15,000,000 investment in Oxyn. See *Nadel v. Play-By-Play Toys & Novelties, Inc., 208 F.3d 368, 382-83 (2d Cir. 2000).*

Fraud Claims Against Onse

Oxyn alleges that Onse's November 16 letter, in which it demanded that Oxyn terminate its traffic trading relationship with Dacom, constituted fraud because, at the time it sent the termination demand, Onse did not intend to honor the Agreement and become a shareholder in Oxyn. Oxyn claims that Onse sent the termination request letter with the purpose of disrupting Oxyn's relationship [\*23] with Dacom and thereby increasing its own leverage in its negotiations with Oxyn. [7] In addition, Oxyn charges that Onse's request that Oxyn agree to the appointment of Mr. Charles Kim as its representative to attempt to negotiate an amendment to the Agreement was false and misleading and was intended to further undermine the Agreement and provide Onse with a justification for providing Mr. Kim with confidential Oxyn documents and information.

      7   This argument is a bit illogical since Oxyn claims that Onse simply wanted to walk away from the Agreement. If this was so, it is unclear why Onse would seek leverage to apply in negotiations with Oxyn.

In order to make out a claim to recover damages for fraud, a plaintiff must prove: (1) a misrepresentation or material omission of fact, (2) which was false and known to be false by the defendant, (3) made for the purpose of inducing the other party to rely upon it, (4) justifiable reliance by the other party on the misrepresentation or material omission, and (5) injury. [\*24] *Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 80, 668 N.E.2d 1370 (1996).* This claim also fails as a matter of law because Oxyn has not come forward with any evidence that when Onse asked Oxyn to terminate its traffic trading relationship with Dacom, it did not, in fact, intend to enter into the anticipated traffic trading relationship with Oxyn as soon as possible. In fact, the evidence, including that relating to the efforts of the Onsenet and Oxyn engineers to establish the necessary interconnection, is to the contrary.

As for the allegation that Onse acted fraudulently when it asked Oxyn to permit Mr. Kim to represent Onse in its negotiations with Oxyn and, in that context, to view documents otherwise protected from disclosure by the Non-Disclosure Agreement between Oxyn and Onse (the "NDA"), Oxyn has proferred no evidence of any misstatement by Onse regarding its desire to have Mr. Kim represent it with respect to its request to renegotiate the Agreement. While it is true that Oxyn does allege that Onse's failure to inform Oxyn that Hyundai had approached it with a business proposal, which it had not accepted, was a material omission, [\*25] and that if Oxyn had known that fact, it would not have agreed to Mr. Kim's appointment, Oxyn has made no showing that it suffered any injury as a result of either Mr. Kim's ap-

pointment or his being given access to Oxyn's documents. [8]

> 8   Oxyn also claims that Onse breached the Non-Disclosure Agreement between itself and Oxyn by revealing confidential information about Oxyn to both Hyundai and Onsenet, Onse's American subsidiary. Oxyn contends that it is entitled to payment of the attorneys fees and costs that it incurred as a result of Onse's alleged breach of the NDA. However, Oxyn has not shown that this alleged breach caused it to incur any costs or fees beyond those it was already paying in connection with its suit for breach of the Agreement. Furthermore, such fees would be payable only if Oxyn prevailed on its claim that the NDA had been breached, which would require proof of damage attributable to the disclosure of the documents to Mr. Kim. See *Gordon v. DeLaurentiis Corp, 141 A.D.2d 435, 436, 529 N.Y.S.2d 777, 779 (1st Dep't 1988).* As stated, Oxyn has not preferred evidence of such damage.

[*26] Claims against Hyundai Telecom, Dr. Yang and Mr. Kim

Oxyn alleges that Hyundai Telecom and its employees, Dr. Yang and Mr. Kim (the "Hyundai defendants") took steps to induce Onse to breach the Agreement with Oxyn, and attempts, on the basis of that claim, to state claims against Hyundai for tortious interference with contract and tortious interference with prospective economic advantage.

A. Tortious Interference with Prospective Economic Advantage

As stated previously, a claim of tortious interference with prospective economic advantage requires a showing that the defendant's actions were for the sole purpose of harming the plaintiff, or were accomplished through wrongful means. Oxyn itself contends that Hyundai's motive for its alleged attempts to undermine the Agreement between Oxyn and Onse was its own economic benefit, and a hoped-for future business relationship between itself and Onse. Moreover, the "wrongful means" alleged by Oxyn are not of the type necessary to support an action for tortious interference with prospective economic advantage, since "persuasion alone" is insufficient, even if it is "knowingly directed at interference with the contract." [*27] *Jabbour v. Albany Medical Center, 237 A.D.2d 787, 789, 654 N.Y.S.2d 862, 864 (3rd Dep't 1997).*

Furthermore, to the extent that the Hyundai defendants allegedly used information from improperly disclosed documents to influence Onse, it was Onse's wrong - not Hyundai's - that gave the Hyundai defendants access to those documents. Hyundai also would have had access only to information that was already in Onse's hands, since it was *from* Onse that the documents came *to* Hyundai. Thus the claim against Hyundai, Mr. Kim and Dr. Yang for tortious interference with prospective economic advantage must be dismissed as a matter of law.

To the extent that the Hyundai defendants are alleged to have interfered with Oxyn's prospective economic relations with third party investors, the claim also fails. As stated previously, under New York law, such a claim requires a showing that *but for* the interference of the defendant, the third parties would have entered into a contract with the plaintiff. Here it is undisputed that the major reason that the third party investors did not invest in Oxyn was Onse's failure to invest $ 15,000,000 in Oxyn pursuant to the Agreement -- not [*28] any action by Hyundai or its employees.

Finally, it is alleged that the Hyundai defendants interfered with future relations between Oxyn and Dacom. This claim fails for the same reasons stated previously. First, it was Oxyn itself that terminated its agreement with Dacom in compliance with Onse's request. There also has been no showing that the Hyundai defendants used improper means of the sort required to make out a claim for tortious interference with prospective economic advantage.

B. Tortious Interference with Contract

Absent a valid contract, there can be no claim for tortious interference with contractual relations. Since the Court has found that the Agreement is incomplete and unenforceable, at least to the extent that it requires Onse to invest $ 11,000,000 in Oxyn, a claim for tortious interference cannot stand. As to the claim that the Hyundai defendants interfered with the portion of the Agreement in which Onse promised to pay $ 4,000,000 within 30 days of the signing of the Agreement, the validity of which has been held to raise questions of fact that cannot be determined on this motion, issues of fact also would preclude summary judgment with respect to this [*29] claim. However, Oxyn's allegations that the Agreement had come under attack from constituencies and individuals within Onse (on or before November 22, 2000), and that Onse was already looking for a way to walk away from the Agreement before the Hyundai defendants became involved (on or after November 23, 2000), "is incompatible with an allegation of 'but for' cause as to" the Hyundai defendants. See *Sharma v. Skaarup Ship Management Corp., 916 F.2d 820, 828 (2d Cir. 1990),* cert. denied, *499 U.S. 907, 113 L. Ed. 2d 218, 111 S. Ct. 1109 (1991).* Additional Claims Against All Defendants

2003 U.S. Dist. LEXIS 17371, *

Finally, Oxyn alleges prima facie tort against both Onse and Hyundai, claims that all Defendants engaged in an illegal civil conspiracy, and makes a claim for injunctive relief. New York does not recognize the tort of civil conspiracy as an independent cause of action. *Houbigant, Inc. v. ACB Mercantile, 914 F. Supp. 964, 989 (S.D.N.Y. 1995)*. The conspiracy doctrine merely permits a showing of joint liability in the event that an underlying tort is shown to have been the result of a common scheme or plan. Atlantis Int'l, Ltd. v. Houbigant (In re Houbigant, Inc.), No. 95 Civ. 9541 (JSM), 1996 U.S. Dist. LEXIS 13424, *17 (S.D.N.Y. Sept. 13, 1996). [*30] Therefore, the Fourteenth cause of action, for Civil Conspiracy, is dismissed.

Similarly, there is no cause of action for injunctive relief under either New York or federal law. *Reuben H. Donnelley Corp. v. Mark I Mktg. Corp., 893 F. Supp. 285, 293 (S.D.N.Y. 1995)*. An injunction is a form of relief that is available only if a plaintiff cannot be compensated for a defendant's allegedly wrongful conduct by a remedy at law. *Id. at 293-94*.

Prima Facie Tort

The elements of a cause of action for prima facie tort are: (1) intentional infliction of harm; (2) resulting in special damages; (3) without excuse or justification; (4) by an act that would otherwise be lawful. *Twin Laboratories, Inc. v. Weider Health & Fitness, 900 F.2d 566, 571 (2d Cir. 1990)*. "The touchstone is 'disinterested malevolence,' meaning that the plaintiff cannot recover unless the defendant's conduct was not only harmful, but done with the sole intent to harm." Id. Motives of profit, self interest, or business advantage have been held to defeat a claim of prima facie tort. *Id.* Oxyn has made no showing that Onse's primary intent [*31] was to harm Oxyn, or that it was motivated at any time by anything other than self-interest in its dealings with Oxyn. Therefore, Oxyn's claim of prima facie tort fails to state a cause of action.

Onse's Claims against Oxyn

Oxyn has moved for partial summary judgment dismissing Onse's counterclaims of fraudulent inducement, indefiniteness, bad faith, and unclean hands, and for an Order holding that Onse breached both the Agreement and the NDA. [9]

9 As stated previously, Oxyn has failed to demonstrate that Onse's alleged breach of the NDA caused it any injury.

Onse interposed these claims in opposition to Oxyn's breach of contract claims. Accordingly, their disposition follows that of the underlying claims. Because summary judgment is hereby granted in Onse's favor with respect to the allegation that Onse breached the Agreement by failing to pay the second payment of $ 11,000,000, Onse's counterclaims with respect to that part of the Agreement are moot. Because questions of fact exist as to both the [*32] severability of the obligation to pay the first $ 4,000,000, and the intent of the parties with respect to the import of that portion of the Agreement, precluding summary judgment at this time, summary judgment also would be inappropriate regarding Onse's counterclaims with respect to that portion of the Agreement.

In its Answer and Counterclaims, Onse alleged that in its presentations and proposals to Onse, Oxyn misrepresented its financial condition, assets, experience, business relationships, and position in the marketplace, and that Onse relied on these misrepresentations, as well as on Oxyn's allegedly false statements regarding the date on which Oxyn's traffic trading agreement with Dacom would expire, when it entered into the Agreement. Onse proffers numerous details to support this contention. Oxyn responds that its statements to Onse were not misleading, and that, in any event, Onse cannot claim to have justifiably relied on Oxyn's representations because it went ahead and entered into the Agreement without waiting for additional financial information that Man-Soo Chang of Onse had requested. This raises an issue of fact that cannot be resolved on this motion. [10]

> 10 A claim for fraud also requires a showing of damage. If it is found that the entire Agreement does not impose a binding obligation on Onse, it may be that Onse has suffered no injury as a result of Oxyn's misrepresentations.

[*33] Conclusion

For the foregoing reasons, Onse's motion for summary judgment is granted in part. Oxyn's claim for breach of the Agreement is dismissed to the extent that it is alleged that Onse breached the obligation to pay Onse $ 11,000,000 toward a total investment of $ 15,000,000 in Oxyn. Summary judgment is denied to both Onse and Oxyn as to Onse's obligation to pay Oxyn $ 4,000,000 within 30 days of the execution of the Agreement. Summary judgment is granted in Onse's favor with respect to Oxyn's claims for tortious interference with contract, tortious interference with prospective economic advantage, fraud, prima facie tort, civil conspiracy and injunctive relief, and those claims are dismissed. The Hyundai defendants' motion to dismiss the Second Amended Complaint against them is granted. Oxyn's motion for partial summary judgment is denied.

**SO ORDERED.**

Dated: September 30, 2003

2003 U.S. Dist. LEXIS 17371, *

JOHN S. MARTIN, JR.                                    U. S. D. J.

LEXSEE 2004 US DIST LEXIS 6904

CENTURY PACIFIC, INC., BECKER ENTERPRISES, INC., Plaintiffs, -against-
HILTON HOTELS CORPORATION, DOUBLETREE CORPORATION, RED
LION HOTELS, INC., Defendants.

03 Civ. 8258 (SAS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

*2004 U.S. Dist. LEXIS 6904*

**April 20, 2004, Decided
April 21, 2004, Filed**

**DISPOSITION:** [*1] Defendants' motion to dismiss was granted in part and denied in part.

**COUNSEL:** For Plaintiffs: Dwight J. Davis, Esq., Douglas L. Friedman, Esq., Stephen J. Cirami, Esq., KING & SPALDING LLP, New York, New York.

For Plaintiffs: Courtland L. Reichman, Esq., Charmaine D. Williams, Esq., KING & SPALDING LLP, Atlanta, Georgia.

For Defendants: Lee W. Stremba, Esq., JENKENS & GILCHRIST PARKER CHAPIN LLP, New York, New York.

For Defendants: Jonathan Solish, Esq., Glenn Plattner, Esq., JENKENS & GILCHRIST LLP, Los Angeles, California.

**JUDGES:** SHIRA A. SCHEINDLIN, U.S.D.J.

**OPINION BY:** SHIRA A. SCHEINDLIN

**OPINION**

**OPINION AND ORDER**

  **SHIRA A. SCHEINDLIN, U.S.D.J.:**

  Plaintiffs Century Pacific, Inc. and Becker Enterprises, Inc. filed this action against defendants Hilton Hotels Corporation, Doubletree Corporation, (collectively "Hilton/Doubletree"), and Red Lion, Inc. claiming violations of the *New York Franchise Sales Act* and common law fraud, negligent misrepresentation, and fraudulent [*2] omission. The claims arise from the cir-

cumstances surrounding the Red Lion hotel franchise agreements plaintiffs entered into with defendants in 2001. Plaintiffs allege that they were victims of a "bait and switch" strategy through which defendants induced plaintiffs to sign long-term franchise agreements by misrepresenting Hilton/Doubletree's plans to retain the Red Lion hotel chain. Plaintiffs claim that at the time of their franchise negotiations with defendants, defendants had, in fact, already decided to sell Red Lion to a smaller, less-profitable hotel chain. Plaintiffs further allege that defendants pursued the franchise agreements with plaintiffs in order to increase Hilton/Doubletree's profits in the planned resale of Red Lion. Defendants move to dismiss on the grounds that the New York Franchise Sales Act does not apply to the franchise agreements and that plaintiffs cannot state viable claims for fraud, negligent misrepresentation, or fraudulent omission. For the following reasons, defendants' motion to dismiss is granted in part and denied in part.

**I. FACTS**

  Plaintiffs allege the following facts, all of which are deemed true for the purposes of this motion.

**[*3] A. The Parties**

  Plaintiffs Century Pacific, a Texas corporation, and Becker Enterprises, a Nevada corporation, entered into franchise agreements with defendants and converted hotels they operated in Colorado into Red Lion franchises in early 2001. *See* Complaint PP 4-5, 22.

  Defendant Hilton Hotels is a Delaware corporation with a principal place of business in Beverly Hills, California. *Id.* P6. Hilton develops, owns, manages, or franchises approximately 2,000 hotels and resort and vacation properties around the world. The Hilton family of

hotels includes defendant Doubletree Hotels, a Delaware corporation and wholly owned subsidiary of Hilton, as well as Embassy Suites Hotels, Hampton Inn, Homewood Suites, and Hilton Garden Inn. *Id.* PP 7, 14.

Defendant Red Lion is a Delaware corporation with a main office in Spokane, Washington. *Id.* *P* 8. Red Lion was acquired by Doubletree in 1996 and by Hilton in 1999. *Id.* PP 15-16. Hilton sold Red Lion to WestCoast Hospitality Corporation ("WestCoast") in early 2002. *Id.* P 36. Jurisdiction is premised on diversity of citizenship. *Id.* P 13.

## B. The Red Lion Chain

Red Lion was founded in 1959 and is best known [*4] for its hotel operations in the Northwest and Western U.S. *Id.* P 15. For Hilton/Doubletree, Red Lion represented a less well-known brand name and was acquired only as part of a larger acquisition by Hilton in 1999 of the Promus Hotel Corporation which included more valuable brands like Embassy Suites and Hampton Inn. *Id.* PP 15-16. Hilton/Doubletree initially intended to eliminate the Red Lion brand and began closing down and converting Red Lion hotels after the acquisition. *Id.* PP 17-18. Sometime in 2000, Hilton/Doubletree secretly decided instead to actively market the Red Lion brand, build up its value, and then sell it within a very short time frame. *Id.* P 19. Publicly, however, Hilton/Doubletree represented that they were working to reinvigorate and expand the Red Lion brand; Hilton/Doubletree converted several of their hotels to Red Lions and aggressively campaigned to sell Red Lion franchises to other existing hotels. *Id.* PP 19-20, 28. Their strategy was apparently to lock in as many long-term franchise agreements as possible in order to increase the purchase price of Red Lion. *Id.* P 21.

### 1. Franchise Negotiations and Agreements

Plaintiffs were [*5] among those existing hotel operators who were targeted by defendants' marketing campaign. Between Fall of 2000 and February 2001, plaintiffs received Uniform Franchise Offering Circulars ("UFOCs") and negotiated with defendants before entering into Red Lion franchise agreements. *Id.* P 22. Defendants persuaded plaintiffs to become Red Lion franchisees by promoting the value of the "Hilton" name and the benefits of being part of the Hilton family of hotels. *Id.* P 23. These benefits included: access to Hilton's worldwide reservation and group sales systems, cross-selling with sister brands, participation in Hilton's group purchasing program, and future participation in the Hilton HHonors program. *Id.*

Officers and employees of Hilton/Doubletree and Red Lion, including Tom Murray and Manfred Gerling,

repeatedly assured plaintiffs that Red Lion was an important and growing part of the Hilton group. *Id.* P 24. These officers and employees specifically told plaintiffs that Hilton/Doubletree had long-term plans to own and grow Red Lion. Murray represented to plaintiffs that he was given "repeated assurances from his seniors that Red Lion is an important part of the Hilton family. [*6] " *Id.* Plaintiffs also received express assurances from Gerling that "we told you before, [Red Lion] is not for sale" and that "Red Lion would have 200 franchises within five years." *Id.* None of defendants' sales and marketing materials, oral statements, or correspondence conveyed to plaintiffs that Hilton/Doubletree had a current intent or desire to sell the Red Lion brand. *Id.* P 25. Instead, those statements and materials all indicated that the Hilton connection was the most important attraction to prospective franchisees. *Id.* P 31.

Plaintiffs relied on those oral and written statements and entered into franchise agreements with defendants on the basis of Hilton/Doubletree's representations as to their intent to keep and grow Red Lion and the benefits Red Lion franchisees would reap as members of the Hilton family. *Id.* PP 27, 32-33.

Plaintiff Becker enterprises executed a franchise agreement with red Lion on January 26, 2001 and plaintiff century Pacific executed an agreement on February 13, 2001. *Id.* P22.

To meet the terms of those agreements and become Red Lion franchisees, plaintiffs spent considerable time and money on converting their existing hotels [*7] into Red Lion hotels and on associated renovations, employee training, and advertising. *Id.* P29. Plaintiffs also agreed to pay substantial royalty fees to become part of the Hilton family. *Id.* P 30. Plaintiffs believed these expenses would be offset by the increased business they would receive as Hilton-affiliated hotels. *Id.* PP 33, 37.

### 2. Sale of Red Lion

Plaintiffs first became aware of Hilton/Doubletree's plans to sell Red Lion on October 19, 2001, when Hilton and WestCoast issued a press release announcing an intended sale to WestCoast. *Id.* P 35. WestCoast acquired Red Lion on or about January 2, 2002 for approximately $ 50 million. *Id.* P 36.

WestCoast is a small, regional hotel chain with less than ten hotels in five states. *Id.* P 38. WestCoast does not offer the kind of benefits or resources that Hilton offered to Red Lion franchisees. *Id.* WestCoast's lack of name brand recognition and franchisee benefits has negatively affected plaintiffs' business. *Id.* Plaintiffs would not have signed franchise agreements with defendants had they known that Red Lion would become affiliated with WestCoast instead of Hilton. *Id.*

Contrary to their [*8] statements and other representations to plaintiffs, defendants knew at the time they were negotiating and executing the franchise agreements that Hilton/Doubletree did not intend to retain the Red Lion brand. *Id.* PP 27, 39. Plaintiffs relied to their detriment on defendants' misrepresentations and failure to disclose their intent to sell Red Lion. *Id.* PP 40-41. Since the sale of Red Lion to WestCoast, plaintiffs have been and continue to be harmed by decreased bookings, loss of walk-ins and regular clientele, and an overall lower value of their franchise hotels because of the brand and name change. *Id.*

## II. LEGAL STANDARD

Under *Rule 12(b)(6) of the Federal Rules of Civil Procedure*, a motion to dismiss should be granted only if "'it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim[s] which would entitle [them] to relief.'" *Weixel v. Board of Educ. of New York, 287 F.3d 138, 145 (2d Cir. 2002)* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)).* The task of the court in ruling on a *Rule 12(b)(6)* motion is "merely to [*9] assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Levitt v. Bear Stearns & Co., Inc., 340 F.3d 94, 101 (2d Cir. 2003)* (quotation marks and citations omitted). When deciding a motion to dismiss, courts must accept all factual allegations in the complaint as true, and draw all reasonable inferences in plaintiffs' favor. *See Chambers v. Time Warner Inc., 282 F.3d 147, 152 (2d Cir. 2002).*

## III. DISCUSSION

### A. Claims Under the New York Franchise Sales Act

Plaintiffs bring their first and second causes of action under the New York Franchise Sales Act, *N.Y. Gen. Bus. Law § 680 et seq* ("the Act"). *First,* plaintiffs claim that defendants violated *§ 683(2)(n) of the Act* which requires that the offeror of a franchise provide prospective franchisees an offering prospectus that includes: "A statement of any past or present practice or of any intent of the franchisor to sell, assign, or discount to a third party any note, contract, or other obligation of the franchisee or subfranchisor in whole or in part." *N.Y. Gen. Bus. Law § 683(2)(n)* [*10] (2004). Plaintiffs argue that defendants violated this provision by failing to include, in the UFOC they issued to plaintiffs, a statement of Hilton/Doubletree's present intent to sell the Red Lion franchise. *See* Complaint P 47. *Second,* plaintiffs allege that defendants' failure to disclose a present intent to sell Red Lion also violated the antifraud section of the Act which deems it unlawful for a person "in connection with the offer, sale, or purchase of any franchise, to directly or indirectly ... (b) make any untrue statement of a material fact or omit to state a material fact ...." *N.Y. Gen. Bus. Law § 687(2)(b)* (2004).

Plaintiffs invoke the Act on the basis of the choice of law provision in their franchise agreements which specifies New York law as controlling in any contract, tort, or other dispute between the parties. *See* Franchise License Agreement, Red Lion Inn & Suites Pagosa Springs ("Franchise Agreement") P 16(b) (attached as Exhibit 1 to the Affirmation of Tom McKiernan, Vice President and General Counsel for WestCoast (as parent company of Red Lion), in Support of Defendants' Motion to Dismiss). [1] The choice of law provision [*11] reads as follows:

> We each agree that the State of New York has a deep and well developed history of business decisional law. For this reason, we each agree that except to the extent governed by the United States Trademark Act of 1946 (Lanham Act; 15 U.S.C. P 1050 *et seq.*), as amended, this Agreement, all relations between us, and any and all disputes between us, whether sounding in contract, tort, or otherwise, are to be exclusively construed in accordance with and/or governed by (as applicable) the laws of the State of New York without recourse to New York (or any other) choice of law conflicts of law principles. If, however, any provision of this Agreement would not be enforceable under the laws of New York, and if the Hotel is located outside of New York and the provision would be enforceable under the laws of the state in which the Hotel is located, then the provision in question (and only that provision) will be interpreted and construed under the laws of that state. Nothing in this section is intended to invoke the application of any franchise, business opportunity, antitrust, "implied covenant," unfair competition, fiduciary or any other doctrine [*12] of law of the State of New York or any other state which would not otherwise apply absent this Paragraph 16b.

Franchise Agreement P16(b). The same section of the agreements also includes a New York forum selection provision. *See id.*

1  Plaintiffs have not alleged a breach of contract and their Complaint does not quote or incorporate the franchise agreements executed with defendants. Defendants, however, have provided the two agreements attached an affidavit filed with their motion to dismiss. The agreements are thus properly before the Court under *Rule 10(c) of the Federal Rules of Civil Procedure.* Because the provisions of the agreements relevant to this discussion are identical, references to "Franchise Agreement" refer to both agreements.

Defendants argue that notwithstanding the New York choice of law provision, plaintiffs cannot invoke the Act because it regulates only franchise offers and sales made in New York or franchises located in New York. Under [*13] the Act, "an offer or sale of a franchise is made in this state when an offer to sell is made in this state, or an offer to buy is accepted in this state, or, if the franchisee is domiciled in this state, the franchised business is or will be operated in this state." *N.Y. Gen. Bus. Law § 681(12)(a)* (2004). Defendants further argue that the last sentence of the choice of law provision in the franchise agreements expressly "carves out" any New York franchise law that would not otherwise apply to the transaction. This sentence provides: "Nothing in this section is intended to invoke the application of any franchise, business opportunity, antitrust, 'implied covenant,' unfair competition, fiduciary or any other doctrine of law of the State of New York or any other state which would not otherwise apply absent this Paragraph 16b." Franchise Agreement P16(b).

Plaintiffs do not allege that the franchise offers or sales were actually made in New York but respond that the New York choice of law provision alone is sufficient to invoke the Act. Plaintiffs also argue that the "carve out" clause of the choice of law provision should not bar their claims because it is [*14] ambiguous and should be construed against defendants or, alternatively, because it should be deemed void against public policy for allowing defendants to circumvent the protections of the chosen state law.

A choice of law provision may provide for extraterritorial application of the New York Franchise Sales Act in certain cases. *See, e.g., Schwartz v. Pillsbury, Inc., 969 F.2d 840, 847 (9th Cir. 1992); Mon-Shore Management, Inc. v. Family Media, Inc., 584 F. Supp. 186, 193 (S.D.N.Y. 1984).* The provision in plaintiffs' contract, however, unambiguously bars extension of the Act to their franchises.

"Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." *Cruden v. Bank of New York, 957 F.2d 961,* 976 *(2d Cir. 1992); see also Paine Webber Inc. v. Bybyk, 81 F.3d 1193, 1199 (2d Cir. 1996)* ("In interpreting a contract, 'words and phrases are given their plain meaning.'" (citations omitted)). Similarly, "[a] court may neither rewrite, under the guise of interpretation, a term of the contract when the term [*15] is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case." *Cruden, 957 F.2d at 976* (citations omitted).

Accordingly, the carve out clause in plaintiffs' agreements, providing that "nothing in this [choice of law] section is intended to invoke the application of any franchise [law] ... of the State of New York ... which would not otherwise apply ...," Franchise Agreement P 16, must be read to preclude the application of New York franchise regulations like the Franchise Sales Act that "[are] applicable only to specific transactions solicited or accepted in New York, or affecting New York." *Mon-Shore, 584 F. Supp. at 191.*

This finding is also consistent with the cases plaintiffs cite in which courts have held that the Act can reach non-New York franchises through a choice of law provision. In each of those cases, the court applied the Act specifically because the choice of law language in the franchise agreement provided that the franchise "*shall be deemed to have been made in New York.*" *See Mon-Shore, 584 F. Supp. at 193; Schwartz, 969 F.2d at 847;* [*16] *McGowan v. Pillsbury Co., 723 F. Supp. 530, 536 (W.D. Wash. 1989).* Plaintiffs' agreements have no such clause and instead *expressly* qualify the scope of New York law that will apply in any dispute.

Plaintiffs' alternative argument, that the carve out provision should be held void as against public policy, must also fail because it is based on the mistaken assumption that the New York Franchise Sales Act was intended to apply to and proscribe waiver clauses in any agreement that invokes New York law. As discussed above, however, the Act "does not apply to commerce that takes place 'wholly outside' of New York," *Mon-Shore, 584 F. Supp. at 190,* unless the contract terms express this intent by providing for a constructive offer and/or sale in New York.

In sum, because the primary objective in interpreting a contract "is to give effect to the intent of the parties as revealed by the language they chose to use," *Seiden Assoc., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992),* the unambiguous carve out of New York franchise law from the parties' choice of law provision must be honored by dismissing plaintiffs' claims under [*17] the Act.

**B. Common Law Fraud Claim**

Plaintiffs' third cause of action asserts that defendants committed common law fraud by knowingly making material misrepresentations and false statements about Hilton/Doubletree's plans for Red Lion. Defendants argue that the claim is not viable because plaintiffs cannot claim reasonable reliance on defendants' oral statements about their plans for Red Lion. Specifically, defendants contend that any oral statements to plaintiffs: (1) were contradicted by express provisions in the franchise agreements giving defendants the right to transfer Red Lion; (2) were canceled by the integration clause of the agreements; and/or (3) amounted to non-actionable "puffing" or "trade talk." Plaintiffs respond that because fraud lies in the specific misrepresentations of fact, their claims that defendants misrepresented their present intent to retain Red Lion survive challenges based on contract terms or the rule that promissory statements are generally not actionable.

To recover for common law fraud in New York, plaintiffs must demonstrate: (1) a misrepresentation of material fact made with knowledge of falsity; (2) justifiable reliance on such misrepresentation; [*18] and (3) resulting harm. *See Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 421, 668 N.E.2d 1370, 646 N.Y.S.2d 76 (1996)*. Plaintiffs claim that they decided to enter into franchise agreements with defendants in reliance on, among other things, oral assurances by officers and employees, including Tom Murray and Manfred Gerling, that "[Red Lion] is not for sale" and that Hilton/Doubletree had long-term plans to grow Red Lion as a Hilton subsidiary. Plaintiffs' ability to show reliance is precluded neither by the contract terms defendants cite nor by the "puffing" doctrine.

*First,* the terms of the franchise agreement granting defendants an express right to transfer Red Lion do not contradict or supersede oral statements by defendants about their present intent to retain Red Lion. Plaintiffs could have reasonably relied on defendants' statements that Hilton/Doubletree had no existing plans to transfer Red Lion while also agreeing to and appreciating defendants' right to transfer Red Lion at any time.

*Second,* the merger or integration clause of paragraph 16(d) of plaintiffs' franchise agreements does not bar admission of defendants' previous oral statements in support of plaintiffs' fraud [*19] claims. [2] Under New York law, a general merger clause precludes neither an action for fraud in the inducement nor parol evidence concerning fraudulent representations. *See Lee v. Goldstrom, 135 A.D.2d 812, 522 N.Y.S.2d 917, 918 (2d Dep't 1987)*. A court should only bar such evidence where the merger clause contains a provision that specifically contradicts a claimed oral representation. *See Bibeault v. Advanced Health Corp., 2002 U.S. Dist. LEXIS 225, No. 97 Civ. 6026, 2002 WL 24305, *3-4 (S.D.N.Y. Jan. 8,*

*2002) (citing Danann Realty Corp. v. Harris, 5 N.Y.2d 317, 320-321, 157 N.E.2d 597, 184 N.Y.S.2d 599 (1959))*. The only specific language in the otherwise boilerplate general merger clause of plaintiffs' franchise agreements provides that plaintiffs "agree that no claims, representations or warranties of earnings, sales, profits, success or failure of the Hotel have been made to you." Franchise Agreement P 16(d). The subject of defendants' alleged misrepresentations -Hilton/Doubletree's present intent to retain Red Lion - is not enumerated in the merger clause. Accordingly, the clause does not bar admission of parol evidence to support plaintiffs' claims.

    2   Under the merger clause, the parties agreed:

> that this Agreement and its attachments will be construed together and will supersede and cancel any prior and/or contemporaneous discussions or writings (whether described as representations, inducements, promises, agreements or by any other term) between us. We each agree that we placed, and will place, no reliance on any such discussions or writings. You agree that no claims, representations or, warranties of earnings, sales, profits, success or failure of the Hotel have been made to you. This Agreement and its attachments is the entire agreement between us and contains all of the terms, conditions, rights and obligations between us with respect to the Hotel and any other aspect of the relationship between us.

    Franchise Agreement P 16(d).

[*20]   Finally, defendants' representations about their present intent to retain Red Lion cannot be summarily dismissed as nonactionable "puffing." New York law recognizes that:

> while mere promissory statements as to what will be done in the future are not actionable, ... it is settled that, *if a promise was actually made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of material existing fact* upon which an action for recision [based on fraudulent inducement] may be predicated.

*Stewart v. Jackson & Nash, 976 F.2d 86, 89 (2d Cir. 1992)* (quoting *Sabo v. Delman, 3 N.Y.2d 155, 160, 143 N.E.2d 906, 164 N.Y.S.2d 714 (1957)* (emphasis added)). *See also Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994)* ("The failure to fulfill a promise to perform future acts is not ground for a fraud action *unless there existed an intent not to perform at the time the promise was made.*" (emphasis added)).

Plaintiffs have adequately alleged that defendants knew, at the time they were negotiating with plaintiffs, that Hilton/Doubletree was actually planning to sell the subsidiary shortly after closing franchise deals [*21] with plaintiffs and others. Accordingly, because plaintiffs may be able to show that defendants' oral promises about their long-term plans to grow Red Lion were made with an intent not to perform, their common law fraud claim may proceed.

## C. Negligent Misrepresentation Claim

Plaintiffs' fourth cause of action alleges that defendants negligently or recklessly disregarded the falsity of their oral and written statements about Hilton/Doubletree's intent to continue to hold and promote Red Lion and thereby breached a duty not to make misrepresentations to plaintiffs. Defendants argue for dismissal of the claim on the ground that there was no special relationship between the parties and therefore no duty owed by defendants to plaintiffs. Defendants further contend that the alleged misrepresentations are not actionable because they were promissory rather than factual in nature. Plaintiffs respond that a special relationship and corresponding duty existed because of defendants' superior knowledge and awareness that plaintiffs would rely on their misrepresentations. Plaintiffs also reiterate their claim that defendants' misrepresentations were factual because they involved defendants' [*22] present intent.

Under New York law, a claim of negligent misrepresentation must satisfy the following five elements:

(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.

*Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000)*. Defendants contest plaintiffs' ability to meet the first and fifth elements.

First, in order to determine the existence of a special relationship and duty in the context of a negligent misrepresentation claim, the Second Circuit has held that New York law requires a fact finder to consider the following three factors: "whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker [*23] was aware of the use to which the information would be put and supplied it for that purpose." *Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 103 (2d Cir. 2001)* (quotation marks and citation omitted). In *Kimmell v. Schaefer, 89 N.Y.2d 257, 675 N.E.2d 450, 652 N.Y.S.2d 715 (1996)*, the New York Court of Appeals explained that "in the commercial context, a duty to speak with care exists when the relationship of the parties, arising out of contract or otherwise, [is] such that in morals and good conscience the one has the right to rely upon the other for information." *89 N.Y.2d at 263, 675 N.E.2d 450, 652 N.Y.S.2d 715* (quotation marks and citation omitted).

In general, a simple commercial relationship, such as that between a buyer and seller or franchisor and franchisee, does not constitute the kind of "special relationship" necessary to support a negligent misrepresentation claim. *See Dimon, Inc. v. Folium, Inc., 48 F. Supp. 2d 359, 373 (S.D.N.Y. 1999)*. A commercial relationship may become a special relationship, however, where "the parties ... enjoy a relationship of trust and reliance 'closer.. than that of the ordinary buyer and seller.'" *Polycast Tech. Corp. v. Uniroyal, Inc., 1988 U.S. Dist. LEXIS 9648, No. 87 Civ. 3297, 1988 WL 96586, [*24] at *10 (S.D.N.Y. Aug. 31, 1988)* (citations omitted). Courts have found a special relationship and duty, for example, where defendants sought to induce plaintiffs into a business transaction by making certain statements or providing specific information with the intent that plaintiffs rely on those statements or information. *See Kimmell, 89 N.Y.2d at 264-65, 675 N.E.2d 450, 652 N.Y.S.2d 715; Suez Equity Investors, 250 F.3d at 103; New York Islanders Hockey Club, LLP v. Comerica Bank-Texas, 71 F. Supp. 2d 108, 119 (E.D.N.Y. 1999)*.

Plaintiffs here have adequately pled a similar fact pattern; their allegations that defendants made numerous false statements about their plans for Red Lion with the specific intent of earning plaintiffs' trust and reliance require a denial of defendants' motion to dismiss this claim. Although it is not clear that defendants' superior knowledge about their own business plans constitutes the kind of unique expertise enumerated in the *Suez Equity*

*Investors* test, the absence of this factor is not fatal at this stage. Courts in this circuit have held that a determination of whether a special relationship exists is highly fact-specific and [*25] "generally not susceptible to resolution at the pleadings stage." *Nasik Breeding & Research Farm Ltd. v. Merck & Co., 165 F. Supp. 2d 514, 536 (S.D.N.Y. 2001).*

Defendants' second argument, that plaintiffs cannot state a claim for negligent misrepresentation because they cannot meet the fifth element of showing that they "reasonably relied" on defendants' statements, also falls short. As previously discussed in the fraud analysis, plaintiffs' allegations of misrepresentation are based not on defendants' failure to fulfill promises about future conduct but on defendants' intent at the time they made the statements about Hilton/Doubletree's plans to retain Red Lion. Accordingly, because plaintiffs have pled that defendants made those promises with a present intent not to perform them, their claim of negligent misrepresentation survives along with their fraud claim. *See Murray v. Xerox Corp., 811 F.2d 118, 121-22 (2d Cir. 1987).*

**D. Fraudulent Omission Claim**

Finally, plaintiffs' fifth cause of action alleges that defendants had a duty to disclose to plaintiffs their present plans to sell the Red Lion subsidiary but instead withheld the information [*26] with the intent to defraud plaintiffs. Plaintiffs claim that they relied on and were harmed by this fraudulent omission. Defendants contend that this omission is nonactionable because the law imposes no duty on a franchisor to disclose to a franchisee the possibility or probability of such a sale. Plaintiffs argue that defendants' duty to disclose arose both from its superior knowledge and from the disclosure provisions of the New York Franchise Sales Act.

New York law recognizes fraudulent omission as a permutation of the common law action for fraud. *See, e.g., Callahan v. Callahan, 127 A.D.2d 298, 514 N.Y.S.2d 819, 821 (3d Dep't 1987)* ("nondisclosure is tantamount to an affirmative representation where a party to a transaction is duty-bound to disclose certain pertinent information."). An omission is actionable only in the context of a duty to disclose, "but a *fiduciary* duty is not the sine qua non of fraudulent omissions." *United States v. Autuori, 212 F.3d 105, 119 (2d Cir. 2000).* The Second Circuit has held that

New York recognizes a duty by a party to a business transaction to speak in three situations: first, where the party has [*27] made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth; second, when the parties stand in a fiduciary or confidential relationship with each other; and third, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.

*Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993)* (citations and internal quotations omitted). The court in *Brass* also noted "a tendency in New York to apply the rule of 'superior knowledge' in an array of contexts in which silence would at one time have escaped criticism." *Id. at 151.*

Plaintiffs' claim of fraudulent omission is actionable under either the first or third contexts described by *Brass* as requiring disclosure. Assuming plaintiffs' allegations are true, plaintiffs specifically questioned defendants during negotiations about Hilton/Doubletree's plans to hold or sell Red Lion, and defendants responded not only with enthusiastic guarantees of their commitment to the Red Lion brand [*28] but with specific assurances that they were not planning to sell. These statements thus triggered, under the first *Brass* scenario, a duty to disclose related or corrective information. Similarly, the third *Brass* scenario is relevant if, as alleged, defendants actually had plans to put Red Lion on the market after sealing the franchise deals and knew that plaintiffs' decision to enter into the agreements was based, at least in part, on an understanding that defendants had no present plans to divest or sell Red Lion. Plaintiffs have thus stated a viable claim of fraudulent omission under New York common law.

Defendants cite a series of cases involving the sale by General Foods of its Burger Chef line of franchises in support of the rule that a franchisor has no duty to disclose a pending sale to a franchisee. These cases are unavailing, however, because they involve plaintiffs who were existing franchisees claiming that they should have been made privy to the franchisor's business plans. *See, e.g., Vaughn v. General Foods Corporation, 797 F.2d 1403, 1414 (7th Cir. 1986)* (describing a fourteen-year arms-length relationship between plaintiff franchisee and defendant [*29] franchisor).

**IV. CONCLUSION**

In sum, after considering all of defendants' arguments in support of their motion to dismiss, their motion is granted as to plaintiffs' claims under the New York Franchise Sales Act and denied as to plaintiffs' claims of common law fraud, negligent misrepresentation, and fraudulent omission.

2004 U.S. Dist. LEXIS 6904, *

The Clerk of the Court is directed to close this motion [docket # 8]. A conference is scheduled for April 27, 2004 at 4:30.

SO ORDERED:

Shira A. Scheindlin

U.S.D.J.

Dated: April 20, 2004

LEXSEE 2005 US DIST LEXIS 2721

**DDCLAB LTD., Plaintiff, -against- E.I. DU PONT DE NEMOURS AND COMPANY, Defendant.**

**03 CV 3654 (GBD)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2005 U.S. Dist. LEXIS 2721*

**February 18, 2005, Decided**
**February 18, 2005, Filed**

**DISPOSITION:**    [*1] Defendant's motion to dismiss complaint was granted.

**COUNSEL:** For DDCLab Ltd., Plaintiff: Russell James Sweeting, Maya & Associates, Fairfield, CT.

**JUDGES:** GEORGE B. DANIELS, United States District Judge.

**OPINION BY:** GEORGE B. DANIELS

**OPINION**

MEMORANDUM DECISION & ORDER

GEORGE B. DANIELS, District Judge:

Plaintiff DDCLAB Ltd. ("DDCLAB") commenced this action, *inter alia,* for breach of contract claiming defendant E.I. Du Pont De Nemours and Company ("DuPont") failed to provide DDCLAB with a promised revolving line of credit. DuPont moved, pursuant to *Fed.R.Civ.P. 12(b)(6),* to dismiss the complaint for failure to state a claim upon which relief can be granted. The motion is granted and the complaint is dismissed in its entirety.

The complaint alleges that in October of 2001, the parties began to negotiate the details of an agreement whereby defendant would invest money in plaintiff. DDCLAB was "looking for" an investment of six million dollars to expand its wholesale/retail business without financial restriction. (Compl. P5). DDCLAB claims that at a October 16, 2001 meeting, DuPont's representatives indicated that DuPont would secure a revolving line of [*2] credit for DDCLAB at a low interest rate of 3-4%. (Compl. P7). The complaint states that "the revolving line of credit was to be set up with the banks as part of

DuPont's investment in DDCLAB." (Compl. P7). On February 25, 2002, DDCLAB was allegedly assured by DuPont "that once the deal was closed, DuPont would set up the revolving line of credit with a bank and DuPont would get the best deal for the borrowing for DDCLAB." (Compl. P8). DuPont's representative allegedly indicated that the revolving line of credit would not be included in the letter of intent between the parties because DuPont would not be lending the money directly to DDCLAB. The complaint indicates that on May 31, 2002, it was again represented that the line of credit would be set up by DuPont with "one of its banks." (Compl. P9). On June 12, 2002, the parties entered into a Commercial Agreement and an Investment Agreement (collectively "the Written Agreements") whereby DuPont invested one million dollars in DDCLAB thereby becoming a 19% shareholding in DDCLAB. The complaint states that "DDCLAB agreed to a smaller investment than it was originally seeking by DuPont of only one million dollars ($ 1,000,000) in consideration [*3] for DuPont's assurances that it would set up a revolving line of credit for DDCLAB once the Written Agreements were executed." (Compl. P10).

The parties executed a Commercial Agreement and an Investment Agreement on June 12, 2002. The Commercial Agreement made no mention of DuPont's obligation to set up a revolving line of credit for DDCLAB.

The parties' Investment Agreement is a comprehensive forty-nine page contract detailing the particular rights and obligations of the parties, including the expressed representations of both contracting parties. Prior to setting forth the specific terms of the agreement, the introductory portion of the contract states:

WHEREAS, DUPONT and DDCLAB
are, simultaneously with execution of this

2005 U.S. Dist. LEXIS 2721, *

Investment Agreement, entering into a certain Commercial Agreement (the above agreements are hereafter referred to as the "Agreements"), which collectively provide for a constructive and mutually beneficial relationship between DUPONT and DDC LAB;

WHEREAS, DDCLAB desires to obtain one million dollars ($ 1,000,000) of additional capital by selling DUPONT 19% of the fully diluted unregistered shares of its common stock and DUPONT desires to acquire the same, [*4] all subject to the terms and conditions of this Investment Agreement; and

WHEREAS, DUPONT desires to acquire an option to purchase up to an additional five percent (5%) of the number of issued and outstanding shares of DDCLAB Common Stock, and DDCLAB is willing to grant such an option to DUPONT as an inducement to DUPONT entering the Agreement;

* * *

NOW, THEREFORE, in consideration of the respective agreements herein contained and subject to the terms and considerations set forth herein, the parties agree . . . (Compl. Ex. B at 1-2).

The Investment Agreement is silent as to any promise by DuPont to establish a revolving line of credit for DDCLAB. The agreement contained an integration provision stating:

This Agreement and the agreements referred to herein contain the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings relating to such subject matter. (Id. at P9.10).

The agreement further provides that any changes or additions to the agreement require DuPont's consent in writing. (Id. at P9.1).

The complaint additionally alleges that on July 14, 2004, after [*5] the Written Agreements were signed, it was represented that "DuPont would set up a revolving line of credit with banks and other investors" and that

"DuPont was working to package DDCLAB to the banks." (Compl. P11). The complaint alleges that on July 17, 2002, DDCLAB advised DuPont "that DuPont's promise to set up the revolving line of credit for DDCLAB was crucial" to DDCLAB's business operations. (Compl. P12). The complaint further states that on August 1, 2002, a DuPont's representative indicated, for the first time, that DuPont did not promise to set up a revolving line of credit for DDCLAB.

Plaintiff claims that it relied on defendant's promises concerning the revolving line of credit by accepting purchase orders for clothing and entering into contractual obligations with manufacturers to produce lines of clothing. DDCLAB contends that it would not have done so without the expectation of an influx of capital from the revolving line of credit. DDCLAB also allegedly hired additional sales personnel in response to DuPont's request that DDCLAB have the necessary personnel to handle the anticipated growth of DDCLAB's business. DDCLAB alleges that without the revolving line of credit, [*6] it has been unable to pay manufacturers for purchase orders; has lost profits, clients, and wholesale accounts; suffered damage to its reputation in the industry; and accumulated millions of dollars in debt. The complaint asserts two causes of action for breach of contract, as well as claims for promissory estoppel, fraud, negligent misrepresentation and breach of fiduciary duty.

## MOTION TO DISMISS STANDARD

In reviewing a complaint for dismissal under *Rule 12(b)(6)*, the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in plaintiff's favor. *Bolt Elec., Inc. v. City of New York, 53 F.3d 465, 469 (2d Cir. 1995).* The complaint should only be dismissed where it appears beyond doubt that the plaintiff can present no set of facts entitling it to relief. *Conley v. Gibson, 355 U.S. 41, 46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984).* On a motion to dismiss, pursuant to *Fed.R.Civ.P. 12(b)(6)*, the Court is precluded from considering matters outside of the complaint. *Courtenay Communications, Corp. v. Hall, 334 F.3d 210, 213 (2d Cir. 2003).* [*7] In this regard, a complaint includes any written instrument attached as an exhibit. *Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002)* (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel., Co., 62 F.3d 69, 72 (2d Cir. 1995)).*

## BREACH OF CONTRACT

In the first two causes of action for breach of contract, plaintiff alleges that the continuing promises made on behalf of DuPont gave rise to an enforceable contract between the parties, and that "DuPont has failed and ne-

glected to perform by the terms of its agreement in that it failed to provide DDCLAB with a revolving line of credit." [1] (Compl. PP21, 28)

> 1 In the first cause of action, DDCLAB claims that it "entered into Written Agreements with DuPont in consideration for DuPont's promises that it would provide a revolving line of credit to DDCLAB." (Compl. P19). In the second cause of action, DDCLAB alleges that it "entered into Written Agreements with DuPont in consideration for DuPont's promises that it would provide a revolving line of credit to DDCLAB once 'the deal was done.'" (Compl. P26) (emphasis added).

[*8] DuPont argues that DDCLAB's conclusory assertion that it sold nineteen percent share of its equity to DuPont for one million dollars in consideration of Du-Pont's oral promises to set up a revolving line of credit fails for the following two reasons: (1) the existence of the comprehensive Written Agreements between the parties; and (2) DDCLAB's unequivocal declaration, through the Investment Agreement's merger clause, that the Written Agreements alone define the rights and obligations of the parties with respect to DuPont's investment in DDCLAB.

Plaintiff argues that its complaint is not based on a claim that, in consideration of defendant's oral promises to set up a revolving line of credit for DDCLAB, DDCLAB sold its equity shares to DuPont for one million dollars. Rather, DDCLAB contends that the complaint alleges that DDCLAB only entered into the Written Agreements because of DuPont's separate oral and written assurances that it would provide DDCLAB with access to a revolving line of credit. DDCLAB maintains that the revolving line of credit was purposefully separate from the Written Agreements, and that the parties agreed not to memorialized that obligation into the Written Agreements [*9] because DuPont was not investing the money directly into DDCLAB.

Where the parties' agreement is clearly set forth in a written document, a determination of the parties' contractual obligations and rights are generally to be determined by examination solely of the written agreement. *W.W.W. Assoc., Inc. v. Giancontieri, 77 N.Y.2d 157, 566 N.E.2d 639, 565 N.Y.S.2d 440, 443 (N.Y. 1990).* Thus, where the written agreement is "clear and complete on its face" and it "lucidly manifests the parties' intent" that the contract supercedes prior oral promises and constitutes the parties' entire agreement, "the parol evidence rule effectively bars any action to enforce the oral agreement." *Doherty v. New York Tel. Co., 202 A.D.2d 627, 609 N.Y.S.2d 306, 307 (N.Y. App. Div. 1994)* (citation omitted). The purpose of having a merger clause in a contract is so that the parole evidence rule may be applied to preclude the in-troduction of extrinsic evidence to alter, vary, or contradict the terms of the writing. *Jarecki v. Shung Moo Louie, 95 N.Y.2d 665, 745 N.E.2d 1006, 722 N.Y.S.2d 784, 786 (N.Y. 2001)* (citation omitted). Such a clause establishes the parties' intent that the written agreement is to be considered a fully integrated [*10] writing. *Primex Int'l Corp. v. Wal-Mart Stores, Inc., 89 N.Y.2d 594, 679 N.E.2d 624, 657 N.Y.S.2d 385, 388 (N.Y. 1997).*

The parole evidence rule is, however, inapplicable with regard to oral agreements that do not vary, modify, or otherwise contradict the parties' written contract. *Gem Corrugated Box Corp. v. Nat'l Kraft Container Corp., 427 F.2d 499, 503 (2d Cir. 1970).* Despite a strong integration clause contained in a written contract, an oral agreement can be treated as a separate and independent contractual obligation. *Lee v. Joseph E. Seagram & Sons, Inc., 552 F.2d 447, 451-52 (2d Cir. 1977).* The primary consideration in determining whether the oral agreement is distinct from the written contract is "whether, in the context of the particular setting, the oral agreement was one which the parties would ordinarily be expected to embody in the writing." *Id. at 451.*

The complaint alleges that "DDCLAB agreed to a smaller investment than it was originally seeking by Du-Pont of only one million dollars ($ 1,000,000) in consideration for DuPont's assurances that it would set up a revolving line of credit for DDCLAB once the Written Agreements were [*11] executed." (Compl. P10). The complaint further states "that the revolving line of credit was to be set up with the banks as part of DuPont's investment in DDCLAB." (Compl. P7). The terms of Du-Pont's investment in DDCLAB is set forth in the Investment Agreement in great detail. However, nowhere in the Investment Agreement, or in the Commercial Agreement, is there any mention of an obligation by Du-Pont to establish a revolving line of credit as part of its investment in DDCLAB. Moreover, the Investment Agreement specifically outlined the parties' respective consideration forming the basis for this agreement. The enumerated consideration did not include DuPont's future obligation to provide DDCLAB with a line of credit. The agreement indicates that DDCLAB would grant Du-Pont an option to purchase additional stock as an inducement to DuPont entering into the agreement. Yet, the agreement is silent as to DuPont's alleged obligation to provide a revolving line of credit which DDCLAB claims served as an inducement for DDCLAB to enter into the agreements for far less than the five million dollars it was seeking.

The complaint alleges that the contractual obligation to provide a line of credit [*12] was part of the investment deal with DuPont, and was the consideration for DDCLAB to enter into the Written Agreements. Reasonable businesspeople would therefore anticipate such an

obligation to be set forth in the written contract. [2] Additionally, DuPont's alleged obligation is so closely connected to the principle transaction, it would clearly be made a part of the written agreement. See, *Mitchill v. Lath, 247 N.Y. 377, 160 N.E. 646, 647 (N.Y. 1928)*. Where "the alleged oral agreement is closely related to the subject dealt with in the written agreement, and thus the transactions are necessarily and inextricably bound together," the parole evidence rule will bar the introduction of extrinsic evidence of a claimed oral agreement. *Backer v. Lewit, 180 A.D.2d 134, 584 N.Y.S.2d 480, 482 & n. 1 (N.Y. App. Div. 1992)*. Since the Investment Agreement contains an integration clause providing that the entire agreement and understanding between the parties are set forth in the agreement, and that the agreement supersedes all prior agreements and understandings, plaintiff is precluded from claiming a separate enforceable contract which induced it to execute the written agreement. Additionally, [*13] the Investment Agreement provides that it could not be modified absent written consent by DuPont. Since plaintiff has not alleged that such a written modification occurred, no breach of contract can be premised upon DuPont's alleged oral representations made after the agreement was executed.

> 2   In fact the complaint alleges that during negotiations, the parties considered whether to include the oral promise in the Written Agreements, and purposely decided to exclude it. Thus, as the parties themselves recognized, given the nature of the promise, it would have been otherwise reasonable to anticipate incorporating it into the Written Agreements. However, the parties opted not to proceed in that manner, and plaintiff chose to execute the contracts with full knowledge that such an oral promise was intentionally omitted and not made a part of the agreements.

Even if providing a revolving line of credit was found to be an independent oral promise of DuPont, separate and apart from the Written Agreements, it would still [*14] be unenforceable. In order for a contract to be binding, there must be a "manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Express Indus. and Terminal Corp. v. New York State Dep't of Transp., 93 N.Y.2d 584, 715 N.E.2d 1050, 693 N.Y.S.2d 857, 860 (N.Y. 1999)* (citation omitted). Even though contractual terms need not be fixed with absolute certainty, *F & K Supply Inc. v. Willowbrook Dev., 288 A.D.2d 713, 732 N.Y.S.2d 734, 737 (N.Y. App. Div. 2001)*, the material terms must be reasonably certain for there to be an enforceable contract. *Cobble Hill Nursing Home v. Henry and Warren Corp., 74 N.Y.2d 475, 548 N.E.2d 203, 548 N.Y.S.2d 920, 923 (N.Y. 1989)*.

No essential material terms were agreed upon by the parties with regard to the alleged oral contract. There is no indication as to the specific sum of financing DuPont purportedly promised to provide to DDCLAB. DDCLAB does, however, note that the parties knew DDCLAB was seeking a six million dollar investment, and settled for a one million dollar cash investment from DuPont. To the extent that such a claim is asserted to suggest that the parties agreed that DuPont would provide [*15] an additional five million dollar revolving line of credit, it fails. In the complaint, DDCLAB alleged it was "looking" for a six million dollar investment, not that it was imperative for the continued growth of its business to obtain that amount. The complaint is barren of any factual allegations to reasonably indicate that the parties agreed to a specific amount of financing.

Nor does the complaint reveal that the parties agreed on an interest rate. Although the complaint initially alleges that DuPont indicated that a low interest rate of 3-4% would be obtained, the complaint also alleges that DuPont "would get the best deal" it could for DDCLAB. Additionally, the complaint states that DuPont represented that it would secure the line of credit from its bank, but that DuPont subsequently indicated that it was working with "banks and other investors" and that "DuPont was working to package DDCLAB to the banks." Furthermore, although the complaint states that the revolving line of credit was to be established after the Written Agreements were signed, the complaint fails to allege any specific date as to when this was to be accomplished. Given the absence of specific material contractual [*16] terms, the purported agreement is too vague to be enforceable. See eg., *Arcan Transp. Inc. v. Marine Midland Bank-Western, 54 A.D.2d 1103, 388 N.Y.S.2d 737, 738 (N.Y. App. Div. 1976)* (finding working capital agreement too inadequate to be enforceable where, *inter alia,* no interest rate was discussed, no repayment schedule was formulated, and no limit was set as to the amount of working capital defendant would be required to advance.).

Additionally, the oral promise is unenforceable as it is not supported by any independent consideration. "Two entirely separate contracts, each based on independent consideration, may be made at the same time and be entirely distinct legally." *Backer, 584 N.Y.S.2d at 482 n. 1* (citing Willston on Contracts § 637 [3d ed.]). Although plaintiff contends that the oral contract is distinct from the Written Agreements, plaintiff has not identified any separate consideration supporting the collateral oral agreement. Plaintiff cannot rely on the consideration provided for in the Written Agreements. Plaintiff's assertion that it relied on such a promise in executing the Written Agreements is insufficient to create a separate oral contract.

[*17] In light of the foregoing, the causes of action for breach of contract are dismissed.

**PROMISSORY ESTOPPEL**

DDCLAB's third cause of action for promissory estoppel must also be dismissed. "A cause of action for promissory estoppel under New York law requires the plaintiff to prove three elements: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance." *Kaye v. Grossman, 202 F.3d 611, 615 (2d Cir. 2000).* Promissory estoppel is a legal fiction which is used as consideration for contractual consideration where a party relies, to its detriment, on the promises of another without having entered into an enforceable contract. See, *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc., 723 F. Supp. 976, 993 (S.D.N.Y. 1989).* It is a narrow doctrine which generally only applies where there is no written contract, or where the parties' written contract is unenforceable for some reason. See, *Phoenix Racing, Ltd. v. Lebanon Valley Auto Racing Corp., 53 F. Supp.2d 199, 219 (N.D.N.Y. 1999).* When justice dictates, the doctrine of promissory [*18] estoppel may be invoked to avoid plaintiff from suffering an unconscionable injury. *Cyberchron Corp. v. Calldata Sys. Dev., Inc., 47 F.3d 39, 44 (2d Cir. 1995).* Nevertheless, "applying promissory estoppel to create contractual obligations where a comprehensive contract exists would contravene the fundamental rules that extrinsic evidence cannot be used to vary the unambiguous terms of a contract, . . . and that obligations inconsistent with the terms of a contract cannot be implied." See, *Hartford, 723 F. Supp. at 993* (citations omitted).

As previously discussed, no clear and unambiguous promise can be gleaned from a reading of the complaint. The complaint also fails to demonstrate DDCLAB's reasonable reliance on DuPont's alleged promises. "In assessing the reasonableness of a plaintiff's alleged reliance, [the Court is] to consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Emergent Capital Inv. Mgmt., LLC. v. Stonepath Group, Inc., 343 F.3d 189, 195 (2d Cir. 2003)* (citation omitted). Since the [*19] parties' Investment Agreement specified their rights and obligations with regard to the investment, it would have been unreasonable for DDCLAB to rely on DuPont's alleged oral promises. Those promises were regarding the same investment, and were deliberately withheld, and yet altered, the terms specified in the written agreement. See, *Four Finger Art Factory, Inc. v. DiNicola, 2000 U.S. Dist. LEXIS 1221, 2000 WL 145466, *8 (S.D.N.Y. Feb. 9, 2000); Thayer v. Dial Indus. Sales, Inc., 85 F. Supp.2d 263, 272 (S.D.N.Y. 2000)*

(quoting *M.H. Segan L.P. v. Hasbro Inc., 924 F. Supp. 512, 527 (S.D.N.Y. 1996)).*

Given the unambiguous integration clause in the parties' Investment Agreement, there existed no basis for DDCLAB's justifiable reliance on the alleged oral promises made prior the execution of that agreement. See, *Phoenix Racing, 53 F. Supp. at 220; Gebbia v. Toronto-Dominion Bank, 306 A.D.2d 37, 762 N.Y.S.2d 38, 38-39 (N.Y. App. Div. 2003).* Nor could DDCLAB justifiably rely on DuPont's alleged oral promises made after the Investment Agreement was executed, given the absence of the requisite written consent by DuPont. The parties are established [*20] businesses represented by experienced and sophisticated businesspeople. The parties engaged in nine months of negotiations which ultimately culminated in two comprehensive Written Agreements. Any oral assurances by DuPont's representatives were not incorporated in the Written Agreements, and are not consistent with the terms of those Written Agreements. Any reliance by DDCLAB upon the alleged oral promises is simply unreasonable. Accordingly, the promissory estoppel claim is dismissed.

**FRAUD**

In the fraud claim, DDCLAB alleges that DuPont knowingly, intentionally and/or recklessly promised a revolving line of credit to DDCLAB with the undisclosed intention not to perform both before and after the Written Agreements were executed.

To assert a claim for fraud under New York law, plaintiff must allege the following four elements: (1) defendant made a material misrepresentation; (2) defendant did so with intent of defrauding plaintiff; (3) plaintiff relied upon the representation; and (4) plaintiff suffered damages as a result of its reliance. *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank, 57 F.3d 146, 153 (2d Cir. 1995)* (citation omitted). [*21] If the fraud claim is premised on the same facts as plaintiff's breach of contract cause of action, with the additional allegation that defendant never intended to perform under the contract, a fraud claim may not be maintained. See, *Astroworks, Inc. v. Astroexhibit, 257 F. Supp.2d 609, 616 (S.D.N.Y. 2003)* (quoting, *PI, Inc. v. Quality Prods., Inc., 907 F. Supp. 752, 761 (S.D.N.Y. 1995)); Int'l Cabeltel Inc. v. Le Groupe Vedeotron Ltee, 978 F. Supp. 483, 486 (S.D.N.Y. 1997); New York Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308, 662 N.E.2d 763, 639 N.Y.S.2d 283, 289 (N.Y. 1995)* (citations omitted). A fraud claim will nevertheless lie, notwithstanding the parties' contractual relationship, where plaintiff can either "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused

by the representation and unrecoverable as contract damages." *Bridgestone/Firestone Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 20 (2d Cir. 1996) (citations and internal parenthetical omitted).

DDCLAB [*22] does not allege that DuPont owed any legal duty to DDCLAB separate and apart from its alleged contractual duty to provide a revolving line of credit in connection with DuPont's investment. The fraudulent misrepresentation at issue, *i.e.,* DuPont's assurances to set up the line of credit, is not collateral or extraneous to the alleged oral contract, but rather constitutes the heart of the alleged agreement. Moreover, DDCLAB is seeking $ 11,000,000 in compensatory and reliance damages, which is the exact amount of damages it is seeking in both of its breach of contract causes of action. The complaint fails to indicate that DDCLAB suffered any special damages as a result of alleged fraud in connection with the oral representations. Since the fraud claim is duplicitous of the breach of contract claims, it cannot survive a motion to dismiss.

## NEGLIGENT MISREPRESENTATION AND BREACH OF FIDUCIARY DUTY CLAIMS

To state a claim for negligent misrepresentation under New York law, plaintiff must allege the following five elements: "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he [*23] or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it: and (5) the plaintiff reasonably relied on it to his or her detriment." *Hydro Investors, Inc. v. Trafalgar Power, Inc.,* 227 F.3d 8, 20 (2d Cir. 2000). "A 'special relationship' requires a closer degree of trust than an ordinary business relationship." *Busino v. Meachem,* 270 A.D.2d 606, 704 N.Y.S.2d 690, 693 (N.Y. App. Div. 2000); see also, *United Safety of Am., Inc. v. Consol. Edison Co. of New York, Inc.,* 213 A.D.2d 283, 623 N.Y.S.2d 591, 593 (N.Y. App. Div. 1995).

To assert a cause of action for breach of fiduciary duty, plaintiff must plead the following three elements: (1) the existence of a fiduciary duty between the parties; (2) the breach of that duty by defendant; and (3) damages suffered by plaintiff as a result of defendant's breach. See, *Kidz Cloz, Inc. v. Officially for Kids, Inc.,* 2001 U.S. Dist. LEXIS 1135, 2002 WL 392291, *4 (S.D.N.Y. Mar. 13, 2002)* (citing *Cramer v. Devon Group, Inc.,* 774 F. Supp. 176, 184 (S.D.N.Y. 1991)). [*24] "Under New York law a fiduciary relationship arises when one has reposed trust or confidence in the integrity or fidelity of another who thereby gains a resulting superiority of influence over the first, or when one assumes control and

responsibility over another." *Reuben H. Connelly Corp. v. Mark I Mktg. Corp.,* 893 F. Supp. 285, 289 (S.D.N.Y. 1995) (citation omitted). A conventional business relationship alone does not give rise to a fiduciary relationship. *Oursler v. Women's Interart Ctr., Inc.,* 170 A.D.2d 407, 566 N.Y.S.2d 295, 297 (N.Y. App. Div. 1991); Feigen v. Advance Capital Mgmt. Corp.,* 150 A.D.2d 281, 541 N.Y.S.2d 797, 799 (N.Y. App. Div. 1989). In the context of a commercial contract, a fiduciary duty may nevertheless exists where the parties specifically agree to it or if "'one party's superior position or superior access to confidential information is so great as virtually to require the other party to repose trust and confidence in the first party.'" See, *Ross v. FSG PrivatAir Inc., 2004 U.S. Dist. LEXIS 16157, 2004 WL 1837366, *5 (S.D.N.Y. Aug. 17, 2004)* (quoting *Calvin Klein Trademark Trust v. Wachner, 123 F. Supp.2d 731, 734-34 (S.D.N.Y. 2000).* [*25] It is incumbent upon a plaintiff to plead some factors in the complaint from which it can be concluded that the parties had a fiduciary relationship. *Ross, 2004 U.S. Dist. LEXIS 16157, 2004 WL 1837366, *6 (quoting Boley v. Pineloch Assocs., Ltd., 700 F. Supp. 673, 681 (S.D.N.Y. 1988)).*

The complaint is bereft of any allegations regarding a prior or existing relationship between the parties which might have given rise to a special relationship of trust and confidence. Rather, the parties' relationship was that of sophisticated businesspeople engaged in an arms-length commercial transaction. Moreover, the complaint fails to reveal that DuPont possessed any special expertise or knowledge, or that DuPont was the only party with access to vital information. The complaint merely indicates that the parties stood on equal footing throughout their negotiations, the execution of the Written Agreements, and their subsequent communications. Notwithstanding DDCLAB's contention to the contrary, a special or fiduciary duty is not imposed upon DuPont as a result of it becoming a minority shareholder in DDCLAB by virtue of the Investment Agreement. See, *Guandong Enters. (N. Am.) Fur Holdings Ltd. v. Hennessy, 2002 U.S. Dist. LEXIS 8719, 2002 WL 1000953, *21 (S.D.N.Y. May 15, 2002)* [*26] (finding that no fiduciary relationship exists between two equal shareholders). Since DuPont did not owe any special or fiduciary duty to DDCLAB, outside of its contractual obligations set forth in the Written Agreements, the causes of action for negligent misrepresentation and breach of fiduciary duty must be dismissed.

## CONCLUSION

In light of the foregoing, defendant's motion to dismiss the complaint is granted, and the case is closed.

Dated: New York, New York

2005 U.S. Dist. LEXIS 2721, *

February 18, 2005                                          GEORGE B. DANIELS

SO ORDERED:                                                United States District Judge