# EXHIBIT 1

LEXSEE 2007 U.S. LEXIS 5901

## BELL ATLANTIC CORPORATION, ET AL., PETITIONERS v. WILLIAM TWOMBLY ET AL.

### No. 05-1126

### SUPREME COURT OF THE UNITED STATES

*127 S. Ct. 1955*; *167 L. Ed. 2d 929*; *2007 U.S. LEXIS 5901*; *75 U.S.L.W. 4337*; *2007-1 Trade Cas. (CCH) P75,709*; *20 Fla. L. Weekly Fed. S 267*

**November 27, 2006, Argued**
**May 21, 2007, Decided**

**NOTICE:**

[***1] The LEXIS pagination of this document is subject to change pending release of the final published version.

**PRIOR HISTORY:** ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT.
*Twombly v. Bell Atl. Corp., 425 F.3d 99, 2005 U.S. App. LEXIS 21390 (2d Cir., 2005)*

**DISPOSITION:** Reversed and remanded.

**SYLLABUS**

The 1984 divestiture of the American Telephone & Telegraph Company's (AT&T) local telephone business left a system of regional service monopolies, sometimes called Incumbent Local Exchange Carriers (ILECs), and a separate long-distance market from which the ILECs were excluded. The Telecommunications Act of 1996 withdrew approval of the ILECs' monopolies, "fundamentally restructuring local telephone markets" and "subjecting [ILECs] to a host of duties intended to facilitate market entry." *AT&T Corp. v. Iowa Utilities Bd., 525 U.S. 366, 371, 119 S. Ct. 721, 142 L. Ed. 2d 834.* It also authorized them to enter the long-distance market. [***2] "Central to the [new] scheme [was each ILEC's] obligation . . . to share its network with" competitive local exchange carriers (CLECs)." *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 402, 124 S. Ct. 872, 157 L. Ed. 2d 823.*

Respondents (hereinafter plaintiffs) represent a class of subscribers of local telephone and/or high speed Internet services in this action against petitioner ILECs for claimed violations of § 1 of the Sherman Act, which prohibits "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." The complaint alleges that the ILECs conspired to restrain trade (1) by engaging in parallel conduct in their respective service areas to inhibit the growth of upstart CLECs; and (2) by agreeing to refrain from competing against one another, as indicated by their common failure to pursue attractive business opportunities in contiguous markets and by a statement by one ILEC's chief executive officer that competing in another ILEC's territory did not seem right. The District Court dismissed the complaint, concluding that parallel business conduct [***3] allegations, taken alone, do not state a claim under § 1; plaintiffs must allege additional facts tending to exclude independent self-interested conduct as an explanation for the parallel actions. Reversing, the Second Circuit held that plaintiffs' parallel conduct allegations were sufficient to withstand a motion to dismiss because the ILECs failed to show that there is no set of facts that would permit plaintiffs to demonstrate that the particular parallelism asserted was the product of collusion rather than coincidence.

Held:

1. Stating a § 1 claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. An allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Pp. 6-17.

(a) Because § 1 prohibits "only restraints effected by a contract, combination, or conspiracy," *Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 775, 104 S. Ct. 2731, 81 L. Ed. 2d 628,* "the crucial question" is whether the challenged anticompetitive conduct "stems from independent decision or from an agreement," *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 540, 74 S. Ct. 257, 98 L. Ed. 273.* While [***4] a showing of parallel "business behavior is

admissible circumstantial evidence from which" agreement may be inferred, it falls short of "conclusively establishing agreement or . . . itself constituting a Sherman Act offense." *Id., at 540-541, 540, 74 S. Ct. 257, 98 L. Ed. 273.* The inadequacy of showing parallel conduct or interdependence, without more, mirrors the behavior's ambiguity: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market. Thus, this Court has hedged against false inferences from identical behavior at a number of points in the trial sequence, *e.g.,* at the summary judgment stage, see *Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538.* Pp. 6-7.

(b) This case presents the antecedent question of what a plaintiff must plead in order to state a *§ 1* claim. *Federal Rule of Civil Procedure 8(a)(2)* requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80.* [***5] While a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, *ibid.,* a plaintiff's obligation to provide the "grounds" of his "entitlement to relief" requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true. Applying these general standards to a *§ 1* claim, stating a claim requires a complaint with enough factual matter to suggest an agreement. Asking for plausible grounds does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects *Rule 8(a)(2)*'s threshold requirement that the "plain statement" possess enough heft to "show that the pleader is entitled to relief." A parallel conduct allegation gets the § 1 complaint close to stating a claim, but without further factual enhancement [***6] it stops short of the line between possibility and plausibility. The requirement of allegations suggesting an agreement serves the practical purpose of preventing a plaintiff with "'a largely groundless claim'" from "'taking up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.'" *Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 347, 125 S. Ct. 1627, 161 L. Ed. 2d 577.* It is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive.

That potential expense is obvious here, where plaintiffs represent a putative class of at least 90 percent of subscribers to local telephone or high-speed Internet service in an action against America's largest telecommunications firms for unspecified instances of antitrust violations that allegedly occurred over a 7-year period. It is no answer to say that a claim just shy of plausible entitlement can be weeded out early in the discovery process, given the common lament that the success of judicial supervision in checking discovery abuse has been modest. Plaintiffs' main [***7] argument against the plausibility standard at the pleading stage is its ostensible conflict with a literal reading of *Conley*'s statement construing *Rule 8*: "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *355 U.S., at 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80.* The "no set of facts" language has been questioned, criticized, and explained away long enough by courts and commentators, and is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Conley* described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival. Pp. 7-17.

2. Under the plausibility standard, plaintiffs' claim of conspiracy in restraint of trade comes up short. First, the complaint leaves no doubt that plaintiffs rest their § 1 claim on descriptions of parallel conduct, not on any independent allegation of actual agreement [***8] among the ILECs. The nub of the complaint is the ILECs' parallel behavior, and its sufficiency turns on the suggestions raised by this conduct when viewed in light of common economic experience. Nothing in the complaint invests either the action or inaction alleged with a plausible conspiracy suggestion. As to the ILECs' supposed agreement to disobey the 1996 Act and thwart the CLECs' attempts to compete, the District Court correctly found that nothing in the complaint intimates that resisting the upstarts was anything more than the natural, unilateral reaction of each ILEC intent on preserving its regional dominance. The complaint's general collusion premise fails to answer the point that there was no need for joint encouragement to resist the 1996 Act, since each ILEC had reason to try and avoid dealing with CLECs and would have tried to keep them out, regardless of the other ILECs' actions. Plaintiffs' second conspiracy theory rests on the competitive reticence among the ILECs themselves in the wake of the 1996 Act to enter into their competitors' territories, leaving the relevant market highly compartmentalized geographically, with minimal competition. This parallel conduct did

[***9] not suggest conspiracy, not if history teaches anything. Monopoly was the norm in telecommunications, not the exception. Because the ILECs were born in that world, doubtless liked it, and surely knew the adage about him who lives by the sword, a natural explanation for the noncompetition is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same. Antitrust conspiracy was not suggested by the facts adduced under either theory of the complaint, which thus fails to state a valid § 1 claim. This analysis does not run counter to *Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508, 122 S. Ct. 992, 152 L. Ed. 2d 1*, which held that "a complaint in an employment discrimination lawsuit [need] not contain specific facts establishing a prima facie case of discrimination." Here, the Court is not requiring heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face. Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed. Pp. 18-24.

*425 F.3d 99*, reversed and remanded.

COUNSEL: Michael Kellogg argued the cause for petitioners.

Thomas O. Barnett argued the cause for the United States, as amicus curiae, by special leave of court.

J. Douglas Richards argued the cause for respondents.

JUDGES: SOUTER, J., delivered the opinion [***10] of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, THOMAS, BREYER, and ALITO, JJ., joined. STEVENS, J., filed a dissenting opinion, in which GINSBURG, J., joined, except as to Part IV.

OPINION BY: SOUTER

OPINION

[**936] [*1961] JUSTICE SOUTER delivered the opinion of the Court.

Liability under § 1 of the Sherman Act, *15 U.S.C. § 1*, requires a "contract, combination . . . , or conspiracy, in restraint of trade or commerce." The question in this putative class action is whether a *§ 1* complaint can survive a motion to dismiss when it alleges that major telecommunications providers engaged in certain parallel conduct unfavorable to competition, absent some factual context suggesting agreement, as distinct from identical, independent action. We hold that such a complaint should be dismissed.

I

The upshot of the 1984 divestiture of the American Telephone & Telegraph Company's (AT&T) local telephone business was a system of regional service monopolies (variously called "Regional Bell Operating Companies," "Baby Bells," or "Incumbent Local Exchange Carriers" (ILECs)), and a separate, competitive market for long-distance service from which the ILECs were excluded. More than a decade [***11] later, Congress withdrew approval of the ILECs' monopolies by enacting the Telecommunications Act of 1996 (1996 Act), 110 Stat. 56, which "fundamentally restructured local telephone markets" and "subjected [ILECs] to a host of duties intended to facilitate market entry." *AT&T Corp. v. Iowa Utilities Bd., 525 U.S. 366, 371, 119 S. Ct. 721, 142 L. Ed. 2d 834 (1999)*. In recompense, the 1996 Act set conditions for authorizing ILECs to enter the long-distance market. See *47 U.S.C. § 271*.

"Central to the [new] scheme [was each ILEC's] obligation . . . to share its network with competitors," *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 402, 124 S. Ct. 872, 157 L. Ed. 2d 823 (2004)*, which came to be known as "competitive local exchange carriers" (CLECs), Pet. for Cert. 6, n. 1 A CLEC could make use of an ILEC's network in any of three ways: by (1) "purchasing local telephone services at wholesale rates for resale to end users," (2) "leasing elements of the [ILEC's] network 'on an unbundled basis,'" or (3) "interconnecting its own facilities with the [ILEC's] network." *Iowa Utilities Bd., supra, at 371, 119 S. Ct. 721, 142 L. Ed. 2d 834* (quoting *47 U.S.C. § 251* [***12] *(c)*). Owing to the "considerable expense and effort" required to make unbundled network elements available to rivals at wholesale prices, *Trinko, supra, at 410, 124 S. Ct. 872, 157 L. Ed. 2d 823*, the ILECs vigorously litigated the scope of the sharing obligation imposed by the 1996 Act, with the result that the Federal Communications Commission (FCC) [**937] three times revised its [*1962] regulations to narrow the range of network elements to be shared with the CLECs. See *Covad Communs. Co. v. FCC, 450 F.3d 528, 533-534 (CADC 2006)* (summarizing the 10-year-long regulatory struggle between the ILECs and CLECs).

Respondents William Twombly and Lawrence Marcus (hereinafter plaintiffs) represent a putative class consisting of all "subscribers of local telephone and/or high speed internet services . . . from February 8, 1996 to present." Amended Complaint in No. 02 CIV. 10220 (GEL) (SDNY) P53, App. 28 (hereinafter Complaint). In this action against petitioners, a group of ILECs, [1] plaintiffs seek treble damages and declaratory and injunctive relief for claimed violations of *§ 1* of the Sherman Act, ch. 647, 26 Stat. 209, as amended, *15 U.S.C. § 1*, which prohibits "every contract, [***13] combination in the form of trust or otherwise, or conspiracy, in restraint of trade

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

or commerce among the several States, or with foreign nations."

1 The 1984 divestiture of AT&T's local telephone service created seven Regional Bell Operating Companies. Through a series of mergers and acquisitions, those seven companies were consolidated into the four ILECs named in this suit: BellSouth Corporation, Qwest Communications International, Inc., SBC Communications, Inc., and Verizon Communications, Inc. (successor-in-interest to Bell Atlantic Corporation). Complaint P21, App. 16. Together, these ILECs allegedly control 90 percent or more of the market for local telephone service in the 48 contiguous States. Id., P48, App. 26.

The complaint alleges that the ILECs conspired to restrain trade in two ways, each supposedly inflating charges for local telephone and high-speed Internet services. Plaintiffs say, first, that the ILECs "engaged in parallel conduct" in their respective service areas to inhibit the growth [***14] of upstart CLECs. Complaint P47, App. 23-26. Their actions allegedly included making unfair agreements with the CLECs for access to ILEC networks, providing inferior connections to the networks, overcharging, and billing in ways designed to sabotage the CLECs' relations with their own customers. Ibid. According to the complaint, the ILECs'"compelling common motivation" to thwart the CLECs' competitive efforts naturally led them to form a conspiracy; "had any one [ILEC] not sought to prevent CLECs . . . from competing effectively . . . , the resulting greater competitive inroads into that [ILEC's] territory would have revealed the degree to which competitive entry by CLECs would have been successful in the other territories in the absence of such conduct." Id., P50, App. 26-27.

Second, the complaint charges agreements by the ILECs to refrain from competing against one another. These are to be inferred from the ILECs' common failure "meaningfully [to] pursue" "attractive business opportunities" in contiguous markets where they possessed "substantial competitive advantages," id., PP40-41, App. 21-22, and from a statement of Richard Notebaert, chief executive officer [***15] (CEO) of the ILEC Qwest, that competing in the territory of another ILEC "'might be a good way to turn a quick dollar but that doesn't make it right,'" id., P42, App. 22.

The complaint couches its ultimate allegations this way:

"In the absence of any meaningful competition between the [ILECs] in one another's markets, and in light of the parallel course of conduct that each engaged in to

prevent competition from CLECs within [**938] their respective local telephone and/or high speed internet services markets and the other facts and market circumstances alleged above, Plaintiffs allege upon information [*1963] and belief that [the ILECs] have entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and have agreed not to compete with one another and otherwise allocated customers and markets to one another." Id., P51, App. 27. [2]

2 In setting forth the grounds for § 1 relief, the complaint repeats these allegations in substantially similar language:

"Beginning at least as early as February 6, 1996, and continuing to the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators engaged in a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets by, among other things, agreeing not to compete with one another and to stifle attempts by others to compete with them and otherwise allocating customers and markets to one another in violation of Section 1 of the Sherman Act." Id., P64, App. 30-31.

[***16] The United States District Court for the Southern District of New York dismissed the complaint for failure to state a claim upon which relief can be granted. The District Court acknowledged that "plaintiffs may allege a conspiracy by citing instances of parallel business behavior that suggest an agreement," but emphasized that "while 'circumstantial evidence of consciously parallel behavior may have made heavy inroads into the traditional judicial attitude toward conspiracy[, . . . ] "conscious parallelism" has not yet read conspiracy out of the Sherman Act entirely.'" 313 F. Supp. 2d 174, 179 (2003) (quoting Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 541, 74 S. Ct. 257, 98 L. Ed. 273 (1954); alterations in original). Thus, the District Court understood that allegations of parallel business conduct, taken alone, do not state a claim under § 1; plaintiffs must allege additional facts that "tend to exclude independent self-interested conduct as an explanation for defendants' parallel behavior." 313 F. Supp. 2d, at 179. The District Court found plaintiffs'

allegations of parallel ILEC actions to discourage competition inadequate [***17] because "the behavior of each ILEC in resisting the incursion of CLECs is fully explained by the ILEC's own interests in defending its individual territory." *Id., at 183.* As to the ILECs' supposed agreement against competing with each other, the District Court found that the complaint does not "allege facts . . . suggesting that refraining from competing in other territories as CLECs was contrary to [the ILECs'] apparent economic interests, and consequently [does] not raise an inference that [the ILECs'] actions were the result of a conspiracy." *Id., at 188.*

The Court of Appeals for the Second Circuit reversed, holding that the District Court tested the complaint by the wrong standard. It held that "plus factors are not *required* to be pleaded to permit an antitrust claim based on parallel conduct to survive dismissal." *425 F.3d 99, 114 (2005)* (emphasis in original). Although the Court of Appeals took the view that plaintiffs must plead facts that "include conspiracy among the realm of 'plausible' possibilities in order to survive a motion to dismiss," it then said that "to rule that allegations of parallel anticompetitive conduct [***18] fail to support a plausible conspiracy claim, a court would have to conclude that there is no set of facts that would permit a [**939] plaintiff to demonstrate that the particular parallelism asserted was the product of collusion rather than coincidence." *Ibid.*

We granted certiorari to address the proper standard for pleading an antitrust conspiracy through allegations of parallel conduct, *547 U.S.    , 126 S. Ct. 2965, 165 L. Ed. 2d 949 (2006),* and now reverse.

[*1964] II

A

Because § 1 of the Sherman Act "does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy," *Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 775, 104 S. Ct. 2731, 81 L. Ed. 2d 628 (1984),* "the crucial question" is whether the challenged anticompetitive conduct "stems from independent decision or from an agreement, tacit or express," *Theatre Enterprises, 346 U.S., at 540, 74 S. Ct. 257, 98 L. Ed. 273.* While a showing of parallel "business behavior is admissible circumstantial evidence from which the fact finder may infer agreement," it falls short of "conclusively establishing agreement or . . . itself constituting a Sherman Act offense." *Id., at 540-541, 74 S. Ct. 257, 98 L. Ed. 273.* Even "conscious [***19] parallelism," a common reaction of "firms in a concentrated market [that] recognize their shared economic interests and their interdependence with respect to price and output decisions" is "not in itself unlawful." *Brooke Group Ltd. v.*

*Brown & Williamson Tobacco Corp., 509 U.S. 209, 227, 113 S. Ct. 2578, 125 L. Ed. 2d 168 (1993);* see 6 P. Areeda & H. Hovenkamp, Antitrust Law P1433a, p. 236 (2d ed. 2003) (hereinafter Areeda & Hovenkamp) ("The courts are nearly unanimous in saying that mere interdependent parallelism does not establish the contract, combination, or conspiracy required by Sherman Act § 1"); Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv. L. Rev. 655, 672 (1962) ("Mere interdependence of basic price decisions is not conspiracy").

The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market. See, *e.g.,* AEI-Brookings Joint Center for Regulatory Studies, Epstein, Motions to Dismiss [***20] Antitrust Cases: Separating Fact from Fantasy, Related Publication 06-08, pp. 3-4 (2006) (discussing problem of "false positives" in § 1 suits). Accordingly, we have previously hedged against false inferences from identical behavior at a number of points in the trial sequence. An antitrust conspiracy plaintiff with evidence showing nothing beyond parallel conduct is not entitled to a directed verdict, see *Theatre Enterprises, supra, 346 U.S. 537, 74 S. Ct. 257, 98 L. Ed. 273;* proof of a § 1 conspiracy must include evidence tending to exclude the possibility of independent action, see *Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984);* and at the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently, see *Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).*

[**940] B

This case presents the antecedent question of what a plaintiff must plead in order to state a claim under § 1 of the Sherman Act. *Federal Rule of Civil Procedure 8(a)(2)* requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in [***21] order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).* While a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, *ibid.; Sanjuan v. American Bd. of Psychiatry and Neurology, Inc., 40 F.3d 247, 251 (CA7 1994),* a plaintiff's obligation to provide the [*1965] "grounds" of his "entitlement to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see *Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d*

209 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004) (hereinafter Wright & Miller) ("The pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), [3] on the assumption that all the allegations [***22] in the complaint are true (even if doubtful in fact), see, e.g., *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508, n. 1, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002); *Neitzke v. Williams*, 490 U.S. 319, 327, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989) ("*Rule 12(b)(6)* does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely").

3 The dissent greatly oversimplifies matters by suggesting that the Federal Rules somehow dispensed with the pleading of facts altogether. See *post*, at 10 (opinion of STEVENS, J.) (pleading standard of Federal Rules "does not require, or even invite, the pleading of facts"). While, for most types of cases, the Federal Rules eliminated the cumbersome requirement that a claimant "set out *in detail* the facts upon which he bases his claim," *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957) (emphasis added), *Rule 8(a)(2)* still requires a "showing," rather than a blanket assertion, of entitlement to relief. Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only "fair notice" of the nature of the claim, but also "grounds" on which the claim rests. See 5 Wright & Miller § 1202, at 94, 95 (*Rule 8(a)* "contemplates the statement of circumstances, occurrences, and events in support of the claim presented" and does not authorize a pleader's "bare averment that he wants relief and is entitled to it").

[***23] In applying these general standards to a § 1 claim, we hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. [4] And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof [**941] of those facts is improbable, and "that a recovery is very

remote and unlikely." *Ibid*. In identifying facts that are suggestive enough to render a § 1 conspiracy plausible, we have the benefit [*1966] of the prior rulings and considered views of leading commentators, already quoted, that lawful parallel conduct fails to bespeak unlawful agreement. It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Hence, when [***24] allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.

4 Commentators have offered several examples of parallel conduct allegations that would state a § 1 claim under this standard. See, e.g., 6 Areeda & Hovenkamp P1425, at 167-185 (discussing "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties"); Blechman, Conscious Parallelism, Signalling and Facilitating Devices: The Problem of Tacit Collusion Under the Antitrust Laws, 24 N. Y. L. S. L. Rev. 881, 899 (1979) (describing "conduct [that] indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement"). The parties in this case agree that "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason" would support a plausible inference of conspiracy. Brief for Respondents 37; see also Reply Brief for Petitioners 12.

[***25] The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of *Rule 8(a)(2)* that the "plain statement" possess enough heft to "show that the pleader is entitled to relief." A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory. An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of "entitlement to relief." Cf. *DM Research, Inc. v. College of*

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

*Am. Pathologists, 170 F.3d 53, 56 (CA1 1999)* ("Terms like 'conspiracy,' or even 'agreement,' are border-line: they might well be sufficient in conjunction with a more specific allegation -- for example, identifying a written agreement or even a basis for inferring a tacit agreement, . . . but a court [***26] is not required to accept such terms as a sufficient basis for a complaint"). [5]

     5 The border in *DM Research* was the line between the conclusory and the factual. Here it lies between the factually neutral and the factually suggestive. Each must be crossed to enter the realm of plausible liability.

We alluded to the practical significance of the *Rule 8* entitlement requirement in *Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)*, when we explained that something beyond the mere possibility of loss causation must be alleged, lest a plaintiff with "'a largely groundless claim'" be allowed to "'take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.'" *Id., at 347, 125 S. Ct. 1627, [**942] 161 L. Ed. 2d 577* (quoting *Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 741, 95 S. Ct. 1917, 44 L. Ed. 2d 539 (1975)).* So, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, "'this basic deficiency [***27] should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" 5 Wright & Miller § 1216, at 233-234 (quoting *Daves v. Hawaiian Dredging Co., 114 F. Supp. 643, 645 (Haw. 1953))*; see also *Dura, supra, at 346, 125 S. Ct. 1627, 161 L. Ed. 2d 577; Asahi Glass Co. v. Pentech Pharmaceuticals, Inc., 289 F. Supp. 2d 986, 995 (ND Ill. 2003)* (Posner, J., sitting by designation) ("Some threshold of plausibility must be crossed at the outset before a patent antitrust case should be permitted to go into its inevitably costly and protracted discovery phase").

Thus, it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, cf. *Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, [*1967] 82 S. Ct. 486, 7 L. Ed. 2d 458 (1962)*, but quite another to forget that proceeding to antitrust discovery can be expensive. As we indicated over 20 years ago in *Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 528, n. 17, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)*, "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy [***28] to proceed." See also *Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (CA7 1984)* ("The costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the

plaintiffs can construct a claim from the events related in the complaint"); Note, Modeling the Effect of One-Way Fee Shifting on Discovery Abuse in Private Antitrust Litigation, *78 N. Y. U. L. Rev. 1887, 1898-1899 (2003)* (discussing the unusually high cost of discovery in antitrust cases); Manual for Complex Litigation, Fourth, § 30, p. 519 (2004) (describing extensive scope of discovery in antitrust cases); Memorandum from Paul V. Niemeyer, Chair, Advisory Committee on Civil Rules, to Hon. Anthony J. Scirica, Chair, Committee on Rules of Practice and Procedure (May 11, 1999), 192 F.R.D. 354, 357 (2000) (reporting that discovery accounts for as much as 90 percent of litigation costs when discovery is actively employed). That potential expense is obvious enough in the present case: plaintiffs represent a putative class of at least 90 percent of all [***29] subscribers to local telephone or high-speed Internet service in the continental United States, in an action against America's largest telecommunications firms (with many thousands of employees generating reams and gigabytes of business records) for unspecified (if any) instances of antitrust violations that allegedly occurred over a period of seven years.

It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through "careful case management," *post* at 4, given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side. See, *e.g.,* Easterbrook, Discovery as Abuse, *69 B. U. L. Rev. 635, 638 (1989)* ("Judges can do little about impositional discovery when parties control the legal claims [**943] to be presented and conduct the discovery themselves"). And it is self-evident that the problem of discovery abuse cannot be solved by "careful scrutiny of evidence at the summary judgment stage," much less "lucid instructions to juries," *post,* at 4; the threat of discovery expense will push cost-conscious defendants to settle even [***30] anemic cases before reaching those proceedings. Probably, then, it is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no "'reasonably founded hope that the [discovery] process will reveal relevant evidence'" to support a § 1 claim. *Dura, 544 U.S., at 347, 125 S. Ct. 1627, 161 L. Ed. 2d 577* (quoting *Blue Chip Stamps, supra, at 741, 95 S. Ct. 1917, 44 L. Ed. 2d 539';* alteration in *Dura*). [6]

     6 The dissent takes heart in the reassurances of plaintiffs' counsel that discovery would be "' "phased" '" and "limited to the existence of the alleged conspiracy and class certification." *Post,* at 24. But determining whether some illegal agreement may have taken place between unspecified

persons at different ILECs (each a multibillion dollar corporation with legions of management level employees) at some point over seven years is a sprawling, costly, and hugely time-consuming undertaking not easily susceptible to the kind of line drawing and case management that the dissent envisions. Perhaps the best answer to the dissent's optimism that antitrust discovery is open to effective judicial control is a more extensive quotation of the authority just cited, a judge with a background in antitrust law. Given the system that we have, the hope of effective judicial supervision is slim: "The timing is all wrong. The plaintiff files a sketchy complaint (the Rules of Civil Procedure discourage fulsome documents), and discovery is launched. A judicial officer does not know the details of the case the parties will present and in theory *cannot* know the details. Discovery is used to find the details. The judicial officer always knows less than the parties, and the parties themselves may not know very well where they are going or what they expect to find. A magistrate supervising discovery does not -- cannot -- know the expected productivity of a given request, because the nature of the requester's claim and the contents of the files (or head) of the adverse party are unknown. Judicial officers cannot measure the costs and benefits to the requester and so cannot isolate impositional requests. Requesters have no reason to disclose their own estimates because they gain from imposing costs on rivals (and may lose from an improvement in accuracy). The portions of the Rules of Civil Procedure calling on judges to trim back excessive demands, therefore, have been, and are doomed to be, hollow. We cannot prevent what we cannot detect; we cannot detect what we cannot define; we cannot define 'abusive' discovery except in theory, because in practice we lack essential information." Easterbrook, Discovery as Abuse, *69 B. U. L. Rev. 635, 638-639 (1989)*.

[***31]  [*1968]  Plaintiffs do not, of course, dispute the requirement of plausibility, and the need for something more than merely parallel behavior explained in *Theatre Enterprises, Monsanto*, and *Matsushita*, and their main argument against the plausibility standard at the pleading stage is its ostensible conflict with an early statement of ours construing *Rule 8*. Justice Black's opinion for the Court in *Conley v. Gibson* spoke not only of the need for fair notice of the grounds for entitlement to relief but of "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *355 U.S., at 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80*.

This "no set of facts" language can be read in isolation as saying that any statement revealing the theory of the claim will suffice unless its factual impossibility may be shown from the face of the pleadings; and the Court of Appeals appears to have read *Conley* in some such way when formulating its understanding of the proper pleading standard, see *425 F.3d at 106, 114* (invoking *Conley*'s "no set [***32] of [**944] facts" language in describing the standard for dismissal). [7]

[7]    The Court of Appeals also relied on Chief Judge Clark's suggestion in *Nagler v. Admiral Corp., 248 F.2d 319 (CA2 1957)*, that facts indicating parallel conduct alone suffice to state a claim under *§ 1. 425 F.3d at 114* (citing *Nagler, supra, at 325*). But *Nagler* gave no explanation for citing *Theatre Enterprises* (which upheld a denial of a directed verdict for plaintiff on the ground that proof of parallelism was not proof of conspiracy) as authority that pleading parallel conduct sufficed to plead a Sherman Act conspiracy. Now that *Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984)*, and *Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*, have made it clear that neither parallel conduct nor conscious parallelism, taken alone, raise the necessary implication of conspiracy, it is time for a fresh look at adequacy of pleading when a claim rests on parallel action.

[***33]  On such a focused and literal reading of *Conley*'s "no set of facts," a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some "set of [undisclosed] facts" to support recovery. So here, the Court of Appeals specifically found the prospect of unearthing direct evidence of conspiracy sufficient to preclude dismissal, even though the complaint [*1969]  does not set forth a single fact in a context that suggests an agreement. *425 F.3d at 106, 114*. It seems fair to say that this approach to pleading would dispense with any showing of a "'reasonably founded hope'" that a plaintiff would be able to make a case, see *Dura, 544 U.S., at 347, 125 S. Ct. 1627, 161 L. Ed. 2d 577* (quoting *Blue Chip Stamps, 421 U.S., at 741, 95 S. Ct. 1917, 44 L. Ed. 2d 539*); Mr. Micawber's optimism would be enough.

Seeing this, a good many judges and commentators have balked at taking the literal terms of the *Conley* passage as a pleading standard. See, *e.g.*, *Car Carriers, 745 F.2d at 1106* ("*Conley* has never been interpreted literally" and, "in practice, a complaint . . . must contain either direct or [***34]  inferential allegations respecting

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

all the material elements necessary to sustain recovery under *some* viable legal theory" (internal quotation marks omitted; emphasis and omission in original); *Ascon Properties, Inc. v. Mobil Oil Co., 866 F.2d 1149, 1155 (CA9 1989)* (tension between *Conley*'s "no set of facts" language and its acknowledgment that a plaintiff must provide the "grounds" on which his claim rests); *O'Brien v. Di Grazia, 544 F.2d 543, 546, n. 3 (CA1 1976)* ("When a plaintiff . . . supplies facts to support his claim, we do not think that *Conley* imposes a duty on the courts to conjure up unpleaded facts that might turn a frivolous claim of unconstitutional . . . action into a substantial one"); *McGregor v. Industrial Excess Landfill, Inc., 856 F.2d 39, 42-43 (CA6 1988)* (quoting *O'Brien*'s analysis); Hazard, From Whom No Secrets Are Hid, *76 Tex. L. Rev. 1665, 1685 (1998)* (describing *Conley* as having "turned *Rule 8* on its head"); Marcus, The Revival of Fact Pleading Under the *Federal Rules of Civil Procedure, 86 Colum. L. Rev. 433, 463-465 (1986)* (noting tension between [***35] *Conley* and subsequent understandings of *Rule 8*).

We could go on, but there is no need to pile up further citations to show that *Conley*'s "no set of facts" language has been questioned, criticized, and explained away long enough. To be fair to the *Conley* Court, the passage should be understood in light of the opinion's preceding summary of the complaint's concrete allegations, which the Court quite reasonably understood as amply stating a claim for [**945] relief. But the passage so often quoted fails to mention this understanding on the part of the Court, and after puzzling the profession for 50 years, this famous observation has earned its retirement. The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. See *Sanjuan, 40 F.3d at 251* (once a claim for relief has been stated, a plaintiff "receives the benefit of imagination, so long as the hypotheses are consistent with the complaint"); accord, *Swierkiewicz, 534 U.S., at 514, 122 S. Ct. 992, 152 L. Ed. 2d 1; National Organization for Women, Inc. v. Scheidler, 510 U.S. 249, 256, 114 S. Ct. 798, 127 L. Ed. 2d 99 (1994);* [***36] *H. J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 249-250, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989); Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984). Conley*, then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival. [8]

8 Because *Conley*'s "'no set of facts'" language was one of our earliest statements about pleading under the Federal Rules, it is no surprise that it has since been "cited as authority" by this Court

and others. *Post*, at 8. Although we have not previously explained the circumstances and rejected the literal reading of the passage embraced by the Court of Appeals, our analysis comports with this Court's statements in the years since *Conley*. See *Dura, 544 U.S., at 347, 125 S. Ct. 1627, 161 L. Ed. 2d 577* (quoting *Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 741, 95 S. Ct. 1917, 44 L. Ed. 2d 539 (1975);* (requiring "'reasonably founded hope that the [discovery] process will reveal relevant evidence'" to support the claim (alteration in *Dura*)); *Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 526, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)* ("It is not . . . proper to assume that [the plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged"); *Wilson v. Schnettler, 365 U.S. 381, 383, 81 S. Ct. 632, 5 L. Ed. 2d 620 (1961)* ("In the absence of . . . an allegation [that the arrest was made without probable cause] the courts below could not, nor can we, assume that respondents arrested petitioner without probable cause to believe that he had committed . . . a narcotics offense"). Nor are we reaching out to decide this issue in a case where the matter was not raised by the parties, see *post*, at 10, since both the ILECs and the Government highlight the problems stemming from a literal interpretation of *Conley*'s "no set of facts" language and seek clarification of the standard. Brief for Petitioners 27-28; Brief for United States as *Amicus Curiae* 22-25; see also Brief for Respondents 17 (describing "petitioners and their amici" as mounting an "attack on *Conley*'s 'no set of facts' standard").

The dissent finds relevance in Court of Appeals precedents from the 1940s, which allegedly gave rise to *Conley*'s "no set of facts" language. See *post*, at 11-13. Even indulging this line of analysis, these cases do not challenge the understanding that, before proceeding to discovery, a complaint must allege facts suggestive of illegal conduct. See, *e.g., Leimer v. State Mut. Life Assur. Co., 108 F.2d 302, 305 (CA8 1940)* ("If, in view of what is alleged, it can reasonably be conceived that the plaintiffs . . . could, upon a trial, establish a case which would entitle them to . . . relief, the motion to dismiss should not have been granted'"); *Continental Collieries, Inc. v. Shober, 130 F.2d 631, 635 (CA3 1942)* ("No matter how likely it may seem that the pleader will be unable to prove his case, he is entitled, upon averring a claim, to an opportunity to try to prove it"). Rather, these cases stand for the unobjectionable proposition that, when a complaint adequately

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the fact-finder. Cf. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974) (a district court weighing a motion to dismiss asks "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims").

[***37] [**946] [*1970] III

When we look for plausibility in this complaint, we agree with the District Court that plaintiffs' claim of conspiracy in restraint of trade comes up short. To begin with, the complaint leaves no doubt that plaintiffs rest their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement among the ILECs. *Supra*, at 4. Although in form a few stray statements speak directly of agreement, [9] on fair reading these are merely legal conclusions resting on the prior allegations. Thus, the complaint first takes account of the alleged "absence of any meaningful competition between [the ILECs] in one another's markets," "the parallel course of conduct that each [ILEC] engaged in to prevent competition from CLECs," "and the other facts and market circumstances alleged [earlier]"; "in light of" these, the complaint concludes "that [the ILECs] have entered into a contract, combination or conspiracy to prevent competitive entry into their . . . markets and have agreed not to compete with one another." Complaint P51, App. 27. [10] The nub of the [*1971] complaint, then, is the ILECs' parallel behavior, consisting of steps to keep the CLECs out [***38] and manifest disinterest in becoming CLECs themselves, and its sufficiency turns on the suggestions raised by this conduct when viewed in light of common economic experience. [11]

9    See Complaint PP51, 64, App. 27, 30-31 (alleging that ILECs engaged in a "contract, combination or conspiracy" and agreed not to compete with one another).

10    If the complaint had not explained that the claim of agreement rested on the parallel conduct described, we doubt that the complaint's references to an agreement among the ILECs would have given the notice required by *Rule 8*. Apart from identifying a seven-year span in which the § 1 violations were supposed to have occurred (*i.e.*, "beginning at least as early as February 6, 1996, and continuing to the present," *id.*, P64, App. 30), the pleadings mentioned no specific time, place, or person involved in the alleged conspiracies. This lack of notice contrasts sharply with the

model form for pleading negligence, Form 9, which the dissent says exemplifies the kind of "bare allegation" that survives a motion to dismiss. *Post*, at 6. Whereas the model form alleges that the defendant struck the plaintiff with his car while plaintiff was crossing a particular highway at a specified date and time, the complaint here furnishes no clue as to which of the four ILECs (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place. A defendant wishing to prepare an answer in the simple fact pattern laid out in Form 9 would know what to answer; a defendant seeking to respond to plaintiffs' conclusory allegations in the § 1 context would have little idea where to begin.

[***39]
11    The dissent's quotations from the complaint leave the impression that plaintiffs directly allege illegal agreement; in fact, they proceed exclusively via allegations of parallel conduct, as both the District Court and Court of Appeals recognized. See *313 F. Supp. 2d 174, 182 (SDNY 2003)*; *425 F.3d 99, 102-104 (CA 2005)*.

We think that nothing contained in the complaint invests either the action or inaction alleged with a plausible suggestion of conspiracy. As to the ILECs' supposed agreement to disobey the 1996 Act and thwart the CLECs' attempts to compete, we agree with the District Court that nothing in the complaint intimates that the resistance to the upstarts was anything more than the natural, unilateral reaction of each ILEC intent on keeping its regional dominance. The 1996 Act did more than just subject the ILECs to competition; it obliged them to subsidize their competitors with their own equipment at [**947] wholesale rates. The economic incentive to resist was powerful, but resisting competition is routine market conduct, and even if the ILECs flouted the 1996 [***40] Act in all the ways the plaintiffs allege, see *id.*, P47, App. 23-24, there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway; so natural, in fact, that if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a § 1 violation against almost any group of competing businesses would be a sure thing.

The complaint makes its closest pass at a predicate for conspiracy with the claim that collusion was necessary because success by even one CLEC in an ILEC's territory "would have revealed the degree to which competitive entry by CLECs would have been successful in the other territories." *Id.*, P50, App. 26-27. But, its logic aside, this general premise still fails to answer the point that there was just no need for joint encouragement to

resist the 1996 Act; as the District Court said, "each ILEC has reason to want to avoid dealing with CLECs" and "each ILEC would attempt to keep CLECs out, regardless of the actions of the other ILECs." *313 F. Supp. 2d, at 184*; cf. *Kramer v. Pollock-Krasner Foundation, 890 F. Supp. 250, 256 (SDNY 1995)* (while the [***41] plaintiff "may believe the defendants conspired . . . , the defendants' allegedly conspiratorial actions could equally have been prompted by lawful, independent goals which do not constitute a conspiracy"). [12]

> 12   From the allegation that the ILECs belong to various trade associations, see Complaint P46, App. 23, the dissent playfully suggests that they conspired to restrain trade, an inference said to be "buttressed by the common sense of Adam Smith." *Post*, at 22, 25-26. If Adam Smith is peering down today, he may be surprised to learn that his tongue-in-cheek remark would be authority to force his famous pinmaker to devote financial and human capital to hire lawyers, prepare for depositions, and otherwise fend off allegations of conspiracy; all this just because he belonged to the same trade guild as one of his competitors when their pins carried the same price tag.

[*1972]   Plaintiffs' second conspiracy theory rests on the competitive reticence among the ILECs themselves in the wake of the 1996 Act, which was [***42] supposedly passed in the "'hope that the large incumbent local monopoly companies . . . might attack their neighbors' service areas, as they are the best situated to do so.'" Complaint P38, App. 20 (quoting Consumer Federation of America, Lessons from 1996 Telecommunications Act: Deregulation Before Meaningful Competition Spells Consumer Disaster, p. 12 (Feb. 2000). Contrary to hope, the ILECs declined "'to enter each other's service territories in any significant way,'" Complaint P38, App. 20, and the local telephone and high speed Internet market remains highly compartmentalized geographically, with minimal competition. Based on this state of affairs, and perceiving the ILECs to be blessed with "especially attractive business opportunities" in surrounding markets dominated by other ILECs, the plaintiffs assert that the ILECs' parallel conduct was "strongly suggestive of conspiracy." *Id.*, P40, App. 21.

But it was not suggestive of conspiracy, not if history teaches anything. In a traditionally unregulated industry with low barriers to entry, sparse competition among large firms dominating separate geographical segments of the market could very well signify illegal agreement, [***43] but here we have an obvious alternative [**948] explanation. In the decade preceding the 1996 Act and well before that, monopoly was the norm

in telecommunications, not the exception. See *Verizon Communs., Inc. v. FCC, 535 U.S. 467, 477-478, 122 S. Ct. 1646, 152 L. Ed. 2d 701 (2002)* (describing telephone service providers as traditional public monopolies). The ILECs were born in that world, doubtless liked the world the way it was, and surely knew the adage about him who lives by the sword. Hence, a natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing.

In fact, the complaint itself gives reasons to believe that the ILECs would see their best interests in keeping to their old turf. Although the complaint says generally that the ILECs passed up "especially attractive business opportunities" by declining to compete as CLECs against other ILECs, Complaint P40, App. 21, it does not allege that competition as CLECs was potentially any more lucrative than other opportunities being pursued by the ILECs during the same period, [13] and [*1973] the complaint is replete with indications that any CLEC faced [***44] nearly insurmountable barriers to profitability owing to the ILECs' flagrant resistance to the network sharing requirements of the 1996 Act, *id.*, P47; App. 23-26. Not only that, but even without a monopolistic tradition and the peculiar difficulty of mandating shared networks, "firms do not expand without limit and none of them enters every market that an outside observer might regard as profitable, or even a small portion of such markets." Areeda & Hovenkamp P307d, at 155 (Supp. 2006) (commenting on the case at bar). The upshot is that Congress may have expected some ILECs to become CLECs in the legacy territories of other ILECs, but the disappointment does not make conspiracy plausible. We agree with the District Court's assessment that antitrust conspiracy was not suggested by the facts adduced under either theory of the complaint, which thus fails to state a valid § 1 claim. [14]

> 13   The complaint quoted a reported statement of Qwest's CEO, Richard Notebaert, to suggest that the ILECs declined to compete against each other despite recognizing that it "'might be a good way to turn a quick dollar.'" P42, App. 22 (quoting Chicago Tribune, Oct. 31, 2002, Business Section, p. 1). This was only part of what he reportedly said, however, and the District Court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn. See *Fed. Rule Evid. 201*.
>
> Notebaert was also quoted as saying that entering new markets as a CLEC would not be "a sustainable economic model" because the CLEC pricing model is "just . . . nuts." Chicago Tribune,

Oct. 31, 2002, Business Section, p. 1 (cited at Complaint P42, App. 22). Another source cited in the complaint quotes Notebaert as saying he thought it "unwise" to "base a business plan" on the privileges accorded to CLECs under the 1996 Act because the regulatory environment was too unstable. Chicago Tribune, Dec. 19, 2002, Business Section, p. 2 (cited at Complaint P45, App. 23).

[***45]

14  In reaching this conclusion, we do not apply any "heightened" pleading standard, nor do we seek to broaden the scope of *Federal Rule of Civil Procedure 9*, which can only be accomplished "'by the process of amending the Federal Rules, and not by judicial interpretation.'" *Swierkiewicz v. Sorema N. A., 534 U.S. 506, 515, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)* (quoting *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993)*). On certain subjects understood to raise a high risk of abusive litigation, a plaintiff must state *factual* allegations with greater particularity than *Rule 8* requires. *Fed. Rules Civ. Proc. 9(b)-(c)*. Here, our concern is not that the allegations in the complaint were insufficiently "particularized", *ibid.*; rather, the complaint warranted dismissal because it failed *in toto* to render plaintiffs' entitlement to relief plausible.

Plaintiffs say that our analysis runs counter to *Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508, 122 S. Ct. 992, [**949] 152 L. Ed. 2d 1 (2002)*, which held that "a complaint in an employment discrimination [***46] lawsuit [need] not contain specific facts establishing a prima facie case of discrimination under the framework set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*." They argue that just as the prima facie case is a "flexible evidentiary standard" that "should not be transposed into a rigid pleading standard for discrimination cases," *Swierkiewicz, supra, at 512, 122 S. Ct. 992, 152 L. Ed. 2d 1*, "transposing 'plus factor' summary judgment analysis woodenly into a rigid *Rule 12(b)(6)* pleading standard . . . would be unwise," Brief for Respondents 39. As the District Court correctly understood, however, "*Swierkiewicz* did not change the law of pleading, but simply re-emphasized . . . that the Second Circuit's use of a heightened pleading standard for Title VII cases was contrary to the Federal Rules' structure of liberal pleading requirements." *313 F. Supp. 2d, at 181* (citation and footnote omitted). Even though Swierkiewicz's pleadings "detailed the events leading to his termination, provided relevant dates, and included the ages and nationalities of at least some of the relevant persons involved with his termination," the Court of Appeals dismissed [***47] his complaint for failing to allege certain additional facts that Swierkiewicz would need at the trial stage to support his claim in the absence of direct evidence of discrimination. *Swierkiewicz, 534 U.S., at 514, 122 S. Ct. 992, 152 L. Ed. 2d 1*. We reversed on the ground that the Court of Appeals had impermissibly applied what amounted to a heightened pleading requirement by insisting that Swierkiewicz allege "specific facts" beyond [*1974] those necessary to state his claim and the grounds showing entitlement to relief. *Id., at 508, 122 S. Ct. 992, 152 L. Ed. 2d 1*.

Here, in contrast, we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face. Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.

* * *

The judgment of the Court of Appeals for the Second Circuit is reversed, and the cause is remanded for further proceedings consistent with this opinion.

It is so ordered.

**DISSENT BY: STEVENS**

**DISSENT**

JUSTICE STEVENS, with whom JUSTICE GINSBURG joins except as to Part IV, dissenting.

In the first paragraph of its 24-page opinion the Court states that the question to be [***48] decided is whether allegations that "major telecommunications providers engaged in certain parallel conduct unfavorable to competition" suffice to state a violation of *§ 1* of the Sherman Act. *Ante*, at 1. The answer to that question has been settled for more than 50 years. If that were indeed the issue, a summary reversal citing *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 74 S. Ct. 257, 98 L. Ed. 273 (1954)*, would adequately resolve [**950] this case. As *Theatre Enterprises* held, parallel conduct is circumstantial evidence admissible on the issue of conspiracy, but it is not itself illegal. *Id., at 540-542, 74 S. Ct. 257, 98 L. Ed. 273*.

Thus, this is a case in which there is no dispute about the substantive law. If the defendants acted independently, their conduct was perfectly lawful. If, however, that conduct is the product of a horizontal agreement among potential competitors, it was unlawful. Plaintiffs have alleged such an agreement and, because the complaint was dismissed in advance of answer, the allegation has not even been denied. Why, then, does the case not proceed? Does a judicial opinion that the charge

is not "plausible" provide a legally acceptable reason [***49] for dismissing the complaint? I think not.

Respondents' amended complaint describes a variety of circumstantial evidence and makes the straightforward allegation that petitioners

"entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and have agreed not to compete with one another and otherwise allocated customers and markets to one another." Amended Complaint in No. 02 CIV. 10220 (GEL) (SDNY) P51, App. 27 (hereinafter Complaint).

The complaint explains that, contrary to Congress' expectation when it enacted the 1996 Telecommunications Act, and consistent with their own economic self-interests, petitioner Incumbent Local Exchange Carriers (ILECs) have assiduously avoided infringing upon each other's markets and have refused to permit noncompetitive competitors to access their networks. The complaint quotes Richard Notebaert, the former CEO of one such ILEC, as saying that competing in a neighboring ILEC's territory "might be a good way to turn a quick dollar but that doesn't make it right." *Id.*, P42, App. 22. Moreover, respondents allege that petitioners "communicate [***50] amongst themselves" through numerous industry associations. *Id.*, P46, App. 23. In sum, respondents allege that petitioners entered into an agreement that has long been recognized as a classic *per se* violation of the Sherman Act. See Report [*1975] of the Attorney General's National Committee to Study the Antitrust Laws 26 (1955).

Under rules of procedure that have been well settled since well before our decision in *Theatre Enterprises*, a judge ruling on a defendant's motion to dismiss a complaint, "must accept as true all of the factual allegations contained in the complaint." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508, n. 1, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002); see *Overstreet v. North Shore Corp.*, 318 U.S. 125, 127, 63 S. Ct. 494, 87 L. Ed. 656 (1943). But instead of requiring knowledgeable executives such as Notebaert to respond to these allegations by way of sworn depositions or other limited discovery -- and indeed without so much as requiring petitioners to file an answer denying that they entered into any agreement -- the majority permits immediate dismissal based on the assurances of company lawyers that nothing untoward was afoot. The Court embraces the argument of those lawyers that [***51] "there is no reason to infer that the

companies had agreed among themselves to do what was only natural anyway," *ante*, at 19; that "there was just no need for joint encouragement [**951] to resist the 1996 Act," *ante*, at 20; and that the "natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing," *ante*, at 21.

The Court and petitioners' legal team are no doubt correct that the parallel conduct alleged is consistent with the absence of any contract, combination, or conspiracy. But that conduct is also entirely consistent with the *presence* of the illegal agreement alleged in the complaint. And the charge that petitioners "agreed not to compete with one another" is not just one of "a few stray statements," *ante*, at 18; it is an allegation describing unlawful conduct. As such, the Federal Rules of Civil Procedure, our longstanding precedent, and sound practice mandate that the District Court at least require some sort of response from petitioners before dismissing the case.

Two practical concerns presumably explain the Court's dramatic departure from settled procedural [***52] law. Private antitrust litigation can be enormously expensive, and there is a risk that jurors may mistakenly conclude that evidence of parallel conduct has proved that the parties acted pursuant to an agreement when they in fact merely made similar independent decisions. Those concerns merit careful case management, including strict control of discovery, careful scrutiny of evidence at the summary judgment stage, and lucid instructions to juries; they do not, however, justify the dismissal of an adequately pleaded complaint without even requiring the defendants to file answers denying a charge that they in fact engaged in collective decision-making. More importantly, they do not justify an interpretation of *Federal Rule of Civil Procedure 12(b)(6)* that seems to be driven by the majority's appraisal of the plausibility of the ultimate factual allegation rather than its legal sufficiency.

I

*Rule 8(a)(2)* of the Federal Rules requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The rule did not come about by happenstance and its language is not inadvertent. The English experience with Byzantine special pleading rules [***53] -- illustrated by the hypertechnical Hilary rules of 1834 [1] -- made obvious [*1976] the appeal of a pleading standard that was easy for the common litigant to understand and sufficed to put the defendant on notice as to the nature of the claim against him and the relief sought. Stateside, David Dudley Field developed the highly influential New York Code of 1848, which required "[a] statement of the facts constituting the cause of action, in ordinary

and concise language, without repetition, and in such a manner as to enable a person of common understanding to know what is intended." An Act to Simplify and Abridge the Practice, Pleadings and Proceedings of the Courts of this State, ch. 379, § 120(2), 1848 N. Y. Laws pp. 497, 521. Substantially similar language appeared in the Federal Equity Rules adopted in 1912. See Fed. Equity Rule 25 (requiring "a short and simple statement of the ultimate facts upon which the plaintiff asks relief, omitting any mere statement of evidence").

    1  See 9 W. Holdsworth, History of English Law 324-327 (1926).

[***54]  [**952]  A difficulty arose, however, in that the Field Code and its progeny required a plaintiff to plead "facts" rather than "conclusions," a distinction that proved far easier to say than to apply. As commentators have noted,

    "it is virtually impossible logically to distinguish among 'ultimate facts,' 'evidence,' and 'conclusions.' Essentially any allegation in a pleading must be an assertion that certain occurrences took place. The pleading spectrum, passing from evidence through ultimate facts to conclusions, is largely a continuum varying only in the degree of particularity with which the occurrences are described." Weinstein & Distler, Comments on Procedural Reform: Drafting Pleading Rules, 57 Colum. L. Rev. 518, 520-521 (1957).

See also Cook, Statements of Fact in Pleading Under the Codes, 21 Colum. L. Rev. 416, 417 (1921) (hereinafter Cook) ("There is no logical distinction between statements which are grouped by the courts under the phrases 'statements of fact' and 'conclusions of law'"). *Rule 8* was directly responsive to this difficulty. Its drafters intentionally avoided any reference to "facts" or "evidence" or "conclusions." See 5 C. [***55] Wright & A. Miller, Federal Practice and Procedure § 1216, p. 207 (3d ed. 2004) (hereinafter Wright & Miller) ("The substitution of 'claim showing that the pleader is entitled to relief' for the code formulation of the 'facts' constituting a 'cause of action' was intended to avoid the distinctions drawn under the codes among 'evidentiary facts,' 'ultimate facts,' and 'conclusions' . . . ").

    Under the relaxed pleading standards of the Federal Rules, the idea was not to keep litigants out of court but rather to keep them in. The merits of a claim would be sorted out during a flexible pretrial process and, as appropriate, through the crucible of trial. See *Swierkiewicz,*

*534 U.S., at 514, 122 S. Ct. 992, 152 L. Ed. 2d 1* ("The liberal notice pleading of *Rule 8(a)* is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim"). Charles E. Clark, the "principal draftsman" of the Federal Rules, [2] put it thus:

    "Experience has shown . . . that we cannot expect the proof of the case to be made through the pleadings, and that such proof is really not their function. We can expect a general statement distinguishing the case from all others, so [***56] that the manner and form of trial and remedy expected are clear, and so that a permanent judgment will result." The [*1977] New Federal Rules of Civil Procedure: The Last Phase -- Underlying Philosophy Embodied in Some of the Basic Provisions of the New Procedure, 23 A. B. A. J. 976, 977 (1937) (hereinafter Clark, New Federal Rules).

The pleading paradigm under the new Federal Rules was well illustrated by the inclusion in the appendix of Form 9, a complaint for negligence. As relevant, the Form 9 complaint states only: "On June 1, 1936, in a public highway called Boylston Street in Boston, Massachusetts, defendant negligently drove a motor vehicle against plaintiff who was then [**953] crossing said highway." Form 9, Complaint for Negligence, Forms App., Fed. Rules Civ. Proc., 28 U.S.C. App., p. 829 (hereinafter Form 9). The complaint then describes the plaintiff's injuries and demands judgment. The asserted ground for relief -- namely, the defendant's negligent driving -- would have been called a "'conclusion of law'" under the code pleading of old. See, *e.g.,* Cook 419. But that bare allegation suffices under a system that "restricts the pleadings to [***57] the task of general notice-giving and invests the deposition-discovery process with a vital role in the preparation for trial." [3] *Hickman v. Taylor, 329 U.S. 495, 501, 67 S. Ct. 385, 91 L. Ed. 451 (1947);* see also *Swierkiewicz, 534 U.S., at 513, n. 4, 122 S. Ct. 992, 152 L. Ed. 2d 1* (citing Form 9 as an example of "'the simplicity and brevity of statement which the rules contemplate'"); *Thomson v. Washington, 362 F.3d 969, 970 (CA7 2004)* (Posner, J.) ("The federal rules replaced fact pleading with notice pleading").

    2  *Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 283, 108 S. Ct. 1133, 99 L. Ed. 2d 296 (1988).*

3  The Federal Rules do impose a "particularity" requirement on "all averments of fraud or mistake," *Fed. Rule Civ. Proc. 9(b)*, neither of which has been alleged in this case. We have recognized that the canon of *expresio unius est exclusio alterius* applies to *Rule 9(b)*. See *Leatherman v. Tarrant Cty. Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993)*.

## II

[***58]  It is in the context of this history that *Conley v. Gibson, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*, must be understood. The *Conley* plaintiffs were black railroad workers who alleged that their union local had refused to protect them against discriminatory discharges, in violation of the National Railway Labor Act. The union sought to dismiss the complaint on the ground that its general allegations of discriminatory treatment by the defendants lacked sufficient specificity. Writing for a unanimous Court, Justice Black rejected the union's claim as foreclosed by the language of *Rule 8. Id., at 47-48, 78 S. Ct. 99, 2 L. Ed. 2d 80*. In the course of doing so, he articulated the formulation the Court rejects today: "In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id., at 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80*.

Consistent with the design of the Federal Rules, *Conley's* "no set of facts" formulation permits outright dismissal only when proceeding to discovery or beyond [***59] would be futile. Once it is clear that a plaintiff has stated a claim that, if true, would entitle him to relief, matters of proof are appropriately relegated to other stages of the trial process. Today, however, in its explanation of a decision to dismiss a complaint that it regards as a fishing expedition, the Court scraps *Conley's* "no set of facts " language. Concluding that the phrase has been "questioned, criticized, and explained away long enough," *ante*, at 16, the Court dismisses it as careless composition.

[*1978]  If *Conley's* "no set of facts" language is to be interred, let it not be without a eulogy. That exact language, which the majority says has "puzzled the profession for 50 years," *ibid.*, has been cited as authority in a dozen opinions of this Court and four separate [**954] writings.[4] In not one of those 16 opinions was the language "questioned," "criticized," or "explained away." Indeed, today's decision is the first by any Member of this Court to express *any* doubt as to the adequacy of the *Conley* formulation. Taking their cues from the federal courts, 26 States and the District of Columbia utilize as their standard for dismissal of a complaint the very language [***60] the majority repudiates: whether it appears "beyond doubt" that "no set of facts" in support of the claim would entitle the plaintiff to relief.[5]

4  *SEC v. Zandford, 535 U.S. 813, 818, 122 S. Ct. 1899, 153 L. Ed. 2d 1 (2002); Davis v. Monroe County Bd. of Ed., 526 U.S. 629, 654, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999); Hartford Fire Ins. Co. v. California, 509 U.S. 764, 811, 113 S. Ct. 2891, 125 L. Ed. 2d 612 (1993); Brower v. County of Inyo, 489 U.S. 593, 598, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989); Hughes v. Rowe, 449 U.S. 5, 10, 101 S. Ct. 173, 66 L. Ed. 2d 163 (1980) (per curiam); McLain v. Real Estate Bd. of New Orleans, Inc., 444 U.S. 232, 246, 100 S. Ct. 502, 62 L. Ed. 2d 441 (1980); Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976); Hospital Building Co. v. Trustees of Rex Hospital, 425 U.S. 738, 746, 96 S. Ct. 1848, 48 L. Ed. 2d 338 (1976); Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974); Cruz v. Beto, 405 U.S. 319, 322, 92 S. Ct. 1079, 31 L. Ed. 2d 263 (1972) (per curiam); Haines v. Kerner, 404 U.S. 519, 521, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972) (per curiam); Jenkins v. McKeithen, 395 U.S. 411, 422, 89 S. Ct. 1843, 23 L. Ed. 2d 404 (1969)* (plurality opinion); see also *Cleveland Bd. of Ed. v. Loudermill, 470 U.S. 532, 554, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985)* (Brennan, J., concurring in part and dissenting in part); *Hoover v. Ronwin, 466 U.S. 558, 587, 104 S. Ct. 1989, 80 L. Ed. 2d 590 (1984)* (STEVENS, J., dissenting); *United Air Lines, Inc. v. Evans, 431 U.S. 553, 561, n. 1, 97 S. Ct. 1885, 52 L. Ed. 2d 571 (1977)* (Marshall, J., dissenting); *Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26, 55, n. 6, 96 S. Ct. 1917, 48 L. Ed. 2d 450 (1976)* (Brennan, J., concurring in judgment).

[***61]

5  See, e.g., *EB Invs., LLC v. Atlantis Development, Inc., 930 So. 2d 502, 507 (Ala. 2005); Department of Health & Social Servs. v. Native Village of Curyung, 151 P. 3d 388, 396 (Alaska 2006); Newman v. Maricopa Cty., 167 Ariz. 501, 503, 808 P.2d 1253, 1255 (App. 1991); Public Serv. Co. of Colo. v. Van Wyk, 27 P. 3d 377, 385-386 (Colo. 2001)* (en banc); *Clawson v. St. Louis Post-Dispatch, LLC, 906 A.2d 308, 312 (D. C. 2006); Hillman Constr. Corp. v. Wainer, 636 So. 2d 576, 578 (Fla. App. 1994); Kaplan v. Kaplan, 266 Ga. 612, 613, 469 S. E. 2d 198, 199 (1996); Wright v. Home Depot U.S.A., 111 Haw. 401,*

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

*406, 142 P. 3d 265, 270 (2006); Taylor v. Maile, 142 Idaho 253, 257, 127 P. 3d 156, 160 (2005); Fink v. Bryant, 2001-CC-0987, p. 4 (La. 11/28/01), 801 So. 2d 346, 349; Gagne v. Cianbro Corp., 431 A.2d 1313, 1318-1319 (Me. 1981); Gasior v. Massachusetts Gen. Hospital, 446 Mass. 645, 647, 846 N.E.2d 1133, 1135 (2006); Ralph Walker, Inc. v. Gallagher, 926 So. 2d 890, 893 (Miss. 2006); Jones v. Montana Univ. System, 337 Mont. 1, 7, 155 P. 3d 1247, ____ (2007); Johnston v. Neb. Dep't of Corr. Servs., 270 Neb. 987, 989, 709 N.W.2d 321, 324 (2006); Blackjack Bonding v. Las Vegas Munic. Ct., 116 Nev. 1213, 1217, 14 P. 3d 1275, 1278 (2000); Shepard v. Ocwen Fed. Bank, 361 N. C. 137, 139, 638 S. E. 2d 197, 199 (2006); Rose v. United Equitable Ins. Co., 2001 ND 154, P10, 632 N.W.2d 429, 434; State ex rel. Turner v. Houk, 112 Ohio St. 3d 561, 562, 2007-Ohio-814, P5, 862 N.E.2d 104, 105 (per curiam); Moneypenney v. Dawson, 2006 OK 53, P2, 141 P. 3d 549, 551; Gagnon v. State, 570 A.2d 656, 659 (R. I. 1990); Osloond v. Farrier, 2003 SD 28, P4, 659 N.W.2d 20, 22 (per curiam); Smith v. Lincoln Brass Works, Inc., 712 S.W.2d 470, 471 (Tenn. 1986); Association of Haystack Property Owners v. Sprague, 145 Vt. 443, 446, 494 A.2d 122, 124 (1985); In re Coday, 156 Wn. 2d 485, 497, 130 P. 3d 809, 815 (2006) (en banc); Haines v. Hampshire Cty. Comm'n, 216 W. Va. 499, 502, 607 S. E. 2d 828, 831 (2004); Warren v. Hart, 747 P.2d 511, 512 (Wyo. 1987); see also Malpiede v. Townson, 780 A.2d 1075, 1082-1083 (Del. 2001) (permitting dismissal only "where the court determines with reasonable certainty that the plaintiff could prevail on no set of facts that may be inferred from the well-pleaded allegations in the complaint" (internal quotation marks omitted)); Canel v. Topinka, 212 Ill. 2d 311, 318, 818 N.E.2d 311, 317, 288 Ill. Dec. 623 (2004) (replacing "appears beyond doubt" in the Conley formulation with "is clearly apparent"); In re Young, 522 N.E.2d 386, 388 (Ind. 1988) (per curiam) (replacing "appears beyond doubt" with "appears to a certainty"); Barkema v. Williams Pipeline Co., 666 N.W.2d 612, 614 (Iowa 2003) (holding that a motion to dismiss should be sustained "only when there exists no conceivable set of facts entitling the non-moving party to relief"); Pioneer Village v. Bullitt Cty., 104 S. W. 3d 757, 759 (Ky. 2003) (holding that judgment on the pleadings should be granted "if it appears beyond doubt that the nonmoving party cannot prove any set of facts that would entitle him/her to relief"); Corley v. Detroit Bd. of Ed., 470 Mich. 274, 277,*

*681 N.W.2d 342, 345 (2004) (per curiam)* (holding that a motion for judgment on the pleadings should be granted only "'if no factual development could possibly justify recovery'"); *Oberkramer v. Ellisville, 706 S.W.2d 440, 441 (Mo. 1986)* (en banc) (omitting the words "beyond doubt" from the *Conley* formulation); *Colman v. Utah State Land Bd., 795 P.2d 622, 624 (Utah 1990)* (holding that a motion to dismiss is appropriate "only if it clearly appears that [the plaintiff] can prove no set of facts in support of his claim"); *NRC Mgmt. Servs. Corp. v. First Va. Bank - Southwest, 63 Va. Cir. 68, 70 (2003)* ("The Virginia standard is identical [to the *Conley* formulation], though the Supreme Court of Virginia may not have used the same words to describe it").

[***62]   [*1979] Petitioners have not requested that the *Conley* formulation be retired, nor have any of the six *amici* who filed [**955] briefs in support of petitioners. I would not rewrite the Nation's civil procedure textbooks and call into doubt the pleading rules of most of its States without far more informed deliberation as to the costs of doing so. Congress has established a process -- a rulemaking process -- for revisions of that order. See *28 U.S.C. §§ 2072-2074 (2000 ed. and Supp. IV)*.

Today's majority calls *Conley*'s "'no set of facts'" language "an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Ante*, at 16. This is not and cannot be what the *Conley* Court meant. First, as I have explained, and as the *Conley* Court well knew, the pleading standard the Federal Rules meant to codify does not require, or even invite, the pleading of facts. [6] The "pleading standard" label the majority gives to what it reads into the *Conley* opinion -- a statement of the permissible factual support for an adequately [***63] pleaded complaint -- would not, therefore, have impressed the *Conley* Court itself. Rather, that Court would have understood the majority's remodeling of its language to express an *evidentiary* standard, which the *Conley* Court had neither need nor want to explicate. Second, it is pellucidly clear that the *Conley* Court was interested in what a complaint *must* contain, not what it *may* contain. In fact, the Court said without qualification that it was "appraising the *sufficiency* of the complaint." *355 U.S., at 45,* [*1980] *78 S. Ct. 99, 2 L. Ed. 2d 80* (emphasis added). It was, to paraphrase today's majority, describing "the minimum standard of adequate pleading to govern a complaint's survival," *ante*, at 16-17.

6   The majority is correct to say that what the Federal Rules require is a "'showing'" of entitlement to relief. *Ante*, at 8, n. 3. Whether and to

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

what extent that "showing" requires allegations of fact will depend on the particulars of the claim. For example, had the amended complaint in this case alleged *only* parallel conduct, it would not have made the required "showing." See *supra*, at 1. Similarly, had the pleadings contained *only* an allegation of agreement, without specifying the nature or object of that agreement, they would have been susceptible to the charge that they did not provide sufficient notice that the defendants may answer intelligently. Omissions of that sort instance the type of "bareness" with which the Federal Rules are concerned. A plaintiff's inability to persuade a district court that the allegations actually included in her complaint are "plausible" is an altogether different kind of failing, and one that should not be fatal at the pleading stage.

[***64] We can be triply sure as to *Conley*'s meaning by examining the three Court of Appeals cases the *Conley* Court cited as support for the "accepted rule" that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of [**956] facts in support of his claim which would entitle him to relief." 355 U.S., at 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80. In the first case, *Leimer v. State Mut. Life Assur. Co. of Worcester, Mass., 108 F.2d 302 (CA8 1940)*, the plaintiff alleged that she was the beneficiary of a life insurance plan and that the insurance company was wrongfully withholding proceeds from her. In reversing the District Court's grant of the defendant's motion to dismiss, the Eighth Circuit noted that court's own longstanding rule that, to warrant dismissal, "'it should appear from the allegations that a cause of action does not exist, rather than that a cause of action has been defectively stated.'" *Id.*, at 305 (quoting *Winget v. Rockwood, 69 F.2d 326, 329 (CA8 1934)*).

The *Leimer* court viewed the Federal Rules -- specifically *Rules 8(a)(2), 12(b)(6), 12(e)* (motion for [***65] a more definite statement), and 56 (motion for summary judgment) -- as reinforcing the notion that "there is no justification for dismissing a complaint for insufficiency of statement, except where it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of the claim." *108 F.2d at 306*. The court refuted in the strongest terms any suggestion that the unlikelihood of recovery should determine the fate of a complaint: "No matter how improbable it may be that she can prove her claim, she is entitled to an opportunity to make the attempt, and is not required to accept as final a determination of her rights based upon inferences drawn in favor of the defendant from her amended complaint." *Ibid.*

The Third Circuit relied on *Leimer*'s admonition in *Continental Collieries, Inc. v. Shober, 130 F.2d 631*

*(1942)*, which the *Conley* Court also cited in support of its "no set of facts" formulation. In a diversity action the plaintiff alleged breach of contract, but the District Court dismissed the complaint on the ground that the contract appeared to be unenforceable under state [***66] law. The Court of Appeals reversed, concluding that there were facts in dispute that went to the enforceability of the contract, and that the rule at the pleading stage was as in *Leimer:* "No matter how likely it may seem that the pleader will be unable to prove his case, he is entitled, upon averring a claim, to an opportunity to try to prove it." *130 F.2d at 635*.

The third case the *Conley* Court cited approvingly was written by Judge Clark himself. In *Dioguardi v. Durning, 139 F.2d 774 (CA2 1944)*, the *pro se* plaintiff, an importer of "tonics," charged the customs inspector with auctioning off the plaintiff's former merchandise for less than was bid for it -- and indeed for an amount equal to the plaintiff's own bid -- and complained that two cases of tonics went missing three weeks before the sale. The inference, hinted at by the averments but never stated in so many words, was that the defendant fraudulently denied the plaintiff his rightful claim to the tonics, which, if true, would have violated federal law. Writing six years after the adoption of the Federal Rules he held the lead rein in drafting, Judge Clark said that the defendant [***67]

"could have disclosed the facts from his point of view, in advance of a trial if he [*1981] chose, by asking for a pre-trial hearing or by moving for a summary judgment with supporting affidavits. But, as it stands, we do not see how the plaintiff may properly be deprived of his day in court to show what he obviously so [**957] firmly believes and for what at present purposes defendant must be taken as admitting." *Id.*, at 775.

As any civil procedure student knows, Judge Clark's opinion disquieted the defense bar and gave rise to a movement to revise *Rule 8* to require a plaintiff to plead a "'cause of action.'" See 5 Wright & Miller § 1201, at 86-87. The movement failed, see *ibid.; Dioguardi* was explicitly approved in *Conley;* and "in retrospect the case itself seems to be a routine application of principles that are universally accepted," 5 Wright & Miller § 1220, at 284-285.

In light of *Leimer, Continental Collieries,* and *Dioguardi, Conley*'s statement that a complaint is not to be dismissed unless "no set of facts" in support thereof would entitle the plaintiff to relief is hardly "puzzling,"

*ante*, at 16. It reflects a philosophy that, unlike [***68] in the days of code pleading, separating the wheat from the chaff is a task assigned to the pretrial and trial process. *Conley*'s language, in short, captures the policy choice embodied in the Federal Rules and binding on the federal courts.

We have consistently reaffirmed that basic understanding of the Federal Rules in the half century since *Conley*. For example, in *Scheuer v. Rhodes, 416 U.S. 232, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)*, we reversed the Court of Appeals' dismissal on the pleadings when the respondents, the Governor and other officials of the State of Ohio, argued that petitioners' claims were barred by sovereign immunity. In a unanimous opinion by then-Justice Rehnquist, we emphasized that

> "when a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. *Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.*" *Id.,* at 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (emphasis added). [***69]

The *Rhodes* plaintiffs had "alleged generally and in conclusory terms" that the defendants, by calling out the National Guard to suppress the Kent State University student protests, "were guilty of wanton, wilful and negligent conduct." *Krause v. Rhodes, 471 F.2d 430, 433 (CA6 1972)*. We reversed the Court of Appeals on the ground that "whatever the plaintiffs may or may not be able to establish as to the merits of their allegations, their claims, as stated in the complaints, given the favorable reading required by the Federal Rules of Civil Procedure," were not barred by the *Eleventh Amendment* because they were styled as suits against the defendants in their individual capacities. *416 U.S., at 238, 94 S. Ct. 1683, 40 L. Ed. 2d 90*.

We again spoke with one voice against efforts to expand pleading requirements beyond their appointed limits in *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993)*. Writing for the unanimous Court, Chief Justice Rehnquist rebuffed the Fifth Circuit's effort to craft a standard for pleading municipal liability that accounted for "the enormous expense involved today in litigation," [***70] *Leatherman v. Tar-rant Cty. Narcotics Intelligence and Coordination Unit, [**958] 954 F.2d 1054, 1057 (1992)* (internal quotation marks omitted), by requiring a plaintiff to "state with factual detail and [*1982] particularity the basis for the claim which necessarily includes why the defendant-official cannot successfully maintain the defense of immunity." *Leatherman, 507 U.S., at 167,113 S. Ct. 1160, 122 L. Ed. 2d 517* (internal quotation marks omitted). We found this language inconsistent with *Rules 8(a)(2)* and *9(b)* and emphasized that motions to dismiss were not the place to combat discovery abuse: "In the absence of [an amendment to *Rule 9(b)*], federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later." *Id., at 168-169,113 S. Ct. 1160, 122 L. Ed. 2d 517*.

Most recently, in *Swierkiewicz, 534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1*, we were faced with a case more similar to the present one than the majority will allow. In discrimination cases, our precedents require a plaintiff at the summary judgment stage to produce either direct evidence of discrimination or, if the claim is based primarily on circumstantial evidence, to meet the shifting [***71] evidentiary burdens imposed under the framework articulated in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*. See, *e.g., Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121, 105 S. Ct. 613, 83 L. Ed. 2d 523 (1985)*. Swierkiewicz alleged that he had been terminated on account of national origin in violation of Title VII of the Civil Rights Act of 1964. The Second Circuit dismissed the suit on the pleadings because he had not pleaded a prima facie case of discrimination under the *McDonnell Douglas* standard.

We reversed in another unanimous opinion, holding that "under a notice pleading system, it is not appropriate to require a plaintiff to plead facts establishing a prima facie case because the *McDonnell Douglas* framework does not apply in every employment discrimination case." *Swierkiewicz, 534 U.S., at 511, 122 S. Ct. 992, 152 L. Ed. 2d 1*. We also observed that *Rule 8(a)(2)* does not contemplate a court's passing on the merits of a litigant's claim at the pleading stage. Rather, the "simplified notice pleading standard" of the Federal Rules "relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious [***72] claims." *Id., at 512, 122 S. Ct. 992, 152 L. Ed. 2d 1*; see Brief for United States et al. as *Amici Curiae* in Swierkiewicz v. Sorema N. A., O. T. 2001, No. 00-1853, p. 10 (stating that a *Rule 12(b)(6)* motion is not "an appropriate device for testing the truth of what is asserted or for determining whether a plaintiff has any evidence to back up what is in the complaint" (internal quotation marks omitted)). [7]

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

7 See also 5 Wright & Miller § 1202, at 89-90 ("Pleadings under the rules simply may be a general summary of the party's position that is sufficient to advise the other party of the event being sued upon, to provide some guidance in a subsequent proceeding as to what was decided for purposes of res judicata and collateral estoppel, and to indicate whether the case should be tried to the court or to a jury. No more is demanded of the pleadings than this; indeed, history shows that no more can be performed successfully by the pleadings" (footnotes omitted)).

As in the discrimination context, we have developed [***73] an evidentiary framework for evaluating claims under *§ 1* of the Sherman Act when those claims rest on entirely circumstantial evidence of conspiracy. See *Matsushita* [**959] *Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. Under *Matsushita*, a plaintiff's allegations of an illegal conspiracy may not, at the summary judgment stage, rest solely on the inferences that may be drawn from the parallel conduct of the defendants. In order to survive a *Rule 56* motion, a *§ 1* plaintiff "must present evidence 'that tends to exclude [*1983] the possibility' that the alleged conspirators acted independently.'" *Id., at 588, 106 S. Ct. 1348, 89 L. Ed. 2d 538* (quoting *Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984)*). That is, the plaintiff "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action." *475 U.S., at 588, 106 S. Ct. 1348, 89 L. Ed. 2d 538.*

Everything today's majority says would therefore make perfect sense if it were ruling on a *Rule 56* motion for summary judgment and the evidence included nothing more than the Court has described. But it should go without saying in the wake of *Swierkiewicz* [***74] that a heightened production burden at the summary judgment stage does not translate into a heightened pleading burden at the complaint stage. The majority rejects the complaint in this case because -- in light of the fact that the parallel conduct alleged is consistent with ordinary market behavior -- the claimed conspiracy is "conceivable" but not "plausible," *ante,* at 24. I have my doubts about the majority's assessment of the plausibility of this alleged conspiracy. See Part III, *infra*. But even if the majority's speculation is correct, its "plausibility" standard is irreconcilable with *Rule 8* and with our governing precedents. As we made clear in *Swierkiewicz* and *Leatherman*, fear of the burdens of litigation does not justify factual conclusions supported only by lawyers' arguments rather than sworn denials or admissible evidence.

This case is a poor vehicle for the Court's new pleading rule, for we have observed that "in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' . . . dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Building Co. v. Trustees of Rex Hospital, 425 U.S. 738, 746, 96 S. Ct. 1848, 48 L. Ed. 2d 338 (1976)* [***75] (quoting *Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S. Ct. 486, 7 L. Ed. 2d 458 (1962)*); see also *Knuth v. Erie-Crawford Dairy Cooperative Assn., 395 F.2d 420, 423 (CA3 1968)* ("The 'liberal' approach to the consideration of antitrust complaints is important because inherent in such an action is the fact that all the details and specific facts relied upon cannot properly be set forth as part of the pleadings"). Moreover, the fact that the Sherman Act authorizes the recovery of treble damages and attorney's fees for successful plaintiffs indicates that Congress intended to encourage, rather than discourage, private enforcement of the law. See *Radovich v. National Football League, 352 U.S. 445, 454, 77 S. Ct. 390, 1 L. Ed. 2d 456 (1957)* ("Congress itself has placed the private antitrust litigant in a most favorable position . . . . In the face of such a policy this Court should not add requirements to burden the private litigant beyond what is specifically set forth by Congress in those laws"). It is therefore more, not less, important in antitrust cases to resist the urge to [**960] engage in armchair economics at the pleading stage.

The same year we decided *Conley* [***76] , Judge Clark wrote, presciently,

"I fear that every age must learn its lesson that special pleading cannot be made to do the service of trial and that live issues between active litigants are not to be disposed of or evaded on the paper pleadings, i.e., the formalistic claims of the parties. Experience has found no quick and easy short cut for trials in cases generally *and antitrust cases in particular.*" Special Pleading in the "Big Case"? in Procedure -- The Handmaid of Justice 147, 148 (C. Wright & H. Reasoner eds. 1965) (hereinafter [*1984] Clark, Special Pleading in the Big Case) (emphasis added).

In this "Big Case," the Court succumbs to the temptation that previous Courts have steadfastly resisted. [8] While the majority assures us that it is not applying any "'heightened'" pleading standard, see *ante*, at 23, n. 14, I shall now explain why I have a difficult time understanding its opinion any other way.

8   Our decision in *Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005),* is not to the contrary. There, the plaintiffs failed adequately to allege loss causation, a required element in a private securities fraud action. Because it alleged nothing more than that the prices of the securities the plaintiffs purchased were artificially inflated, the *Dura* complaint failed to "provide the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the [alleged] misrepresentation." *Id., at 347, 125 S. Ct. 1627, 161 L. Ed. 2d 577.* Here, the failure the majority identifies is not a failure of notice -- which "notice pleading" rightly condemns -- but rather a failure to satisfy the Court that the agreement alleged might plausibly have occurred. That being a question not of *notice* but of *proof,* it should not be answered without first hearing from the defendants (as apart from their lawyers).

Similarly, in *Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983),* in which we also found an antitrust complaint wanting, the problem was not that the injuries the plaintiffs alleged failed to satisfy some threshold of plausibility, but rather that the injuries *as alleged* were not "the type that the antitrust statute was intended to forestall." *Id., at 540, 103 S. Ct. 897, 74 L. Ed. 2d 723;* see *id., at 526, 103 S. Ct. 897, 74 L. Ed. 2d 723* ("As the case comes to us, we must assume that the Union can prove the facts alleged in its amended complaint. It is not, however, proper to assume that the Union can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged").

[***77] III

The Court does not suggest that an agreement to do what the plaintiffs allege would be permissible under the antitrust laws, see, *e.g., Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 526-527, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983).* Nor does the Court hold that these plaintiffs have failed to allege an injury entitling them to sue for damages under those laws, see *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489-490, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977).* Rather, the theory on which the Court permits dismissal is that, so far as the Federal Rules are concerned, no agreement has been alleged at all. This is a mind-boggling conclusion.

As the Court explains, prior to the enactment of the Telecommunications Act of 1996 the law prohibited the defendants from competing with each other. The new statute was enacted to replace a monopolistic market with a competitive one. The Act did not merely require the regional monopolists [**961] to take affirmative steps to facilitate entry to new competitors, see *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 402, 124 S. Ct. 872, 157 L. Ed. 2d 823 (2004);* it also permitted the existing firms to compete with each [***78] other and to expand their operations into previously forbidden territory. See *47 U.S.C. § 271.* Each of the defendants decided not to take the latter step. That was obviously an extremely important business decision, and I am willing to presume that each company acted entirely independently in reaching that decision. I am even willing to entertain the majority's belief that any agreement among the companies was unlikely. But the plaintiffs allege in three places in their complaint, PP 4, 51, 64, App. 11, 27, 30, that the ILECs did in fact agree both to prevent competitors from entering into their local markets and to forgo competition with each other. And as the Court [*1985] recognizes, at the motion to dismiss stage, a judge assumes "that all the allegations in the complaint are true (even if doubtful in fact)." *Ante,* at 8-9.

The majority circumvents this obvious obstacle to dismissal by pretending that it does not exist. The Court admits that "in form a few stray statements in the complaint speak directly of agreement," but disregards those allegations by saying that "on fair reading these are merely legal conclusions resting on the prior allegations" of parallel [***79] conduct. *Ante,* at 18. The Court's dichotomy between factual allegations and "legal conclusions" is the stuff of a bygone era, *supra,* at 5-7. That distinction was a defining feature of code pleading, see generally Clark, The Complaint in Code Pleading, 35 Yale L. J. 259 (1925-1926), but was conspicuously abolished when the Federal Rules were enacted in 1938. See *United States v. Employing Plasterers Ass'n, 347 U.S. 186, 188, 74 S. Ct. 452, 98 L. Ed. 618 (1954)* (holding, in an antitrust case, that the Government's allegations of effects on interstate commerce must be taken into account in deciding whether to dismiss the complaint "whether these charges be called 'allegations of fact' or 'mere conclusions of the pleader'"); *Brownlee v. Conine, 957 F.2d 353, 354 (CA7 1992)* ("The Federal Rules of Civil Procedure establish a system of notice pleading rather than of fact pleading, . . . so the happenstance that a complaint is 'conclusory,' whatever exactly that overused lawyers' cliche means, does not automatically condemn it"); *Walker Distributing Co. v. Lucky Lager Brewing Co., 323 F.2d 1, 3-4 (CA9 1963)* ("One purpose of *Rule 8* [***80] was to get away from the highly technical distinction between statements of fact and conclu-

sions of law . . . "); *Oil, Chemical & Atomic Workers Int'l Union v. Delta, 277 F.2d 694, 697 (CA6 1960)* ("Under the notice system of pleading established by the Rules of Civil Procedure, . . . the ancient distinction between pleading 'facts' and 'conclusions' is no longer significant"); 5 Wright & Miller § 1218, at 267 ("The federal rules do not prohibit the pleading of facts or legal conclusions as long as fair notice is given to the parties"). "Defendants entered into a contract" is no more a legal conclusion than "defendant negligently drove," see Form 9; *supra*, at [**962] 6. Indeed it is less of one. [9]

9  The Court suggests that the allegation of an agreement, even if credited, might not give the notice required by *Rule 8* because it lacks specificity. *Ante*, at 18-19, n. 10. The remedy for an allegation lacking sufficient specificity to provide adequate notice is, of course, a *Rule 12(e)* motion for a more definite statement. See *Swierkiewicz v. Sorema N. A., 534 U.S. 506, 514, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)*. Petitioners made no such motion and indeed have conceded that "our problem with the current complaint is not a lack of specificity, it's quite specific." Tr. of Oral Arg. 14. Thus, the fact that "the pleadings mentioned no specific time, place, or persons involved in the alleged conspiracies," *ante*, at 18, n. 10, is, for our purposes, academic.

[***81]  Even if I were inclined to accept the Court's anachronistic dichotomy and ignore the complaint's actual allegations, I would dispute the Court's suggestion that any inference of agreement from petitioners' parallel conduct is "implausible." Many years ago a truly great economist perceptively observed that "people of the same trade seldom meet together, even for merriment and diversion, but the conversation ends in a conspiracy against the public, or in some contrivance to raise prices." A. Smith, An Inquiry Into the Nature and Causes of the Wealth of Nations, in 39 Great Books of the Western World 55 (R. Hutchins & M. Adler eds. 1952). I am not so cynical as to accept that sentiment at face value, but I need not do so here. Respondents' complaint [*1986] points not only to petitioners' numerous opportunities to meet with each other, Complaint P46, App. 23, [10] but also to Notebaert's curious statement that encroaching on a fellow incumbent's territory "might be a good way to turn a quick dollar but that doesn't make it right," *id.,* P42, App. 22. What did he mean by that? One possible (indeed plausible) inference is that he meant that while it would be in his company's economic self-interest [***82] to compete with its brethren, he had agreed with his competitors not to do so. According to the complaint, that is how the Illinois Coalition for Competitive Telecom construed Notebaert's statement, *id.,* P44, App. 22 (calling the statement "evidence of potential collusion

among regional Bell phone monopolies to not compete against one another and kill off potential competitors in local phone service"), and that is how Members of Congress construed his company's behavior, *id.,* P45, App. 23 (describing a letter to the Justice Department requesting an investigation into the possibility that the ILECs'"'very apparent non-competition policy" was coordinated).

10  The Court describes my reference to the allegation that the defendants belong to various trade associations as "playfully" suggesting that the defendants conspired to restrain trade. *Ante*, at 20, n. 12. Quite the contrary: an allegation that competitors meet on a regular basis, like the allegations of parallel conduct, is consistent with -- though not sufficient to prove -- the plaintiffs' entirely serious and unequivocal allegation that the defendants entered into an unlawful agreement. Indeed, if it were true that the plaintiffs "rest their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement among the ILECs," *ante*, at 18, there would have been no purpose in including a reference to the trade association meetings in the amended complaint.

[***83]  Perhaps Notebaert meant instead that competition would be sensible in the short term but not in the long run. That's what his lawyers tell us anyway. See Brief for Petitioners 36. But I would think that no one would know better what Notebaert meant than Notebaert himself. Instead of permitting respondents to ask Notebaert, however, the Court looks to other [**963] quotes from that and other articles and decides that what he meant was that entering new markets as a CLEC would not be a "'sustainable economic model.'" *Ante*, at 22, n. 13. Never mind that -- as anyone ever interviewed knows -- a newspaper article is hardly a verbatim transcript; the writer selects quotes to package his story, not to record a subject's views for posterity. But more importantly the District Court was required at this stage of the proceedings to construe Notebaert's ambiguous statement in the plaintiffs' favor. [11] See *Allen v. Wright, 468 U.S. 737, 768, n. 1, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984)*. The inference the statement supports -- that simultaneous decisions by ILECs not even to attempt to poach customers from one another once the law authorized them to do so were the product of an agreement -- sits comfortably within [***84] the realm of possibility. That is all the Rules require.

11  It is ironic that the Court seeks to justify its decision to draw factual inferences in the defendants' favor at the pleading stage by citing to a rule of evidence, *ante*, at 22, n. 13. Under *Fed-*

eral Rule of Evidence 201(b), a judicially noticed fact "must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Whether Notebaert's statements constitute evidence of a conspiracy is hardly beyond reasonable dispute.

To be clear, if I had been the trial judge in this case, I would not have permitted the plaintiffs to engage in massive discovery based solely on the allegations in this complaint. On the other hand, I surely would not have dismissed the complaint [*1987] without requiring the defendants to answer the charge that they "have agreed not to compete with [***85] one another and otherwise allocated customers and markets to one another." [12] P51, App. 27. Even a sworn denial of that charge would not justify a summary dismissal without giving the plaintiffs the opportunity to take depositions from Notebaert and at least one responsible executive representing each of the other defendants.

> 12   The Court worries that a defendant seeking to respond to this "conclusory" allegation "would have little idea where to begin." *Ante*, at 19, n. 10. A defendant could, of course, begin by either denying or admitting the charge.

Respondents in this case proposed a plan of "'phased discovery'" limited to the existence of the alleged conspiracy and class certification. Brief for Respondents 25-26. Two petitioners rejected the plan. *Ibid.* Whether or not respondents' proposed plan was sensible, it was an appropriate subject for negotiation. [13] Given the charge in the complaint -- buttressed [**964] by the common sense of Adam Smith -- I cannot say that the possibility that joint discussions [***86] [*1988] and perhaps some agreements played a role in petitioners' decision-making process is so implausible that dismissing the complaint before any defendant has denied the charge is preferable to granting respondents even a minimal opportunity to prove their claims. See Clark, New Federal Rules 977 ("Through the weapons of discovery and summary judgment we have developed new devices, with more appropriate penalties to aid in matters of *proof*, and do not need to force the pleadings to their less appropriate function").

> 13   The potential for "sprawling, costly, and hugely time-consuming" discovery, *ante*, at 13, n. 6, is no reason to throw the baby out with the bathwater. The Court vastly underestimates a district court's case-management arsenal. Before discovery even begins, the court may grant a de-

fendant's *Rule 12(e)* motion; *Rule 7(a)* permits a trial court to order a plaintiff to reply to a defendant's answer, see *Crawford-El v. Britton, 523 U.S. 574, 598, 118 S. Ct. 1584, 140 L. Ed. 2d 759 (1998)*; and *Rule 23* requires "rigorous analysis" to ensure that class certification is appropriate, *General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 160, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)*; see *In re Initial Public Offering Securities Litigation, 471 F.3d 24 (CA2 2006)* (holding that a district court may not certify a class without ruling that each *Rule 23* requirement is met, even if a requirement overlaps with a merits issue). *Rule 16* invests a trial judge with the power, backed by sanctions, to regulate pretrial proceedings via conferences and scheduling orders, at which the parties may discuss, *inter alia*, "the elimination of frivolous claims or defenses," *Rule 16(c)(1)*; "the necessity or desirability of amendments to the pleadings," *Rule 16(c)(2)*; "the control and scheduling of discovery," *Rule 16(c)(6)*; and "the need for adopting special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems," *Rule 16(c)(12)*. Subsequently, *Rule 26* confers broad discretion to control the combination of interrogatories, requests for admissions, production requests, and depositions permitted in a given case; the sequence in which such discovery devices may be deployed; and the limitations imposed upon them. See *523 U.S., at 598-599, 118 S. Ct. 1584, 140 L. Ed. 2d 759*. Indeed, *Rule 26(c)* specifically permits a court to take actions "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" by, for example, disallowing a particular discovery request, setting appropriate terms and conditions, or limiting its scope.

In short, the Federal Rules contemplate that pretrial matters will be settled through a flexible process of give and take, of proffers, stipulations, and stonewalls, not by having trial judges screen allegations for their plausibility *vel non* without requiring an answer from the defendant. See *Societe Internationale pour Participations Industrielles et Commerciales, S. A. v. Rogers, 357 U.S. 197, 206, 78 S. Ct. 1087, 2 L. Ed. 2d 1255 (1958)* ("*Rule 34* is sufficiently flexible to be adapted to the exigencies of particular litigation"). And should it become apparent over the course of litigation that a plaintiff's filings bespeak an *in terrorem* suit, the district court has at its call its own *in terrorem* device, in the form of

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

a wide array of *Rule 11* sanctions. See *Rules 11(b), (c)* (authorizing sanctions if a suit is presented "for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation"); see *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc., 498 U.S. 533, 111 S. Ct. 922, 112 L. Ed. 2d 1140 (1991)* (holding that *Rule 11* applies to a represented party who signs a pleading, motion, or other papers, as well as to attorneys); *Atkins v. Fischer, 232 F.R.D. 116, 126 (DC 2005)* ("As possible sanctions pursuant to *Rule 11*, the court has an arsenal of options at its disposal").

[***87] I fear that the unfortunate result of the majority's new pleading rule will be to invite lawyers' debates over economic theory to conclusively resolve antitrust suits in the absence of any evidence. It is no surprise that the antitrust defense bar -- among whom "lament" as to inadequate judicial supervision of discovery is most "common," see *ante,* at 12 -- should lobby for this state of affairs. But "we must recall that their primary responsibility is to win cases for their clients, not to improve law administration for the public." Clark, Special Pleading in the Big Case 152. As we did in our prior decisions, we should have instructed them that their remedy was to seek to amend the Federal Rules -- not our interpretation of them. [14] See *Swierkiewicz, 534 U.S., at 515, 122 S. Ct. 992, 152 L. Ed. 2d 1; Crawford-El v. Britton, 523 U.S. 574, 595, 118 S. Ct. 1584, 140 L.* [**965] *Ed. 2d 759 (1998); Leatherman, 507 U.S., at 168, 113 S. Ct. 1160, 122 L. Ed. 2d 517.*

14    Given his "background in antitrust law," *ante,* at 13, n. 6, Judge Easterbrook has recognized that the most effective solution to discovery abuse lies in the legislative and rulemaking arenas. He has suggested that the remedy for the ills he complains of requires a revolution in the rules of civil procedure:

"Perhaps a system in which judges pare away issues and focus on investigation is too radical to contemplate in this country -- although it prevailed here before 1938, when the Federal Rules of Civil Procedure were adopted. The change could not be accomplished without abandoning notice pleading, increasing the number of judicial officers, and giving them more authority . . . . If we are to rule out judge-directed discovery, however, we must be prepared to pay the piper. Part of the price is the high cost of unnecessary discovery -- impositional and otherwise." Discovery as Abuse, *69 B. U. L. Rev. 635, 645 (1989).*

[***88] IV

Just a few weeks ago some of my colleagues explained that a strict interpretation of the literal text of statutory language is essential to avoid judicial decisions that are not faithful to the intent of Congress. *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ., 550 U.S. ___, ___, 127 S. Ct. 1534, 167 L. Ed. 2d 449 (2007)* (SCALIA, J., dissenting). I happen to believe that there are cases in which other tools of construction are more reliable than text, but I agree of course that congressional intent should guide us in matters of statutory interpretation. *Id., at ___, 127 S. Ct. 1534, 167 L. Ed. 2d 449* (STEVENS, J., concurring). This is a case in which the intentions of the drafters of three important sources of law -- the Sherman Act, the Telecommunications Act of 1996, and the Federal Rules of Civil Procedure -- all point unmistakably in the same direction, yet the Court marches resolutely the other way. Whether the Court's actions will benefit only defendants in antitrust treble-damages cases, or whether its test for the sufficiency of a complaint will inure to the benefit of all civil defendants, is a question that the future will answer. But that the Court has announced a significant new rule that does not even purport to [***89] respond [*1989] to any congressional command is glaringly obvious.

The transparent policy concern that drives the decision is the interest in protecting antitrust defendants -- who in this case are some of the wealthiest corporations in our economy -- from the burdens of pretrial discovery. *Ante,* at 11-13. Even if it were not apparent that the legal fees petitioners have incurred in arguing the merits of their *Rule 12(b)* motion have far exceeded the cost of limited discovery, or that those discovery costs would burden respondents as well as petitioners, [15] that concern would not provide an adequate justification for this law-changing decision. For in the final analysis it is only a lack of confidence in the ability of trial judges to control discovery, buttressed by appellate judges' independent appraisal of the plausibility of profoundly serious factual allegations, that could account for this stark break from precedent.

15    It would be quite wrong, of course, to assume that dismissal of an antitrust case after discovery is costless to plaintiffs. See *Fed. Rule Civ. Proc. 54(d)(1)* ("Costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs").

[***90] If the allegation of conspiracy happens to be true, today's decision obstructs the congressional policy favoring competition that undergirds both the Telecommunications Act of 1996 and the Sherman Act itself. More importantly, even if there is abundant evidence that the allegation is untrue, directing that the case be dismissed without even looking at any of that evidence

127 S. Ct. 1955, *; 167 L. Ed. 2d 929, **;
2007 U.S. LEXIS 5901, ***; 75 U.S.L.W. 4337

marks a fundamental -- and unjustified -- change in the character of pretrial practice.

Accordingly, I respectfully dissent.

LEXSEE 1990 U.S. DIST. LEXIS 8810

**ANDREASEN, INC., Plaintiff, v. ORLY INTERNATIONAL, INC., Defendant**

**No. 88 Civ. 3529 (KMW)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*1990 U.S. Dist. LEXIS 8810*

**July 17, 1990
July 17, 1990, Filed**

**JUDGES:** [*1] James C. Francis, IV, United States Magistrate.

**OPINION BY:** FRANCIS

**OPINION**

*MEMORANDUM AND ORDER*

In this diversity action, Andreasen, Inc. ("Andreasen"), an advertising agency, has sued its former client, Orly International ("Orly"), for breach of contract. The parties had agreed that Andreasen would produce a thirty second television commercial touting Orly's French Manicure product. Andreasen did so, and it now contends that Orly has failed to make full payment under the basic contract. Andreasen further argues that Orly is liable for overages that were incurred and for the costs of customizing and duplicating the television spot. In response, Orly contends that the commercial does not meet the quality specifications agreed upon by the parties and that there was no agreement that Orly would pay for overages.

The case was tried before me on consent of the parties pursuant to *28 U.S.C. § 636(c)*. On the basis of the evidence presented, I find that the finished commercial met the contractual standards and that Orly is therefore liable for the unpaid portion of the contract price. On the other hand, although Orly did agree to pay for overages that it incurred in the production costs, most of the additional [*2] charges billed are not attributable to Orly. Finally, it was understood that the costs of customizing and duplicating the commercial would be borne by Orly. The following constitute my findings of fact and conclusions of law pursuant to *Rule 52 of the Federal Rules of Civil Procedure*.

*Background*

Orly is a manufacturer of nail care products and nail color based in California. (Tr. 240). [1] In 1978, it developed its French Manicure product, a kit consisting of three bottles of nail polish and white tip guides. (Tr. 251-52; 267-69). The consumer paints the tips of each nail white and the rest of the nail beige or pink, using the stick-on tip guides for precise application. (Tr. 269). The result is a more "natural" look than is achieved with other manicures. (Tr. 269).

1  "Tr." refers to the trial transcript.

In late 1987, Orly's president, Jeffrey Pink, decided to promote the retail sales of the French Manicure through television advertising. (Tr. 243.) He contacted Thomas Della Corte, an account executive with an [*3] agency that books media advertising time. (Tr. 212, 244). Mr. Della Corte suggested the names of two advertising agencies that might produce the commercial, one of which was Andreasen. (Tr. 244). On February 11, 1988, Mr. Pink sent Susan Andreasen, the agency's president, an outline of a commercial. (Tr. 17-19, 244-45; Pl. exh. 1, 1-A). This proposal suggested an advertisement opening with a "splash" of color appearing on the screen. (Tr. 243; Pl. exh. 1-A).

Ms. Andreasen then agreed to develop the storyboards for two alternative commercials. For this, Orly would pay $ 3,000, which would be applied to the overall price of the advertisement if Andreasen was chosen to produce it. (Tr. 18; Pl. exh. 2). Andreasen created the storyboards and at the same time contacted Tulchin Studios ("Tulchin") where the commercial would be shot. (Tr. 20-21). On February 24, 1988, Ms. Andreasen sent Mr. Pink two storyboards and a budget. One proposed commercial was entitled "Splash" and incorporated Mr. Pink's initial concept; the other was called "Merlin." The

estimated price for production was in excess of $ 54,000. (Tr. 22-25; Pl. exh. 3, 3-A, 3-B, 3-C, 3-D).

On Approximately March 18, Mr. Pink spoke [*4] with Ms. Andreasen and negotiated the price down to $ 44,573.00 for producing the "Splash" commercial. (Tr. 24-25). Ms. Andreasen then sent Mr. Pink a contract which called for production in time for broadcasting by April 11, 1988. Payment of $ 10,000 was to be made right away, with half of the balance due on March 28 and the remainder due on April 28. Costs of customizing and duplicating were specifically excluded from the price, and no mention of overages appears in the document. (Tr. 25-26; Pl. exh. 4). Mr. Pink subsequently executed this contract.

Over the next several days, Ms. Andreasen made some changes in the Splash storyboard at Mr. Pink's request. These included changing the prop held by the model in one scene from a tennis racquet to a barbell. Also, a hand was deleted from the vortex -- a swirl of colors -- at the beginning of the film. Finally a "macro" shot was added, showing closeups of the manicure being applied. The revised storyboard was sent to Mr. Pink, as were tapes of selected models and voices who had been auditioned by Tulchin. (Tr. 28-33; Pl. exh 5, 6, 6-A, 7).

At trial, Ms. Andreasen testified that at this time Mr. Pink wanted to move the broadcast date one [*5] week earlier than had been scheduled, from April 11 to April 4, thus necessitating an earlier shoot of the commercial. (Tr. 33-34). However, any such change must have been discussed earlier, since by March 17, Tulchin had scheduled the shoot for March 28, the date that it actually took place. (Def. exh. F.).

Tulchin had arranged for one full day of preparation, one day of shooting, and one day of editing. (Tr. 144-46; Def. exh. F). Mr. Pink understood that shooting would take place in one day, as shown by his letter to Ms. Andreasen of March 18 (Tr. 314-15; Def. exh. G.) Nevertheless, Ms. Andreasen arranged for the Splash shot itself to be done on March 25 so that Mr. Pink could view it on the 28th when he arrived in New York to review the shooting of the commercial. (Tr. 38).

On the morning of the 28th, Ms. Andreasen picked up Mr. Pink and brought him to the studio. They first reviewed the splash scene together, and Mr. Pink was dissatisfied. Tulchin agreed to reshoot it for $ 500, and after some discussion, Ms. Andreasen and Mr. Pink agreed to split this cost evenly. (Tr. 40-43, 259-60; Def. exh. I). Shooting was further delayed when Mr. Pink insisted on certain changes in the script [*6] for the voiceover. (Tr. 43-48; Pl. exh. 8, 8-A, 8-B, 9, 9-A). The first shooting did not begin until 11:15 or 11:30, though it had been scheduled to start at 10:00 a.m. (Tr. 48, 152-53).

The first live shot consisted of a model picking up a barbell. (Tr. 48). In this scene, as in virtually all that followed, Mr. Pink intervened to alter the way in which the scene was shot. In this case, he directed that the model grip and move the barbell differently from the way that the studio had planned it. (Tr. 49, 154-56, 264).

The next scene involved a secretary typing at a computer keyboard. Again, Mr. Pink was dissatisfied with the design, and he changed the camera angle and insisted on using different props. (Tr. 51, 156-57). After that, a scene depicting a couple at the theater was shot, and Mr. Pink again gave additional direction to the crew. (Tr. 159).

After breaking for lunch, the studio prepared to do the "macro" shot: the closeup of the model's application of the manicure. Although Mr. Pink had provided Andreasen with samples of his own product, the model arrived with a manicure done with a different product. Mr. Pink would not permit the filming to proceed until her hands were done [*7] over with the Orly French Manicure. However, when this was done the first time, he was still dissatisfied, and he directed that it be redone again with a different color. (Tr. 52-54, 160-63, 262-64). In addition, when the shot was finally underway, Mr. Pink re 'the model to repeat her actions until he was satisfied. (Tr. 161, 268).

The last live shot scheduled for the day of the shoot was the "product" shot, showing the packaging of the French Manicure. Mr. Pink was unhappy with the design for this shot, and insisted that one of the bottles of nail polish be removed since only three bottles, not four, are contained in each kit. (Tr. 167-69, 267-68). However, four bottles appeared on the storyboard that was previously provided to Mr. Pink. (Pl. exh. 6-A).

Mr. Pink insists that the changes that he required were merely corrections necessary to display his product properly. He contends that he played no role in changing the lighting of scenes, altering camera angles, and the like. (Tr. 261-62, 266, 298-99, 307-08, 318). However, Mr. Pink was insensitive to the fact that the most minor "corrections" could require substantial adjustments in the photography. (Tr. 49, 152, 157). Furthermore, [*8] to the extent that his testimony on this issue conflicts with that of Ms. Andreasen and Kenneth Chambers, the producer for Tulchin, it is not credible. Both Mr. Chambers and Ms. Andreasen testified in detail regarding the invasive nature of Mr. Pink's participation on the set. His activities far exceeded the provision of expert advice concerning the manicure.

Mr. Pink's interference repeatedly caused delays (Tr. 49-50, 52, 53, 153, 156, 158, 159, 161, 163, 168), and Mr. Pink was repeatedly warned that he would be charged for the overages. (Tr. 45-46, 47, 51-52, 56-57,

157-58, 160, 164, 169-70, 174). Indeed, Mr. Pink acknowledged as much when he subsequently complained of Ms. Andreasen's "habit" of seeking additional payments when problems arose during the shooting. (Tr. 277, 280-82; Def. exh. L). When warned of the costs involved in the changes that he wanted, Mr. Pink nevertheless insisted on implementing them. (Tr. 45-46, 51-52, 56-57, 169-70).

After the live shots were completed, the splash was shot again. Mr. Pink continued to express dissatisfaction over the efforts, and he himself made attempts to splash paint on glass to achieve the desired results. (Tr. 55-56, 170-73, 309-10). [*9] The shooting finally ended at about 5:00 am. on the morning of the 29th. (Tr. 173).

The film was then processed, and on March 30 the parties viewed it in the editing room at Tulchin Studios. (Tr. 58). At that time, the film was in the form of a "rough cut"; it included a substantially complete video together with a rough soundtrack or "scratch track", including special effects but without the voiceover. (Tr. 59-60, 205-06). Mr. Pink expressed complete satisfaction with the results, and left the remaining production to the agency's discretion. (Tr. 59-60). Although Ms. Andreasen asked Mr. Pink to return the following day to review the final edit, he declined to do so because of a previously scheduled trip to Europe. (Tr. 62). At the conclusion of the editing session that Mr. Pink attended, he was presented with a bill for the overtime charges. (Tr. 63).

After Mr. Pink left for Europe, the editing was finished and the completed commercial was copied and sent to the designated television stations as well as to Mr. Pink's place of business. (Tr. 62-63). Although Ms. Andreasen offered to send a copy for Mr. Pink to review in Europe, he declined. (Tr. 63).

After returning to California, [*10] Mr. Pink reviewed the completed commercial and called Ms. Andreasen to express his unhappiness. He said that the splash and the sound effects were not right. (Tr. 65). Ms. Andreasen agreed to see if further revisions could be made, and she subsequently reported to Mr. Pink that Tulchin would do additional shooting and editing only after its prior bills, including overages were paid. (Tr. 65-66). Mr. Pink reiterated that he disliked various aspects of the commercial. (Tr. 66; Def. exh. L).

He followed this up with a letter dated May 3, 1988 detailing his dissatisfaction with the final commercial. (Def. exh. J). He contended that the splash was too short and that it had been created by animation, though this is denied by Ms. Andreasen and by Tulchin's producer. Tr. 81, 171). Next, Mr. Pink complained that the splash sound was inadequate. He further contended that the voiceover did not match the visual and was not strong

and clear. Finally, he argued that the editing did not conform to the storyboard. Mr. Pink thus recommended that the splash be reshot, a new splashing sound developed, a better voice -- perhaps a man's -- be used, and the commercial be reedited, allowing more time for [*11] the splash and conforming certain audio and visual segments. (Def. exh. J).

No agreement was reached for making further revisions because Tulchin would only participate if its outstanding bills were first paid. (Tr. 71). In addition to the $ 500 for reshooting the splash scene, Tulchin asserted that it was owed $ 12,457 for additional overtime. (Def. exh. I). At trial, Mr. Chambers testified that he calculated this amount based on the extra time spent from 4:00 p.m. on the afternoon of the shoot until the shooting was finally finished at 5:00 a.m. the following morning. (Tr. 173-76, 182-97).

However, his testimony on this issue was confused, and it was contradicted by the bill that he sent to Ms. Andreasen. In that bill, Mr. Chambers stated:

After our estimate was submitted to you the following shots were added:

1) application of the white tip

2) removal of the white tip

3) brush on of protective coat

These three shots took 4 hours of overtime.

Please note, we are not requesting an overage for any of the other 16 hours of principal photography, even though we feel strongly that some of this overtime was not caused by the production company. We are only requesting the 4 hours for [*12] the shots added subsequent to our agreement.

In addition our recommended production schedule which allowed for normal preparation time was substantially compressed causing us to open our studio on Sunday and bring in our crew at double time.

(Def. exh. I). Thus, when Mr. Chambers presented the bill to Andreasen, he attributed the overage to certain specific shots and to utilizing Sunday as the set-up day. Tulchin explicitly waived other potential overage charges.

Moreover, Mr. Chambers acknowledged that Ms. Andreasen knew in advance of the macro shot; it was not a last-minute change by Mr. Pink. (Tr. 191-92). Nor is there any evidence that Mr. Pink was told that this scene would be subject to overage charges. (Tr. 192-93). Similarly, when the set-up was rescheduled to Sunday to allow for the splash scene to be shot for Mr. Pink's review, no one at Tulchin apparently advised Ms. Andreasen or

1990 U.S. Dist. LEXIS 8810, *

Mr. Pink that overages would be incurred as a result. (Tr. 183-85).

Because he was unable to have the commercial revised to his satisfaction, Mr. Pink cancel led the balances of the television time he had booked. In all, the commercial aired for four weeks after Mr. Pink had anticipated running [*13] it for a year. (Tr. 213, 221-22, 289).

When Mr. Pink failed to pay the balance under the original contract or the overages incurred, Ms. Andreasen initiated this lawsuit. She seeks the final payment of $ 17,286.50 called for by the original contract (Pl. exh. 4), together with $ 2,729.75 for customizing and duplicating the commercial. (Tr. 68-70; Pl. exh. 10, 10-A, 10-B, 10-C, 10-D). Further, she demands payment of the $ 12,707.00 that Tulchin has billed for overages. (Tr. 174-75; Def. exh. I).

*Discussion*

A. *The Basic Contract* [2]

    2  In a diversity case such as this, a federal court applies the choice-at-law rules of the forum state. *See Klaxon Co. v. Stentor Electrical Manufacturing Co., 313 U.S. 487 (1941).* Here, the parties have not suggested which state's substantive law applies. However, because Andreasen is a New York corporation and the contract at issue was to be executed here, only New York has any significant interest in the case, and its law governs. *See Monarch Insurance Co. v. Insurance Corp. of Ireland, 835 F.2d 32, 35 (2d Cir. 1987); Krauss v. Manhattan Life Insurance Co., 643 F.2d 98, 100 (2d Cir. 1981).*

[*14] The basic contract entered into by Orly required Andreasen to develop "one :30 TV commercial for ORLY in time for April 11, 1988 broadcast." (Pl. exh. 4). Although the contract terms do not establish a standard for evaluation of the finished product, Susan Andreasen agrees that she was committed to providing a top quality commercial. (Tr. 91-92; *see also* Tr. 253).

Under these circumstances, Mr. Pink's subjective dissatisfaction with the completed commercial is legally irrelevant. The contract might have included a provision calling for performance to the satisfaction of Orly. *See. e.g., Fursmidt v. Hotel Abbey Holding Corp., 10 A.D.2d 447, 449, 200 N.Y.S.2d 256, 259* (1st Dep't 1960). However, it did not. Instead, the parties agreed that Andreasen would produce a "top quality commercial," [3] thus adopting an implicitly objective standard for judging performance. *See Grimpel v. Hochman, 74 Misc.2d 39, 43-44, 343 N.Y.S.2d 507, 512 (N.Y.C. Civ. Ct. 1972).*

    3  This was an oral modification to the written contract. *See infra* at 17.

[*15] Furthermore, "those who hire experts for the predominant purpose of rendering services, relying on their special skills, cannot expect infallibility." *Milan Associates, Inc. v. North Avenue Development Corp., 42 N.Y.2d 482, 486, 398 N.Y.S.2d 882, 884 (1977).* Thus, because this is a service contract, no special warranties are implied, and Andreasen's obligations are limited to what is required by the contract; Judged objectively, the finished product meets the contractual standard.

Although, as in all human endeavors, there is room for improvement, the advertisement succeeds in presenting the product in an attention-catching and stylish manner. Mr. Pink's most serious complaint concerns the "splash" at the beginning of the commercial. When Mr. Pink originally viewed the splash on day of the shoot, he and Ms. Andreasen agreed that it was unsatisfactory, and they arranged for it to be reshot. This was done, but upon reviewing the rough cut of the commercial, Mr. Pink was still dissatisfied. (Tr. 61, 272). He contends that the splash does not look like a splash, and that in fact it was done by animation. (Tr. 272; Def. exh. J). Further, he complains that the splash sound is inaccurate, [*16] and that the entire splash scene is too short to be effective. (Tr. 272; Def. exh. J).

The splash, however, closely resembles its depiction in the storyboards. (*Compare* Pl. exh. 11 *with* Pl. exh. 6). Whether, in fact, it was ultimately produced by animation is of little consequence, since Mr. Pink had already rejected the results of the direct splashing techniques. Furthermore, he has been unable to articulate with any precision what is unsatisfactory about the visual splash. Similarly, the splash sound is adequate, and Mr. Pink failed to describe or provide an example of special effects that would have met his expectations. Finally, it is probably correct that the commercial would be more effective if the splash were longer in duration. However, Mr. Pink fails to appreciate the time constraints involved in a thirty second commercial, and he does not suggest how other scenes might have been eliminated or shortened to allow for his change.

Next, Mr. Pink objects that the voiceover is not properly coordinated with the visual scenes. For example, in describing the style of the French manicure, the word "fashionable" was to be used in conjunction with the theater scene, but in [*17] the finished product it is heard during the computer scene. (Tr. 276; Def. exh. J; Pl. exh. 9; Pl. exh. 11). Again, however, Mr. Pink's criticism ignores the timing constraints for the commercial. Bringing that single word into conjunction with the theater scene would require wholesale changes in the voice-

over, disrupting the rhythm. It is simply too minor a deviation to justify rewriting of the script.

Mr. Pink also complains that the sound effects intended for the computer scene overlap into the gymroom scene. (Tr. 276; Def. exh. L). This is simply not evident in viewing the commercial. The modern rhythmic sound effects at the beginning of the commercial may resemble the sounds of a computer keyboard, but there is no reason to believe that these effects were intended to be limited to the computer scene.

Finally, Mr. Pink contends that the voiceover is not strong and clear, and he suggests using a male voice. (Def. exh. J). This suggestion is frivolous, and it demonstrates Mr. Pink's tendency to perceive the need for additional changes at every turn. Well in advance of shooting, Ms. Andreasen supplied Mr. Pink with tapes of the voices of several prospective models. Despite the fact [*18] that he approved the model whose voice was used, Mr. Pink now recommends seeking a different model. (Tr. 312-13). There is no objective basis for his dissatisfaction.

The commercial produced by Andreasen thus meets the contractual standard for a top quality product. Mr. Pink's objections are either unfounded or could not be remedied within the production constraints. Accordingly, Andreasen has performed under the contract, and Orly is liable for the balance due of $ 17,286.50.

B. *Duplication and Customizing*

The basic contract specifically excluded costs of customizing and duplicating from the contract price. (Pl. exh. 4). Nevertheless, it was clearly understood by the parties that the commercial would be customized to indicate where the product was available in each of the respective television markets. (Tr. 46; Pl. exh. 9-A). Further, it was necessary to duplicate the commercial so that a copy could be sent to each television station that would air it. (Tr. 180). Mr. Pink agreed to pay for these services (Tr. 68-69), and Orly is therefore liable for the amount due of $ 2,729.75.

*Overages*

The basic contract does not address the question of responsibility for any overages incurred [*19] in the production of the commercial. Nevertheless, a written contract may be subject to oral modification as long as it contains no provision forbidding oral change. *See Mathews v. ABC Television, Inc., 1989 U.S. Dist. LEXIS 10694* (S.D.N.Y.) at * 18; *Paxall Circle Machinery v. My Brands, Inc., 1989 U.S. Dist. LEXIS 8680* (S.D.N.Y.) at * 6; *Merrill Lynch Realty Associates, Inc. v. Burr, 140 A.D.2d 589, 593, 528 N.Y.S.2d 857, 860* (2d Dep't 1988); *Local 50, Bakery Confectionery and Tobacco Workers*

*Union. AFL-CIO v. American Bakeries Co., 73 A.D.2d 862, 862, 423 N.Y.S.2d 493, 494* (1st Dep't 1980).

Here, the basic contract did not preclude oral modification, and there is substantial evidence that Mr. Pink agreed to pay for overages. Initially, when the first attempt at creating the splash was found to be unacceptable, Mr. Pink and Ms. Andreasen agreed to split the cost of reshooting. (Tr. 40-43, 259-60). Thereafter, each time Mr. Pink sought changes that would cost of production, he was warned that he would be billed for them. (Tr. 45-47, 51-52, 56-57, 157-58, 160, 164, 169-70, 174, 277, 282-83). He did not protest, but instead directed that the changes be implemented. (Tr. [*20] 45-46, 51-52, 56-57, 169-70). Accordingly, he indicated assent to this addition to the basic contract.

Much of the evidence presented by Andreasen at trial was directed toward demonstrating that the production delays were attributable to Mr. Pink. In most instances this was the case. In others -- such as Mr. Pink's insistence that the model display the Orly product and his demand that the barbell scene conform to the storyboard -- overages were the responsibility of Andreasen or Tulchin, and could not be charged to Mr. Pink.

However, when Mr. Pink agreed to pay overages, he understood that his agreement was with Andreasen, which in turn had contracted with Tulchin for the production. Thus, Orly agreed only to pay those overages for which Andreasen was billed and which were attributable to delays caused by Mr. Pink. The evidence shows that some overages were charged to Andreasen and some overages were attributable to Mr. Pink, but these were not the same charges. On one hand, Orly cannot be charged for overages that Tulchin declined to bill Andreasen for. On other hand, the two categories of overages for which Tulchin did charge Andreasen -- the macro shot and the set-up on Sunday [*21] -- were not Mr. Pink's responsibility.

Thus, the only overage for which Orly is liable is its share of the cost of the reshoot of the splash scene The total amount due for that overage is $ 500 (Def. exh. I), and Orly therefore owes $ 250.

D. *Interest and Attorneys' Fees*

Andreasen also seeks an award of pre-judgment interest and attorneys' fees. Under New York law, a party that prevails on a breach of contract claim is entitled to interest as part of the judgment. *See Adams v. Lindblad Travel, Inc., 730 F.2d 89, 93* (2d Cir. 1984). Accordingly, Andreasen is entitled to interest at the statutory rate of nine percent per year. *N.Y.C.P.L.R. § 5004*. This should be calculated from the date when final payment was due on the basic contract, April 28, 1988, based on the total principal amount due of $ 20,266.25.

1990 U.S. Dist. LEXIS 8810, *

In the complaint, Andreasen also included a demand for attorneys' fees. However, there is no apparent authority for fee-shifting in this case, and the plaintiff presented no time records on which any award could be based. Accordingly, this application is denied.

*Conclusion*

For the reasons set forth above, Orly is liable to Andreasen for $ 17,286.50, representing the balance [*22] due under the contract, together with $ 2,729,75 for customizing and duplicating. Orly is further liable for $ 250 or its share of the cost of the reshoot of the splash, but not for any additional overages. Andreasen shall be awarded prejudgment interest on the total award of $ 20,266.25 at the rate of nine percent per year from April 28, 1988, but its application for attorneys' fees is denied.

The Clerk of the Court shall enter judgment forthwith in accordance with this determination.

SO ORDERED.

LEXSEE 2005 U.S. DIST. LEXIS 2721

**DDCLAB LTD., Plaintiff, -against- E.I. DU PONT DE NEMOURS AND COM-PANY, Defendant.**

**03 CV 3654 (GBD)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2005 U.S. Dist. LEXIS 2721*

**February 18, 2005, Decided**
**February 18, 2005, Filed**

**DISPOSITION:** [*1] Defendant's motion to dismiss complaint was granted.

**COUNSEL:** For DDCLab Ltd., Plaintiff: Russell James Sweeting, Maya & Associates, Fairfield, CT.

**JUDGES:** GEORGE B. DANIELS, United States District Judge.

**OPINION BY:** GEORGE B. DANIELS

**OPINION**

MEMORANDUM DECISION & ORDER

GEORGE B. DANIELS, District Judge:

Plaintiff DDCLAB Ltd. ("DDCLAB") commenced this action, *inter alia,* for breach of contract claiming defendant E.I. Du Pont De Nemours and Company ("DuPont") failed to provide DDCLAB with a promised revolving line of credit. DuPont moved, pursuant to *Fed.R.Civ.P. 12(b)(6),* to dismiss the complaint for failure to state a claim upon which relief can be granted. The motion is granted and the complaint is dismissed in its entirety.

The complaint alleges that in October of 2001, the parties began to negotiate the details of an agreement whereby defendant would invest money in plaintiff. DDCLAB was "looking for" an investment of six million dollars to expand its wholesale/retail business without financial restriction. (Compl. P5). DDCLAB claims that at a October 16, 2001 meeting, DuPont's representatives indicated that DuPont would secure a revolving line of [*2] credit for DDCLAB at a low interest rate of 3-4%. (Compl. P7). The complaint states that "the revolving line of credit was to be set up with the banks as part of DuPont's investment in DDCLAB." (Compl. P7). On February 25, 2002, DDCLAB was allegedly assured by DuPont "that once the deal was closed, DuPont would set up the revolving line of credit with a bank and DuPont would get the best deal for the borrowing for DDCLAB." (Compl. P8). DuPont's representative allegedly indicated that the revolving line of credit would not be included in the letter of intent between the parties because DuPont would not be lending the money directly to DDCLAB. The complaint indicates that on May 31, 2002, it was again represented that the line of credit would be set up by DuPont with "one of its banks." (Compl. P9). On June 12, 2002, the parties entered into a Commercial Agreement and an Investment Agreement (collectively "the Written Agreements") whereby DuPont invested one million dollars in DDCLAB thereby becoming a 19% shareholding in DDCLAB. The complaint states that "DDCLAB agreed to a smaller investment than it was originally seeking by DuPont of only one million dollars ($ 1,000,000) in consideration [*3] for DuPont's assurances that it would set up a revolving line of credit for DDCLAB once the Written Agreements were executed." (Compl. P10).

The parties executed a Commercial Agreement and an Investment Agreement on June 12, 2002. The Commercial Agreement made no mention of DuPont's obligation to set up a revolving line of credit for DDCLAB.

The parties' Investment Agreement is a comprehensive forty-nine page contract detailing the particular rights and obligations of the parties, including the expressed representations of both contracting parties. Prior to setting forth the specific terms of the agreement, the introductory portion of the contract states:

WHEREAS, DUPONT and DDCLAB are, simultaneously with execution of this

2005 U.S. Dist. LEXIS 2721, *

Investment Agreement, entering into a certain Commercial Agreement (the above agreements are hereafter referred to as the "Agreements"), which collectively provide for a constructive and mutually beneficial relationship between DUPONT and DDC LAB;

WHEREAS, DDCLAB desires to obtain one million dollars ($ 1,000,000) of additional capital by selling DUPONT 19% of the fully diluted unregistered shares of its common stock and DUPONT desires to acquire the same, [*4] all subject to the terms and conditions of this Investment Agreement; and

WHEREAS, DUPONT desires to acquire an option to purchase up to an additional five percent (5%) of the number of issued and outstanding shares of DDCLAB Common Stock, and DDCLAB is willing to grant such an option to DUPONT as an inducement to DUPONT entering the Agreement;

* * *

NOW, THEREFORE, in consideration of the respective agreements herein contained and subject to the terms and considerations set forth herein, the parties agree . . . (Compl. Ex. B at 1-2).


The Investment Agreement is silent as to any promise by DuPont to establish a revolving line of credit for DDCLAB. The agreement contained an integration provision stating:

This Agreement and the agreements referred to herein contain the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings relating to such subject matter. (Id. at P9.10).

The agreement further provides that any changes or additions to the agreement require DuPont's consent in writing. (Id. at P9.1).

The complaint additionally alleges that on July 14, 2004, after [*5] the Written Agreements were signed, it was represented that "DuPont would set up a revolving line of credit with banks and other investors" and that

"DuPont was working to package DDCLAB to the banks." (Compl. P11). The complaint alleges that on July 17, 2002, DDCLAB advised DuPont "that DuPont's promise to set up the revolving line of credit for DDCLAB was crucial" to DDCLAB's business operations. (Compl. P12). The complaint further states that on August 1, 2002, a DuPont's representative indicated, for the first time, that DuPont did not promise to set up a revolving line of credit for DDCLAB.

Plaintiff claims that it relied on defendant's promises concerning the revolving line of credit by accepting purchase orders for clothing and entering into contractual obligations with manufacturers to produce lines of clothing. DDCLAB contends that it would not have done so without the expectation of an influx of capital from the revolving line of credit. DDCLAB also allegedly hired additional sales personnel in response to DuPont's request that DDCLAB have the necessary personnel to handle the anticipated growth of DDCLAB's business. DDCLAB alleges that without the revolving line of credit, [*6] it has been unable to pay manufacturers for purchase orders; has lost profits, clients, and wholesale accounts; suffered damage to its reputation in the industry; and accumulated millions of dollars in debt. The complaint asserts two causes of action for breach of contract, as well as claims for promissory estoppel, fraud, negligent misrepresentation and breach of fiduciary duty.

## MOTION TO DISMISS STANDARD

In reviewing a complaint for dismissal under *Rule 12(b)(6)*, the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in plaintiff's favor. *Bolt Elec., Inc. v. City of New York, 53 F.3d 465, 469 (2d Cir. 1995)*. The complaint should only be dismissed where it appears beyond doubt that the plaintiff can present no set of facts entitling it to relief. *Conley v. Gibson, 355 U.S. 41, 46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984)*. On a motion to dismiss, pursuant to *Fed.R.Civ.P. 12(b)(6)*, the Court is precluded from considering matters outside of the complaint. *Courtenay Communications, Corp. v. Hall, 334 F.3d 210, 213 (2d Cir. 2003)*. [*7] In this regard, a complaint includes any written instrument attached as an exhibit. *Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002)* (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel., Co., 62 F.3d 69, 72 (2d Cir. 1995))*.

## BREACH OF CONTRACT

In the first two causes of action for breach of contract, plaintiff alleges that the continuing promises made on behalf of DuPont gave rise to an enforceable contract between the parties, and that "DuPont has failed and ne-

glected to perform by the terms of its agreement in that it failed to provide DDCLAB with a revolving line of credit." [1] (Compl. PP21, 28)

> 1  In the first cause of action, DDCLAB claims that it "entered into Written Agreements with DuPont in consideration for DuPont's promises that it would provide a revolving line of credit to DDCLAB." (Compl. P19). In the second cause of action, DDCLAB alleges that it "entered into Written Agreements with DuPont in consideration for DuPont's promises that it would provide a revolving line of credit to DDCLAB once 'the deal was done.'" (Compl. P26) (emphasis added).

[*8]  DuPont argues that DDCLAB's conclusory assertion that it sold nineteen percent share of its equity to DuPont for one million dollars in consideration of DuPont's oral promises to set up a revolving line of credit fails for the following two reasons: (1) the existence of the comprehensive Written Agreements between the parties; and (2) DDCLAB's unequivocal declaration, through the Investment Agreement's merger clause, that the Written Agreements alone define the rights and obligations of the parties with respect to DuPont's investment in DDCLAB.

Plaintiff argues that its complaint is not based on a claim that, in consideration of defendant's oral promises to set up a revolving line of credit for DDCLAB, DDCLAB sold its equity shares to DuPont for one million dollars. Rather, DDCLAB contends that the complaint alleges that DDCLAB only entered into the Written Agreements because of DuPont's separate oral and written assurances that it would provide DDCLAB with access to a revolving line of credit. DDCLAB maintains that the revolving line of credit was purposefully separate from the Written Agreements, and that the parties agreed not to memorialized that obligation into the Written Agreements [*9] because DuPont was not investing the money directly into DDCLAB.

Where the parties' agreement is clearly set forth in a written document, a determination of the parties' contractual obligations and rights are generally to be determined by examination solely of the written agreement. *W.W.W. Assoc., Inc. v. Giancontieri, 77 N.Y.2d 157, 566 N.E.2d 639, 565 N.Y.S.2d 440, 443 (N.Y. 1990).* Thus, where the written agreement is "clear and complete on its face" and it "lucidly manifests the parties' intent" that the contract supercedes prior oral promises and constitutes the parties' entire agreement, "the parol evidence rule effectively bars any action to enforce the oral agreement." *Doherty v. New York Tel. Co., 202 A.D.2d 627, 609 N.Y.S.2d 306, 307 (N.Y. App. Div. 1994)* (citation omitted). The purpose of having a merger clause in a contract is so that the parole evidence rule may be applied to preclude the in-

troduction of extrinsic evidence to alter, vary, or contradict the terms of the writing. *Jarecki v. Shung Moo Louie, 95 N.Y.2d 665, 745 N.E.2d 1006, 722 N.Y.S.2d 784, 786 (N.Y. 2001)* (citation omitted). Such a clause establishes the parties' intent that the written agreement is to be considered a fully integrated [*10] writing. *Primex Int'l Corp. v. Wal-Mart Stores, Inc., 89 N.Y.2d 594, 679 N.E.2d 624, 657 N.Y.S.2d 385, 388 (N.Y. 1997).*

The parole evidence rule is, however, inapplicable with regard to oral agreements that do not vary, modify, or otherwise contradict the parties' written contract. *Gem Corrugated Box Corp. v. Nat'l Kraft Container Corp., 427 F.2d 499, 503 (2d Cir. 1970).* Despite a strong integration clause contained in a written contract, an oral agreement can be treated as a separate and independent contractual obligation. *Lee v. Joseph E. Seagram & Sons, Inc., 552 F.2d 447, 451-52 (2d Cir. 1977).* The primary consideration in determining whether the oral agreement is distinct from the written contract is "whether, in the context of the particular setting, the oral agreement was one which the parties would ordinarily be expected to embody in the writing." *Id. at 451.*

The complaint alleges that "DDCLAB agreed to a smaller investment than it was originally seeking by DuPont of only one million dollars ($ 1,000,000) in consideration for DuPont's assurances that it would set up a revolving line of credit for DDCLAB once the Written Agreements were [*11] executed." (Compl. P10). The complaint further states "that the revolving line of credit was to be set up with the banks as part of DuPont's investment in DDCLAB." (Compl. P7). The terms of DuPont's investment in DDCLAB is set forth in the Investment Agreement in great detail. However, nowhere in the Investment Agreement, or in the Commercial Agreement, is there any mention of an obligation by DuPont to establish a revolving line of credit as part of its investment in DDCLAB. Moreover, the Investment Agreement specifically outlined the parties' respective consideration forming the basis for this agreement. The enumerated consideration did not include DuPont's future obligation to provide DDCLAB with a line of credit. The agreement indicates that DDCLAB would grant DuPont an option to purchase additional stock as an inducement to DuPont entering into the agreement. Yet, the agreement is silent as to DuPont's alleged obligation to provide a revolving line of credit which DDCLAB claims served as an inducement for DDCLAB to enter into the agreements for far less than the five million dollars it was seeking.

The complaint alleges that the contractual obligation to provide a line of credit [*12] was part of the investment deal with DuPont, and was the consideration for DDCLAB to enter into the Written Agreements. Reasonable businesspeople would therefore anticipate such an

obligation to be set forth in the written contract. [2] Additionally, DuPont's alleged obligation is so closely connected to the principle transaction, it would clearly be made a part of the written agreement. See, *Mitchill v. Lath, 247 N.Y. 377, 160 N.E. 646, 647 (N.Y. 1928)*. Where "the alleged oral agreement is closely related to the subject dealt with in the written agreement, and thus the transactions are necessarily and inextricably bound together," the parole evidence rule will bar the introduction of extrinsic evidence of a claimed oral agreement. *Backer v. Lewit, 180 A.D.2d 134, 584 N.Y.S.2d 480, 482 & n. 1 (N.Y. App. Div. 1992)*. Since the Investment Agreement contains an integration clause providing that the entire agreement and understanding between the parties are set forth in the agreement, and that the agreement supersedes all prior agreements and understandings, plaintiff is precluded from claiming a separate enforceable contract which induced it to execute the written agreement. Additionally, [*13] the Investment Agreement provides that it could not be modified absent written consent by DuPont. Since plaintiff has not alleged that such a written modification occurred, no breach of contract can be premised upon DuPont's alleged oral representations made after the agreement was executed.

> 2   In fact the complaint alleges that during negotiations, the parties considered whether to include the oral promise in the Written Agreements, and purposely decided to exclude it. Thus, as the parties themselves recognized, given the nature of the promise, it would have been otherwise reasonable to anticipate incorporating it into the Written Agreements. However, the parties opted not to proceed in that manner, and plaintiff chose to execute the contracts with full knowledge that such an oral promise was intentionally omitted and not made a part of the agreements.

Even if providing a revolving line of credit was found to be an independent oral promise of DuPont, separate and apart from the Written Agreements, it would still [*14] be unenforceable. In order for a contract to be binding, there must be a "manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Express Indus. and Terminal Corp. v. New York State Dep't of Transp., 93 N.Y.2d 584, 715 N.E.2d 1050, 693 N.Y.S.2d 857, 860 (N.Y. 1999)* (citation omitted). Even though contractual terms need not be fixed with absolute certainty, *F & K Supply Inc. v. Willowbrook Dev., 288 A.D.2d 713, 732 N.Y.S.2d 734, 737 (N.Y. App. Div. 2001)*, the material terms must be reasonably certain for there to be an enforceable contract. *Cobble Hill Nursing Home v. Henry and Warren Corp., 74 N.Y.2d 475, 548 N.E.2d 203, 548 N.Y.S.2d 920, 923 (N.Y. 1989)*.

No essential material terms were agreed upon by the parties with regard to the alleged oral contract. There is no indication as to the specific sum of financing DuPont purportedly promised to provide to DDCLAB. DDCLAB does, however, note that the parties knew DDCLAB was seeking a six million dollar investment, and settled for a one million dollar cash investment from DuPont. To the extent that such a claim is asserted to suggest that the parties agreed that DuPont would provide [*15] an additional five million dollar revolving line of credit, it fails. In the complaint, DDCLAB alleged it was "looking" for a six million dollar investment, not that it was imperative for the continued growth of its business to obtain that amount. The complaint is barren of any factual allegations to reasonably indicate that the parties agreed to a specific amount of financing.

Nor does the complaint reveal that the parties agreed on an interest rate. Although the complaint initially alleges that DuPont indicated that a low interest rate of 3-4% would be obtained, the complaint also alleges that DuPont "would get the best deal" it could for DDCLAB. Additionally, the complaint states that DuPont represented that it would secure the line of credit from its bank, but that DuPont subsequently indicated that it was working with "banks and other investors" and that "DuPont was working to package DDCLAB to the banks." Furthermore, although the complaint states that the revolving line of credit was to be established after the Written Agreements were signed, the complaint fails to allege any specific date as to when this was to be accomplished. Given the absence of specific material contractual [*16] terms, the purported agreement is too vague to be enforceable. See eg., *Arcan Transp. Inc. v. Marine Midland Bank-Western, 54 A.D.2d 1103, 388 N.Y.S.2d 737, 738 (N.Y. App. Div. 1976)* (finding working capital agreement too inadequate to be enforceable where, *inter alia,* no interest rate was discussed, no repayment schedule was formulated, and no limit was set as to the amount of working capital defendant would be required to advance.).

Additionally, the oral promise is unenforceable as it is not supported by any independent consideration. "Two entirely separate contracts, each based on independent consideration, may be made at the same time and be entirely distinct legally." *Backer, 584 N.Y.S.2d at 482 n. 1* (citing Willston on Contracts § 637 [3d ed.]). Although plaintiff contends that the oral contract is distinct from the Written Agreements, plaintiff has not identified any separate consideration supporting the collateral oral agreement. Plaintiff cannot rely on the consideration provided for in the Written Agreements. Plaintiff's assertion that it relied on such a promise in executing the Written Agreements is insufficient to create a separate oral contract.

[*17] In light of the foregoing, the causes of action for breach of contract are dismissed.

## PROMISSORY ESTOPPEL

DDCLAB's third cause of action for promissory estoppel must also be dismissed. "A cause of action for promissory estoppel under New York law requires the plaintiff to prove three elements: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance." *Kaye v. Grossman, 202 F.3d 611, 615 (2d Cir. 2000)*. Promissory estoppel is a legal fiction which is used as consideration for contractual consideration where a party relies, to its detriment, on the promises of another without having entered into an enforceable contract. See, *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc., 723 F. Supp. 976, 993 (S.D.N.Y. 1989)*. It is a narrow doctrine which generally only applies where there is no written contract, or where the parties' written contract is unenforceable for some reason. See, *Phoenix Racing, Ltd. v. Lebanon Valley Auto Racing Corp., 53 F. Supp.2d 199, 219 (N.D.N.Y. 1999)*. When justice dictates, the doctrine of promissory [*18] estoppel may be invoked to avoid plaintiff from suffering an unconscionable injury. *Cyberchron Corp. v. Calldata Sys. Dev., Inc., 47 F.3d 39, 44 (2d Cir. 1995)*. Nevertheless, "applying promissory estoppel to create contractual obligations where a comprehensive contract exists would contravene the fundamental rules that extrinsic evidence cannot be used to vary the unambiguous terms of a contract, . . . and that obligations inconsistent with the terms of a contract cannot be implied." See, *Hartford, 723 F. Supp. at 993* (citations omitted).

As previously discussed, no clear and unambiguous promise can be gleaned from a reading of the complaint. The complaint also fails to demonstrate DDCLAB's reasonable reliance on DuPont's alleged promises. "In assessing the reasonableness of a plaintiff's alleged reliance, [the Court is] to consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Emergent Capital Inv. Mgmt., LLC. v. Stonepath Group, Inc., 343 F.3d 189, 195 (2d Cir. 2003)* (citation omitted). Since the [*19] parties' Investment Agreement specified their rights and obligations with regard to the investment, it would have been unreasonable for DDCLAB to rely on DuPont's alleged oral promises. Those promises were regarding the same investment, and were deliberately withheld, and yet altered, the terms specified in the written agreement. See, *Four Finger Art Factory, Inc. v. DiNicola, 2000 U.S. Dist. LEXIS 1221, 2000 WL 145466, *8 (S.D.N.Y. Feb. 9, 2000)*; *Thayer v. Dial Indus. Sales, Inc., 85 F. Supp.2d 263, 272 (S.D.N.Y. 2000)*

(quoting *M.H. Segan L.P. v. Hasbro Inc., 924 F. Supp. 512, 527 (S.D.N.Y. 1996))*.

Given the unambiguous integration clause in the parties' Investment Agreement, there existed no basis for DDCLAB's justifiable reliance on the alleged oral promises made prior the execution of that agreement. See, *Phoenix Racing, 53 F. Supp. at 220*; *Gebbia v. Toronto-Dominion Bank, 306 A.D.2d 37, 762 N.Y.S.2d 38, 38-39 (N.Y. App. Div. 2003)*. Nor could DDCLAB justifiably rely on DuPont's alleged oral promises made after the Investment Agreement was executed, given the absence of the requisite written consent by DuPont. The parties are established [*20] businesses represented by experienced and sophisticated businesspeople. The parties engaged in nine months of negotiations which ultimately culminated in two comprehensive Written Agreements. Any oral assurances by DuPont's representatives were not incorporated in the Written Agreements, and are not consistent with the terms of those Written Agreements. Any reliance by DDCLAB upon the alleged oral promises is simply unreasonable. Accordingly, the promissory estoppel claim is dismissed.

## FRAUD

In the fraud claim, DDCLAB alleges that DuPont knowingly, intentionally and/or recklessly promised a revolving line of credit to DDCLAB with the undisclosed intention not to perform both before and after the Written Agreements were executed.

To assert a claim for fraud under New York law, plaintiff must allege the following four elements: (1) defendant made a material misrepresentation; (2) defendant did so with intent of defrauding plaintiff; (3) plaintiff relied upon the representation; and (4) plaintiff suffered damages as a result of its reliance. *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank, 57 F.3d 146, 153 (2d Cir. 1995)* (citation omitted). [*21] If the fraud claim is premised on the same facts as plaintiff's breach of contract cause of action, with the additional allegation that defendant never intended to perform under the contract, a fraud claim may not be maintained. See, *Astroworks, Inc. v. Astroexhibit, 257 F. Supp.2d 609, 616 (S.D.N.Y. 2003)* (quoting, *PI, Inc. v. Quality Prods., Inc., 907 F. Supp. 752, 761 (S.D.N.Y. 1995))*; *Int'l Cabeltel Inc. v. Le Groupe Vedeotron Ltee, 978 F. Supp. 483, 486 (S.D.N.Y. 1997)*; *New York Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308, 662 N.E.2d 763, 639 N.Y.S.2d 283, 289 (N.Y. 1995)* (citations omitted). A fraud claim will nevertheless lie, notwithstanding the parties' contractual relationship, where plaintiff can either "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused

2005 U.S. Dist. LEXIS 2721, *

by the representation and unrecoverable as contract damages." *Bridgestone/Firestone Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 20 (2d Cir. 1996) (citations and internal parenthetical omitted).

DDCLAB [*22] does not allege that DuPont owed any legal duty to DDCLAB separate and apart from its alleged contractual duty to provide a revolving line of credit in connection with DuPont's investment. The fraudulent misrepresentation at issue, *i.e.,* DuPont's assurances to set up the line of credit, is not collateral or extraneous to the alleged oral contract, but rather constitutes the heart of the alleged agreement. Moreover, DDCLAB is seeking $ 11,000,000 in compensatory and reliance damages, which is the exact amount of damages it is seeking in both of its breach of contract causes of action. The complaint fails to indicate that DDCLAB suffered any special damages as a result of alleged fraud in connection with the oral representations. Since the fraud claim is duplicitous of the breach of contract claims, it cannot survive a motion to dismiss.

## NEGLIGENT MISREPRESENTATION AND BREACH OF FIDUCIARY DUTY CLAIMS

To state a claim for negligent misrepresentation under New York law, plaintiff must allege the following five elements: "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he [*23] or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Hydro Investors, Inc. v. Trafalgar Power, Inc.,* 227 F.3d 8, 20 (2d Cir. 2000). "A 'special relationship' requires a closer degree of trust than an ordinary business relationship." *Busino v. Meachem,* 270 A.D.2d 606, 704 N.Y.S.2d 690, 693 (N.Y. App. Div. 2000); see also, *United Safety of Am., Inc. v. Consol. Edison Co. of New York, Inc.,* 213 A.D.2d 283, 623 N.Y.S.2d 591, 593 (N.Y. App. Div. 1995).

To assert a cause of action for breach of fiduciary duty, plaintiff must plead the following three elements: (1) the existence of a fiduciary duty between the parties; (2) the breach of that duty by defendant; and (3) damages suffered by plaintiff as a result of defendant's breach. See, *Kidz Cloz, Inc. v. Officially for Kids, Inc.,* 2001 U.S. Dist. LEXIS 1135, 2002 WL 392291, *4 (S.D.N.Y. Mar. 13, 2002)* (citing *Cramer v. Devon Group, Inc.,* 774 F. Supp. 176, 184 (S.D.N.Y. 1991)). [*24] "Under New York law a fiduciary relationship arises when one has reposed trust or confidence in the integrity or fidelity of another who thereby gains a resulting superiority of influence over the first, or when one assumes control and

responsibility over another." *Reuben H. Connelly Corp. v. Mark I Mktg. Corp.,* 893 F. Supp. 285, 289 (S.D.N.Y. 1995) (citation omitted). A conventional business relationship alone does not give rise to a fiduciary relationship. *Oursler v. Women's Interart Ctr., Inc.,* 170 A.D.2d 407, 566 N.Y.S.2d 295, 297 (N.Y. App. Div. 1991); *Feigen v. Advance Capital Mgmt. Corp.,* 150 A.D.2d 281, 541 N.Y.S.2d 797, 799 (N.Y. App. Div. 1989). In the context of a commercial contract, a fiduciary duty may nevertheless exists where the parties specifically agree to it or if "'one party's superior position or superior access to confidential information is so great as virtually to require the other party to repose trust and confidence in the first party.'" See, *Ross v. FSG PrivatAir Inc.,* 2004 U.S. Dist. LEXIS 16157, 2004 WL 1837366, *5 (S.D.N.Y. Aug. 17, 2004)* (quoting *Calvin Klein Trademark Trust v. Wachner,* 123 F. Supp.2d 731, 734-34 (S.D.N.Y. 2000). [*25] It is incumbent upon a plaintiff to plead some factors in the complaint from which it can be concluded that the parties had a fiduciary relationship. *Ross,* 2004 U.S. Dist. LEXIS 16157, 2004 WL 1837366, *6 (quoting *Boley v. Pineloch Assocs., Ltd.,* 700 F. Supp. 673, 681 (S.D.N.Y. 1988)).

The complaint is bereft of any allegations regarding a prior or existing relationship between the parties which might have given rise to a special relationship of trust and confidence. Rather, the parties' relationship was that of sophisticated businesspeople engaged in an arms-length commercial transaction. Moreover, the complaint fails to reveal that DuPont possessed any special expertise or knowledge, or that DuPont was the only party with access to vital information. The complaint merely indicates that the parties stood on equal footing throughout their negotiations, the execution of the Written Agreements, and their subsequent communications. Notwithstanding DDCLAB's contention to the contrary, a special or fiduciary duty is not imposed upon DuPont as a result of it becoming a minority shareholder in DDCLAB by virtue of the Investment Agreement. See, *Guandong Enters. (N. Am.) Fur Holdings Ltd. v. Hennessy,* 2002 U.S. Dist. LEXIS 8719, 2002 WL 1000953, *21 (S.D.N.Y. May 15, 2002)* [*26] (finding that no fiduciary relationship exists between two equal shareholders). Since DuPont did not owe any special or fiduciary duty to DDCLAB, outside of its contractual obligations set forth in the Written Agreements, the causes of action for negligent misrepresentation and breach of fiduciary duty must be dismissed.

## CONCLUSION

In light of the foregoing, defendant's motion to dismiss the complaint is granted, and the case is closed.

Dated: New York, New York

2005 U.S. Dist. LEXIS 2721, *

February 18, 2005

GEORGE B. DANIELS

SO ORDERED:

United States District Judge

LEXSEE 1990 U.S. DIST. LEXIS 16956

**SHERI WILSON-GRAY, Plaintiff, v. JAY FEINBERG LTD. and NORTON GARFINKLE, Defendants**

**No. 90 Civ. 0001 (MBM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1990 U.S. Dist. LEXIS 16956*

**December 17, 1990, Decided**

**COUNSEL:** [*1] Lee D. Unterman, Esq., Patricia L. Moore, Esq., Broudy & Jacobson, Attorneys for Plaintiff, New York, New York.

Samuel B. Mayer, Esq., Attorney for Defendant, New York, New York.

**JUDGES:** Michael B. Mukasey, United States District Judge.

**OPINION BY:** MUKASEY

**OPINION**

OPINION AND ORDER

Defendant Norton Garfinkle moves for summary judgment on the ground that the employment agreement upon which plaintiff sues was between plaintiff and defendant Jay Feinberg Ltd., not between plaintiff and Garfinkle personally. According to defendant Garfinkle, the written agreement and plaintiff's own deposition testimony reflect that plaintiff was employed by Jay Feinberg Ltd., not its chairman Norton Garfinkle, and that Garfinkle signed that written agreement only in his capacity as chairman of Jay Feinberg Ltd., not in his personal capacity. As set forth below, the record shows conclusively that Garfinkle is correct, and therefore his motion is granted.

I.

Under *Fed. R. Civ. P. 56(c)*, a trial judge must grant summary judgment if the evidence demonstrates that "there is no genuine issue as to any material fact and [that] the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc., 477* [*2] *U.S. 242, 250 (1986)*. In determining whether a genuine issue of material fact has been raised, a court must resolve all ambiguities and all reasonable inferences

against the moving party. *United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)* (per curiam), *cited in Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 57 (2d Cir. 1987)*.

The evidence includes a written employment agreement signed by plaintiff and by Garfinkle. This agreement is on Jay Feinberg Ltd. stationery and is signed "Norton Garfinkle, Chairman." Defendant points to the first paragraph, which reads: "We are delighted to have you join our company in an important executive capacity. This letter will serve to outline briefly the details of our agreement," as evidence of two facts: one, that the agreement was between plaintiff and the company (note the use of the words "we" and "our"), and two, that this document embodies the entire agreement between the parties.

Plaintiff's deposition testimony does not materially contradict the essentials of defendant's legal position. Thus, Wilson-Gray testified at her deposition that she understood from a conversation with an employment agent that she was [*3] applying for a job as president of Jay Feinberg Ltd. (Pl. Dep. at 22) When she first met with Garfinkle, the substance of the conversation revolved around his plans for Jay Feinberg Ltd. (Pl. Dep. at 24), as well as her qualifications to run it. She testified that once employment discussions began, she asked Garfinkle for a contract, and, reluctantly, he capitulated. (Pl. Dep. at 33) She testified that she had gotten the impression during her meetings with Garfinkle that it was conceivable that she would work for him as an individual. (Pl. Dep. at 36) She testified that she knew that she would be working for Jay Feinberg Ltd. (Pl. Dep. at 36-37) She testified that she asked Garfinkle specifically who she would be working for, and he replied that she would be working for him. When asked whether Garfinkle stated that she was to be working for him as an individual, rather than as someone associated with Jay

Feinberg Ltd., she replied "I don't think he discriminated between the two at this time." (Pl. Dep. at 38) She was shown a draft of the written agreement and testified that the only thing she requested be changed, after consulting with her attorney, was that her 1989 bonus be specified. [*4] (Pl. Dep. at 39-40)

However, plaintiff submits an affidavit on this motion which tells a somewhat different story. In her affidavit in opposition to this motion plaintiff states that when she first heard of the job through a head-hunter, she knew of Garfinkle and his personal reputation. It was her understanding after first talking to him that he would be "free to place [her] in a position at any one of a number of the companies owned or controlled by him, although my initial duties would involve [Jay Feinberg Ltd.]," (Pl. Aff. para. 2) and that is was not uncommon for someone on the payroll of one of his companies to be assigned to do work at one of the other companies he owned or controlled. More important for purposes of this motion, she states that during their discussions Garfinkle agreed that she would be employed by him personally. (Pl. Aff. para. 6) She also states that she initiated the request that "the more salient terms of our arrangement be confirmed in writing" and that her concern was that the writing confirm that her arrangement was with Garfinkle personally. (Pl. Aff. para. 7)

Factual assertions made by Wilson-Gray in her affidavit in support of the motion in opposition [*5] to the motion for summary judgment will be disregarded to the extent those assertions contradict statements previously made by her at a deposition. *Reisner v. General Motors Corp., 671 F.2d 91, 93 (2d Cir. 1982).*

II.

In New York, when a written contract seems on its face to be a definite and complete statement of the parties' agreement, parol evidence of antecedent oral agreements, negotiations, or understandings, is not admissible to vary or contradict the writing. *Marine Midland Bank-Southern v. Thurlow, 53 N.Y.2d 381, 442 N.Y.S.2d 417, 425 N.E.2d 805 (1981).*

Defendant has the burden to show that the written contract here is integrated -- that is, that it embodies the whole of the parties' agreement, *see Lee v. Joseph E. Seagram & Sons, Inc., 413 F.Supp. 693 (S.D.N.Y. 1976), aff'd, 552 F.2d 447 (2d Cir. 1977),* although in New York, "a contract which appears complete on its face is an integrated agreement as a matter of law." *Battery S.S. Corp. v. Refineria Panama, S.A., 513 F.2d 735, 738 n. 3 (2d Cir. 1975); Happy Dack Trading Co. v. Agro-Industries, Inc., 602 F.Supp. 986, 991 (S.D.N.Y. 1984).* Absent a merger clause, whether the writing [*6] is an integrated agreement is determined "'by reading the writ-

ing in the light of surrounding circumstances, and by determining whether or not the agreement was one which the parties would ordinarily be expected to embody in the writing.'" *Braten v. Bankers Trust Co., 60 N.Y.2d 155, 162, 468 N.Y.S.2d 861, 864, 456 N.E.2d 802, 805 (1983) (quoting Ball v. Grady, 267 N.Y. 470, 472, 196 N.E. 402 (1935)).*

Some factors used by New York courts to determine whether a written agreement is fully integrated include: whether the writing refers to the oral agreement, or whether the alleged oral agreement "is the sort of complex arrangement which is customarily reduced to writing," *Manufacturers Hanover Trust Co. v. Margolis, 115 A.D.2d 406, 407-08, 496 N.Y.S.2d 36, 37 (1st Dep't 1985);* whether the parties and their counsel negotiated during a lengthy period, resulting in a specially drawn and executed agreement, and whether the condition at issue is fundamental to the agreement, *Braten, 468 N.Y.S.2d at 864;* whether the writing contains wording like "'in consideration of the mutual promises herein contained, it is agreed and covenanted as follows,' and ends by stating [*7] that 'the foregoing correctly sets forth your understanding of our Agreement.'" *Joseph E. Seagram & Sons, 413 F.Supp. at 701;* whether the writing is typewritten, as opposed to a standard printed form, and whether it describes a complicated agreement. *Pecorella v. Greater Buffalo Press, Inc., 84 A.D.2d 950, 446 N.Y.S.2d 709 (4th Dep't 1981).*

In *Adler & Shaykin v. Wachner, 721 F.Supp. 472 (S.D.N.Y. 1988),* then-District Court Judge Walker found the following language indicated that a written agreement was meant to supersede any prior oral agreements: "'In view of the settlement provided in the Settlement Agreement, it is agreed as follows . . .' and 'Please confirm your agreement with the foregoing by signing and returning a copy of this letter . . .'" *Id. at 477.* Other factors which reinforced this interpretation included: the writing addressed a straightforward transaction, the parties were represented and aided by experienced counsel, and the alleged oral agreement was the "sort of complex arrangement customarily reduced to writing and which the parties would ordinarily be expected to embody in the writing." *Id. at 478.*

In *Namad v. Salomon Inc., [*8] 147 A.D.2d 385, 537 N.Y.S.2d 807 (1st Dep't 1989),* the Appellate Division found the following language in an employment contract sufficient to show that the parties intended the written document to contain all of their agreement: "'we wish to set forth our agreement for you continued employment by the Philipp Brothers organization,'" finding it unnecessary for the document to contain any "talismanic lawyers' phrases." *Id., 537 N.Y.S.2d at 809.*

1990 U.S. Dist. LEXIS 16956, *

The writing here is clearly an integrated document. As in *Adler & Shaykin* and *Namad,* the letter signed by plaintiff and Garfinkle contains language indicating that the writing is integrated: "This letter will serve to outline briefly the details of our agreement." Again as in *Adler & Shaykin,* plaintiff was represented by counsel who reviewed the letter agreement before plaintiff signed it. Given the importance plaintiff claims she attached to an agreement that she was employed by Garfinkle personally, the alleged oral agreement here is just the sort of agreement "which the parties would ordinarily be expected to embody in the writing." *Id., 721 F.Supp. at 478.* There is no allegation that plaintiff was presented with a standard [*9] form letter agreement; in fact, the evidence clearly indicates that the letter was created at the request of plaintiff specifically for plaintiff. *See Pecorella, 446 N.Y.S.2d at 709.*

III.

Of course, even if the written document is integrated, plaintiff could introduce evidence of a collateral oral agreement -- that is, an oral agreement related to the agreement that comprises the writing, though not related strongly enough that one would have expected its terms to be included in the writing itself. According to the Appellate Division in *Namad,* in order for evidence of an extrinsic oral agreement to be received to vary the terms of a written contract, three conditions must exist: "'(1)

the agreement must in form be a collateral one; (2) it must not contradict express or implied provisions of the written contract; (3) it must be one that parties would not ordinarily be expected to embody in the writing . . . It must not be so clearly connected with the principal transaction as to be part and parcel of it.'" *Id.* (quoting *Mitchill v. Lath, 247 N.Y. 377, 381, 160 N.E. 646 (1928)).*

Plaintiff asserts in her affidavit on this motion that she demanded a writing from Garfinkle [*10] and that her essential concern was that the writing reflect an agreement between plaintiff and Garfinkle. It is inconceivable that what she states to be the single most fundamental term, that her contract was with Garfinkle personally, would not be included within the four corners of the document, particularly since she was represented by counsel who reviewed the document.

It cannot be disputed on this evidence that the letter comprises the sum of the parties' agreement. Plaintiff is therefore barred from asserting any agreement between herself and Garfinkle personally.

* * * *

For the above reasons, defendant's motion for summary judgment dismissing plaintiff's claims against Norton Garfinkle personally is granted.

SO ORDERED:

LEXSEE 2006 U.S. DIST. LEXIS 78884

**MARIA ARIAS-ZEBALLOS, Plaintiff, v. DR. ANAMAH TAN, Defendant.**

**06 Civ. 1268 (GEL)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2006 U.S. Dist. LEXIS 78884*

**October 26, 2006, Decided**
**October 27, 2006, Filed**

**SUBSEQUENT HISTORY:** Request granted *Arias-Zeballos v. Tan, 2007 U.S. Dist. LEXIS 5068 (S.D.N.Y., Jan. 24, 2007)*

**PRIOR HISTORY:** *Zeballos v. Anamah Tan, 2006 U.S. Dist. LEXIS 46366 (S.D.N.Y., July 7, 2006)*

**COUNSEL:** [*1] Maria Arias-Zeballos, Pro se.

Betsy Lambert, New York, NY, for defendant. [1]

> 1    After all of the motions here at issue were fully briefed, the law firm of Proskauer Rose LLP was substituted as counsel of record for defendant Tan, in the place of Betsy Lambert.

**JUDGES:** GERARD E. LYNCH, United States District Judge.

**OPINION BY:** GERARD E. LYNCH

**OPINION**

**OPINION AND ORDER**

GERARD E. LYNCH, District Judge:

Defendant Anamah Tan moves to dismiss pro se plaintiff Maria Arias-Zeballos's complaint, which primarily alleges breach of an oral employment contract. In the alternative, defendant moves to strike portions of the complaint, and moves for a more definite statement pursuant to *Federal Rule of Civil Procedure 12(e)*. Plaintiff moves to dismiss defendant's counterclaims, and in the alternative for a more definite statement pursuant to *Rule 12(e)*. The motion to strike and both motions to dismiss will be granted in part and denied in part. Both motions for a more definite statement will be denied.

**BACKGROUND**

I. Plaintiff's Allegations

Plaintiff, a United States citizen residing in New York, filed a complaint in the Supreme Court [*2] of the County of New York on January 11, 2006, alleging primarily that defendant, a citizen of Singapore, had failed to compensate plaintiff in violation of an oral employment contract. According to the complaint, the parties agreed in 2003 that plaintiff would perform "two different and independent" jobs for defendant in exchange for a total annual salary of $ 60,000. (Complaint PP 12, 14, 15.) The first job was to assist defendant in her work as President of the International Council of Women (ICW); the second was to assist defendant in her campaign to be elected to a United Nations committee working on issues related to the Convention on the Elimination of All Forms of Discrimination Against Women ("CEDAW"), and to serve as defendant's assistant after she was elected. (Id. PP 6, 9, 14, 16, 22, 61, 68.) Plaintiff's responsibilities for both jobs included drafting defendant's speeches and conducting research related to the activities of the ICW and the CEDAW committee. (See, e.g., id. PP 63, 75.)

In September of 2003, plaintiff claims, defendant informed her that although she remained committed to paying plaintiff at a rate of at least $ 60,000 per year, she lacked the funds [*3] to begin payment at that rate immediately. Defendant explained that she would pay plaintiff at a rate of $ 2,500 per month, or $ 30,000 per year, with funds from a Singaporean government entity; the second half of the $ 60,000 salary promised to plaintiff would not be withheld altogether, but merely deferred until defendant secured additional funding from another source, which was expected to occur in 2004. Plaintiff accepted defendant's offer. (Id. PP 15, 67-68.)

After meeting with officials of the Singapore government in October 2003 to discuss her employment, plaintiff signed a written employment contract with defendant in November 2003 pursuant to which she agreed to assist with defendant's CEDAW-related work in exchange for a salary of $ 2,500 per month. (Id. P 69, Ex. A.) The contract, which is annexed to the complaint, contains a description of responsibilities plaintiff would carry out in order to "assist Dr. Tan in her CEDAW campaign through the non-governmental channel." (Id.) Though at least one sentence in the contract requires plaintiff to perform ICW-related tasks, plaintiff claims that that sentence was deleted at her insistence after the contract was signed [*4] (id. P 69), and that both parties understood the contract to encompass their agreement only with respect to CEDAW-related work. The ICW-related work was to be governed separately by the parties' prior oral agreement, pursuant to which defendant had agreed to pay plaintiff an additional $ 30,000. (Id. PP 15, 61, 68-69.)

The parties' relationship began to deteriorate in early July 2005, when plaintiff claims she overheard defendant screaming over the phone about defendant's domestic employees in Singapore. (Id. P 83.) When plaintiff objected to what she perceived to be defendant's "discriminatory and inhumane" treatment of the employee (id. P 84), defendant allegedly retaliated against plaintiff by threatening to terminate her job and by carrying out, during the following days, "a series of malicious, intentional[] actions" against plaintiff, "creating a very negative work environment" (id. P 85). The tension between the parties culminated in a confrontation at a CEDAW meeting on July 15, 2005; according to the complaint, defendant became angry and screamed at plaintiff in the middle of the session, causing plaintiff great humiliation. (Id. PP 88-89.)

[*5] After the July 15 confrontation, plaintiff concluded that defendant was purposefully making it impossible for plaintiff to do her job, and that defendant had no intention to pay her the additional compensation she had promised. After consulting with the office of legal counsel at the United Nations ("UN") about the matter, she submitted a letter to the members of the CEDAW committee, detailing defendant's mistreatment of plaintiff and other employees. (Id. P 91.) Plaintiff stopped performing any work for defendant, but attempted, at first with the assistance of counsel, to secure the compensation she was allegedly owed. (Id. PP 92-93.) When her efforts failed, she filed suit, alleging breach of contract, discrimination, retaliation and defamation.

## II. Defendant's Allegations

Defendant disputes plaintiff's characterization of the events, and claims that the written contract signed by the

parties in 2003 encompassed the entirety of their agreement. [2] From September 2003 to July 2005, defendant contends, plaintiff never asked for more than the $ 2,500 per month salary. (Id. P 25.)

> 2 Defense counsel states in a reply affirmation that the ICW-related work did not form part of the parties' agreement, and that plaintiff was simply an ICW volunteer who was never promised compensation for that work. (Lambert Reply to Affidavit in Opp. to D. Mot. to Dismiss and Strike ("Lambert Reply") P 42.) In her Partial Answer, however, defendant suggests that the written agreement between the parties encompassed both CEDAW and ICW work. (Partial Answer P 23.)

[*6] Defendant also asserts counterclaims against plaintiff, alleging that the letter plaintiff delivered to members of the CEDAW committee in July 2005 contained "false and severely defamatory statements" about defendant and her work. (Partial Answer P 27.) Plaintiff also allegedly made defamatory oral statements to UN personnel, and sent a letter containing defamatory statements to Singapore's UN ambassador. (Id. PP 35, 37.) In addition to her defamation claims, defendant asserts counterclaims for intentional infliction of emotional distress, prima facie tort, and "breach of contractual fiduciary duty." (Id. P 59 et seq.)

## III. Procedural History

After plaintiff filed her complaint in state court, defendant removed the case to this Court, asserting diversity of citizenship. Defendant then moved to dismiss and to strike, and plaintiff moved to remand. [3] While the motions were pending, defendant filed her counterclaims against plaintiff, and plaintiff moved to dismiss those claims.

> 3 After defendant's motion to dismiss and to strike was fully briefed, plaintiff submitted a sur-reply in opposition to defendant's motion. Defendant objected to the submission of the additional papers. Because the Court would reach the same conclusion on the motion to dismiss and to strike regardless of whether the sur-reply is taken into consideration, the Court need not resolve whether it was properly submitted.

[*7] Finding that plaintiff had failed to effect proper service under New York law, this Court denied all of the pending motions, quashed the improper service, and granted plaintiff additional time to effect proper service. *Zeballos v. Anamah Tan, 2006 U.S. Dist. LEXIS 46366, 06 Civ. 1268 (GEL), 2006 WL 1975995, at *7 (S.D.N.Y. July 10, 2006).* The Court's Opinion and Order

advised the parties that the counterclaims and both motions to dismiss, as well as the motion to strike, could be re-submitted to the Court after plaintiff had effected service, or after defendant had waived her service objection. Id. Defendant filed a waiver of her service objection on July 14, 2006, and re-asserted her counterclaims. Both parties sent letters re-instating their prior motions. Though the Court's July 10, 2006, Opinion and Order provided that the parties could submit additional briefing if they requested and received permission from the Court, neither party sought permission to do so.

After receiving notice that the parties were willing to attempt to settle at least some of their claims, the Court referred the matter to Magistrate Judge Kevin F. Fox for a settlement conference. The conference, which took place on [*8] August 22, 2006, was unsuccessful.

## DISCUSSION

Resolution of the pending motions has been complicated and delayed in part by both parties' inclusion of lengthy, irrelevant and redundant arguments and exhibits in their submissions to the Court. The Court's resolution of the issues pending before it has not been aided by the excessive repetition of factual allegations appearing in the complaint; nor does the inclusion of ad hominem attacks enhance the persuasiveness of the parties' arguments.

Much of the problem has been the parties' failure to understand the standard on a motion to dismiss for failure to state a claim. When considering such a motion, the Court must accept as true all of the non-moving party's factual allegations and draw all reasonable inferences in the non-moving party's favor. *Oteze Fowlkes v. Adamec, 432 F.3d 90, 95 (2d Cir. 2005).* The claims (or counterclaims) may be dismissed only if it appears beyond doubt that the party asserting them can prove no set of facts in support of her claim which would entitle her to relief. Id. Similarly, in the absence of an evidentiary hearing on a motion to dismiss for lack of personal jurisdiction, [*9] the Court accepts as true all of the non-movant's "averments of jurisdictional facts." *In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 206 (2d Cir. 2003).*

Thus, a party may not defeat a motion to dismiss merely by repetitious insistence that her factual allegations are true and that her adversary's account is false. Similarly, affidavits from third parties to support or deny facts alleged in the complaint cannot affect the Court's disposition of a motion to dismiss for failure to state a claim. The truth of competing accounts of the facts can only be determined at trial. [4] At this stage, the Court must accept the truth of the factual allegations in the pleadings asserting claims, regardless of whether either party proffers affidavits or other evidence.

4   Some portions of plaintiff's submissions suggest an erroneous belief that the Court may grant her final relief on her causes of action at this stage. (See, e.g., Affidavit in Opp. to D. Mot. to Dismiss at 26.) This is incorrect. Though the Court denies in part defendant's motion to dismiss, plaintiff still bears the burden of producing evidence to support the surviving claims, and defendant still has an opportunity to produce evidence in her defense. Absent a settlement or default judgment, plaintiff may not be granted relief unless she prevails at the summary judgment stage or at trial.

[*10] The Court is aware that plaintiff is proceeding without a lawyer. Even a pro se plaintiff, however, must make some effort to ascertain what is relevant at a given stage of the proceedings. At a minimum, litigants, including pro se litigants, must refrain from excessive repetition and irrelevant, ad hominem attacks on their adversaries. All parties, moreover, must comply with the Court's Individual Rules. These Rules are available at http://www.nysd.uscourts.gov/Individual_Practices/Lynch.pdf. Both parties have violated those rules here by submitting excessively long motion papers. [5]

5   Parties may not circumvent these rules by attaching affidavits to their memoranda of law, particularly where the affidavits contain extensive legal arguments.

## II. Defendant's Motion to Dismiss

### A. Personal Jurisdiction

"In a diversity case a federal court may exercise personal jurisdiction over a party in accordance with the law of the forum state." *Koehler v. Bank of Bermuda Ltd., 101 F.3d 863, 865 (2d Cir. 1996);* [*11] see *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 124 (2d Cir. 2002).* Thus, to determine whether personal jurisdiction over defendant exists here, the court must first determine whether New York law would confer jurisdiction to reach the defendant on the New York state courts. Id. If jurisdiction would exist under New York law, the Court must proceed to consider whether New York's exercise of jurisdiction would be permissible under the *Due Process Clause.* Id.

The plaintiff carries the burden of demonstrating that the court may exercise jurisdiction over the defendant. *DiStefano v. Carozzi N. Am., Inc., 286 F.3d 81, 84 (2d Cir. 2001); CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 364 (2d Cir. 1986).* However, where, as here, a "court chooses to rely on pleadings and affidavits" rather than conduct an evidentiary hearing, "the plaintiff need

only make a *prima facie* showing of personal jurisdiction over defendant." Id.; see *DiStefano, 286 F.3d at 84*. This requires "an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction [*12] over the defendant." *Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996)* (alteration in original) (citation and internal quotation marks omitted); see *Holey Soles Holdings, Ltd. v. Foam Creations, Inc., 2006 U.S. Dist. LEXIS 25880, 05 Civ. 6893 (MBM), 2006 WL 1147963, at *3 (S.D.N.Y. May 1, 2006)*. In the absence of an evidentiary hearing, the pleadings "are construed in the light most favorable to the plaintiff." Id.

New York Civil Practice Law and Rules § 302 provides that "[a]s to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary [who] transacts any business within the state or contracts anywhere to supply goods or services in the state." *N.Y.C.P.L.R. § 302(a)(1)*. The transacting-business element is satisfied where a defendant has "purposely availed [himself or herself] of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws." *D.H. Blair & Co., Inc. v. Gottdiener, 462 F.3d 95, 104 (2d Cir. 2006)* (citation and internal [*13] quotation marks omitted).

To determine whether the exercise of personal jurisdiction comports with due process, the Court first asks whether defendant "has certain minimum contacts [with the forum] . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Bank Brussels Lambert, 305 F.3d at 127* (alterations in original) (citation and internal quotation marks omitted). If plaintiff's claims relate to defendant's contacts with New York, "minimum contacts" exist if defendant "purposefully availed [herself] of the privilege of doing business in [New York] and could foresee being haled into court [here]." Id. (citation and internal quotation marks omitted). The second part of the due process analysis asks whether the assertion of jurisdiction "is reasonable under the circumstances of the particular case." *Id. at 129* (citation and internal quotation marks omitted).

Here, the exercise of jurisdiction over defendant clearly comports with § 302(a)(1) and with the *Due Process Clause*. Defendant acknowledges that she hired plaintiff in connection, at a minimum, with defendant's CEDAW committee [*14] activities, and that these activities required regular, extensive stays in New York. (D. Affidavit in Opp. to P. Mot. to Remand PP 1-2, 4; see also Partial Answer PP 20-23.) The written contract, moreover, explicitly contemplates that plaintiff would assist defendant with professional activities that defendant would carry out in New York. (See, e.g., Complaint

Ex. A, Annex A (requiring plaintiff to "work out the budget needed to organise the tea or luncheon meetings where [defendant] will speak in New York").) According to the complaint, the parties worked together frequently on ICW and CEDAW matters at New York locations during plaintiff's employment, including the United Nations and a Manhattan apartment owned by defendant. (See, e.g., Complaint PP 83, 88-89; see also Affidavit in Opp. to D. Mot. to Dismiss at 17.) In view of these undisputed facts and detailed allegations, defendant's objections to the court's exercise of personal jurisdiction are entirely without merit.

B. Failure to Comply with Federal *Rule 8(a)(2)*

*Federal Rule of Civil Procedure 8(a)(2)* requires that the plaintiff's complaint provide "a short [*15] and plain statement of the claim showing that the pleader is entitled to relief." Defendant asks the Court to dismiss the complaint for failure to comply with this requirement.

Dismissal based on failure to comply with *Rule 8(a)(2)* "is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988)*; see also *Wynder v. McMahon, 360 F.3d 73, 80 (2d Cir. 2004)*. That is not the case here. Though plaintiff's complaint, consisting of twenty five single-spaced pages plus exhibits, is unnecessarily long and repetitive in light of the nature of her claims, the true substance of the allegations is sufficiently clear, and defendant's "ability to understand or to mount a defense" is not so "overwhelm[ed]" as to warrant dismissal. Id. Accordingly, the motion to dismiss for failure to comply with *Rule 8(a)(2)* is denied. [6]

> 6    Defendant also makes passing references to the formalities required by Federal *Rules 10* and *11*. The motion to dismiss for the purported violation of those Rules is denied.

[*16] C. Discrimination and Retaliation

Reading the complaint liberally, the only act of illegal discrimination alleged is defendant's mistreatment of her maids in Singapore on the basis of their race or national origin, as well as retaliation against plaintiff in New York for protesting the allegedly discriminatory treatment. Defendant is correct that plaintiff's failure to exhaust her administrative remedies dooms her discrimination and retaliation claim under Title VII of the Civil Rights Act. See *Williams v. New York City Hous. Auth., 458 F.3d 67, 70 (2d Cir. 2006)*.

Liberally construed, however, plaintiff's complaint may also be read as asserting claims under *42 U.S.C. §*

2006 U.S. Dist. LEXIS 78884, *

*1981* and the New York Human Rights Law ("NYHRL"), neither of which contain an administrative exhaustion requirement. See *Lumhoo v. Home Depot USA, Inc.,* 229 F. Supp. 2d 121, 136 n.12 (E.D.N.Y. 2002); *Oteri-Harkins v. City of New York,* 1998 U.S. Dist. LEXIS 21876, 97-CV-2309 (JG), 1998 WL 817689, at *6 (E.D.N.Y. Feb. 5, 1998); *Gilani v. NASD,* 1997 U.S. Dist. LEXIS 12287, 96 Civ. 8070 (SS), 1997 WL 473383, at *10 (S.D.N.Y. Aug. 19, 1997); see [*17] also *McEachin v. McGuinnis,* 357 F.3d 197, 199 n.2 (2d Cir. 2004) ("It is well-established that the failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim. Factual allegations alone are what matters." (citation and internal quotation marks omitted)).

The *§ 1981* claim must nevertheless be dismissed, however, because *§ 1981* does not apply extraterritorially to protect defendant's foreign employees in Singapore. See, e.g., *Ofori-Tenkorang v. Am. Int'l Group, Inc.,* 460 F.3d 296, 303-06 (2d Cir. 2006) (holding that *42 U.S.C. § 1981* does not apply extraterritorially). For similar reasons, plaintiff's Title VII claim would be barred even if she had exhausted her administrative remedies. See *Torrico v. IBM Corp.,* 213 F. Supp. 2d 390, 399 (S.D.N.Y. 2002) (noting that Title VII applies to United States citizens working abroad for United States employers, but not foreign citizens working abroad, even if they work for United States employers). Though plaintiff alleges that defendant retaliated against her -- a United States citizen living and working in [*18] the United States -- for objecting to the discrimination abroad, discriminatory retaliation is only prohibited by Title VII and *§ 1981* where the underlying conduct to which a plaintiff objects is itself prohibited, or where the plaintiff has a good faith, *reasonable* belief that the conduct is prohibited. See, e.g., *Hawkins v. 1115 Legal Serv. Care,* 163 F.3d 684, 693 (2d Cir. 1998); *Kauffman v. Maxim Healthcare Servs.,* 2006 U.S. Dist. LEXIS 47514, 04 Civ. 2869 (TCP), 2006 WL 1983196, at *5 (S.D.N.Y. July 13, 2006); *Ayton v. Lenox Hill Hosp.,* 1997 U.S. Dist. LEXIS 122, 93 Civ. 6601 (BSJ), 1997 WL 10000, at *4 (S.D.N.Y. Jan 10, 1997). That is not the case here.

Any claim under the NYHRL also must fail. While that statute may prohibit discriminatory conduct taking place in New York even where the victim of the discrimination works abroad, see *Torrico,* 213 F. Supp. 2d at 407 n.11, defendant's alleged discrimination against her domestic employees in the instant case involved discriminatory policies that were created and carried out in Singapore. Though defendant is alleged to have made phone calls from New York to punish her maids for violating the discriminatory policy [*19] defendant established in Singapore, the phone calls do not, considering all the circumstances, create a sufficient connection to

New York to bring the discrimination against the maids within the purview of the NYHRL. [7] Plaintiff's retaliation claim fails because it would not have been reasonable for her to believe that New York state discrimination law governed defendant's employment relationship with the maids at her home in Singapore. See *Butler v. Raytel Med. Corp.,* 2004 U.S. Dist. LEXIS 26023, 98 CV 6446 (SJ), 2004 WL 1961522, at *2 (E.D.N.Y. Aug. 24, 2004).

> 7  *Torrico v. IBM Corp.,* 213 F. Supp. 2d 390 (S.D.N.Y. 2002), and *Torrico v. IBM Corp.,* 319 F. Supp. 2d 390 (S.D.N.Y. 2004), are not to the contrary. Torrico involved allegations that New York based employees of a New York corporation had taken discriminatory actions in New York against an employee of the corporation who had been sent from New York to work on an assignment abroad. See, e.g., *id. at 399.* The underlying alleged discrimination in the instant case, in contrast, involves Singapore-based household employees of an individual citizen of Singapore, whose employment does not have the slightest connection to New York and whose employer's limited connections to New York are entirely unrelated to her employment of the alleged victims of discrimination in Singapore. There is no credible argument that the NYHRL governs the employment relationship between a Singapore citizen and domiciliary and her domestic employees in Singapore.

[*20] D. Parol Evidence Rule

Defendant argues that any claims based on the alleged oral contract should be dismissed pursuant to the parol evidence rule, which bars "all evidence of prior or contemporaneous negotiations or agreements offered to modify or contradict the provisions" of an integrated written contract between the parties. *Point Developers, Inc. v. FDIC,* 921 F. Supp. 1014, 1019 (E.D.N.Y. 1996); see also *Greenfield v. Philles Records, Inc.,* 98 N.Y.2d 562, 780 N.E.2d 166, 170, 750 N.Y.S.2d 565 (N.Y. 2002) ("[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."). Accepting plaintiff's allegations as true and drawing all reasonable inferences in plaintiff's favor, the Court finds that the parol evidence rule does not bar the oral contract claim.

The parol evidence rule only applies where the written agreement is complete and "integrated," that is, where the agreement is "one which represents the entire understanding of the parties to the transaction." *Morgan Stanley High Yield Sec. v. Seven Circle Gaming Corp.,* 269 F. Supp. 2d 206, 213-14 (S.D.N.Y. 2003). [*21] Here, however, it is difficult to accept defendant's argu-

2006 U.S. Dist. LEXIS 78884, *

ment that the written contract was integrated, because defendant has implicitly conceded that the parties' employment relationship extended beyond the narrow terms of the written agreement. Specifically, defendant argues that the "one contract" into which the parties entered governed their relationship for two years (Lambert Reply P 39), despite the fact that the written contract on which she relies was explicitly limited to only *one year* of employment. (See Complaint Ex. A. (providing that the contract would be in effect only from "1 September 2003 to 15 August 2004").)

The parol evidence rule is also limited to contract provisions that are unambiguous. See *Wayland Inv. Fund, LLC v. Millenium Seacarriers, Inc., 111 F. Supp. 2d 450, 454 (S.D.N.Y. 2000)* ("If the terms are ambiguous or contradictory, . . . the rule permits the consideration of [parol] evidence . . . to ascertain the true meaning of the terms.") Here, defendant's own submissions to the Court suggest that the written contract contains fundamental ambiguities going to the heart of the parties' dispute. For example, though the affidavit [*22] submitted by defense counsel in support of the Motion to Dismiss and to Strike avers that "there was a written contract in place that specifically anticipates . . . that plaintiff pro se will do work that involves the UN-CEDAW committee and ICW work" (Lambert Affidavit in Support of Mot. to Dismiss and to Strike ("Lambert Affidavit") P 2), a reply affidavit submitted by the same attorney states that plaintiff's ICW-related work "was always voluntary and neither the Defendant nor anyone representing her ever agreed to compensate the Plaintiff pro se for work for that charitable organization." (Lambert Reply P 42.)

Even assuming these inconsistencies could be explained or disregarded, however, the Court still could not find the written contract to be integrated as a matter of law. Where, as here, the parties' written agreement does not contain a merger clause, the court determines whether the agreement is integrated "'by reading the writing in the light of surrounding circumstances, and by determining whether or not the agreement was one which the parties would ordinarily be expected to embody in the writing.'" Id., quoting *Braten v. Bankers Trust Co., 60 N.Y.2d 155, 456 N.E.2d 802, 804, 468 N.Y.S.2d 861 (1983)* [*23] (additional citation omitted); see *Myskina v. Conde Nast Publ'ns., Inc, 386 F. Supp. 2d 409, 415-16 (S.D.N.Y. 2005); Wayland Inv. Fund, LLC, 111 F. Supp. 2d at 454.* Factors to consider in deciding whether a contract is integrated include:

> whether the document in question refers to the oral agreement, or whether the alleged oral agreement between the parties is the sort of complex arrangement which is customarily reduced to writing; whether the parties were represented by experienced counsel when they entered into the agreement; whether the parties and their counsel negotiated during a lengthy period, resulting in a specially drawn out and executed agreement, and whether the condition at issue is fundamental; if the contract, which does not include the standard integration clause, nonetheless contains wording like "in consideration of the mutual promises herein contained, it is agreed and covenanted as follows," and ends by stating that "the foregoing correctly sets forth your understanding of our Agreement."

*Morgan Stanley High Yield Sec., 269 F. Supp. 2d at 214* (citations omitted); see *Adler & Shaykin v. Wachner, 721 F. Supp. 472, 477 (S.D.N.Y. 1988).* [*24]

These factors are highly fact-dependent, and at this stage the Court must view the facts in the light most favorable to the plaintiff. In that light, the relevant factors support the conclusion that the written contract in the instant case is not a complete, integrated agreement. On the facts alleged by plaintiff, there is nothing complex about the alleged oral contract; plaintiff was not represented by counsel when she entered the written agreement; the parties did not produce a "drawn out" agreement after a lengthy negotiation period; the alleged condition at issue -- payment for plaintiff's ICW-related work for defendant -- is not in any way "fundamental" to the CEDAW work explicitly governed by the written contract; and there is no language in the contract that remotely resembles a merger clause or that otherwise suggests that the contract is integrated.

Moreover, even if the written contract were fully integrated, plaintiff's oral contract claim could survive under the "collateral agreement" exception to the parol evidence rule. This exception allows consideration of an oral agreement extrinsic to an integrated agreement where the oral agreement is (1) a collateral agreement [*25] which (2) does "not contradict express or implied provisions of the written contract," and (3) which is not a contract that "parties would . . . ordinarily be expected to embody in the writing"; that is, "it must not be so clearly connected with the principal transaction as to be part and parcel of it." *Dujardin v. Liberty Media Corp., 359 F. Supp. 2d 337, 356 (S.D.N.Y. 2005)* (citations and internal quotation marks omitted); see *Myskina, 386 F. Supp. 2d at 416; Mitchill v. Lath, 247 N.Y. 377, 160 N.E. 646, 647 (N.Y. 1928); Namad v. Salomon Inc., 147 A.D.2d 385, 387, 537 N.Y.S.2d 807 (1st Dep't 1989);* see also *DDCLAB Ltd. v. E.I. du Pont de Nemours & Co., 2005*

U.S. Dist. LEXIS 2721, 03 CV 3654 (GBD), 2005 WL 425495, at *5 (S.D.N.Y. Feb. 18, 2005) ("[T]wo entirely separate contracts, each based on independent consideration, may be made at the same time and be entirely distinct legally." (citation and internal quotation marks omitted)). Accepting as true plaintiff's allegations and drawing all reasonable inferences in plaintiff's favor, the oral contract alleged to exist here could satisfy these conditions, given that it governs a set [*26] of responsibilities that are distinct from plaintiff's CEDAW-related work and does not contradict any provision of the written agreement. Moreover, because plaintiff's compensation for ICW-related work, according to the complaint, was not to be funded by the same source that paid for plaintiff's CEDAW-related work, one would not necessarily expect that the CEDAW-related contract would embody plaintiff's ICW-related responsibilities. [8]

8 Though the Court need not analyze the issue here, it is also possible that the parol evidence rule is rendered inapplicable, in whole or in part, by the fact that, according to the complaint, defendant repeatedly promised plaintiff, *after* the written contract was signed, that defendant would pay her additional compensation in consideration for plaintiff's continued work on ICW-related projects. (E.g., Complaint P 78); see *Backer v. Lewit*, 180 A.D.2d 134, 138, 584 N.Y.S.2d 480 (1st Dep't 1992) ("[T]he parol evidence rule has no application to a subsequent agreement or subsequent oral modification of a written contract which is supported by new consideration." (citations omitted)).

[*27] E. Defamation

Though defendant asks the Court to dismiss all of plaintiff's claims, she does not address any of her arguments to plaintiff's claim for defamation, except to say that the allegations of defamation are untrue. (See, e.g., Lambert Reply P 23.) Accordingly, to the extent defendant moves to dismiss that claim, the motion is denied.

II. Defendant's Motion to Strike and Motion for a More Definite Statement

A. Motion to Strike

Defendant moves to strike a large portion of plaintiff's complaint, arguing that many of the allegations are redundant, immaterial, and/or scandalous. Though *Federal Rule of Civil Procedure 12(f)* permits the Court to strike portions of a complaint for these reasons, motions to strike are "generally disfavored." *Slue v. N.Y. Univ. Med. Ctr.*, 409 F. Supp. 2d 349, 374 (S.D.N.Y. 2006) (citation and internal quotation marks omitted); see also

*Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) ("[C]ourts should not tamper with the pleadings unless there is a strong reason for so doing."). A defendant moving to strike portions of a complaint must "'state [*28] with particularity'" the grounds for her motion and "'set forth the nature of relief or type of order sought.'" *Kutzler v. Thor Indus.*, 2003 U.S. Dist. LEXIS 11886, 03 C 2389, 2003 WL 21654260, at *3 (N.D. Ill. July 14, 2003), quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1380 (2d ed. 1990); see *Fed. R. Civ. P. 7(b)* ("An application to the court for an order shall be by motion which, unless made during a hearing or trial, . . . shall state with particularity the grounds therefor, and shall set forth the relief or order sought."); see also *Crawford by Jefferson v. School Dist.*, 1998 U.S. Dist. LEXIS 8064, 98-1851, 1998 WL 288288, at *2 (E.D. Pa. 1998) ("Motions to strike . . . will only be granted when the movant clearly show[s] that the challenged matter has no bearing on the subject matter of the litigation and that its inclusion will prejudice the defendants." (second alteration in original) (citation and internal quotation marks omitted)); cf. *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 579 (2d Cir. 1969) ("[T]he motion to strike was much too general in that it did not specify [*29] which parts of the . . . affidavit should be stricken and why. . . . [T]he motion to strike must be precise."). For the most part, defendant has failed to meet that burden here.

1. Motion to Strike for Immateriality and Redundancy

While plaintiff's complaint is certainly repetitive, defendant's papers in support of her motion to strike suffer from the same flaw, and provide no meaningless guidance that could help the Court determine which paragraphs of the complaint are appropriate to eliminate as redundant or immaterial. An affidavit submitted by defense counsel, for example, asks the Court to strike *all* paragraphs in the complaint as redundant and immaterial except paragraphs 1 through 5. (Lambert Affidavit P 16.) Granting such a request would require the Court to strike all paragraphs describing plaintiff's causes of action, as well as the paragraphs containing plaintiff's relatively short prayer for relief. The only paragraphs remaining would be a few short paragraphs with information regarding the parties' residence, citizenship and places of business; one paragraph identifying defense counsel; and one paragraph suggesting that the parties entered into a contract. (Complaint [*30] PP 1-5.) Clearly, this is not the only information relevant to plaintiff's claims.

Such a sweeping, indiscriminate motion to strike, without any explanation as to how or why the targeted paragraphs are immaterial or redundant, does not contain the requisite "particularity" or otherwise "clearly" show that an order to strike is warranted. Cf. *Perma Research*

*and Dev. Co, 410 F.3d at 579* ("[P]laintiff was required to do more than swing its bludgeon wildly. . . . [T]he motion to strike must be precise."). Moreover, because it seeks to strike virtually the entire complaint, defendant's motion to strike is effectively indistinguishable from her motion to dismiss for violation of *Rule 8(a)(2)*, which the Court has already denied. Accordingly, the motion to strike for immateriality and redundancy is denied.

### 2. Motion to Strike Scandalous Information

Defendant's motion to strike "scandalous" materials from the complaint is slightly more focused. Rather than citing almost the entire complaint, defendant identifies specific allegations she considers improper. She argues, for example, that the complaint improperly refers to (1) defendant's personal wealth, (2) the amount [*31] defendant paid for an apartment, and (3) the fact that defendant hired a personal trainer. (Lambert Affidavit P 17.) With respect to the payment defendant allegedly made for an apartment and the allegation that defendant hired a personal trainer, the motion to strike will be granted. These allegations regarding defendant's personal affairs have no conceivable relationship to the merits of any of the claims or counterclaims.

In all other respects, the motion to strike scandalous allegations is denied. Though general allegations regarding defendant's wealth are not pertinent to plaintiff's claims, they are relevant to defendant's counterclaims. Indeed, in support of her counterclaims, defendant has herself submitted to the court statements made by plaintiff regarding defendant's wealth; defendant claims that the statements are "defamatory in nature." (Partial Answer PP 27-28.) By incorporating these statements into her counterclaims, defendant forfeits any argument that identical statements in plaintiff's submissions must be stricken from the record.

Defendant also claims that paragraphs 3, 4, 8, 12, 13, 15, 23-27, 30, 31, 33-56, 68, 69, and 71-94 of the complaint should be stricken [*32] as scandalous. It is impossible to make sense of this claim, as the cited paragraphs include numerous factual allegations and requests for relief that could not be considered scandalous or otherwise prejudicial under any reasonable standard; the cited paragraphs also include information that defendant herself has provided to the Court. (Compare, e.g., Complaint P 3 (providing defense counsel's name and address), with D. Mot. to Dismiss and to Strike at 1 (same).) The request to strike such statements is frivolous.

Accordingly, except to the extent that the complaint refers to defendant's personal trainer or the amount she paid for her apartment, defendant's motion to strike the complaint's allegations as "scandalous" is denied.

### B. Motion for a More Definite Statement

Where "a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading," *Federal Rule of Civil Procedure 12(e)* allows the party to "move for a more definite statement before interposing a responsive pleading." *Fed. R. Civ. P. 12(e)*. A motion [*33] under *Rule 12(e)* must "point out the defects complained of and the details desired." Id.

Defendant moves for a more definite statement under *Rule 12(e)*, arguing that paragraphs 6 through 56 of the complaint are vague and ambiguous. (Lambert Affidavit P 14). Defendant makes no effort, however, to "point out . . . the details desired." *Fed. R. Civ. P. 12(e)*. Accordingly, the motion is denied.

Defendant's *Rule 12(e)* motion is in any event in large part frivolous. The vast majority of the paragraphs she labels vague and ambiguous cannot be considered the slightest bit vague or ambiguous under any reasonable standard. For example, the cited paragraphs of the complaint include paragraphs specifying the amount of damages that plaintiff seeks for particular causes of action (Complaint PP 32, 36, 45, 56); paragraphs succinctly and clearly describing plaintiff's understanding of the parties' written contract (id. PP 19-22); and a paragraph stating, correctly, that the contract is attached as "Exhibit A" (id. P 17). Because the argument that such allegations are vague and ambiguous lacks any rational foundation, the Court cannot help but conclude [*34] that defendant's *Rule 12(e)* motion is the product of either extreme carelessness or a concerted effort to cause delay.

### III. Plaintiff's Motion to Dismiss Counterclaims [9]

> 9   As discovery has barely begun, the Court denies plaintiff's request that it treat the Motion to Dismiss the Counterclaims as a motion for summary judgment. (7/25/06 Arias-Zeballos Letter at 1.)

Plaintiff's Affirmation in Support of the Motion to Dismiss the Counterclaims contains few arguments that are pertinent to the motion to dismiss, consisting instead of irrelevant attacks on defendant's character and unnecessary repetition of factual allegations plaintiff has elaborated elsewhere. Plaintiff also vigorously disputes the truth of defendant's allegations at length; such arguments are misplaced, however, because in considering the motion to dismiss, the Court must accept defendant's allegations as true. See *Oteze Fowlkes v. Adamec, 432 F.3d 90, 95 (2d Cir. 2005)*. Nevertheless, plaintiff's motion to dismiss will be [*35] granted with respect to two of the counterclaims, as those claims are meritless on their face.

### A. Motion to Dismiss the Defamation Claim

Even assuming that, as plaintiff's motion to dismiss suggests, the stringent requirements applicable to defamation claims brought by public figures would apply to defendant's defamation counterclaim, that counterclaim survives.

A public figure claiming defamation must prove that defamatory statements were made about her; that the statements would likely be understood as defamatory by an ordinary person; that the statements were false; and that plaintiff published the statements with actual malice, that is, with either knowledge of their falsity or reckless disregard of the truth. *Church of Scientology Int'l v. Behar, 238 F.3d 168, 173 (2d Cir. 2001).* [10] Defendant's Partial Answer adequately alleges facts which, if true, support a defamation claim under this standard.

> [10] Because the alleged defamatory statements involved defendant's profession, she need not allege special damages to prevail on her defamation claim. See *Slue, 409 F. Supp. 2d at 368,* citing *Wadsworth v. Beaudet, 267 A.D.2d 727, 701 N.Y.S.2d 145 (3d Dep't 1999).*

[*36] None of plaintiff's arguments compels a different conclusion. Though plaintiff insists that the statements she made were true and made in good faith, these are factual contentions that can only be resolved at trial; for purposes of the instant motion, the Court must accept as true the allegations of the counterclaimant. After discovery, plaintiff will have ample opportunity to argue on summary judgment or at trial that the evidence demonstrates that her statements about defendant were true, and/or that they were privileged statements made in good faith.

Plaintiff also suggests that the alleged defamatory statements were mere expressions of her opinion. Though statements of pure opinion are not actionable under New York law, see *Qureshi v. St. Barnabas Hosp. Ctr., 430 F. Supp. 2d 279, 288 (S.D.N.Y. 2006),* most of the statements alleged to be defamatory here were clearly statements of fact. See also *Slue, 409 F. Supp. 2d at 370.* Other statements alleged to be defamatory here were statements of "mixed opinion, which are actionable if they imply that they are based upon facts which justify the opinion but are unknown to those reading or hearing it. [*37] " *Id.* (alterations, citation, and internal quotation marks omitted).

Plaintiff also argues that her statements were protected by the *First Amendment.* However, while the Free Speech Clause of the *First Amendment* restricts defamation actions, it does not bar those actions altogether. See *Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 100-01 (2d Cir. 2000);* see also *United States v. Irving, 452 F.3d 110, 120 (2d Cir. 2006).* If defendant can prove the

elements of defamation described above, the *First Amendment* will not provide plaintiff with a defense against the counterclaim.

Accordingly, plaintiff's motion to dismiss the counterclaim for defamation is denied.

### B. Intentional Infliction of Emotional Distress

To state a claim for intentional infliction of emotional distress, defendant must allege "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of New York, 78 F.3d 787, 790 (2d Cir. 1996),* citing *Howell v. N.Y. Post Co., 81 N.Y.2d 115, 612 N.E.2d 699, 702, 596 N.Y.S.2d 350 (N.Y. 1993);* see [*38] *Slatkin v. Lancer Litho Packaging Corp., 33 A.D.3d 421, 822 N.Y.S.2d 507, 2006 N.Y. App. Div. LEXIS 12188, 2006 WL 2884417 (1st Dep't 2006).* "New York courts have imposed a very high threshold for intentional infliction of emotional distress claims, requiring that the conduct must be so outrageous and extreme as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Druschke v. Banana Republic, Inc., 359 F. Supp. 2d 308, 314 (S.D.N.Y. 2005)* (citation and internal quotation marks omitted); see *Freihofer v. Hearst Corp., 65 N.Y.2d 135, 143, 480 N.E.2d 349, 490 N.Y.S.2d 735 (1985).*

The conduct forming the basis of defendant's emotional distress claim here -- e.g., plaintiff's use of negative terms to describe defendant to third parties, plaintiff's allegations of defendant's verbal abuse and illegal employment activities, and plaintiff's instigation of a lawsuit -- is not so "atrocious and intolerable" as to meet the high threshold for intentional infliction of emotional distress claims under New York law. *Druschke, 359 F. Supp. 2d at 314;* see *Conboy v. AT & T Corp., 241 F.3d 242, 258 (2d Cir. 2001).* [*39] Moreover, New York law bars defendant's claim to the extent it is based solely on the statements forming the basis of defendant's defamation claim. See *Demas v. Levitsky, 291 A.D.2d 653, 660, 738 N.Y.S.2d 402 (3d Dep't 2002)* ("[A] cause of action alleging intentional infliction of emotional distress should be dismissed where the conduct complained of falls well within the ambit of other traditional tort liability." (citation and internal quotation marks omitted)). Accordingly, the counterclaim for intentional infliction of emotional distress is dismissed.

### C. Prima Facie Tort

To state a claim for prima facie tort, defendant must allege "(1) intentional infliction of harm, (2) resulting in special damages, (3) without excuse or justification, (4) by an act or series . . . of acts which are otherwise legal."

*Cardo v. Board of Mgrs., Jefferson Vil. Condo 3, 29 A.D.3d 930, 931, 817 N.Y.S.2d 315 (2d Dep't 2006)* (alteration in original) (citation and internal quotation marks omitted). The allegation of special damages is a "critical element" of the cause of action, and may not by satisfied merely be alleging "the physical, psychological, or financial demands of defending a lawsuit." Id. (citations and [*40] internal quotation marks omitted). The special damages, moreover, "must be alleged with sufficient particularity to identify actual losses, [and] round sums without any attempt at itemization are insufficient." *Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc., 361 F. Supp. 2d 283, 306 (S.D.N.Y. 2005).*

Defendant fails to allege special damages, claiming instead that the damages "are unknown yet at this time but exceed an amount of $ 250,000." (Partial Answer P 58.) This is insufficient to state a claim for prima facie tort.

Furthermore, it is clear that the prima facie tort claim is predicated primarily on the allegedly malicious instigation by plaintiff of a lawsuit against defendant. This is not a proper basis for a prima facie tort claim. See *Curiano v. Suozzi, 63 N.Y.2d 113, 118, 469 N.E.2d 1324, 480 N.Y.S.2d 466 (1984)* ("New York courts have consistently refused to allow retaliatory lawsuits based on prima facie tort predicated on the malicious institution of a prior civil action."); *id. at 119* ("To permit [the] action to continue under these circumstances would create a situation where litigation could conceivably continue *ad infinitum* with [*41] each party claiming that the opponent's previous action was malicious and meritless."). Moreover, to the extent defendant seeks relief for the alleged defamatory statements, she must rely on her defamation cause of action rather than pleading a duplicative claim for prima facie tort based on the very same statements. See *id. at 118-19* (noting that litigants may not use prima facie tort claims to avoid the "stringent requirements" for "traditional torts," and explaining that prima facie tort claims "should not become a 'catch-all' alternative for every cause of action which cannot stand on its legs" (citation and additional internal quotation marks omitted)).

Accordingly, defendant's counterclaim for prima facie tort is dismissed.

D. Breach of Fiduciary Duty

Under New York law, "'[i]t is well settled that an employee owes a duty of good faith and loyalty to an employer in the performance of the employee's duties.'" *Slue, 409 F. Supp. 2d at 373-74* (alteration in original) (emphasis omitted), quoting *Wallack Freight Lines, Inc. v. Next Day Express, Inc., 273 A.D.2d 462, 711 N.Y.S.2d 891 (2d Dep't 2000).* Defendant alleges that plaintiff breached her [*42] duties to defendant by disclosing to third parties confidential personal and professional information about defendant and her work with the CE-DAW committee. Plaintiff presents no colorable argument to dismiss this counterclaim; nor does the Court's independent review of defendant's pleadings suggest that the claim should be dismissed. Accordingly, the motion to dismiss the counterclaim for breach of fiduciary duty is denied. [11]

> 11  Referring to paragraph 61 of defendant's Partial Answer, plaintiff argues that the reference to plaintiff's "misappropriat[ion]" of defendant's private personal and business information "is such a broad accusation that unless [defendant] details the very specifics of it, it is not even possible for Plaintiff to address it." (P. Mot. to Dismiss Counterclaims at 21.) Construing this as a motion pursuant to *Federal Rule of Civil Procedure 12(e)* for a more definite statement, the Court denies plaintiff's motion. While the cited allegation is somewhat vague, it is not "so excessively vague and ambiguous as to be unintelligible and as to prejudice the [plaintiff] seriously in attempting to answer it." *Peter L. Leepson, P.C. v. Allan Riley Co., 2006 U.S. Dist. LEXIS 52875, 04 Civ. 3720 (LTS), 2006 WL 2135806, at *6 (S.D.N.Y. July 31, 2006 )* (citation and internal quotation marks omitted); see also id. ("[M]otions for a more definite statement are generally disfavored because of their dilatory effect . . . . The preferred course is to encourage the use of discovery procedures to apprise the parties of the factual basis of the claims made in the pleadings." (second alteration in original) (citations and internal quotation marks omitted)). There is thus no basis for requiring further pleading by defendant.

[*43] **CONCLUSION**

For the foregoing reasons, the motion to strike and both motions to dismiss are granted in part and denied in part. Both motions for a more definite statement are denied. If either party moves for a reconsideration of this Opinion -- which the Court strongly discourages -- any submission in support of the motion (or in opposition thereto) must be limited to five pages, double-spaced. By separate order issued today, this case will be referred to Magistrate Judge Fox for general pretrial matters.

SO ORDERED.

Dated: New York, New York

October 26, 2006

GERARD E. LYNCH

2006 U.S. Dist. LEXIS 78884, *

United States District Judge

LEXSEE 1994 U.S. DIST. LEXIS 6377

**MAX SALZMANN, MARGITTA SALZMANN, ESTHER SALZMANN and PETER SALZMANN, Plaintiffs, v. PRUDENTIAL SECURITIES INC., formerly known as PRUDENTIAL-BACHE SECURITIES INCORPORATED, WILLIAM G. McCORMICK, FRED BERENS, HARVEY BALDINGER and ONE OR MORE UNKNOWN PRUDENTIAL GINNIE MAE TRADERS, Defendants.**

**91 Civ. 4253 (KTD)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1994 U.S. Dist. LEXIS 6377*

**May 13, 1994, Decided**
**May 16, 1994, Filed**

**SUBSEQUENT HISTORY:**    [*1]  As Amended May 16, 1994.

**COUNSEL:** THEODORE H. FRIEDMAN, P.C., New York, N.Y. ABRAHAM WAX, P.C., New York, N.Y. Of Counsel: Theodore H. Friedman, David E. Bamberger.

CAHILL GORDON & REINDEL, New York, New York. Of Counsel: Thomas J. Kavaler, Dean R. Nicyper, William E. Goydan, Richard C. Schoenstein, James P. Bonner.

**JUDGES:** DUFFY

**OPINION BY:** KEVIN THOMAS DUFFY

**OPINION**

*MEMORANDUM & ORDER*

**KEVIN THOMAS DUFFY, D.J.:**

Defendants Prudential Securities Inc. ("Prudential"), William G. McCormick ("McCormick"), Fred Berens ("Berens"), Harvey Baldinger ("Baldinger"), and One or More Unknown Prudential Ginnie Mae Traders ("Unknown Traders") move to dismiss the entire Amended Complaint for failure to state a claim upon which relief can be granted pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure* and for failure to plead the fraud allegations with sufficient particularity pursuant to *Rule 9(b) of the Federal Rules of Civil Procedure.* Defendants also move to strike portions of the Amended Complaint pursuant to *Rule 12(f) of the Federal Rules of Civil Procedure* and for sanctions pursuant to *Rule 11 of the Federal Rules of Civil Procedure.*

Plaintiffs Max Salzmann ("Salzmann"), Margitta Salzmann, Esther Salzmann, and Peter Salzmann, in [*2] response, have moved to file a Second Amended Complaint pursuant to *Rule 15 of the Federal Rules of Civil Procedure* and for permission to file certain supplemental papers regarding the motion to dismiss pursuant to Rule 3(c)(3) of the Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York.

For the reasons set forth below, Defendants' motion to dismiss is granted in part and denied in part; Defendants' motion to strike portions of the Amended Complaint is granted; Defendants' motion for sanctions is denied; Plaintiffs' motion to file a Second Amended Complaint is granted; and, Plaintiffs' motion for permission to file certain supplemental papers is denied.

*BACKGROUND*

(1) *Procedural History*

Plaintiffs initially commenced this action on June 20, 1991. The initial complaint charged defendants with: (1) violations of the Racketeer Influenced Corrupt Organization Act of 1970 ("RICO"), *18 U.S.C. §§ 1962(c), 1962(b),* and *1962(d);* (2) violations of § 10(b) of the Securities Exchange Act of 1934, as amended, *15 U.S.C. § 78j(b),* and the Securities and Exchange Commission [*3] *Rule 10b-5,* 17 C.F.R. § 240 10b-5; (3) common law fraud; (4) breach of fiduciary duty; (5) breach of contract; and (6) negligence. Defendants moved to dis-

miss the entire complaint, and in a Memorandum and Order dated March 10, 1993, I granted the motion to dismiss.

With the exception of the § 10(b) and *Rule 10b-5* claim, however, the dismissal was granted without prejudice, and I granted plaintiffs 20 days to file an amended complaint that remedied the deficiencies set forth in the Memorandum & Order. Subsequently, plaintiffs filed an amended complaint alleging common law fraud, breach of contract, breach of fiduciary duty, negligence and RICO violations. Thereafter, the defendants brought this motion.

*(2) The Amended Complaint*

The Salzmanns are residents of La Paz, Bolivia, where they own a fabric production business. Am. Compl. PP 1, 45. In 1986, the Salzmann's wealth, approximately $ 8-10 million, was invested in certificates of deposit and other insured investments in commercial banks and savings and loans across the United States. Am. Compl. P 47. On September 5, 1986, Salzmann met with representatives of Prudential to discuss the possibility of opening a securities account [*4] with Prudential. Am. Compl. P 49. Salzmann allegedly represented that his investment objective was wealth preservation and that he would be unwilling to invest any more than 10% to 15% of his wealth in investments carrying a degree of risk greater than insured bank deposits. Am. Compl. P 52.

Berens allegedly responded by representing that he and Baldinger would be able to create a portfolio of investments for the Salzmanns that would achieve an annual return of 15% and still be able to satisfy the Salzmanns' criteria for safety. Am. Compl. P 54. Berens then allegedly recommended two specific investment strategies for the attainment of this objective: (1) investments in positions in the "when issued" market for Government National Mortgage Association pass-through certificates ("Ginnie Maes") and (2) investments in securities of public companies that were subject to a tender offer that had either been made or approved by the target company. Am. Compl. P 55-62. In addition, McCormick allegedly made an express representation that he acceded to Berens' proposals for this investment of Salzmann's funds and claimed that Berens' strategy was "very safe and conservative." Am. Compl. P 64.

[*5] At the conclusion of this meeting, Salzmann agreed to open an account with Prudential, and he funded it with approximately $ 1.6 million. This amount was later increased. During September 1986, plaintiffs purchased one tender offer stock and a $ 2 million position in the "when issued" market for November 1986 Ginnie Maes. Am. Compl. P 65-69. In October 1986, Salzmann sold the Ginnie Mae position in the November 1986 se-

ries for a profit of $ 4,670, and he purchased a $ 3 million position in the "when issued" market for the January 1987 series. In November 1986, this position was sold, netting a gain of $ 38,430. Am. Compl. PP 74-82.

In December 1986, Berens allegedly convinced Salzmann to utilize a margin account at Prudential. These funds were allegedly used for purchasing tender offer stocks. Am. Compl. PP 85-86. The account statements show that on November 30, 1986, the Salzmanns had a zero margin balance, a credit of $ 1,342,624 in the cash account, and a priced portfolio of securities of $ 3,894,840. Gupta Aff., Ex. C. The Salzmanns' account statement for December 31, 1986 show a debit of $ 25,168,949 in the margin account, a cash balance of less than $ 300,000, and priced portfolio [*6] of securities of $ 37,111,215. Gupta Aff., Ex. D. Berens allegedly earned $ 199,000 in commissions from these trades, and the Salzmanns paid Prudential $ 225,000 in margin interest to maintain these positions. Am. Compl. PP 91-92.

Although they allege that they had no familiarity with the nature and mechanics of these investments, Salzmann placed an additional $ 7.9 million in cash, including borrowed funds, into their Prudential account. Am. Compl. PP 95-96, 100-101. In January and February 1987, with these new funds, the defendants allegedly continued to implement the tender offer investment strategy. Salzmann then placed even more funds into the account, largely from maturing certificates of deposit held in individual accounts. Am. Compl. P 104.

In a meeting in Miami in early March, 1987, Berens allegedly recommended that Salzmann establish a $ 75 million position in the "when issued" market for 8% Ginnie Maes with a June 1, 1987 issue date. Berens allegedly represented that this position was conservative and fully consistent with Salzmann's objective of wealth preservation. Salzmann approved this strategy and between March 4-13, 1987, positions with a face amount of $ 75 million [*7] were purchased for between 98 and 98.25% of par (the "March 1987 Ginnie Mae purchases"). Am. Compl. PP 108-109, 114.

On March 19, 1987, Berens and Salzmann had another meeting at Prudential. Berens allegedly advised Salzmann that an affiliate of The First Boston Corporation ("First Boston") had just announced that it had agreed to merge with, and would be commencing a tender offer for, Allegheny International ("Allegheny"), at a price of $ 24.60 per common share. Berens allegedly recommended that Salzmann purchase at least 275,000 shares of Allegheny's common stock, which could still be purchased at $ 24.375 per share. In addition, Berens allegedly represented that the Allegheny merger was a "done deal." Between March 19 and 27, 1987, 283,600

1994 U.S. Dist. LEXIS 6377, *

shares of Allegheny were purchased for $ 6,912,750 (the "Allegheny investment"). Am. Compl. PP 134-138.

On April 24, 1987, First Boston announced that certain conditions to its tender offer had not been met, and as a result, the offer had expired. Berens allegedly communicated this fact to Max Salzmann. In the same conversation, Berens allegedly represented that Prudential had specific "market information" that a "deal" for Allegheny would still [*8] get "done." Salzmann retained his Allegheny stock. Am. Compl. PP 149-150.

On May 4, 1987, Allegheny and First Boston announced that they had mutually agreed to terminate their merger agreement. Berens allegedly advised Salzmann of this fact. In addition, Berens allegedly recommended that Salzmann should not sell any part of his Allegheny holdings because a revised deal for Allegheny was in progress. Am. Compl. P 158.

During May and April of 1987, Berens and Salzmann allegedly had several discussions regarding Salzmann's position in the "when issued" market for the June 1987 Ginnie Maes. Based on these discussions, $ 20 million of the Ginnie Mae position was sold in April and $ 10 million was sold in May for a loss. The prices for these trades ranged from 90.0625 to 91.25. Plaintiffs allege that the exact amount of loss was never disclosed to them. Am. Compl. PP 147-148, 151, 154 and 159. In addition, plaintiffs allege that account records were sent to their Miami residence instead of the residence in La Paz. Am. Compl. P 71. Consequently, they allegedly were not aware of the extent of the losses.

In early June 1987, Salzmann and Baldinger discussed the June 1987 Ginnie Mae position [*9] in a telephone conversation. Baldinger allegedly explained that the Ginnie Mae position had not improved. Baldinger allegedly represented that the losses to date were "not serious" and could be recouped once the market improved. Moreover, he allegedly informed Max Salzmann that the remaining $ 45 million position in the June 1987 Ginnie Maes could be "rolled over" into a new series of "when issued" Ginnie Maes with the same coupon but with a September 1, 1987 issuance date. Baldinger allegedly represented that the rollover investment was suitable for Salzmann, and Salzmann approved this strategy. As a result, between June 11 and 16, 1987, the remainder of Salzmann's $ 45 million position was sold, and a new $ 45 million position was purchased in the "when issued" market for the September 1987 Ginnie Maes (the "rollover Ginnie Mae purchases"). Am. Compl. PP 167-171. Plaintiffs allege that the rollover strategy was nothing more than a sham concocted to conceal the true nature and extent of Max's actual loss on his original $ 75 million position, which was $ 5,096,909. Am. Compl. PP 172-77.

The Salzmanns also allege that in a series of telephone conversations between June 22, 1987 and [*10] July 9, 1987, Baldinger and Berens recommended that the Salzmanns' purchase 80,000 preferred shares of the Freuhauf Corporation of Delaware ("Freuhauf"), which Salzmann did (the "Freuhauf investment"). Baldinger and Berens allegedly failed to inform the Salzmanns that Prudential was acting as a principal in this sale. Am. Compl. PP 188-191. Preferred shares of Freuhauf were allegedly rated "below investment grade" by one major rating agency. This information allegedly was never disclosed to plaintiffs. Am. Compl. P 184.

By August 1987, Salzmann began selling the rollover Ginnie Mae positions for a loss. Am. Compl. PP 195-196. By September 21, 1987, all the rollover positions were settled for a total loss of $ 2,111,751. Am. Compl. 200-201. In addition, Berens allegedly recommended that the Salzmanns retain the position in Allegheny, which they did. Am. Compl. PP 198-199.

Salzmann returned to Miami in mid-September, 1987, and he directed a partial liquidation of his portfolio for cash. At this meeting, Salzmann again asked for advice regarding the Allegheny and Freuhauf holdings. Baldinger allegedly represented that it was appropriate for the Salzmanns to hold these securities in their [*11] portfolio. The values of these securities have apparently diminished greatly. Am. Compl. PP 200-207.

*DISCUSSION*

(1) *Motion to Dismiss* [1]

> 1   The factual allegations in the Amended Complaint must be treated as true for the purposes of the motion to dismiss. *Frasier v. General Elec. Co., 930 F.2d 1004, 1007 (2d Cir. 1991), citing Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).*

(A) *Count I*

Count I alleges that through their actions, defendants committed common law fraud and deceit. In substance, the plaintiffs claim that the defendants misrepresented the degree of risk of the investments recommended to them. In particular, the plaintiffs allege that the defendants represented that these investments were conservative and of a wealth-preserving nature, when in fact they were extremely risky. Am. Compl. PP 216-217.

Defendants argue that: (1) Count I is time-barred as to the March 1987 Ginnie [*12] Mae purchases and the Allegheny investment; and (2) plaintiffs have failed to show they justifiably relied on defendant's alleged misrepresentation for the rollover Ginnie Mae purchases and the Freuhauf investment.

Under New York's borrowing statute, a plaintiff's claim is time-barred if it is untimely under either New York's limitation period or the limitation period of the jurisdiction where the cause of action accrued. *N.Y. Civ. Prac. L. & R. § 202* (McKinney 1990). To determine the applicable statute of limitations, it is first necessary to determine in which jurisdiction did the cause of action accrue. Plaintiffs argue that the cause of action accrued in Bolivia since that is where plaintiffs are domiciled. Defendants argue that since plaintiffs maintain a residence in Florida and all the transactions occurred in Florida, the cause of action accrued in Florida.

A cause of action accrues generally where the injury occurred, and with fraud claims, this is usually where the economic loss occurs. *Farley v. Baird, Patrick & Co., 750 F. Supp. 1209, 1215 (S.D.N.Y. 1990)*. Plaintiffs are domiciled in La Paz, Bolivia, but they also maintain a residence in [*13] Florida. Am. Compl. PP 46, 71. Under New York law, residence for borrowing statute purposes is not synonymous with domicile, and a claim may accrue for borrowing statute purposes in more than one jurisdiction. *Antone v. General Motors Corp., 64 N.Y.2d 20, 484 N.Y.S.2d 514, 517-18, 473 N.E.2d 742 (Ct. App. 1984). See also Sack v. Low, 478 F.2d 360, 368 (2d Cir. 1973)*.

The determination as to whether an individual maintains a residence in a particular jurisdiction depends on whether that individual "has a significant connection with some locality in that jurisdiction as the result of living there for some length of time during the course of a year." *Antone, 484 N.Y.S.2d at 518*. In this case, the Amended Complaint reveals that Max Salzmann repeatedly stayed at the plaintiff's Miami home. Am. Compl. PP 46, 49, 72, 108, 134, 203. Moreover, Peter and Esther Salzmann, lived in the Miami home while attending college. In addition, the Salzmanns owned, rather than rented, the Miami residence. Am. Compl. 46, 71. All of these factors indicate [*14] that while the plaintiffs may have been domiciled in Bolivia, they maintained a residence in Florida for the purpose of New York's borrowing statute. *See also S. Axelrod Co. v. Mel Dixon Studio, Inc., 122 Misc. 2d 770, 471 N.Y.S.2d 945, 952 (N.Y. Co. 1983)* (if an individual "occupies a dwelling for the time being, either for a block of time or intermittently but on a regular basis," the dwelling is a residence).

The most important factor in determining this issue is that all the transactions were conducted through Prudential's Miami office. Indeed, the various meetings where the alleged fraud occurred took place in Florida. In sum, with all these factors, the New York Court of Appeals would rule that the cause of action accrued in Florida.

Under New York's borrowing statute, the rules of the jurisdiction with the shortest statute of limitations time period are applicable. [2] Florida's statute of limitations for fraud is 4 years, *Fla. Stat. Ann. § 95.11(3)(j)* (West 1982), and it is applicable here as it is the shortest period. Therefore, under New York's borrowing statute, Florida's law with respect to the statute of limitations for fraud [*15] is applicable to plaintiffs' claims. Both the specific period set forth under Florida law and its principles with respect to tolling and discovery are applicable to plaintiff's fraud claim. *See Antone, 484 N.Y.S.2d at 519*. Under Florida law, a plaintiff has an obligation to inquire, and the statute of limitations begins to run, as soon as the plaintiff obtains "notice of the *possible* invasion of [his] legal rights." *Breitz v. Lykes-Pasco Packing Co., 561 So. 2d 1204, 1205 (Fla. Dist. Ct. App. 1990)* (emphasis added) (citations omitted). Thus, to have been timely, the fraud claim must have been commenced within four years of the date that the plaintiffs discovered the fraud or could have discovered, through reasonable diligence, the alleged basis for their fraud claim. *Id. See Matthews v. Matthews, 222 So. 2d 282, 284 (Fla. Dist. Ct. App. 1969)*.

2   Even if the plaintiff's did not maintain a residence in Florida, "the plaintiff's residence need not necessarily be the situs of the economic impact of the fraud, and the court can properly consider *all relevant factors* in determining where the loss is felt." *Lang v. Paine, Webber, Jackson & Curtis, Inc., 582 F. Supp. 1421, 1425 (S.D.N.Y. 1984)*. *Lang* reasoned that the cause of action accrued in Massachusetts even though plaintiff resided in Ottawa because the plaintiff opened and maintained an account in Boston, all trades were directed from Massachusetts, and the direct loss of the investment decisions was imposed on the funds in an account in Massachusetts. *Id. at 1426*. The Amended Complaint's allegations relate only to the Salzmanns' trading activity that took place in Florida. Thus, while the Salzmanns may have maintained a home and a business in Bolivia, for the purposes of these investment activities, they maintained a separate financial base in Florida. As in *Lang,* the place of injury is not the plaintiff's domicile but the situs of their investment activities, *i.e.,* Florida.

[*16]   The initial complaint was filed on June 20, 1991. Thus, any fraud claim that was discovered or could have been discovered through reasonable diligence prior to June 20, 1987 is time-barred. The purchases of the rollover Ginnie Maes and the Freuhauf investment were made after this date. Thus, any potential fraud claim regarding these two purchases are not time-barred.

The March 1987 Ginnie Mae purchases and the Allegheny investment occurred prior to June 20, 1987. The issue, therefore, is whether plaintiffs had knowledge of the possibility that these investments were not "conservative" and that the defendants' representations were misleading. The substantial, continuing loss suffered by plaintiffs in their Ginnie Mae trading compels the conclusion that plaintiffs should have been aware of the possibility of fraudulent conduct prior to June 20, 1987. Starting on April 4, 1987 and ending on June 16, 1987, the defendants sold Ginnie Mae positions at a loss of over $ 5 million. Am. Compl., Ex. 10. All of these trades were pre-approved by Salzmann. Am. Compl. PP 147-48, 151, 154, 159, 159-71. These trading losses are obviously of substantial magnitude and would place any reasonable investor [*17] on notice prior to June 20, 1987 of the possibility that the alleged representations regarding the Ginnie Mae purchases were fraudulent. *See Armstrong v. McAlpin, 699 F.2d 79, 88 (2d Cir. 1983).*

Plaintiffs claim that since the account statements were mailed to the Florida residence, they were not aware of the extent of the losses until after June 20, 1987. The plaintiffs were, however, undeniably aware of the fact that these investments were losing money. Am. Compl. P 159. This awareness should have put the plaintiffs on notice that the investments were not conservative, and accordingly, they had notice of the alleged fraud prior to June 20, 1987.

Similarly, plaintiffs were on inquiry notice of the falsity of the alleged representations concerning their investment in Allegheny. Plaintiffs established a $ 6,912,750 Allegheny position between March 19 and March 27, 1987. Am. Compl. P 137. By May 31, 1987, the market value of this position had diminished to $ 4,821,200. Am. Compl. P 161. Moreover, the Amended Complaint concedes that plaintiffs were informed by defendants prior to June 20, 1987 that the tender offer which had allegedly been characterized [*18] as a "done deal" had expired and that the First Boston merger proposal had been terminated. Am. Compl. PP 149, 158. Given the magnitude of these losses, plaintiffs should have been cognizant prior to June 20, 1987 of the possibility that the alleged representations regarding the First Boston/Allegheny merger were false. *See Commodore Int'l, Ltd. v. National Union Fire Ins. Co., 184 A.D.2d 19, 591 N.Y.S.2d 168, 170* (1st Dep't 1992) ("A loss is 'discovered' once [plaintiff] has obtained facts sufficient to cause a reasonable person to recognize that there has been dishonesty or fraud resulting in loss."). Any further alleged representations by plaintiff simply do not change the fact that plaintiffs had inquiry notice prior to June 20, 1987. Therefore, applying Florida's four years statute of limitations, plaintiffs' fraud claims regarding the March

1987 Ginnie Mae purchases and the Allegheny investment are time-barred.

Defendants contend that the fraud claims regarding the rollover Ginnie Mae purchases and the Freuhauf investment should also be dismissed because the element of justifiable reliance is missing. Defendants specifically argue [*19] that because the losses suffered from the March 1987 Ginnie Mae purchases and the Allegheny investment were so great that relying on representations that the rollover purchases and the Freuhauf investment were conservative cannot be justified.

This argument may indeed be correct as a factual matter. A motion to dismiss, however, is not the proper procedural mechanism to make this factual determination. *See Whitebread (US) Holdings v. Baron Phillipe de Rothschild, S.A., 630 F. Supp. 972, 978 (S.D.N.Y 1986).* Thus, the motion to dismiss fraud claims regarding the rollover Ginnie Mae purchases and the Freuhauf investment is denied. [3]

> 3   Defendants also argue that the fraud claim should be dismissed because it is redundant with the contract claim. As the contract claim is dismissed for reasons set forth below, this argument is moot.

(B) *Count II*

Count II alleges that defendants breached the fiduciary duty owed to plaintiffs by making extremely risky investments. Am. Compl. P 229. The [*20] defendants argue that this claim is time-barred, and it fails to state a claim upon which relief can be granted. The applicable statute of limitations for a breach of fiduciary duty claim is 3 years. [4] *N.Y. Civ. Prac. L. & R. § 214(4)* (McKinney 1990).

> 4   Plaintiffs claim that the applicable statute of limitations is 6 years, relying on *N.Y. Civ. Prac. L. & R. § 213(1)*. *Section 213(1)* only applies, however, where the remedy sought is equitable. *See Loengard v. Santa Fe Indus., Inc., 70 N.Y.2d 262, 519 N.Y.S.2d 801, 803-04, 514 N.E.2d 113 (Ct. App. 1987)*. In this case, the Amended Complaint reveals that the remedy sought is exclusively money damages. Am. Compl. P 234. Thus, *§ 213(1)* is not applicable here.

Like all claims other than those specifically excepted by the New York State Legislature, a cause of action for a breach of fiduciary duty under New York law accrues upon the occurrence of the alleged wrongful act. *See Shochat v. Weisz, 757 F. Supp. 189, 194 (E.D.N.Y. 1991).* [*21]  *See also Steinhardt v. Johns-*

*Manville Corp.*, 54 N.Y.2d 1008, 446 N.Y.S.2d 244, 246, 430 N.E.2d 1297 (Ct. App. 1981), cert. denied, 456 U.S. 967 (1982); *Di Maio v. State*, 128 Misc. 2d 101, 488 N.Y.S.2d 550, 552-53 (Ct. Cl. 1985). Thus, for this claim to be timely, the cause of action must have accrued after June 20, 1988. As the last purchase plaintiff seeks to recover occurred on July 10, 1987, it clearly did not. Consequently, the three-year statute of limitations bars this claim.

In addition, under New York law, "a broker does not, in the ordinary course of business, owe a fiduciary duty to a purchaser of securities." *Fekety v. Gruntal & Co.*, 191 A.D.2d 370, 595 N.Y.S.2d 190, 190-91 (1st Dep't 1993). The allegations in the Amended Complaint do not purport to identify a situation that is different from an ordinary broker-client relationship. The account appears to have been non-discretionary as Salzmann pre-approved every trade. Am. Compl. P 147-48, 151, 154, 159-71. Indeed, the allegations suggest [*22] that the relationship was typical. Thus, based on the Amended Complaint, the defendants did not owe plaintiffs a fiduciary duty. As a result, count II fails to state a claim upon which relief can be granted.

### (C) *Count III*

Count III alleges that the Salzmanns are third party beneficiaries of contracts entered into by Prudential with the New York Stock Exchange (the "NYSE") and the National Association of Securities Dealers, Inc. (the "NASD"). Plaintiffs allege that Prudential breached these contracts by making the alleged misrepresentations that form the basis of the Amended Complaint. Am. Compl. PP 236-246. Defendants argue that Count III fails to state a claim upon which relief can be granted.

It is settled law in that the NYSE and the NASD rules do not provide plaintiffs with a private right of action. *See, e.g., Lowenbraun v. L.F. Rothschild*, [1986-1987 Transfer Binder]Fed. Sec. L. Rep. (CCH) P 93,066, at 95,297 (S.D.N.Y. 1987); *Frota v. Prudential-Bache Securities, Inc.*, 639 F. Supp. 1186, 1190 (S.D.N.Y. 1986). Plaintiffs, however, argue that they are not making a claim under federal law that defendants violated [*23] the NYSE or the NASD rules. Instead, they contend that this claim is based solely on the alleged contractual breaches.

This circuit has not directly addressed this issue. The Court of Appeals for the Second Circuit, however, encountered third party beneficiary claims by commodities investors arguing that a broker violated its contract with the New York Mercantile Exchange to the detriment of the investor. Although it did not address the issue, it did indicate that such a claim would be rejected because no evidence existed to suggest that particular investors were intended beneficiaries of such agreements. *Ryder Energy*

*Distribution Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 781 (2d Cir. 1984).

Moreover, courts in the Third Circuit have rejected such claims on the grounds that third party beneficiary claims are simply attempts to circumvent the decisions that hold that plaintiffs do not have a private right of action under these rules. *See Bloch v. Prudential-Bache Securities*, 707 F. Supp. 189, 195-196 (W.D. Pa. 1989). To hold that plaintiffs are entitled to make a third-party beneficiary claim is to hold, in [*24] effect, that plaintiffs have a private cause of action under the NYSE and the NASD rules. Such a ruling would be "incongruous with the large body of case law holding that no private cause of action exists for violation of the rules of self-regulatory organizations." *Id. at 196.* I believe *Bloch* correctly states the law. Accordingly, Count III fails to state a claim upon which relief can be granted.

### (D) *Count IV*

Count IV alleges that the defendants breached a contractual agreement entered into by the parties when it invested plaintiffs' funds in risky investments. In particular, the plaintiffs allege that defendants breached oral warranties that they would invest conservatively. Am. Compl. PP 247-257. The parties entered into a written contract in December 1986. [5]

> 5    Count IV also alleges that the defendants breached their obligation of dealing in good faith. Under New York law, a "plaintiff may allege bad faith as part of its breach of contract claim, but bad faith does not provide an independent basis of recovery." *Quail Ridge Assocs. v. Chemical Bank*, 162 A.D.2d 917, 558 N.Y.S.2d 655, 657 (3d Dep't), appeal dismissed, 76 N.Y.2d 936, 563 N.Y.S.2d 64, 564 N.E.2d 674 (1990). *See also Fasolino Foods Co. v. Banca Nazionale Del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992). The contracts Prudential entered into with the NASD and the NYSE are, for reasons explained above, not actionable, and plaintiffs point to no provision of the written contract that has been breached. Thus, there is nothing left from which to base a breach of covenant of good faith claim.

[*25] Plaintiffs allege that defendants induced them into signing the written contract by making the alleged, oral representations regarding the type of investments they would make. Am. Compl. P 249. This claim appears to be nothing more than a regurgitation of the fraud claim made in Count I. By plaintiff's own admission, "nothing in the written agreement sets forth any representations, warranties, covenants, conditions or any other contractual term relating to the manner in which plain-

tiffs' funds were to be invested." (Pl. Mem. of Law at 28).

Plaintiffs, however, claim that these alleged oral representations were part of the "entire" contract or that they were part of a separate, enforceable "collateral" agreement. This claim, however, simply cannot be gleaned from the Amended Complaint, which only alleges that the defendants made these representations in order to induce the plaintiffs to sign the written contract. Am. Compl. P 249. There is no specific allegation that these representations were part of a contract or that they form a separate collateral agreement. Thus, the claim is actually one for fraud and not for a contractual breach, and it thereby fails to state a claim upon which [*26] relief can be granted [6]

> 6    Defendants also argue that the parole evidence rule would bar all evidence regarding the alleged oral representations. "Where the parties have reduced their agreement to an integrated writing, the parol evidence rule operates to exclude evidence of all prior or contemporaneous negotiations or agreements offered to contradict or modify the terms of their writing." *Adler & Shaykin v. Wachner, 721 F. Supp. 472, 476 (S.D.N.Y. 1988).* Plaintiffs argue that the written agreement is not an "integration" of all rights and obligations entered into by the parties because it does not contain terms expressly requiring Prudential to invest their funds conservatively. Of course, the fact that these terms were not included in the contract could indicate that they were not part of the bargain. Nevertheless, under New York law, with written agreements such as the one in this case, where no integration or merger clause exists, the court must partake in a factual analysis of the contract to determine whether the agreement is fully integrated. *Braten v. Bankers Trust Co., 60 N.Y.2d 155, 468 N.Y.S.2d 861, 864, 456 N.E.2d 802 (Ct. App. 1983). See also Adler & Shaykin, 721 F. Supp. at 476-77.* Of course, the pleadings in the Amended Complaint are treated as true. In this case, no allegation exists as to the integration of the written agreement. Thus, it is impossible to determine whether the parole evidence rule would operate to bar evidence regarding the alleged oral representations.

[*27] (E) *Count V*

Count V alleges that Prudential negligently hired, discharged, and supervised its employees, thereby causing damage to plaintiffs. Am. Compl. PP 258-264. The defendants argue that this claim is time-barred. The applicable statute of limitations is 3 years. *N.Y. C.P.L.R. § 214(4).*

The cause of action for a "negligent supervision" claim accrues upon the occurrence of the alleged wrongful act. *See Shochat, 757 F. Supp. at 194. See also Steinhardt, 446 N.Y.S.2d at 246; Di Maio, 488 N.Y.S.2d at 552.* The last purchase for which plaintiff seeks to recover occurred on July 10, 1987. As such, for this claim to be timely, it would have had to have been commenced by July 10, 1990. This action was commenced on June 20, 1991. As a result, this claim is time-barred.

(F) *The RICO Claims (Counts VI-VIII)*

Plaintiffs have moved for leave to file a Second Amended Complaint and have submitted a proposed Second Amended Complaint. The only allegations that the proposed Second Amended Complaint seeks to amend involve Counts VI-VIII (the "RICO Counts"). [*28] The defendants are not opposing this motion. Thus, I am considering the motion to dismiss partially withdrawn with respect to the issues that these proposed amended pleadings address. To the extent that the amended pleadings in the proposed Second Amended Complaint attempt to resolve issues raised in the defendants' motion to dismiss (e.g. alleging facts sufficient to establish a pattern of racketeering), these issues will not be addressed. The proposed Second Amended Complaint, however, does not resolve two issues raised in the motion to dismiss, and those issues will be addressed next.

(1) *Statute of Limitations*

The statute of limitations for all civil RICO claims is four years. *Agency Holding Corp. v. Malley-Duff & Assoc., Inc., 483 U.S. 143, 156, 97 L. Ed. 2d 121, 107 S. Ct. 2759 (1987).* Moreover, a cause of action for RICO claims accrues "at the time [plaintiff] discovered or should have discovered the injury." *Bankers Trust Co. v. Rhoades, 859 F.2d 1096, 1102 (2d Cir. 1988), cert. denied, 490 U.S. 1007, 104 L. Ed. 2d 158, 109 S. Ct. 1642 (1989).* [*29] As with Count I, the substantial loss suffered by plaintiffs in their Ginnie Mae trading yields the conclusion that plaintiffs, at the very least, should have discovered the injury caused by defendants' allegedly inappropriate investing prior to June 20, 1987. The losses from the 1987 Ginnie Mae purchases are of such a magnitude that the plaintiffs were on notice prior to June 20, 1987 of a possible RICO violation. *See Armstrong, 699 F.2d at 88.*

Similarly, plaintiffs should have discovered that the alleged RICO injury caused by the alleged representations concerning their investment in Allegheny. The Amended Complaint concedes that plaintiffs were informed by defendants prior to June 20, 1987 the tender offer that had allegedly been characterized as a "done deal" had expired and that the First Boston merger proposal had been terminated. Am. Compl. PP 149, 158.

Thus, plaintiffs should have discovered prior to June 20, 1987 the possibility that the alleged representations regarding the First Boston/Allegheny merger were false. *See id.* Therefore, applying the four year statute of limitations, the RICO claims for damages arising out of the March 1987 [*30] Ginnie Mae purchases and the Allegheny investment are time-barred.

Plaintiffs argue that the statute of limitations should be tolled because defendants fraudulently concealed the existence of the RICO claim. In order to prove fraudulent concealment sufficient to toll the statute, plaintiff must allege that: (1) the defendants concealed the existence of the cause of action from the plaintiff; (2) plaintiff remained in ignorance of the existence of the cause of action until a time within four years of the filing of the complaint, and (3) plaintiff's ignorance was not attributable to a lack of diligence on plaintiff's part. *See State of New York v. Hendrickson, 840 F.2d 1065, 1083* (2d Cir.), *cert. denied, 488 U.S. 848 (1988). See also In re General Development Bond Litigation, 800 F. Supp. 1128, 1142-43 (S.D.N.Y. 1992), aff'd, 991 F.2d 36 (2d Cir. 1993).* The Amended Complaint contains no allegations that would establish fraudulent concealment. *See General Development, 800 F. Supp. at 1142-43.* More importantly, both the Amended Complaint [*31] and the proposed Second Amended Complaint show plaintiffs were aware of the losses. This indicates that plaintiffs could not establish either the first or second element of the fraudulent concealment standard. Thus, the statute of limitations is not tolled, and the RICO claims for damages arising out of the March 1987 Ginnie Mae purchases and the Allegheny investment are time-barred.

### (2) *Count VI Enterprise*

Defendants argue that Count VI fails to state a claim upon which relief can be granted against Prudential because it fails to allege an "enterprise" that is distinct from the "persons" claimed to be culpable. *18 U.S.C. § 1962(c)* provides that:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

*18 U.S.C. § 1962(c).* Count VI alleges that the RICO enterprise is an "association-in-fact" comprised of McCormick, Berens, Baldinger, the Unknown Traders, [*32] and Prudential. Am. Compl. P 268-69.

The Court of Appeals for the Second Circuit has held that "corporate entity may not be simultaneously the 'enterprise' and the 'person' who conducts the affairs of the enterprise through a pattern of racketeering activity." *Bennett v. United State Trust Co., 770 F.2d 308, 315 (2d Cir. 1985), cert. denied, 474 U.S. 1058, 88 L. Ed. 2d 776, 106 S. Ct. 800 (1986).* The Court of Appeals, however, has not specifically ruled on the issue of whether a corporation and its employees may form a RICO enterprise. The rulings in this court on this issue have not been consistent. Several decisions hold that allegations that an enterprise is composed of a corporation and one or more of its employees are valid. *See, e.g., Kuczynski v. Ragen Corp. 732 F. Supp. 378, 387 (S.D.N.Y. 1989). See also Metzner v. D.H. Blair & Co., 663 F. Supp. 716, 722 (S.D.N.Y. 1987).* One decision holds that a corporation and its principal officers cannot form an enterprise. *Official Publications, Inc. v. Kable News Co., 775 F. Supp. 631, 636 (S.D.N.Y. 1991),* [*33] *citing Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639, 280 U.S. App. D.C. 60, 883 F.2d 132, 141 (D.C. Cir. 1989), rev'd on other grounds, 286 U.S. App. D.C. 182, 913 F.2d 948 (D.C. Cir. 1990)* (en banc).

The Court of Appeals for the Second Circuit, however, has ruled that:

> While we have held that a solitary entity cannot, as a matter of law, simultaneously constitute both the RICO "person" whose conduct is prohibited and the entire RICO "enterprise" whose affairs are impacted by the RICO person, . . . we see no reason why a single entity could not be both the RICO person and one of a number of members of the RICO "enterprise."

*Cullen v. Margiotta, 811 F.2d 698, 730* (2d Cir.) (citations omitted), *cert. denied, 483 U.S. 1021 (1987). See also Jacobson v. Cooper, 882 F.2d 717, 720 (2d Cir. 1989)* ("Where the overlap between the defendants and the alleged RICO enterprise is only partial a RICO claim may be sustained."). *Cullen* specifically refused to dismiss *§ 1962(c)* claims [*34] against several defendants who allegedly formed an enterprise consisting of a town, a town committee and a county committee. *Cullen, 811 F.2d at 730.* While *Cullen* did not involve a corporation and its employees, the language of the decision indicates that Court of Appeals would rule that a corporation can form a RICO "enterprise" with its employees. Accordingly, defendants motion to dismiss Count VI against Prudential for failing to allege a distinction between an "enterprise" and a "person" is denied.

### (G) *McCormick and the Unknown Traders*

Defendants argue that all claims against McCormick and the Unknown Traders are time-barred. Neither McCormick nor the Unknown Traders were named defendants in the initial complaint. When an amended complaint is filed after expiration of the applicable period of limitations, the causes of action alleged in that complaint must satisfy the requirement of *Rule 15(c) of the Federal Rules of Civil Procedure* in order to "relate back" to the date of the filing of the initial complaint. Otherwise, the claims are time-barred.

As set forth by the Supreme Court,

> relation back is dependent upon four factors, all of [*35] which must be satisfied: (1) the basic claim must have arisen out of the conduct set forth in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party must or should have known that, but for a mistake concerning identity the actions would have been brought against it; and (4) the second and third requirements must have been fulfilled within the prescribed limitations period.

*Schiavone v. Fortune, 477 U.S. 21, 29, 91 L. Ed. 2d 18, 106 S. Ct. 2379 (1986)*. It appears that plaintiffs have satisfied none of these factors.

In particular, the Amended Complaint in no way shows that, but for a mistake of identity, McCormick and the Unknown Traders would have been named as defendants. The Amended Complaint alleges nothing that demonstrates that the plaintiffs had insufficient access to information to determine the identity of McCormick or the fact that their allegations of fraud extended to the Unknown Traders. *See Afrika v. Selsky, 750 F. Supp. 595, 599-600 (S.D.N.Y. 1989)*. Indeed, the Amended Complaint [*36] specifically alleges that McCormick expressly represented that he acceded to the investment strategy proposed by Berens and that this strategy was "very safe and conservative." Am. Compl. P 64. Yet, the Amended Complaint offers no explanation as to why this allegation could not have been made in the initial complaint. Therefore, the claims against McCormick and the Unknown Traders do not "relate back" to the initial complaint. [7] As a result, the statute of limitations applicable to the claims against McCormick and the Unknown Traders expired prior to the date of the filing of the Amended Complaint, which was April 19, 1993. [8]

7    Plaintiffs argue that New York's rules control as to whether these claims "relate back." New York's relation back rules are clearly not applicable to the RICO Counts. *See Koal Indus. Corp. v. Asland, S.A., 808 F. Supp. 1143, 1157 (S.D.N.Y. 1992)*. With respect to the fraud claims, New York's law applies the same "mistake of identity" requirement as does *Schiavone. Mondello v. New York Blood Center, 80 N.Y.2d 219, 590 N.Y.S.2D 19, 23, 604 N.E.2d 81 (Ct. App. 1989)*. Thus, the claims against McCormick and the Unknown Traders do not "relate back" to the initial Complaint even if New York rules apply.

[*37]

8    The applicable statutes of limitation in which McCormick and the Unknown Traders are named are four years for the fraud claim in Count I and four years for the RICO claims in Counts VI - VIII. The statute of limitations clearly expired by April 19, 1993, as the causes of action undeniably accrued prior to April 19, 1989. Count II also alleged that McCormick breached the fiduciary duty owed to plaintiffs. As this entire Count II was dismissed, for reasons stated above, it is not necessary to address whether this claim is time-barred as to McCormick.

### (H) *Particularities of Fraud Allegations*

Defendants argue that plaintiffs have not pled the allegations of fraud that underlie the claim in Count I and the predicate acts of the RICO Counts with sufficient particularity as required by *Rule 9 of the Federal Rules of Civil Procedure. Rule 9(b)* requires allegations of fraud "be stated with particularity." *Fed. R. Civ. P. 9(b)*. Claims of fraud and RICO are governed by *Rule 9(b)*. *See Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 114 (2d Cir. 1982)*; *Metro Furniture Rental, Inc. v. Alessi, 770 F. Supp. 198, 201 (S.D.N.Y. 1991)*. [*38] Fraud allegations must specify the time, place, speaker and content of the alleged misrepresentations. *See Luce v. Edelstein, 802 F.2d 49, 54 (2d Cir. 1986)*.

Moreover, *Rule 9(b)* pleadings cannot be based on "information and belief," unless the facts are particularly within the opposing party's knowledge. *Id. at 54 n.1.* "This exception to the general rule must not be mistaken for license to base claims of fraud on speculation and conclusory allegations. Where pleading is permitted on information and belief, a complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard." *Wexner v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir. 1990)* (citations omitted).

In this case, the pleadings appear to satisfy *Rule 9(b)*, as they allege "the time, place, and content of the

1994 U.S. Dist. LEXIS 6377, *

statements and actions in question." *McCoy v. Goldberg, 748 F. Supp. 146, 155 (S.D.N.Y. 1990).* The crux of the Amended Complaint is that the defendants misrepresented the degree of risk of the investments. *See Cohen v. Prudential-Bache Sec. Inc., 713 F. Supp. 653, 660-61 (S.D.N.Y. 1989).* [*39] The Amended Complaint alleges the necessary elements for making such a claim, and it does so with sufficient particularity. The allegations that are made on "information and belief" are very limited and do not entail the focus of the Amended Complaint. Thus, while the Amended Complaint is not a model example of pleading fraud claims with particularity, it does satisfy the primary goal of *Rule 9(b)*, which is to state the time, place and speaker of the alleged misrepresentations and to provide defendants with fair notice of the fraud claims against them. *See Metro Furniture, 770 F. Supp. at 201.* Accordingly, defendants motion to dismiss the fraud claims for failure to state the claims with particularity is denied.

(2) *Motion to Strike*

Defendants move to strike all allegations in the Amended Complaint regarding trading in "principal only stripped" Ginnie Maes. [9] The allegations in the Amended Complaint accuse defendants of purchasing a "pool" of Ginnie Maes, and then, when later closing out the position, only crediting the plaintiff's account with the proceeds from selling a "principal only strip" Ginnie Mae. Am. Compl. PP 23-25. This allegation [*40] amounts to a charge of theft, *i.e.,* that the defendants kept the interest portion of the Ginnie Maes for themselves. Plaintiffs make this allegation based on the fact that the account statements represent that the Ginnie Mae securities as "P/O Pool." *See* Gupta Aff., Ex. H. Defendants argue that this claim is groundless and has no basis in fact, and they contend "P/O Pool" stands for "pair-off." [10]

9    A "principal only stripped Ginnie Mae" is a derivative security in which the interest portion of the Ginnie Mae security is removed. Since most of the principal of a debt is usually repaid toward the end of the term of the loan, these securities are more valuable if debtors do not pre-pay their loans. Thus, when interest rates decrease, the value of these securities will also decrease as debtors often refinance and prepay their debt. As interest rates increase, however, the value of these securities increases as it becomes less likely debtors will refinance. This interest rate/return pattern is identical to an unstripped Ginnie Mae, but it is inversely related to "interest only stripped Ginnie Maes," which reacts positively to interest rate decreases. *See* Stuart Weiss, *The Big Losses at Merrill Lynch: Why it was Blindsided,* Bus. Wk., May 18, 1987 at 112-113, Gupta Aff. Ex. N.

More importantly, "principal only" Ginnie Maes are much more volatile than the unstripped Ginnie Mae. William W. Bartlett, *Mortgage-Backed Securities,* 385, Gupta Aff., Ex. O.

[*41]

10    A pair-off is a security purchase transaction which is closed out or sold at, or prior to, settlement date. This is a common practice among securities dealers because it obviates the need for delivery of the securities being sold.

*Rule 12(f)* [11] allows me to strike a pleading "when it appears beyond peradventure that it is sham and false and that its allegations are devoid of factual basis." *Kramer, Levin,* (S.D.N.Y. 1986) (citations omitted). An examination of plaintiffs' account statement undeniably reveals that the trades of the Ginnie Mae pools were "paired-off." Moreover, these records establish that plaintiffs were paid for accrued interest on each buy, and they received accrued interest on each sale. Gupta Aff., Exs. C, E, J, and M. This clearly shows that all of plaintiffs' trades involved full interest-bearing "pools."

11    In pertinent part, *Rule 12(f)* states: "The court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous material." *Fed. R. Civ. P. 12(f).*

[*42] In addition, plaintiffs earned money on Ginnie Mae trades in 1986. Am. Compl. PP 74-82. This would not have been possible had defendants purchased Ginnie Mae pools but only credited plaintiffs with proceeds from the sale of "stripped" Ginnie Mae pools. Thus, the allegations regarding the "principal only stripped" Ginnie Maes have no basis in fact. Accordingly, all allegations regarding the "principal only stripped" Ginnie Maes are stricken. [12]

12    Defendants have also moved for sanctions regarding these groundless allegations pursuant to *Rule 11 of the Federal Rules of Civil Procedure.* While the allegations are groundless, this area of investment is somewhat complex, and I am giving plaintiffs the "benefit of the doubt." Thus, the motion for sanctions is denied.

(3) *Plaintiff's Motions*

(A) *Motion for Leave to File a Second Amended Complaint*

As the defendants do not oppose plaintiff's motion for a Second Amended Complaint, this motion is granted. Plaintiffs are hereby directed to file and serve within 20 [*43] days hereof a Second hereby directed to file and serve within 20 days hereof a Second Amended Complaint consistent with this Memorandum and Order.

(B) *Motion to File Supplemental Papers*

Most of the supplemental papers that plaintiffs seek to file involve matters having to do with the proposed amendments in the Second Amended Complaint. Thus, their consideration here is unnecessary, as the plaintiffs are permitted to file a Second Amended Complaint. Other supplemental papers that plaintiffs seek to file involve the motion to dismiss. With a motion to dismiss, I must limit consideration to those facts alleged in the Amended Complaint. *Cosmas v. Hassett, 886 F.2d 8, 13 (2d Cir. 1989).* The arguments that parties present interpret the Amended Complaint, and their purpose is simply to highlight the deficiencies or strengths of the Amended Complaint. The plaintiffs adequately made their arguments in a 107 page memorandum of law. The supplemental papers simply rehash these arguments. Accordingly, the motion to file supplemental papers is denied.

*CONCLUSION*

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part; [*44] Defendants' motion to strike portions of the Complaint is granted; Defendants' motion for sanctions is denied; Plaintiffs' motion to file a Second Amended Complaint is granted; and, Plaintiffs' motion for permission to file certain supplemental papers regarding the motion to dismiss is denied.

SO ORDERED.

DATED: New York, New York

May 13, 1994

KEVIN THOMAS DUFFY, U.S.D.J.

FOCUS - 1 of 4 DOCUMENTS

**RICHARD G. HYMAN, Plaintiff, -v.- INTERNATIONAL BUSINESS MACHINES CORPORATION and EMPLOYMENT SOLUTIONS CORPORATION, Defendants. PHILIP J. PALESE, Plaintiff, -v.- INTERNATIONAL BUSINESS MACHINES CORPORATION and EMPLOYMENT SOLUTIONS CORPORATION, Defendants.**

**98 Civ. 1371 (JSM), 98 Civ. 1372 (JSM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2000 U.S. Dist. LEXIS 15136*

**October 17, 2000, Decided
October 17, 2000, Filed**

**DISPOSITION:**     [*1]  IBM's motion for summary judgment denied with respect to fraudulent inducement claims but granted on negligent misrepresentation claims.

**COUNSEL:** For plaintiffs: Neal Brickman, New York, NY.

For defendants: Jeffrey G. Huvelle, Covington & Burling, Washington, D.C.

For defendants: Richard D. Bentzen, Cerussi & Spring, White Plains, NY.

**JUDGES:** JOHN S. MARTIN, JR., U.S.D.J.

**OPINION BY:** JOHN S. MARTIN, JR.

**OPINION**

*OPINION and ORDER*

JOHN S. MARTIN, Jr., District Judge:

Richard G. Hyman ("Hyman") and Philip J. Palese ("Palese") bring these actions claiming that they were fraudulently induced to leave their jobs at International Business Machines Corp. ("IBM") and join its subsidiary, Employment Solutions Corp. ("ESC"), by false representations of a five-year contract between the two companies. They also bring actions for negligent misrepresentation based on the same statements. IBM moves on behalf of itself and as successor-in-interest to ESC for summary judgment on both claims. For the reasons set forth below, IBM's motion is granted in part and denied in part.

I. BACKGROUND

In November 1991, IBM determined that rather than serving its staff recruitment needs in-house, it would [*2] form a wholly-owned subsidiary, ESC, to perform that function. In February 1992, IBM announced an incentive program, Employment Solutions Transition Program (the "EST Program"), designed to recruit IBM employees to leave IBM and join ESC. The EST Program featured a severance package and a leave-of-absence option during which IBM employee benefits would continue to accrue. Thereafter, certain IBM employees who had been hired to operate ESC, including Lee Covert ("Covert"), began to personally recruit IBM employees for the new venture.

Both Hyman and Palese began their careers at IBM in the 1960s. In 1992, each was employed in a division of IBM handling college recruitment. In March 1992, both Hyman and Palese were approached by Covert for the purpose of recruiting them to work at ESC.

During his conversations with Plaintiffs regarding employment at ESC, Covert represented that ESC had signed a five-year contract with IBM that would ensure ESC's viability for at least that period of time. Plaintiffs claim that similar representations were made by other ESC employees when offers of employment were officially extended to them. Plaintiffs allege that in reliance on these statements, they [*3] resigned their employment at IBM in April 1992 and accepted jobs at ESC. Plaintiffs claim that no such five-year contract had been signed at the time these representations were made, and was never in fact signed. They further allege that Covert

and other ESC employees knew, or should have known, that such statements were false when they were made. At the time of their departure from IBM, Plaintiffs both signed a release of all claims they had against IBM.

Plaintiffs each worked at ESC for approximately two years and performed substantially the same functions that they had performed at IBM. In March 1994, Palese's position was terminated when down-sizing caused IBM to drop several of the colleges he serviced. In April 1994, Hyman's position was terminated when IBM reversed course and decided to dissolve ESC and return its recruiting outfit to in-house management. Both plaintiffs remained out of work for several months before obtaining positions elsewhere.

Plaintiffs allege that as a result of leaving IBM, they suffered lost base salary, lost vacation pay, lower pension accumulation, and lost matching contributions to savings plans, among other injuries. They also allege that at the [*4] time of their departure from IBM, that company had in place a full employment policy providing that in the event a position was terminated, the employee would be reassigned to another area in the company. Plaintiffs were at-will employees of both IBM and ESC.

## II. DISCUSSION

### A. The Releases

IBM argues that the releases that Plaintiffs signed upon leaving IBM's employ bar them from suing either IBM or ESC. The release's own language, however, defeats this argument. The release bars suit against IBM and its "agents, directors, officers, employees, representatives, successors and assigns" for any claims that Plaintiffs may have, including those relating to the termination of their employment. Popper Decl. Exs. A, B.

ESC, as a subsidiary of IBM, is not covered by the language of the release, broad though it may be. Plaintiffs' claims are directed at Covert and others who acted as agents of ESC, although they were also employed by IBM at the time. Thus, to the extent that Plaintiffs' allegations concern ESC and its agents, they fall outside the four corners of the release. Indeed, IBM is being sued here only in its capacity as successor-in-interest to ESC. There is nothing in the language [*5] of the release that can justify extending it to claims against later-created subsidiaries. [1]

> [1] The statements Plaintiffs signed to the effect that in leaving IBM they had not relied on any promises except those contained in the EST Program materials also pertains to statements of IBM employees, as IBM was the entity to which the releases applied.

### B. Fraudulent Inducement Claims

IBM next argues that Plaintiffs' fraudulent inducement claims are barred by the at-will employment doctrine. Under New York law, at-will employees cannot recover for wrongful termination, nor can they evade this bar by suing in tort. *See Murphy v. American Home Prods. Corp., 58 N.Y.2d 293, 297, 300-02, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983); Ullmann v. Norma Kamali, Inc., 207 A.D.2d 691, 616 N.Y.S.2d 583, 584 (App. Div. 1994).* In addition, plaintiffs cannot masquerade a breach of contract claim as a fraud claim. *See Saleemi v. Pencom Sys., Inc., 2000 U.S. Dist. LEXIS 6545,* No. 99 Civ. 667, 2000 WL 640647, at *4-5 (S.D.N.Y. May 17, 2000). At-will employees can, [*6] however, recover for fraudulent statements that induce them into accepting positions of employment by showing: (1) a material false representation; (2) scienter; (3) reasonable reliance; (4) damages; and, relevant here, (5) that the fraudulent misrepresentation was collateral or extraneous to the employment agreement. *See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 19-20 (2d Cir. 1996); Stewart v. Jackson & Nash, 976 F.2d 86, 88-90 (2d Cir. 1992).*

Plaintiffs have successfully pleaded a cause of action for fraudulent inducement. Plaintiffs do not seek to recover for their termination from ESC and its consequent impact on their careers and pocketbooks, but rather allege that they were induced to leave secure positions at IBM by the defendants' false representations, and that this inducement led to injuries stemming from the act of resigning from IBM. In *Stewart v. Jackson & Nash*, the Second Circuit Court of Appeals found that the plaintiff stated a claim for fraudulent inducement where she alleged that she changed employment in reliance on false promises regarding the nature of the defendant's law practice and her duties [*7] there. *976 F.2d 86, 88 (2d Cir. 1992).* The court found that the *Stewart* plaintiff's injuries, which involved damage to her career growth, "commenced well before her termination and were, in several important respects, unrelated to it." *Id. at 88.*

Courts since *Stewart* have allowed claims for fraudulent inducement where the injury alleged stems from leaving a former place of employment or agreeing to remain in a compromised position at a current place of employment, rather than from the termination or failure to perform terms of the employment agreement. *See, e.g., Doehla v. Wathne Ltd., 2000 U.S. Dist. LEXIS 9913,* No. 98 Civ. 6087, 2000 WL 987280, at *5-6 (S.D.N.Y. July 17, 2000); *Caron v. The Travelers Corp., 1998 U.S. Dist. LEXIS 10481,* No. 96 Civ. 6236, 1998 WL 395319, at *3-5 (S.D.N.Y. July 15, 1998); *Kissner v. Inter-Continental Hotels Corp., 1998 U.S. Dist. LEXIS 9248,* No. 97 Civ 8400, 1998 WL 337067, at *3 (S.D.N.Y.

June 25, 1998); *Cole v. Kobs & Draft Adver., Inc., 921 F. Supp. 220, 224-26 (S.D.N.Y. 1996); Garnier v. J.C. Penney Co., 863 F. Supp. 139, 140-41, 143 (S.D.N.Y. 1994); see also Navaretta v. Group Health, Inc., 191 A.D.2d 953, 595 N.Y.S.2d 839, 841 (App. Div. 1993).* [*8]

IBM attempts to distinguish *Stewart* and its progeny by arguing that those cases require a qualitative injury relating to the employee's experience at the new place of employment, such as affirmative damage to career growth or reputation. IBM asserts that Hyman and Palese performed their jobs successfully at ESC and suffered no actual injury until their termination from that company. However, the *Stewart* court used a straightforward fraud analysis in distinguishing the plaintiff's claim from one arising from the job termination itself, requiring only that the injury be separate and apart from the loss of a job. It so happened that the *Stewart* plaintiff's injuries were in the nature of damage to her career advancement, while Plaintiffs' injuries arise from loss of security and other benefits attendant to continued employment at IBM. [2]

> 2    In addition, while several cases following *Stewart* have involved injury similar to that of the *Stewart* plaintiff, no court has held that damage to career growth and reputation are the only permissible injuries in an at-will employee's fraudulent inducement action.

[*9] In addition to articulating an overall theory of fraudulent inducement, Plaintiffs have raised material issues of fact as to each of the elements of that cause of action. First, Plaintiffs have alleged that in reliance upon the statements of Covert and others that a five-year contract was in place between IBM and ESC, they resigned their employment at IBM and accepted positions at ESC. IBM concedes that such representations were made. Plaintiffs have raised triable issues of fact as to whether a five-year contract ever existed and as to whether those representations were material in causing Hyman and Palese to resign from IBM.

Second, Plaintiffs allege that Covert and other agents of ESC knew, or should have known, that there was no five-year contract in place at the time that they represented its existence to Plaintiffs. Plaintiffs' supporting affidavits raise a question of fact as to whether this was so.

Third, IBM argues that Plaintiffs, as at-will employees, could not reasonably rely on a representation of secure job employment. This assertion might be correct if Plaintiffs were challenging their termination from ESC. However, the measure of reliance here centers on the representation [*10] of a five-year contract that induced Plaintiffs to leave IBM, not on whether Plaintiffs would

in fact be employed at ESC for five years. Whether reliance on such representations was reasonable is a question of fact.

Fourth, damages in fraud actions are limited to out-of-pocket losses incurred as a direct result of the misrepresentation. *See Lama Holding Co. v. Smith Barney, Inc., 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996).* While IBM argues that Plaintiffs have in fact suffered no losses due to their subsequent earnings and severance packages, such determinations are appropriately made by the finder of fact. In addition, although Plaintiffs were at-will employees of IBM, damages can be measured based on how long they likely would have remained at IBM. *See Caron, 1998 WL 395319, at *5; Navaretta, 595 N.Y.S.2d at 841.*

Finally, the representations of a five-year contract between IBM and ESC were separate and apart from Plaintiffs' offers of employment or the terms of the offers. As such, those statements were "collateral or extraneous" to the employment contract itself. *See Bridgestone/Firestone, 98 F.3d at 20; Tannehill v. Paul Stuart, Inc., 226 A.D.2d 117, 640 N.Y.S.2d 505, 506 (App. Div. 1996).* [*11]

Thus, Plaintiffs have properly pleaded a cause of action for fraudulent inducement, and have met their burden in raising triable issues of fact as to each of its elements.

## C. Negligent Misrepresentation Claims

Plaintiffs' second claim alleges that the statements of Covert and others at ESC constituted reckless or negligent misrepresentations. Under New York law, Plaintiffs may recover for negligent misrepresentation only if IBM or ESC owed them a fiduciary duty. *See Stewart, 976 F.2d at 90.* Employers do not owe employees fiduciary duties. *See Ellis v. Provident Life & Accident Ins. Co., 3 F. Supp. 2d 399, 411 (S.D.N.Y. 1998), aff'd, 172 F.3d 37 (2d Cir. 1999).* Because Plaintiffs have offered no other facts that suggest the existence of such a duty, summary judgment in favor of IBM is appropriate on this claim. *See Kimmell v. Schaefer, 89 N.Y.2d 257, 263, 652 N.Y.S.2d 715, 675 N.E.2d 450 (1996).*

## III. CONCLUSION

IBM's motion for summary judgment is denied with respect to the fraudulent inducement claims but granted on the negligent misrepresentation claims.

## SO ORDERED.

Dated: New York, New York

October 17, 2000

2000 U.S. Dist. LEXIS 15136, *

JOHN S. MARTIN, JR.,  [*12]  U.S.D.J.