UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

| | |
|---|---|
| NAVIGANT CONSULTING, INC., a Delaware corporation, | : |
| | : |
| Plaintiff, | : Case No. 07 CIV 4854 |
| | : |
| | : **SECOND AMENDED ANSWER,** |
| - against - | : **AFFIRMATIVE DEFENSES,** |
| | : **AND COUNTERCLAIMS** |
| | : |
| JESS VARUGHESE, an individual, | : **JURY TRIAL DEMANDED** |
| | : |
| | : |
| Defendant. | : |

----------------------------------------------------------------x

## SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND JURY DEMAND

Defendant and counterclaimant Jess Varughese ("Varughese") hereby answers the complaint of Navigant Consulting, Inc. ("Navigant") on personal knowledge with respect to his own acts and upon information and belief with respect to all others and asserts the affirmative defenses and counterclaims set forth herein as follows:

## SUMMARY OF THE COMPLAINT

1.      Denies the allegations contained in paragraph 1 of the complaint.

2.      Denies the allegations contained in paragraph 2 of the complaint.

3.      Denies the allegations contained in paragraph 3 of the complaint.

4.      Denies the allegations contained in paragraph 4 of the complaint and alleges that Varughese is not contractually obligated to repay Navigant his starting bonus or retention bonus, that the amount sought by Varughese in his counterclaims far exceed any amount claimed by Navigant herein and that Navigant's claims are barred by its own fraudulent activities and unclean hands.

5.      Denies that Navigant has any colorable claims against Varughese as alleged in paragraph 5 of the complaint except admits that Navigant purports to bring the claims described in this paragraph.

## THE PARTIES

6.      Admits the allegations in paragraph 6 of the complaint.

7.      Denies the allegations contained in paragraph 7 of the complaint except admits that Varughese is a citizen of the State of New York residing at 14 Bayberry Road, Armonk, New York within this judicial district, that he is a former employee of Navigant, former co-leader of Navigant's Financial Services Practice, the practice area leader of Navigant's GFI subpractice, and a former Managing Director of Navigant.

## JURISDICTION

8.      Admits that the Court has diversity jurisdiction.

9.      Admits that Navigant purports to allege jurisdiction under 18 U.S.C. § 1331, but denies that Navigant has stated a colorable claim against Varughese under the provisions of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, cited by Navigant in the complaint.

10.      Denies that Varughese committed even a single wrong in or directed in New York as alleged in paragraph 10 of the complaint except admits that the Court has personal jurisdiction over him.

11.      Admits that venue is proper in this Court and that Varughese signed an agreement with Navigant that provides for venue in any state or federal court of competent jurisdiction in or for Armonk, New York.

## FACTUAL ALLEGATIONS

### Navigant's Financial Services Practice

12.    Admits the allegations contained in paragraph 12 of the complaint.

### Navigant's GFI Subpractice

13.    Denies the allegations contained in paragraph 13 of the complaint except admits that the GFI subpractice provides financial, staffing and operations advisory services for its clients and that Navigant provides services to Deutsche Bank's New York office and elsewhere.

14.    Denies the allegations contained in paragraph 14 of the complaint except admits that Navigant's GFI subpractice provides staffing support in two main ways.

15.    Denies the allegations contained in paragraph 15 of the complaint and alleges that, in fulfilling additional temporary support needs, the first option for Varughese's team was always to fulfill these positions with the most qualified candidates who were both cost-effective and available for the duration of the engagement.

16.    Admits the allegations contained in paragraph 16 of the complaint.

17.    Denies the allegations contained in paragraph 17 of the complaint except admits that Navigant finds appropriate individuals to work in on-site positions within Deutsche Bank and that Navigant is responsible for billing for its services.

18.    Denies knowledge or information sufficient to form a belief as to the truth or falsity of allegations concerning the number of consultants presently deployed on GFI projects at Navigant as alleged in paragraph 18 of the complaint, denies the remaining allegations contained in this paragraph, except admits that Varughese led the GFI subpractice, that Peter Bond was an Associate Director in the GFI subpractice and that Kostakis was one of four directors and two associate directors within the GFI subpractice.

### Defendant's Employment with Navigant

19.      Admits the allegations contained in paragraph 19 of the complaint, except denies that Varughese's sign-on bonus was subject to repayment if Varughese resigned within 36 months and alleges that there are additional employment terms not set forth in this paragraph.

20.      Denies the allegations contained in paragraph 20 of the complaint and alleges that the GFI subpractice, did not exist before Varughese joined Navigant, that Varughese was hired to build Navigant's presence in the capital market space and that Varughese built such a practice, which he named the GFI subpractice.

21.      Denies the allegations contained in paragraph 21 of the complaint.

22.      Admits the allegations contained in paragraph 22 of the complaint to the extent that they purport to describe Varughese's responsibilities as of January 2007 but not prior thereto.

23.      Denies the allegations contained in paragraph 23 of the complaint except admits that Varughese was asked to join the Business and Financial Operations Advisory Segment Committee, and alleges that Varughese did not attend a single management committee meeting.

24.      Denies the allegations contained in paragraph 24 of the complaint and alleges that, pursuant to Navigant's policies and express instructions, only the Managing Director and manager of record on a client contract had primary and direct responsibility for the work performed under the contract, including staffing decisions, that Deutsche Bank was managed by Sharon Siegel Voelzke ("Voelzke"), not Varughese, and that Varughese was expressly instructed by Navigant not to have direct responsibility for Deutsche Bank.

25.      Denies the allegations contained in paragraph 25 of the complaint, and alleges that, when staffing projects, Varughese's team would fill positions with the most qualified candidates who were both cost-effective and available for the duration of the engagement.

26.      Denies the allegations contained in paragraph 26 of the complaint.

27.      Denies the allegations contained in paragraph 27 of the complaint and alleges that pursuant to Navigant's express instructions Varughese was not permitted to have direct responsibility for Deutsche Bank and was not familiar with the day-to-day details of Navigant's relationship with this company.

### Certain of the Defendant's Fiduciary, Contractual and Other Duties

28.      The allegations contained in paragraph 28 call for a legal conclusion for which no response is required.

29.      Denies the allegations contained in paragraph 29 of the complaint.

30.      Denies the allegations contained in paragraph 30 of the complaint.

31.      Paragraph 31 of the complaint contains a characterization of a term of a Non-Solicitation Agreement.  Since this agreement speaks for itself, no response is required and Varughese refers the Court to the Non-Solicitation Agreement for the true and accurate terms and conditions thereof.

32.      Paragraph 32 purports to contain excerpts of a Non-Solicitation Agreement.  Since the agreement speaks for itself, no response is required and Varughese respectfully refers the Court to the Non-Solicitation Agreement for the true and accurate terms and conditions thereof.

33.      Varughese admits that he signed a Certificate of Receipt as referenced in paragraph 33 of the complaint.  The remaining allegations of this paragraph purport to be

an excerpt of a provision from Navigant's Employee Handbook. Since the Employee Handbook speaks for itself, no response is required and Varughese respectfully refers the Court to the Employee Handbook for the true and accurate terms and conditions thereof.

34.    Paragraph 34 contains characterizations of certain terms of an Employee Handbook. Since the Employee Handbook speaks for itself, no response is required and Varughese respectfully refers the Court to the Employee Handbook for the true and accurate terms and conditions thereof.

35.    Paragraph 35 contains characterizations of certain terms of an Employee Handbook. Since the Employee Handbook speaks for itself, no response is required and Varughese respectfully refers the Court to the Employee Handbook for the true and accurate terms and conditions thereof.

36.    Paragraph 36 contains both characterizations of certain terms of an Employee Handbook and purports to reproduce excerpts thereof. Since the Employee Handbook speaks for itself, no response is required and Varughese respectfully refers the Court to the Employee Handbook for the true and accurate terms and conditions thereof.

37.    Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 37 of the complaint.

**Varughese's Starting Bonus**

38.    Paragraph 38 contains characterizations of certain terms of the Recovery Agreement. Since the Recovery Agreement speaks for itself, no response is required and Varughese respectfully refers the Court to the Recovery Agreement for the true and accurate terms and conditions thereof.

39.    Paragraph 39 contains characterizations of the terms of the Recovery Agreement. Since the Recovery Agreement speaks for itself, no response is required and

Varughese respectfully refers the court to the Recovery Agreement for the true and accurate terms and conditions thereof.

40.    Paragraph 40 appears to contain an excerpt of a provision from the Recovery Agreement.  Since the Recovery Agreement speaks for itself, no response is required and Varughese respectfully refers the Court to the Recovery Agreement for the true and accurate terms and conditions thereof.

41.    Paragraph 41 is a characterization of one of the terms of the Recovery Agreement.  Since the Recovery Agreement speaks for itself, no response is required and Varughese respectfully refers the court to the Recovery Agreement for the true and accurate terms and conditions thereof.

42.    Paragraph 42 of the complaint calls for a legal conclusion for which no response is required.

43.    Paragraph 43 appears to contain an excerpt of one provision of the Recovery Agreement.  Since the Recovery Agreement speaks for itself, no response is required and Varughese respectfully refers the Court to the Recovery Agreement for the true and accurate terms and conditions thereof.

### Varughese's Retention Bonus

44.    Paragraph 44 contains a characterization of certain terms of a Retention Bonus Agreement.  Since the Retention Bonus Agreement speaks for itself, no response is required and Varughese respectfully refers the Court to the Retention Bonus Agreement for the true and accurate terms and conditions thereof.

45.    Paragraph 45 contains a characterization of the terms of a Retention Bonus Agreement.  Since the Retention Bonus Agreement speaks for itself, no response is

required and Varughese respectfully refers the Court to the Retention Bonus Agreement for the true and accurate terms and conditions thereof.

46.     Paragraph 46 purports to contain an excerpt of one provision of the Retention Bonus Agreement.  Since the Retention Bonus Agreement speaks for itself, no response is required and Varughese respectfully refers the Court to the Retention Bonus Agreement for the true and accurate terms and conditions thereof.

47.     Paragraph 47 contains a characterization of the terms of the Retention Bonus and calls for a legal conclusion for which no response is required.  Varughese respectfully refers the Court to the Retention Bonus Agreement for the true and accurate terms and conditions thereof.

48.     Paragraph 48 contains a characterization of the terms of the Retention Bonus and calls for a legal conclusion for which no response is required.  Varughese respectfully refers the Court to the Retention Bonus Agreement for the true and accurate terms and conditions thereof.

49.     Paragraph 49 contains a characterization of the terms of the Retention Bonus and calls for a legal conclusion for which no response is required.  Varughese respectfully refers the Court to the Retention Bonus Agreement for the true and accurate terms and conditions thereof.

<b>Varughese Received Restricted Stock Pursuant to<br>Restricted Stock Award Agreement</b>

50.     Admits that Varughese executed a Restricted Stock Award Agreement on or about September 13, 2005.

51.     Paragraph 51 contains characterizations of the terms of the Restricted Stock Award Agreement. Since the Restricted Stock Award Agreement speaks for itself, no

response is required and Varughese respectfully refers the Court to the Restricted Stock Award Agreement for the true and accurate terms and conditions thereof.

52.    Paragraph 52 contains a characterization of the terms of the Restricted Stock Award Agreement and calls for a legal conclusion for which no response is required. Varughese respectfully refers the Court to the Restricted Stock Award Agreement for the true and accurate terms and conditions thereof.

53.    Paragraph 53 contains a characterization of the terms of the Restricted Stock Award Agreement and calls for a legal conclusion for which no response is required. Varughese respectfully refers the Court to the Restricted Stock Award Agreement for the true and accurate terms and conditions thereof.

54.    Admits only that Varughese has vested awards of 5,170 shares of restricted stock.  The remaining allegations contained in paragraph 54 are a characterization of the terms of the Restricted Stock Award Agreement and calls for a legal conclusion for which no response is required. Varughese respectfully refers the Court to the Restricted Stock Award Agreement for the true and accurate terms and conditions thereof.

### Varughese's Development of New And Competing Business Venture

55.    Denies the allegations contained in paragraph 55 of the complaint.

56.    Denies the allegations contained in paragraph 56 except admits that on March 7, 2007 Varughese sent external counsel an email attaching Navigant's proposed Retention Bonus Agreement, that Varughese signed the Retention Bonus Agreement, and received payment of $115,000 from Navigant.

57.     Denies the allegations contained in paragraph 57 of the complaint except admits that Varughese voluntarily resigned from Navigant in early April, 2007 and that his last day of employment at Navigant was April 20, 2007.

58.     Denies the allegations contained in paragraph 58 of the complaint.

59.     Denies the allegations contained in paragraph 59 of the complaint except admits that Varughese is listed as a contact person for Milestone.

## Varughese's Plot To Raid Navigant's
## Employees and Business Opportunities

60.     Denies the allegations contained in paragraph 60 of the complaint.

61.     Denies the allegations contained in paragraph 61 of the complaint and alleges that Varughese's team communicated with Navigant subcontractors and received and requested resumes from them in the ordinary course of business.

62.     Denies the allegations contained in paragraph 62 of the complaint and alleges that in fact, in April 2007, Varughese and his team actively directed numerous opportunities towards Navigant.  Specifically, among other opportunities that Varughese's team directed towards Navigant, Varughese caused three Navigant employees to be deployed in positions for Navigant clients in April 2007;  Varughese favorably recommended Navigant to an important target client of Navigant (a well-known investment bank) and actively assisted Navigant in developing this valuable corporate opportunity during the week of April 16, 2007; and Varughese's team discussed and transitioned to Navigant leadership a significant Request for Proposal opportunity from a financial services group during the week of April 23, 2007.

63.     Denies the allegations contained in paragraph 63 of the complaint.

64.     Denies the allegations contained in paragraph 64 of the complaint.

65.    Denies the allegations contained in paragraph 65 of the complaint.

66.    Denies the allegations contained in paragraph 66 of the complaint.

67.    Denies the allegations contained in paragraph 67 of the complaint.

68.    Denies the allegations contained in paragraph 68 of the complaint except admits that Davis is now employed by Milestone and alleges that Davis is not working on the same matters as she worked on at Navigant.

69.    Denies knowledge or information sufficient to form a belief as to the truth or falsity of matters concerning other parties and denies the remaining allegations contained in paragraph 69 of the Complaint except admits that Milham is currently working for Milestone and expressly denies that Milham is working on the same matters as he worked on at Navigant.

70.    Denies knowledge or information sufficient to form a belief as to the truth or falsity of matters concerning other parties and denies the remaining allegations contained in paragraph 70 of the Complaint except admits that Ellis is currently working for Milestone and expressly denies that Ellis is working on the same matters as he worked on at Navigant.

71.    Paragraph 71 contains a characterization of the terms of a Confidentiality and Property Agreement and calls for a legal conclusion for which no response is required. Varughese respectfully refers the Court to the Confidentiality and Property Agreement for the true and accurate terms and conditions thereof.

72.    Paragraph 72 appears to contain an excerpt of a provision in a Confidentiality and Property Agreement.  Since the Confidentiality and Property Agreement speaks for itself, no response is required and Varughese respectfully refers the

Court to the Confidentiality and Property Agreement for the true and accurate terms and conditions thereof.

73.     Denies knowledge or information sufficient to form a belief as to the truth or falsity of facts relating to third parties and denies the remaining allegations contained in paragraph 73 of the complaint.

74.     Denies the allegations contained in paragraph 74 of the complaint.

**Varughese's Team Steals Corporate Opportunities from Navigant**

75.     Denies the allegations contained in paragraph 75 of the complaint.

**Varughese's Team Takes First Corporate Opportunity**

76.     Denies the allegations contained in paragraph 76 of the complaint.

77.     Denies the allegations contained in paragraph 77 of the complaint.

78.     Denies the allegations contained in paragraph 78 of the complaint.

79.     Denies the allegations contained in paragraph 79 of the complaint, except admits that Varughese's team received numerous resumes from third party consultants in the ordinary course of business and that the resumes of the individuals referenced therein may have been included among them.

80.     Denies knowledge or information sufficient to form a belief as to allegations pertaining to third parties.

81.     Denies that the GFI subpractice ever hired the four non-Navigant consultants to work on matters for Deutsche Bank as alleged in paragraph 81 of the complaint, and denies knowledge or information sufficient to form a belief as to allegations pertaining to the opinions or thoughts of third parties.

82.     Denies the allegations contained in paragraph 82 of the complaint.

**Varughese's Team Takes Second Corporate Opportunity**

83.      Denies the allegations contained in paragraph 83 of the complaint.

84.      Denies the allegations contained in paragraph 84 of the complaint.

85.      Denies the allegations contained in paragraph 85 of the complaint.

86.      Denies the allegations contained in paragraph 86 of the complaint.

87.      Denies knowledge or information sufficient to form a belief as to truth or falsity of allegations pertaining to third parties as alleged in paragraph 87 of the complaint.

88.      Denies the allegations contained in paragraph 88 of the complaint.

89.      Denies knowledge, information or belief sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 89 of the complaint, and alleges that numerous resumes were sent to Varughese's team in the ordinary course of business and that the resume of the consultant in question may have been emailed to Varughese's team.

90.      Denies the allegations contained in paragraph 90 of the complaint.

**Varughese's Team Takes Third Corporate Opportunity**

91.      Admits the allegations contained in paragraph 91 of the complaint and alleges that Navigant terminated its relationship with the client referenced in this paragraph and that Sandhu's role with this client ended as a consequence thereof.

92.      Admits the allegations contained in paragraph 92 of the complaint, but alleges that Varughese replaced the Navigant consultant at issue with Sandhu at the express request of the client because of the client's ongoing dissatisfaction with the performance of the Navigant consultant, which dissatisfaction was known to Navigant's leadership.

93.      Denies the allegations contained in paragraph 93 of the complaint.

94.      Denies the allegations contained in paragraph 94 of the complaint.

**Varughese's Team Attempts to Take Another Corporate Opportunity**

95.      Denies the allegations contained in paragraph 95 of the complaint.

96.      Denies knowledge or information sufficient to form a belief as to truth or falsity of allegations pertaining to third parties as alleged in paragraph 96.

97.      Denies the allegations contained in paragraph 97 of the complaint and alleges that upon information and belief, Carson is working for Navigant.

**COUNT I- BREACH OF FIDUCIARY DUTY AND AIDING AND ABETTING OTHERS IN BREACH OF THEIR FIDUCIARY DUTIES**

98.      Varughese repeats and realleges each of his responses set forth in paragraphs 1 through 97 above as if fully set forth herein.

99.      Denies the allegations contained in paragraph 99 of the complaint.

100.      Denies the allegations contained in paragraph 100 of the complaint.

101.      Denies the allegations contained in paragraph 101 of the complaint.

102.      Denies the allegations contained in paragraph 102 of the complaint.

**COUNT II- BREACH OF CONTRACT**

103.      Varughese repeats and realleges each of his responses set forth in paragraphs 1 through 102 above as if fully set forth herein.

104.      Denies the allegations contained in paragraph 104 of the complaint.

105.      Denies the allegations contained in paragraph 105 of the complaint.

106.      Denies the allegations contained in paragraph 106 of the complaint, and alleges that Varughese is entitled to retain his vested shares under the Restricted Stock Agreement because he did not breach any term of his employment agreement.

## COUNT III- REPAYMENT UNDER RECOVERY AGREEMENT
## AND RETENTION BONUS AGREEMENT

107.      Varughese repeats and realleges each of his responses set forth in paragraphs 1 through 106 above as if fully set forth herein.

108.      Denies the allegations contained in paragraph 108 of the complaint.

109.      Denies the allegations contained in paragraph 109 of the complaint except admits that Varughese's starting date at Navigant was in or about August 31, 2005 and that his last day of employment at Navigant was April 20, 2007, and alleges that Navigant subsequently represented to Varughese that the bonus paid to him was remuneration for Varughese's forfeiture of his 2005 bonus and stock vesting opportunities from his prior employer, and was thus a non-refundable payment to compensate Varughese for lost opportunities that he would be entitled to retain even if he later chose to leave Navigant.

110.      Denies the allegations contained in paragraph 110 of the complaint, and alleges that, even if Navigant's false assertion regarding repayment were correct, under the terms of the Recovery Agreement, Navigant has incorrectly calculated the amounts purportedly due.

111.      Denies the allegations contained in paragraph 111 of the complaint.

112.      Denies the allegations contained in paragraph 112 of the complaint except admits that the Retention Bonus Agreement was signed in or about March 9, 2007 and that Varughese's last day of employment at Navigant was April 20, 2007, and alleges that Navigant subsequently represented both orally and in writing to Varughese that the funds paid to him under the Retention Bonus Agreement was compensation for work that Varughese performed in 2006, and thus part of Varughese's 2006 compensation.

113.    Denies the allegations contained in paragraph 113 of the complaint, and alleges that, even if Navigant's false assertion regarding repayment were correct, Navigant has incorrectly calculated the amounts purportedly due under the Retention Bonus Agreement, as modified by the express representations made by Navigant to Varughese and others regarding the calculation of repayment under that agreement.

114.    Denies the allegations contained in paragraph 114 of the complaint.

## COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030 ET SEQ)

115.    Varughese repeats and realleges each of his responses set forth in paragraphs 1 through 114 above as if fully set forth herein.

116.    Denies the allegations contained in paragraph 116 of the complaint.

117.    Denies the allegations contained in paragraph 117 of the complaint.

118.    Denies the allegations contained in paragraph 118 of the complaint.

119.    Denies the allegations contained in paragraph 119 of the complaint.

120.    Denies the allegations contained in paragraph 120 of the complaint.

121.    Denies the allegations contained in paragraph 121 of the complaint.

122.    Denies the allegations contained in paragraph 122 of the complaint.

123.    Denies the allegations contained in paragraph 123 of the complaint.

## RESPONSE TO PRAYER FOR RELIEF

124.    Varughese denies that Navigant is entitled to any of the relief requested or to any other relief.

## FIRST AFFIRMATIVE DEFENSE

125.    The complaint fails to state a claim upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

126.    The claims are barred by the doctrines of unclean hands and equitable estoppel. As set forth in more detail in Varughese's counterclaims, Navigant aggressively solicited Varughese and convinced him to leave his prior employment by making false and fraudulent promises about the compensation Varughese would receive at Navigant and the position he would hold.  Navigant targeted Varughese while still employed elsewhere and actively lured him from his prior employer in the hopes of building a practice group that it was otherwise ill-equipped to build.

## THIRD AFFIRMATIVE DEFENSE

127.    Navigant's breach of contract claims are barred, in whole or in part, by its own material breach of the various agreements.

## FOURTH AFFIRMATIVE DEFENSE

128.    Navigant's breach of contract claims are barred because Navigant fraudulently induced Varughese to enter into the various agreements.

## FIFTH AFFIRMATIVE DEFENSE

129.    Navigant's breach of contract claims under the Recovery Agreement and Retention Bonus Agreement are barred by the doctrines of modification and/or waiver. Specifically, Navigant cannot prevail on its claim under the Recovery Agreement to recover a portion of the sign-on bonus paid to Varughese because Navigant subsequently represented to Varughese that the bonus paid to him was remuneration for Varughese's forfeiture of his 2005 bonus and stock vesting opportunities from his prior employer, and was thus a non-refundable payment to compensate Varughese for lost opportunities that he would be entitled to retain even if he later chose to leave Navigant.  Likewise, Navigant cannot recover on its claim under the Retention Bonus Agreement because Navigant

subsequently represented both orally and in writing to Varughese that the funds paid to him
under the Retention Bonus Agreement were compensation for work that Varughese
performed in 2006, and were part of Varughese's 2006 compensation. Even if Navigant's
false assertions regarding repayment under these agreements were correct, Navigant has
incorrectly calculated the amounts purportedly due under them.

## COUNTERCLAIMS

### Summary of Counterclaims

130.    These counterclaims arise out of Navigant's discrimination against Mr.
Varughese, carried out in conjunction with its systemic fraudulent practice of soliciting
individuals from other companies and inducing those individuals to join Navigant by
making false and fraudulent promises that it never intends to keep. As discussed in more
detail below, in keeping with this systemic practice, Navigant embarked on a carefully
crafted campaign of false representations and aggressive solicitation techniques designed to
lure Varughese from his then-place of employment and to exploit his extensive knowledge
of the financial services industry to build a successful capital markets group at Navigant
that never existed before.

131.    Although Varughese successfully built a significant capital market
presence at Navigant, Navigant breached its agreement to provide additional compensation
to Varughese based on his division's performance. In addition, Navigant fraudulently
reneged on its express promises – which it never intended to keep at the time they were
made – to make Varughese head of Navigant's Financial Services Practice and to guarantee
that Varughese would receive total compensation in an amount equal to 20% of the net
revenue generated by the GFI subpractice. In so doing, Navigant fraudulently induced
Varughese to leave his current employment and to accept a position at Navigant that he

never would have accepted if Navigant had told him the truth about its lack of intent to compensate him or to promote him in accordance with its promises.

132.     Moreover, on information and belief, Navigant's refusal to promote Varughese to Head of the Financial Services Practice was based in substantial part on the fact that Varughese is a person of Indian descent.  Consistent with the composition of Navigant's senior management – which is almost all Caucasian – Navigant named Voelzke, a Caucasian woman, to be Head of the Financial Services practices instead of Varughese. And Navigant did so despite the fact that Varughese was fully qualified to be head of the Financial Services practice, far more qualified with the relevant skills and experience for that position than Voelzke, and was specifically promised that position at the time Navigant recruited him.

133.     Still worse, Navigant subsequently gave Varughese instead a far less senior and far more demeaning title, "co-leader" of the Financial Services Practice, together with Erik Linn – a Caucasian man.  On information and belief, Navigant had never previously named "co-leaders" for its individual practice groups.  Rather, Navigant's longstanding policy and practice was to place each such practice under the leadership of a single individual, who – also by company policy and practice – was a Caucasian man or woman.  Thus, though numerous Caucasian persons had been vested with sole leadership, Navigant departed from this usual practice in the case of Varughese, a person of Indian descent.  Consistent with Navigant's pattern of staffing leadership positions with Caucasian persons, Navigant chose instead to treat a person of Indian descent differently, apparently motivated by its own discriminatory belief that a racial minority, such as Varughese, could not lead a practice group on his own, but instead needed the assistance and purported "co-

leadership" of a Caucasian man, albeit one far less experienced and qualified than Varughese himself. Varughese's purported "promotion" to be a "co-leader" of the Financial Services Practice was in fact a discriminatory, adverse employment action that caused Varughese loss of professional stature and esteem, humiliation, and additional monetary and emotional harm.

134.    In April 2007, Varughese finally departed Navigant to practice in the field in which he has worked for his entire adult life and pursue leadership roles that had been foreclosed to him at Navigant due to discriminatory and fraudulent intent. Rather than own up to its breach of promises and fraud, Navigant instead commenced this action in willful retaliation for Varughese commencing his own legitimate business in the very sector in which he has devoted the last fifteen years of his professional life and in which Navigant would have no significant presence but for Varughese. Navigant's action is nothing more than a transparent attempt to shut down legitimate competitive conduct by a former employee. On the other hand, Varughese's counterclaims are a legitimate attempt by Varughese to redress the harm caused by Navigant's employment discrimination, breach of contract and fraud. By this action, Varughese also seeks punitive damages against Navigant, based on its willful and fraudulent conduct as alleged herein.

## Jurisdiction and Venue

135.    This Court has jurisdiction over the counterclaims under 28 U.S.C. § 1332 because Navigant is incorporated in Delaware and has its principal place of business in Illinois, and Varughese is a citizen of the State of New York, and the amount in controversy, exclusive of interests and costs, exceeds the sum of $75,000. In addition, this Court has supplemental jurisdiction over these counterclaims under 28 U.S.C. § 1367. Venue is appropriate in this District for the same reasons alleged in the complaint.

## Factual Allegations For Counterclaims

### Navigant Targets Varughese As A Valuable Recruit
### And Aggressively Solicits Him to Leave Bearing Point

136.    In 2005, Navigant decided to develop a new practice area in capital markets – an area in which Navigant had little or no prior expertise.

137.    Navigant had previously hired a former employee of Bearing Point, Varughese's former employer.  In the course of his employment at Navigant, this individual, on information and belief, identified Varughese as a valuable potential recruit at Bearing Point who could be instrumental in helping Navigant build a capital markets practice, and to assist in the development of its existing financial services practice.

138.    Varughese at the time had over fifteen years of experience and expertise in the capital markets and global financial services business in New York, and was already a well-known consulting professional in this segment of the market.

139.    In or about January 2005, Varughese received a series of unsolicited telephone calls from Navigant employees actively encouraging him to consider leaving his position at Bearing Point for a position at Navigant.

140.    From the representations that Navigant employees made to him at the time, it was clear to Varughese that Navigant had conducted extensive background research about him and his qualifications, and had targeted him as a valuable recruit in its effort to build a capital markets practice.

141.    Varughese resisted Navigant's initial attempts to recruit him and declined repeated overtures to meet with Navigant to discuss a position there.

**Navigant Induces Varughese To Join Navigant
With False Promises It Never Intended To Keep**

142.    In February 2005, Varughese finally agreed to have lunch with Doug

Reichert, Navigant's Executive Managing Director, to discuss a possible position with

Navigant.

143.    At the lunch, Reichert told Varughese that Navigant was extremely

interested in having Varughese join Navigant, and that Navigant was prepared to do

everything it could to make that possible.

144.    In mid-February 2005, Varughese agreed to have a breakfast meeting in

New York with Julie Howard ("Howard"), Navigant's Chief Operating Officer, to discuss

the new position.  Howard flew to New York for the sole purpose of meeting with

Varughese and persuading him to join Navigant.

145.    At that meeting, Varughese explained that he had some questions about

the position that Navigant envisioned for him – in particular, Varughese was not sure who

within Navigant was hiring him, and what precisely his role would be within Navigant.

146.    Howard told Varughese that she was hiring him, that Varughese would

report directly to Howard, and that Howard intended to make Varughese the head of

Navigant's Financial Services Practice, which she explained was going to be defined to

become a distinct practice group within Navigant.

147.    At the time of the breakfast, Navigant's financial services practice was a

part of its Financial Insurance & Claims Services ("FICS") Practice.  Howard told

Varughese that the FICS Practice was shortly going to be separated into two separate

practice groups, one of which would be a new practice group, called the Financial Services

Practice, devoted exclusively to financial services.  Howard told Varughese that the

Financial Services Practice would be established in approximately three months, and that Varughese would be head of the Financial Services Practice from its inception.

148.     Though he had not otherwise planned to leave Bearing Point, these representations by Howard and Reichert about the position Varughese would have at Navigant caused Varughese to consider accepting employment with Navigant.

149.     In or about late May 2005, Reichert and Varughese met to negotiate further terms of Varughese's potential employment with Navigant.  Reichert told Varughese that he would receive total compensation of 20% of the net revenue generated by the GFI subpractice under his direction.  Reichert explicitly represented to Varughese that if 20% of the net revenue generated by the GFI subpractice for a given year exceeded Varughese's base salary and any other compensation that might be paid by Navigant, Navigant would make up the difference to ensure that his total compensation package equaled 20% of the net revenue generated by the GFI subpractice.

150.     In late June, Reichert called Varughese and asked him what it would take to finalize the deal and get Varughese to join Navigant. Varughese told Reichert that he needed another confirmation directly from Howard that he would be made head of the Financial Services Practice as previously represented.  Reichert arranged for Varughese and Howard to speak directly for the express purpose of confirming Navigant's promise that Varughese would head the Financial Services Practice.  During that phone call, Varughese explained to Howard that he would not leave his position at Bearing Point and accept Navigant's offer of employment unless he received assurances that, as Howard previously had promised, the Financial Services Practice was going to be established as a

separate practice group within a few months, and that Varughese would be made the head of that practice at its inception.

151.    Howard expressly confirmed to Varughese that the Financial Services Practice would be split off from FICS in a few months, and that Varughese would be made head of the Financial Services Practice at that time.

152.    Based on Navigant's practices at the company and statements that were made to Varughese at the time of his resignation, it is apparent that Navigant never intended to meet its compensation promises.  It was also clear from Navigant's actions as set forth in more detail below – namely, its decision to make Voelzke the head of the Financial Services Practice instead of Varughese, despite his superior qualifications – that Navigant also never intended to make Varughese the head of the Financial Services Practice.

153.    Navigant falsely promised Varughese that he would be the head of the Financial Services Practice, and that he would receive total compensation equal to 20% of the net revenue generated by the GFI subpractice, in order to fraudulently induce him to leave his position with Bearing Point and to join Navigant.

154.    Upon information and belief, Navigant makes it a practice to solicit and recruit high-level consultants, such as Varughese, by making false promises that it never intends to keep.

## Varughese Accepts Navigant's Offer of Employment

155.    On June 29, 2005, Navigant sent Varughese a letter addressing certain employment terms, including some aspects of his compensation such as his base salary and eligibility to participate in Navigant's discretionary bonus program.

156.    The June 29 letter did not contain any integration clause reciting that it represented the entire agreement between the parties with respect to Varughese's compensation, nor did it bar any oral modification.

157.    Varughese also received two other documents, the Non-Solicitation Agreement and the Recovery Agreement.

158.    On July 15, 2005, Varughese signed the June 29 letter, and in addition signed the Non-Solicitation Agreement and the Recovery Agreement.

159.    Subsequently, on September 13, 2005, Varughese agreed in writing to the terms of a Restricted Stock Award Agreement, or Long-Term Incentive Plan, in what was, upon information and belief, a Navigant form letter for that plan.

160.    The complete terms to which Varughese agreed in accepting employment with Navigant included Navigant's promise that, after the calculation of compensation he might receive under the terms of the various writings he had signed, or any other compensation Navigant might pay, Navigant would make whatever payment was necessary to bring Varughese's total compensation to an amount equal to 20% of the net revenue generated by the GFI subpractice.

161.    Both parties understood that Varughese's employment agreement included the additional term, to which the parties orally agreed, that Varughese would receive total compensation in an amount equal to 20% of net revenue generated by the GFI subpractice.

**Varughese Brings His Substantial Expertise and Experience to Navigant And
Creates A Successful Capital Markets Practice**

162.    Varughese began employment at Navigant on or about August 31, 2005.

163.    As Navigant had hoped when it recruited him, Varughese brought with him comprehensive knowledge and expertise in the capital markets area, including an

understanding of pricing and typical contractual arrangements, client needs, and marketing strategies; prospective clients, and subcontractors; and a strategic vision for creating a successful financial services practice targeted at capital markets and investment management clients.

164.    Before Varughese joined Navigant, Navigant did not possess any of this expertise or experience in the capital markets area.

165.    In 2006, Varughese exceeded all expected revenue goals for the GFI subpractice.  Under Varughese's leadership, the GFI subpractice significantly exceeded its goals for the period of the 2007 through the end of April.

166.    Varughese's experience and expertise were thus indispensable to Navigant's ability to develop and create a successful capital markets practice.

**Navigant Reaffirms Its Promise To Pay Varughese**
**<u>20% of Net Revenue, And Never Fulfills That Promise</u>**

167.    Shortly after Varughese began employment with Navigant in the Fall of 2005, Navigant on two occasions reaffirmed and renewed its express promise to pay Varughese total compensation equal to 20% of the net revenue generated by the GFI subpractice.  Navigant made another representation renewing and reaffirming this compensation promise to Varughese in early 2006.

168.    Navigant, through Doug Reichert, made these representations to Varughese in the context of Navigant's efforts to recruit new candidates.  Navigant reaffirmed the oral compensation promise it had made to Varughese as part of its effort to fraudulently induce potential candidates to join Navigant on the same false terms – just as Navigant had made the exact same promises to Varughese at the time it recruited him.

169.     Varughese assented to and accepted these renewed oral promises, which Navigant made subsequent to the time that Varughese began working at Navigant.

170.     During the course of his employment with Navigant, Navigant failed to fulfill its promise that Varughese would receive a total compensation package equal to 20% of net revenue generated by the GFI subpractice.

171.     Indeed, although Varughese's division generated approximately $7- $8 million in net revenue in 2006, Varughese's total compensation for 2006 was approximately $815,000 – an amount far short of the 20% net revenue figure (approximately $1.4 - $1.6 million) that Navigant expressly promised to pay him.

172.     Varughese later learned, from Voelzke and others within Navigant, that the false promises Navigant had made to him of a compensation packages equaling 20% of net revenue were standard operating procedure at Navigant when recruiting candidates, and that Navigant routinely did not honor such promises.

173.     Indeed, as noted, on at least three occasions during his employment at Navigant, Varughese personally observed high-level Navigant employees making similar promises to prospective candidates of Navigant.

174.      It was generally understood within Navigant that Navigant would make such promises solely to induce prospective hires to join Navigant, that Navigant never intended to fulfill these promises, and that it did not in fact do so.   Navigant's failure to live up to these promises caused, and is causing, substantial and widespread discontent among Navigant's workforce.

### In Furtherance Of Its Fraudulent Scheme, Navigant
### Fails to Make Varughese Head of Financial Services

175.    Notwithstanding Varughese's indispensable contribution to Navigant's efforts to develop and create a capital markets practice area, and its express and repeated promises that Varughese would be named head of the Financial Services Practice once it was created, Navigant announced in or about November 2005 that Voelzke, a Caucasian woman, was to be named head of that practice.

176.    The decision to appoint Voelzke as head of the Financial Services Practice had no sound business justification inasmuch as Voelzke did not possess the extensive experience and proven leadership that Varughese had demonstrated in the capital markets and financial services area for over fifteen years.  In fact, Voelzke's experience was primarily in the insurance and claims services sector.

177.    In October 2005 – just one month after Varughese joined Navigant, and one month before Voelzke was made head of Financial Services– Voelzke inadvertently sent Varughese a company email containing an organizational chart of Navigant's financial services and insurance practices.  The chart listed Voelzke, not Varughese, as the head of the Financial Services Practice.

178.    When Varughese asked Voelzke why the organizational chart listed her as the head of the Financial Services Practice, Voelzke falsely stated that that information was not accurate and had no significance.  Yet, despite this representation, one month later, Voelzke was in fact made head of this practice.

179.    Navigant obviously never intended to make Varughese the head of the Financial Services Practice, and had a secret and undisclosed intention to name Voelzke as head of that practice instead.

180.     Navigant falsely told Varughese otherwise solely for the purpose of fraudulently inducing him to leave his position with Bearing Point and join Navigant.

181.     On information and belief, Navigant has as a general matter a practice of making similar false and fraudulent representations to prospective employees in an effort to induce them to join Navigant and to leave valuable employment positions.

182.     In addition, on information and belief, the decision to name Voelzke to the position of Head of the Financial Services Practice, instead of Varughese, was motivated by Navigant's discriminatory intent to keep the composition of its senior management Caucasian, and the ineligibility of a racial minority, such as Varughese, to be endowed with a sole, prominent position of authority at Navigant.

### Navigant Names Varughese To The Novel and Demeaning Position of "Co-Leader" of the Financial Services Practice

183.     In January 2007, in yet another restructuring of Navigant's practice groups, Navigant promoted Voelzke to a different position within the company, leaving the position of Head of the Financial Services Practice – the position that Navigant falsely promised to Varughese in 2005 – once again vacant.

184.     Instead of attempting to rectify its prior, discriminatory refusal to name Varughese sole Head of the Financial Services Practice, Navigant instead added insult to injury and named Varughese to a novel title – one created apparently for racial minorities – "co-leader" of that practice.  Navigant named Erik Linn, a Caucasian man with substantially less experience than Varughese in the financial services arena and far less qualifications, as the other "co-leader" of the Financial Services Practice.

185.    On information and belief, Navigant had never before named two individuals to be "co-leaders" of an individual practice group.  Rather, the established company policy was to name a single individual – on information and belief, always a Caucasian individual during the time of Varughese's employment – to lead each practice group.

186.    Navigant's decision to name Varughese as "co-leader" of the Financial Services Practice represented a strategic ploy by Navigant to financially exploit Varughese's expertise while depriving him of the full status and authority which he had earned and deserved, and continuing its discrimination among senior management.

187.    By giving Varughese an empty, shared change of title, rather than the genuine promotion to a senior leadership role that he had been promised, Navigant hoped to lull Varughese into staying at the company and continuing to devote efforts to Navigant's behalf.  At the same time, by twice denying Varughese the position of sole Head of the Financial Services Practice that it had originally promised him, and by ensuring that a Caucasian man be seen at the helm of the Financial Services Practice rather than permit that group to be led solely by a person of Indian descent,  Navigant perpetuated its discriminatory practice of excluding racial minorities from  the most senior management positions at the company.

188.    The novel position of "co-leader" of the Financial Services Practice was demeaning to Varughese in that it suggested to others, within Navigant and in the industry more generally, that Varughese was not capable or qualified to lead the Financial Services Practice by himself.  This was especially true in light of Navigant's settled and publicly known practice of having practice areas be led by a single person.  Given Varughese's

qualifications and professional experience, the only inference to be drawn from Navigant's strained effort to avoid promoting him as promised is that Navigant's conduct was motivated by the fact that Varughese is a person of Indian descent and not, like the rest of Navigant's senior management (including persons promoted to the position of sole head of a practice group), a Caucasian man or woman.

## FIRST COUNTERCLAIM
### (Fraudulent Inducement)

189.    Varughese repeats and realleges Paragraphs 1 through 188 above as if fully set forth herein.

190.    Navigant fraudulently induced Varughese to accept employment at Navigant, and to leave his position at Bearing Point, by falsely stating that Varughese would be made head of the Financial Services Practice at Navigant once that practice was established, and by falsely promising him that his total compensation package would be equal to 20% of the net revenue generated by the GFI subpractice.

191.    Navigant knew when it made these representations that Varughese would leave his position at Bearing Point, and take a position with Navigant, only if Navigant would make Varughese the head of its Financial Services Practice, and only if Navigant promised to pay him a total compensation package equal to 20% of the net revenue generated by the GFI subpractice.

192.    Navigant's representation that it would make Varughese head of the Financial Services Practice, although separate from and extraneous to Navigant's offer of employment, was highly material to Varughese's decision to leave Bearing Point and join Navigant.

193.    At the time Navigant made this representation, it had a preconceived and undisclosed intention of never carrying it out.  Instead, Navigant always had intended to make Voelzke the head of its Financial Services Practice.

194.    Navigant promised Varughese otherwise with the intention of fraudulently inducing him to leave a valuable position at Bearing Point and to join Navigant.

195.    Navigant's promise that Varughese would receive a total compensation package equal to 20% of the net revenue generated by the GFI subpractice was also highly material to Varughese's decision to leave Bearing Point and join Navigant.

196.    Like Navigant's promise to make Varughese head of the Financial Services Practice, Navigant had a preconceived and undisclosed intention and practice of never carrying out its promises regarding Varughese's compensation, and promised him otherwise with the intention of fraudulently inducing him to leave a valuable position at Bearing Point and to join Navigant.

197.    Navigant had a clear motive and opportunity to fraudulently induce Varughese to join Navigant because Navigant was actively recruiting Varughese; knew that Varughese was a highly valuable recruit who would be essential to Navigant's ability to build a successful capital markets practice, and to develop an overall strategic vision for the Financial Services Practice; and knew that Varughese would not be willing to join Navigant unless he was assured that he would be made head of the Financial Services Practice, and that he would receive a total compensation package equal to 20% of the net revenue generated by the GFI subpractice.

198.    Navigant's fraudulent intent is evidenced, among other things, by its decision to appoint Voelzke to head the Financial Services Practice instead of Varughese –

despite the fact that Varughese was obviously more qualified to be the head of that practice, and had been hired with the express understanding that that would be his primary role at Navigant.

199.    Furthermore, Navigant's secret and undisclosed intention of making Voelzke head of the Financial Services Practice is demonstrated by the circulation of an organizational chart listing Voelzke as the head of the Financial Services Practice approximately one month before the formal announcement naming Voelzke head of that practice, and just one month after Varughese had been hired with false promises that he would have that position.

200.    Navigant's fraudulent intent as of the time it made its false compensation promise is evidenced, among other things, by its established practice and policy of making similar promises of compensation packages equaling 20% of net revenue in an effort to induce prospective hires to join Navigant, which promises are routinely not honored.  It was generally understood within Navigant that Navigant would make such promises solely to induce prospective hires to join Navigant, that Navigant never intended to fulfill these promises, and that it did not in fact do so.

201.    Varughese reasonably relied on Navigant's false representations in deciding to leave his employment at Bearing Point and to join Navigant.

202.    As a direct result of Navigant's fraudulent inducement of Varughese, Varughese has suffered special damages, unrecoverable as contract damages, in the form of, but not limited to, lost employment opportunities at Bearing Point, loss of professional opportunities, loss of professional reputation, diminution of his earnings and earning capacity, and damage to his career growth and potential.

203.    Varughese is entitled to compensatory damages to remedy Navigant's fraudulent inducement.

204.    Because of Navigant's fraudulent motives in soliciting Varughese to leave his former employment, its conscious disregard of Varughese's interests, its egregious conduct, and its reckless pattern of similar fraudulent solicitation targeted at other valuable potential employees, Varughese is entitled to an award of punitive damages.

## SECOND COUNTERCLAIM
### (Breach of Contract)

205.    Varughese repeats and realleges Paragraphs 1 through 204 above as if fully set forth herein.

206.    The terms of Varughese's employment relationship are partially reflected in the various writings referenced in the Complaint.

207.    In addition to these writings between the parties, Navigant expressly promised that Varughese's total compensation package would be equal to 20% of the net revenue generated by the GFI subpractice, and that Navigant would pay Varughese such amounts as might be necessary to ensure that his total compensation equaled that amount.

208.    Varughese expressly accepted this offer and both parties considered it to be a material term of his employment agreement with Navigant.

209.    Navigant breached this contractual obligation by failing to compensate Varughese for 20% of the net revenue generated by the GFI subpractice during the course of his employment with Navigant.

210.    In addition, on at least three occasions subsequent to the date on which he began employment at Navigant (twice in the Fall of 2005, and once in early 2006),

Navigant again promised Varughese that his total compensation package would be equal to 20% of the net revenue generated by the GFI subpractice.

211.    Varughese assented to and accepted these oral compensation promises each time that Navigant made them, and provided consideration for these promises by continuing to work at Navigant.

212.    To the extent Navigant's pre-employment oral compensation promises to Varughese do not constitute an enforceable contract, Varughese alleges in the alternative that Navigant's subsequent oral promises to Varughese regarding his entitlement to 20% of the net revenue generated by the GFI subpractice constitute a binding, oral modification of his employment agreement.

213.    As a result of Navigant's breach of Varughese's employment agreement – as originally agreed to, or in the alternative, as modified by Navigant's subsequent oral promises – Varughese has suffered damages in an amount to be determined at trial, but not less than $1.2 million.

214.    Varughese is therefore entitled to an award of compensatory damages.

### THIRD COUNTERCLAIM
**(Employment Discrimination, New York State Human Rights Law, Executive Law §§ 290 et seq.)**

215.    Varughese repeats and realleges Paragraphs 1 through 214 above as if fully set forth herein.

216.    Navigant is an employer within the meaning of the Human Rights Law § 292(5) in that it employs more than four individuals.

217.    Navigant's discriminatory acts took place in New York and were directed against Varughese, a New York state resident.

218.    Varughese is an individual of Indian descent, and is thus a member of a protected class under the Human Rights Law.

219.    Navigant falsely told Varughese at the time it recruited him to join Navigant that he would be named the head of Navigant's Financial Services Practice shortly after the commencement of his employment in August 2005.

220.    Although Navigant repeatedly told Varughese that he was amply qualified for the position of Head of the Financial Services Practice, which he was, and indeed promised him that he would be named to that position at the appropriate time, Navigant instead named Voelzke, a Caucasian woman, to that position in November 2005 even though Varughese had made it known at the time that he desired the position and applied for the position.

221.    Given Varughese's extensive experience and proven track record in the financial services area, and Voelzke's comparative lack of relevant experience, the decision to name Voelzke and not Varughese to be Head of the Financial Services Practice was motivated by Navigant's discriminatory intent to keep racial minorities from occupying senior management positions at the company.

222.    On information and belief, during Varughese's tenure at Navigant, senior management positions at Navigant were occupied by Caucasian men or Caucasian women. Indeed, at the time of Navigant's discriminatory acts, there was not a single person of color who occupied a senior management position at the company.  On information and belief, Navigant's current senior management is similarly devoid of any racial minorities, and is composed exclusively of Caucasian men and Caucasian women.

223.    In violation of the Human Rights Law, Navigant discriminated against Varughese in the terms and conditions of his employment on the basis of his race by failing to promote him to be head of the Financial Services Practice in 2005, and by subsequently giving him in 2007 a novel and demeaning "co-leadership" position to share with a Caucasian man, thus suggesting to Navigant employees and to the industry that a person of Indian descent somehow is incapable of leading a Navigant practice group on his own.

224.    Varughese has suffered and continues to suffer mental anguish, emotional distress, and other compensable injuries as a result of Navigant's discriminatory actions.

**FOURTH COUNTERCLAIM**
**(Employment Discrimination, New York City Human Rights Law,**
**N.Y.C. Admin. Code §§ 8-101 et seq.)**

225.    Varughese repeats and realleges Paragraphs 1 through 224 above as if fully set forth herein.

226.    Navigant is an employer within the meaning of the Administrative Code, § 8-102(5) in that it employs more than four individuals.

227.    Navigant's discriminatory acts took place in New York City.

228.    A copy of this Second Amended Answer and Counterclaims is being served upon the New York City Corporation Counsel and the Commission on Human Rights of the City of New York.

229.    Varughese is a man of Indian descent, and is thus a member of a protected class under the Administrative Code.

230.    Navigant falsely told Varughese at the time it recruited him to join Navigant that he would be named the head of Navigant's Financial Services practice shortly after the commencement of his employment in August 2005.

231.    Although Navigant repeatedly told Varughese that he was amply qualified for the position of head of the Financial Services Practice, which he was, and indeed promised him that he would be named to that position at the appropriate time, Navigant instead named Voelzke, a Caucasian woman, to that position in November 2005 eventhough Varughese had made it known at the time that he desired the position and applied for the position.

232.    Given Varughese's extensive experience and proven track record in the financial services area, and Voelzke's comparative lack of relevant experience, the decision to name Voelzke and not Varughese to be head of the Financial Services Practice was motivated in substantial part by Navigant's discriminatory intent to keep racial minorities from occupying senior management positions at the company.

233.    On information and belief, senior management positions at Navigant are occupied by Caucasian men or women.  Indeed, at the time of Navigant's discriminatory acts, there was not a single person of color who occupied a senior management position at the company.  On information and belief, Navigant's current senior management is similarly devoid of any racial minorities, and is composed exclusively of Caucasian men or women.

234.    In violation of the Administrative Code, Navigant discriminated against Varughese in the terms and conditions of his employment on the basis of his race by failing to promote him to be head of the Financial Services Practice in 2005, and by subsequently giving him in 2007 a novel and demeaning "co-leadership" position to share with a Caucasian man, thus suggesting to Navigant employees and to the industry that a person of Indian descent somehow is incapable of leading a Navigant practice group on his own.

235.    In taking the above described discriminatory actions, defendant acted with malice and reckless indifference to Varughese's rights under the Administrative Code.

236.    Varughese has suffered and continues to suffer mental anguish, emotional distress, and other compensable injuries as a result of Navigant's discriminatory actions.

## PRAYER FOR RELIEF

**WHEREFORE,** Varughese respectfully requests that the Court enter judgment in favor of Varughese and against Navigant, and enter an Order:

(a)    dismissing the complaint in its entirety;

(b)    on his counterclaim for fraudulent inducement, awarding Varughese compensatory damages in an amount to be determined at trial, and punitive damages in an amount to be determined at trial but not less than $1,000,0000;

(c)    on his counterclaim for breach of contract, awarding Varughese damages in an amount to be determined at trial, but not less than $1.2 million arising from Navigant's breach of contract;

(d)    on his counterclaim for employment discrimination under the Human Rights Law and the Administrative Code, awarding Varughese earnings he would have received but for Navigant's discriminatory acts, including, but not limited to, wages, bonuses, pension benefits, other lost benefits, loss of good will, and interest thereon, and compensatory damages, including damages for mental anguish, pain and suffering, and humiliation;

(e)    on his counterclaims under the Administrative Code, awarding Varughese punitive damages and attorneys' fees and costs; and

     (f)     awarding Varughese such other and further relief as may be just

and proper.

Dated: December 19, 2007
      New York, New York

**COHEN & GRESSER LLP**

By: _____/s/_____
     Karen H. Bromberg (KB 2153)
     Alexandra Wald (AW 0225)
     Nathaniel P. T. Read (NR 8807)

     100 Park Avenue, 23rd Floor
     New York, NY 10017
     Phone:  (212) 957-7600
     Fax:  (212) 957-4514

     *Attorneys for Defendant*
      *Jess Varughese*